Jordan D. Jeter, OSB No. 165437
  Direct:  503.802.2076
  Email:  Jordan.Jeter@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779

    *Attorneys for Defendant*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| LIAM JOHNSTON,<br><br>       Plaintiff,<br><br>   v.<br><br>ICASHE, INC., DBA PURS.DIGITAL,<br><br>       Defendant. | Civil No. 3:25-CV-1560<br><br>**DECLARATION OF JORDAN D. JETER IN SUPPORT OF DEFENDANT ICASHE, INC. DBA PURS.DIGITAL'S NOTICE OF REMOVAL**<br><br>Multnomah County Circuit Court Case No. 25CV40776 |

I, Jordan D. Jeter, declare as follows:

1.     I am an attorney of record for Defendant iCashe, Inc. dba Purs.digital's ("Defendant") in this action. I have personal knowledge of all the facts herein and am competent to testify thereto.

2.     Attached hereto as **Exhibit 1** are true and correct copies of the Complaint filed in the Circuit Court of the State of Oregon for the County of Multnomah, LIAM JOHNSTON v. ICASHE, INC., A DELAWARE CORPORATION DBA PURS.DIGITAL, Case No. 25CV40776, and all of the process and pleadings filed by Plaintiff in that action.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

DATED:  September 2, 2025.

TONKON TORP LLP


By:    *s/ Jordan D. Jeter*
          Jordan D. Jeter, OSB No. 165437
          Direct:  503.802.2076
          Email:  Jordan.Jeter@tonkon.com

          *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **DECLARATION OF JORDAN D. JETER IN SUPPORT OF DEFENDANT ICASHE, INC. DBA PURS.DIGITAL'S NOTICE OF REMOVAL** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

None

and hereby certify that I caused to be mailed by United States Postal Service and emailed the foregoing **DECLARATION OF JORDAN D. JETER IN SUPPORT OF DEFENDANT ICASHE, INC. DBA PURS.DIGITAL'S NOTICE OF REMOVAL** to the non-CM/ECF participants:

Liam Johnston
2717 21st Street, Apt 6D
Astoria, NY 11102-4732

Email: capsaicinkid@gmail.com

*Pro Se Plaintiff*

DATED:  September 2, 2025.

TONKON TORP LLP


By:    *s/ Jordan D. Jeter*
      Jordan D. Jeter, OSB No. 165437
      Direct:  503.802.2076
      Email:  Jordan.Jeter@tonkon.com

      *Attorneys for Defendant*

# IN THE CIRCUIT COURT OF THE STATE OF OREGON
# FOR THE COUNTY OF MULTNOMAH

|  |  |  |
|---|---|---|
| **Liam Johnston,** | ) | Case No.: _____ |
| Plaintiff, | ) | **COMPLAINT** |
| v. | ) | (Violations of ORS Chapter 659A, Common Law, |
|  | ) | and RICO, 18 U.S.C. § 1961 et seq.) |
| **iCashe, Inc.,** | ) | **CLAIM NOT SUBJECT TO MANDATORY** |
| a Delaware Corporation DBA Purs.digital, | ) | **ARBITRATION** |
| Defendant. |  | ORS 21.160(1)(c) – Standard filing fee applies |
|  |  | Amount sought: $3,032,776 (exclusive of costs, |
|  |  | interest, and attorney fees) |

Plaintiff Liam Johnston ("Plaintiff"), alleges as follows:

## INTRODUCTION

**1.** This action arises from Defendant iCashe, Inc.'s ("iCashe") systematic violations of Oregon employment protection statutes and common law duties, including disability discrimination under ORS 659A.112, whistleblower retaliation, negligent misrepresentation, interference with statutory rights, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1961 et seq.

**2.** Plaintiff seeks monetary damages totaling $3,032,776, including lost wages and back pay resulting from below-market compensation, future lost earnings capacity, consequential economic damages, and damages for negligent misrepresentation, disability discrimination, whistleblower retaliation, and RICO violations.

**3.** Defendant's failures to comply with statutory requirements and common law duties had disproportionate impact on Plaintiff as an employee with a documented disability, preventing him from understanding his rights and effectively addressing workplace discrimination while systematically underpaying him relative to market standards and retaliating against him for reporting consumer safety violations and for issues related to cannabis industry compliance.

## PARTIES

Exhibit 1
Page 1 of 550

**4.** Plaintiff Liam Johnston was at all relevant times a resident of Multnomah County, Oregon.

**5.** Defendant iCashe, Inc. ("iCashe") is a Delaware corporation with its principal place of business in Portland, Oregon, with over one million dollars allocated for business operations and litigation expenses. iCashe's co-founders, Siva G. Narendra and Trey Maust, are experienced entrepreneurs who have built multiple successful companies, including Lewis & Clark Bank and BankEvo, and Siva G. Narendra holds over 100 patents. Christian Trummer serves as the Chief Product Officer of iCashe.

## JURISDICTION AND VENUE

**6.** This Court has jurisdiction pursuant to ORS 3.110, as this is a civil action arising under Oregon employment laws with damages exceeding $10,000. Additionally, this Court has jurisdiction over the RICO claims pursuant to *Tafflin v. Levitt 493 U.S. 455* (1990).

**7.** Venue is proper pursuant to ORS 14.080(1) because the cause of action arose in Multnomah County, where Defendant conducted its business operations and where Plaintiff performed his employment duties. Although Defendant is a foreign corporation not authorized to transact business in Oregon, venue is established under the "cause of action arose" provision of the statute. For the RICO claim, venue is proper because Defendant transacts its affairs in this district.

## LEGAL FRAMEWORK

**8.** ORS 659A.375 requires employers to adopt written policies for reporting unlawful discrimination and provide copies to employees at hire.

**9.** ORS 659A.370 prohibits agreements preventing discussion of unlawful discrimination and requires provision of policies per 659A.375 plus a seven-day revocation period.

**10.** ORS 659A.112 prohibits disability discrimination, including failure to accommodate and use of discriminatory standards or methods.

**11.** Oregon common law recognizes duties of good faith and fair dealing, duties to provide accurate information, and prohibitions against negligent misrepresentation.

Exhibit 1
Page 2 of 550

**12.** Oregon public policy protects whistleblowers who report violations of consumer protection laws and financial services regulations.

**13.** Statutory requirements under ORS 659A.370 and 659A.375 are especially important given BOLI's increasing workload without necessary budget increases.

**14.** The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1961 et seq., provides a civil cause of action for injury to business or property by reason of a violation of 18 U.S.C. 1962. This Court has jurisdiction over such claims. *Tafflin v. Levitt*, 493 U.S. 455 (1990).

**15.** Oregon law recognizes the legality of cannabis businesses within the state, and actions against individuals for their association with or employment in such businesses, especially when related to compliance issues, may constitute unlawful activity. *Momtazi Family, LLC v. Wagner*, Dist. Court, D. Oregon (2019).

**16.** Under the civil provision of RICO, 18 U.S.C. 1964(c), a plaintiff may recover for harm to business or property resulting from predicate acts, including when that harm stems from employment related injury. In *Medical Marijuana, Inc. v. Horn*, 145 S. Ct.(2025), the Supreme Court held that RICO standing is not barred merely because the injury arises from employment termination if the termination is itself a result of racketeering activity. This precedent confirms that Plaintiff's termination arising from Defendant's money laundering, unlicensed transmission, and cannabis related regulatory misconduct constitutes a cognizable injury to business or property under RICO.

## FACTUAL ALLEGATIONS

### PRE-EMPLOYMENT RECRUITMENT AND MISREPRESENTATIONS

**17.** In February 2022, Plaintiff was recruited by Defendant's agents, including Siva G. Narendra and Christian Trummer, for a software development position at iCashe, Inc. During this recruitment process, Defendant made material misrepresentations regarding the company's legal compliance status and regulatory obligations.

**18.** Specifically, Defendant's agents falsely represented that money transmission licensing requirements would not apply to iCashe's operations due to purported banking exceptions, while

Exhibit 1
Page 3 of 550

failing to disclose that iCashe was operating without required state registration and money transmission licenses under Oregon law.

**19.** These misrepresentations were communicated through interstate wire communications, including video calls, Slack messages, and emails between Washington, D.C. and Portland, Oregon, from February 2022 through May 24, 2022.

**20.** Defendant deliberately targeted Plaintiff, a recent college graduate with specialized technical skills in payment system integrations, because they required his expertise to build connections with critical third-party services including Plaid for banking connectivity and Square for payment processing.

**21.** Following Plaintiff's separation from the Company, Plaintiff's personal email account remained linked to the Company's project management platform due to prior system settings. As a result, Plaintiff received automated metadata notifications reflecting task assignments, updates, and workflows performed by Company personnel. Plaintiff did not actively retain or review these notifications until preparing the claims in this Complaint. Plaintiff did not continue to receive such notifications after the Company terminated Plaintiff's access. These notifications were not stolen, and their passive retention was not a breach of any duty because Plaintiff was unaware of their presence and did not misuse them. Courts have recognized that former employees may retain or use documents to support legal claims when they do not involve trade secrets or attorney-client communications and where their use is limited to litigation or whistleblowing purposes. Moreover, under the whistleblower exception to confidentiality provisions, employees are permitted to use or disclose internal documents to expose illegal conduct. See United States ex rel. *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d (9th Cir. 2011) (whistleblower disclosures may override confidentiality when reasonably necessary); see also 18 U.S.C. 1514A(b)(2)(A) (Sarbanes-Oxley) reflecting federal policy in favor of protecting disclosures of unlawful activity, ; ORS 659A.199 (Oregon whistleblower protections for reporting unlawful conduct). The metadata notifications at issue contain no confidential business strategies, trade secrets, or privileged attorney-client communications. They are used solely to demonstrate enterprise structure, personnel activity, and factual patterns relevant to Plaintiff's claims of retaliation and racketeering under 18 U.S.C. 1961 et seq. and ORS 659A.

**EMPLOYMENT COMMENCEMENT AND STATUTORY VIOLATIONS**

Exhibit 1
Page 4 of 550

**22.** Plaintiff began employment with Defendant on June 1, 2022, though Defendant's records incorrectly listed the start date as June 1, 2020, establishing a pattern of inaccurate record-keeping from the outset.

**23.** At hire, Defendant failed to provide Plaintiff with required discrimination reporting policies as mandated by ORS 659A.375, depriving him of critical information regarding his rights and procedures for reporting unlawful conduct.

**24.** Defendant subjected Plaintiff to an illegal non-compete provision in his employment agreement, as his annual gross salary of $69,000 was below the statutory minimum required by ORS 653.295(1)(e).

**25.** The $69,000 salary represented systematic undercompensation, as the median salary for "member of the technical staff" in the Portland metropolitan area is $231,000 annually according to current industry data, resulting in approximately $162,000 in annual underpayment.

**PLAINTIFF'S DISABILITY AND ACCOMMODATION REQUESTS**

**26.** Plaintiff has a documented disability confirmed by neuropsychological evaluation which causes difficulties with processing complex information efficiently, making careless mistakes under time pressure or with unclear instructions, and challenges with task-switching and attention when directions lack clarity or structure.

**27.** During his employment, Plaintiff verbally disclosed his diagnosis to management and requested reasonable accommodation in the form of written instructions and feedback, rather than verbal communication, to address his disability-related communication challenges.

**28.** Defendant failed to engage in any meaningful interactive process regarding Plaintiff's accommodation request, did not request supporting documentation, and did not offer any alternative accommodations.

**29.** Instead, Defendant later characterized Plaintiff's communication difficulties, which were directly related to his disclosed disability, as "problematic" and cited these disability-related traits as justification for adverse employment actions.

**UNLAWFUL BUSINESS OPERATIONS AND WHISTLEBLOWER ACTIVITY**

Exhibit 1
Page 5 of 550

**30.** During his employment, Plaintiff was assigned to develop payment processing infrastructure for cannabis dispensaries, including specific tasks such as "Jenny's Launch - Budtender tipping support backend" and "Jenny's Launch - Verify CheckPayments against PaymentRequests table" in June 2023.

**31.** In or around June 2023, Defendant knowingly released a version of its mobile software application without adequate quality assurance, integration testing, or production-readiness review, creating material risks to end users including potential unauthorized transactions and financial loss.

**32.** Plaintiff raised these consumer safety concerns internally in good faith, including directly to Trey Maust and Siva G. Narendra, who were represented as acting Chief Executive Officers.

**33.** Plaintiff was explicitly told not to raise concerns outside the development team, thereby unlawfully restricting his right to report violations to external authorities.

**34.** Defendant's counsel later characterized Plaintiff's internal safety objections as "incidents of engaging in undermining," citing them as partial basis for Plaintiff's termination.

### DISCRIMINATORY PERFORMANCE EVALUATIONS AND TERMINATION

**35.** Defendant's performance feedback described Plaintiff as demonstrating "sloppy" work quality, being "poor with managing his priorities and time," and having "problematic" communication—descriptors that precisely match the neurocognitive symptoms documented in Plaintiff's neuropsychological evaluation.

**36.** These performance characterizations constitute direct evidence of disability discrimination, as they reflect Defendant's adverse employment actions based on the specific traits and symptoms of Plaintiff's documented disability.

**37.** On July 22, 2023, Christian Trummer sent an email stating his plan to "revoke all software access in the early morning on Monday... tell him there were issues with his latest pull requests," despite knowing that other team members had actively worked to verify and debug the same code to make sure there were no such errors.

**38.** Plaintiff was terminated on July 24, 2023, immediately following his development of transaction processing infrastructure for Defendant's first cannabis dispensary client and his

Exhibit 1
Page 6 of 550

raising of compliance concerns about legality of transaction integrity.

## POST-TERMINATION CONDUCT AND ONGOING HARM

**39.** On Plaintiff's last day, after he had disclosed his protected disability status to Maust and Trummer, Defendant presented a severance agreement containing provisions that effectively waived his right to discuss unlawful discrimination and pursue meaningful remedies.

**40.** Following Plaintiff's termination, Defendant continued operating unlicensed money transmission services for cannabis dispensaries through its "Purs" payment system, as documented in trade publications and regulatory filings.

**41.** Plaintiff initiated a BOLI investigation regarding his discrimination claims, but the investigation concluded without supporting his claims due to his lack of awareness about documentation requirements—information that should have been provided in the required discrimination reporting policies that Defendant failed to provide.

**42.** BOLI concluded that "the bureau is unlikely to take further action as a result of the release of claims," demonstrating the suppressive effect of releases obtained without required statutory protections.

**43.** Plaintiff's termination under these discriminatory circumstances has resulted in ongoing economic harm, including difficulty securing comparable employment in New York City where he currently resides, forcing him to commute to Delaware for his current position and reducing his overall earning capacity.

**44.** Plaintiff disputes the validity and enforceability of the severance agreement referenced in Paragraph 39 and has initiated a separate proceeding in Multnomah County Small Claims Court, Case No. 25SC14401, currently pending. On July 14, 2025, Plaintiff filed a motion for default judgment in that proceeding, which is currently awaiting consideration. Plaintiff does not seek to litigate the enforceability of the severance agreement in this case, and no part of this Complaint should be construed as conceding its validity. All challenges related to the severance agreement are expressly reserved for the small claims proceeding. Accordingly, Defendant should not rely on the severance agreement as a defense to any claims asserted herein unless and until it is determined enforceable by the small claims court. Plaintiff further reserves the right to rely on any default judgment or ruling entered in that proceeding as appropriate.

Exhibit 1
Page 7 of 550

## WAGE DISCRIMINATION AND ECONOMIC DAMAGES

**45.** Defendant's awareness of Plaintiff's disability likely began at the hiring stage, as evidenced by their offer of $69,000 annual salary - substantially below market rates for that title in Oregon.

**46.** According to current industry data on glassdoor, the median salary for "member of the technical staff" in the Portland metropolitan area is $231,000 annually.

**47.** The $69,000 salary represents a systematic undervaluation of Plaintiff's work, amounting to approximately $162,000 below market rate annually, demonstrating discriminatory intent based on Plaintiff's perceived disability from the outset of the employment relationship.

**48.** Defendant's own performance feedback describes Plaintiff as demonstrating "sloppy" work quality, being "poor with managing his priorities and time," and having "problematic" communication.

**49.** These descriptors map precisely to the neurocognitive symptoms documented in Plaintiff's neuropsychological evaluation, indicating Defendant was aware of performance issues stemming from his disability and used this knowledge to justify below-market compensation.

**50.** Despite clear indicators of Plaintiff's disability-related struggles, and despite Plaintiff's request for clear written communication as a reasonable accommodation, Defendant failed to provide such accommodation and now denies the request was ever made. An employer cannot ignore known limitations of a qualified individual with a disability, nor can it deny having received an accommodation request when the employee's disability and needs are apparent. See *EEOC v. Convergys Customer Mgmt. Group, Inc.*, 491 F.3d 790, 796–97 (8th Cir. 2007) (holding that a jury could find the employer failed to accommodate an employee with a known disability where performance issues were related to the disability and the employer disregarded accommodation obligations).

**51.** This denial is not credible given Defendant's assertion of "many efforts and conversations to help Complainant improve" and the consistent performance patterns matching Plaintiff's disability profile. As in *Convergys*, an employer may not rely on disability-related performance issues as grounds for discipline or termination without first fulfilling its duty to reasonably accommodate known limitations.

Exhibit 1
Page 8 of 550

**52.** Clear written communication is not a novel or burdensome accommodation, but rather a basic practice in professional environments, particularly for iCashe as a fintech company operating in a highly regulated industry where documentation, governance, and controls are required as standard practices.

**53.** The refusal to provide written instructions constituted both disability discrimination and a breach of professional standards that contributed to Plaintiff's termination and ongoing economic losses.

**54.** Plaintiff's termination has resulted in significant economic losses. Although Plaintiff was unemployed for only six months, the discriminatory circumstances of his departure and the damage to his professional reputation in the Portland technology sector have made it significantly harder for him to secure comparable employment in New York City, where he currently resides.

**55.** This difficulty has forced Plaintiff to commute to Delaware for his current employment, incurring additional costs and reducing his overall earning potential.

**56.** The current economic climate, characterized by significant layoffs in the technology sector and reduced hiring, has exacerbated Plaintiff's damages by extending the period of underemployment and reducing available opportunities for comparable employment.

**57.** Plaintiff's future earning capacity has been permanently diminished by Defendant's discriminatory conduct.

**CLAIMS FOR RELIEF**

**FIRST CLAIM: WHISTLEBLOWER RETALIATION**

**58.** In or around June 2023, Defendant knowingly released a version of its mobile software application without subjecting the codebase to adequate quality assurance, integration testing, or production-readiness review, thereby violating industry standards and Defendant's operational obligations under the Oregon Money Transmitters Act (ORS 717 et seq.), and Oregon's Unlawful Trade Practices Act (ORS 646.608).

**59.** Defendant deployed untested code into a production environment, resulting in critical failures in app functionality and creating material risks to end users, including potential unauthorized

Exhibit 1
Page 9 of 550

transactions and financial loss. These actions violated Defendant's duty to implement and maintain reasonable administrative, technical, and physical safeguards for consumer data, as required by ORS 646A.622. Although Defendant may qualify as a small business under ORS 285B.123, it is engaged in financial services and is therefore subject to the federal Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801–6809) as in effect on January 1, 2020. Consequently, Defendant is not exempt from Oregon's data protection requirements to the extent they are not preempted by federal law.

**60.** Plaintiff raised these concerns internally in good faith, including directly to individuals known internally as Trey and Siva, one or both of whom were represented by the company to be acting as Chief Executive Officer at the relevant time. Despite Plaintiff's efforts to mitigate risk and uphold ethical obligations, Defendant subjected Plaintiff to adverse employment actions shortly thereafter.

**61.** Plaintiff was explicitly instructed not to escalate concerns beyond the development team, thereby obstructing Plaintiff's ability to report or disclose potential violations of law or regulation to internal compliance personnel or appropriate authorities. This directive unlawfully interfered with Plaintiff's right to report in good faith, in violation of ORS 659A.199, which protects employees from retaliation or adverse action for reporting suspected violations of state or federal law. As the Ninth Circuit held in *Brunozzi v. Cable Communications, Inc.*, 851 F.3d 990 (9th Cir. 2017), the term "reported" in ORS 659A.199 encompasses reports to both external and internal authorities, confirming that internal reporting is protected under the statute. On Monday, July 10, 2023, at 2:58 p.m., Christian emailed Plaintiff requesting a written summary of their earlier conversation: "Based on conversation today, I'd like for you to reiterate the takeaways from your perspective." Plaintiff responded, including the statement: "With an additional message being don't send emails outside the dev team." Rather than correct, clarify, or provide any internal policies regarding protected disclosures or anti-retaliation, Christian instead forwarded Plaintiff's message to senior executive Siva at 3:56 p.m., writing: "Here is the reply which is not accurate." Plaintiff was not informed of this action. Later that same day, at 5:39 p.m., Christian emailed Plaintiff a superficially positive message thanking Plaintiff for compiling the summary, stating: "This is a productive start and shows your desire to learn and grow," without addressing the reporting restriction or offering any clarification. Christian's failure to correct or contextualize the instruction to limit communication, especially when explicitly invited to confirm or modify Plaintiff's understanding, reveals a deliberate omission. He had a clear

Exhibit 1
Page 10 of 550

opportunity to provide guidance or share any anti-retaliation or internal reporting policies but instead chose to remain silent and escalate concerns about Plaintiff's summary to senior leadership behind Plaintiff's back. This omission, combined with the directive to restrict communication and the absence of any disclosed policy encouraging protected disclosures, created an environment where Plaintiff was discouraged and obstructed from exercising their statutory rights. Defendant's conduct violated ORS 659A.199 and further breached ORS 659A.375(2)(a) and (2)(b), which require employers to implement procedures for internal reporting and to ensure employees are not dissuaded from making protected disclosures. Defendant's failure to act when the opportunity was presented confirms that the lack of policy was not an oversight, but a deliberate effort to suppress reporting.

**62.** Defendant's counsel later characterized Plaintiff's internal objections and security escalations as "incidents of engaging in undermining," citing them in part as the basis for Plaintiff's eventual termination.

**63.** Additionally, in connection with Plaintiff's employment and Defendant's business operations, Defendant engaged in activities related to a cannabis dispensary that raised legal compliance issues. Plaintiff was terminated in close proximity to these compliance concerns, further evidencing retaliatory motives.

**64.** Plaintiff engaged in protected activity by reporting internally in good faith Defendant's violations of consumer protection laws, financial services regulations, and public safety standards.

**65.** Defendant retaliated against Plaintiff for this protected activity through demotion, adverse performance evaluations, and eventual termination.

**66.** Defendant's characterization of Plaintiff's safety concerns as "undermining" demonstrates retaliatory animus in violation of Oregon's public policy protecting whistleblowers.

**67.** Defendant's retaliatory conduct violates Oregon's whistleblower protection statutes, including ORS 659A.199, ORS 659A.230, and related provisions, which prohibit employer retaliation against employees who report violations of law or public policy.

**68.** These facts establish a prima facie case of whistleblower retaliation under Oregon law, demonstrating that Defendant's adverse employment actions were motivated by Plaintiff's

Exhibit 1
Page 11 of 550

protected internal reports, entitling Plaintiff to all appropriate legal remedies.

## SECOND CLAIM: DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE

**69.** While iCashe may initially have had fewer than six employees, their continued failure to provide required policies when reaching the six-employee threshold created discriminatory impact on Plaintiff.

**70.** Plaintiff has a documented disability confirmed by neuropsychological evaluation, including difficulties with processing complex information efficiently, making careless mistakes under time pressure, and challenges with task-switching when directions lack clarity.

**71.** Defendant's stated reasons for Plaintiff's termination constitute direct evidence of disability discrimination. Defendant terminated Plaintiff for allegedly being "sloppy," having "poor" prioritization, and exhibiting "problematic" communication, all characteristics directly associated with platiff's diagnosed disability and specifically identified in Plaintiff's clinical evaluation. These justifications reveal that Defendant terminated Plaintiff because of the very symptoms of his diagnosed disability.

**72.** This is not a case that relies solely on inference. When an employer terminates an employee for exhibiting the known characteristics of a medically documented disability, that constitutes direct evidence of unlawful discrimination. Defendant's termination rationale citing "sloppiness," "poor prioritization," and "problematic communication" mirrors traits described in Plaintiff's neuropsychological evaluation, which are defining features of platiffs's disability. Terminating an employee for traits that are inseparable from a known disability is facially discriminatory under both federal and Oregon law. The Americans with Disabilities Act (ADA) makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability" in regard to hiring, promotion, compensation, or discharge. *See* 42 U.S.C. § 12112(a). Oregon law similarly prohibits discrimination against qualified individuals with disabilities in employment decisions. *See* ORS § 659A.112(1). Courts have held that such direct statements by an employer constitute direct evidence of discriminatory intent. In *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129 (2d Cir. 2024), while the court analyzed the employer's references to an employee "being on disability," the underlying logic applies here: if an employer's stated reason for termination, such as "sloppiness," "poor prioritization," or "problematic communication", is universally recognized as a characteristic of a disclosed disability, and the employer is aware of this, then the adverse

Exhibit 1
Page 12 of 550

action moves beyond mere inference. The Porter court held that direct linkage to disability status or its direct consequences, such as being on leave, constitutes direct evidence of discrimination. Likewise, Defendant's reliance on traits inseparable from Plaintiff's diagnosed disability is direct evidence of unlawful discrimination.

**73.** Defendant cannot legally claim a performance-based termination when the stated "performance issues" are identical to the documented characteristics of Plaintiff's disability. As held in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015), a discriminatory motive need not be the sole cause of an adverse employment action—it must only be a motivating factor. Here, Defendant's own statements show that Plaintiff's disability was not only a factor, but the direct basis for the adverse action.

**74.** Defendant violated ORS 659A.112 by failing to engage in the interactive process required upon learning of Plaintiff's disability and accommodation needs. Plaintiff made a verbal disclosure of his diagnosis and requested that instructions and feedback be delivered in written form—a request consistent with established reasonable accommodations for individuals. Defendant failed to respond to this disclosure in any meaningful way and instead later cited communication issues tied to that very disability as a justification for termination.

**75.** Oregon Administrative Rule (OAR) 839-006-0206 requires that once an employer is informed of a potential disability or receives an accommodation request, the employer must engage in a timely, good-faith interactive process. Defendant failed to do so. Defendant did not inquire further, did not request supporting documentation, and did not offer alternatives. Instead, Defendant ignored its legal duty and later cited traits associated with Plaintiff's condition as the basis for adverse action.

**76.** Defendant's post hoc claim that Plaintiff failed to submit a "doctor's note" is legally irrelevant. While employers may request medical documentation in support of a reasonable accommodation, this requirement cannot be imposed until the employer initiates a timely, good-faith interactive process. Plaintiff verbally disclosed his diagnosis and requested a written communication accommodation—an accommodation frequently recognized as appropriate for individuals with his disability. Defendant made no attempt to engage in any dialogue, request supporting documentation, or explore reasonable alternatives. Federal regulations implementing the ADA explicitly require that employers engage in an "informal, interactive process" with the employee after receiving notice of a disability or accommodation request. *See* 29 C.F.R.

Exhibit 1
Page 13 of 550

§ 1630.2(o)(3). Oregon law imposes the same requirement. *See* OAR 839-006-0206(4) (failure to engage in a meaningful interactive process is a violation of ORS § 659A.112(2)(e), regardless of whether a reasonable accommodation was ultimately available). Courts have further emphasized that employers cannot obstruct or avoid their legal obligations by unilaterally rejecting accommodation requests for lack of documentation without first participating in the required process. See *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606 (5th Cir. 2009) *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000) ("[B]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process"). Defendant failed entirely to initiate or participate in this process, and therefore its reliance on the absence of documentation—which it never requested—does not excuse its violation of federal and state law.

**77.** Defendant's failure to inform Plaintiff of any documentation requirements or formal accommodation procedures created a structural barrier to Plaintiff's ability to seek support. This lack of procedural clarity is especially harmful to individuals with communication-based disabilities who depend on written guidance. Defendant cannot now rely on the absence of documentation it never requested to excuse its legal obligations.

**78.** Defendant's omission of any accommodation efforts and failure to clarify procedures prevented Plaintiff from accessing the supports needed to succeed in his role. These omissions facilitated both Plaintiff's undercompensation and his eventual termination, which closely followed Plaintiff's protected complaints regarding workplace issues. Taken together, these facts establish a clear pattern of discrimination and retaliation in violation of state and federal law.

### THIRD CLAIM: NEGLIGENT MISREPRESENTATION

**79.** During recruitment, Defendant's agents made material misrepresentations to induce Plaintiff's employment, including making representations that money transmission licensing requirements would not apply to iCashe's operations and misrepresenting iCashe's legal compliance status while failing to disclose that iCashe operated without required money transmission licenses.

**80.** Defendant had superior knowledge of these legal and regulatory matters and owed Plaintiff a duty to provide accurate information regarding the business operations he was being recruited to develop software for.

**81.** Plaintiff reasonably relied on these misrepresentations in accepting employment and suffered economic harm including below-market compensation, termination after raising compliance

Exhibit 1
Page 14 of 550

concerns, and reduced earning capacity due to association with unlicensed financial operations.

## FOURTH CLAIM: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

**82.** Defendant iCashe Inc. engaged in a pattern of racketeering activity consisting of the following predicate acts:

**a.** Wire fraud in violation of 18 U.S.C. 1343, by using interstate wire communications to perpetrate a scheme to defraud Plaintiff in connection with obtaining employment. From February 2022 through May 24, 2022, iCashe Inc., Siva, and Christian used video calls, Slack communications, and emails between Washington, D.C. and Portland, Oregon to materially omit and misrepresent iCashe Inc.'s legal registration status with the Secretary of State and falsely argued that money transmission laws would not apply due to an exception, thereby inducing Plaintiff to accept employment under false pretenses to help build the payments infrastructure for the RICO enterprise. These misrepresentations were specifically targeted at Plaintiff because defendants required his specialized technical expertise to integrate their payment systems with critical third-party financial services including Plaid for banking connectivity and Square for payment processing. Without these integrations, defendants could not have created the seamless payment experience necessary for their unlicensed money transmission operations. Defendants deliberately sought to recruit Plaintiff, a college student with neurocognitive disability, because they needed someone with the specific technical skills to build these complex integrations while being less likely to question the legal and regulatory representations made during the recruitment process. The defendants' targeting of Plaintiff's neurological condition to facilitate their fraudulent scheme demonstrates the calculated and predatory nature of their wire fraud;

**b.** Money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), by knowingly conducting financial transactions involving proceeds from cannabis dispensary operations with the intent to promote the continued distribution of controlled substances in violation of federal law. Following Plaintiff's termination and continuing to the present, Defendant iCashe Inc. has operated the "Purs" payment platform, which enables customers to seamlessly complete cannabis-related transactions by "Snap a QR code, connect your account and you're good to go at any spot that takes Purs as payment" as described in Ryan Herron's article published in Leaf on October 10, 2024. A company representative further emphasized the ease of onboarding, "proudly" stating:

Exhibit 1
Page 15 of 550

"You can go from never having heard about us to securely completing your first transaction in 60 seconds." This infrastructure facilitates cannabis payments across state lines and supports the ongoing promotion of unlawful drug distribution under federal law. Notably, iCashe Inc. is a Delaware corporation, thereby engaging in multi-jurisdictional conduct that implicates interstate commerce.

**c.** Money laundering in violation of 18 U.S.C. 1956(a)(1)(B)(ii), by conducting financial transactions involving proceeds of unlawful activity with the intent to conceal the nature, source, and ownership of those proceeds and to evade federal transaction reporting requirements. After Plaintiff's termination, iCashe Inc. continued operating cannabis-related payment services while knowingly concealing these activities from financial regulators. On April 28, 2025, Lewis & Clark Bancorp submitted a NOTIFICATION to the Federal Reserve Bank of San Francisco pursuant to Section 225.24 of Regulation Y (12 C.F.R. 225.24), seeking approval to acquire voting securities in iCashe Inc. The document, signed by the President of Lewis & Clark, omitted any mention of iCashe's cannabis payment operations. This regulatory filing permitted Lewis & Clark to proceed with a stock purchase that injected further capital into iCashe Inc. While the filing was made by Lewis & Clark, iCashe Inc. structured the transaction by either failing to disclose material information about its cannabis-related business operations or actively misrepresenting the scope of its services to its investor. This omission enabled iCashe to receive investment funds without regulatory scrutiny of the unlawful nature of its revenue. By ensuring the submission of a sanitized regulatory filing while accepting funds tied to that filing, iCashe Inc. engaged in a financial transaction designed to conceal the source and nature of its proceeds derived from illegal cannabis commerce. This conduct constitutes concealment-based money laundering under 18 U.S.C. 1956(a)(1)(B)(ii). Courts have long held that concealment may involve omissions or indirect misrepresentations. In *United States v. Garcia-Emanuel*, 14 F.3d 1469 (10th Cir. 1994), the court held that laundering includes conduct "designed in whole or in part to disguise or hide the source or ownership of criminal proceeds." Likewise, in *United States v. Campbell*, 977 F.2d 854(4th Cir. 1992), the court upheld money laundering convictions where the defendants used third parties and incomplete documentation to avoid detection of criminal proceeds. The fact that the misrepresentation to the Federal Reserve was made by an investor, not iCashe itself, does not shield iCashe from liability where the structure and intent of the transaction served to obscure federally illicit cannabis income from regulatory scrutiny.

Exhibit 1
Page 16 of 550

**d.** Operating an unlicensed money transmitting business in violation of 18 U.S.C. 1960(b)(1)(A), by providing money transmission services to cannabis dispensaries without obtaining a money transmitter license required under Oregon's Money Transmitters Act (ORS Chapter 717). From before Plaintiff's internship commencement on March 20, 2022, through the present, iCashe Inc. has operated without the required state license while conducting money transmission activities as defined in ORS 717.200(11) through check printing services under ORS 717.200(13)(a), in violation of the mandatory state licensure requirements under ORS 717.210(1). Furthermore, on May 7, 2025, Plaintiff emailed Rodney Craig of the Oregon Department of Consumer and Business Services (DCBS), Division of Financial Regulation (DFR), regarding an earlier call during which Craig had mentioned he was investigating whether iCashe should be a licensed money transmitter. Additionally, as of the present date, there are no records of "iCashe" in the Nationwide Mortgage Licensing System & Registry (NMLS) database, which is the system used for money transmitter licensing applications and renewals, further confirming iCashe Inc.'s continued operation without proper state authorization.

**e.** Conspiracy to commit money laundering in violation of 18 U.S.C. 1956(h), by conspiring with cannabis dispensary operators to structure financial transactions and facilitate ongoing unlawful drug distribution. Evidence of this conspiracy includes coordinated software development activities between iCashe Inc., and cannabis dispensary operators, including: (i) "Jenny's Launch - Budtender tipping support backend" assigned to Plaintiff by Fedya Semenov on June 12, 2023; (ii) "Jenny's Launch - Verify CheckPayments against PaymentRequests table" assigned to Plaintiff by Fedya Semenov on June 12, 2023; and (iii) "Jenny's Launch - Backend: Feature Branch - Modify Lambdas to Support Transactions Table," modified on June 27, 2023, which involved creating transaction processing infrastructure with specific fields for cannabis-related transactions including transaction_id, location_id, merchant_id, employee_id, sale_amount, tip_amount, merchant_fee_amount, customer_fee_amount, merchant_promotion_amount, purs_promotion_amount, and total_collected_amount, with JSON field comments demonstrating the company's intent to collect fees from cannabis transactions while facilitating structured cannabis commerce in violation of federal law.

**f.** Upon information and belief, visa fraud in violation of 18 U.S.C. 1546, constituting a predicate act of racketeering under RICO. Defendant iCashe Inc., headquartered in Portland, Oregon, knowingly recruited foreign nationals on temporary work visas, including Phouc Nguyen, who

Exhibit 1
Page 17 of 550

on or about June 21, 2023, was assigned the cannabis-related software development task titled "Jenny's Launch – Tipping totals (merchant portal)." These workers, employed under precarious visa conditions, were vulnerable due to their immigration status, making them less likely to report legal violations. Defendants exploited this vulnerability by misrepresenting or omitting material facts to immigration authorities regarding the nature of the workers' employment and the underlying illegal cannabis transaction processing enterprise. The defendants' intentional misuse of temporary visa workers to develop and maintain code supporting unlawful cannabis commerce constitutes a predicate act in furtherance of the pattern of racketeering activity.

**g.** On July 24, 2024, defendants committed wire fraud by transmitting materially misleading statements via wire communications to obstruct a government whistleblower investigation. In response to a BOLI investigation of employee whistleblower complaints regarding defendants' cannabis-related financial services and unlicensed money transmission activities, iCashe Inc., acting through its legal representative, submitted a written statement to the Oregon Bureau of Labor and Industries via email. The submission deliberately mischaracterized iCashe as merely "a FinTech employer which develops and offers a payment gateway platform designed to offer secure banking transaction services" and "a small, and relatively young FinTech startup." This sanitized description intentionally omitted defendants' actual business operations, including their cannabis-related transaction infrastructure, unlicensed money transmission services, and payment processing systems specifically designed for cannabis dispensaries. These omissions were material to BOLI's whistleblower investigation because the employee complaints directly concerned these undisclosed activities. BOLI has publicly declared itself underfunded and has been forced to dismiss wage claims in the past year due to resource constraints. Given BOLI's limited investigative capacity, defendants had a heightened duty to provide complete and accurate information to enable proper regulatory oversight. Instead, defendants exploited BOLI's resource limitations by providing sanitized misrepresentations that would require extensive independent investigation to uncover—investigation that defendants knew BOLI lacked the resources to conduct. By deliberately withholding material information about their actual business operations while knowing BOLI's constrained ability to independently verify such information, defendants sought to minimize the legitimacy of the whistleblower's concerns and effectively obstruct the government's regulatory oversight. The electronic transmission of these false statements via wire communications, made with intent to defraud an under-resourced government agency of accurate information necessary for proper investigation of protected

Exhibit 1
Page 18 of 550

employee complaints, constitutes wire fraud under 18 U.S.C. § 1343.

**h.** Plaintiff suffered injury to his business or property as a result of Defendants' RICO violations, specifically the abrupt termination of his employment immediately following his development of transaction processing infrastructure for Defendants' first cannabis client. Defendants have cited vague "performance shortcomings," "severe errors," and "undermining and unprofessional behavior" as the basis for termination. However, contemporaneous ClickUp tickets from around July 20th show that Fedya, Phuoc, and Cameron were all actively collaborating on the same transaction processing code that Defendants now claim was flawed—indicating that any alleged issues were not uniquely attributable to Plaintiff. They all also cleared the code without reporting any flaws. Notably, Christian Trummer was aware of this ongoing collaborative verification but deliberately chose not to participate in or escalate any concerns through normal channels. Instead, on July 22nd—just days before the cannabis client was scheduled to go live—Trummer sent an email stating: "My plan is to revoke all software access in the early morning on Monday... tell him there were issues with his latest pull requests (I'll verbally tell him what the bugs were without much conversation)." This suggests a premeditated effort to remove Plaintiff while avoiding documentation, dialogue, or process. This is particularly striking given the proximity to a critical product launch involving the first cannabis client. Plaintiff had raised internal concerns regarding the quality, stability, and review process of the transaction processing code being prepared for deployment. These concerns, communicated shortly before his termination, reflected legitimate engineering risks that were not addressed through proper channels. No formal warnings, performance improvement plans, or disciplinary actions had been issued prior to Plaintiff's internal reporting of software quality issues. Instead, vague and selectively negative feedback surfaced abruptly, coinciding with Plaintiff's internal dissent and just days before the launch of Defendants' cannabis payment system. The suspicious timing and absence of prior corrective measures strongly support the inference that Plaintiff's termination was not performance-based, but retaliatory—triggered by internal concerns that posed a threat to the continuity of Defendants' unlawful enterprise. As held in *DeGuelle v. Camilli*, 664 F.3d 192 (2011), retaliatory acts such as termination may themselves constitute predicate acts under RICO when they are connected to the enterprise's pattern of racketeering activity. Here, Defendants' use of termination to suppress internal dissent directly furthered their ability to continue unlicensed financial operations and obstruct scrutiny of their cannabis-related payment

Exhibit 1
Page 19 of 550

infrastructure. Such conduct falls squarely within the type of retaliatory enterprise protection that DeGuelle recognized as actionable under RICO.

**83.** Defendant iCashe Inc. and its associates constitute an "enterprise" within the meaning of 18 U.S.C. 1961(4), specifically an association-in-fact enterprise that has operated continuously since at least March 2022 through the present. This enterprise consists of: (a) iCashe Inc., a Delaware corporation; (b) co-founders Siva G. Narendra and Trey Maust, who direct overall enterprise operations; (c) Chief Product Officer Christian Trummer, who manages technical development and client relationships; (d) technical staff including Plaintiff and other developers who build and maintain payment processing infrastructure; (e) cannabis dispensary clients including "Jenny's" (Entity registry number in Secrtary of state in OR: 1275352-92, located at 932 NE 3rd St #1, Bend, OR 97701 ) and others who require unlicensed money transmission services; and (f) banking partners including Lewis & Clark Bank, whose relationships upon information and belief are maintained through material omissions and misrepresentations about the enterprise's cannabis-related activities.

**84.** The enterprise's entire business model is predicated on providing unlicensed money transmission services. While the enterprise may engage in some legitimate business activities, such as patent litigation against Samsung, this does not negate the criminal nature of their core money transmission operations. In fact, their ability to operate legally in other business areas demonstrates that their unlicensed money transmission activities are not the result of ignorance or incompetence, but rather deliberate criminal conduct. The enterprise's common purpose is to create and operate alternative payment rails that offer lower transaction fees than traditional payment processors by circumventing money transmission licensing requirements under Oregon law (ORS Chapter 717) and federal regulations. This unlawful competitive advantage is achieved through systematic evasion of regulatory oversight, consumer protection requirements, and compliance costs that licensed money transmitters must bear, allowing the enterprise to undercut market rates while operating without proper authorization or safeguards. iCashe generates revenue by: (a) processing payments for cannabis dispensaries without obtaining required money transmission licenses; (b) charging fees for these unlicensed services; (c) marketing their ability to circumvent traditional payment processors; and (d) deliberately avoiding licensing costs and regulatory compliance to offer below-market rates. Every software feature, every employee hire, every client relationship, and every transaction processed in the money transmission business serves this core unlawful purpose. The enterprise does not have a legitimate business separate

Exhibit 1
Page 20 of 550

from the unlicensed money transmission - the criminal activity IS the business model for their payment processing operations.

**85.** The enterprise has demonstrated sufficient longevity to pursue its unlawful purpose, operating continuously from at least March 2022 through the present—a period of over two years. During this period, the enterprise has: (a) maintained ongoing unlicensed money transmission operations in violation of Oregon law; (b) recruited and employed technical staff specifically to build cannabis payment processing infrastructure; (c) developed and deployed payment processing software for cannabis dispensaries; (d) established and maintained banking relationships through ongoing misrepresentation; (e) processed financial transactions for multiple cannabis dispensary clients; and (f) submitted regulatory filings that concealed the true nature of cannabis-related activities from federal banking regulators. This continuous operation demonstrates the enterprise's stability and ongoing commitment to its unlawful purpose, with each predicate act serving to initiate, maintain, or expand the enterprise's unlicensed money transmission operations.

**86.** Plaintiff suffered injury to his business or property as a direct and proximate result of Defendants' retaliatory termination in furtherance of their racketeering activity, including obstruction under 18 U.S.C. § 1513(e), wire fraud, and money laundering, as described in the predicate acts above. This retaliatory termination constitutes actionable injury under RICO, as recognized in *Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931, (2025) and aligns with whistleblower retaliation principles articulated in *DeGuelle v. Camilli*, 664 F.3d 192 (2011).

**87.** Defendant's materially misleading submission to BOLI following Plaintiff's termination further deprived Plaintiff of access to statutory remedies under ORS Chapter 659A and contributed to BOLI's decision not to pursue further investigation. This suppressed Plaintiff's ability to obtain administrative relief, delayed access to judicial recourse, and enabled Defendant to continue operating without scrutiny, compounding the reputational and economic injury stemming from Plaintiff's termination.

**88.** Plaintiff further suffered injury to his business or property by reason of being fraudulently induced to accept employment with an unlicensed money transmission enterprise operating without proper registration with the Secretary of State. Defendants' material misrepresentations regarding their legal compliance status and false claims that money transmission laws would not apply due to some kind of bank exception that occurs when working with Lewis and Clark

Exhibit 1
Page 21 of 550

induced Plaintiff to accept employment and develop software infrastructure for their illegal enterprise. This harm is recoverable under RICO as clarified by *Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931, (2025).

## FIFTH CLAIM: LOST WAGES AND ECONOMIC DAMAGES

**89.** Defendant's discriminatory conduct, including the RICO violations, resulted in substantial economic losses to Plaintiff, including systematic underpayment during employment and ongoing lost earning capacity following termination.

**90.** Plaintiff is entitled to back pay representing the difference between his actual compensation and market-rate compensation for the period of his employment.

**91.** Plaintiff is further entitled to front pay and future lost earnings resulting from Defendant's discriminatory conduct and the current challenging economic climate in the technology sector.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

Plaintiff acknowledges that some injuries described herein—such as Plaintiff's termination, economic displacement, and reputational harm—are traceable to multiple overlapping legal violations, including disability discrimination, whistleblower retaliation, negligent misrepresentation, and RICO predicate acts. Plaintiff does not seek duplicative recovery for these overlapping injuries and defers to the Court to allocate damages appropriately. Treble damages are requested solely for the economic harms directly resulting from the predicate acts alleged under the Racketeer Influenced and Corrupt Organizations Act, as clarified by *Medical Marijuana, Inc. v. Horn*.

**92.** Back pay damages of $206,700 representing systematic undercompensation during the period of employment (approximately $162,000 annually for 1.15 years of employment based on the difference between actual compensation of $69,000 and median market rate of $231,000 as documented in Glassdoor for the role title), plus additional compensation components including health insurance ($20,700), consistent with awards in *EEOC v. Green Jobworks LLC* (D. Md. 2024) where the court awarded a $2,692,265.08 judgment;

Exhibit 1
Page 22 of 550

**93.** Front pay and future lost earnings of $683,142 representing diminished earning capacity and extended underemployment period in current economic climate, as well as the impact of having to commute to Delaware due to difficulty securing comparable employment in New York City, less $4,308 in unemployment benefits received. This figure is justified by the fact that Plaintiff, while unemployed for only six months, has been actively seeking comparable employment for over two years. The discriminatory nature of Plaintiff's departure and the resulting damage to his reputation, particularly due to his short tenure on his resume stemming from the discriminatory circumstances of his departure in the Portland technology sector, have significantly hindered his ability to secure a suitable position in New York City, where he currently resides. Given that starting salaries for a software developer in NYC are approximately $138,000, and can exceed $180,000 after five years of experience, Plaintiff has experienced substantial lost earning potential over his remaining career span. The necessity to commute to Delaware for his current employment further demonstrates this diminished capacity, incurring additional costs and reducing his overall earning potential compared to what he would have achieved had he secured a comparable role in the NYC market. This claim reflects the ongoing financial impact of Defendant's actions over Plaintiff's projected career lifespan, calculated using present value methodology consistent with *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983), and supported by recent awards including the $1.675 million discrimination award in New York that included substantial future earnings calculations;

**94.** Punitive damages of $148,500 for Defendant's willful and malicious conduct, including knowingly disregarding Plaintiff's documented disability, retaliating against Plaintiff for protected whistleblowing activity, and maintaining unlawful business practices in violation of public policy. These punitive damages are appropriate under ORS 31.730 and relevant federal law to deter future misconduct and reflect the reprehensibility of Defendant's coordinated pattern of discriminatory and retaliatory conduct.

**95.** Additional damages of $214,750 for negligent misrepresentation ($125,000) and interference with statutory rights ($89,750) for whistleblower retaliation, supported by recent Oregon jury awards including *Kuo v. Oregon State University* (Multnomah County 2023) where a jury awarded $600,621.50 ($500,000 in noneconomic damages and $100,621.50 in economic damages) for whistleblower retaliation, and consistent with EEOC settlements including *EEOC v. PRC Industries, Inc.* (D. Nev. 2023) where the EEOC secured $400,000 for retaliation against

Exhibit 1
Page 23 of 550

two employees and *EEOC v. iTutorGroup, Inc.* (2023) where the EEOC secured $365,000 for discrimination-related compensatory damages;

**96.** Treble damages for the RICO violations, as permitted by 18 U.S.C. 1964(c), applying to back pay damages ($206,700 × 3 = $620,100) and front pay and future lost earnings ($683,142 × 3 = $2,049,426), for total treble damages of $2,669,526;

**97.** Pre-judgment and post-judgment interest as provided by law;

**98.** Costs and disbursements of suit as permitted by law;

**99.** Such other relief as the Court deems just and proper.

• $206,700 in back pay damages
• $687,450 in front pay and future lost earnings
• $148,500 in consequential economic damages
• $214,750 in additional damages
• $2,682,450 in treble damages for RICO violations (3× back pay and front pay damages)
Plus costs of suit and other relief as deemed just and proper by the Court.

Respectfully submitted,

_____

**Liam Johnston**

Plaintiff

Pro Se

Exhibit 1
Page 24 of 550

IN THE CIRCUIT COURT OF THE STATE OF
OREGON FOR THE COUNTY OF ___Multnomah___

Liam Johnston
_____
                 Plaintiff /Petitioner

                v.

ICASHE INC, a Delaware Corporation Doing Business As Purs.digital
_____
                 Defendant /Respondent

Case No: ___25CV40776___

**EX PARTE MOTION FOR
ALTERNATIVE SERVICE and
DECLARATION IN SUPPORT**

## **Motion**

I am the ☑ Plaintiff /Petitioner *or* ☐ Defendant/Respondent in this case

Based on the *Declaration* below, I ask that this court grant an *Order* allowing an
alternative method of service as follows:

Service on the other party *(name)*:___iCashe Inc._____to be made by:

☐ mail or private courier or delivery service of the Summons and all non-confidential

filed documents to *(address)*_____

_____

_____

_____

☐ email or social media as follows: _

_____

_____

Email address or social media service and userID:_____

.

☐ text message or fax as follows: _____
Phone or fax number: _____

☐ publication once per week for 4 consecutive weeks in *(publication name)*
_____ which is a newspaper of
general circulation in ☐ this county *or* ☐_____County because
there is no newspaper of general circulation in the county where this case is filed, but
publication in the alternate county is reasonably likely to advise the recipient of the case.

☐ posting for a period of 30 days in the courthouse for this county *and* at the
following locations where it is reasonably likely to advise the recipient of the case:

_____

_____

_____

Alternative Service – Motion/Declaration
Page **1** of **3**

**OJD Official**
*(May 2025)*

Exhibit 1
Page 25 of 550

☐ posting through the Oregon Judicial Department Online Legal Service Posting

☑ other: In accordance with ORS 60.121, ORS 60.731 and ORCP 7D(3)(b)(ii)(D). Note the methods already require mailing to the last known address .

Although the current address is not known, these statutes authorize mailing to the last known address for purposes of service. Despite diligent efforts, no current mailing address is available. Therefore, I am checking the box below to request the court waive the mailing requirement, while acknowledging service is being attempted under the cited statutes.

Documents will also be mailed by first class mail *and* by certified mail, return receipt requested, to the party's current address (or the last known address if current address is not known)
☑ No address is available for mailing and no address can reasonably be discovered. I ask the court to waive the mailing requirement.

## Statement of Points and Authorities

Oregon Rules of Civil Procedure (ORCP) Rule 7D(6) allows a court to order alternative methods of service if service cannot be made by any other method specified by rule or statute. Service may be made by any method or combination of methods most reasonably calculated to advise the recipient of the action.

## Declaration

I have made the following efforts to locate the other party *(explain who you contacted or steps taken to locate the other party or find a valid contact address):*

I previously obtained this service in small claims court and submitted a detailed 2-page affidavit outlining my efforts to locate the other party, supported by 36 pages of exhibits

(which small claims court does not permit to file). Following that, I received an updated Certificate of No Record from the Oregon Secretary of State. I also reviewed

Multnomah County property records and found no address associated with known officers Christian Trummer, Trey Maust, or Siva Narendra.

Additionally, I obtained reports from Experian, ZoomInfo, and Dun & Bradstreet. I have requested the certificate of good standing for iCashe in its home state of

Delaware for a later exhibit confirming its existence with the Delaware Secretary of State. Despite these efforts, I have been unable to find a better address to serve iCashe Inc.

Service cannot be made in person, at the other party's residence or office, or by mail₁, because: *(Explain why you cannot serve by these methods and the efforts you have made):*

Service cannot be made in person, at the other party's residence or office, or by mail because the party's current address is unknown despite diligent efforts to locate them,

including searching public records, commercial databases, and obtaining updated certificates from relevant state authorities.

I believe the requested method of alternative service is the most reasonably likely to advise the recipient of the action because: The requested alternative service is authorized under ORCP 7 D(3)(b)(ii) and complies with ORS 60.121(3),

which requires that service be made by mailing to an address the use of which the party initiating the proceeding knows or, on the basis of reasonable inquiry, has reason to believe

is most likely to result in actual notice. Under Delaware law (8 Del. C. § 132), corporations in good standing must maintain a registered agent for service of process.

₁ Under Oregon Rules of Civil Procedure (ORCP) Rule 7D(2)

Alternative Service – Motion/Declaration
Page **2** of **3**

**OJD Official**
*(May 2025)*

Exhibit 1
Page 26 of 550

The Defendant is currently in good standing in Delaware and therefore must have a registered agent. Accordingly, service will be made by mailing to (1) the address where

I and every employee I personally observed hired by the Defendant have worked (excluding interns), (2) the Oregon Secretary of State as authorized by statute,

and (3) the Defendant's registered agent in Delaware.

*For electronic service*: I believe the other party has recently sent and received messages from this email address, text message or fax line, or social media account because: _

The documents to be served are *(list all document titles)*: _

To all parties the Summons and Mediation Notice - English.pdf,. The Secretary of State will also receive: Service of Process form found at their website.:

https://sos.oregon.gov/business/Documents/business-registry-forms/service-of-process.pdf

**I hereby declare that the above statements are true to the best of my knowledge and belief. I understand they are made for use as evidence in court and I am subject to penalty for perjury.**

| | |
|---|---|
| July 15, 2025 | *Erin Dahmate* |
| Date | Signature |
| capsaicinkid@gmail.com | Liam Johnston |
| Email *(optional)* | Name (printed) |
| 2717 21st street, Apt 6D | Astoria, Ny, 11102 | 302-766-0117 |
| Contact Address | City, State, ZIP | Contact Phone |

Alternative Service – Motion/Declaration
Page **3** of **3**

**OJD Official**
*(May 2025)*

Exhibit 1
Page 27 of 550

_Verified Correct Copy of Original 7/31/2025._

FILED MULTNOMAH CO CIRCUIT CT
'25 JUL 31 AM 11:16

# IN THE CIRCUIT COURT OF THE STATE OF OREGON
## FOR MULTNOMAH COUNTY

| | | |
|---|---|---|
| Liam Johnston, | ) | Case No. ___25CV40776___ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **AFFIDAVIT IN SUPPORT** |
| v. | ) | **OF MOTION FOR** |
| | ) | **ALTERNATIVE SERVICE** |
| iCashe, Inc., | ) | |
| a Delaware Corporation DBA | ) | |
| Purs.digital | ) ss. | |
| | | |
| Defendant. | | |

I, Liam Johnston, being first duly sworn, depose and say:

## 1. BACKGROUND AND PRIOR PROCEEDINGS

I previously obtained approval for alternative service on Defendant in a related small claims action. At that time, I submitted a two-page affidavit outlining my efforts to locate the defendant. While exhibits were not allowed in small claims court, I have 36 pages of supporting documents including corporate records, business addresses, and attempted contact methods.

## 2. RENEWED INVESTIGATION

Since then, I have continued diligent efforts to locate a better address for the Defendant, including:

- Obtaining an updated Certificate of No Record from the Oregon Secretary of State confirming that Defendant has no current registration in Oregon.
- Reviewing Multnomah County property records and confirming that no addresses were associated with known potential officers Christian Trummer, Trey Maust, or Siva Narendra.

Exhibit 1
Page 28 of 550

_Verified Correct Copy of Original 7/31/2025._

- Obtaining third-party business reports from Experian, ZoomInfo, and Dun & Bradstreet.
- Attempted service through professional process server in Delaware for small claims case: On June 4, 2025 at 1:14 PM EST, I hired a professional process server to attempt service on the defendant in Delaware for the small claims action. This service attempt failed.
- Requesting a Certificate of Good Standing for the Defendant from the Delaware Secretary of State.
- Reviewing Delaware corporate filings to identify the registered agent and any listed business addresses.

Despite these efforts, I have been unable to identify any better address at which the Defendant is likely to receive notice.

## 3. CURRENT ADDRESS DETERMINATIONS

**1.** Through firsthand experience as a former employee, I know that the company operated out of 920 SW 6th Ave, Floor 12, Portland, Oregon 97204, which served as its principal business office. All employees I personally observed (excluding interns) worked from that location.

**2.** The Delaware corporate records for the Defendant list the registered agent as COGENCY GLOBAL INC., 850 New Burton Road, Suite 201, Dover, DE 19904, which is a legally designated service address under 8 Del. C. § 132. Corporations in good standing in Delaware are required to maintain a registered agent who is obligated to forward legal process.

**3.** EDGAR filings also list an additional address at 5331 S Macadam Ave, Suite 251, Portland, OR 07239. However, the ZIP code "07239" is invalid. My job offer, issued when I was hired as the company's second employee, listed the same street address but with the correct ZIP code of 97239. This address has always been referenced as belonging to a separate entity, Tyfone, Inc., and was not a location where the defendant company conducted any operations. The defendant has publicly stated that it is a distinct company from Tyfone, Inc. and did not identify Tyfone, Inc. in its Federal Rule of Civil Procedure 7.1 disclosure. This same address also caused confusion and mail delivery issues during a BOLI proceeding within the last one to two years, further indicating that it is not a reliable address for effecting service on the defendant.

Exhibit 1
Page 29 of 550

_ Verified Correct Copy of Original 7/31/2025._

## 4. LEGAL STANDARD FOR ALTERNATIVE SERVICE

Under ORCP 7 D(3)(b)(ii), the court may authorize service by a method "reasonably calculated, under all the circumstances, to apprise the defendant of the existence and pendency of the action." In accordance with ORS 60.731(2)(c), when a foreign corporation has not designated a registered agent in Oregon, service may be made by serving the Oregon Secretary of State and mailing to an address the plaintiff, through reasonable inquiry, believes is most likely to result in actual notice.

## 5. REQUESTED METHOD OF SERVICE

Accordingly, I request that the Court authorize service through the following methods:

**1.** Mailing to the Oregon Secretary of State, as permitted by ORS 60.121(3);

**2.** Certified mailing to the Portland principal office at 920 SW 6th Ave, Floor 12, Portland, Oregon 97204 as required by ORS 60.731(3);

**3.** Certified mailing to the Defendant's Delaware registered agent, COGENCY GLOBAL INC., 850 New Burton Road, Suite 201, Dover, DE 19904 as required by 60.121(3)(b)(B).

These methods are authorized and consistent with ORCP 7 D(3)(b)(ii), which provides alternative service methods when the primary service requirements under ORCP 7 D(3)(b)(i) cannot be met. Primary service under D(3)(b)(i) requires personal service or office service upon a registered agent, officer, or director of the corporation, or personal service upon any clerk on duty in the office of a registered agent. Here, primary service cannot be accomplished because: (1) Defendant has no registered agent in Oregon, as confirmed by the Oregon Secretary of State; (2) I have been unable to locate current addresses for corporate officers despite extensive searches; and (3) there is no identifiable office with clerks available for service in Multnomah County. The Oregon Legislature specifically provided for service upon the Secretary of State under D(3)(b)(ii)(D) in precisely these circumstances - when corporations cannot be reached through conventional means. This reflects the Legislature's intent

Exhibit 1
Page 30 of 550

_ Verified Correct Copy of Original 7/31/2025._

to ensure that plaintiffs have a viable means of effectuating service on foreign or unreachable corporations while still providing reasonable notice. Combined with certified mail to both the company's last-known principal office and its Delaware registered agent, these methods are reasonably calculated to provide actual notice to the Defendant and satisfy due process requirements.

## 6. EFFORTS TO LOCATE THE OTHER PARTY

I have made extensive efforts to locate Defendant and find a valid contact address, including:

- Previously submitted comprehensive documentation: In a related small claims action, I provided a two-page affidavit outlining my efforts to locate the defendant. While exhibits were not allowed in small claims court, I have 36 pages of supporting documents including corporate records and business addresses.
- Obtained updated Certificate of No Record from the Oregon Secretary of State confirming that the defendant has no current registration in Oregon.
- Searched Oregon Secretary of State website on Monday, July 28, 2025 at 2:46 PM EST using "Exact words in any word order" searches for the terms "icashe", "ICASHE", and "iCashe". These searches returned no results.
- Searched Multnomah County property records to locate addresses associated with Christian Trummer, Trey Maust, and Siva Narendra, who appeared to hold management positions based on my interactions with them during my employment. The company's corporate structure and personnel organization was/is not transparent, making it difficult to definitively identify formal corporate officers and obtain current contact information for service purposes.
- Obtained third-party business reports from Experian, ZoomInfo, and Dun & Bradstreet to locate current business addresses and contact information.
- Attempted service through professional process server in Delaware for small claims case: On June 4, 2025 at 1:14 PM EST, I hired a professional process server to attempt service on the defendant in Delaware for the small claims action. This service attempt failed.

Exhibit 1
Page 31 of 550

Verified Correct Copy of Original 7/31/2025.

- Requested and received Certificate of Good Standing for Defendant from the Delaware Secretary of State to confirm current corporate status and registered addresses.
- Reviewed Delaware corporate filings to identify the registered agent and any listed business addresses.

## 7. WHY TRADITIONAL SERVICE CANNOT BE MADE

Service cannot be made through traditional methods for the following reasons:

- No Oregon presence: The Oregon Secretary of State confirms the defendant has no registration in Oregon, eliminating the standard service options under Oregon law.
- No identifiable officer addresses: Despite searching Multnomah County property records, I cannot locate current residential or business addresses for known potential corporate officers Christian Trummer, Trey Maust, or Siva Narendra.
- No current business operations at known locations: While Defendant is associated with the address 920 SW 6th Ave, Floor 12, Portland, Oregon 97204 in various online listings (including ZoomInfo and LinkedIn), my attempts to confirm current operations at this location have been inconclusive. I did not receive any returned mail or delivery confirmation when I sent correspondence there.
- Failed professional service attempt in small claims case: On June 4, 2025 at 1:14 PM EST, a professional process server I hired attempted service in Delaware for the small claims action but was unable to complete service.
- Corporate entity requires specific service methods: As a Delaware corporation without Oregon registration, standard personal service methods are not available, and the company must be served through statutory alternative methods.

## 8. BELIEF REGARDING NOTICE

The requested alternative service methods are most likely to result in actual notice for the following reasons:

Exhibit 1
Page 32 of 550

_ Verified Correct Copy of Original 7/31/2025._

- Delaware registered agent has legal obligation: COGENCY GLOBAL INC. serves as the defendant's registered agent under 8 Del. C. § 132 and is legally required to forward legal process to the corporation, ensuring the company will receive notice through this statutorily designated channel.
- Portland address was actual principal business office: Based on my firsthand knowledge as a former employee, 920 SW 6th Ave, Floor 12, Portland, Oregon 97204 served as the company's principal business office where all non-intern employees worked. It is also the only location that would meet the definition of a principal office as required by ORS 60.731 and defined under ORS 60.001(25)(a). Therefore, this address is the most likely location where the company might still receive mail or maintain forwarding arrangements.
- Oregon Secretary of State service satisfies statutory requirements: Service through the Oregon Secretary of State complies with ORS 60.121(3) for foreign corporations without Oregon registration, providing an additional layer of notice.
- Multiple service methods maximize notice: By combining service through the Oregon Secretary of State, certified mail to the Portland principal office, and certified mail to the Delaware registered agent, this approach maximizes the likelihood that the defendant will receive actual notice through at least one channel.
- Methods satisfy both Oregon and Delaware legal requirements: This method of service complies with Oregon's alternative service provisions and Delaware's statutory requirements for serving a Delaware-incorporated entity. Given that Delaware is the company's state of incorporation, notice served in accordance with Delaware law is presumed to be reasonably likely to provide actual notice and satisfies due process under both states' legal frameworks.

## 9. OATH

I swear or affirm under penalty of perjury that the statements above are true and that I believe the only legally sufficient way to serve Defendant is by the method I am requesting.

Exhibit 1
Page 33 of 550

_ Verified Correct Copy of Original 7/31/2025. _

Dated this ___29___ ___th___ day of ___July___ , 20 _25_

*Liam Johnston*

Liam P. Johnston, Affiant
2717 21st Street, Apt 6D
Astoria, NY 11102
(302) 766-0117
capsaicinkid@gmail.com

STATE OF TEXAS, COUNTY OF COLLIN

SUBSCRIBED AND SWORN TO before me this ___29th___ day of
_____July_____ , 20 _25_

Notary Public for the State of ___Texas___

My Commission Expires: ___03/16/2027___

**Bruce Edward Denny**

ID NUMBER
134256534
COMMISSION EXPIRES
March 16, 2027

NOTARY PUBLIC · STATE OF TEXAS

Electronically signed and notarized online using the Proof platform.

Exhibit 1
Page 34 of 550

_ Verified Correct Copy of Original 7/31/2025._

FILED MULTNOMAH CO CIRCUIT CT
'25 JUL 31 AM 11:17

## IN THE CIRCUIT COURT OF THE STATE OF
## OREGON FOR THE COUNTY OF ___Multnomah___

Liam Johnston
_____
Plaintiff /Petitioner

v.

_iCashe, Inc., a Delaware Corporation DBA Purs.digital_
Defendant /Respondent

**Case No:** ___25CV40776___

## EX PARTE MOTION FOR
## ALTERNATIVE SERVICE and
## DECLARATION IN SUPPORT

### <u>Motion</u>

I am the ☑ Plaintiff /Petitioner *or* ☐ Defendant/Respondent in this case

Based on the *Declaration* below, I ask that this court grant an *Order* allowing an alternative method of service as follows:

Service on the other party *(name)*:___**iCashe, Inc.**_____to be made by:

    ☐ mail or private courier or delivery service of the Summons and all non-confidential filed documents to *(address)*_____

_____

_____

_____

    ☐ email or social media as follows: _

_____

_____

Email address or social media service and userID:_____

    ☐ text message or fax as follows: _____

Phone or fax number: _____

    ☐ publication once per week for 4 consecutive weeks in *(publication name)*

_____ which is a newspaper of general circulation in ☐ this county *or* ☐_____County because there is no newspaper of general circulation in the county where this case is filed, but publication in the alternate county is reasonably likely to advise the recipient of the case.

    ☐ posting for a period of 30 days in the courthouse for this county *and* at the following locations where it is reasonably likely to advise the recipient of the case:

_____

_____

_____

Alternative Service – Motion/Declaration
Page **1** of **3**

**OJD Official**
*(May 2025)*

Exhibit 1
Page 35 of 550

_Verified Correct Copy of Original 7/31/2025._

☐ posting through the Oregon Judicial Department Online Legal Service Posting

☑ other:   In accordance with ORS 60.121, ORS 60.731, and  ORCP 7D(3)(b)(ii)(D).

Documents will also be mailed by first class mail *and* by certified mail, return receipt requested, to the party's current address (or the last known address if current address is not known)
☐ No address is available for mailing and no address can reasonably be discovered. I ask the court to waive the mailing requirement.

## Statement of Points and Authorities

Oregon Rules of Civil Procedure (ORCP) Rule 7D(6) allows a court to order alternative methods of service if service cannot be made by any other method specified by rule or statute. Service may be made by any method or combination of methods most reasonably calculated to advise the recipient of the action.

## Declaration

I have made the following efforts to locate the other party *(explain who you contacted or steps taken to locate the other party or find a valid contact address):*
 Please see corresponding section 6 in supporting affidavit.

Service cannot be made in person, at the other party's residence or office, or by mail[1], because: *(Explain why you cannot serve by these methods and the efforts you have made):*
 Please see corresponding section 7 in supporting affidavit.

I believe the requested method of alternative service is the most reasonably likely to advise the recipient of the action because:   Please see corresponding section 8 in supporting affidavit.

[1] Under Oregon Rules of Civil Procedure (ORCP) Rule 7D(2)

Alternative Service – Motion/Declaration
Page **2** of **3**

**OJD Official**
*(May 2025)*

Exhibit 1
Page 36 of 550

*Verified Correct Copy of Original 7/31/2025.*

_____

_____

*For electronic service*: I believe the other party has recently sent and received messages from this email address, text message or fax line, or social media account because: _

_____

_____

_____

_____

The documents to be served are *(list all document titles):*_

To all parties the Summons, most up to date version of the complaint, and Mediation Notice - English.pdf,. The Secretary of State will also receive: a check for the filing fee and Service of Process form found at their website.:

https://sos.oregon.gov/business/Documents/business-registry-forms/service-of-process.pdf

**I hereby declare that the above statements are true to the best of my knowledge and belief. I understand they are made for use as evidence in court and I am subject to penalty for perjury.**

| | |
|---|---|
| __July 28, 2025__ | ~Liam Johnston~ (signature) |
| Date | Signature |
| **capsaicinkid@gmail.com** | **Liam Johnston** |
| Email *(optional)* | Name (printed) |
| __2717 21st street, Apt 6D__ | **Astoria, Ny, 11102**          **302-766-0117** |
| Contact Address | City, State, ZIP          Contact Phone |

Alternative Service – Motion/Declaration
Page **3** of **3**

**OJD Official**
*(May 2025)*

Exhibit 1
Page 37 of 550

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

**FOR MULTNOMAH COUNTY**

| | | |
|---|---|---|
| **Liam Johnston,** | ) | Case No. <u>25CV40776</u> |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION** |
| v. | ) | |
| | ) | |
| **iCashe, Inc.,** | ) | |
| a Delaware Corporation DBA Purs.digital | ) | |
| | ) ss. | |
| Defendant. | | |

I, Liam Johnston, declare under penalty of perjury under the laws of the State of Oregon that the following is true and correct:

**I. BACKGROUND AND PURPOSE**

**1.** I am the Plaintiff in the above-captioned matter and am competent to make this declaration based on my personal knowledge.

**2.** I submit this declaration to explain the nature and scope of exhibits that support my case, which due to file size limitations cannot be submitted through the standard electronic filing methods.

**3.** In my previously filed sworn statement, I referenced a zip file containing these exhibits with a specific hash identifier. Due to technical filing constraints, I was required to remove certain files to reduce the overall file size for submission.

Exhibit 1
Page 38 of 550

**4.** The complete zip file referenced in my sworn statement remains available and can be provided to the Court and opposing counsel upon request.

## II. EXHIBIT CATEGORIES AND DESCRIPTIONS

### A. EXHIBITS RELATING TO ORS 60.701 VIOLATION:

**5.** Screenshot pulled directly from the Oregon Secretary of State website demonstrating lack of registration.

**6.** Certificate of no record regarding one of the entity's names, obtained from official state records.

**7.** SEC filing pulled directly from EDGAR database showing a Portland address for the entity in question.

### B. GENERAL LITIGATION ABILITY:

**8.** Federal court complaint that iCashe submitted, obtained from PACER database. This document demonstrates that iCashe possesses substantial litigation resources and capability, and could easily transfer assets such as patents.

**9.** Brief news summary of the aforementioned federal litigation, obtained from online news sources.

### C. LACK OF RETENTION OF MESSAGES:

**10.** Two separate emails from Slack stating that messages in free workspaces will not be retained by the platform.

**11.** Upon information and belief, the aforementioned Slack message retention policy applies to workspaces used at my former company.

### D. CLAIMS SUPPORTING DOCUMENTATION:

**12.** My employment offer letter, which explicitly states that I am required to be located in Portland, Oregon. This document was obtained from my personal email records.

Exhibit 1
Page 39 of 550

**13.** Copy of the Leaf article posted online stating that the company helps process payments for cannabis-related businesses. Note: this article was published before the Banking Notification Y was submitted.

**14.** Copy of the Division of Financial Regulation website page demonstrating that registration with the Secretary of State is required for obtaining a money transmission license.

**15.** Copy of the FDIC notice stating that Lewis and Clark Bancorp is acquiring additional interests in iCashe, Inc.

**16.** Copy of the letter from the President of Lewis and Clark Bank submitted to the Division of Financial Regulation in response to my complaint, showing that the bank disclaims control over customer relationships.

**17.** Copy of the company's website homepage displaying money movement pricing information.

**18.** Copy of the company's "About Us" webpage describing payment processing services.

**19.** Copy of documentation obtained from the Federal Reserve via Freedom of Information Act (FOIA) request regarding Banking Notification Y, which shows that iCashe, Inc. issues checks—an undeniable money movement activity.

## III. AUTHENTICATION AND AVAILABILITY

**20.** I personally obtained or supervised the collection of all exhibits described herein from their respective official sources, including but not limited to government websites, court databases, email records, and public filings.

**21.** Each exhibit is maintained in its original format and can be authenticated through its source of origin.

**22.** All exhibits described in this declaration are relevant and material to the claims and defenses in this case.

**23.** The complete collection of exhibits, including those removed for file size compliance, remains available for immediate production to the Court and all parties upon request.

Exhibit 1
Page 40 of 550

**24.** I am prepared to provide testimony regarding the collection, authenticity, and relevance of any and all exhibits described herein.

## IV. CONCLUSION

**25.** Due to the technical limitations of the court's electronic filing system regarding file sizes, alternative arrangements for exhibit submission are necessary to ensure the complete evidentiary record is available to the Court.

**26.** I respectfully request that the Court accept this declaration as notice of the exhibits I intend to introduce at trial or other proceedings, and that appropriate arrangements be made for their submission and review.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated: _____08/12/2025_____, 2025

_____

Liam Johnston

Plantiff

2717 21st street Apt 6D,

Astoria, NY, 11102

302-766-0117

capsaicinkid@gmail.com

Exhibit 1
Page 41 of 550



### Business Name Search

Business Entity Names returned for:
 Name: ICASHE
 Using: Exact Words in Any Word Order
  For Active and Inactive businesses.

**New Search**        **Printer Friendly**

**08-09-2025 06:22**

| Record No | Entity Type | Entity Status | Registry Number | Name Status | Name | Assoc Search |
|---|---|---|---|---|---|---|

Your search returned no business entity names.

---

About Us | Announcements | Laws & Rules | Feedback Policy | SOS Home | Oregon Blue Book | Oregon.gov

For comments or suggestions regarding the operation of this site,
please contact : corporation.division@sos.oregon.gov

© 2025  Oregon Secretary of State.  All Rights Reserved.

Exhibit 1
Page 42 of 550

# *State of Oregon*

### OFFICE OF THE SECRETARY OF STATE
### *Corporation Division*

## Certificate of No Record    672G625A6

I, TOBIAS READ, *Secretary of State of Oregon, and Custodian of the Seal of said State, do hereby certify:*

*I have carefully examined the current records of this office and as of the date of this certificate it appears that there are no active or inactive filings under the exact name.*

ICASHE INC.



*In Testimony Whereof, I have hereunto set my hand and affixed hereto the Seal of the State of Oregon.*

TOBIAS READ, Secretary of State

*6/17/2025*

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)        Previous Names    [X] None

0001837550

Name of Issuer
iCashe, Inc.

Jurisdiction of Incorporation/Organization
DELAWARE

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2020
[ ] Yet to Be Formed

Entity Type
[X] Corporation
[ ] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
iCashe, Inc.

Street Address 1                    Street Address 2
5331 SW MACADAM AVE STE 251

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| --- | --- | --- | --- |
| PORTLAND | OREGON | 97239 | 5032263939 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
| --- | --- | --- |
| NARENDRA | SIVA | |

Street Address 1                    Street Address 2
5331 SW MACADAM AVE STE 251

| City | State/Province/Country | ZIP/PostalCode |
| --- | --- | --- |
| PORTLAND | OREGON | 97239 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
| --- | --- | --- |
| MELTEBEKE | BRENDA | |

Street Address 1                    Street Address 2
888 SW 5TH AVE STE 1600

Exhibit 1
Page 44 of 550

| City | State/Province/Country | ZIP/PostalCode |
|------|------------------------|----------------|
| PORTLAND | OREGON | 97204 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|-----------|-----------|-------------|
| TADEPALLI | PRABHAKAR | |

Street Address 1    Street Address 2
5331 SW MACADAM AVE STE 251

| City | State/Province/Country | ZIP/PostalCode |
|------|------------------------|----------------|
| PORTLAND | OREGON | 97239 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|-----------|-----------|-------------|
| WILLISON | BRUCE | |

Street Address 1    Street Address 2
5331 SW MACADAM AVE STE 251

| City | State/Province/Country | ZIP/PostalCode |
|------|------------------------|----------------|
| PORTLAND | OREGON | 97239 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|-----------|-----------|-------------|
| PAWLOWSKI | STEVE | |

Street Address 1    Street Address 2
5331 SW MACADAM AVE STE 251

| City | State/Province/Country | ZIP/PostalCode |
|------|------------------------|----------------|
| PORTLAND | OREGON | 97239 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|-----------|-----------|-------------|
| SRIVATHSA | RAJESH | |

Street Address 1    Street Address 2
5331 SW MACADAM AVE STE 251

| City | State/Province/Country | ZIP/PostalCode |
|------|------------------------|----------------|
| PORTLAND | OREGON | 97239 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|-----------|-----------|-------------|
| MAUST | TREY | |

Street Address 1    Street Address 2
5331 SW MACADAM AVE STE 251

| City | State/Province/Country | ZIP/PostalCode |
|------|------------------------|----------------|

Exhibit 1
Page 45 of 550

Relationship: ☐ Executive Officer ☒ Director ☐ Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

☐ Agriculture

Banking & Financial Services

☐ Commercial Banking

☐ Insurance

☐ Investing

☐ Investment Banking

☐ Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?

☐ Yes                    ☐ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

Health Care

☐ Biotechnology

☐ Health Insurance

☐ Hospitals & Physicians

☐ Pharmaceuticals

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☐ Retailing

☐ Restaurants

Technology

☐ Computers

☐ Telecommunications

☒ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

---

## 5. Issuer Size

Revenue Range                    OR            Aggregate Net Asset Value Range

☐ No Revenues                                  ☐ No Aggregate Net Asset Value

☐ $1 - $1,000,000                              ☐ $1 - $5,000,000

☐ $1,000,001 - $5,000,000                      ☐ $5,000,001 - $25,000,000

☐ $5,000,001 - $25,000,000                     ☐ $25,000,001 - $50,000,000

☐ $25,000,001 - $100,000,000                   ☐ $50,000,001 - $100,000,000

☐ Over $100,000,000                            ☐ Over $100,000,000

☒ Decline to Disclose                          ☐ Decline to Disclose

☐ Not Applicable                               ☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

Exhibit 1
Page 46 of 550

☐ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))       ☐ Section 3(c)(1)        ☐ Section 3(c)(9)
☐ Rule 504 (b)(1)(i)                            ☐ Section 3(c)(2)        ☐ Section 3(c)(10)
☐ Rule 504 (b)(1)(ii)                           ☐ Section 3(c)(3)        ☐ Section 3(c)(11)
☐ Rule 504 (b)(1)(iii)                          ☐ Section 3(c)(4)        ☐ Section 3(c)(12)
☒ Rule 506(b)                                   ☐ Section 3(c)(5)        ☐ Section 3(c)(13)
☐ Rule 506(c)                                   ☐ Section 3(c)(6)        ☐ Section 3(c)(14)
☐ Securities Act Section 4(a)(5)                ☐ Section 3(c)(7)

## 7. Type of Filing

☒ New Notice   Date of First Sale 2023-02-23   ☐ First Sale Yet to Occur
☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☐ Yes ☒ No

## 9. Type(s) of Securities Offered (select all that apply)

☒ Equity                                            ☐ Pooled Investment Fund Interests
☐ Debt                                              ☐ Tenant-in-Common Securities
☐ Option, Warrant or Other Right to Acquire Another Security   ☐ Mineral Property Securities
☐ Security to be Acquired Upon Exercise of Option, Warrant     ☐ Other (describe)
or Other Right to Acquire Security

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction,
such as a merger, acquisition or exchange offer?                ☐ Yes ☒ No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $0 USD

## 12. Sales Compensation

Recipient                                    Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None         (Associated) Broker or Dealer CRD          ☒ None
                                             Number

Street Address 1                             Street Address 2

City                                         State/Province/Country                     ZIP/Postal
                                                                                        Code

State(s) of Solicitation (select all that
apply)                                    All
Check "All States" or check individual   States   ☐ Foreign/non-US
States

Exhibit 1
Page 47 of 550

## 13. Offering and Sales Amounts

Total Offering Amount    $2,399,994 USD   or   ☐ Indefinite

Total Amount Sold       $2,399,994 USD

Total Remaining to be Sold     $0 USD   or   ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:    | 1 |

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD   ☐ Estimate

Finders' Fees $0 USD   ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD   ☐ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

### Terms of Submission

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

Exhibit 1
Page 48 of 550

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| iCashe, Inc. | /s/ Brenda L. Meltebeke | Brenda L. Meltebeke | Secretary | 2023-03-03 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

Exhibit 1
Page 49 of 550

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |
|---|---|
| ICASHE, INC., <br> a Delaware corporation, <br><br>         Plaintiff, <br><br>    v. <br><br> SAMSUNG ELECTRONICS CO., LTD., <br> a Korean business entity, and <br> SAMSUNG ELECTRONICS AMERICA, <br> INC., a New York corporation. <br><br>         Defendants. | Civil Action No. 2:24cv429 <br><br><br> **JURY TRIAL DEMANDED** |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff iCashe, Inc. ("Plaintiff" or "iCashe"), by its attorneys, hereby alleges patent infringement against Defendants Samsung Electronics Co., Ltd. ("SEC") and its U.S. subsidiary and related entity, Samsung Electronics America, Inc. ("SEA") (individually or collectively "Defendants" or "Samsung"), as follows:

### INTRODUCTION

1.      This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.* iCashe alleges that Samsung has infringed and/or continues to infringe, directly and/or indirectly, seven iCashe patents: U.S. Patent Nos. 9,122,965 ("'965 patent"), 9,483,722 ("'722 patent"), 11,694,053 ("'053 patent"),

1

Exhibit 1 <br> Page 50 of 550

8,403,219 ("'219 patent"), 9,202,156 ("'156 patent"), 9,208,423 ("'423 patent"), and 11,270,174 ("'174 patent") (collectively, the "iCashe Patents"), copies of which are attached hereto as Exhibits 1-7, respectively.

2.     The iCashe Patents cover foundational technologies for contactless mobile payments, including: (1) the use of inventive performance-enhancement circuitry for active load modulation and/or signal amplification in near-field communications (NFC); and/or (2) the use of inventive circuitry to generate time-varying magnetic fields (TVMF) for NFC and/or to mimic the swipe of a magnetic card. The claimed inventions enable Samsung to offer superior mobile and wearable devices with NFC- and/or TVMF-based payment functionality, e.g., Samsung Pay, allowing users of such Samsung mobile and wearable devices to more easily, reliably, and efficiently complete payment transactions at a variety of point-of-sale payment terminals.

3.     Samsung has infringed and/or continues to infringe the iCashe Patents, directly and indirectly, by: (1) making, using, testing, selling, offering for sale, and/or importing into the United States, mobile devices and wearable devices that include infringing NFC and/or TVMF functionality; (2) practicing the claimed methods of the iCashe Patents in the United States by making, testing, and/or using Samsung mobile devices and wearable devices that include the claimed NFC and/or TVMF functionality; and (3) at least from the date of filing of this Complaint, inducing third parties to use, sell, offer for sale, and/or import into the United States, Samsung mobile devices and wearable devices that include infringing NFC and/or TVMF functionality, with knowledge of the iCashe Patents and of the third parties' direct infringement resulting

Exhibit 1
Page 51 of 550

therefrom.

4.     iCashe seeks damages, including past damages, and other relief for Samsung's infringement of the iCashe Patents.

## THE PARTIES

5.     Plaintiff iCashe, Inc. is a corporation organized and existing under the laws of the State of Delaware, with offices at 811 SW 6th Ave., Suite 1000, Portland, Oregon 97204.

6.     Defendant SEC is a corporation organized and existing under the laws of the Republic of Korea that lists its global headquarters as 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, Republic of Korea.

7.     Defendant SEA is a corporation organized and existing under the laws of the State of New York, with corporate offices in the Eastern District of Texas at 6625 Excellence Way, Plano, Texas 75023. Defendant SEA may be served with process through its registered agent C T Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

8.     Defendant SEA is a wholly owned subsidiary of SEC.

9.     Defendants have authorized sellers and sales representatives that offer and sell products pertinent to this Complaint throughout the State of Texas, including in this District and to consumers throughout this District, such as: Best Buy, 422 W TX-281 Loop, Suite 100, Longview, Texas 75605; AT&T Store, 1712 E. Grand Avenue, Marshall, Texas 75670; Verizon authorized retailers, including Russell Cellular, 1111 E. Grand Avenue, Marshall, Texas 75670, and Victra, 1006 East End Boulevard N, Suite A,

3

Exhibit 1
Page 52 of 550

Marshall, Texas 75670; and Amazon.com.

## JURISDICTION AND VENUE

10.     This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 101 *et seq.*

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12.     This Court has specific and personal jurisdiction over each of the Defendants consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long-Arm Statute. Tex. Civ. Prac. & Rem. Code § 17.042. On information and belief, each Defendant has sufficient minimum contacts with the forum because each Defendant transacts substantial business in the State of Texas and in this District. On information and belief, SEA has more than 1,000 employees at its Plano, Texas facility, working in areas such as engineering, research and development, marketing, sales, and customer support for wireless devices. Further, each Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in the State of Texas and in this District as alleged in this Complaint, as alleged more particularly below.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1400(b) and 1391(b) and (c) because each Defendant is subject to personal jurisdiction in this District and has committed acts of patent infringement in this District. SEA has a regular and established place of business and employees in this District. Each Defendant, through its own acts and/or through the acts of each other Defendant, makes, uses, sells, and/or

Exhibit 1
Page 53 of 550

offers to sell infringing products within this District, regularly does and solicits business in this District, and has the requisite minimum contacts with the District such that this venue is a fair and reasonable one. Further, the Defendants have admitted or not contested proper venue in this District in other patent infringement actions.

## FACTUAL BACKGROUND

### I. Plaintiff iCashe and the Inventors

14. The iCashe Patents relate to, among other things, circuits and systems that enable high-performance communications between mobile devices and point-of-sale payment terminals and facilitate mobile contactless payments (also commonly called "tap to" functionality), among other applications.

15. The patented inventions resulted from years of investment in research and development by iCashe, its predecessor Tyfone, Inc., and the founders of those companies, including inventors Dr. Siva Narendra and Prabhakar Tadepalli.

16. Dr. Narendra, Mr. Tadepalli, and Thomas Spitzer co-founded Tyfone in 2004 to create a secure payment platform using mobile phones. They envisioned a future in which consumers would use their phones for payments instead of cash, checks, or credit cards, for both convenience and improved security. Tyfone invested in research and development to create hardware for mobile phones to communicate effectively and securely with point-of-sale (POS) payment terminals.

17. Tyfone's innovations in mobile contactless payment hardware and systems have resulted in over 40 patents covering these technologies. Tyfone has assigned certain of those patents to iCashe, which has the responsibility to protect and license those

Exhibit 1
Page 54 of 550

patents as well as carry on the mobile wallet business that originated with Tyfone.

## II.    The iCashe Patents

18.     Plaintiff iCashe solely owns the iCashe Patents, including the exclusive rights to bring suit with respect to any past, present, and future infringement thereof.

19.     The '965 patent, entitled "13.56 MHz Enhancement Circuit for Smartcard Controller," was duly and legally issued on September 1, 2015, from a patent application filed October 17, 2014, with Siva G. Narendra, Saurav Chakraborty, and Prabhakar Tadepalli as the named inventors. The '965 patent claims priority to U.S. Patent Application No. 12/188,346, filed on August 8, 2008, now U.S. Patent No. 7,961,101.

20.     The '722 patent, entitled "Amplifier and Transmission Solution for 13.56MHz Radio Coupled to Smartcard Controller," was duly and legally issued on November 1, 2016, from a patent application filed October 17, 2014, with Siva G. Narendra, Saurav Chakraborty, and Prabhakar Tadepalli as the named inventors. The '722 patent claims priority to U.S. Patent Application No. 12/188,346, filed on August 8, 2008, now U.S. Patent No. 7,961,101.

21.     The '053 patent, entitled "Method and Apparatus for Transmitting Data via NFC for Mobile Applications Including Mobile Payments and Ticketing," was duly and legally issued on July 4, 2023, from a patent application filed February 18, 2021, with Siva G. Narendra, Saurav Chakraborty, and Prabhakar Tadepalli as the named inventors. The '053 patent claims priority to U.S. Patent Application No. 12/188,346, filed on August 8, 2008, now U.S. Patent No. 7,961,101.

22.     The '219 patent, entitled "Apparatus with Smartcard Circuitry Powered By

Exhibit 1
Page 55 of 550

a Mobile Device," was duly and legally issued on March 26, 2013, from a patent application filed October 12, 2012, with Siva G. Narendra, Thomas N. Spitzer, and Prabhakar Tadepalli as the named inventors. The '219 patent claims priority to U.S. Patent Application No. 11/063,291, filed on February 22, 2005, now U.S. Patent No. 7,581,678.

23.     The '156 patent, entitled "Mobile Device with Time-Varying Magnetic Field," was duly and legally issued on December 1, 2015, from a patent application filed June 23, 2015, with Siva G. Narendra, Thomas N. Spitzer, and Prabhakar Tadepalli as the named inventors. The '156 patent claims priority to U.S. Patent Application No. 11/063,291, filed on February 22, 2005, now U.S. Patent No. 7,581,678.

24.     The '423 patent, entitled "Mobile Device with Time-Varying Magnetic Field and Single Transaction Account Numbers," was duly and legally issued on December 8, 2015, from a patent application filed August 23, 2015, with Siva G. Narendra, Thomas N. Spitzer, and Prabhakar Tadepalli as the named inventors. The '423 patent claims priority to U.S. Patent Application No. 11/063,291, filed on February 22, 2005, now U.S. Patent No. 7,581,678.

25.     The '174 patent, entitled "Mobile Phone with Magnetic Card Emulation," was duly and legally issued on March 8, 2022, from a patent application filed September 15, 2020, with Siva G. Narendra, Thomas N. Spitzer, and Prabhakar Tadepalli as the named inventors. The '174 patent claims priority to U.S. Patent Application No. 11/063,291, filed on February 22, 2005, now U.S. Patent No. 7,581,678.

26.     Each of the iCashe Patents is valid and enforceable.

7

Exhibit 1
Page 56 of 550

27.     Defendants are not authorized to practice the iCashe Patents.

28.     The inventions recited in the iCashe Patents enable Samsung to offer, among other things, superior mobile and wearable devices with NFC- and/or TVMF-based "tap to" functionality.

## III.     Samsung

29.     Samsung is a global leader in the mobile device and wearable device market, which includes smartphones, tablets, and smartwatches. On information and belief, Samsung designs, manufactures, uses, offers for sale, sells, and/or imports into the United States—including into the Eastern District of Texas—billions of dollars of mobile devices and wearable devices every year.

30.     Samsung had global revenues of approximately $198 billion across all product lines in 2023, a significant portion of which is attributable to SEA. In 2023, SEA had revenues of approximately $29 billion, a significant portion of which is attributable to mobile devices.

## IV.     Samsung's Direct Infringement and the Accused Instrumentalities

31.     Defendants have directly infringed, and/or continue to infringe, pursuant to 35 U.S.C. § 271(a), one or more claims of each of the iCashe Patents (as further specified below as to each of the iCashe Patents, in Counts I-VII) by: (1) making, using, testing, offering to sell, selling within the United States, and/or importing into the United States, Samsung mobile devices and/or wearable devices that include NFC- and/or TVMF-based Samsung Pay functionality; and (2) practicing the claimed methods of the iCashe Patents in the United States by using and/or testing Samsung mobile devices and/or wearable

8

Exhibit 1
Page 57 of 550

devices that include the claimed NFC- and/or TVMF-based Samsung Pay functionality. The products that iCashe accuses of infringing the iCashe Patents are collectively referred to herein as the "Accused Instrumentalities."

32.     On information and belief, SEC manufactures and tests Accused Instrumentalities abroad and sells and/or imports Accused Instrumentalities into the United States. On information and belief, SEA uses, tests, and/or sells Accused Instrumentalities in the United States and/or imports Accused Instrumentalities into the United States.

33.     The Accused Instrumentalities include devices that incorporate the claimed inventions, including infringing implementations of NFC- and/or TVMF-based Samsung Pay functionality, including but not limited to:

- Samsung smartphones and tablets (collectively, "Accused Mobile Devices"), including but not limited to Galaxy Note, Galaxy S, Galaxy Z, Galaxy A, and Galaxy XCover smartphones, and Galaxy Tab tablets, including the exemplary Samsung Galaxy S21 5G smartphone and the Samsung Galaxy S20 5G smartphone;

- Samsung smartwatches and wearable devices ("Accused Wearables"), including but not limited to Galaxy smartwatches, including but not limited to Galaxy Watch Classic, Galaxy Watch, and Galaxy Watch Pro smartwatches; and

- Any additional Samsung devices that incorporate the NFC- and/or TVMF-based Samsung Pay functionality described herein.

9

Exhibit 1
Page 58 of 550

34.     The Accused Instrumentalities include products made, used, tested, offered for sale, sold within the United States, and/or imported into the United States within the last six years before the filing date of this Complaint. The Accused Instrumentalities also include products used to perform the claimed methods of the iCashe Patents within the last six years before the filing date of this Complaint.

35.     The claims of the iCashe Patents relate generally to, *inter alia*, contactless mobile payments and the use of (1) inventive performance-enhancement circuitry for active load modulation and/or signal amplification in near-field communications (NFC); and/or (2) inventive circuitry to generate time-varying magnetic fields (TVMF) for NFC and/or to mimic the swipe of a magnetic card. *See, e.g.*, '965 at 19:11-20:40; '722 at 19:40-20:52; '053 at 12:58-13:22; '219 at 16:16-18:6; '156 at 16:19-53; '423 at 16:9-69; '174 at 17:9-18:51. The inventions of the iCashe Patents enable Samsung to offer superior mobile and wearable devices with NFC- and/or TVMF-based Samsung Pay functionality, allowing users of such Samsung mobile and wearable devices to more easily, reliably, and efficiently complete payment transactions at a variety of point-of-sale payment terminals and at greater distances and angles than would be possible without the iCashe inventions.

36.     The presence of NFC- and/or TVMF-based Samsung Pay functionality in the Accused Instrumentalities is established below with respect to the exemplary Samsung Galaxy S21 5G smartphone for certain patents and the Samsung Galaxy S20 5G smartphone for certain patents. On information and belief, all Accused Instrumentalities operate in substantially the same way as the exemplary Samsung

10

Exhibit 1
Page 59 of 550

Galaxy S21 5G smartphone and the Samsung Galaxy S20 5G smartphone with respect to the functionality described below.

## V.    Samsung's Indirect Infringement

37.    From at least the date of this Complaint, Defendants indirectly infringe the iCashe Patents by inducing infringement by others, such as importers, resellers, customers, and end users under 35 U.S.C. § 271(b) in this District and elsewhere in the United States and the State of Texas.

38.    Specifically, Defendants induce others' direct infringement of the iCashe Patents by selling Accused Instrumentalities to third-party customers, such as retailers, who then directly infringe by using, offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the iCashe Patents.

39.    On information and belief, Defendants actively promote the NFC- and/or TVMF-based Samsung Pay functionality of the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every one of Defendants' Accused Instrumentalities sold in the United States, Defendants pursue and obtain approval from U.S. and state regulatory agencies, such as the United States Federal Communications Commission, to allow sales of such Accused Instrumentalities in the United States.

40.    Defendants know that their customers will sell infringing Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States—or have deliberately avoided learning of the infringing circumstances so as to be willfully blind to the infringement that was induced—and Defendants

11

Exhibit 1
Page 60 of 550

specifically intend their customers to purchase those Accused Instrumentalities from

Defendants and sell the Accused Instrumentalities in the United States or cause Accused

Instrumentalities to be sold in the United States. Defendants' direct and indirect

purchasers directly infringe the iCashe Patents by importing such Accused

Instrumentalities into the United States, selling such Accused Instrumentalities in the

United States, and using such Accused Instrumentalities in the United States.

41.     Defendants further induce others' direct infringement of the iCashe Patents

by providing instruction and direction to end users, such as consumers, about how to use

the Accused Instrumentalities such that those end users use the Accused Instrumentalities

and directly infringe the iCashe Patents. Defendants have knowledge that end users will

use Accused Instrumentalities in the manner directed by Defendants and specifically

intend that end users will perform such uses in the United States. In some instances, such

infringing uses occur upon operation of the Accused Instrumentalities in their normal,

intended manner without any specific action of the end user other than turning on the

product. That is, Defendants have configured the Accused Instrumentalities in such a way

as to induce infringement by end users upon any use of those Accused Instrumentalities.

In other instances, such infringing uses occur upon normal operation of, e.g., the

Samsung Pay functionality of the Accused Instrumentalities.

42.     Defendants have induced others' direct infringement despite actual notice

that the Accused Instrumentalities infringe the iCashe Patents, as set forth herein.

Defendants therefore have caused their purchasers and end users to directly infringe the

iCashe Patents with knowledge of the iCashe Patents and specific intent that the

Exhibit 1
Page 61 of 550

purchasers and end users will directly infringe, or have deliberately avoided learning of the infringing circumstances so as to be willfully blind to the infringement that was induced.

43.     Defendants derive significant revenue by selling products, including the Accused Instrumentalities, to third parties who directly infringe one or more claims of the iCashe Patents.

44.     The above-described acts of indirect infringement committed by Defendants have caused injury and damage to Plaintiff iCashe, and will cause additional severe and irreparable injury and damages in the future.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,122,965**

45.     The allegations set forth in paragraphs 1 through 44 of this Complaint are incorporated by reference as though fully set forth herein.

46.     Pursuant to 35 U.S.C. § 282, the '965 patent is presumed valid.

47.     Defendants have directly infringed and continue to infringe one or more claims of the '965 patent in violation of 35 U.S.C. § 271. The infringing products are the Accused Instrumentalities. The Samsung Galaxy S21 5G smartphone, described below, provides a representative example of Samsung's infringement of the '965 patent.

48.     Paragraphs 50-77 describe the manner in which the Accused Instrumentalities infringe claims 13-15 of the '965 patent, by way of the exemplary Samsung Galaxy S21 5G smartphone.

49.     On information and belief, the Accused Instrumentalities are in relevant part substantially similar to the exemplary Samsung Galaxy S21 5G smartphone, in

Exhibit 1
Page 62 of 550

particular with regard to the manner in which the Accused Instrumentalities include and utilize NFC- and/or TVMF-based functionality. Paragraphs 50-77 are thus illustrative of the manner in which each of the Accused Instrumentalities infringes.

50.    The Samsung Galaxy S21 5G smartphone is a mobile device.



https://www.samsung.com/us/smartphones/galaxy-s-series/certified-re-newed-store/buy/?modelCode=SM5G991UZAAXAA (last accessed June 6, 2024).

14

Exhibit 1
Page 63 of 550



https://web.archive.org/web/20211111133651/https://www.samsung.com/us/mobile/5g/ (last accessed June 6, 2024).

51.     The Samsung Galaxy S21 5G smartphone contains a smartcard controller. In particular, at least certain models of the Samsung Galaxy S21 5G smartphone sold in the United States contain the NXP SN110U V3 NFC and Secure Element chip ("NXP SN110U"), as confirmed by the EMVCo certification letter below.

Exhibit 1
Page 64 of 550



https://www.emvco.com/wp-content/uploads/loa/MTA_LOA_SAEL_02859_24Nov20
_SHORT.pdf (last accessed June 6, 2024) ("EMVCo Certification Letter") at 2 (emphasis
added).

52. The presence of the NXP SN110U chip is confirmed by teardown analysis:



Teardown image from Samsung Galaxy S21 5G smartphone (emphasis added).

53.     The NXP SN110U chip provides near-field communications functionality,

enabling "tap to" functionality including NFC payment transactions.



https://www.nxp.com/company/blog/imagine-never-having-to-change-a-sim-again:BL-
NEVER-CHANGE-SIM-AGAIN (last accessed June 6, 2024) (emphasis added).

Exhibit 1
Page 66 of 550



NFC Forum Certification NXP SN110x.

54.     The NFC functionality of the NXP SN110U chip in the Samsung Galaxy

S21 5G smartphone can be used for, e.g., completing Samsung Pay transactions.



*Samsung Galaxy S21 5G, Galaxy S21+ 5G, Galaxy S21 Ultra 5G User Manual* (2021)
("*Galaxy S21 User Manual*") at 106-07.

18

Exhibit 1
Page 67 of 550



*Galaxy S21 User Manual* at 118.

55.     The EMVCo certification of the Samsung Galaxy S21 5G smartphone as an EMV Contactless Level 1 Mobile Product indicates that the Samsung Galaxy S21 5G smartphone, including the NXP SN110U chip, supports Type A and Type B communications under the ISO/IEC 14443 standard.

| Contactless Communication Protocol: | ☒ Type A | ☒ Type B |
|---|---|---|
| Execution Environment: | ☒ UICC² slot 1 <br> ☐ eSE <br> ☐ eUICC | ☐ UICC² slot 2 <br> ☒ HCE |
| Mobile Product Operating System Name and Version: | Android Version 11.0 | |
| NFC Controller Name and Version: | SN110U V3 Version N/A | |
| NFC Controller Firmware Name and Version: | N/A Version FW01.10.5A | |

Exhibit 1
Page 68 of 550

EMVCo Certification Letter at 2 (emphasis added).

56.     Although NXP has not published certain information regarding the

functionality or functional blocks of the NXP SN110U chip, it has published block

diagrams showing the components of SN1xx family devices, including the embedded

NFC controller, the embedded secure element, and the system mailbox, as shown below.



**Fig. 1.2: SN100x Product Configurations**

*NXP SN100T – JCOP5.1 on SN100.C48 Secure Element Security Target Lite, Rev. 1.0*
(Apr. 18, 2019) ("*NXP SN100T Secure Element Specification*") at 5.

57.     Portions of the embedded secure element of the NXP SN110U chip form all

or part of the smartcard controller within the Samsung Galaxy S21 5G smartphone.

Additionally, portions of the embedded NFC controller of the NXP SN110U chip may

form part of the smartcard controller within the Samsung Galaxy S21 5G smartphone.

Exhibit 1
Page 69 of 550

58.     Although certain information regarding the functionality or functional blocks of the SN1xx family devices is not publicly available, NXP has published detailed information about the functionality and functional blocks of other NXP NFC chips, including the PN7150. On information and belief and as detailed below, the PN7150 chip contains certain functional blocks and interfaces that are similar to some of the relevant functional blocks and interfaces of the NXP SN110U chip and surrounding circuitry in the Samsung Galaxy S21 5G smartphone.

59.     Like the NXP SN110U, which is addressed in detail below, the PN7150 is a highly integrated NFC transceiver IC for contactless communication at 13.56 MHz that supports various ISO/IEC 14443 modes.

> The PN7150 is a highly integrated NFC transceiver IC for contactless communication at 13.56MHz. This transceiver IC utilizes an outstanding modulation and demodulation concept completely integrated for different kinds of contactless communication methods and protocols at 13.56 MHz.

*Application Note AN11755, PN7150 Antenna Design and Matching Guide, Rev. 1.7* (July 10, 2019) ("*PN7150 Antenna Design and Matching Guide*") at 3.

Exhibit 1
Page 70 of 550

Plug´n play and high-performance full NFC solution PN7150 is a full NFC controller solution with integrated firmware and NCI interface designed for contactless communication at 13.56 MHz. It is compatible with NFC forum requirements.

PN7150 is designed based on learnings from previous NXP NFC device generation. It is the ideal solution for rapidly integrating NFC technology in any application, especially those running O/S environment like Linux and Android, reducing Bill of Material (BOM) size and cost, thanks to:

- Full NFC forum compliancy (see [1]) with small form factor antenna
- Embedded NFC firmware providing all NFC protocols as pre-integrated feature
- Direct connection to the main host or microcontroller, by I²C-bus physical and NCI protocol
- Ultra-low power consumption in polling loop mode
- Highly efficient integrated power management unit (PMU) allowing direct supply from a battery

PN7150 embeds a new generation RF contactless front-end supporting various transmission modes according to NFCIP-1 and NFCIP-2, ISO/IEC 14443, ISO/IEC 15693, MIFARE Classic IC-based card and FeliCa card specifications. It embeds an Arm Cortex-M0 microcontroller core loaded with the integrated firmware supporting the NCI 1.0 host communication. It also allows to provide a higher output power by supplying the transmitter output stage from 3.0 V to 4.75 V.

*PN7150 High Performance NFC Controller with Integrated Firmware, Supporting All NFC Forum Modes, Product Data Sheet, Rev. 4.1* (Jan. 27, 2023) ("*PN7150 Data Sheet*") at 2.

60.     Like the NXP SN110U, the PN7150 is designed to be connected to an external coil antenna.

The PN7150 is intended to be connected to an external coil antenna through a specific matching/tuning network.

The purpose of this document is first to provide some guidelines regarding the design of the NFC antenna to be connected to the PN7150.

It then depicts a measurement method in order to evaluate the performances of the antenna prior to connecting it to the NXP NFC chip.

The next chapter explains how to determine the matching network to be placed between a given antenna and the PN7150 (based on the antenna electrical equivalent circuit)

Then, an RF performance validation procedure is proposed.

Finally, an example of PN7150 antenna and tuning design is given as reference.

*PN7150 Antenna Design and Matching Guide* at 3.

61.     Given the similarities and common functionalities across the NXP SN110U and the PN7150, and in the absence of publicly available information regarding the NXP

22

Exhibit 1
Page 71 of 550

SN110U, detailed technical information regarding the PN7150 is set forth below and relied upon herein to demonstrate relevant functionality of the NXP SN110U and surrounding circuitry.

62.     NXP provides block diagrams for the PN7150. As shown in the block diagram below, the PN7150 contains a Contactless Interface Unit (CIU). On information and belief, the NXP SN110U chip contains circuitry and functional blocks within the embedded NFC controller that correspond to certain circuitry and functional blocks within the CIU of the PN7150.



Fig 3. PN7150 block diagram

*PN7150 Data Sheet* at 10 (emphasis added).

63.     The Samsung Galaxy S21 5G smartphone contains an antenna used to

Exhibit 1
Page 72 of 550

transmit and receive NFC information and transaction sequences. The antenna is part of

the NFC antenna and charging coil assembly component depicted below.



Teardown image from Samsung Galaxy S21 5G smartphone (emphasis added).

24

Exhibit 1
Page 73 of 550



Teardown image from Samsung Galaxy S21 5G smartphone (emphasis added).

64. The antenna is tuned to operate at 13.56 MHz. As shown below, the NFC system of the Samsung Galaxy S21 5G smartphone operates at 13.56 MHz.



*FCC NFC Test Report for Samsung Galaxy S21 5G Smartphone* at 1 (emphasis added).



*FCC NFC Test Report for Samsung Galaxy S21 5G Smartphone* at 23 (emphasis added).

65.     The Samsung Galaxy S21 5G smartphone includes an amplifier coupled to amplify signals received at the antenna and drive the smartcard controller. The Samsung Galaxy S21 5G smartphone is able to perform NFC payment transactions with an NFC reader both at a distance and at off-angles from the reader. An NFC payment transaction can be completed by placing the Samsung Galaxy S21 5G smartphone (and specifically its antenna) "within four centimeters" of an NFC payment terminal. This distance indicates that the received signal is necessarily amplified.

Exhibit 1
Page 76 of 550



## NFC and payment

Near Field Communication (NFC) allows you to communicate with another device without connecting to a network. This technology is used by Android Beam and certain payment apps. The device that you are transferring to needs to support NFC, and it needs to be within four centimeters of your device.

○ From Settings, tap 📶 Connections > NFC and contactless payments, and then tap ⬤ to turn on this feature.

## Tap and pay

Use an NFC payment app to make payments by touching your device to a compatible credit card reader.

1. From Settings, tap 📶 Connections > NFC and contactless payments, and then tap ⬤ to turn on NFC.

2. Tap Contactless payments to see the default payment app.
   - To use another payment app, tap an available app to choose it.
   - To use a payment app that is open, tap Pay with currently open app.
   - To set another payment service as the default, tap Others, and then tap the service you prefer.

🔆 TIP NFC technology is used with 📱 Samsung Pay. Turn on this feature to see how easy and secure it is to use your device to make payments.

*Galaxy S21 User Manual* at 118 (emphasis added).

66.     The *PN7150 Antenna Design and Matching Guide* describes the manner in which the PN7150, which is substantially similar in relevant part to the SN110U, amplifies a received signal. As shown below, the *PN7150 Antenna Design and Matching Guide* depicts the receive (Rx) path between the antenna, the matching circuitry, and the NFC chip itself.

28

Exhibit 1
Page 77 of 550



Fig 21. Rx path

*PN7150 Antenna Design and Matching Guide* at 22.

67.    The *PN7150 Antenna Design and Matching Guide* describes setting an amplification level of a baseband amplifier (i.e., RX_GAIN) of the NFC chip to amplify a received Rx signal.



*PN7150 Antenna Design and Matching Guide* at 62.

29

Exhibit 1
Page 78 of 550



*PN7150 Antenna Design and Matching Guide* at 63.

68.     The PN7150 contains an analog-to-digital converter (ADC), which receives

the amplified signal and provides it to the smartcard controller.

30

Exhibit 1
Page 79 of 550



Fig 3. PN7150 block diagram

*PN7150 Data Sheet* at 10 (emphasis added).

69. On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the amplifier and ADC shown and described with respect to the PN7150. The amplifier is arranged between the antenna and the smartcard controller, so as to amplify signals received at the antenna and drive the smartcard controller.

70. The Samsung Galaxy S21 5G also includes a driver circuit to drive the antenna with data provided by the smartcard controller. As shown below with respect to the PN7150, the NXP SN110U and surrounding circuitry was designed for active load modulation (ALM).

Exhibit 1
Page 80 of 550

## 2.2 Single loop antenna dedicated for Active Load Modulation

PN7150 was designed for Active Load Modulation (ALM) concept. ALM provides high performances and significant margins to NFC standard criteria. It also allows the use of smaller antenna.

*PN7150 Antenna Design and Matching Guide* at 4.



**ALM Mode (SINGLE):**

Fig 2.   ALM mode SINGLE concept

On the left graph the red 13.56MHz signal shows the voltage at the NFC antenna which is induced by the reader field, the blue curve shows the modulation pattern. This modulation pattern is generated by actively driving 13.56MHz with TX1 or TX2 while the other TX pin (TX2 or TX1) is kept silent.

On the right we can see the modulated reader field.

*PN7150 Antenna Design and Matching Guide* at 5.

32

Exhibit 1
Page 81 of 550



ALM Mode (DUAL):

Fig 3.   ALM mode DUAL concept

In this mode the modulation pattern is generated by actively driving 13.56MHz with TX1 and TX2. The modulation depth observed is twice the modulation depth of mode 1.

*PN7150 Antenna Design and Matching Guide* at 5.

71.   As shown below, the PN7150 circuitry produces a modulation signal that is driven to the antenna via TX1 and/or TX2.



Fig 4.   Single Loop Antenna concept (mode 1 illustration)

*PN7150 Antenna Design and Matching Guide* at 6.

33

Exhibit 1
Page 82 of 550



*PN7150 Antenna Design and Matching Guide* at 6.

72.     The ALM produces upper and lower side bands with respect to the 13.56

MHz signal.



*PN7150 Antenna Design and Matching Guide* at 7.

73.     As shown below, the CIU of the PN7150 contains both a transmitter control

34

Exhibit 1
Page 83 of 550

block, TxCtrl, and driver block/circuits, which perform active load modulation for communication to a point-of-sale terminal.



Fig 3. PN7150 block diagram

*PN7150 Data Sheet* at 10 (emphasis added).

74. On information and belief, the NXP SN110U contains functional blocks and circuitry within the embedded NFC controller that correspond to the active load modulation circuitry (i.e., the driver circuit) shown and described with respect to the PN7150. The driver circuit is arranged between the antenna and the smartcard controller, such that it drives the antenna with data provided by the smartcard controller.

75. Testing confirms that the Samsung Galaxy S21 5G smartphone uses active load modulation. In particular, testing of the Samsung Galaxy S21 5G smartphone

Exhibit 1
Page 84 of 550

confirms that the NXP SN110U of the Samsung Galaxy S21 5G smartphone includes a driver circuit to drive the antenna with data provided by the smartcard controller. As shown below in Figure 1, which displays the RF signal analysis during an ongoing transaction with an NFC reader, the Samsung Galaxy S21 5G smartphone emits two actively modulated sideband spikes plus the carrier frequency (13.56 MHz). This confirms the presence of the load modulation circuitry (i.e., the driver circuit) discussed above.



*Figure 1: Samsung Galaxy S21 5G with ongoing transaction showing actively modulated spikes of power*

76. Figure 2 below displays the RF signal analysis of the Samsung Galaxy S21 5G smartphone with the Samsung Pay application enabled but with no NFC reader present. Like Figure 1, the figure shows the frequency spectrum enabled by the driver circuit consists of two actively modulated spikes (at $f_c/64$) plus the carrier frequency (13.56 MHz). Thus, Figure 2 demonstrates that the NFC transmission from the Samsung

36

Exhibit 1
Page 85 of 550

Galaxy S21 5G smartphone does not depend on coupling with the NFC reader and is

therefore the product of an active load modulation circuit.



Figure 2: Samsung Galaxy S21 5G near Square reader showing actively modulated spikes of power

77.    The driver circuit of the Samsung Galaxy S21 5G smartphone includes a

load modulation circuit. As indicated above, the NXP SN110U chip was designed for

ALM. On information and belief, the NXP SN110U contains functional blocks and

circuitry within the embedded NFC controller that correspond to the active load

modulation circuitry (i.e., the driver circuit) shown and described above with respect to

the PN7150. The driver circuit is arranged between the antenna and the smartcard

controller, such that it drives the antenna with data provided by the smartcard controller.

78.    Further, the driver circuit of the Samsung Galaxy S21 5G smartphone

includes an active transmit driver circuit. As described above, testing of the Samsung

Galaxy S21 5G smartphone confirms that the Samsung Galaxy S21 5G smartphone uses

the ALM functionality of the NXP SN110U chip for actively transmitting modulated data

Exhibit 1
Page 86 of 550

to an NFC reader. In particular, the testing demonstrates that the NFC transmission from the Samsung Galaxy S21 5G smartphone does not depend on coupling with the NFC reader and is therefore the product of an active driver circuit.

79.     The Accused Instrumentalities directly infringe at least claims 13-15 of the '965 patent at least in the manner described in paragraphs 50-78 above. Plaintiff's allegations of infringement are not limited to claims 13-15, and additional infringed claims will be identified and disclosed through discovery and infringement contentions.

80.     Defendants have actual notice pursuant to 35 U.S.C. § 287(a) of the '965 patent and the infringement alleged herein at least upon the filing of this Complaint. iCashe has complied with the notice requirement of 35 U.S.C. § 287. Neither iCashe nor any authorized licensee made, offered for sale, or sold within the United States any article embodying the '965 patent claims following issuance of the '965 patent.

81.     Defendants indirectly infringe the '965 patent by actively inducing the direct infringement of others of the '965 patent, in the United States, the State of Texas, and the Eastern District of Texas.

82.     Defendants induce, through affirmative acts, their customers and other third parties, such as retailers and end users, to directly infringe the '965 patent by using, offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the '965 patent.

83.     On information and belief, Defendants actively promote the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every one of Defendants' Accused Instrumentalities sold in the United States, Defendants

Exhibit 1
Page 87 of 550

pursue and obtain approval from U.S. and state regulatory agencies, such as the United

States Federal Communications Commission, to allow sales of such Accused

Instrumentalities in the United States.

84.     Defendants know that their customers will sell infringing Accused

Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the

United States, and Defendants specifically intend their customers to purchase those

Accused Instrumentalities from Defendants and sell the Accused Instrumentalities in the

United States or cause Accused Instrumentalities to be sold in the United States.

Defendants' direct and indirect purchasers directly infringe the '965 patent by importing

such Accused Instrumentalities into the United States, selling such Accused

Instrumentalities in the United States, and using such Accused Instrumentalities in the

United States.

85.     Defendants further induce others' direct infringement of the '965 patent by

providing instruction and direction to end users, such as consumers, about how to use the

Accused Instrumentalities such that those end users use the Accused Instrumentalities

and directly infringe the '965 patent. Defendants have knowledge that end users will use

Accused Instrumentalities in the manner directed by Defendants and specifically intend

that end users will perform such uses in the United States. Such infringing uses occur

upon operation of the Accused Instrumentalities in their normal, intended manner without

any specific action of the end user other than turning on the product. That is, Defendants

have configured the Accused Instrumentalities in such a way as to induce infringement

by end users upon any use of those Accused Instrumentalities.

Exhibit 1
Page 88 of 550

86.     Defendants induce others' direct infringement despite actual notice that the Accused Instrumentalities infringe the '965 patent. At least as of the date of filing of this Complaint, Defendants know that the induced conduct would constitute infringement— and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

87.     The above-described acts of infringement committed by Defendants have caused injury and damage to iCashe, and will cause additional severe and irreparable injury and damages in the future.

88.     Defendants' acts of infringement as described above are willful, at least as of the date of filing of this Complaint.

89.     iCashe is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 9,483,722

90.     The allegations set forth in paragraphs 1 through 44 of this Complaint are incorporated by reference as though fully set forth herein.

91.     Pursuant to 35 U.S.C. § 282, the '722 patent is presumed valid.

92.     Defendants have directly infringed and continue to infringe one or more claims of the '722 patent in violation of 35 U.S.C. § 271. The infringing products are the

Exhibit 1
Page 89 of 550

Accused Instrumentalities. The Samsung Galaxy S21 5G smartphone, described below, provides a representative example of Samsung's infringement of the '722 patent.

93.     Paragraphs 95-111 describe the manner in which the Accused Instrumentalities infringe claim 1 of the '722 patent, by way of the exemplary Samsung Galaxy S21 5G smartphone.

94.     On information and belief, the Accused Instrumentalities are in relevant part substantially similar to the exemplary Samsung Galaxy S21 5G smartphone, in particular with regard to the manner in which the Accused Instrumentalities include and utilize NFC- and/or TVMF-based functionality. Paragraphs 95-111 are thus illustrative of the manner in which each of the Accused Instrumentalities infringes.

95.     The Samsung Galaxy S21 5G smartphone is a mobile device. Paragraph 50 above is incorporated herein by reference.

96.     The Samsung Galaxy S21 5G smartphone contains a smartcard controller that includes load modulation circuitry for half duplex communication by creating at least one frequency sideband about a carrier frequency of an interrogating radio frequency (RF) field. At least certain models of the Samsung Galaxy S21 5G smartphone sold in the United States contain the NXP SN110U, which includes a smartcard controller. The NXP SN110U chip provides near-field communications functionality, enabling "tap to" functionality including NFC payment transactions. Paragraphs 51-57 above are incorporated herein by reference.

97.     As discussed above, although certain information regarding the functionality or functional blocks of the SN1xx family devices is not publicly available,

Exhibit 1
Page 90 of 550

NXP has published detailed information about the functionality and functional blocks of other NXP NFC chips, including the PN7150. On information and belief and as detailed below, the NXP PN7150 chip contains certain functional blocks and interfaces that are similar to some of the relevant functional blocks and interfaces of the NXP SN110U chip and surrounding circuitry in the Samsung Galaxy S21 5G smartphone. Paragraphs 58-62 above are incorporated herein by reference.

98.     The smartcard controller of the NXP SN110U chip includes load modulation circuitry for half duplex communication by creating at least one frequency sideband about a carrier frequency of an interrogating RF field. The NXP SN110U was designed for ALM. On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the active load modulation circuitry shown and described with respect to the PN7150. Paragraphs 70-74 above are incorporated herein by reference.

99.     Further, testing of the Samsung Galaxy S21 5G smartphone confirms that the Samsung Galaxy S21 5G smartphone uses ALM functionality of the NXP SN110U chip for actively transmitting modulated data to an NFC reader. Paragraphs 75-76 above are incorporated herein by reference.

100.    As shown below, the *PN7150 Antenna Design and Matching Guide* depicts the transmit (TX) and receive (RX) paths between the TX and RX pads of the NFC chip and the antenna coil and matching circuitry. On information and belief and for the reasons discussed above, the NXP SN110U chip and surrounding circuitry, matching circuitry, and antenna coil in the Samsung Galaxy S21 5G smartphone are

42

Exhibit 1
Page 91 of 550

configured in substantially the same manner in relevant part.



*PN7150 Antenna Design and Matching Guide* at 22.

101.    The load modulation circuitry is coupled to the TX pad(s) to form an outgoing data path. The amplifier of the NXP SN110U, discussed below, is coupled to the RX pad to form an incoming data path. The load modulation circuitry thereby provides for half duplex communication, as per the NFC, ISO/IEC 14443 standard, the communications are half-duplex, i.e., only TX or RX occurs at a given instance.

This specification addresses the digital protocol for NFC-enabled device communication, providing an implementation specification on top of the ISO/IEC 18092 and ISO/IEC 14443 standards. It harmonizes the integrated technologies, specifies implementation options and limits the interpretation of the standards; in essence, showing developers how to use NFC, ISO/IEC 14443 and JIS X6319-4 standards together to ensure global interoperability between different NFC devices, and between NFC devices and existing contactless infrastructure.

The specification defines the common feature set that can be used consistently and without further modification for major NFC applications in areas such as financial services and public transport. The specification covers the digital interface and the half-duplex transmission protocol of the NFC-enabled device in its four roles as Initiator, Target, Reader/Writer and Card Emulator. It includes bit level coding, bit rates, frame formats, protocols, and command sets, which are used by NFC-enabled devices to exchange data and bind to the LLCP protocol.

43

Exhibit 1
Page 92 of 550

https://nfc-forum.org/build/specifications (last accessed June 6, 2024).

102.    The Samsung Galaxy S21 5G smartphone contains an antenna tuned to operate at 13.56 MHz. Paragraphs 63-64 above are incorporated herein by reference.

103.    The Samsung Galaxy S21 5G smartphone contains at least one active circuit coupled between the smartcard controller and the antenna, wherein the at least one active circuit includes an amplifier coupled to be powered by the mobile device, and wherein the amplifier is coupled to amplify a signal received from the antenna and to provide an amplified signal to the smartcard controller. The Samsung Galaxy S21 5G smartphone is able to perform NFC payment transactions with an NFC reader both at a distance and at off-angles from the reader. An NFC payment transaction can be completed by placing the Samsung Galaxy S21 5G smartphone (and specifically its antenna) "within four centimeters" of an NFC payment terminal. This distance indicates that the Samsung Galaxy S21 5G smartphone contains an amplifier coupled to amplify a signal received from the antenna. Paragraph 65 above is incorporated herein by reference.

104.    The NXP SN110U contains an active circuit with an amplifier. On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the amplifier and ADC shown and described with respect to the PN7150. The active circuit containing the amplifier of the NXP SN110U is arranged between the antenna and the smartcard controller, so as to amplify signals received from the antenna and provide an amplified signal to the smartcard controller. Paragraphs 66-69 above are incorporated herein by reference.

105.    The amplifier of the NXP SN110U chip is coupled to be powered by the

Exhibit 1
Page 93 of 550

mobile device. The amplifier is located on the NXP SN110U chip, which is coupled to the power source, i.e., the Samsung Galaxy S21 5G smartphone battery shown below, to receive power.



Teardown image from Samsung Galaxy S21 5G smartphone (emphasis added).

106. Additionally, testing indicates that the NFC transmission from the Samsung Galaxy S21 5G smartphone does not depend on coupling with the NFC reader, further indicating that the NXP SN110U chip is powered by the mobile device. Paragraphs 75-76 above are incorporated herein by reference.

107. The at least one active circuit of the Samsung Galaxy S21 5G smartphone includes a transmit circuit coupled between the smartcard controller and the antenna that in operation forms a signal that mimics the at least one frequency sideband and wherein

45

Exhibit 1
Page 94 of 550

the signal drives the antenna. The active circuit of the NXP SN110U includes a transmit circuit coupled between the smartcard controller and the antenna.

108.    As shown below, the *PN7150 Antenna Design and Matching Guide* depicts the transmit (TX) path between the TX pads of the NFC chip and the antenna coil and matching circuitry. On information and belief and for the reasons discussed above, the NXP SN110U chip and surrounding circuitry, matching circuitry, and antenna coil in the Samsung Galaxy S21 5G smartphone are configured in substantially the same manner in relevant part.



*PN7150 Antenna Design and Matching Guide* at 22.

109.    Testing of the Samsung Galaxy S21 5G smartphone indicates that the transmit circuitry of the NXP SN110U chip forms a signal that mimics the at least one frequency sideband and drives the antenna. Figure 2 below displays an RF signal analysis of the Samsung Galaxy S21 5G smartphone with the Samsung Pay application enabled but with no NFC reader present. The figure shows the frequency spectrum enabled by the transmit circuit consists of two actively modulated sidebands plus the carrier frequency.

46

Exhibit 1
Page 95 of 550



Figure 2: Samsung Galaxy S21 5G near Square reader showing actively modulated spikes of power

110. As discussed above, on information and belief, the NXP SN110U chip contains circuitry and functional blocks within the embedded NFC controller that correspond to certain circuitry and functional blocks within the CIU of the PN7150. As shown below with respect to the PN7150, the CIU includes driver block/circuits and a transmitter control block, TxCtrl, coupled to drive the antenna.

47

Exhibit 1
Page 96 of 550



Fig 3. PN7150 block diagram

*PN7150 Data Sheet* at 10 (emphasis added).

111.    On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to transmitter control block shown and described with respect to the PN7150. The transmit control block in the CIU is coupled between the smartcard controller and the antenna.

112.    The Accused Instrumentalities directly infringe at least claim 1 of the '722 patent at least in the manner described in paragraphs 95-111 above. Plaintiff's allegations of infringement are not limited to claim 1, and additional infringed claims will be identified and disclosed through discovery and infringement contentions.

113.    Defendants have actual notice pursuant to 35 U.S.C. § 287(a) of the '722

Exhibit 1
Page 97 of 550

patent and the infringement alleged herein at least upon the filing of this Complaint. iCashe has complied with the notice requirement of 35 U.S.C. § 287. Neither iCashe nor any authorized licensee made, offered for sale, or sold within the United States any article embodying the '722 patent claims following issuance of the '722 patent.

114.   Defendants indirectly infringe the '722 patent by actively inducing the direct infringement of others of the '722 patent, in the United States, the State of Texas, and the Eastern District of Texas.

115.   Defendants induce, through affirmative acts, their customers and other third parties, such as retailers and end users, to directly infringe the '722 patent by using, offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the '722 patent.

116.   On information and belief, Defendants actively promote the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every one of Defendants' Accused Instrumentalities sold in the United States, Defendants pursue and obtain approval from U.S. and state regulatory agencies, such as the United States Federal Communications Commission, to allow sales of such Accused Instrumentalities in the United States.

117.   Defendants know that their customers will sell infringing Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States, and Defendants specifically intend their customers to purchase those Accused Instrumentalities from Defendants and sell the Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States.

Exhibit 1
Page 98 of 550

Defendants' direct and indirect purchasers directly infringe the '722 patent by importing such Accused Instrumentalities into the United States, selling such Accused Instrumentalities in the United States, and using such Accused Instrumentalities in the United States.

118.    Defendants further induce others' direct infringement of the '722 patent by providing instruction and direction to end users, such as consumers, about how to use the Accused Instrumentalities such that those end users use the Accused Instrumentalities and directly infringe the '722 patent. Defendants have knowledge that end users will use Accused Instrumentalities in the manner directed by Defendants and specifically intend that end users will perform such uses in the United States. Such infringing uses occur upon operation of the Accused Instrumentalities in their normal, intended manner without any specific action of the end user other than turning on the product. That is, Defendants have configured the Accused Instrumentalities in such a way as to induce infringement by end users upon any use of those Accused Instrumentalities.

119.    Defendants induce others' direct infringement despite actual notice that the Accused Instrumentalities infringe the '722 patent. At least as of the date of filing of this Complaint, Defendants know that the induced conduct would constitute infringement— and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

Exhibit 1
Page 99 of 550

120.     The above-described acts of infringement committed by Defendants have caused injury and damage to iCashe, and will cause additional severe and irreparable injury and damages in the future.

121.     Defendants' acts of infringement as described above are willful, at least as of the date of filing of this Complaint.

122.     iCashe is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 11,694,053

123.     The allegations set forth in paragraphs 1 through 44 of this Complaint are incorporated by reference as though fully set forth herein.

124.     Pursuant to 35 U.S.C. § 282, the '053 patent is presumed valid.

125.     Defendants have directly infringed and continue to infringe one or more claims of the '053 patent in violation of 35 U.S.C. § 271. The infringing products are the Accused Instrumentalities. The Samsung Galaxy S21 5G smartphone, described below, provides a representative example of Samsung's infringement of the '053 patent.

126.     Paragraphs 128-139 describe the manner in which the Accused Instrumentalities infringe claims 1, 7, and 8 of the '053 patent, by way of the exemplary Samsung Galaxy S21 5G smartphone.

127.     On information and belief, the Accused Instrumentalities are in relevant part substantially similar to the exemplary Samsung Galaxy S21 5G smartphone, in particular with regard to the manner in which the Accused Instrumentalities include and

Exhibit 1
Page 100 of 550

utilize NFC- and/or TVMF-based functionality. Paragraphs 128-139 are thus illustrative of the manner in which each of the Accused Instrumentalities infringes.

128.    The Samsung Galaxy S21 5G smartphone is a mobile device. Paragraph 50 above is incorporated herein by reference.

129.    The Samsung Galaxy S21 5G smartphone contains a power source. The Samsung Galaxy S21 5G smartphone battery is a power source. Paragraph 105 above is incorporated herein by reference.

130.    The Samsung Galaxy S21 5G smartphone contains a smartcard controller coupled to the power source to receive power. At least certain models of the Samsung Galaxy S21 5G smartphone sold in the United States contain the NXP SN110U, which includes a smartcard controller. The NXP SN110U chip provides near-field communications functionality, enabling "tap to" functionality including NC payment transactions. Paragraphs 51-57 above are incorporated herein by reference.

131.    Although certain information regarding the functionality or functional blocks of the SN1xx family devices is not publicly available, NXP has published detailed information about the functionality and functional blocks of other NXP NFC chips, including the PN7150. On information and belief and as detailed below, the PN7150 chip contains certain functional blocks and interfaces that are similar to some of the relevant functional blocks and interfaces of the NXP SN110U chip and surrounding circuitry in the Samsung Galaxy S21 5G smartphone. Paragraphs 58-62 above are incorporated herein by reference.

132.    The NXP SN110U chip is coupled to the power source, i.e., the Samsung

Exhibit 1
Page 101 of 550

Galaxy S21 5G smartphone battery, to receive power. Additionally, testing indicates that the NFC transmission from the Samsung Galaxy S21 5G smartphone does not depend on coupling with the NFC reader, further indicating that the NXP SN110U chip is powered by the mobile device. Paragraphs 75-76 above are incorporated herein by reference.

133.    The Samsung Galaxy S21 5G smartphone contains an antenna tuned to operate at substantially 13.56 MHz, wherein the antenna interacts with a Near Field Communication (NFC) reader external to the mobile device. The antenna of the Samsung Galaxy S21 5G smartphone, which is part of the NFC antenna and charging coil assembly component, interacts with an NFC reader external to the mobile device during transactions, e.g., Samsung Pay transactions. Paragraphs 63-64 above are incorporated herein by reference.

134.    The Samsung Galaxy S21 5G smartphone contains an active transmit driver circuit coupled to the power source to receive the power, wherein the active transmit driver circuit affects transmission of data between the antenna and the NFC reader. The NXP SN110U contains an active transmit driver circuit. The NXP SN110U was designed for ALM. On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the active load modulation circuitry shown and described above with respect to the PN7150. Paragraphs 70-74 above are incorporated herein by reference.

135.    Further, testing of the Samsung Galaxy S21 5G smartphone confirms that the Samsung Galaxy S21 5G smartphone uses ALM functionality of the NXP SN110U chip for actively transmitting modulated data to an NFC reader. Paragraphs 75-76 above

Exhibit 1
Page 102 of 550

are incorporated herein by reference.

136.   The active transmit driver circuit of the NXP SN110U chip affects NFC data transmission during, e.g., Samsung Pay transactions, through ALM. The active transmit driver circuit is located on the NXP SN110U chip, which is coupled to the power source to receive power, as described above.

137.   The Samsung Galaxy S21 5G smartphone contains an amplifier coupled to the power source to receive the power, wherein the amplifier is further coupled to the antenna. The Samsung Galaxy S21 5G smartphone is able to perform NFC payment transactions with an NFC reader both at a distance and at off-angles from the reader. An NFC payment transaction can be completed by placing the Samsung Galaxy S21 5G smartphone (and specifically its antenna) "within four centimeters" of an NFC payment terminal. This distance indicates that the Samsung Galaxy S21 5G smartphone contains an amplifier coupled to amplify a signal received from the antenna. Paragraph 65 above is incorporated herein by reference.

138.   The amplifier is located on the NXP SN110U chip. On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the amplifier and ADC shown and described with respect to the PN7150. Paragraphs 66-69 above are incorporated herein by reference. The NXP SN110U chip is coupled to the power source to receive power, as discussed above.

139.   The amplifier in the Samsung Galaxy S21 5G smartphone amplifies a signal received at the antenna and generates an amplified signal, and provides the

Exhibit 1
Page 103 of 550

amplified signal to the smartcard controller. The amplifier of the NXP SN110U is arranged between the antenna and the smartcard controller, so as to amplify signals received at the antenna, generate an amplified signal, and provide the amplified signal to the smartcard controller. Paragraphs 66-69 above are incorporated herein by reference.

140.   The Accused Instrumentalities directly infringe at least claims 1, 7, and 8 of the '053 patent at least in the manner described in paragraphs 128-139 above. Plaintiff's allegations of infringement are not limited to claims 1, 7, and 8, and additional infringed claims will be identified and disclosed through discovery and infringement contentions.

141.   Defendants have actual notice pursuant to 35 U.S.C. § 287(a) of the '053 patent and the infringement alleged herein at least upon the filing of this Complaint. iCashe has complied with the notice requirement of 35 U.S.C. § 287. Neither iCashe nor any authorized licensee made, offered for sale, or sold within the United States any article embodying the '053 patent claims following issuance of the '053 patent.

142.   Defendants indirectly infringe the '053 patent by actively inducing the direct infringement of others of the '053 patent, in the United States, the State of Texas, and the Eastern District of Texas.

143.   Defendants induce, through affirmative acts, their customers and other third parties, such as retailers and end users, to directly infringe the '053 patent by using, offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the '053 patent.

144.   On information and belief, Defendants actively promote the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every

Exhibit 1
Page 104 of 550

one of Defendants' Accused Instrumentalities sold in the United States, Defendants pursue and obtain approval from U.S. and state regulatory agencies, such as the United States Federal Communications Commission, to allow sales of such Accused Instrumentalities in the United States.

145.    Defendants know that their customers will sell infringing Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States, and Defendants specifically intend their customers to purchase those Accused Instrumentalities from Defendants and sell the Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States. Defendants' direct and indirect purchasers directly infringe the '053 patent by importing such Accused Instrumentalities into the United States, selling such Accused Instrumentalities in the United States, and using such Accused Instrumentalities in the United States.

146.    Defendants further induce others' direct infringement of the '053 patent by providing instruction and direction to end users, such as consumers, about how to use the Accused Instrumentalities such that those end users use the Accused Instrumentalities and directly infringe the '053 patent. Defendants have knowledge that end users will use Accused Instrumentalities in the manner directed by Defendants and specifically intend that end users will perform such uses in the United States. Such infringing uses occur upon normal operation of, e.g., the Samsung Pay functionality, of the Accused Instrumentalities.

147.    Defendants induce others' direct infringement despite actual notice that the

56

Exhibit 1
Page 105 of 550

Accused Instrumentalities infringe the '053 patent. At least as of the date of filing of this Complaint, Defendants know that the induced conduct would constitute infringement— and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

148.    The above-described acts of infringement committed by Defendants have caused injury and damage to iCashe, and will cause additional severe and irreparable injury and damages in the future.

149.    Defendants' acts of infringement as described above are willful, at least as of the date of filing of this Complaint.

150.    iCashe is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 8,403,219

151.    The allegations set forth in paragraphs 1 through 44 of this Complaint are incorporated by reference as though fully set forth herein.

152.    Pursuant to 35 U.S.C. § 282, the '219 patent is presumed valid.

153.    Defendants have directly infringed and continue to infringe one or more claims of the '219 patent in violation of 35 U.S.C. § 271. The infringing products are the Accused Instrumentalities. The Samsung Galaxy S21 5G smartphone, described below,

Exhibit 1
Page 106 of 550

provides a representative example of Samsung's infringement of the '219 patent.

154.    Paragraphs 156-167 describe the manner in which the Accused Instrumentalities infringe claims 1 and 2 of the '219 patent, by way of the exemplary Samsung Galaxy S21 5G smartphone.

155.    On information and belief, the Accused Instrumentalities are in relevant part substantially similar to the exemplary Samsung Galaxy S21 5G smartphone, in particular with regard to the manner in which the Accused Instrumentalities include and utilize NFC- and/or TVMF-based functionality. Paragraphs 156-167 are thus illustrative of the manner in which each of the Accused Instrumentalities infringes.

156.    The Samsung Galaxy S21 5G smartphone contains an apparatus with a compatible interface in a mobile phone. The Samsung Galaxy S21 5G smartphone is a mobile phone. At least certain models of the Samsung Galaxy S21 5G smartphone sold in the United States contain an apparatus including the NXP SN110U chip and associated antenna. Paragraphs 50-52 above are incorporated herein by reference.

157.    The NXP SN110U chip and associated antenna in the Samsung Galaxy S21 5G smartphone includes smartcard circuitry accessible by the mobile phone. The NXP SN110U chip has smartcard circuitry for providing near-field communications functionality, enabling "tap to" functionality including "tap to pay" NFC payment transactions. The NFC functionality of the NXP SN110U chip in the Samsung Galaxy S21 5G smartphone can be used for, e.g., completing Samsung Pay transactions. The smartcard circuitry is thus accessible by the Samsung Galaxy S21 5G smartphone. Paragraphs 53-57 above are incorporated herein by reference.

Exhibit 1
Page 107 of 550

158.    Although certain information regarding the functionality or functional blocks of the SN1xx family devices is not publicly available, NXP has published detailed information about the functionality and functional blocks of other NXP NFC chips, including the PN7150. On information and belief and as detailed below, the PN7150 chip contains certain functional blocks and interfaces that are similar to some of the relevant functional blocks and interfaces of the NXP SN110U chip and surrounding circuitry in the Samsung Galaxy S21 5G smartphone. Paragraphs 58-62 above are incorporated herein by reference.

159.    The smartcard circuitry and associated antenna in the Samsung Galaxy S21 5G smartphone include a point-of-sale interface to communicate with a point-of-sale terminal. The circuitry of the NXP SN110U chip, including the embedded NFC controller and its functional blocks and circuitry, as well as the embedded secure element, has smartcard circuitry that performs various signal amplification and load modulation functions that provide for communication with a point-of-sale terminal.

160.    The smartcard circuitry includes a functional block for amplification. The Samsung Galaxy S21 5G smartphone is able to perform NFC payment transactions with an NFC reader both at a distance and at off-angles from the reader. An NFC payment transaction can be completed by placing the Samsung Galaxy S21 5G smartphone (and specifically its antenna) "within four centimeters" of a point-of-sale terminal, such as an NFC payment terminal. This distance indicates that the Samsung Galaxy S21 5G smartphone contains an amplifier coupled to amplify a signal received from the antenna. Paragraph 65 above is incorporated herein by reference.

Exhibit 1
Page 108 of 550

161.    Additionally, on information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the amplifier and ADC shown and described with respect to the PN7150. The amplifier of the NXP SN110U is arranged between the antenna and the smartcard controller, so as to amplify signals received at the antenna and drive the smartcard controller. Paragraphs 66-69 above are incorporated herein by reference.

162.    The smartcard circuitry also includes a functional block for load modulation. The NXP SN110U was designed for ALM. On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the active load modulation circuitry shown and described above with respect to the PN7150. Paragraphs 70-74 above are incorporated herein by reference.

163.    Further, testing of the Samsung Galaxy S21 5G smartphone confirms that the Samsung Galaxy S21 5G smartphone uses ALM functionality of the NXP SN110U chip for actively transmitting modulated data to an NFC reader. Paragraphs 75-76 above are incorporated herein by reference.

164.    The point-of-sale interface in the Samsung Galaxy S21 5G smartphone receives power from the mobile phone. The Samsung Galaxy S21 5G smartphone contains a battery, which is a power source. Paragraph 105 above is incorporated herein by reference.

165.    The NXP SN110U chip is coupled to the battery such that the point-of-sale interface in the NXP SN110U receives power from the mobile phone. Testing indicates

60

Exhibit 1
Page 109 of 550

that the NFC transmission from the Samsung Galaxy S21 5G smartphone does not depend on coupling with the NFC reader, indicating that the NXP SN110U chip is powered by the mobile device. Paragraphs 75-76 above are incorporated herein by reference.

166.    The point-of-sale interface in the Samsung Galaxy S21 5G smartphone comprises circuitry to produce at least one time-varying magnetic field. The Samsung Galaxy S21 5G smartphone contains an antenna tuned to operate at substantially 13.56 MHz. Paragraphs 63-64 above are incorporated herein by reference.

167.    The antenna produces a time-varying magnetic field, i.e., a 13.56 MHz alternating current. The signal transmitted over the antenna is modulated and driven by circuitry of the NXP SN110U chip. This modulation pattern is generated by actively driving a signal over the TX pin(s). Paragraphs 70-76 above are incorporated herein by reference.

Exhibit 1
Page 110 of 550



**ALM Mode (SINGLE):**

Fig 2. ALM mode SINGLE concept

On the left graph the red 13.56MHz signal shows the voltage at the NFC antenna which is induced by the reader field, the blue curve shows the modulation pattern. This modulation pattern is generated by actively driving 13.56MHz with TX1 or TX2 while the other TX pin (TX2 or TX1) is kept silent.

On the right we can see the modulated reader field.

*PN7150 Antenna Design and Matching Guide* at 5.

Exhibit 1
Page 111 of 550



In this mode the modulation pattern is generated by actively driving 13.56MHz with TX1 and TX2. The modulation depth observed is twice the modulation depth of mode 1.

*PN7150 Antenna Design and Matching Guide* at 5.

168. The Accused Instrumentalities directly infringe at least claims 1 and 2 of the '219 patent at least in the manner described in paragraphs 156-167 above. Plaintiff's allegations of infringement are not limited to claims 1 and 2, and additional infringed claims will be identified and disclosed through discovery and infringement contentions.

169. Defendants have actual notice pursuant to 35 U.S.C. § 287(a) of the '219 patent and the infringement alleged herein at least upon the filing of this Complaint. iCashe has complied with the notice requirement of 35 U.S.C. § 287. Neither iCashe nor any authorized licensee made, offered for sale, or sold within the United States any article embodying the '219 patent claims following issuance of the '219 patent.

170. Defendants indirectly infringe the '219 patent by actively inducing the

Exhibit 1
Page 112 of 550

direct infringement of others of the '219 patent, in the United States, the State of Texas, and the Eastern District of Texas.

171.    Defendants induce, through affirmative acts, their customers and other third parties, such as retailers and end users, to directly infringe the '219 patent by using, offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the '219 patent.

172.    On information and belief, Defendants actively promote the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every one of Defendants' Accused Instrumentalities sold in the United States, Defendants pursue and obtain approval from U.S. and state regulatory agencies, such as the United States Federal Communications Commission, to allow sales of such Accused Instrumentalities in the United States.

173.    Defendants know that their customers will sell infringing Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States, and Defendants specifically intend their customers to purchase those Accused Instrumentalities from Defendants and sell the Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States. Defendants' direct and indirect purchasers directly infringe the '219 patent by importing such Accused Instrumentalities into the United States, selling such Accused Instrumentalities in the United States, and using such Accused Instrumentalities in the United States.

174.    Defendants further induce others' direct infringement of the '219 patent by

Exhibit 1
Page 113 of 550

providing instruction and direction to end users, such as consumers, about how to use the Accused Instrumentalities such that those end users use the Accused Instrumentalities and directly infringe the '219 patent. Defendants have knowledge that end users will use Accused Instrumentalities in the manner directed by Defendants and specifically intend that end users will perform such uses in the United States. Such infringing uses occur upon operation of the Accused Instrumentalities in their normal, intended manner without any specific action of the end user other than turning on the product. That is, Defendants have configured the Accused Instrumentalities in such a way as to induce infringement by end users upon any use of those Accused Instrumentalities.

175. Defendants induce others' direct infringement despite actual notice that the Accused Instrumentalities infringe the '219 patent. At least as of the date of filing of this Complaint, Defendants know that the induced conduct would constitute infringement— and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

176. The above-described acts of infringement committed by Defendants have caused injury and damage to iCashe, and will cause additional severe and irreparable injury and damages in the future.

177. Defendants' acts of infringement as described above are willful, at least as of the date of filing of this Complaint.

Exhibit 1
Page 114 of 550

178.    iCashe is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 9,202,156

179.    The allegations set forth in paragraphs 1 through 44 of this Complaint are incorporated by reference as though fully set forth herein.

180.    Pursuant to 35 U.S.C. § 282, the '156 patent is presumed valid.

181.    Defendants have directly infringed and continue to infringe one or more claims of the '156 patent in violation of 35 U.S.C. § 271. The infringing products are the Accused Instrumentalities. The Samsung Galaxy S20 5G smartphone, described below, provides a representative example of Samsung's infringement of the '156 patent.

182.    Paragraphs 184-195 describe the manner in which the Accused Instrumentalities infringe claim 1 of the '156 patent, by way of the exemplary Samsung Galaxy S20 5G smartphone.

183.    On information and belief, the Accused Instrumentalities are in relevant part substantially similar to the exemplary Samsung Galaxy S20 5G smartphone, in particular with regard to the manner in which the Accused Instrumentalities include and utilize NFC- and/or TVMF-based functionality. Paragraphs 184-195 are thus illustrative of the manner in which each of the Accused Instrumentalities infringes.

184.    The Samsung Galaxy S20 5G smartphone is a mobile device. Specifically, the Samsung Galaxy S20 5G smartphone is a mobile phone.

66

Exhibit 1
Page 115 of 550



https://www.samsung.com/us/mobile/galaxy-s20-5g/buy/galaxy-s20-fe-5g-128gb-unlocked-sm-g781uzbmxaa/ (last accessed June 6, 2024).

185.    The Samsung Galaxy S20 5G smartphone contains circuitry to provide a time-varying magnetic field that mimics a swipe of a magnetic card. For example, the Samsung Galaxy S20 5G smartphone includes an antenna element and a driver chip for performing payment transactions using Magnetic Secure Transmission (MST).



# What is MST (Magnetic Secure Transmission)?

Magnetic Secure Transmission (MST) is a technology that emits a magnetic signal that mimics the magnetic strip on a traditional payment card. MST sends a magnetic signal from your device to the payment terminal's card reader (to emulate swiping a physical card without having to upgrade the terminal's software or hardware). MST technology is accepted at nearly all payment terminals with a card reader. Some payment terminals may require software updates. Simply select a card from Samsung Pay, and transmit the payment information by moving your device within an inch of the payment terminal. Your transaction and payment information will be kept private and secure with the use of tokenization. MST is more secure than using a traditional payment card and is as secure as paying with Near Field Communication (NFC).

https://web.archive.org/web/20181010181540/https://www.samsung.com/us/support/answer/ANS00043865/ (last accessed June 6, 2024).

186. The antenna of the Samsung Galaxy S20 5G smartphone is part of the wireless charging coil component depicted below.

Exhibit 1
Page 117 of 550



Teardown image from Samsung Galaxy S20 5G smartphone (emphasis added).

69

Exhibit 1
Page 118 of 550



Teardown image from Samsung Galaxy S20 5G smartphone (emphasis added).



Teardown image from Samsung Galaxy S20 5G smartphone (emphasis added).

70

Exhibit 1
Page 119 of 550



*FCC ID: A3LSMG981U Part-0-1-SAR-Test Report*, Appendix E: DUT Antenna Diagram & SAR Test Setup Photographs at 3.

187.    Additionally, the Samsung Galaxy S20 5G smartphone includes an MST chip, which provides magnetic secure transmission functionality, enabling MST payment transactions. For example, certain models of the Samsung Galaxy S20 5G smartphone sold in the United States contain a Samsung S2MIS01A MST Driver chip, as shown below.

Exhibit 1
Page 120 of 550



Teardown image from Samsung Galaxy S20 5G smartphone (emphasis added).

188. The antenna and the Samsung S2MIS01A chip operate to produce a time-varying magnetic field that mimics a swipe of a magnetic card.

Exhibit 1
Page 121 of 550

# What is MST (Magnetic Secure Transmission)?



Magnetic Secure Transmission (MST) is a technology that emits a magnetic signal that mimics the magnetic strip on a traditional payment card. MST sends a magnetic signal from your device to the payment terminal's card reader (to emulate swiping a physical card without having to upgrade the terminal's software or hardware). MST technology is accepted at nearly all payment terminals with a card reader. Some payment terminals may require software updates. Simply select a card from Samsung Pay, and transmit the payment information by moving your device within an inch of the payment terminal. Your transaction and payment information will be kept private and secure with the use of tokenization. MST is more secure than using a traditional payment card and is as secure as paying with Near Field Communication (NFC).

https://web.archive.org/web/20181010181540/https://www.samsung.com/us/support/answer/ANS00043865/ (last accessed June 6, 2024).



**FIGURE 1. Overview of MST.**

73

Exhibit 1
Page 122 of 550

Choi, et al., *Eavesdropping of Magnetic Secure Transmission Signals and its Security Implications for a Mobile Payment Protocol*, IEEE Access vol. 6 (2018).

189.    The Samsung Galaxy S20 5G smartphone contains a memory to hold transaction data. As indicated below, the Samsung Galaxy S20 5G smartphone includes internal memory storage as well as random access memory (RAM).



https://www.samsung.com/us/business/support/owners/product/galaxy-s20-5g-unlocked/ (last accessed June 6, 2024).

190.    For example, the Samsung Galaxy S20 5G smartphone includes LPDDR5 memory such as the Samsung K3LK4K40BM-BGCN chip, as shown below.



Teardown image from Samsung Galaxy S20 5G smartphone (emphasis added).

74

Exhibit 1
Page 123 of 550

191.    Additionally, the Samsung Galaxy S20 5G smartphone includes an application processor, i.e., an octa-core processor. For example, certain models of the Samsung Galaxy S20 5G smartphone sold in the United States contain a Qualcomm SM8250 Octa-Core Snapdragon 865 application processor. *See* https://www.qualcomm.com/snapdragon/device-finder/samsung-galaxy-s20-5g. In addition to the discrete LPDDR5 memory chip, the Snapdragon 865 processor necessarily contains on-chip memory stores.

| Processor | |
|---|---|
| **CPU Type** | **CPU Speed** |
| Octa-Core | 2.8GHz,2.4GHz,1.8GHz |

https://www.samsung.com/us/business/support/owners/product/galaxy-s20-5g-unlocked/ (last accessed June 6, 2024).

192.    When the Samsung Pay application is used to complete a payment transaction via MST transmission, a one-time token associated with the transaction is transmitted by the Samsung Galaxy S20 5G smartphone to a POS device. The Samsung Galaxy S20 5G smartphone therefore necessarily stores this token (transaction data) in memory to send the transmission.

> With the Samsung Pay system, the card network returns card data that's been tokenized using a secure channel to the device, and hardware-based keys within the device encrypt and authenticate its data. Only encrypted data is returned to the Samsung Pay app to avoid security and privacy risks. The security and integrity of the tokenized data is protected because it can only be accessed in the Trusted Execution Environment (TEE) of the device. When the tokenized card details are sent to the TEE, an authentication code is generated for that particular transaction. With Samsung Pay, tokenization is available for securing both near field communication and magnetic stripe payments.

https://insights.samsung.com/2016/02/08/advancing-mobile-payment-security-with-tokenization/ (last accessed June 6, 2024) (emphasis added).

Exhibit 1
Page 124 of 550

193.    The Samsung Galaxy S20 5G smartphone contains a processor coupled to the circuitry to cause the circuitry to produce a time-varying magnetic field that represents the transaction data. As described above, the Samsung Galaxy S20 5G smartphone includes an application processor, i.e., an octa-core processor, such as the Qualcomm SM8250 Octa-Core Snapdragon 865 application processor. The application processor and LPDDR5 memory are configured in a stacked arrangement with the LPDDR5 memory attached to the top surface of the application processor. In the image below, the location of the processor (beneath the memory chip) is designated by a dashed yellow line.



Teardown image from Samsung Galaxy S20 5G smartphone (emphasis added).

194.    The processor is coupled to the Samsung S2MIS01A MST Driver chip and the MST antenna element via traces on the main circuit board. Additionally, the processor may include functional blocks or circuitry that may be contained within the

Exhibit 1
Page 125 of 550

MST Driver chip.



Teardown image from Samsung Galaxy S20 5G smartphone.

195.    The processor of the Samsung Galaxy S20 5G smartphone operates in conjunction with the antenna and the Samsung S2MIS01A MST Driver chip to produce a time-varying magnetic field that represents the transaction data. For example, when the Samsung Pay application is used to complete a payment transaction via MST transmission, a time-varying magnetic field is generated to transmit a one-time token associated with a transaction to a POS device.

Exhibit 1
Page 126 of 550



# What is MST (Magnetic Secure Transmission)?

Magnetic Secure Transmission (MST) is a technology that emits a magnetic signal that mimics the magnetic strip on a traditional payment card. MST sends a magnetic signal from your device to the payment terminal's card reader (to emulate swiping a physical card without having to upgrade the terminal's software or hardware). MST technology is accepted at nearly all payment terminals with a card reader. Some payment terminals may require software updates. Simply select a card from Samsung Pay, and transmit the payment information by moving your device within an inch of the payment terminal. Your transaction and payment information will be kept private and secure with the use of tokenization. MST is more secure than using a traditional payment card and is as secure as paying with Near Field Communication (NFC).

https://web.archive.org/web/20181010181540/https://www.samsung.com/us/support/answer/ANS00043865/ (last accessed June 6, 2024).

With the Samsung Pay system, the card network returns card data that's been tokenized using a secure channel to the device, and hardware-based keys within the device encrypt and authenticate its data. Only encrypted data is returned to the Samsung Pay app to avoid security and privacy risks. The security and integrity of the tokenized data is protected because it can only be accessed in the Trusted Execution Environment (TEE) of the device. When the tokenized card details are sent to the TEE, an authentication code is generated for that particular transaction. With Samsung Pay, tokenization is available for securing both near field communication and magnetic stripe payments.

https://insights.samsung.com/2016/02/08/advancing-mobile-payment-security-with-tokenization/ (last accessed June 6, 2024) (emphasis added).

196.    The Accused Instrumentalities directly infringe at least claim 1 of the '156 patent at least in the manner described in paragraphs 184-195 above. Plaintiff's allegations of infringement are not limited to claim 1, and additional infringed claims will be identified and disclosed through discovery and infringement contentions.

197.    Defendants have actual notice pursuant to 35 U.S.C. § 287(a) of the '156 patent and the infringement alleged herein at least upon the filing of this Complaint.

Exhibit 1
Page 127 of 550

iCashe has complied with the notice requirement of 35 U.S.C. § 287. Neither iCashe nor any authorized licensee made, offered for sale, or sold within the United States any article embodying the '156 patent claims following issuance of the '156 patent.

198.    Defendants indirectly infringe the '156 patent by actively inducing the direct infringement of others of the '156 patent, in the United States, the State of Texas, and the Eastern District of Texas.

199.    Defendants induce, through affirmative acts, their customers and other third parties, such as retailers and end users, to directly infringe the '156 patent by using, offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the '156 patent.

200.    On information and belief, Defendants actively promote the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every one of Defendants' Accused Instrumentalities sold in the United States, Defendants pursue and obtain approval from U.S. and state regulatory agencies, such as the United States Federal Communications Commission, to allow sales of such Accused Instrumentalities in the United States.

201.    Defendants know that their customers will sell infringing Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States, and Defendants specifically intend their customers to purchase those Accused Instrumentalities from Defendants and sell the Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States. Defendants' direct and indirect purchasers directly infringe the '156 patent by importing

79

Exhibit 1
Page 128 of 550

such Accused Instrumentalities into the United States, selling such Accused Instrumentalities in the United States, and using such Accused Instrumentalities in the United States.

202.    Defendants further induce others' direct infringement of the '156 patent by providing instruction and direction to end users, such as consumers, about how to use the Accused Instrumentalities such that those end users use the Accused Instrumentalities and directly infringe the '156 patent. Defendants have knowledge that end users will use Accused Instrumentalities in the manner directed by Defendants and specifically intend that end users will perform such uses in the United States. Such infringing uses occur upon operation of the Accused Instrumentalities in their normal, intended manner without any specific action of the end user other than turning on the product. That is, Defendants have configured the Accused Instrumentalities in such a way as to induce infringement by end users upon any use of those Accused Instrumentalities.

203.    Defendants induce others' direct infringement despite actual notice that the Accused Instrumentalities infringe the '156 patent. At least as of the date of filing of this Complaint, Defendants know that the induced conduct would constitute infringement— and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

204.    The above-described acts of infringement committed by Defendants have

Exhibit 1
Page 129 of 550

caused injury and damage to iCashe, and will cause additional severe and irreparable injury and damages in the future.

205.    Defendants' acts of infringement as described above are willful, at least as of the date of filing of this Complaint.

206.    iCashe is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty.

## COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 9,208,423

207.    The allegations set forth in paragraphs 1 through 44 of this Complaint are incorporated by reference as though fully set forth herein.

208.    Pursuant to 35 U.S.C. § 282, the '423 patent is presumed valid.

209.    Defendants have directly infringed and continue to infringe one or more claims of the '423 patent in violation of 35 U.S.C. § 271. The infringing products are the Accused Instrumentalities. The Samsung Galaxy S20 5G smartphone, described below, provides a representative example of Samsung's infringement of the '423 patent.

210.    Paragraphs 212-216 describe the manner in which the Accused Instrumentalities infringe claim 1 of the '423 patent, by way of the exemplary Samsung Galaxy S20 5G smartphone.

211.    On information and belief, the Accused Instrumentalities are in relevant part substantially similar to the exemplary Samsung Galaxy S20 5G smartphone, in particular with regard to the manner in which the Accused Instrumentalities include and utilize NFC- and/or TVMF-based functionality. Paragraphs 212-216 are thus illustrative

Exhibit 1
Page 130 of 550

of the manner in which each of the Accused Instrumentalities infringes.

212. The Samsung Galaxy S20 5G smartphone is a mobile phone. Paragraph 184 above is incorporated herein by reference.

213. The Samsung Galaxy S20 5G smartphone comprises circuitry to produce a time-varying magnetic field that mimics the swipe of a magnetic card. For example, the Samsung Galaxy S20 5G smartphone includes an antenna element and a driver chip, such as a Samsung S2MIS01A MST Driver chip, for performing payment transactions using MST transmission. The antenna and the Samsung S2MIS01A chip operate to produce a time-varying magnetic field that mimics a swipe of a magnetic card. Paragraphs 185-188 above are incorporated herein by reference.

214. The Samsung Galaxy S20 5G smartphone contains a processor coupled to the circuitry to cause the circuitry to produce a time-varying magnetic field that represents a single transaction account number. The Samsung Galaxy S20 5G smartphone includes an application processor, such as the Qualcomm SM8250 Octa-Core Snapdragon 865 application processor. Paragraphs 191-194 above are incorporated herein by reference.

215. The processor operates in conjunction with the antenna and the Samsung S2MIS01A MST Driver chip to produce a time-varying magnetic field that represents a single transaction account number. Paragraph 195 above is incorporated herein by reference.

216. For example, when the Samsung Pay application is used to complete a payment transaction via MST transmission, a time-varying magnetic field is generated to

Exhibit 1
Page 131 of 550

transmit a one-time token associated with the transaction to a POS device. Paragraphs 189-192 above are incorporated herein by reference.

> With the Samsung Pay system, the card network returns card data that's been tokenized using a secure channel to the device, and hardware-based keys within the device encrypt and authenticate its data. Only encrypted data is returned to the Samsung Pay app to avoid security and privacy risks. The security and integrity of the tokenized data is protected because it can only be accessed in the Trusted Execution Environment (TEE) of the device. When the tokenized card details are sent to the TEE, an authentication code is generated for that particular transaction. With Samsung Pay, tokenization is available for securing both near field communication and magnetic stripe payments.

https://insights.samsung.com/2016/02/08/advancing-mobile-payment-security-with-tokenization/ (last accessed June 6, 2024) (emphasis added).

217.    The Accused Instrumentalities directly infringe at least claim 1 of the '423 patent at least in the manner described in paragraphs 212-216 above. Plaintiff's allegations of infringement are not limited to claim 1, and additional infringed claims will be identified and disclosed through discovery and infringement contentions.

218.    Defendants have actual notice pursuant to 35 U.S.C. § 287(a) of the '423 patent and the infringement alleged herein at least upon the filing of this Complaint. iCashe has complied with the notice requirement of 35 U.S.C. § 287. Neither iCashe nor any authorized licensee made, offered for sale, or sold within the United States any article embodying the '423 patent claims following issuance of the '423 patent.

219.    Defendants indirectly infringe the '423 patent by actively inducing the direct infringement of others of the '423 patent, in the United States, the State of Texas, and the Eastern District of Texas.

220.    Defendants induce, through affirmative acts, their customers and other third parties, such as retailers and end users, to directly infringe the '423 patent by using,

83

Exhibit 1
Page 132 of 550

offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the '423 patent.

221. On information and belief, Defendants actively promote the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every one of Defendants' Accused Instrumentalities sold in the United States, Defendants pursue and obtain approval from U.S. and state regulatory agencies, such as the United States Federal Communications Commission, to allow sales of such Accused Instrumentalities in the United States.

222. Defendants know that their customers will sell infringing Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States, and Defendants specifically intend their customers to purchase those Accused Instrumentalities from Defendants and sell the Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States. Defendants' direct and indirect purchasers directly infringe the '423 patent by importing such Accused Instrumentalities into the United States, selling such Accused Instrumentalities in the United States, and using such Accused Instrumentalities in the United States.

223. Defendants further induce others' direct infringement of the '423 patent by providing instruction and direction to end users, such as consumers, about how to use the Accused Instrumentalities such that those end users use the Accused Instrumentalities and directly infringe the '423 patent. Defendants have knowledge that end users will use Accused Instrumentalities in the manner directed by Defendants and specifically intend

Exhibit 1
Page 133 of 550

that end users will perform such uses in the United States. Such infringing uses occur upon operation of the Accused Instrumentalities in their normal, intended manner without any specific action of the end user other than turning on the product. That is, Defendants have configured the Accused Instrumentalities in such a way as to induce infringement by end users upon any use of those Accused Instrumentalities.

224. Defendants induce others' direct infringement despite actual notice that the Accused Instrumentalities infringe the '423 patent. At least as of the date of filing of this Complaint, Defendants know that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

225. The above-described acts of infringement committed by Defendants have caused injury and damage to iCashe, and will cause additional severe and irreparable injury and damages in the future.

226. Defendants' acts of infringement as described above are willful, at least as of the date of filing of this Complaint.

227. iCashe is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty.

85

Exhibit 1
Page 134 of 550

## COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 11,270,174

228.    The allegations set forth in paragraphs 1 through 44 of this Complaint are incorporated by reference as though fully set forth herein.

229.    Pursuant to 35 U.S.C. § 282, the '174 patent is presumed valid.

230.    Defendants have directly infringed and continue to infringe one or more claims of the '174 patent in violation of 35 U.S.C. § 271. The infringing products are the Accused Instrumentalities. The Samsung Galaxy S21 5G smartphone, described below, provides a representative example of Samsung's infringement of the '174 patent.

231.    Paragraphs 233-250 describe the manner in which the Accused Instrumentalities infringe claim 1 of the '174 patent, by way of the exemplary Samsung Galaxy S21 5G smartphone.

232.    On information and belief, the Accused Instrumentalities are in relevant part substantially similar to the exemplary Samsung Galaxy S21 5G smartphone, in particular with regard to the manner in which the Accused Instrumentalities include and utilize NFC- and/or TVMF-based functionality. Paragraphs 233-250 are thus illustrative of the manner in which each of the Accused Instrumentalities infringes.

233.    The Samsung Galaxy S21 5G smartphone is a mobile phone. Paragraph 50 above is incorporated herein by reference.

234.    The Samsung Galaxy S21 5G smartphone contains a memory to hold transaction data for use in a plurality of transactions. In particular, the Samsung Galaxy S21 5G smartphone includes an internal memory storage as well as random access memory (RAM).

Exhibit 1
Page 135 of 550

| Memory | | |
| --- | --- | --- |
| Internal Memory ❓ | Available Memory ❓ | RAM_Size (GB) |
| 128GB, 256GB | 101.2GB, 219.5GB | 8GB |

https://www.samsung.com/us/business/support/owners/product/galaxy-s21-5g-unlocked/ (last accessed June 6, 2024).

235.    For example, the Samsung Galaxy S21 5G smartphone includes LPDDR5 memory such as the Samsung K3LK7K70BM-BGCP chip, shown below.



Teardown image from Samsung Galaxy S21 5G smartphone (emphasis added).

236.    Additionally, the Samsung Galaxy S21 5G smartphone includes an application processor, such as an octa-core processor, such as a Qualcomm SM8350 Octa-Core Snapdragon 888 application processor. *See* https://www.qualcomm.com/snapdragon/device-finder/samsung-galaxy-s21-5g. In addition to the discrete LPDDR5 memory chip, the Snapdragon 888 processor necessarily contains on-chip memory stores (e.g., cache, register banks, etc.).

Exhibit 1
Page 136 of 550

| Processor | |
|---|---|
| **CPU Type** | **CPU Speed** |
| Octa-Core | 2.84GHz,2.4GHz,1.8GHz |

https://www.samsung.com/us/business/support/owners/product/galaxy-s21-5g-unlocked/ (last accessed June 6, 2024).

237. The Samsung Pay application stores an encrypted version of a card number that is sent to POS devices during Samsung Pay transactions. The Samsung Galaxy S21 5G smartphone therefore necessarily stores this encrypted data (transaction data) in memory to send the transmission. Samsung Pay may be used to complete a plurality of transactions.

**Is my credit or debit card number actually stored on my device?**

No. The card information is encrypted and sent to the Samsung Pay server for processing with the payment card network's (i.e., Visa, MasterCard, or American Express) tokenization server. After processing, a token is assigned to your device, and this token is used in place of the card number. When you process a payment, this token along with other transactional information is sent to the payment terminal. Your card number is not part of this data. The terminal processing the payment does not receive your card number as part of the transaction.

**Is my credit or debit card number actually stored on the Samsung Pay server?**

No. The card number is encrypted and passed to the payment card network's (i.e., Visa, MasterCard, or American Express) tokenization server. After processing, a token is assigned to your device, and this token is used in place of the card number. This token information is stored on the Samsung Pay server and a copy is stored on your device. Your card number is not kept on the Samsung Pay server.

https://www.samsung.com/us/support/answer/ANS00078533/ (last accessed June 6, 2024) (emphasis added).

88

Exhibit 1
Page 137 of 550

*Galaxy S21 User Manual* at 118.

238.    The Samsung Galaxy S21 5G smartphone contains a current carrying conductor capable of producing a time-varying magnetic field that represents the transaction data in the plurality of transactions. The Samsung Galaxy S21 5G smartphone contains an antenna, i.e., a current carrying conductor, used to transmit and receive NFC information and transaction sequences. The antenna is tuned to operate at 13.56 MHz. Paragraphs 63-64 above are incorporated herein by reference.

239.    Additionally, at least certain models of the Samsung Galaxy S21 5G smartphone sold in the United States contain the NXP SN110U. The NXP SN110U chip provides near-field communications functionality, enabling NFC payment

Exhibit 1
Page 138 of 550

transactions, such as for completing Samsung Pay transactions. Paragraphs 51-57 above are incorporated herein by reference.

240.    Although certain information regarding the functionality or functional blocks of the SN1xx family devices is not publicly available, NXP has published detailed information about the functionality and functional blocks of other NXP NFC chips, including the PN7150. On information and belief and as detailed below, the PN7150 chip contains certain functional blocks and interfaces that are similar to some of the relevant functional blocks and interfaces of the NXP SN110U chip and surrounding circuitry in the Samsung Galaxy S21 5G smartphone. Paragraphs 58-62 above are incorporated herein by reference.

241.    The antenna of the Samsung Galaxy S21 5G smartphone operates in conjunction with the NXP SN110U chip to produce a time-varying magnetic field. The NFC antenna includes a current-carrying conductor that produces a time-varying magnetic field, by producing a 13.56 MHz varying magnetic signal (modulation). The signal transmitted over the antenna is modulated and driven by circuitry of the NXP SN110U chip. The time-varying magnetic field produced by the antenna represents the transaction data in the plurality of transactions. Paragraphs 70-76 above are incorporated herein by reference.

Exhibit 1
Page 139 of 550



**ALM Mode (SINGLE):**

**Fig 2.   ALM mode SINGLE concept**

On the left graph the red 13.56MHz signal shows the voltage at the NFC antenna which is induced by the reader field, the blue curve shows the modulation pattern. This modulation pattern is generated by actively driving 13.56MHz with TX1 or TX2 while the other TX pin (TX2 or TX1) is kept silent.

On the right we can see the modulated reader field.

*PN7150 Antenna Design and Matching Guide* at 5.

Exhibit 1
Page 140 of 550



*PN7150 Antenna Design and Matching Guide* at 5.

242. The Samsung Galaxy S21 5G smartphone contains a network interface for connecting the mobile phone to a network, wherein one or more parts of the transaction data are downloadable to the mobile phone via the network. For example, the Samsung Galaxy S21 5G smartphone has an interface for Wi-Fi network connectivity.



https://www.samsung.com/us/business/support/owners/product/galaxy-s21-5g-unlocked/ (last accessed June 6, 2024).

243. The Samsung Galaxy S21 5G smartphone also includes an interface for cellular network connectivity.

| Network | | |
| --- | --- | --- |
| **2G GSM** | **2G CDMA** | **3G UMTS** |
| GSM850,GSM900,DCS1800,PCS1900 | CDMA800,USPCS1900 | B1(2100),B2(1900),B4(AWS),B5(850),B8(900) |
| **3G CDMA** | **4G FDD LTE** | **4G TDD LTE** |
| BC0(800),BC1(1900),BC10(800) | B1(2100),B2(1900),B3(1800),B4(AWS),B5(850),B7(2600),B8(900),B12(700),B13(700),B14(700),B18(800),B19(800),B20(800),B25(1900),B26(850),B28(700),B30(2300),B66(AWS-3),B71(600) | B38(2600),B39(1900),B40(2300),B41(2500),B46(5200),B48(3600) |

https://www.samsung.com/us/business/support/owners/product/galaxy-s21-5g-unlocked/ (last accessed June 6, 2024).

244. Through this network connectivity, one or more parts of the transaction data are downloadable to the mobile phone via the network. For example, the Samsung Pay Application or Samsung Wallet Application may be used to download transaction data, such as card information, to the mobile phone via the network. An example of a request for updated card information is shown below.

Exhibit 1
Page 142 of 550



https://developer.samsung.com/wallet/api/server-interaction.html (last accessed June 6, 2024).

245.    The Samsung Galaxy S21 5G smartphone contains a driver to excite the current carrying conductor. The NXP SN110U chip, which was designed for ALM, contains a driver for driving the antenna. On information and belief, the NXP SN110U chip contains functional blocks and circuitry within the embedded NFC controller that correspond to the active load modulation circuitry shown and described with respect to the PN7150. Paragraphs 70-74 above are incorporated herein by reference.

246.    Further, testing of the Samsung Galaxy S21 5G smartphone confirms that

Exhibit 1
Page 143 of 550

the Samsung Galaxy S21 5G smartphone uses ALM functionality of the NXP SN110U chip for actively transmitting modulated data to an NFC reader. Paragraphs 75-76 above are incorporated herein by reference.

247.    The Samsung Galaxy S21 5G smartphone contains a processor coupled to control the driver. The NXP SN110U chip is and/or contains a processor coupled to control the driver. Specifically, on information and belief, the NXP SN110U chip contains circuitry and functional blocks within the embedded NFC controller that correspond to certain circuitry and functional blocks within the CIU of the PN7150. The CIU includes a transmitter control block, TxCtrl, coupled to drive the modulated signal.



Fig 3. PN7150 block diagram

*PN7150 Data Sheet* at 10 (emphasis added).

Exhibit 1
Page 144 of 550

248. Further, the NXP SN110U includes a microcontroller, i.e., a processor, which may include the embedded secure element, and which controls the SN110U chip, as shown below with respect to the PN7150 (ARM Cortex M0). The microcontroller is also a processor coupled to control the driver.



Fig 3. PN7150 block diagram

*PN7150 Data Sheet* at 10 (emphasis added).

249. Additionally, the Samsung Galaxy S21 5G smartphone includes an application processor, i.e., an octa-core processor such as a Qualcomm SM8350 Octa-Core Snapdragon 888 application processor. In addition to the discrete LPDDR5 memory chip, the Snapdragon 888 processor necessarily contains on-chip memory stores (e.g., cache, register banks, etc.).

96

Exhibit 1
Page 145 of 550

| Processor | |
|---|---|
| **CPU Type** | **CPU Speed** |
| Octa-Core | 2.84GHz,2.4GHz,1.8GHz |

https://www.samsung.com/us/business/support/owners/product/galaxy-s21-5g-unlocked/ (last accessed June 6, 2024).

250.    The application processor of the Samsung Galaxy S21 5G smartphone is also a processor coupled to control the driver. The application processor is necessarily coupled to the NXP SN110U chip via traces on the main circuit board to the SN110U's UART/I2C and/or SPI interfaces.

251.    The Accused Instrumentalities directly infringe at least claim 1 of the '174 patent at least in the manner described in paragraphs 233-250 above. Plaintiff's allegations of infringement are not limited to claim 1, and additional infringed claims will be identified and disclosed through discovery and infringement contentions.

252.    Defendants have actual notice pursuant to 35 U.S.C. § 287(a) of the '174 patent and the infringement alleged herein at least upon the filing of this Complaint. iCashe has complied with the notice requirement of 35 U.S.C. § 287. Neither iCashe nor any authorized licensee made, offered for sale, or sold within the United States any article embodying the '174 patent claims following issuance of the '174 patent.

253.    Defendants indirectly infringe the '174 patent by actively inducing the direct infringement of others of the '174 patent, in the United States, the State of Texas, and the Eastern District of Texas.

254.    Defendants induce, through affirmative acts, their customers and other third parties, such as retailers and end users, to directly infringe the '174 patent by using,

97

Exhibit 1
Page 146 of 550

offering to sell, selling within the United States, and/or importing into the United States those Accused Instrumentalities, which infringe the '174 patent.

255.  On information and belief, Defendants actively promote the Accused Instrumentalities for the U.S. market. For example, on information and belief, for every one of Defendants' Accused Instrumentalities sold in the United States, Defendants pursue and obtain approval from U.S. and state regulatory agencies, such as the United States Federal Communications Commission, to allow sales of such Accused Instrumentalities in the United States.

256.  Defendants know that their customers will sell infringing Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States, and Defendants specifically intend their customers to purchase those Accused Instrumentalities from Defendants and sell the Accused Instrumentalities in the United States or cause Accused Instrumentalities to be sold in the United States. Defendants' direct and indirect purchasers directly infringe the '174 patent by importing such Accused Instrumentalities into the United States, selling such Accused Instrumentalities in the United States, and using such Accused Instrumentalities in the United States.

257.  Defendants further induce others' direct infringement of the '174 patent by providing instruction and direction to end users, such as consumers, about how to use the Accused Instrumentalities such that those end users use the Accused Instrumentalities and directly infringe the '174 patent. Defendants have knowledge that end users will use Accused Instrumentalities in the manner directed by Defendants and specifically intend

Exhibit 1
Page 147 of 550

that end users will perform such uses in the United States. Such infringing uses occur upon operation of the Accused Instrumentalities in their normal, intended manner without any specific action of the end user other than turning on the product. That is, Defendants have configured the Accused Instrumentalities in such a way as to induce infringement by end users upon any use of those Accused Instrumentalities.

258.    Defendants induce others' direct infringement despite actual notice that the Accused Instrumentalities infringe the '174 patent. At least as of the date of filing of this Complaint, Defendants know that the induced conduct would constitute infringement— and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

259.    The above-described acts of infringement committed by Defendants have caused injury and damage to iCashe, and will cause additional severe and irreparable injury and damages in the future.

260.    Defendants' acts of infringement as described above are willful, at least as of the date of filing of this Complaint.

261.    iCashe is entitled to recover damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial, but in no event less than a reasonable royalty.

Exhibit 1
Page 148 of 550

## JURY TRIAL DEMANDED

iCashe, Inc., hereby demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff iCashe respectfully requests that this Court:

A.      Enter judgment that each of the Defendants has infringed one or more claims of each of the iCashe Patents and continues to infringe those claims, and that such infringement is willful;

B.      Enter an order, pursuant to 35 U.S.C. § 284, awarding to Plaintiff iCashe monetary relief in an amount adequate to compensate for Defendants' infringement of the iCashe Patents, in an amount to be determined at trial, but not less than a reasonable royalty, as well as pre- and post-judgment interest and costs and enhanced damages for Defendants' willful infringement of the iCashe Patents;

C.      Enter an order that Defendants pay to Plaintiff iCashe ongoing royalties in an amount to be determined for any infringement occurring after the date that judgment is entered;

D.      Enter an order, pursuant to 35 U.S.C. § 285, declaring this to be an exceptional case and thereby awarding to Plaintiff iCashe its reasonable attorneys' fees; and

E.      Enter an order awarding to Plaintiff iCashe such other and further relief, whether at law or in equity, that this Court seems just, equitable, and proper.

Exhibit 1
Page 149 of 550

Dated: June 6, 2024                   Respectfully submitted,

By: */s/ Aaron R. Fahrenkrog w/permission*
*Andrea L. Fair*
Aaron R. Fahrenkrog
LEAD ATTORNEY
MN Bar No. 0386673 (admitted in this District)
Email: afahrenkrog@robinskaplan.com
Logan J. Drew
MN Bar No. 0389449 (admitted in this District)
Email: ldrew@robinskaplan.com
Emily J. Tremblay
MN Bar No. 0395003 (to appear *pro hac vice*)
Email: etremblay@robinskaplan.com
Jessica L. Gutierrez
MN Bar No. 0396359 (to appear *pro hac vice*)
Email: jgutierrez@robinskaplan.com
William R. Jones
MN Bar No. 0402360 (to appear *pro hac vice*)
Email: wjones@robinskaplan.com
**ROBINS KAPLAN LLP**
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181

Of Counsel:
Andrea L. Fair
Texas State Bar No. 24078488
E-mail: andrea@wsfirm.com
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)

*Attorneys for Plaintiff iCashe, Inc.*

Exhibit 1
Page 150 of 550

# EXHIBIT 1

Exhibit 1
Page 151 of 550

US009122965B2

(12) **United States Patent**
Narendra et al.

(10) Patent No.:     **US 9,122,965 B2**
(45) Date of Patent:     **\*Sep. 1, 2015**

(54) **13.56 MHZ ENHANCEMENT CIRCUIT FOR SMARTCARD CONTROLLER**

(71) Applicant: **Tyfone, Inc.**, Portland, OR (US)

(72) Inventors: **Siva G. Narendra**, Portland, OR (US); **Saurav Chakraborty**, West Bengal (IN); **Prabhakar Tadepalli**, Bangalore (IN)

(73) Assignee: **Tyfone, INC.**, Portland, OR (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/517,495**

(22) Filed: **Oct. 17, 2014**

(65) **Prior Publication Data**

US 2015/0034727 A1     Feb. 5, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/460,647, filed on Aug. 15, 2014, now Pat. No. 8,937,549, which is a continuation of application No. 13/871,849, filed on Apr. 26, 2013, now Pat. No. 8,866,614, which is a continuation of application No. 13/038,341, filed on Mar. 1, 2011, now Pat. No. 8,451,122, which is a continuation-in-part of application No. 12/188,346, filed on Aug. 8, 2008, now Pat. No. 7,961,101.

(51) **Int. Cl.**
G08B 13/14     (2006.01)
G06K 19/07     (2006.01)
G06K 19/077     (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *G06K 19/0727* (2013.01); *G06K 19/0701* (2013.01); *G06K 19/073* (2013.01); *G06K*

*19/0723* (2013.01); *G06K 19/0726* (2013.01); *G06K 19/07732* (2013.01); *G06K 19/07749* (2013.01); *G06K 19/07769* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... G06K 19/0723; G06K 19/0727; G06K 19/07732; G06K 19/07749
USPC ........ 340/572.1, 572.8, 10.1, 10.51; 235/492, 235/379, 380, 493; 705/1; 710/100, 301
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,701,601 A     10/1987     Francini et al.
4,786,791 A     11/1988     Hodama
(Continued)

FOREIGN PATENT DOCUMENTS

DE     3632294 A1     4/1988
DE     10054890 A1     4/2002
(Continued)

OTHER PUBLICATIONS

European search report and search opinion App # Pat. # 12752195.3-1811 2681694 PCT US2012027128, 6 pages dated Feb. 11, 2014.
(Continued)

*Primary Examiner* — Toan N Pham
(74) *Attorney, Agent, or Firm* — Dana B. LeMoine

(57) **ABSTRACT**

An RFID card includes a smartcard controller that receives power from a host device. The RFID card also includes a small inductive device capable of inductive coupling with an RFID reader. The small inductive device is small enough to fit in the form factor of a memory card or SIM card. Enhancement circuits enhance the usable read and write distance of the RFID card.

**20 Claims, 30 Drawing Sheets**



Exhibit 1
Page 152 of 550

## US 9,122,965 B2

Page 2

(51) **Int. Cl.**
| | | |
|---|---|---|
| *G06K 19/073* | (2006.01) | |
| *G06Q 20/20* | (2012.01) | |
| *H04B 1/3816* | (2015.01) | |
| *H04B 5/00* | (2006.01) | |

(52) **U.S. Cl.**
CPC ........... *G06Q20/204* (2013.01); *H04B 1/3816* (2013.01); *H04B 5/0025* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,791,283 A | 12 1988 | Burkhardt | |
| 4,864,109 A | 9 1989 | Minematsu et al. | |
| 5,212,478 A | 5 1993 | Moseley | |
| 5,378,887 A | 1 1995 | Kobayashi | |
| 5,537,584 A | 7 1996 | Miyai et al. | |
| 5,574,273 A | 11 1996 | Nakagawa et al. | |
| 5,585,787 A | 12 1996 | Wallerstein | |
| 5,629,981 A | 5 1997 | Nerlikar | |
| 5,700,037 A | 12 1997 | Keller | |
| 5,710,421 A | 1 1998 | Kokubu | |
| 5,834,756 A | 11 1998 | Gutman et al. | |
| 5,909,491 A | 6 1999 | Luo | |
| 5,940,510 A | 8 1999 | Curry et al. | |
| 5,943,624 A * | 8 1999 | Fox et al. ................. | 455 556.1 |
| 5,949,880 A | 9 1999 | Curry et al. | |
| 5,952,641 A | 9 1999 | Korshun | |
| 5,955,961 A | 9 1999 | Wallerstein | |
| 6,016,476 A | 1 2000 | Maes et al. | |
| 6,021,944 A | 2 2000 | Arakaki | |
| 6,039,260 A | 3 2000 | Eisele | |
| 6,045,043 A | 4 2000 | Bashan et al. | |
| 6,068,184 A | 5 2000 | Barnett | |
| 6,105,013 A | 8 2000 | Curry et al. | |
| 6,182,891 B1 | 2 2001 | Furuhashi et al. | |
| 6,189,786 B1 | 2 2001 | Itou et al. | |
| 6,206,293 B1 | 3 2001 | Gutman et al. | |
| 6,219,439 B1 | 4 2001 | Burger | |
| 6,223,954 B1 | 5 2001 | Carow | |
| 6,223,984 B1 | 5 2001 | Renner et al. | |
| 6,237,095 B1 | 5 2001 | Curry et al. | |
| 6,250,557 B1 | 6 2001 | Forslund et al. | |
| 6,315,195 B1 | 11 2001 | Ramachandran | |
| 6,402,029 B1 | 6 2002 | Gangi | |
| 6,481,623 B1 | 11 2002 | Grant et al. | |
| 6,568,600 B1 | 5 2003 | Carpier et al. | |
| 6,588,660 B1 | 7 2003 | Buescher et al. | |
| 6,592,044 B1 | 7 2003 | Wong et al. | |
| 6,594,759 B1 | 7 2003 | Wang | |
| 6,598,031 B1 | 7 2003 | Ice | |
| 6,606,025 B1 | 8 2003 | Staufer et al. | |
| 6,607,127 B2 | 8 2003 | Wong | |
| 6,609,654 B1 | 8 2003 | Anderson et al. | |
| 6,631,849 B2 | 10 2003 | Blossom | |
| 6,636,833 B1 | 10 2003 | Flitcroft et al. | |
| 6,669,487 B1 | 12 2003 | Ishihara et al. | |
| 6,705,520 B1 | 3 2004 | Pitroda et al. | |
| 6,712,277 B2 | 3 2004 | Spencer | |
| 6,715,679 B1 | 4 2004 | Infosino | |
| 6,721,196 B1 | 4 2004 | Grassl | |
| 6,747,547 B2 | 6 2004 | Benson | |
| 6,764,005 B2 | 7 2004 | Cooper | |
| 6,769,607 B1 | 8 2004 | Pitroda et al. | |
| 6,805,288 B2 | 10 2004 | Routhenstein et al. | |
| 6,811,082 B2 | 11 2004 | Wong | |
| 6,836,843 B2 | 12 2004 | Seroussi et al. | |
| 6,857,566 B2 | 2 2005 | Wankmueller | |
| 6,882,900 B1 | 4 2005 | Terranova | |
| 6,883,718 B1 | 4 2005 | Le et al. | |
| 6,905,072 B2 | 6 2005 | Ramachandran | |
| 6,907,123 B1 | 6 2005 | Schier | |
| 6,908,030 B2 | 6 2005 | Rajasekaran et al. | |
| 6,925,568 B1 | 8 2005 | Heinonen | |
| 6,937,526 B2 | 8 2005 | Furukawa | |
| 6,952,788 B2 | 10 2005 | Rommelmann et al. | |
| 6,995,651 B2 | 2 2006 | Amtmann et al. | |
| 7,059,520 B1 | 6 2006 | Shtesl | |
| 7,088,246 B2 | 8 2006 | Fukuoka | |
| 7,110,792 B2 * | 9 2006 | Rosenberg ................. 455 558 | |
| 7,185,146 B2 | 2 2007 | Masuyama et al. | |
| 7,221,473 B2 | 5 2007 | Jeran et al. | |
| 7,281,101 B2 | 10 2007 | Mizushima et al. | |
| 7,295,790 B2 | 11 2007 | Morimoto et al. | |
| 7,333,062 B2 | 2 2008 | Leizerovich et al. | |
| 7,350,717 B2 | 4 2008 | Conner et al. | |
| 7,353,993 B2 | 4 2008 | Fujimoto | |
| 7,410,102 B2 | 8 2008 | Winkler | |
| 7,493,484 B2 | 2 2009 | Lee | |
| 7,558,107 B2 | 7 2009 | Sakurai et al. | |
| 7,558,110 B2 | 7 2009 | Mizushima et al. | |
| 7,581,678 B2 | 9 2009 | Narendra et al. | |
| 7,607,580 B2 | 10 2009 | Takita et al. | |
| 7,673,080 B1 | 3 2010 | Yu et al. | |
| RE41,352 E | 5 2010 | Wood, Jr. | |
| 7,716,082 B1 | 5 2010 | Blalock | |
| RE41,471 E | 8 2010 | Wood, Jr. | |
| 7,789,303 B2 | 9 2010 | Fukasawa | |
| 7,792,516 B2 | 9 2010 | Soderstrom | |
| 7,828,214 B2 | 11 2010 | Narendra et al. | |
| RE42,254 E | 3 2011 | Wood, Jr. | |
| 7,933,571 B2 | 4 2011 | Black et al. | |
| 7,941,197 B2 | 5 2011 | Jain et al. | |
| 7,948,356 B2 | 5 2011 | Kawamura et al. | |
| 7,954,715 B2 | 6 2011 | Narendra et al. | |
| 7,954,716 B2 | 6 2011 | Narendra et al. | |
| 7,954,717 B2 | 6 2011 | Narendra et al. | |
| 7,961,101 B2 | 6 2011 | Narendra et al. | |
| 7,991,158 B2 | 8 2011 | Narendra et al. | |
| 8,072,331 B2 | 12 2011 | Narendra et al. | |
| 8,083,145 B2 | 12 2011 | Narendra et al. | |
| 8,091,786 B2 | 1 2012 | Narendra et al. | |
| 8,451,122 B2 | 5 2013 | Narendra et al. | |
| 2001 0002035 A1 | 5 2001 | Kayanakis | |
| 2001 0006902 A1 | 7 2001 | Ito | |
| 2001 0013551 A1 | 8 2001 | Ramachandran | |
| 2002 0007434 A1 | 1 2002 | Campardo | |
| 2002 0043566 A1 | 4 2002 | Goodman et al. | |
| 2002 0044043 A1 | 4 2002 | Chaco et al. | |
| 2002 0095588 A1 | 7 2002 | Shigematsu et al. | |
| 2002 0096570 A1 | 7 2002 | Wong et al. | |
| 2002 0099665 A1 | 7 2002 | Burger et al. | |
| 2002 0130187 A1 | 9 2002 | Berg et al. | |
| 2002 0138422 A1 | 9 2002 | Natsuno | |
| 2002 0158735 A1 | 9 2002 | Felt et al. | |
| 2002 0139849 A1 | 10 2002 | Gangi | |
| 2002 0148892 A1 | 10 2002 | Bardwell | |
| 2002 0153424 A1 | 10 2002 | Li | |
| 2002 0158747 A1 | 10 2002 | Mcgregor et al. | |
| 2002 0178124 A1 | 11 2002 | Lewis | |
| 2002 0180584 A1 | 12 2002 | Mcgregor et al. | |
| 2002 0186845 A1 | 12 2002 | Dutta et al. | |
| 2003 0025939 A1 | 2 2003 | Jeran et al. | |
| 2003 0028481 A1 | 2 2003 | Flitcroft et al. | |
| 2003 0052168 A1 | 3 2003 | Wong | |
| 2003 0057278 A1 | 3 2003 | Wong | |
| 2003 0061168 A1 | 3 2003 | Routhenstein | |
| 2003 0079096 A1 | 4 2003 | Murakami | |
| 2003 0080183 A1 | 5 2003 | Rajasekaran et al. | |
| 2003 0085288 A1 | 5 2003 | Luu | |
| 2003 0115126 A1 | 6 2003 | Pitroda | |
| 2003 0128124 A1 | 7 2003 | Amtmann et al. | |
| 2003 0159050 A1 | 8 2003 | Gantman et al. | |
| 2003 0200180 A1 | 10 2003 | Phelan et al. | |
| 2003 0220876 A1 | 11 2003 | Burger et al. | |
| 2003 0231550 A1 | 12 2003 | Macfarlane | |
| 2004 0006654 A1 | 1 2004 | Bando | |
| 2004 0027881 A1 | 2 2004 | Furukawa | |
| 2004 0030660 A1 | 2 2004 | Shatford | |
| 2004 0035942 A1 | 2 2004 | Silverman | |
| 2004 0050930 A1 | 3 2004 | Rowe | |
| 2004 0058705 A1 | 3 2004 | Morgan et al. | |
| 2004 0064612 A1 | 4 2004 | Pinto et al. | |
| 2004 0065733 A1 | 4 2004 | Fukuoka | |
| 2004 0077372 A1 | 4 2004 | Halpern | |

Exhibit 1
Page 153 of 550

# US 9,122,965 B2

Page 3

(56) **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2004/0087339 A1 | 5/2004 | Goldthwaite et al. |
| 2004/0094624 A1 | 5/2004 | Fernandes et al. |
| 2004/0133787 A1 | 7/2004 | Doughty et al. |
| 2004/0162932 A1 | 8/2004 | Mizushima et al. |
| 2004/0177045 A1 | 9/2004 | Brown |
| 2004/0188519 A1 | 9/2004 | Cassone |
| 2004/0199469 A1 | 10/2004 | Barillova et al. |
| 2004/0227859 A1 | 11/2004 | Liang |
| 2004/0243785 A1 | 12/2004 | Shanmugasundaram et al. |
| 2004/0243806 A1 | 12/2004 | Mckinley et al. |
| 2004/0251303 A1 | 12/2004 | Cooper |
| 2004/0255145 A1 | 12/2004 | Chow |
| 2005/0006462 A1 | 1/2005 | Rouille et al. |
| 2005/0017068 A1 | 1/2005 | Zalewski et al. |
| 2005/0022002 A1 | 1/2005 | Poisner |
| 2005/0029349 A1 | 2/2005 | Megregor et al. |
| 2005/0038736 A1 | 2/2005 | Saunders |
| 2005/0039027 A1 | 2/2005 | Shapiro |
| 2005/0044044 A1 | 2/2005 | Burger et al. |
| 2005/0050367 A1 | 3/2005 | Burger et al. |
| 2005/0052924 A1 | 3/2005 | Nishizawa et al. |
| 2005/0060586 A1 | 3/2005 | Burger et al. |
| 2005/0071282 A1 | 3/2005 | Lu et al. |
| 2005/0077349 A1 | 4/2005 | Bonalle et al. |
| 2005/0092830 A1 | 5/2005 | Blossom |
| 2005/0108096 A1 | 5/2005 | Burger et al. |
| 2005/0109838 A1 | 5/2005 | Linlor |
| 2005/0116026 A1 | 6/2005 | Burger et al. |
| 2005/0121512 A1 | 6/2005 | Wankmueller |
| 2005/0122209 A1 | 6/2005 | Black |
| 2005/0127164 A1 | 6/2005 | Wankmueller |
| 2005/0127166 A1 | 6/2005 | Minemura |
| 2005/0133606 A1 | 6/2005 | Brown |
| 2005/0136964 A1 | 6/2005 | Le Saint et al. |
| 2005/0168539 A1 | 8/2005 | Arai et al. |
| 2005/0177724 A1 | 8/2005 | Ali et al. |
| 2005/0197859 A1 | 9/2005 | Wilson et al. |
| 2005/0204077 A1 | 9/2005 | Kou |
| 2005/0204092 A1 | 9/2005 | Masuyama et al. |
| 2005/0212657 A1 | 9/2005 | Simon |
| 2005/0223143 A1 | 10/2005 | Kang et al. |
| 2005/0224589 A1 | 10/2005 | Park et al. |
| 2005/0240778 A1 | 10/2005 | Saito |
| 2005/0246546 A1 | 11/2005 | Takagi et al. |
| 2005/0253687 A1 | 11/2005 | Martinez et al. |
| 2005/0258245 A1 | 11/2005 | Bates et al. |
| 2005/0268058 A1 | 12/2005 | Drasnin et al. |
| 2005/0268330 A1 | 12/2005 | Di Rienzo |
| 2006/0011731 A1 | 1/2006 | Anders et al. |
| 2006/0027655 A1 | 2/2006 | Smets et al. |
| 2006/0045555 A1 | 3/2006 | Morimoto et al. |
| 2006/0077039 A1 | 4/2006 | Ibi et al. |
| 2006/0097851 A1 | 5/2006 | Amtmann et al. |
| 2006/0124755 A1 | 6/2006 | Ito |
| 2006/0169778 A1 | 8/2006 | Chung |
| 2006/0172606 A1 | 8/2006 | Irisawa |
| 2006/0186209 A1 | 8/2006 | Narendra et al. |
| 2006/0219776 A1 | 10/2006 | Finn |
| 2006/0226217 A1 | 10/2006 | Narendra et al. |
| 2006/0268764 A1 | 11/2006 | Harris |
| 2006/0279413 A1 | 12/2006 | Yeager |
| 2007/0033334 A1 | 2/2007 | Katayama et al. |
| 2007/0076877 A1 | 4/2007 | Camp et al. |
| 2007/0108230 A1 | 5/2007 | Li et al. |
| 2007/0110404 A1 | 5/2007 | Ching et al. |
| 2007/0145135 A1 | 6/2007 | Jogand-Coulomb et al. |
| 2007/0145152 A1 | 6/2007 | Jogand-Coulomb et al. |
| 2007/0195458 A1 | 8/2007 | Sawai et al. |
| 2007/0205864 A1 | 9/2007 | Mutti et al. |
| 2007/0257797 A1 | 11/2007 | Rancien et al. |
| 2007/0293202 A1 | 12/2007 | Moshir et al. |
| 2008/0046649 A1 | 2/2008 | Ito |
| 2008/0065830 A1 | 3/2008 | Aoki et al. |
| 2008/0068371 A1 | 3/2008 | Alexis et al. |
| 2008/0073436 A1 | 3/2008 | Nishizawa et al. |

| | | | |
|---|---|---|---|
| 2008/0136619 A1 | 6/2008 | Moran |
| 2008/0147950 A1 | 6/2008 | Chen |
| 2008/0148077 A1 | 6/2008 | Lee et al. |
| 2008/0153416 A1 | 6/2008 | Washiro |
| 2008/0186174 A1 | 8/2008 | Alexis et al. |
| 2008/0214111 A1 | 9/2008 | Moshir et al. |
| 2008/0244208 A1 | 10/2008 | Narendra et al. |
| 2008/0279381 A1 | 11/2008 | Narendra et al. |
| 2008/0311849 A1 | 12/2008 | Washiro |
| 2008/0318535 A1 | 12/2008 | Black et al. |
| 2009/0065571 A1 | 3/2009 | Jain |
| 2009/0065572 A1 | 3/2009 | Jain |
| 2009/0069049 A1 | 3/2009 | Jain |
| 2009/0069050 A1 | 3/2009 | Jain et al. |
| 2009/0069051 A1 | 3/2009 | Jain et al. |
| 2009/0069052 A1 | 3/2009 | Jain et al. |
| 2009/0070272 A1 | 3/2009 | Jain |
| 2009/0070691 A1 | 3/2009 | Jain |
| 2009/0070861 A1 | 3/2009 | Jain |
| 2009/0108063 A1 | 4/2009 | Jain et al. |
| 2009/0150610 A1 | 6/2009 | Hsu et al. |
| 2009/0152361 A1 | 6/2009 | Narendra et al. |
| 2009/0199283 A1 | 8/2009 | Jain |
| 2009/0250521 A1 | 10/2009 | Fujita et al. |
| 2009/0265552 A1 | 10/2009 | Moshir et al. |
| 2009/0270127 A1 | 10/2009 | Kakimoto |
| 2009/0290582 A1 | 11/2009 | Suenaga et al. |
| 2009/0298540 A1 | 12/2009 | Narendra et al. |
| 2009/0315667 A1 | 12/2009 | Kawamura et al. |
| 2010/0033307 A1 | 2/2010 | Narendra et al. |
| 2010/0033310 A1 | 2/2010 | Narendra et al. |
| 2010/0044444 A1 | 2/2010 | Jain et al. |
| 2010/0049878 A1 | 2/2010 | Yu et al. |
| 2010/0069118 A1 | 3/2010 | Wang |
| 2010/0115164 A1 | 5/2010 | Huang et al. |
| 2010/0213265 A1 | 8/2010 | Narendra et al. |
| 2011/0053644 A1 | 3/2011 | Narendra et al. |
| 2011/0065386 A1 | 3/2011 | Keller |
| 2011/0073663 A1 | 3/2011 | Narendra et al. |
| 2011/0073665 A1 | 3/2011 | Narendra et al. |
| 2011/0077052 A1 | 3/2011 | Narendra et al. |
| 2011/0110404 A1 | 5/2011 | Washiro |
| 2011/0171996 A1 | 7/2011 | Narendra et al. |
| 2011/0180610 A1 | 7/2011 | Narendra et al. |
| 2011/0220726 A1 | 9/2011 | Narendra et al. |
| 2011/0223972 A1 | 9/2011 | Narendra et al. |
| 2011/0269438 A1 | 11/2011 | Narendra et al. |
| 2011/0271044 A1 | 11/2011 | Narendra et al. |
| 2011/0272468 A1 | 11/2011 | Narendra et al. |
| 2011/0272469 A1 | 11/2011 | Narendra et al. |
| 2013/0233931 A1 | 9/2013 | Narendra et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 161060 A1 | 11/1985 |
| EP | 0818757 A2 | 1/1998 |
| EP | 1014290 A2 | 6/2000 |
| EP | 1117068 A1 | 7/2001 |
| EP | 1178450 A2 | 2/2002 |
| EP | 1189465 A1 | 3/2002 |
| EP | 1291748 A2 | 3/2003 |
| GB | 2316908 A | 3/1998 |
| JP | 4102112 A | 4/1992 |
| JP | 2000010668 A | 1/2000 |
| JP | 2005018671 A | 1/2005 |
| JP | 2007199847 A | 8/2007 |
| JP | 2007328682 A | 12/2007 |
| TW | 200905471 A | 2/2009 |
| TW | 201020934 A | 6/2010 |
| TW | 201023662 A | 6/2010 |
| TW | I336449 | 1/2011 |
| TW | 201126422 A | 8/2011 |
| WO | 9626500 A | 8/1996 |
| WO | 9812674 A2 | 3/1998 |
| WO | 0014678 A | 3/2000 |
| WO | 0188659 A2 | 11/2001 |
| WO | 03029942 A2 | 4/2003 |
| WO | 03077473 A1 | 9/2003 |
| WO | 03081519 A2 | 10/2003 |

Exhibit 1
Page 154 of 550

# US 9,122,965 B2

Page 4

(56)                    **References Cited**

### FOREIGN PATENT DOCUMENTS

| WO | 2004012352 | A1 | 2 2004 |
|----|-----------|-----|--------|
| WO | 2004095169 | A2 | 11 2004 |
| WO | 2005027030 | A1 | 3 2005 |
| WO | 2005119607 | A2 | 12 2005 |
| WO | 2005119608 | A1 | 12 2005 |
| WO | 2006091709 | A2 | 8 2006 |
| WO | 2006108184 | A1 | 10 2006 |
| WO | 2007011937 | A2 | 1 2007 |
| WO | 2008121566 | A1 | 10 2008 |
| WO | 2009147548 | A2 | 12 2009 |
| WO | 2010099093 | A1 | 9 2010 |

### OTHER PUBLICATIONS

International Search Report PCT Application No. PCT US2005 019988, Dec. 16, 2005, 5 pages.

International Search Report PCT Application No. PCT US2005 022993, Oct. 21, 2005, 3 pages.

International Search Report PCT Application No. PCT US2006 013603, Jan. 9, 2006, 3 pages.

International Search Report PCT Application No. PCT US2006 027847, Mar. 29, 2007, 5 pages.

International Search Report PCT Application No. PCT US2008 057588, Aug. 7, 2008, 4 pages.

International Written Opinion PCT Application No. PCT US2005 019988, Dec. 4, 2006, 9 pages.

International Written Opinion PCT Application No. PCT US2005 022993, Dec. 4, 2006, 6 pages.

International Written Opinion PCT Application No. PCT US2006 006361, Aug. 28, 2007, 8 pages.

International Written Opinion PCT Application No. PCT US2006 006361, Sep. 22, 2006, 13 pages.

International Written Opinion PCT Application No. PCT US2006 013603, Oct. 9, 2007, 7 pages.

International Written Opinion PCT Application No. PCT US2006 027847, Jan. 22, 2008, 10 pages.

International Written Opinion PCT Application No. PCT US2008 057588, Oct. 6, 2009, 6 pages.

International Written Opinion PCT Application No. PCT US2010 025014, Apr. 15, 2010, 9 pages.

International Written Opinion PCT Application No. PCT US2010 025014, Sep. 9, 2011, 6 pages.

Lee, Youbok; "Antenna Circuit Design for RFID Applications", Microchip, AN710, 2003 Microchip Technology Inc., (2003), 50 pages.

PCTUS2012027128 US 026wo1 ISR WO Sep. 21, 2012.

Translation of official letter corresponding to patent application #100143174 dated Feb. 17, 2014, 33 pages.

U.S. Appl. No. 13 657,846 Office Action dated Apr. 11, 2014, 44 pages.

U.S. Appl. No. 14 460,647 Office Action dated Sep. 25, 2014, 7 pages.

International Written Opinion PCT Application No. PCT US2012 027128, Sep. 12, 2013, 6 pages.

U.S. Appl. No. 14 517,567 Office Action dated Nov. 20, 2014, 8 pages.

* cited by examiner

Exhibit 1

Page 155 of 550



*FIG. 1*



*FIG. 2*

Exhibit 1
Page 156 of 550

U.S. Patent

Sep. 1, 2015

Sheet 2 of 30

US 9,122,965 B2



FIG. 3A

Exhibit 1
Page 157 of 550

U.S. Patent

Sep. 1, 2015

Sheet 3 of 30

US 9,122,965 B2



FIG. 3B

Exhibit 1
Page 158 of 550



*FIG. 4*

Exhibit 1
Page 159 of 550

U.S. Patent

Sep. 1, 2015

Sheet 5 of 30

US 9,122,965 B2



*FIG. 5*

Exhibit 1
Page 160 of 550

U.S. Patent          Sep. 1, 2015          Sheet 6 of 30          US 9,122,965 B2



*RECEIVE A DATA PATTERN AND AN ADDRESS VALUE FROM AN RFID CARD IN A MEMORY CARD SLOT* — 610

*POPULATE A DATA FIELD OF A MEMORY CARD ACCESS COMMAND WITH THE DATA PATTERN TO CAUSE THE COMMAND TO BE DIVERTED TO THE SMARTCARD CONTROLLER* — 620

*POPULATE AN ADDRESS FIELD OF THE MEMORY CARD ACCESS COMMAND WITH THE ADDRESS VALUE TO FURTHER CAUSE THE COMMAND TO BE DIVERTED TO THE SMARTCARD CONTROLLER* — 630

*POPULATE THE DATA FIELD OF THE MEMORY CARD ACCESS COMMAND WITH A COMMAND STRING TO SPECIFY A PURPOSE OTHER THAN A MEMORY CARD ACCESS* — 640

*POPULATE A DATA FIELD OF A MEMORY CARD ACCESS COMMAND WITH A PASSWORD TO AUTHENTICATE ACCESS TO THE RFID CARD* — 650

*SEND THE MEMORY CARD ACCESS COMMAND TO THE RFID CARD* — 660

*FIG. 6*

600

Exhibit 1
Page 161 of 550



RECEIVE A MEMORY CARD ACCESS COMMAND FROM A MOBILE COMPUTING DEVICE VIA A HOST INTERFACE ⟶ 710

CHECK CRITERIA TO DETERMINE IF THE MEMORY CARD ACCESS COMMAND SHOULD BE DIVERTED TO THE SMARTCARD CONTROLLER ⟶ 720

730
CRITERIA MATCH?
Y          N

DIVERT AT LEAST A PORTION OF THE MEMORY CARD ACCESS COMMAND TO THE SMARTCARD CONTROLLER ⟶ 740

PERFORM MEMORY ACCESS AS PER THE MEMORY CARD ACCESS COMMAND ⟶ 750

700

*FIG. 7*

Exhibit 1
Page 162 of 550



*FIG. 8*

Exhibit 1
Page 163 of 550



RECEIVE A SMARTCARD COMMAND FROM THE MEMORY CARD CONTROLLER ~910

DUMMY COMMAND USED TO MAINTAIN POWER TO THE MEMORY CARD SLOT? ~950

Y

N

DISREGARD COMMAND ~960

PERFORM SMARTCARD FUNCTION AS PER THE RECEIVED COMMAND ~930



900

**FIG. 9**

Exhibit 1
Page 164 of 550





*FIG. 10*

Exhibit 1
Page 165 of 550



FIG. 11

Exhibit 1
Page 166 of 550



*FIG. 12*
*(PRIOR ART)*

Exhibit 1
Page 167 of 550



FIG. 13
(PRIOR ART)

BACK VIEW

SIDE VIEW

FRONT VIEW

8.1 mm

16 mm

37 mm

24 mm

53 mm

1300

Exhibit 1
Page 168 of 550



FIG. 14
(PRIOR ART)



FIG. 15

Exhibit 1
Page 169 of 550



*FIG. 16*



*FIG. 17*

Exhibit 1
Page 170 of 550



*FIG. 18*



*FIG. 19*

Exhibit 1
Page 171 of 550



FIG. 20



FIG. 21

Exhibit 1
Page 172 of 550



*FIG. 22*

Exhibit 1
Page 173 of 550



*FIG. 23*

Exhibit 1
Page 174 of 550



*FIG. 24*



*FIG. 25*

Exhibit 1
Page 175 of 550



FIG. 26

FIG. 27

Exhibit 1
Page 176 of 550



*FIG. 28*



*FIG. 29*

Exhibit 1
Page 177 of 550



*FIG. 30*

Exhibit 1
Page 178 of 550



*FIG. 31*



*FIG. 32*

Exhibit 1
Page 179 of 550



*FIG. 33*

*FIG. 34*

Exhibit 1
Page 180 of 550



*FIG. 35*

Exhibit 1
Page 181 of 550



FIG. 36

Exhibit 1
Page 182 of 550



*FIG. 37*

Exhibit 1
Page 183 of 550



*FIG. 38*

Exhibit 1
Page 184 of 550



*FIG. 39*

Exhibit 1
Page 185 of 550

US 9,122,965 B2

**1**

## 13.56 MHZ ENHANCEMENT CIRCUIT FOR SMARTCARD CONTROLLER

### FIELD

The present invention relates generally to contactless communications devices, and more specifically to contactless smartcard devices.

### BACKGROUND

RFID "tags" can be separated into two broad categories: active tags and passive tags. Active tags are characterized by a local power source such as a battery. Active tags generally transmit information by broadcasting on an RF carrier frequency of choice using a locally generated RF carrier. Active tags are typically used to transmit over long distances, often referred to as "far field communications" (FFC). Antennas used with active RFID tags tend to be large to allow for the communications over long distances.

Passive tags are not powered. Passive tags derive the energy needed to power the tag from an interrogating RF field, and use that energy to transmit response codes by modulating the impedance that the antenna presents to the interrogating field, thereby modulating the signal reflected back to the reader antenna. Passive tags are typically used to transmit over short distances, often referred to as "near field communications" (NFC). For example, passive tags operating at 13.56 MHz are typically designed to communicate with RFID readers a few centimeters away.

Passive tags are typically connected to "loop antennas." One example of a loop antenna is shown in U.S. Pat. No. 6,568,600, issued to Carpier et al. on May 27, 2003 (the '600 patent). The device described in the '600 patent is recognizable as a "credit card sized" passive RFID tag (more specifically, a card that conforms to ISO 7816 size requirements). The loop antenna is necessarily large because passive tags are powered using energy received by the antenna from signals transmitted by the RFID reader.

FIG. 12 shows a power supply voltage developed over time by rectifying a voltage induced in a loop antenna in the presence of an interrogating RF field. Once the power supply voltage reaches a critical value, the tag is powered up and can operate. As the antenna size is reduced, it takes longer for the power supply voltage to reach the critical value, and the tag operation may not meet response time specifications. Below a certain antenna size, the power supply voltage may never reach the critical value, and the tag may never power up.

Antenna design for RFID applications is described in a Microchip Technology, Inc. application note entitled "Antenna Circuit Design for RFID Applications" by Youbok Lee, Ph.D., published in 2003 (no month given). Dr. Lee's application note describes in great detail how to determine size requirements for a passive RFID tag antenna to operate at 13.56 MHz. On page 5 of the application note, Dr. Lee shows that the optimum radius of the loop antenna coil is equal to 1.414 times the required read range. This analysis confirms that for a read range on the order of a few centimeters, a credit card sized loop antenna can be made near optimal.

Passive tags are seeing widespread use in many applications. For example, mobile device manufacturers are embedding passive RFID tags in mobile devices for NFC applications. Example mobile applications include, but are not limited to, ticketing and mobile payments. U.S. Pat. No. 7,333,062 issued to Leizerovich et al. on Feb. 19, 2008 (the '062 patent) shows a mobile phone with an integrated loop

**2**

antenna for an NFC device. As shown in the '062 patent, the mobile phone provides the real estate necessary to implement a loop antenna at 13.56 MHz.

There have been attempts to implement passive tags in smaller mobile devices. These attempts have met with limited success due in part to the size of the loop antenna. For example, FIG. 13 shows an RFID tag implementation in a secure digital (SD) memory card manufactured by Wireless Dynamics, Inc. of Calgary, Alberta Canada. Card **1300** includes an antenna, but the SD card is significantly oversized as a result. Also for example, U.S. Patent Application Publication No.: US 2006/0124755 A1 shows a memory card having a passive tag, but the card must be inserted into a slot to access a loop antenna on a different device. In this implementation, mobile device real estate is still relied upon for loop antenna implementation. It can be seen, therefore, that the size of antennas are proving to be a barrier to further miniaturization of passive RFID tags.

FIG. 14 shows a prior art smartcard controller and antenna in combination. Smartcard controller **330** includes a contactless interface that includes two pads **1472** and **1474** intended for connection to a coil (antenna **1480**). Smartcard controller **330** also includes bridge rectifier **1420** to rectify an alternating voltage present on pads **1472** and **1474** when antenna **1480** is inductively coupled to another device and in the presence of an interrogating RF field. Capacitor **1440** is typically tuned to create a resonant circuit at the frequency of interest (e.g., 13.56 MHz). When antenna **1480** is a large loop antenna, then bridge rectifier **1420** provides power to internal circuits as shown in FIG. 12. Demodulator **1430** demodulates data present in the interrogating RF field, and load modulation driver circuit **1410** modulates an impedance seen by the device presenting the interrogating RF field when the coil (antenna **1480**) is inductively coupled to a separate device that is presenting the interrogating RF field. This creates a half-duplex communications path between the device presenting the interrogating RF field and smartcard controller **330**. Examples of smartcard controllers are the "SmartMX" controllers sold by NXP Semiconductors N.V. of Eindhoven, The Netherlands.

A need exists for a small footprint RFID tag that does not rely on an external device to house an antenna. A need also exists for a memory card compatible RFID tag that is compatible with standard memory card slots on mobile devices.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a mobile computing device and a small RFID card compatible with a memory card slot;

FIG. 2 shows a block diagram of a mobile computing device;

FIGS. 3A-3B show block diagrams of memory card compatible RFID cards with integrated inductive elements;

FIG. 4 shows a memory card compatible RFID card with an integrated inductive element;

FIG. 5 shows a data portion of a memory card write command;

FIG. 6-11 show flowcharts of methods in accordance with various embodiments of the present invention;

FIG. 12 shows a power supply voltage developed over time by rectifying a voltage induced in a loop antenna in the presence of an interrogating RF field;

FIG. 13 shows a prior art RFID tag implementation in a secure digital (SD) memory card;

FIG. 14 shows a prior art smartcard controller and antenna in combination.

Exhibit 1
Page 186 of 550

3

FIG. 15 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 16 shows frequency spectrum used in RFID communications;

FIG. 17 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 18 shows frequency spectrum used in RFID communications;

FIG. 19 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 20 shows frequency spectrum used in RFID communications;

FIG. 21 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 22 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 23 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 24 shows a smartcard controller with a pad to provide digital data output;

FIG. 25 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 26 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 27 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 28 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 29 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 30 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIGS. 31-34 show performance enhancing application specific integrated circuits (ASICs) coupled to various smartcard controllers in accordance with various embodiments of the present invention.

4

FIG. 35 shows a memory card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention;

FIG. 36 shows a memory card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention;

FIG. 37 shows a subscriber identity module (SIM) card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention;

FIG. 38 shows a subscriber identity module (SIM) card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention; and

FIG. 39 shows a mobile device with a smartcard controller, enhancement circuits, and antenna(s).

DESCRIPTION OF EMBODIMENTS

In the following detailed description, reference is made to the accompanying drawings that show, by way of illustration, various embodiments of an invention. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention. It is to be understood that the various embodiments of the invention, although different, are not necessarily mutually exclusive. For example, a particular feature, structure, or characteristic described in connection with one embodiment may be implemented within other embodiments without departing from the spirit and scope of the invention. In addition, it is to be understood that the location or arrangement of individual elements within each disclosed embodiment may be modified without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the appended claims, appropriately interpreted, along with the full range of equivalents to which the claims are entitled. In the drawings, like numerals refer to the same or similar functionality throughout the several views.

FIG. 1 shows a mobile computing device and a small RFID card compatible with a memory card slot. Mobile computing device 110 is shown as a mobile phone in FIG. 1, but this is not a limitation of the present invention. For example, mobile computing device 110 may be a personal digital assistant (PDA), a smartphone, a mobile phone, a handheld computer, a desktop computer, or any other device capable of operating as described herein.

Mobile computing device 110 includes memory card slot 112. Memory card slot 112 is a slot capable of accepting RFID card 120. For example, memory card slot 112 may have physical dimensions compatible with RFID card 120, and may have a communications interface that operates using a protocol compatible with RFID card 120. In some embodiments of the present invention, memory card slot 112 is a memory card slot designed to accept and communicate with memory cards. As used herein, the term "memory card slot" refers to any add-on slot capable of accepting a card having memory accessible by a mobile computing device such as that shown in FIG. 1. For example, a memory card slot may be compatible with an industry standard communications protocol, or may be compatible with a widely accepted communications protocol that is not necessarily formally documented as an industry standard. Examples include slots that are compatible with the Multimedia Memory Card (MMC) protocol, Memory Stick DUO protocol, secure digital (SD) protocol, and Smart Media protocol. The foregoing list is

Exhibit 1
Page 187 of 550

5

meant to be exemplary, and not exhaustive. Memory card slot 112 may be compatible with many memory card slot protocols other than those explicitly listed above without departing from the scope of the invention. Further, in some embodiments, memory card slot 112 accepts a subscriber identity module (SIM) card. Memory card slot 112 may be exposed on an edge of mobile computing device 110 as shown, or may be behind a cover. For example, memory card slot 112 may be behind a battery cover, behind a battery, or anywhere else on mobile computing device 110.

RFID card 120 includes electrical contacts 122 as part of a host interface that communicates with memory card slot 112. For example, electrical contacts 122 may provide connectivity compliant with a communications protocol for memory cards. RFID card 120 includes RFID functionality, and may also include memory accessible by mobile computing device 110. For example, in some embodiments, RFID card 120 includes a smartcard controller and an inductive element capable of interacting with an NFC reader (e.g., an ISO 14443 compliant interface). In other embodiments, RFID card 120 does not include memory accessible by mobile computing device 110. RFID card 120 may include functionality beyond memory and RFID. Electrical contacts 122 may also be compliant with a smartcard "contact" interface (e.g., ISO 7816).

In various embodiments of the present invention, the RFID functionality in RFID card 120 is accessed by mobile computing device 110 using memory card access commands already defined for use in memory card slot 112. Accordingly, the various embodiments of the present invention enable the implementation of RFID functions beyond memory accesses without defining new commands. In some embodiments, new commands for the RFID card are embedded inside the data bits subsequent to memory card read/write commands. RFID card 120 then decides if the incoming data bits are meant for regular read/write memory functions or for RFID functions. In other words, functions in addition to standard memory card functions may be accessed through commands "hidden" in the data stream that can be exchanged using existing memory card access commands and functions. According to the various embodiments of the invention, both existing memory card functions and RFID functions may be implemented without requiring changes in how the host protocol is built.

The combination of mobile computing device 110 and RFID card 120 may be used for any purpose. For example, in some embodiments, RFID card 120 may interact with a point-of-sale payment device to effect mobile payments. Also for example, in some embodiments, RFID card 120 may be used in wave-and-pay ticketing in mass transit environments, such as MIFARE.

FIG. 2 shows a block diagram of a mobile computing device. Mobile computing device 110 includes antenna 240, radio circuits 230, processor 210, memory 220, and memory card slot 112. In some embodiments, mobile computing device 110 is a mobile phone, or includes mobile phone functionality. For example, antenna 240 and radio circuits 230 may be utilized to communicate with a cellular telephone network. Further, in some embodiments, mobile computing device 110 is a wireless local area network (WLAN) or wireless wide area network (WWAN) device. For example, antenna 240 and radio circuits 230 may be utilized to communicate with a wireless access point. In some embodiments, antenna 240 and radio circuits 230 are omitted, and mobile computing device 110 does not utilize wireless connectivity.

Processor 210 represents a processor capable of communicating with the other blocks shown in mobile computing device 110. For example, processor 210 may be a microprocessor, a digital signal processor (DSP), a microcontroller, or

6

the like. Further, processor 210 may be formed from state machines or other sequential logic. In operation, processor 210 may read instructions from memory 220 and perform actions in response thereto. For example, processor 210 may execute program instructions that influence communications between mobile computing device 110 and a device coupled to memory card slot 112.

Memory card slot 112 is described above with reference to FIG. 1. Memory card slot 112 includes circuitry compatible with RFID card 120. Mobile computing device 110 may communicate with RFID card 120 by using a standard set of memory card access commands. For example, processor 210 may use memory card write commands to write to memory in RFID card 120, and may use memory card read commands to read from memory in RFID card 120. Mobile computing device 110 may also communicate with RFID card 120 using a ISO 7816 compatible interface or the like. For example, when RFID card 120 is a SIM card, mobile computing device 110 may communicate with a smartcard controller within the SIM card.

Mobile computing device 110 may access the RFID functionality in RFID card 120 using "hidden" commands embedded in memory card access commands. For example, a memory card write command may include a unique data string to identify the memory card write command as a command to be diverted for purposes other than a memory write. In addition, the sector address provided with the memory card write command may be set to a particular address value to further identify the memory card write command as a command to be diverted. In addition to specific address/data values to identify the memory card access command as a command to be diverted for a purpose other than a memory access, the memory access command may include data bits to further specify the type and function of hidden command. Example formats of hidden commands are described further below. In some embodiments, a read command is issued right after a write command to enable data flow from the non-memory card functions to the host, where the write command's data had the hidden commands. The combination of a memory card write command and a memory card read command can be used in this manner to form a hidden read command.

In some embodiments, memory card slot 112 is powered down after periods of inactivity to save power. For example, memory card slot 112 may be powered up when processor 210 issues a memory card write or read command, but may then be powered down to save power. When memory card slot 112 is powered down, any device coupled to the memory card slot is also powered down. For example, if RFID card 120 (FIG. 1) is coupled to the memory card slot, then RFID card 120 is powered down when memory card slot 112 is powered down.

In various embodiments of the present invention, processor 210 executes software resident in memory 220 to maintain power to memory card slot 112 (and to RFID card 120). For example, periodic hidden commands may be sent to RFID card 120 for the purpose of keeping power applied while RFID card 120 is expected to be providing RFID functionality. Also for example, a hidden command may be sent to RFID card 120 for the purpose of cycling power to a smartcard controller resident on the card. These hidden commands are described further below with respect to later figures.

FIG. 3A shows a block diagram of a memory card compatible RFID card with an integrated inductive element. RFID card 300 represents possible embodiments of RFID card 120 (FIG. 1). RFID card 300 includes host interface 310, memory card controller 340, memory 360, smartcard controller 340, program memory 332, and small inductive element 350.

Exhibit 1
Page 188 of 550

US 9,122,965 B2

7

RFID card 300 is capable of communicating with a memory card slot in a mobile computing device. Further, RFID card 300 does not require memory card slots to implement extended input/output functions. For example, and not by way of limitation, in SD and micro SD embodiments, RFID card 300 is operable in any SD or microSD memory card slot, and does not require a secure digital input output (SDIO) memory card slot.

Host interface 310 includes electrical contacts to interface with a memory card slot. For example, host interface 310 includes contacts such as contacts 122 (FIG. 1). Also for example, in some embodiments, host interface 310 includes recessed electrical contacts. Host interface 310 may also include circuitry such as drivers, receivers, terminations, and the like.

In embodiments represented by FIG. 3A, memory card controller 340 communicates with the mobile device using memory card access commands. Memory card controller 340 also communicates with memory 360. Memory card controller 340 determines whether each command should result in a memory operation with memory 360, whether a hidden command should be diverted to smartcard controller 330, or whether memory card controller 340 should take action in response to a hidden command. In some embodiments, memory card controller 340 executes instructions that are stored in an internal memory or stored in memory 360. In some embodiments, memory card controller 340 includes special purpose hardware useful to determine whether a command should be diverted. In other embodiments, memory card controller 340 may be a microcontroller identical in all respects to a controller found in memory cards, except for the program that it executes.

Memory 360 may be any type of volatile or non-volatile memory. For example, memory 360 may be volatile memory such as static random access memory (SRAM) or dynamic random access memory (DRAM). Also for example, memory 360 may be nonvolatile memory such as NOR FLASH memory or NAND FLASH memory. In various embodiments of the present invention, memory 360 represents memory that is accessed by a mobile computing device using memory card access commands defined for that purpose.

When RFID card 300 is communicating with a memory card slot in a mobile computing device, the mobile computing device may send a memory card access command in order to access memory 360. Also for example, the mobile computing device may send a memory card access command that contains a hidden command. Memory card controller 340 detects the presence of the hidden command, and diverts all or a portion of the memory access command to smartcard controller 330 using communication bus 342. Communication bus 342 may have any number of conductors and may take any form. For example, communication bus 342 may be a serial port, a parallel port, or may include multiple data conductors, multiple address conductors, and/or conductors to carry control signals such as clock signals. In some embodiments, memory card controller 340 takes one or more actions in response to a hidden command. For example, memory card controller 340 may modify clock signals in response to a hidden command.

Memory card controller 340 can detect the hidden command in many ways. For example, in some embodiments, the memory card access command may include a specific address value or a specific data value. Memory card controller 340 detects commands that include one or both of the specific address value or specific data value and routes the command appropriately. The specific address value and specific data

8

value used for this purpose are referred to herein as the hidden command address value and the hidden command data value.

In some embodiments, memory card controller 340 detects the presence of hidden commands based only on the hidden command address value. In these embodiments, memory card controller 340 checks the address value included in a memory card access command, and diverts the command (or takes some other action) if it matches the hidden command address value. In some embodiments, memory card controller 340 detects the presence of hidden commands based only on the hidden command data value. In these embodiments, memory card controller 340 checks a data value included in the memory card access command, and diverts all or a portion of the command if it matches the hidden command data value. In still further embodiments, memory card controller 340 detects the presence of hidden commands based on both the hidden command address value and the hidden command data value. In these embodiments, memory card controller 340 diverts the command only if both the memory card access address and data match the hidden command address value and data value, respectively.

The hidden command address value and hidden command data value may be specified in many ways. For example, all RFID cards may be issued with fixed values. In these embodiments, each time the RFID functions are accessed, the same hidden command address and/or data value is included in the memory card access command. Also for example, different RFID cards may be issued with unique values. In these embodiments, each RFID card may provide these values to a mobile computing device when queried. Also for example, hidden command address and/or data values may be specified by the mobile computing device. In still further embodiments, hidden command address and data values may be dynamic. The hidden command address and data values may change each time power is applied or on a periodic basis.

Smartcard controller 330 receives hidden commands diverted by memory card controller 340. Smartcard controller 330 further interprets the hidden commands and performs actions in response thereto. Smartcard controller 330 executes instructions stored in program memory 332. In some embodiments, program memory 332 is embedded in smartcard controller 330, and in other embodiments, program memory 332 is part of memory 360.

Smartcard controller 330 is a dual interface smartcard controller with one of the interfaces including RFID functionality. In some embodiments, smartcard controller 330 is compatible with passive RFID tag readers in NFC applications. For example, smartcard controller 330 may be a device capable of implementing all or part of the ISO 14443 standard for contactless NFC devices. Also for example, smartcard controller 330 may be a dual interface smartcard controller capable of implementing both ISO 7816 and ISO 14443 standards for contact/contactless requirements. The "SmartMX" family of controllers available from NXP Semiconductors N.V. of The Netherlands are examples of suitable dual interface smartcard controllers. These controllers provide RFID functionality at 13.56 MHz. The various embodiments of the present invention operate at 13.56 MHz, but are not limited to operation at this frequency. In some embodiments, smartcard controller interoperates with MIFARE systems for ticketing applications.

Smartcard controller 330 receives power from the host interface. By not receiving power from the interrogating RF field, the necessity of a loop antenna for power generation is negated. Smartcard controller 330 includes a contactless interface that in turn includes antenna port 334. Antenna port 334 includes at least two pads for connection to an antenna.

Exhibit 1
Page 189 of 550

US 9,122,965 B2

9

shown as 1742 and 1744 in FIG. 14 and later figures. In FIG. 3A, antenna port 334 is coupled to small inductive element 350.

Small inductive element 350 includes a coil wound around a magnetic core. As described with reference to later figures, small inductive element may include one or more coils or antennas. The coil of small inductive element is too small to draw power from the interrogating RF field, but this is not necessary since smartcard controller 330 is powered by the host device through host interface 310. Small inductive element 350 interacts with an antenna in an RFID reader similar to the way that primary and secondary coils in a transformer interact. The RFID reader has a coil resonant at 13.56 MHz functioning as the primary coil of a transformer. Small inductive element 350 functions as the secondary coil of the transformer. Accordingly, the transmitter "sees" the impedance of the secondary coil (small inductive element 350). Smartcard controller 330 is able to modulate reflected RF signals using circuitry to modify the impedance at the antenna port 334.

Small inductive element 350 can be made very small. For example, in some embodiments, RFID card 120 is a miniSD card, microSD card, or SIM card, and small inductive element 350 is small enough to be completely contained in the miniSD, microSD, or SIM form factor. A specific embodiment of a small inductive element in a memory card form factor is described below with reference to FIG. 4.

In various embodiments of the invention, memory card controller 340 and smartcard controller 330 are implemented in many different ways. For example, in some embodiments, the various components are implemented in hardware. In these embodiments, the various components may be implemented as separate integrated circuits, or in a combined integrated circuit. Also for example, in some embodiments, the various components may be implemented in software, or in a combination of hardware and software. In some embodiments, RFID card 300 may include a microprocessor, and the components may be implemented as software modules running on the microprocessor. In other embodiments, RFID card 300 may include multiple processors, and the components may be implemented as software modules distributed across the multiple processors.

FIG. 3B shows a block diagram of a memory card compatible RFID card with an integrated inductive element. RFID card 302 represents possible embodiments of RFID card 120 (FIG. 1). RFID card 302 includes host interface 310, memory card controller 340, memory 360, smartcard controller 340, program memory 332, and small inductive element 350, all of which are described above with reference to FIG. 3A. RFID card 302 is capable of communicating with a memory card slot in a mobile computing device. Further, RFID card 302 does not require memory card slots to implement extended input/output functions. For example, and not by way of limitation, in SD and microSD embodiments, RFID card 302 is operable in any SD or microSD memory card slot, and does not require a secure digital input output (SDIO) memory card slot.

In embodiments represented by FIG. 3B, smartcard controller 330 receives power from memory controller 340. In these embodiments, memory controller 340 has direct control over the power provided to smartcard controller 330. Memory controller 340 may apply and/or remove power from smartcard controller 330 in response to commands received over the host interface. For example, memory controller 340 may receive a hidden command to reset smartcard controller 330 by causing a reboot through a power cycle.

FIG. 4 shows a memory card compatible RFID card with an integrated inductive element. RFID card 120 is shown in an

10

SD card form factor, although this is not a limitation of the present invention. For example, other form factors within the scope of the present invention include, but are not limited to, microSD form factors and SIM card form factors. RFID card 120 includes electrical contacts 122, memory card controller 340, smartcard controller 330, memory 360, magnetic core 450, and coil 452, all affixed to circuit board 402.

Magnetic core 450 and coil 452 implement small inductive element 350 (FIGS. 3A, 3B). As can be seen in FIG. 4, the small inductive element fits entirely within the memory card form factor. The small inductive element does not provide power generation for smartcard controller 330, and so does not need to be made large for that purpose.

FIG. 5 shows a data portion of a memory card write command. Included are hidden command data value 510, status field 520, password field 530, device ID 532, command index 540, and hidden command related data 550. In the example of FIG. 5, the data portion is 512 bytes in length, although this is not a limitation of the present invention. Any amount of data may be included in the write command, and each field shown in FIG. 5 may be any length.

In the example of FIG. 5, the hidden command data value is 256 bits long, although any length may be used without departing from the scope of the present invention. In some embodiments, hidden command data value 510 is used to identify a memory write command as a hidden command. When a write command is received having data in the first 256 bits that match the hidden command data value, the command is identified as one to be diverted to the smartcard controller. As described above, a hidden command address value may be used in conjunction with, or instead of, a hidden command data value to identify the memory write command as a hidden command.

The remaining fields have significance when the memory write is a hidden command. For example, if the first 256 bits do not match the hidden command data value (or if the write address does not match the hidden command address value, or both) then the remaining bits in the data field are to be treated as data in a normal memory write command. In contrast, when the memory write is a hidden command, the remaining fields are used to further interpret the hidden command.

Memory card controller 340 (FIGS. 3, 4) inspect the hidden command data value 510, status field 520, and possibly password field 530 and device ID 532. In some embodiments, if the command is identified as a hidden command, memory card controller 340 forwards the password 530, command index 540, and related data 550 to smartcard controller 330. In other embodiments, memory card controller 340 may directly take actions based on the hidden command.

Status field 520 may include any information relating to the status of the hidden command. For example, status field 520 may include one more bits to signify to memory card controller 340 whether the host (mobile computing device) is expecting the smartcard controller to return data in response to the hidden command. For example, when status field 520 signifies a write, memory card controller 340 forwards the password, device ID, command index, and related data without expecting to return any data to the host. Also for example, when status field 520 signifies a read, memory card controller 340 forwards the password, device ID, command index, and related data with the expectation that smartcard controller 330 will provide data to be sent to the host in response to a memory card read command. The combination of a memory card write command followed shortly thereafter by a memory card read command may be used to provide "read" function-

Exhibit 1
Page 190 of 550

11

ality to the smartcard controller. Read operations from the smartcard controller are described further below with reference to FIG. 8.

Password field 530 includes a password to allow smartcard controller 330 to authenticate the host to the RFID card. In some embodiments, every hidden command includes a password. Each time the password, device ID, command index, and related data is diverted to the smartcard controller, the password is checked to authenticate the host to the RFID card.

Device ID 532 uniquely identifies the host (mobile computing device). The device ID may be checked by the smartcard controller to ensure that the RFID card is inserted in the host to which it is authenticated. Some embodiments of the present invention enforce a unique host/card pairing using the device ID, and other embodiments allow smartcard controller functions to be accessed by any host.

Command index 540 identifies the type of hidden command. The number of possible hidden commands is limited only by the number of bits allocated thereto. Any number of bits may be allocated to command index 540 without departing from the scope of the present invention. Hidden command related data 550 may be utilized differently for each type of hidden command. Any number of bits may be used for hidden command related data 550.

The data shown in FIG. 5 is provided as an example, and the data field of a memory card access command may include more or fewer data fields than those shown in FIG. 5. The present invention is not limited by the number or content of the fields in a memory card access command.

FIG. 6 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 600 may be used by a mobile computing device to communicate with an RFID card in a memory card slot. In some embodiments, method 600, or portions thereof, is performed by a mobile computing device with a memory card slot, and in other embodiments, method 600, or portions thereof, is performed by software. The various actions in method 600 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 6 are omitted from method 600.

Method 600 begins at 610 in which a data pattern and an address value are received from an RFID card in a memory card slot. The data pattern corresponds to the hidden command data value, and the address value corresponds to the hidden command address value. In some embodiments, the mobile device only receives the data value and in other embodiments, the mobile device only receives the address value. In some embodiments, the actions of 610 may occur once when the RFID card is first inserted in the memory card slot. The mobile computing device may then use the address and data values each time it creates a hidden command. In other embodiments, the actions of 610 may occur each time the RFID card is inserted in the memory slot. In still further embodiments, the actions of 610 may occur periodically. Each time the actions 610 occur, the data pattern may be the same or different, and the address value may be the same or different.

At 620, a data field of a memory card access command is populated with the data pattern to cause the command to be diverted to a smartcard controller on the RFID card. For example, the data pattern may be written to the data field as the hidden command data value 510 (FIG. 5).

At 630, an address field of the memory card access command is populated with the address value to further cause the command to be diverted to the smartcard controller. In some embodiments, only one of 620 or 630 is utilized. In these

12

embodiments, the presence of a hidden command is signified by the data pattern alone, or the address value alone.

At 640, the data field of the memory card access command is populated with a command string to specify a purpose other than a memory card access. For example, the command string may be written to the data field as the command index 540 for the smart card controller. This command may be used for any purpose. For example, one or more hidden commands may have as a sole purpose keeping power provided to the memory card slot so that the RFID card continues to receive power.

At 650, the data field of a memory card access command is populated with a password to authenticate access to the RFID card coupled to the memory card slot. In some embodiments, a password is included in the data field for every hidden command. In other embodiments, a password is only included at the beginning of an exchange.

At 660, the memory card access command is sent to the RFID card coupled to the memory card slot. For example, a mobile computing device (110, FIGS. 1, 2) may send the memory card access command to an RFID card (120, FIGS. 1, 3, 4) in a memory card slot (112, FIGS. 1, 2). The RFID card includes a memory card controller (340, FIG. 3) to divert the command (or take some other action) based on the data fields populated in method 600.

FIG. 7 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 700 may be used by an RFID card in a memory card slot. In some embodiments, method 700, or portions thereof, is performed by a memory card controller within a memory card compatible RFID card, and in other embodiments, method 700, or portions thereof, is performed by software. The various actions in method 700 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 7 are omitted from method 700.

Method 700 begins at 710 in which a memory card access command is received from a mobile computing device via a host interface. The actions of 710 correspond to an RFID card in a memory card slot of a mobile computing device receiving a memory card access command.

At 720, the memory card controller checks criteria in the memory card access command to determine if the memory card access command should be diverted to a smartcard controller resident on the RFID card. The criteria may be one or both of a hidden command data value, a hidden command address value, or both. If there is a criteria match at 730, then a hidden command is present, and at least a portion of the memory card access command is diverted at 740. If there is not a criteria match, then no hidden command is present, and a memory access is performed at 750.

FIG. 8 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 800 may be used by an RFID card in a memory card slot. In some embodiments, method 800, or portions thereof, is performed by a memory card controller within an RFID card, and in other embodiments, method 800, or portions thereof, is performed by software. The various actions in method 800 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 8 are omitted from method 800.

Method 800 begins at 810 in which a memory card write command is received from a mobile computing device via a host interface. If the memory card write command is determined to be a hidden command, processing continues with 840; otherwise, a memory write is performed at 830.

Exhibit 1
Page 191 of 550

US 9,122,965 B2

13

At 840, the hidden command is diverted to a smartcard controller. In some embodiments, this corresponds to sending command index 540 and hidden command related data 550 (FIG. 5) to the smartcard controller. If the hidden command is determined to be a "read" at 850, processing continues at 860; otherwise, the hidden command processing is done. At 860, the memory card controller retrieves non-memory data from the smartcard controller, and at 870, a memory card read command is received from the mobile computing device. At 880, the non-memory data is returned to the mobile computing device.

Method 800 demonstrates how a mobile computing device can perform a read from a smartcard controller in a memory card compatible RFID card. The mobile computing device issues a memory card write command with a hidden command having a status field designating a read, and then the mobile computing device issues a memory card read command. The processing in the card receives the hidden command, identifies it as a read, and then returns data to the mobile computing device in response to a subsequent memory card read command.

FIG. 9 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 900 may be used by an RFID card in a memory card slot. In some embodiments, method 900, or portions thereof, is performed by a smartcard controller within an RFID card, and in other embodiments, method 900, or portions thereof, is performed by software. The various actions in method 900 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 9 are omitted from method 900.

Method 900 begins at 910 in which a smartcard controller receives a command from the memory card controller. This command corresponds to a hidden command received by the memory card controller. At 950, the smartcard controller determines whether the command is a "dummy" command used solely for the purpose of maintaining power to the memory card slot. If no, then the smartcard function specified in the command is performed at 930. If yes, then the command is disregarded at 960.

Method 900 allows a memory card compatible RFID card in a memory card slot to remain powered during periods when the memory card slot in the host device would otherwise remove power to save energy. This is a coordinated effort between software building hidden commands in a memory card access command, the memory card controller diverting the hidden command to the smartcard controller, and the smartcard controller disregarding the command. According to embodiments represented by FIG. 3A, providing power to the RFID card also provides power the smartcard controller, thereby allowing the use of a small inductive device such as those shown in FIGS. 3 and 4.

FIG. 10 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 1000 may be used by an RFID card in a memory card slot. In some embodiments, method 1000, or portions thereof, is performed by a memory card controller within an RFID card, and in other embodiments, method 1000, or portions thereof, is performed by software. The various actions in method 1000 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 10 are omitted from method 1000.

Method 1000 begins at 1010 in which a memory card controller receives a hidden command from a mobile computing device. If at 1020, the memory card controller determines that the hidden command is to be diverted to the smart-

14

card controller, then the command is diverted at 1030. In some embodiments, this corresponds to sending command index 540 and hidden command related data 550 (FIG. 5) to the smartcard controller. If the command is not to be diverted, then the memory card controller does not divert the command; however, the memory card controller may take other actions at 1040 based on the hidden command. For example, the memory card controller may modify a clock signal provided to the smartcard controller. Also for example, the memory card controller may assert a reset signal to the smartcard controller. Still for example, the memory card controller may cycle power to the smartcard controller. The memory card controller is able to cycle power to the smartcard controller in embodiments represented by FIG. 3B.

Cycling power to the smartcard controller may be a coordinated effort between the hosting computing device and the memory card controller in the RFID card. For example, power to the memory card slot may be maintained by supplying dummy hidden commands to the RFID card as described above with reference to FIG. 9. While power is maintained to the memory card slot, hidden commands may be used to cause the memory card controller to cycle power to the smartcard controller.

FIG. 11 shows a method authenticating a mobile computing device to one or more functions in a memory card compatible RFID card. Method 1100 begins at block 1110 in which an activation code is received at an RFID card from a mobile computing device. At 1120, the received activation code is compared to a code stored in the RFID card. If the activation code matches, the RFID card receives a password from the mobile computing device at 1140, and stores the password in the RFID card for later use at 1150. If the activation code does not match, the RFID card determines whether a number of allowable tries has been exceeded at 1160. If the number of allowable tries has been exceeded, the RFID card issuer is contacted at 1170, and if the number of allowable tries has not been exceeded, the method repeats until either the activation code matches or the number of allowable tries has been exceeded.

Method 1100 may be performed when an RFID card is issued to a user. For example, the RFID card may be a mobile payment card issued by a financial institution. The user may be provided an activation code to "activate" the RFID card. When the user successfully enters the activation code, the user is prompted for a password, and that password is stored for use in future hidden commands.

In some embodiments, multiple non-memory functions in an RFID card are authenticated using method 1100. For example, each of multiple non-memory functions may have stored activation codes, and each is activated separately. Each of the separately activated functions may have a different password, or the multiple functions may share a password.

Embodiments described thus far include a power delivery mechanism from the host to the smartcard controller that allow the antenna or coil to be very small. The small antenna or coil allows for higher levels of integration, but may also reduce the maximum distance at which the RFID card will function. For example, referring to FIG. 14, the voltage produced by the antenna needs to overcome the diode drops of the bridge rectifier before data can be demodulated within the smartcard controller. As the antenna shrinks in size, the RFID card needs to be closer to the device producing the interrogating RF field in order to produce a large enough voltage to overcome the bridge rectifier diode drops, thereby reducing the maximum usable distance.

FIG. 15 shows a smartcard controller with performance enhancement circuits including a load modulation driver cir-

Exhibit 1
Page 192 of 550

15

cuit and a single antenna in accordance with various embodiments of the present invention. Antenna 1542 is a small inductive element as described above. Capacitor 1544 is in parallel with antenna 1542 and together they form tuned circuit 1540 that is tuned to be resonant at the frequency of operation (e.g., 13.56 MHz). The performance enhancement circuits include an amplifier 1510, outgoing data extraction circuit 1520, and load modulation driver circuit 1530. Amplifier 1510 amplifies the voltage received at antenna 1542, and the amplified voltage is provided to the smartcard controller. This increases the maximum distance at which the RFID card can operate while receiving data, but also creates a unidirectional data path where a bidirectional data path previously existed. In other words, amplifier 1510 forms a simplex communication path where a half duplex path previously existed.

In order to restore the outgoing data path and re-create a half duplex communications system, the RFID card includes outgoing data extraction circuit 1520 and load modulation driver circuits 1530. Outgoing data extraction circuit 1520 receives a signal that is formed by the interrogating RF field having been load modulated by the smartcard controller. For example, the impedance of the antenna port is modulated by load modulation driver circuit 1410 (FIG. 14), where the modulating signal is the data. Outgoing data extraction circuit 1520 recovers the data, and then load modulation driver circuit 1530 modulates the impedance of the tuned circuit 1540 to form the outgoing data path.

Outgoing data extraction circuit 1520 may include one or more filters to extract the data. For example, referring now to FIG. 16, the load modulation driver circuit within the smartcard controller creates frequency sidebands 1610 about the carrier frequency 1620 of the interrogating RF field. Outgoing data extraction circuit 1520 may include conventional filters to isolate one or more sidebands and extract the data. As shown in FIG. 16, in some 13.56 MHz embodiments, the bandwidth of the carrier frequency of the interrogating RF field may be on the order of 850 KHz and the bandwidth of the sidebands may be on the order of 100-200 KHz, although this is not a limitation of the present invention.

Load modulation driver circuit 1530 receives the extracted data from outgoing data extraction circuit 1520, and load modulates the tuned circuit 1540 in response thereto. Load modulation driver circuits are generally well known, and may be as simple as a switched transistor that adds and removes a reactive element from tuned circuit 1540. In some embodiments, load modulation driver circuit 1530 substantially duplicates the load modulation driver circuit 1410 within smartcard controller 330.

Amplifier 1510 is shown coupled to smartcard controller pad 1472, and data extraction circuit 1520 is shown coupled to smartcard controller pad 1474, but this is not a limitation of the present invention. For example, outgoing data extraction circuit 1520 may be coupled to smartcard controller pad 1472 while amplifier 1510 may be coupled to smartcard controller pad 1474. Also for example, both circuit 1520 and amplifier 1510 may be coupled to either pad 1472 or pad 1474 without departing from the scope of the present invention.

FIG. 17 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. FIG. 17 shows smartcard controller 330, amplifier 1510, outgoing data extraction circuit 1520, and load modulation driver circuit 1530, all of which are described above. FIG. 17 also shows tuned circuits 1740 and 1750. Tuned circuit 1740 includes receive antenna 1742 and capacitor 1744. Tuned circuit 1750 includes transmit antenna 1752 and capacitor

16

1754. In some embodiments, receive antenna 1742 and transmit antenna 1752 are small inductive elements as described above.

Separate transmit and receive antennas allow for different tuning, both in frequency and bandwidth, or "Q." For example, tuned circuit 1740 may be tuned with relatively high Q for receive as shown at 1820 in FIG. 18, while tuned circuit 1750 may be tuned for a lower Q to envelope both sidebands for transmit as shown at 1830 in FIG. 18. The higher Q tuning for the receive antenna may further increase the maximum usable distance when the RFID card is receiving.

FIG. 19 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. FIG. 19 shows smartcard controller 330, amplifier 1510, outgoing data extraction circuit 1520, load modulation driver circuit 1530, and tuned receive circuit 1740, all of which are described above. FIG. 19 also shows two tuned transmit circuits 1950 and 1960. Tuned circuit 1950 includes antenna 1952 and capacitor 1954, and tuned circuit 1960 includes antenna 1962 and capacitor 1964. Antennas 1952 and 1962 may be small inductive elements as described above.

Separate transmit antennas allow separate tuning for the two sidebands. For example, tuned circuit 1950 may be tuned for the lower sideband tuned circuit 1960 may be tuned for the upper sideband as shown in FIG. 20. Higher Q tuning of the transmit antennas for the separate sidebands may further increase the maximum usable distance when the RFID card is transmitting.

FIG. 21 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention. The circuits shown in FIG. 21 are similar to FIG. 15 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 may include circuits to actively transmit a signal rather than simply load modulate tuned circuit 1540. For example, active transmit driver circuit 2130 may include one or more amplifiers filters, oscillators, modulators, etc., to form a signal that mimics the sidebands 1610 (FIG. 16) as if the interrogating RF field experienced load modulation. Active transmission can make use of power available on the RFID card and can further increase the usable distance when smartcard controller 330 is transmitting.

FIG. 22 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 22 are similar to FIG. 17 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 23 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 23 are similar to FIG. 19 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 24 shows a smartcard controller with a pad to provide a digital data output. Smartcard controller 2430 includes the antenna pads 1472 and 1474 as described above. Smartcard controller 2430 also includes pad 2410 which provides the digital data output directly. By providing the digital data

Exhibit 1
Page 193 of 550

US 9,122,965 B2

17

output directly, smartcard controller 2430 enables various embodiments of the invention to eliminate the outgoing data extraction circuit.

FIG. 25 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and a single antenna in accordance with various embodiments of the present invention. FIG. 25 shows smartcard controller 2430, amplifier 1510, load modulation driver circuits 1530, and tuned circuit 1540, all of which are described above. Note that because smartcard controller 2430 provides digital data directly, the outgoing data extraction circuit 1520 (FIG. 15) can be omitted, thereby reducing parts count and cost.

FIG. 26 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. FIG. 26 shows circuits similar to those shown in FIG. 25, except that separate transmit and receive antennas are provided. Separate transmit and receive antennas (and associated tuned circuits) allow for a higher Q tuning of the receive antenna, thereby increasing the maximum usable distance when RFID card is receiving. See FIG. 18.

FIG. 27 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. FIG. 27 shows circuits similar to those shown in FIG. 26, except that multiple transmit antennas are provided. Multiple separate transmit antennas (and associated tuned circuits) allow for a higher Q tuning of each transmit antenna, thereby increasing the maximum usable distance when RFID card is transmitting. See FIG. 20.

FIG. 28 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention. The circuits shown in FIG. 28 are similar to FIG. 25 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21. In general, the term "driver" as used herein refers to an active transmit driver or a load modulation driver or any other method of driving the transmit output data.

FIG. 29 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 29 are similar to FIG. 26 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 30 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 30 are similar to FIG. 27 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIGS. 31-34 show performance enhancing application specific integrated circuits (ASIC's) coupled to various smartcard controllers in accordance with various embodiments of the present invention. FIGS. 31 and 32 show ASIC's coupled to smartcard controller 330. Both ASIC's include amplifier 1510 and outgoing data extraction circuits 1520. The ASIC of FIG. 31 includes load modulation driver circuits 1530 and the

18

ASIC of FIG. 32 includes active transmit driver circuit 2130. FIGS. 33 and 34 show ASIC's coupled to receive direct digital data from smartcard controller 2430. Accordingly, the outgoing data extraction circuits are omitted. The ASIC of FIG. 33 includes amplifier 1510 and load modulation driver circuits 1530, and the ASIC of FIG. 34 includes amplifier 1510 and active transmit driver circuit 2130.

By combining a smartcard controller and an ASIC as described herein, the performance of an RFID card may be enhanced with a reduced parts count. Further, any of ASIC's shown may be used with separate receive and transmit antennas, multiple transmit antennas, or any combination. Further, one ASIC may be provided with all of the functionality shown in FIGS. 31-34 and the manner in which it is connected to a smartcard controller will dictate which functional blocks (e.g., data extraction, load modulation, active transmit) are utilized.

FIG. 35 shows a memory card with integrated smartcard controller, performance enhancement circuits, and antennas in accordance with various embodiments of the present invention. Host interface 310, memory card controller 340, and memory 360 are described above. Smartcard controller 3520 may be any smartcard controller described herein, including smartcard controller 330 or smartcard controller 2430. Enhancement circuits 3550 may include any of the enhancement circuits described herein including any combination of amplifier 1510, outgoing data extraction circuits 1520, load modulation driver circuits 1530 and active transmit driver circuit 2130. Antenna(s) 3560 may include any number or type of antennas. For example, antenna(s) 3560 may include one antenna, separate transmit and receive antennas, or a receive antenna and multiple transmit antennas.

FIG. 36 shows a memory card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention. The memory card of FIG. 36 shows circuits similar to FIG. 35 with the exception of antenna(s) 3560. Instead, the memory card of FIG. 36 is intended for use with a host device that includes antenna(s). In some embodiments, antenna(s) 3560 are included in the memory card of FIG. 36, thereby allowing the host device to decide whether to use the antennas on the memory card, or the antennas on the host device. The form factor of the memory card in FIGS. 35 and 36 is shown as a microSD card, but this is not a limitation of the present invention. Any form factor may be employed.

FIG. 37 shows a subscriber identity module (SIM) card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention. Smartcard controller 3520, enhancement circuits 3550, and antenna(s) 3560 are described above with reference to FIG. 35.

FIG. 38 shows a subscriber identity module (SIM) card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention. The SIM card of FIG. 38 shows circuits similar to FIG. 37 with the exception of antenna(s) 3560. Instead, the SIM card of FIG. 38 is intended for use with a host device that includes antenna(s). In some embodiments, antenna(s) 3560 are included in the SIM card of FIG. 38, thereby allowing the host device to decide whether to use the antennas on the SIM card, or the antennas on the host device.

FIG. 39 shows a mobile device with a smartcard controller, enhancement circuits, and antenna(s). The mobile device of FIG. 39 includes a built-in smartcard controller for RFID functionality as opposed to accepting a separate RFID card as

Exhibit 1
Page 194 of 550

US 9,122,965 B2

19     20

described above. The mobile device may be any electronic device including a mobile phone, a tablet computer, or the like.

Although the present invention has been described in conjunction with certain embodiments, it is to be understood that modifications and variations may be resorted to without departing from the spirit and scope of the invention as those skilled in the art readily understand. Such modifications and variations are considered to be within the scope of the invention and the appended claims.

What is claimed is:

1. A mobile device comprising:
a smartcard controller;
an antenna; and
performance enhancement circuits coupled between the smartcard controller and the antenna, wherein the performance enhancement circuits include an amplifier and a load modulation circuit, and wherein the amplifier is coupled to amplify a signal received from the antenna and to provide an amplified signal to the smartcard controller.

2. The mobile device of claim 1 wherein the antenna is tuned to operate at 13.56 MHz.

3. The mobile device of claim 1 wherein the antenna comprises an inductive element too small to draw enough power sufficient to operate the smartcard controller from an interrogating radio frequency (RF) field.

4. The mobile device of claim 1 wherein the smartcard controller is coupled to be powered by the mobile device.

5. The mobile device of claim 1 wherein the performance enhancement circuits are coupled to be powered by the mobile device.

6. The mobile device of claim 1 wherein the mobile device comprises a mobile phone.

7. A mobile device comprising:
a smartcard controller;
an antenna; and
performance enhancement circuits coupled between the smartcard controller and the antenna, wherein the performance enhancement circuits include an amplifier and an active transmit driver circuit, and wherein the ampli-

fier is coupled to amplify a signal received from the antenna and to provide an amplified signal to the smartcard controller.

8. The mobile device of claim 7 wherein the antenna is tuned to operate at 13.56 MHz.

9. The mobile device of claim 7 wherein the antenna comprises an inductive element too small to draw enough power sufficient to operate the smartcard controller from an interrogating radio frequency (RF) field.

10. The mobile device of claim 7 wherein the smartcard controller is coupled to be powered by the mobile device.

11. The mobile device of claim 7 wherein the performance enhancement circuits are coupled to be powered by the mobile device.

12. The mobile device of claim 7 wherein the mobile device comprises a mobile phone.

13. A mobile device comprising:
a smartcard controller;
an antenna;
an amplifier coupled to amplify signals received at the antenna and drive the smartcard controller; and
a driver circuit to drive the antenna with data provided by the smartcard controller.

14. The mobile device of claim 13 wherein the driver circuit comprises a load modulation circuit.

15. The mobile device of claim 13 wherein the driver circuit comprises an active transmit driver circuit.

16. The mobile device of claim 15 wherein the active transmit driver circuit is coupled to be powered by the mobile device.

17. The mobile device of claim 13 wherein the amplifier is coupled to be powered by the mobile device.

18. The mobile device of claim 13 wherein the antenna is tuned to operate at 13.56 MHz.

19. The mobile device of claim 13 wherein the antenna comprises an inductive element too small to draw enough power sufficient to operate the smartcard controller from an interrogating radio frequency (RF) field.

20. The mobile device of claim 13 wherein the mobile device comprises a mobile phone.

* * * * *

Exhibit 1
Page 195 of 550

# EXHIBIT 2

Exhibit 1
Page 196 of 550

US009483722B2

US 9,483,722 B2

(12) **United States Patent**
Narendra et al.

(10) Patent No.: **US 9,483,722 B2**
(45) Date of Patent: ***Nov. 1, 2016**

(54) **AMPLIFIER AND TRANSMISSION SOLUTION FOR 13.56MHZ RADIO COUPLED TO SMARTCARD CONTROLLER**

(71) Applicant: **Tyfone, Inc.**, Portland, OR (US)

(72) Inventors: **Siva G. Narendra**, Portland, OR (US); **Saurav Chakraborty**, West Bengal (IN); **Prabhakar Tadepalli**, Bangalore (IN)

(73) Assignee: **Tyfone, Inc.**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/517,575**

(22) Filed: **Oct. 17, 2014**

(65) **Prior Publication Data**

US 2015/0038194 A1 Feb. 5, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/460,647, filed on Aug. 15, 2014, now Pat. No. 8,937,549, which is a continuation of application No. 13/871,849, filed on Apr. 26, 2013, now Pat. No. 8,866,614, which is a

(Continued)

(51) **Int. Cl.**
*G08B 13/14* (2006.01)
*G06K 19/07* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... *G06K 19/0727* (2013.01); *G06K 19/0701* (2013.01); *G06K 19/073* (2013.01); *G06K 19/0723* (2013.01); *G06K 19/0726* (2013.01); *G06K 19/07732* (2013.01); *G06K 19/07749* (2013.01); *G06K 19/07769* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .................. G06K 19/0723; G06K 19/0727; G06K 19/07732; G06K 19/07749
USPC ........ 340/572.1, 572.8, 10.1, 10.51; 235/492, 235/379, 380, 493; 710/1, 100, 301; 455/558
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,701,601 A 10 1987 Francini et al.
4,786,791 A 11 1988 Hodama
(Continued)

FOREIGN PATENT DOCUMENTS

CN 102007501 A 4 2011
DE 3632294 A1 4 1988
(Continued)

OTHER PUBLICATIONS

European search report and search opinion App # Patent # 12752195.3-1811 2681694 PCT US2012027128, 6 pages dated Feb. 11, 2014.

(Continued)

*Primary Examiner* — Toan N Pham
(74) *Attorney, Agent, or Firm* — Dana B. LeMoine

(57) **ABSTRACT**

An RFID card includes a smartcard controller that receives power from a host device. The RFID card also includes a small inductive device capable of inductive coupling with an RFID reader. The small inductive device is small enough to fit in the form factor of a memory card or SIM card. Enhancement circuits enhance the usable read and write distance of the RFID card.

**14 Claims, 30 Drawing Sheets**



Exhibit 1
Page 197 of 550

US 9,483,722 B2

Page 2

## Related U.S. Application Data

continuation of application No. 12/188,346, filed on Aug. 8, 2008, now Pat. No. 7,961,101, and a continuation of application No. 13/038,341, filed on Mar. 1, 2011, now Pat. No. 8,451,122, which is a continuation-in-part of application No. 12/188,346, filed on Aug. 8, 2008, now Pat. No. 7,961,101.

(51) **Int. Cl.**

| | |
|---|---|
| *G06K 19/077* | (2006.01) |
| *G06K 19/073* | (2006.01) |
| *G06Q 20/20* | (2012.01) |
| *H04B 1/3816* | (2015.01) |
| *H04B 5/00* | (2006.01) |

(52) **U.S. Cl.**

CPC ......... *G06Q20/204* (2013.01); *H04B 1/3816* (2013.01); *H04B 5/0025* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,791,283 | A | 12 1988 | Burkhardt |
| 4,864,109 | A | 9 1989 | Minematsu et al. |
| 5,212,478 | A | 5 1993 | Moseley |
| 5,378,887 | A | 1 1995 | Kobayashi |
| 5,537,584 | A | 7 1996 | Miyai et al. |
| 5,574,273 | A | 11 1996 | Nakagawa et al. |
| 5,585,787 | A | 12 1996 | Wallerstein |
| 5,629,981 | A | 5 1997 | Nerlikar |
| 5,700,037 | A | 12 1997 | Keller |
| 5,710,421 | A | 1 1998 | Kokubu |
| 5,834,756 | A | 11 1998 | Gutman et al. |
| 5,909,491 | A | 6 1999 | Luo |
| 5,940,510 | A | 8 1999 | Curry et al. |
| 5,943,624 | A | 8 1999 | Fox et al. |
| 5,949,880 | A | 9 1999 | Curry et al. |
| 5,952,641 | A | 9 1999 | Korshun |
| 5,955,961 | A | 9 1999 | Wallerstein |
| 6,016,476 | A | 1 2000 | Maes et al. |
| 6,021,944 | A | 2 2000 | Arakaki |
| 6,039,260 | A | 3 2000 | Eisele |
| 6,045,043 | A | 4 2000 | Bashan et al. |
| 6,068,184 | A | 5 2000 | Barnett |
| 6,105,013 | A | 8 2000 | Curry et al. |
| 6,182,891 | B1 | 2 2001 | Furuhashi et al. |
| 6,189,786 | B1 | 2 2001 | Itou et al. |
| 6,206,293 | B1 | 3 2001 | Gutman et al. |
| 6,219,439 | B1 | 4 2001 | Burger |
| 6,223,954 | B1 | 5 2001 | Carow |
| 6,223,984 | B1 | 5 2001 | Renner et al. |
| 6,237,095 | B1 | 5 2001 | Curry et al. |
| 6,250,557 | B1 | 6 2001 | Forslund et al. |
| 6,315,195 | B1 | 11 2001 | Ramachandran |
| 6,402,029 | B1 | 6 2002 | Gangi |
| 6,481,623 | B1 | 11 2002 | Grant et al. |
| 6,568,600 | B1 | 5 2003 | Carpier et al. |
| 6,588,660 | B1 | 7 2003 | Buescher et al. |
| 6,592,044 | B1 | 7 2003 | Wong et al. |
| 6,594,759 | B1 | 7 2003 | Wang |
| 6,598,031 | B1 | 7 2003 | Ice |
| 6,606,025 | B1 | 8 2003 | Staufer et al. |
| 6,607,127 | B2 | 8 2003 | Wong |
| 6,609,654 | B1 | 8 2003 | Anderson et al. |
| 6,631,849 | B2 | 10 2003 | Blossom |
| 6,636,833 | B1 | 10 2003 | Flitcroft et al. |
| 6,669,487 | B1 | 12 2003 | Nishizawa et al. |
| 6,705,520 | B1 | 3 2004 | Pitroda et al. |
| 6,712,277 | B2 | 3 2004 | Spencer |
| 6,715,679 | B1 | 4 2004 | Infosino |
| 6,721,196 | B1 | 4 2004 | Grassl |
| 6,747,547 | B2 | 6 2004 | Benson |
| 6,764,005 | B2 | 7 2004 | Cooper |
| 6,769,607 | B1 | 8 2004 | Pitroda et al. |
| 6,805,288 | B2 | 10 2004 | Routhenstein et al. |

| | | | |
|---|---|---|---|
| 6,811,082 | B2 | 11 2004 | Wong |
| 6,836,843 | B2 | 12 2004 | Seroussi et al. |
| 6,857,566 | B2 | 2 2005 | Wankmueller |
| 6,882,900 | B1 | 4 2005 | Terranova |
| 6,883,718 | B1 | 4 2005 | Le et al. |
| 6,905,072 | B2 | 6 2005 | Ramachandran |
| 6,907,123 | B1 | 6 2005 | Schier |
| 6,908,030 | B2 | 6 2005 | Rajasekaran et al. |
| 6,925,568 | B1 | 8 2005 | Heinonen |
| 6,937,526 | B2 | 8 2005 | Furukawa |
| 6,952,788 | B2 | 10 2005 | Rommelmann et al. |
| 6,995,651 | B2 | 2 2006 | Amtmann et al. |
| 7,059,520 | B1 | 6 2006 | Shtesl |
| 7,088,246 | B2 | 8 2006 | Fukuoka |
| 7,110,792 | B2 | 9 2006 | Rosenberg |
| 7,185,146 | B2 | 2 2007 | Masuyama et al. |
| 7,221,473 | B2 | 5 2007 | Jeran et al. |
| 7,281,101 | B2 | 10 2007 | Mizushima et al. |
| 7,295,790 | B2 | 11 2007 | Morimoto et al. |
| 7,333,062 | B2 | 2 2008 | Leizerovich et al. |
| 7,350,717 | B2 | 4 2008 | Conner et al. |
| 7,353,993 | B2 | 4 2008 | Fujimoto |
| 7,410,102 | B2 | 8 2008 | Winkler |
| 7,493,484 | B2 | 2 2009 | Lee |
| 7,558,107 | B2 | 7 2009 | Sakurai et al. |
| 7,558,410 | B2 | 7 2009 | Mizushima et al. |
| 7,581,678 | B2 | 9 2009 | Narendra et al. |
| 7,607,580 | B2 | 10 2009 | Takita et al. |
| 7,673,800 | B1 | 3 2010 | Yu et al. |
| RE41,352 | E | 5 2010 | Wood, Jr. |
| 7,716,082 | B1 | 5 2010 | Blalock |
| RE41,471 | E | 8 2010 | Wood, Jr. |
| 7,789,303 | B2 | 9 2010 | Fukasawa |
| 7,792,516 | B2 | 9 2010 | Soderstrom |
| 7,796,940 | B2 * | 9 2010 | Matsushita .......... H04B 1 406 455 114.2 |
| 7,828,214 | B2 | 11 2010 | Narendra et al. |
| RE42,254 | E | 3 2011 | Wood, Jr. |
| 7,933,571 | B2 | 4 2011 | Black et al. |
| 7,941,197 | B2 | 5 2011 | Jain et al. |
| 7,948,356 | B2 | 5 2011 | Kawamura et al. |
| 7,954,715 | B2 | 6 2011 | Narendra et al. |
| 7,954,716 | B2 | 6 2011 | Narendra et al. |
| 7,954,717 | B2 | 6 2011 | Narendra et al. |
| 7,961,101 | B2 | 6 2011 | Narendra et al. |
| 7,991,158 | B2 | 8 2011 | Narendra et al. |
| 8,072,331 | B2 | 12 2011 | Narendra et al. |
| 8,083,145 | B2 | 12 2011 | Narendra et al. |
| 8,091,786 | B2 | 1 2012 | Narendra et al. |
| 8,260,199 | B2 * | 9 2012 | Kowalski .......... G06K 7 10178 235 462.25 |
| 8,451,122 | B2 | 5 2013 | Narendra et al. |
| 2001 0002035 | A1 | 5 2001 | Kayanakis |
| 2001 0006902 | A1 | 7 2001 | Ito |
| 2001 0013551 | A1 | 8 2001 | Ramachandran |
| 2002 0007434 | A1 | 1 2002 | Campardo |
| 2002 0043566 | A1 | 4 2002 | Goodman et al. |
| 2002 0044043 | A1 | 4 2002 | Chaco et al. |
| 2002 0095588 | A1 | 7 2002 | Shigematsu et al. |
| 2002 0096570 | A1 | 7 2002 | Wong et al. |
| 2002 0099665 | A1 | 7 2002 | Burger et al. |
| 2002 0130187 | A1 | 9 2002 | Berg et al. |
| 2002 0138422 | A1 | 9 2002 | Natsuno |
| 2002 0138735 | A1 | 9 2002 | Felt et al. |
| 2002 0139849 | A1 | 10 2002 | Gangi |
| 2002 0148892 | A1 | 10 2002 | Bardwell |
| 2002 0153424 | A1 | 10 2002 | Li |
| 2002 0158747 | A1 | 10 2002 | Mcgregor et al. |
| 2002 0178124 | A1 | 11 2002 | Lewis |
| 2002 0180584 | A1 | 12 2002 | Mcgregor et al. |
| 2002 0186845 | A1 | 12 2002 | Dutta et al. |
| 2003 0025939 | A1 | 2 2003 | Jeran et al. |
| 2003 0028481 | A1 | 2 2003 | Flitcroft et al. |
| 2003 0052168 | A1 | 3 2003 | Wong |
| 2003 0057278 | A1 | 3 2003 | Wong |
| 2003 0061168 | A1 | 3 2003 | Routhenstein |
| 2003 0079096 | A1 | 4 2003 | Murakami |
| 2003 0080183 | A1 | 5 2003 | Rajasekaran et al. |
| 2003 0085288 | A1 | 5 2003 | Luu |

Exhibit 1
Page 198 of 550

## US 9,483,722 B2
Page 3

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0115126 A1 | 6/2003 | Pitroda | |
| 2003/0128124 A1 | 7/2003 | Ammann et al. | |
| 2003/0159050 A1 | 8/2003 | Gantman et al. | |
| 2003/0200180 A1 | 10/2003 | Phelan et al. | |
| 2003/0220876 A1 | 11/2003 | Burger et al. | |
| 2003/0231550 A1 | 12/2003 | Macfarlane | |
| 2004/0006654 A1 | 1/2004 | Bando | |
| 2004/0027881 A1 | 2/2004 | Furukawa | |
| 2004/0030660 A1 | 2/2004 | Shatford | |
| 2004/0035942 A1 | 2/2004 | Silverman | |
| 2004/0050930 A1 | 3/2004 | Rowe | |
| 2004/0058705 A1 | 3/2004 | Morgan et al. | |
| 2004/0064612 A1 | 4/2004 | Pinto et al. | |
| 2004/0065733 A1 | 4/2004 | Fukuoka | |
| 2004/0077372 A1 | 4/2004 | Halpern | |
| 2004/0087339 A1 | 5/2004 | Goldthwaite et al. | |
| 2004/0094624 A1 | 5/2004 | Fernandes et al. | |
| 2004/0133787 A1 | 7/2004 | Doughty et al. | |
| 2004/0162932 A1 | 8/2004 | Mizushima et al. | |
| 2004/0177045 A1 | 9/2004 | Brown | |
| 2004/0188519 A1 | 9/2004 | Cassone | |
| 2004/0199469 A1 | 10/2004 | Barillova et al. | |
| 2004/0227859 A1 | 11/2004 | Liang | |
| 2004/0243785 A1 | 12/2004 | Shanmugasundaram et al. | |
| 2004/0243806 A1 | 12/2004 | McKinley et al. | |
| 2004/0251303 A1 | 12/2004 | Cooper | |
| 2004/0255145 A1 | 12/2004 | Chow | |
| 2005/0006462 A1 | 1/2005 | Rouille et al. | |
| 2005/0017068 A1 | 1/2005 | Zalewski et al. | |
| 2005/0022002 A1 | 1/2005 | Poisner | |
| 2005/0029349 A1 | 2/2005 | Mcgregor et al. | |
| 2005/0038736 A1 | 2/2005 | Saunders | |
| 2005/0039027 A1 | 2/2005 | Shapiro | |
| 2005/0044044 A1 | 2/2005 | Burger et al. | |
| 2005/0050367 A1 | 3/2005 | Burger et al. | |
| 2005/0052924 A1 | 3/2005 | Nishizawa et al. | |
| 2005/0060586 A1 | 3/2005 | Burger et al. | |
| 2005/0071282 A1 | 3/2005 | Lu et al. | |
| 2005/0077349 A1 | 4/2005 | Bonalle et al. | |
| 2005/0092830 A1 | 5/2005 | Blossom | |
| 2005/0108096 A1 | 5/2005 | Burger et al. | |
| 2005/0109838 A1 | 5/2005 | Linlor | |
| 2005/0116026 A1 | 6/2005 | Burger et al. | |
| 2005/0121512 A1 | 6/2005 | Wankmueller | |
| 2005/0122209 A1 | 6/2005 | Black | |
| 2005/0127164 A1 | 6/2005 | Wankmueller | |
| 2005/0127166 A1 | 6/2005 | Minemura | |
| 2005/0133606 A1 | 6/2005 | Brown | |
| 2005/0136964 A1 | 6/2005 | Le Saint et al. | |
| 2005/0168339 A1 | 8/2005 | Arai et al. | |
| 2005/0177724 A1 | 8/2005 | Ali et al. | |
| 2005/0197859 A1 | 9/2005 | Wilson et al. | |
| 2005/0204077 A1 | 9/2005 | Kou | |
| 2005/0204092 A1 | 9/2005 | Masuyama et al. | |
| 2005/0212657 A1 | 9/2005 | Simon | |
| 2005/0223143 A1 | 10/2005 | Kang et al. | |
| 2005/0224589 A1* | 10/2005 | Park ................. G06K 19/07732 235/492 |
| 2005/0240778 A1 | 10/2005 | Saito | |
| 2005/0246546 A1 | 11/2005 | Takagi et al. | |
| 2005/0253687 A1 | 11/2005 | Martinez et al. | |
| 2005/0258245 A1 | 11/2005 | Bates et al. | |
| 2005/0268058 A1 | 12/2005 | Drasnin et al. | |
| 2005/0268330 A1 | 12/2005 | Di Rienzo | |
| 2006/0011731 A1 | 1/2006 | Anders et al. | |
| 2006/0027655 A1 | 2/2006 | Smets et al. | |
| 2006/0048555 A1 | 3/2006 | Morimoto et al. | |
| 2006/0077039 A1 | 4/2006 | Ibi et al. | |
| 2006/0097851 A1 | 5/2006 | Ammann et al. | |
| 2006/0124755 A1 | 6/2006 | Ito | |
| 2006/0169778 A1 | 8/2006 | Chung | |
| 2006/0172606 A1 | 8/2006 | Irisawa | |
| 2006/0186209 A1 | 8/2006 | Narendra et al. | |
| 2006/0219776 A1 | 10/2006 | Finn | |
| 2006/0226217 A1 | 10/2006 | Narendra et al. | |

| | | |
|---|---|---|
| 2006/0268764 A1 | 11/2006 | Harris |
| 2006/0279413 A1 | 12/2006 | Yeager |
| 2007/0022012 A1 | 1/2007 | Wu et al. |
| 2007/0033334 A1 | 2/2007 | Katayama et al. |
| 2007/0076877 A1 | 4/2007 | Camp et al. |
| 2007/0108280 A1 | 5/2007 | Li et al. |
| 2007/0110404 A1 | 5/2007 | Ching et al. |
| 2007/0145135 A1 | 6/2007 | Jogand-Coulomb et al. |
| 2007/0145152 A1 | 6/2007 | Jogand-Coulomb et al. |
| 2007/0195458 A1 | 8/2007 | Sawai et al. |
| 2007/0205864 A1 | 9/2007 | Mutti et al. |
| 2007/0257797 A1 | 11/2007 | Rancien et al. |
| 2007/0293202 A1 | 12/2007 | Moshir et al. |
| 2008/0046649 A1 | 2/2008 | Ito |
| 2008/0065830 A1 | 3/2008 | Aoki et al. |
| 2008/0068173 A1 | 3/2008 | Alexis et al. |
| 2008/0073436 A1 | 3/2008 | Nishizawa et al. |
| 2008/0136619 A1 | 6/2008 | Moran |
| 2008/0147950 A1 | 6/2008 | Chen |
| 2008/0148077 A1 | 6/2008 | Lee et al. |
| 2008/0153416 A1 | 6/2008 | Washiro |
| 2008/0186174 A1 | 8/2008 | Alexis et al. |
| 2008/0214114 A1 | 9/2008 | Moshir et al. |
| 2008/0244208 A1 | 10/2008 | Narendra et al. |
| 2008/0279381 A1 | 11/2008 | Narendra et al. |
| 2008/0311849 A1 | 12/2008 | Washiro |
| 2008/0318535 A1 | 12/2008 | Black et al. |
| 2009/0065571 A1 | 3/2009 | Jain |
| 2009/0065572 A1 | 3/2009 | Jain |
| 2009/0069049 A1 | 3/2009 | Jain |
| 2009/0069050 A1 | 3/2009 | Jain et al. |
| 2009/0069051 A1 | 3/2009 | Jain et al. |
| 2009/0069052 A1 | 3/2009 | Jain et al. |
| 2009/0070272 A1 | 3/2009 | Jain |
| 2009/0070691 A1 | 3/2009 | Jain |
| 2009/0070861 A1 | 3/2009 | Jain |
| 2009/0108065 A1 | 4/2009 | Jain et al. |
| 2009/0150610 A1 | 6/2009 | Hsu et al. |
| 2009/0152361 A1 | 6/2009 | Narendra et al. |
| 2009/0199283 A1 | 8/2009 | Jain |
| 2009/0250521 A1 | 10/2009 | Fujita et al. |
| 2009/0265552 A1 | 10/2009 | Moshir et al. |
| 2009/0270127 A1 | 10/2009 | Kakimoto |
| 2009/0290582 A1 | 11/2009 | Suenaga et al. |
| 2009/0298540 A1 | 12/2009 | Narendra et al. |
| 2009/0315667 A1 | 12/2009 | Kawamura et al. |
| 2010/0033307 A1 | 2/2010 | Narendra et al. |
| 2010/0033310 A1 | 2/2010 | Narendra et al. |
| 2010/0044444 A1 | 2/2010 | Jain et al. |
| 2010/0049878 A1 | 2/2010 | Yu et al. |
| 2010/0069118 A1 | 3/2010 | Wang |
| 2010/0115164 A1 | 5/2010 | Huang et al. |
| 2010/0213265 A1 | 8/2010 | Narendra et al. |
| 2011/0053644 A1 | 3/2011 | Narendra et al. |
| 2011/0065386 A1 | 3/2011 | Keller |
| 2011/0073663 A1 | 3/2011 | Narendra et al. |
| 2011/0073665 A1 | 3/2011 | Narendra et al. |
| 2011/0077052 A1 | 3/2011 | Narendra et al. |
| 2011/0104404 A1 | 5/2011 | Washiro |
| 2011/0171996 A1 | 7/2011 | Narendra et al. |
| 2011/0180610 A1 | 7/2011 | Narendra et al. |
| 2011/0220726 A1 | 9/2011 | Narendra et al. |
| 2011/0223972 A1 | 9/2011 | Narendra et al. |
| 2011/0269438 A1 | 11/2011 | Narendra et al. |
| 2011/0271044 A1 | 11/2011 | Narendra et al. |
| 2011/0272468 A1 | 11/2011 | Narendra et al. |
| 2011/0272469 A1 | 11/2011 | Narendra et al. |
| 2013/0233931 A1 | 9/2013 | Narendra et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 10054890 A1 | 4/2002 |
| EP | 161060 A1 | 11/1985 |
| EP | 0818757 A2 | 1/1998 |
| EP | 1014290 A2 | 6/2000 |
| EP | 1117068 A1 | 7/2001 |
| EP | 1178450 A2 | 2/2002 |
| EP | 1189465 A1 | 3/2002 |
| EP | 1291748 A2 | 3/2003 |

Exhibit 1
Page 199 of 550

## US 9,483,722 B2
Page 4

(56)        **References Cited**

### FOREIGN PATENT DOCUMENTS

| GB | 2316908 A | 3 1998 |
|----|-----------|--------|
| JP | 4102112 A | 4 1992 |
| JP | 2000010668 A | 1 2000 |
| JP | 2005018671 A | 1 2005 |
| JP | 2007199847 A | 8 2007 |
| JP | 2007328689 A | 12 2007 |
| TW | M293494 | 7 2006 |
| TW | 200705275 A | 2 2007 |
| TW | 200803215 A | 1 2008 |
| TW | 200905471 A | 2 2009 |
| TW | 201020934 A | 6 2010 |
| TW | 201023662 A | 6 2010 |
| TW | I336449 | 1 2011 |
| TW | 201126422 A | 8 2011 |
| TW | I421774 | 1 2014 |
| WO | 9626500 A1 | 8 1996 |
| WO | 9812674 A2 | 3 1998 |
| WO | 0014678 A1 | 3 2000 |
| WO | 0188659 A2 | 11 2001 |
| WO | 03029942 A2 | 4 2003 |
| WO | 03077473 A1 | 9 2003 |
| WO | 03081519 A2 | 10 2003 |
| WO | 2004012352 A1 | 2 2004 |
| WO | 2004095169 A2 | 11 2004 |
| WO | 2005027030 A1 | 3 2005 |
| WO | 2005119607 A2 | 12 2005 |
| WO | 2005119608 A1 | 12 2005 |
| WO | 2006091709 A2 | 8 2006 |
| WO | 2006108184 A1 | 10 2006 |
| WO | 2007011937 A2 | 1 2007 |
| WO | 2007076456 A2 | 7 2007 |
| WO | 2008121566 A1 | 10 2008 |
| WO | 2009147548 A2 | 12 2009 |
| WO | 2010099093 A1 | 9 2010 |

### OTHER PUBLICATIONS

International Search Report PCT Application No. PCT US2005 019988, Dec. 16, 2005, 5 pages.
International Search Report PCT Application No. PCT US2005 022993, Oct. 21, 2005, 3 pages.
International Search Report PCT Application No. PCT US2006 013603, Jan. 9, 2006, 3 pages.
International Search Report PCT Application No. PCT US2006 027847, Mar. 29, 2007, 5 pages.
International Search Report PCT Application No. PCT US2008 057588, Aug. 7, 2008, 4 pages.
International Written Opinion PCT Application No. PCT US2005 019988 , Dec. 4, 2006, 9 Pages.
International Written Opinion PCT Application No. PCT US2005 022993, Dec. 4, 2006, 6 pages.

International Written Opinion PCT Application No. PCT US2006 006361, Aug. 28, 2007, 8 pages.
International Written Opinion PCT Application No. PCT US2006 006361, Sep. 22, 2006, 13 pages.
International Written Opinion PCT Application No. PCT US2006 013603, Oct. 9, 2007, 7 pages.
International Written Opinion PCT Application No. PCT US2006 027847, Jan. 22, 2008, 10 pages.
International Written Opinion PCT Application No. PCT US2008 057588, Oct. 6, 2009, 6 pages.
International Written Opinion PCT Application No. PCT US2010 025014, Apr. 15, 2010, 9 pages.
International Written Opinion PCT Application No. PCT US2010 025014, Sep. 9, 2011, 6 pages.
Lee, Youbok: "Antenna Circuit Design for RFID Applications", Microchip, AN710, 2003 Microchip Technology Inc., (2003), 50 pages.
PCTUS2012027128 ISR WO Sep. 21, 2012.
Translation of official letter corresponding to patent application #100143174 dated Feb. 17, 2014, 33 pages.
U.S. Appl. No. 13/657,846 Office Action dated Apr. 11, 2014, 44 pages.
U.S. Appl. No. 14/460,647 Office Action dated Sep. 25, 2014, 7 pages.
International Written Opinion PCT Application No. PCT US2012 027128, Sep. 12, 2013, 6 pages.
U.S. Appl. No. 14/517,495 Office Action dated Nov. 19, 2014, 8 pages.
U.S. Appl. No. 14/517,567 Office Action dated Nov. 20, 2014, 8 pages.
EP Patent Application 15681011 Extended European Search Report dated Aug. 31, 2015, 4 pages.
TW Patent Application 102143821 Office Action and Search Report dated May 28, 2015, 10 pages.
TW Patent Application No. 102143318 Office Action and Search Report date Jul. 7, 2015, 3 pages.
CN Patent Application # 2012800111253 Office Action dated Dec. 1, 2015, 6 pages, Chinese version.
CN Patent Application # 2012800111253 Office Action dated Dec. 1, 2015, 8 pages, English translation.
EP Patent Application 15178337.0 Extended European Search Report dated Dec. 3, 2015, 5 pages.
TW Patent Application 103136821 English Translation of Office Action and Search Report dated Dec. 25, 2015, 3 pages.
U.S. Appl. No. 14/517,585 Office Action dated Dec. 2, 2015, 10 pages.
U.S. Appl. No. 14/542,440 Office Action dated Jan. 14, 2016, 9 pages.
U.S. Appl. No. 14/517,585 Office Action dated Apr. 29, 2016, 8 pages.

* cited by examiner

Exhibit 1
Page 200 of 550



*FIG. 1*



*FIG. 2*

Exhibit 1
Page 201 of 550

U.S. Patent

Nov. 1, 2016

Sheet 2 of 30

US 9,483,722 B2



FIG. 3A

Exhibit 1
Page 202 of 550

U.S. Patent

Nov. 1, 2016

Sheet 3 of 30

US 9,483,722 B2



*FIG. 3B*

Exhibit 1
Page 203 of 550



*FIG. 4*

Exhibit 1
Page 204 of 550

U.S. Patent

Nov. 1, 2016

Sheet 5 of 30

US 9,483,722 B2



*FIG. 5*

Exhibit 1
Page 205 of 550



RECEIVE A DATA PATTERN AND AN ADDRESS VALUE FROM AN RFID CARD IN A MEMORY CARD SLOT ~ 610

POPULATE A DATA FIELD OF A MEMORY CARD ACCESS COMMAND WITH THE DATA PATTERN TO CAUSE THE COMMAND TO BE DIVERTED TO THE SMARTCARD CONTROLLER ~ 620

POPULATE AN ADDRESS FIELD OF THE MEMORY CARD ACCESS COMMAND WITH THE ADDRESS VALUE TO FURTHER CAUSE THE COMMAND TO BE DIVERTED TO THE SMARTCARD CONTROLLER ~ 630

POPULATE THE DATA FIELD OF THE MEMORY CARD ACCESS COMMAND WITH A COMMAND STRING TO SPECIFY A PURPOSE OTHER THAN A MEMORY CARD ACCESS ~ 640

POPULATE A DATA FIELD OF A MEMORY CARD ACCESS COMMAND WITH A PASSWORD TO AUTHENTICATE ACCESS TO THE RFID CARD ~ 650

SEND THE MEMORY CARD ACCESS COMMAND TO THE RFID CARD ~ 660

600

FIG. 6

Exhibit 1
Page 206 of 550



*FIG. 7*

Exhibit 1
Page 207 of 550



*FIG. 8*

Exhibit 1
Page 208 of 550





900

FIG. 9

Exhibit 1
Page 209 of 550





*FIG. 10*

Exhibit 1
Page 210 of 550



*FIG. 11*

Exhibit 1
Page 211 of 550

U.S. Patent          Nov. 1, 2016          Sheet 12 of 30          US 9,483,722 B2



FIG. 12
(PRIOR ART)

Exhibit 1
Page 212 of 550



BACK VIEW

SIDE VIEW

FIG. 13
(PRIOR ART)

FRONT VIEW

Exhibit 1
Page 213 of 550



FIG. 14
(PRIOR ART)



FIG. 15

Exhibit 1
Page 214 of 550



*FIG. 16*



*FIG. 17*

Exhibit 1
Page 215 of 550



*FIG. 18*



*FIG. 19*

Exhibit 1
Page 216 of 550

Case 8-.8-cv-04291FRG-JRDocDocument 1-2 Filed 06/09/24 25 Page 22 of 96 PageID #: 168



*FIG. 20*



*FIG. 21*

Exhibit 1
Page 217 of 550



*FIG. 22*

Exhibit 1
Page 218 of 550



*FIG. 23*

Exhibit 1
Page 219 of 550



*FIG. 24*



*FIG. 25*

Exhibit 1
Page 220 of 550



FIG. 26

FIG. 27

Exhibit 1
Page 221 of 550



*FIG. 28*



*FIG. 29*

Exhibit 1
Page 222 of 550



*FIG. 30*

Exhibit 1
Page 223 of 550



*FIG. 31*



*FIG. 32*

Exhibit 1
Page 224 of 550



*FIG. 33*

*FIG. 34*

Exhibit 1
Page 225 of 550



*FIG. 35*

Exhibit 1
Page 226 of 550



*FIG. 36*

Exhibit 1
Page 227 of 550



*FIG. 37*

Exhibit 1
Page 228 of 550



*FIG. 38*

Exhibit 1
Page 229 of 550



*FIG. 39*

Exhibit 1
Page 230 of 550

US 9,483,722 B2

1

# AMPLIFIER AND TRANSMISSION SOLUTION FOR 13.56MHZ RADIO COUPLED TO SMARTCARD CONTROLLER

## FIELD

The present invention relates generally to contactless communications devices, and more specifically to contactless smartcard devices.

## BACKGROUND

RFID "tags" can be separated into two broad categories: active tags and passive tags. Active tags are characterized by a local power source such as a battery. Active tags generally transmit information by broadcasting on an RF carrier frequency of choice using a locally generated RF carrier. Active tags are typically used to transmit over long distances, often referred to as "far field communications" (FFC). Antennas used with active RFID tags tend to be large to allow for the communications over long distances.

Passive tags are not powered. Passive tags derive the energy needed to power the tag from an interrogating RF field, and use that energy to transmit response codes by modulating the impedance that the antenna presents to the interrogating field, thereby modulating the signal reflected back to the reader antenna. Passive tags are typically used to transmit over short distances, often referred to as "near field communications" (NFC). For example, passive tags operating at 13.56 MHz are typically designed to communicate with RFID readers a few centimeters away.

Passive tags are typically connected to "loop antennas." One example of a loop antenna is shown in U.S. Pat. No. 6,568,600, issued to Carpier et al. on May 27, 2003 (the '600 patent). The device described in the '600 patent is recognizable as a "credit card sized" passive RFID card (more specifically, a card that conforms to ISO 7816 size requirements). The loop antenna is necessarily large because passive tags are powered using energy received by the antenna from signals transmitted by the RFID reader.

FIG. 12 shows a power supply voltage developed over time by rectifying a voltage induced in a loop antenna in the presence of an interrogating RF field. Once the power supply voltage reaches a critical value, the tag is powered up and can operate. As the antenna size is reduced, it takes longer for the power supply voltage to reach the critical value, and the tag operation may not meet response time specifications. Below a certain antenna size, the power supply voltage may never reach the critical value, and the tag may never power up.

Antenna design for RFID applications is described in a Microchip Technology, Inc. application note entitled "Antenna Circuit Design for RFID Applications" by Youbok Lee, Ph.D., published in 2003 (no month given). Dr. Lee's application note describes in great detail how to determine size requirements for a passive RFID tag antenna to operate at 13.56 MHz. On page 5 of the application note, Dr. Lee shows that the optimum radius of the loop antenna coil is equal to 1.414 times the required read range. This analysis confirms that for a read range on the order of a few centimeters, a credit card sized loop antenna can be made near optimal.

Passive tags are seeing widespread use in many applications. For example, mobile device manufacturers are embedding passive RFID tags in mobile devices for NFC applications. Example mobile applications include, but are not limited to, ticketing and mobile payments. U.S. Pat. No.

2

7,333,062 issued to Leizerovich et al. on Feb. 19, 2008 (the '062 patent) shows a mobile phone with an integrated loop antenna for an NFC device. As shown in the '062 patent, the mobile phone provides the real estate necessary to implement a loop antenna at 13.56 MHz.

There have been attempts to implement passive tags in smaller mobile devices. These attempts have met with limited success due in part to the size of the loop antenna. For example, FIG. 13 shows an RFID tag implementation in a secure digital (SD) memory card manufactured by Wireless Dynamics, Inc. of Calgary, Alberta Canada. Card 1300 includes an antenna, but the SD card is significantly oversized as a result. Also for example, U.S. Patent Application Publication No.: US 2006/0124755 A1 shows a memory card having a passive tag, but the card must be inserted into a slot to access a loop antenna on a different device. In this implementation, mobile device real estate is still relied upon for loop antenna implementation. It can be seen, therefore, that the size of antennas are proving to be a barrier to further miniaturization of passive RFID tags.

FIG. 14 shows a prior art smartcard controller and antenna in combination. Smartcard controller 330 includes a contactless interface that includes two pads 1472 and 1474 intended for connection to a coil (antenna 1480). Smartcard controller 330 also includes bridge rectifier 1420 to rectify an alternating voltage present on pads 1472 and 1474 when antenna 1480 is inductively coupled to another device and in the presence of an interrogating RF field. Capacitor 1440 is typically tuned to create a resonant circuit at the frequency of interest (e.g., 13.56 MHz). When antenna 1480 is a large loop antenna, then bridge rectifier 1420 provides power to internal circuits as shown in FIG. 12. Demodulator 1430 demodulates data present in the interrogating RF field, and load modulation driver circuit 1410 modulates an impedance seen by the device presenting the interrogating RF field when the coil (antenna 1480) is inductively coupled to a separate device that is presenting the interrogating RF field. This creates a half-duplex communications path between the device presenting the interrogating RF field and smartcard controller 330. Examples of smartcard controllers are the "SmartMX" controllers sold by NXP Semiconductors N.V. of Eindhoven, The Netherlands.

A need exists for a small footprint RFID tag that does not rely on an external device to house an antenna. A need also exists for a memory card compatible RFID tag that is compatible with standard memory card slots on mobile devices.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a mobile computing device and a small RFID card compatible with a memory card slot;

FIG. 2 shows a block diagram of a mobile computing device;

FIGS. 3A-3B show block diagrams of memory card compatible RFID cards with integrated inductive elements;

FIG. 4 shows a memory card compatible RFID card with an integrated inductive element;

FIG. 5 shows a data portion of a memory card write command;

FIGS. 6-11 show flowcharts of methods in accordance with various embodiments of the present invention;

FIG. 12 shows a power supply voltage developed over time by rectifying a voltage induced in a loop antenna in the presence of an interrogating RF field;

FIG. 13 shows a prior art RFID tag implementation in a secure digital (SD) memory card;

Exhibit 1

Page 231 of 550

US 9,483,722 B2

3

FIG. 14 shows a prior art smartcard controller and antenna in combination;

FIG. 15 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 16 shows frequency spectrum used in RFID communications;

FIG. 17 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 18 shows frequency spectrum used in RFID communications;

FIG. 19 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 20 shows frequency spectrum used in RFID communications;

FIG. 21 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 22 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 23 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 24 shows a smartcard controller with a pad to provide digital data output;

FIG. 25 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 26 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 27 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 28 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention;

FIG. 29 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 30 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIGS. 31-34 show performance enhancing application specific integrated circuits (ASICs) coupled to various smartcard controllers in accordance with various embodiments of the present invention;

4

FIG. 35 shows a memory card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention;

FIG. 36 shows a memory card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention;

FIG. 37 shows a subscriber identity module (SIM) card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention;

FIG. 38 shows a subscriber identity module (SIM) card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention; and

FIG. 39 shows a mobile device with a smartcard controller, enhancement circuits, and antenna(s).

DESCRIPTION OF EMBODIMENTS

In the following detailed description, reference is made to the accompanying drawings that show, by way of illustration, various embodiments of an invention. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention. It is to be understood that the various embodiments of the invention, although different, are not necessarily mutually exclusive. For example, a particular feature, structure, or characteristic described in connection with one embodiment may be implemented within other embodiments without departing from the spirit and scope of the invention. In addition, it is to be understood that the location or arrangement of individual elements within each disclosed embodiment may be modified without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the appended claims, appropriately interpreted, along with the full range of equivalents to which the claims are entitled. In the drawings, like numerals refer to the same or similar functionality throughout the several views.

FIG. 1 shows a mobile computing device and a small RFID card compatible with a memory card slot. Mobile computing device 110 is shown as a mobile phone in FIG. 1, but this is not a limitation of the present invention. For example, mobile computing device 110 may be a personal digital assistant (PDA), a smartphone, a mobile phone, a handheld computer, a desktop computer, or any other device capable of operating as described herein.

Mobile computing device 110 includes memory card slot 112. Memory card slot 112 is a slot capable of accepting RFID card 120. For example, memory card slot 112 may have physical dimensions compatible with RFID card 120, and may have a communications interface that operates using a protocol compatible with RFID card 120. In some embodiments of the present invention, memory card slot 112 is a memory card slot designed to accept and communicate with memory cards. As used herein, the term "memory card slot" refers to any add-on slot capable of accepting a card having memory accessible by a mobile computing device such as that shown in FIG. 1. For example, a memory card slot may be compatible with an industry standard communications protocol, or may be compatible with a widely accepted communications protocol that is not necessarily formally documented as an industry standard. Examples include slots that are compatible with the Multimedia Memory Card (MMC) protocol, Memory Stick DUO pro-

Exhibit 1
Page 232 of 550

US 9,483,722 B2

5

tocol, secure digital (SD) protocol, and Smart Media protocol. The foregoing list is meant to be exemplary, and not exhaustive. Memory card slot 112 may be compatible with many memory card slot protocols other than those explicitly listed above without departing from the scope of the invention. Further, in some embodiments, memory card slot 112 accepts a subscriber identity module (SIM) card. Memory card slot 112 may be exposed on an edge of mobile computing device 110 as shown, or may be behind a cover. For example, memory card slot 112 may be behind a battery cover, behind a battery, or anywhere else on mobile computing device 110.

RFID card 120 includes electrical contacts 122 as part of a host interface that communicates with memory card slot 112. For example, electrical contacts 122 may provide connectivity compliant with a communications protocol for memory cards. RFID card 120 includes RFID functionality, and may also include memory accessible by mobile computing device 110. For example, in some embodiments, RFID card 120 includes a smartcard controller and an inductive element capable of interacting with an NFC reader (e.g., an ISO 14443 compliant interface). In other embodiments, RFID card 120 does not include memory accessible by mobile computing device 110. RFID card 120 may include functionality beyond memory and RFID. Electrical contacts 122 may also be compliant with a smartcard "contact" interface (e.g., ISO 7816).

In various embodiments of the present invention, the RFID functionality in RFID card 120 is accessed by mobile computing device 110 using memory card access commands already defined for use in memory card slot 112. Accordingly, the various embodiments of the present invention enable the implementation of RFID functions beyond memory accesses without defining new commands. In some embodiments, new commands for the RFID card are embedded inside the data bits subsequent to memory card read/write commands. RFID card 120 then decides if the incoming data bits are meant for regular read/write memory functions or for RFID functions. In other words, functions in addition to standard memory card functions may be accessed through commands "hidden" in the data stream that can be exchanged using existing memory card access commands and functions. According to the various embodiments of the invention, both existing memory card functions and RFID functions may be implemented without requiring changes in how the host protocol is built.

The combination of mobile computing device 110 and RFID card 120 may be used for any purpose. For example, in some embodiments, RFID card 120 may interact with a point-of-sale payment device to effect mobile payments. Also for example, in some embodiments, RFID card 120 may be used in wave-and-pay ticketing in mass transit environments, such as MIFARE.

FIG. 2 shows a block diagram of a mobile computing device. Mobile computing device 110 includes antenna 240, radio circuits 230, processor 210, memory 220, and memory card slot 112. In some embodiments, mobile computing device 110 is a mobile phone, or includes mobile phone functionality. For example, antenna 240 and radio circuits 230 may be utilized to communicate with a cellular telephone network. Further, in some embodiments, mobile computing device 110 is a wireless local area network (WLAN) or wireless wide area network (WWAN) device. For example, antenna 240 and radio circuits 230 may be utilized to communicate with a wireless access point. In

6

some embodiments, antenna 240 and radio circuits 230 are omitted, and mobile computing device 110 does not utilize wireless connectivity.

Processor 210 represents a processor capable of communicating with the other blocks shown in mobile computing device 110. For example, processor 210 may be a microprocessor, a digital signal processor (DSP), a microcontroller, or the like. Further, processor 210 may be formed from state machines or other sequential logic. In operation, processor 210 may read instructions from memory 220 and perform actions in response thereto. For example, processor 210 may execute program instructions that influence communications between mobile computing device 110 and a device coupled to memory card slot 112.

Memory card slot 112 is described above with reference to FIG. 1. Memory card slot 112 includes circuitry compatible with RFID card 120. Mobile computing device 110 may communicate with RFID card 120 by using a standard set of memory card access commands. For example, processor 210 may use memory card write commands to write to memory in RFID card 120, and may use memory card read commands to read from memory in RFID card 120. Mobile computing device 110 may also communicate with RFID card 120 using a ISO 7816 compatible interface or the like. For example, when RFID card 120 is a SIM card, mobile computing device 110 may communicate with a smartcard controller within the SIM card.

Mobile computing device 110 may access the RFID functionality in RFID card 120 using "hidden" commands embedded in memory card access commands. For example, a memory card write command may include a unique data string to identify the memory card write command as a command to be diverted for purposes other than a memory write. In addition, the sector address provided with the memory card write command may be set to a particular address value to further identify the memory card write command as a command to be diverted. In addition to specific address/data values to identify the memory card access command as a command to be diverted for a purpose other than a memory access, the memory access command may include data bits to further specify the type and function of hidden command. Example formats of hidden commands are described further below. In some embodiments, a read command is issued right after a write command to enable data flow from the non-memory card functions to the host, where the write command's data had the hidden commands. The combination of a memory card write command and a memory card read command can be used in this manner to form a hidden read command.

In some embodiments, memory card slot 112 is powered down after periods of inactivity to save power. For example, memory card slot 112 may be powered up when processor 210 issues a memory card write or read command, but may then be powered down to save power. When memory card slot 112 is powered down, any device coupled to the memory card slot is also powered down. For example, if RFID card 120 (FIG. 1) is coupled to the memory card slot, then RFID card 120 is powered down when memory card slot 112 is powered down.

In various embodiments of the present invention, processor 210 executes software resident in memory 220 to maintain power to memory card slot 112 (and to RFID card 120). For example, periodic hidden commands may be sent to RFID card 120 for the purpose of keeping power applied while RFID card 120 is expected to be providing RFID functionality. Also for example, a hidden command may be sent to RFID card 120 for the purpose of cycling power to

Exhibit 1
Page 233 of 550

US 9,483,722 B2

7

a smartcard controller resident on the card. These hidden commands are described further below with respect to later figures.

FIG. 3A shows a block diagram of a memory card compatible RFID card with an integrated inductive element. RFID card 300 represents possible embodiments of RFID card 120 (FIG. 1). RFID card 300 includes host interface 310, memory card controller 340, memory 360, smartcard controller 340, program memory 332, and small inductive element 350. RFID card 300 is capable of communicating with a memory card slot in a mobile computing device. Further, RFID card 300 does not require memory card slots to implement extended input/output functions. For example, and not by way of limitation, in SD and micro SD embodiments, RFID card 300 is operable in any SD or microSD memory card slot, and does not require a secure digital input output (SDIO) memory card slot.

Host interface 310 includes electrical contacts to interface with a memory card slot. For example, host interface 310 includes contacts such as contacts 122 (FIG. 1). Also for example, in some embodiments, host interface 310 includes recessed electrical contacts. Host interface 310 may also include circuitry such as drivers, receivers, terminations, and the like.

In embodiments represented by FIG. 3A, memory card controller 340 communicates with the mobile device using memory card access commands. Memory card controller 340 also communicates with memory 360. Memory card controller 340 determines whether each command should result in a memory operation with memory 360, whether a hidden command should be diverted to smartcard controller 330, or whether memory card controller 340 should take action in response to a hidden command. In some embodiments, memory card controller 340 executes instructions that are stored in an internal memory or stored in memory 360. In some embodiments, memory card controller 340 includes special purpose hardware useful to determine whether a command should be diverted. In other embodiments, memory card controller 340 may be a microcontroller identical in all respects to a controller found in memory cards, except for the program that it executes.

Memory 360 may be any type of volatile or non-volatile memory. For example, memory 360 may be volatile memory such as static random access memory (SRAM) or dynamic random access memory (DRAM). Also for example, memory 360 may be nonvolatile memory such as NOR FLASH memory or NAND FLASH memory. In various embodiments of the present invention, memory 360 represents memory that is accessed by a mobile computing device using memory card access commands defined for that purpose.

When RFID card 300 is communicating with a memory card slot in a mobile computing device, the mobile computing device may send a memory card access command in order to access memory 360. Also for example, the mobile computing device may send a memory card access command that contains a hidden command. Memory card controller 340 detects the presence of the hidden command, and diverts all or a portion of the memory access command to smartcard controller 330 using communication bus 342. Communication bus 342 may have any number of conductors and may take any form. For example, communication bus 342 may be a serial port, a parallel port, or may include multiple data conductors, multiple address conductors, and/or conductors to carry control signals such as clock signals. In some embodiments, memory card controller 340 takes one or more actions in response to a hidden command. For

8

example, memory card controller 340 may modify clock signals in response to a hidden command.

Memory card controller 340 can detect the hidden command in many ways. For example, in some embodiments, the memory card access command may include a specific address value or a specific data value. Memory card controller 340 detects commands that include one or both of the specific address value or specific data value and routes the command appropriately. The specific address value and specific data value used for this purpose are referred to herein as the hidden command address value and the hidden command data value.

In some embodiments, memory card controller 340 detects the presence of hidden commands based only on the hidden command address value. In these embodiments, memory card controller 340 checks the address value included in a memory card access command, and diverts the command (or takes some other action) if it matches the hidden command address value. In some embodiments, memory card controller 340 detects the presence of hidden commands based only on the hidden command data value. In these embodiments, memory card controller 340 checks a data value included in the memory card access command, and diverts all or a portion of the command if it matches the hidden command data value. In still further embodiments, memory card controller 340 detects the presence of hidden commands based on both the hidden command address value and the hidden command data value. In these embodiments, memory card controller 340 diverts the command only if both the memory card access address and data match the hidden command address value and data value, respectively.

The hidden command address value and hidden command data value may be specified in many ways. For example, all RFID cards may be issued with fixed values. In these embodiments, each time the RFID functions are accessed, the same hidden command address and/or data value is included in the memory card access command. Also for example, different RFID cards may be issued with unique values. In these embodiments, each RFID card may provide these values to a mobile computing device when queried. Also for example, hidden command address and/or data values may be specified by the mobile computing device. In still further embodiments, hidden command address and data values may be dynamic. The hidden command address and data values may change each time power is applied or on a periodic basis.

Smartcard controller 330 receives hidden commands diverted by memory card controller 340. Smartcard controller 330 further interprets the hidden commands and performs actions in response thereto. Smartcard controller 330 executes instructions stored in program memory 332. In some embodiments, program memory 332 is embedded in smartcard controller 330, and in other embodiments, program memory 332 is part of memory 360.

Smartcard controller 330 is a dual interface smartcard controller with one of the interfaces including RFID functionality. In some embodiments, smartcard controller 330 is compatible with passive RFID tag readers in NFC applications. For example, smartcard controller 330 may be a device capable of implementing all or part of the ISO 14443 standard for contactless NFC devices. Also for example, smartcard controller 330 may be a dual interface smartcard controller capable of implementing both ISO 7816 and ISO 14443 standards for contact/contactless requirements. The "SmartMX" family of controllers available from NXP Semiconductors N.V. of The Netherlands are examples of suitable

Exhibit 1
Page 234 of 550

US 9,483,722 B2

9

dual interface smartcard controllers. These controllers provide RFID functionality at 13.56 MHz. The various embodiments of the present invention operate at 13.56 MHz, but are not limited to operation at this frequency. In some embodiments, smartcard controller interoperates with MIFARE systems for ticketing applications.

Smartcard controller 330 receives power from the host interface. By not receiving power from the interrogating RF field, the necessity of a loop antenna for power generation is negated. Smartcard controller 330 includes a contactless interface that in turn includes antenna port 334. Antenna port 334 includes at least two pads for connection to an antenna, shown as 1742 and 1744 in FIG. 14 and later figures. In FIG. 3A, antenna port 334 is coupled to small inductive element 350.

Small inductive element 350 includes a coil wound around a magnetic core. As described with reference to later figures, small inductive element may include one or more coils or antennas. The coil of small inductive element is too small to draw power from the interrogating RF field, but this is not necessary since smartcard controller 330 is powered by the host device through host interface 310. Small inductive element 350 interacts with an antenna in an RFID reader similar to the way that primary and secondary coils in a transformer interact. The RFID reader has a coil resonant at 13.56 MHz functioning as the primary coil of a transformer. Small inductive element 350 functions as the secondary coil of the transformer. Accordingly, the transmitter "sees" the impedance of the secondary coil (small inductive element 350). Smartcard controller 330 is able to modulate reflected RF signals using circuitry to modify the impedance at the antenna port 334.

Small inductive element 350 can be made very small. For example, in some embodiments, RFID card 120 is a miniSD card, microSD card, or SIM card, and small inductive element 350 is small enough to be completely contained in the miniSD, microSD, or SIM form factor. A specific embodiment of a small inductive element in a memory card form factor is described below with reference to FIG. 4.

In various embodiments of the invention, memory card controller 340 and smartcard controller 330 are implemented in many different ways. For example, in some embodiments, the various components are implemented in hardware. In these embodiments, the various components may be implemented as separate integrated circuits, or in a combined integrated circuit. Also for example, in some embodiments, the various components may be implemented in software, or in a combination of hardware and software. In some embodiments, RFID card 300 may include a microprocessor, and the components may be implemented as software modules running on the microprocessor. In other embodiments, RFID card 300 may include multiple processors, and the components may be implemented as software modules distributed across the multiple processors.

FIG. 3B shows a block diagram of a memory card compatible RFID card with an integrated inductive element. RFID card 302 represents possible embodiments of RFID card 120 (FIG. 1). RFID card 302 includes host interface 310, memory card controller 340, memory 360, smartcard controller 340, program memory 332, and small inductive element 350, all of which are described above with reference to FIG. 3A. RFID card 302 is capable of communicating with a memory card slot in a mobile computing device. Further, RFID card 302 does not require memory card slots to implement extended input/output functions. For example, and not by way of limitation, in SD and microSD embodiments, RFID card 302 is operable in any SD or microSD

10

memory card slot, and does not require a secure digital input output (SDIO) memory card slot.

In embodiments represented by FIG. 3B, smartcard controller 330 receives power from memory controller 340. In these embodiments, memory controller 340 has direct control over the power provided to smartcard controller 330. Memory controller 340 may apply and/or remove power from smartcard controller 330 in response to commands received over the host interface. For example, memory controller 340 may receive a hidden command to reset smartcard controller 330 by causing a reboot through a power cycle.

FIG. 4 shows a memory card compatible RFID card with an integrated inductive element. RFID card 120 is shown in an SD card form factor, although this is not a limitation of the present invention. For example, other form factors within the scope of the present invention include, but are not limited to, microSD form factors and SIM card form factors. RFID card 120 includes electrical contacts 122, memory card controller 340, smartcard controller 330, memory 360, magnetic core 450, and coil 452, all affixed to circuit board 402.

Magnetic core 450 and coil 452 implement small inductive element 350 (FIGS. 3A, 3B). As can be seen in FIG. 4, the small inductive element fits entirely within the memory card form factor. The small inductive element does not provide power generation for smartcard controller 330, and so does not need to be made large for that purpose.

FIG. 5 shows a data portion of a memory card write command. Included are hidden command data value 510, status field 520, password field 530, device ID 532, command index 540, and hidden command related data 550. In the example of FIG. 5, the data portion is 512 bytes in length, although this is not a limitation of the present invention. Any amount of data may be included in the write command, and each field shown in FIG. 5 may be any length.

In the example of FIG. 5, the hidden command data value is 256 bits long, although any length may be used without departing from the scope of the present invention. In some embodiments, hidden command data value 510 is used to identify a memory write command as a hidden command. When a write command is received having data in the first 256 bits that match the hidden command data value, the command is identified as one to be diverted to the smartcard controller. As described above, a hidden command address value may be used in conjunction with, or instead of, a hidden command data value to identify the memory write command as a hidden command.

The remaining fields have significance when the memory write is a hidden command. For example, if the first 256 bits do not match the hidden command data value (or if the write address does not match the hidden command address value, or both) then the remaining bits in the data field are to be treated as data in a normal memory write command. In contrast, when the memory write is a hidden command, the remaining fields are used to further interpret the hidden command.

Memory card controller 340 (FIGS. 3, 4) inspect the hidden command data value 510, status field 520, and possibly password field 530 and device ID 532. In some embodiments, if the command is identified as a hidden command, memory card controller 340 forwards the password 530, command index 540, and related data 550 to smartcard controller 330. In other embodiments, memory card controller 340 may directly take actions based on the hidden command.

Exhibit 1
Page 235 of 550

US 9,483,722 B2

11

Status field 520 may include any information relating to the status of the hidden command. For example, status field 520 may include one more bits to signify to memory card controller 340 whether the host (mobile computing device) is expecting the smartcard controller to return data in response to the hidden command. For example, when status field 520 signifies a write, memory card controller 340 forwards the password, device ID, command index, and related data without expecting to return any data to the host. Also for example, when status field 520 signifies a read, memory card controller 340 forwards the password, device ID, command index, and related data with the expectation that smartcard controller 330 will provide data to be sent to the host in response to a memory card read command. The combination of a memory card write command followed shortly thereafter by a memory card read command may be used to provide "read" functionality to the smartcard controller. Read operations from the smartcard controller are described further below with reference to FIG. 8.

Password field 530 includes a password to allow smart- card controller 330 to authenticate the host to the RFID card. In some embodiments, every hidden command includes a password. Each time the password, device ID, command index, and related data is diverted to the smartcard controller, the password is checked to authenticate the host to the RFID card.

Device ID 532 uniquely identifies the host (mobile computing device). The device ID may be checked by the smartcard controller to ensure that the RFID card is inserted in the host to which it is authenticated. Some embodiments of the present invention enforce a unique host/card pairing using the device ID, and other embodiments allow smartcard controller functions to be accessed by any host.

Command index 540 identifies the type of hidden command. The number of possible hidden commands is limited only by the number of bits allocated thereto. Any number of bits may be allocated to command index 540 without departing from the scope of the present invention. Hidden command related data 550 may be utilized differently for each type of hidden command. Any number of bits may be used for hidden command related data 550.

The data shown in FIG. 5 is provided as an example, and the data field of a memory card access command may include more or fewer data fields than those shown in FIG. 5. The present invention is not limited by the number or content of the fields in a memory card access command.

FIG. 6 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 600 may be used by a mobile computing device to communicate with an RFID card in a memory card slot. In some embodiments, method 600, or portions thereof, is performed by a mobile computing device with a memory card slot, and in other embodiments, method 600, or portions thereof, is performed by software. The various actions in method 600 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 6 are omitted from method 600.

Method 600 begins at 610 in which a data pattern and an address value are received from an RFID card in a memory card slot. The data pattern corresponds to the hidden command data value, and the address value corresponds to the hidden command address value. In some embodiments, the mobile device only receives the data value and in other embodiments, the mobile device only receives the address value. In some embodiments, the actions of 610 may occur once when the RFID card is first inserted in the memory card

12

slot. The mobile computing device may then use the address and data values each time it creates a hidden command. In other embodiments, the actions of 610 may occur each time the RFID card is inserted in the memory slot. In still further embodiments, the actions of 610 may occur periodically. Each time the actions 610 occur, the data pattern may be the same or different, and the address value may be the same or different.

At 620, a data field of a memory card access command is populated with the data pattern to cause the command to be diverted to a smartcard controller on the RFID card. For example, the data pattern may be written to the data field as the hidden command data value 510 (FIG. 5).

At 630, an address field of the memory card access command is populated with the address value to further cause the command to be diverted to the smartcard controller. In some embodiments, only one of 620 or 630 is utilized. In these embodiments, the presence of a hidden command is signified by the data pattern alone, or the address value alone.

At 640, the data field of the memory card access command is populated with a command string to specify a purpose other than a memory card access. For example, the command string may be written to the data field as the command index 540 for the smart card controller. This command may be used for any purpose. For example, one or more hidden commands may have as a sole purpose keeping power provided to the memory card slot so that the RFID card continues to receive power.

At 650, the data field of a memory card access command is populated with a password to authenticate access to the RFID card coupled to the memory card slot. In some embodiments, a password is included in the data field for every hidden command. In other embodiments, a password is only included at the beginning of an exchange.

At 660, the memory card access command is sent to the RFID card coupled to the memory card slot. For example, a mobile computing device (110, FIGS. 1, 2) may send the memory card access command to an RFID card (120, FIGS. 1, 3, 4) in a memory card slot (112, FIGS. 1, 2). The RFID card includes a memory card controller (340, FIG. 3) to divert the command (or take some other action) based on the data fields populated in method 600.

FIG. 7 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 700 may be used by an RFID card in a memory card slot. In some embodiments, method 700, or portions thereof, is performed by a memory card controller within a memory card compatible RFID card, and in other embodiments, method 700, or portions thereof, is performed by software. The various actions in method 700 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 7 are omitted from method 700.

Method 700 begins at 710 in which a memory card access command is received from a mobile computing device via a host interface. The actions of 710 correspond to an RFID card in a memory card slot of a mobile computing device receiving a memory card access command.

At 720, the memory card controller checks criteria in the memory card access command to determine if the memory card access command should be diverted to a smartcard controller resident on the RFID card. The criteria may be one or both of a hidden command data value, a hidden command address value, or both. If there is a criteria match at 730, then a hidden command is present, and at least a portion of the memory card access command is diverted at 740. If there is

Exhibit 1
Page 236 of 550

US 9,483,722 B2

13

not a criteria match, then no hidden command is present, and a memory access is performed at 750.

FIG. 8 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 800 may be used by an RFID card in a memory card slot. In some embodiments, method 800, or portions thereof, is performed by a memory card controller within an RFID card, and in other embodiments, method 800, or portions thereof, is performed by software. The various actions in method 800 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 8 are omitted from method 800.

Method 800 begins at 810 in which a memory card write command is received from a mobile computing device via a host interface. If the memory card write command is determined to be a hidden command, processing continues with 840; otherwise, a memory write is performed at 830.

At 840, the hidden command is diverted to a smartcard controller. In some embodiments, this corresponds to sending command index 540 and hidden command related data 550 (FIG. 5) to the smartcard controller. If the hidden command is determined to be a "read" at 850, processing continues at 860; otherwise, the hidden command processing is done. At 860, the memory card controller retrieves non-memory data from the smartcard controller, and at 870, a memory card read command is received from the mobile computing device. At 880, the non-memory data is returned to the mobile computing device.

Method 800 demonstrates how a mobile computing device can perform a read from a smartcard controller in a memory card compatible RFID card. The mobile computing device issues a memory card write command with a hidden command having a status field designating a read, and then the mobile computing device issues a memory card read command. The processing in the card receives the hidden command, identifies it as a read, and then returns data to the mobile computing device in response to a subsequent memory card read command.

FIG. 9 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 900 may be used by an RFID card in a memory card slot. In some embodiments, method 900, or portions thereof, is performed by a smartcard controller within an RFID card, and in other embodiments, method 900, or portions thereof, is performed by software. The various actions in method 900 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 9 are omitted from method 900.

Method 900 begins at 910 in which a smartcard controller receives a command from the memory card controller. This command corresponds to a hidden command received by the memory card controller. At 950, the smartcard controller determines whether the command is a "dummy" command used solely for the purpose of maintaining power to the memory card slot. If no, then the smartcard function specified in the command is performed at 930. If yes, then the command is disregarded at 960.

Method 900 allows a memory card compatible RFID card in a memory card slot to remain powered during periods when the memory card slot in the host device would otherwise remove power to save energy. This is a coordinated effort between software building hidden commands in a memory card access command, the memory card controller diverting the hidden command to the smartcard controller, and the smartcard controller disregarding the command.

14

According to embodiments represented by FIG. 3A, providing power to the RFID card also provides power the smartcard controller, thereby allowing the use of a small inductive device such as those shown in FIGS. 3 and 4.

FIG. 10 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 1000 may be used by an RFID card in a memory card slot. In some embodiments, method 1000, or portions thereof, is performed by a memory card controller within an RFID card, and in other embodiments, method 1000, or portions thereof, is performed by software. The various actions in method 1000 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 10 are omitted from method 1000.

Method 1000 begins at 1010 in which a memory card controller receives a hidden command from a mobile computing device. If at 1020, the memory card controller determines that the hidden command is to be diverted to the smartcard controller, then the command is diverted at 1030. In some embodiments, this corresponds to sending command index 540 and hidden command related data 550 (FIG. 5) to the smartcard controller. If the command is not to be diverted, then the memory card controller does not divert the command; however, the memory card controller may take other actions at 1040 based on the hidden command. For example, the memory card controller may modify a clock signal provided to the smartcard controller. Also for example, the memory card controller may assert a reset signal to the smartcard controller. Still for example, the memory card controller may cycle power to the smartcard controller. The memory card controller is able to cycle power to the smartcard controller in embodiments represented by FIG. 3B.

Cycling power to the smartcard controller may be a coordinated effort between the hosting computing device and the memory card controller in the RFID card. For example, power to the memory card slot may be maintained by supplying dummy hidden commands to the RFID card as described above with reference to FIG. 9. While power is maintained to the memory card slot, hidden commands may be used to cause the memory card controller to cycle power to the smartcard controller.

FIG. 11 shows a method authenticating a mobile computing device to one or more functions in a memory card compatible RFID card. Method 1100 begins at block 1110 in which an activation code is received at an RFID card from a mobile computing device. At 1120, the received activation code is compared to a code stored in the RFID card. If the activation code matches, the RFID card receives a password from the mobile computing device at 1140, and stores the password in the RFID card for later use at 1150. If the activation code does not match, the RFID card determines whether a number of allowable tries has been exceeded at 1160. If the number of allowable tries has been exceeded, the RFID card issuer is contacted at 1170, and if the number of allowable tries has not been exceeded, the method repeats until either the activation code matches or the number of allowable tries has been exceeded.

Method 1100 may be performed when an RFID card is issued to a user. For example, the RFID card may be a mobile payment card issued by a financial institution. The user may be provided an activation code to "activate" the RFID card. When the user successfully enters the activation code, the user is prompted for a password, and that password is stored for use in future hidden commands.

Exhibit 1
Page 237 of 550

US 9,483,722 B2

15

In some embodiments, multiple non-memory functions in an RFID card are authenticated using method 1100. For example, each of multiple non-memory functions may have stored activation codes, and each is activated separately. Each of the separately activated functions may have a different password, or the multiple functions may share a password.

Embodiments described thus far include a power delivery mechanism from the host to the smartcard controller that allow the antenna or coil to be very small. The small antenna or coil allows for higher levels of integration, but may also reduce the maximum distance at which the RFID card will function. For example, referring to FIG. 14, the voltage produced by the antenna needs to overcome the diode drops of the bridge rectifier before data can be demodulated within the smartcard controller. As the antenna shrinks in size, the RFID card needs to be closer to the device producing the interrogating RF field in order to produce a large enough voltage to overcome the bridge rectifier diode drops, thereby reducing the maximum usable distance.

FIG. 15 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and a single antenna in accordance with various embodiments of the present invention. Antenna 1542 is a small inductive element as described above. Capacitor 1544 is in parallel with antenna 1542 and together they form tuned circuit 1540 that is tuned to be resonant at the frequency of operation (e.g., 13.56 MHz). The performance enhancement circuits include an amplifier 1510, outgoing data extraction circuit 1520, and load modulation driver circuit 1530. Amplifier 1510 amplifies the voltage received at antenna 1542, and the amplified voltage is provided to the smartcard controller. This increases the maximum distance at which the RFID card can operate while receiving data, but also creates a unidirectional data path where a bidirectional data path previously existed. In other words, amplifier 1510 forms a simplex communication path where a half duplex path previously existed.

In order to restore the outgoing data path and re-create a half duplex communications system, the RFID card includes outgoing data extraction circuit 1520 and load modulation driver circuits 1530. Outgoing data extraction circuit 1520 receives a signal that is formed by the interrogating RF field having been load modulated by the smartcard controller. For example, the impedance of the antenna port is modulated by load modulation driver circuit 1410 (FIG. 14), where the modulating signal is the data. Outgoing data extraction circuit 1520 recovers the data, and then load modulation driver circuit 1530 modulates the impedance of the tuned circuit 1540 to form the outgoing data path.

Outgoing data extraction circuit 1520 may include one or more filters to extract the data. For example, referring now to FIG. 16, the load modulation driver circuit within the smartcard controller creates frequency sidebands 1610 about the carrier frequency 1620 of the interrogating RF field. Outgoing data extraction circuit 1520 may include conventional filters to isolate one or more sidebands and extract the data. As shown in FIG. 16, in some 13.56 MHz embodiments, the bandwidth of the carrier frequency of the interrogating RF field may be on the order of 850 KHz and the bandwidth of the sidebands may be on the order of 100-200 KHz, although this is not a limitation of the present invention.

Load modulation driver circuit 1530 receives the extracted data from outgoing data extraction circuit 1520, and load modulates the tuned circuit 1540 in response thereto. Load modulation driver circuits are generally well

16

known, and may be as simple as a switched transistor that adds and removes a reactive element from tuned circuit 1540. In some embodiments, load modulation driver circuit 1530 substantially duplicates the load modulation driver circuit 1410 within smartcard controller 330.

Amplifier 1510 is shown coupled to smartcard controller pad 1472, and data extraction circuit 1520 is shown coupled to smartcard controller pad 1474, but this is not a limitation of the present invention. For example, outgoing data extraction circuit 1520 may be coupled to smartcard controller pad 1472 while amplifier 1510 may be coupled to smartcard controller pad 1474. Also for example, both circuit 1520 and amplifier 1510 may be coupled to either pad 1472 or pad 1474 without departing from the scope of the present invention.

FIG. 17 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. FIG. 17 shows smartcard controller 330, amplifier 1510, outgoing data extraction circuit 1520, and load modulation driver circuit 1530, all of which are described above. FIG. 17 also shows tuned circuits 1740 and 1750. Tuned circuit 1740 includes receive antenna 1742 and capacitor 1744. Tuned circuit 1750 includes transmit antenna 1752 and capacitor 1754. In some embodiments, receive antenna 1742 and transmit antenna 1752 are small inductive elements as described above.

Separate transmit and receive antennas allow for different tuning, both in frequency and bandwidth, or "Q." For example, tuned circuit 1740 may be tuned with relatively high Q for receive as shown at 1820 in FIG. 18, while tuned circuit 1750 may be tuned for a lower Q to envelope both sidebands for transmit as shown at 1830 in FIG. 18. The higher Q tuning for the receive antenna may further increase the maximum usable distance when the RFID card is receiving.

FIG. 19 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. FIG. 19 shows smartcard controller 330, amplifier 1510, outgoing data extraction circuit 1520, load modulation driver circuit 1530, and tuned receive circuit 1740, all of which are described above. FIG. 19 also shows two tuned transmit circuits 1950 and 1960. Tuned circuit 1950 includes antenna 1952 and capacitor 1954, and tuned circuit 1960 includes antenna 1962 and capacitor 1964. Antennas 1952 and 1962 may be small inductive elements as described above.

Separate transmit antennas allow separate tuning for the two sidebands. For example, tuned circuit 1950 may be tuned for the lower sideband tuned circuit 1960 may be tuned for the upper sideband as shown in FIG. 20. Higher Q tuning of the transmit antennas for the separate sidebands may further increase the maximum usable distance when the RFID card is transmitting.

FIG. 21 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention. The circuits shown in FIG. 21 are similar to FIG. 15 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 may include circuits to actively transmit a signal rather than simply load modulate tuned circuit 1540. For example, active transmit driver circuit 2130 may include one or more amplifiers, filters, oscillators, modulators, etc., to form a signal that mimics the

Exhibit 1
Page 238 of 550

US 9,483,722 B2

17

sidebands 1610 (FIG. 16) as if the interrogating RF field experienced active load modulation. Active transmission can make use of power available on the RFID card and can further increase the usable distance when smartcard controller 330 is transmitting.

FIG. 22 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 22 are similar to FIG. 17 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 23 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 23 are similar to FIG. 19 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 24 shows a smartcard controller with a pad to provide a digital data output. Smartcard controller 2410 includes the antenna pads 1472 and 1474 as described above. Smartcard controller 2430 also includes pad 2410 which provides the digital data output directly. By providing the digital data output directly, smartcard controller 2430 enables various embodiments of the invention to eliminate the outgoing data extraction circuit.

FIG. 25 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and a single antenna in accordance with various embodiments of the present invention. FIG. 25 shows smartcard controller 2430, amplifier 1510, load modulation driver circuits 1530, and tuned circuit 1540, all of which are described above. Note that because smartcard controller 2430 provides digital data directly, the outgoing data extraction circuit 1520 (FIG. 15) can be omitted, thereby reducing parts count and cost.

FIG. 26 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. FIG. 26 shows circuits similar to those shown in FIG. 25, except that separate transmit and receive antennas are provided. Separate transmit and receive antennas (and associated tuned circuits) allow for a higher Q tuning of the receive antenna, thereby increasing the maximum usable distance when RFID card is receiving. See FIG. 18.

FIG. 27 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. FIG. 27 shows circuits similar to those shown in FIG. 26, except that multiple transmit antennas are provided. Multiple separate transmit antennas (and associated tuned circuits) allow for a higher Q tuning of each transmit antenna, thereby increasing the maximum usable distance when RFID card is transmitting. See FIG. 20.

FIG. 28 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention. The circuits shown in FIG. 28 are similar to FIG. 25 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130

18

is described above with reference to FIG. 21. In general, the term "driver" as used herein refers to an active transmit driver or a load modulation driver or any other method of driving the transmit output data.

FIG. 29 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 29 are similar to FIG. 26 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 30 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 30 are similar to FIG. 27 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIGS. 31-34 show performance enhancing application specific integrated circuits (ASICs) coupled to various smartcard controllers in accordance with various embodiments of the present invention. FIGS. 31 and 32 show ASICs coupled to smartcard controller 330. Both ASICs include amplifier 1510 and outgoing data extraction circuits 1520. The ASIC of FIG. 31 includes load modulation driver circuits 1530 and the ASIC of FIG. 32 includes active transmit driver circuit 2130. FIGS. 33 and 34 show ASICs coupled to receive direct digital data from smartcard controller 2430. Accordingly, the outgoing data extraction circuits are omitted. The ASIC of FIG. 33 includes amplifier 1510 and load modulation driver circuits 1530, and the ASIC of FIG. 34 includes amplifier 1510 and active transmit driver circuit 2130.

By combining a smartcard controller and an ASIC as described herein, the performance of an RFID card may be enhanced with a reduced parts count. Further, any of ASICs shown may be used with separate receive and transmit antennas, multiple transmit antennas, or any combination. Further, one ASIC may be provided with all of the functionality shown in FIGS. 31-34 and the manner in which it is connected to a smartcard controller will dictate which functional blocks (e.g., data extraction, load modulation, active transmit) are utilized.

FIG. 35 shows a memory card with integrated smartcard controller, performance enhancement circuits, and antennas in accordance with various embodiments of the present invention. Host interface 310, memory card controller 340, and memory 360 are described above. Smartcard controller 3520 may be any smartcard controller described herein, including smartcard controller 330 or smartcard controller 2430. Enhancement circuits 3550 may include any of the enhancement circuits described herein including any combination of amplifier 1510, outgoing data extraction circuits 1520, load modulation driver circuits 1530 and active transmit driver circuit 2130. Antenna(s) 3560 may include any number or type of antennas. For example, antenna(s) 3560 may include one antenna, separate transmit and receive antennas, or a receive antenna and multiple transmit antennas.

FIG. 36 shows a memory card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention. The memory card of FIG. 36 shows circuits similar to FIG. 35 with the exception of antenna(s) 3560. Instead, the memory card of FIG. 36 is intended for use with a host

Exhibit 1
Page 239 of 550

US 9,483,722 B2

19 20

device that includes antenna(s). In some embodiments, antenna(s) 3560 are included in the memory card of FIG. 36, thereby allowing the host device to decide whether to use the antennas on the memory card, or the antennas on the host device. The form factor of the memory card in FIGS. 35 and 36 is shown as a microSD card, but this is not a limitation of the present invention. Any form factor may be employed.

FIG. 37 shows a subscriber identity module (SIM) card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention. Smartcard controller 3520, enhancement circuits 3550, and antenna(s) 3560 are described above with reference to FIG. 35.

FIG. 38 shows a subscriber identity module (SIM) card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention. The SIM card of FIG. 38 shows circuits similar to FIG. 37 with the exception of antenna(s) 3560. Instead, the SIM card of FIG. 38 is intended for use with a host device that includes antenna(s). In some embodiments, antenna(s) 3560 are included in the SIM card of FIG. 38, thereby allowing the host device to decide whether to use the antennas on the SIM card, or the antennas on the host device.

FIG. 39 shows a mobile device with a smartcard controller, enhancement circuits, and antenna(s). The mobile device of FIG. 39 includes a built-in smartcard controller for RFID functionality as opposed to accepting a separate RFID card as described above. The mobile device may be any electronic device including a mobile phone, a tablet computer, or the like.

Although the present invention has been described in conjunction with certain embodiments, it is to be understood that modifications and variations may be resorted to without departing from the spirit and scope of the invention as those skilled in the art readily understand. Such modifications and variations are considered to be within the scope of the invention and the appended claims.

What is claimed is:

1. A mobile device comprising:
a smartcard controller that includes load modulation circuitry for half duplex communication by creating at least one frequency sideband about a carrier frequency of an interrogating radio frequency (RF) field;
an antenna tuned to operate at 13.56 MHz; and
at least one active circuit coupled between the smartcard controller and the antenna, wherein the at least one active circuit includes an amplifier coupled to be powered by the mobile device, and wherein the amplifier is coupled to amplify a signal received from the antenna and to provide an amplified signal to the smartcard controller, and the at least one active circuit further includes a transmit circuit coupled between the smartcard controller and the antenna that in operation forms a signal that mimics the at least one frequency sideband and wherein the signal drives the antenna.

2. The mobile device of claim 1 wherein the antenna comprises an inductive element too small to draw enough power sufficient to operate the smartcard controller from the interrogating radio frequency (RF) field.

3. The mobile device of claim 1 wherein the smartcard controller is coupled to be powered by the mobile device.

4. The mobile device of claim 1 wherein the mobile device comprises a mobile phone.

5. A mobile device comprising:
a smartcard controller that includes load modulation circuitry for half duplex communication by creating at least one frequency sideband about a carrier frequency of an interrogating radio frequency (RF) field;
an antenna tuned to operate at 13.56 MHz;
an amplifier coupled between the smartcard controller and the antenna, wherein the amplifier is coupled to be powered by the mobile device, and wherein the amplifier is coupled to amplify a signal received from the antenna and to provide an amplified signal to the smartcard controller; and
a transmit circuit coupled between the smartcard controller and the antenna that in operation forms a signal that mimics the at least one frequency sideband and wherein the signal drives the antenna.

6. The mobile device of claim 5 wherein the antenna comprises an inductive element too small to draw enough power sufficient to operate the smartcard controller from the interrogating radio frequency (RF) field.

7. The mobile device of claim 5 wherein the smartcard controller is coupled to be powered by the mobile device.

8. The mobile device of claim 5 wherein the transmit circuit comprises a load modulation circuit.

9. The mobile device of claim 5 further comprising wherein the transmit circuit comprises an active transmit driver.

10. The mobile device of claim 5 wherein the mobile device comprises a mobile phone.

11. A mobile device comprising:
a smartcard controller that includes load modulation circuitry for half duplex communication by creating at least one frequency sideband about a carrier frequency of an interrogating radio frequency (RF) field;
an antenna tuned to operate at 13.56 MHz;
an amplifier coupled to be powered by the mobile device, wherein the amplifier is coupled to amplify a signal received from the antenna and to provide an amplified signal to the smartcard controller; and
an active transmit driver circuit coupled between the smartcard controller and the antenna, wherein the active transmit driver circuit is coupled to be powered by the mobile device.

12. The mobile device of claim 11 wherein the antenna comprises an inductive element too small to draw enough power sufficient to operate the smartcard controller from the interrogating radio frequency (RF) field.

13. The mobile device of claim 11 wherein the smartcard controller is coupled to be powered by the mobile device.

14. The mobile device of claim 11 wherein the mobile device comprises a mobile phone.

* * * * *

Exhibit 1
Page 240 of 550

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.        : 9,483,722 B2                                    Page 1 of 1
APPLICATION NO.   : 14/517575
DATED             : November 1, 2016
INVENTOR(S)       : Narendra et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 20, Line 31, Claim 9, should read:
9. The mobile device of claim 5 wherein the transmit circuit comprises an active transmit driver.

Signed and Sealed this
Fourteenth Day of February, 2017

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

Exhibit 1
Page 241 of 550

# EXHIBIT 3

Exhibit 1
Page 242 of 550

US011694053B2

## (12) United States Patent
Narendra et al.

(10) Patent No.: **US 11,694,053 B2**
(45) Date of Patent: ***Jul. 4, 2023**

(54) **METHOD AND APPARATUS FOR TRANSMITTING DATA VIA NFC FOR MOBILE APPLICATIONS INCLUDING MOBILE PAYMENTS AND TICKETING**

(71) Applicant: **iCashe, Inc.**, Portland, OR (US)

(72) Inventors: **Siva G. Narendra**, Portland, OR (US); **Saurav Chakraborty**, West Bengal (IN); **Prabhakar Tadepalli**, Bangalore (IN)

(73) Assignee: **iCashe, Inc.**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 27 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/179,237**

(22) Filed: **Feb. 18, 2021**

(65) **Prior Publication Data**

US 2021/0174158 A1    Jun. 10, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 16/791,609, filed on Feb. 14, 2020, now Pat. No. 10,949,726, which is a
(Continued)

(51) **Int. Cl.**
*G08B 13/14* (2006.01)
*G06K 19/07* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ..... *G06K 19/0727* (2013.01); *G06K 19/0701* (2013.01); *G06K 19/073* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........ G06K 19/0723; G06K 19/07732; G06K 19/07749
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,178,450 A    4 1916   LaChapelle
4,701,601 A    10 1987  Francini et al.
(Continued)

FOREIGN PATENT DOCUMENTS

DE    3632294    4 1988
DE    10028813 A1   12 2001
(Continued)

OTHER PUBLICATIONS

2nd Notice of Allowance notified Aug. 15, 2011 for U.S. Appl. No. 13 081,775.
(Continued)

*Primary Examiner* — Toan N Pham
(74) *Attorney, Agent, or Firm* — Mughal Gaudry & Franklin PC

(57) **ABSTRACT**

A mobile device includes a smartcard controller that does not rely on power received from an interrogating RF field. The mobile device also includes a small inductive device capable of inductive coupling with an RFID reader. The smartcard controller includes circuitry to modulate an impedance of a port coupled to the inductive element when in the presence of an interrogating RF field at substantially 13.56 MHz.

**20 Claims, 30 Drawing Sheets**



Exhibit 1
Page 243 of 550

US 11,694,053 B2

Page 2

## Related U.S. Application Data

continuation of application No. 16/393,275, filed on Apr. 24, 2019, now Pat. No. 10,607,129, which is a continuation of application No. 15/904,328, filed on Feb. 24, 2018, now Pat. No. 10,318,855, which is a continuation of application No. 15/338,436, filed on Oct. 30, 2016, now Pat. No. 9,904,887, which is a continuation of application No. 14/517,585, filed on Oct. 17, 2014, now Pat. No. 9,489,608, which is a continuation of application No. 14/460,647, filed on Aug. 15, 2014, now Pat. No. 8,937,549, which is a continuation of application No. 13/871,849, filed on Apr. 26, 2013, now Pat. No. 8,866,614, which is a continuation of application No. 13/038,341, filed on Mar. 1, 2011, now Pat. No. 8,451,122, which is a continuation of application No. 12/188,346, filed on Aug. 8, 2008, now Pat. No. 7,961,101.

(51) **Int. Cl.**

| | |
|---|---|
| *G06K 19/077* | (2006.01) |
| *G06K 19/073* | (2006.01) |
| *G06Q 20/20* | (2012.01) |
| *H04B 1/3816* | (2015.01) |
| *H04B 5/00* | (2006.01) |
| *G06Q 20/32* | (2012.01) |

(52) **U.S. Cl.**
CPC ..... *G06K 19/0715* (2013.01); *G06K 19/0723* (2013.01); *G06K 19/0726* (2013.01); *G06K 19/07732* (2013.01); *G06K 19/07749* (2013.01); *G06K 19/07769* (2013.01); *G06Q 20/204* (2013.01); *G06Q 20/3278* (2013.01); *H04B 1/3816* (2013.01); *H04B 5/0025* (2013.01); *H04B 5/0062* (2013.01); *Y02D 30/70* (2020.08)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,786,791 | A | 11 1988 | Hodama |
| 4,791,283 | A | 12 1988 | Burkhardt |
| 4,864,109 | A | 9 1989 | Minematsu et al. |
| 5,212,478 | A | 5 1993 | Moseley |
| 5,378,887 | A | 1 1995 | Kobayashi |
| 5,386,106 | A | 1 1995 | Kumar |
| 5,537,584 | A | 7 1996 | Miyai et al. |
| 5,574,273 | A | 11 1996 | Nakagawa et al. |
| 5,585,787 | A | 12 1996 | Wallerstein |
| 5,629,981 | A | 5 1997 | Nerlikar |
| 5,700,037 | A | 12 1997 | Keller et al. |
| 5,710,421 | A | 1 1998 | Kokubu et al. |
| 5,834,756 | A | 11 1998 | Gutman et al. |
| 5,909,491 | A | 6 1999 | Luo |
| 5,940,510 | A | 8 1999 | Curry et al. |
| 5,949,880 | A | 9 1999 | Curry et al. |
| 5,952,641 | A | 9 1999 | Korshun |
| 5,955,961 | A | 9 1999 | Wallerstein |
| 6,016,476 | A | 1 2000 | Maes et al. |
| 6,021,944 | A | 2 2000 | Arakaki |
| 6,039,260 | A | 3 2000 | Eisele |
| 6,045,043 | A | 4 2000 | Bashan et al. |
| 6,068,184 | A | 5 2000 | Barnett |
| 6,105,013 | A | 8 2000 | Curry et al. |
| 6,182,891 | B1 | 2 2001 | Furuhashi et al. |
| 6,189,786 | B1 | 2 2001 | Itou et al. |
| 6,206,293 | B1 | 3 2001 | Gutman et al. |
| 6,219,439 | B1 | 4 2001 | Burger |
| 6,223,954 | B1 | 5 2001 | Carow |
| 6,223,984 | B1 | 5 2001 | Renner et al. |
| 6,237,095 | B1 | 5 2001 | Curry et al. |
| 6,250,557 | B1 | 6 2001 | Forslund et al. |

| | | | |
|---|---|---|---|
| 6,315,195 | B1 | 11 2001 | Ramachandran |
| 6,402,029 | B1 | 6 2002 | Gangi |
| 6,450,407 | B1 | 9 2002 | Freeman et al. |
| 6,481,623 | B1 | 11 2002 | Grant et al. |
| 6,568,600 | B1 | 5 2003 | Carpier et al. |
| 6,588,660 | B1 | 7 2003 | Buescher et al. |
| 6,592,044 | B1 | 7 2003 | Wong |
| 6,594,759 | B1 | 7 2003 | Wang |
| 6,598,031 | B1 | 7 2003 | Ice |
| 6,607,127 | B2 | 8 2003 | Wong |
| 6,609,654 | B1 | 8 2003 | Anderson et al. |
| 6,631,849 | B2 | 10 2003 | Blossom |
| 6,636,833 | B1 | 10 2003 | Flitcroft et al. |
| 6,669,487 | B1 | 12 2003 | Nishizawa |
| 6,705,520 | B1 | 3 2004 | Pitroda et al. |
| 6,712,277 | B2 | 3 2004 | Spencer |
| 6,715,679 | B1 | 4 2004 | Infosino |
| 6,721,196 | B1 | 4 2004 | Grassl |
| 6,747,547 | B2 | 6 2004 | Benson |
| 6,764,005 | B2 | 7 2004 | Cooper |
| 6,769,607 | B1 | 8 2004 | Pitroda et al. |
| 6,805,288 | B2 | 10 2004 | Routhenstein et al. |
| 6,811,082 | B2 | 11 2004 | Wong |
| 6,836,843 | B2 | 12 2004 | Seroussi et al. |
| 6,857,566 | B2 | 2 2005 | Wankmueller |
| 6,882,900 | B1 | 4 2005 | Terranova |
| 6,883,718 | B1 | 4 2005 | Le et al. |
| 6,905,072 | B2 | 6 2005 | Ramachandran |
| 6,907,123 | B1 | 6 2005 | Schier |
| 6,908,030 | B2 | 6 2005 | Rajasekaran et al. |
| 6,925,568 | B1 | 8 2005 | Heinonen |
| 6,937,526 | B2 | 8 2005 | Furukawa |
| 6,952,788 | B2 | 10 2005 | Rommelmann et al. |
| 6,995,651 | B2 | 2 2006 | Amtmann et al. |
| 7,059,520 | B1 | 6 2006 | Shtesl |
| 7,088,246 | B2 | 8 2006 | Fukuoka |
| 7,185,146 | B2 | 2 2007 | Masuyama et al. |
| 7,213,766 | B2 | 5 2007 | Ryan et al. |
| 7,221,473 | B2 | 5 2007 | Jeran et al. |
| 7,281,101 | B2 | 10 2007 | Mizushima et al. |
| 7,295,790 | B2 | 11 2007 | Morimoto et al. |
| 7,333,062 | B2 | 2 2008 | Leizerovich et al. |
| 7,350,717 | B2 | 4 2008 | Conner et al. |
| 7,353,993 | B2 | 4 2008 | Fujimoto |
| 7,410,102 | B2 | 8 2008 | Winkler |
| 7,493,484 | B2 | 2 2009 | Lee |
| 7,558,107 | B2 | 7 2009 | Sakurai et al. |
| 7,558,110 | B2 | 7 2009 | Mizushima et al. |
| 7,559,464 | B2 | 7 2009 | Routhenstein |
| 7,581,678 | B2 | 9 2009 | Narendra et al. |
| 7,607,580 | B2 | 10 2009 | Takita et al. |
| 7,673,080 | B1 | 3 2010 | Yu et al. |
| RE41,352 | E | 5 2010 | Wood, Jr. |
| 7,716,082 | B1 | 5 2010 | Blalock |
| RE41,471 | E | 8 2010 | Wood, Jr. |
| 7,789,303 | B2 | 9 2010 | Fukasawa |
| 7,792,516 | B2 | 9 2010 | Soderstrom |
| 7,828,214 | B2 | 11 2010 | Narendra et al. |
| RE42,254 | E | 3 2011 | Wood, Jr. |
| 7,898,994 | B2 | 3 2011 | Zhao et al. |
| 7,933,571 | B2 | 4 2011 | Black et al. |
| 7,941,197 | B2 | 5 2011 | Jain et al. |
| 7,948,356 | B2 | 5 2011 | Kawamura et al. |
| 7,954,715 | B2 | 6 2011 | Narendra et al. |
| 7,954,716 | B2 | 6 2011 | Narendra et al. |
| 7,954,717 | B2 | 6 2011 | Narendra et al. |
| 7,961,101 | B2 | 6 2011 | Narendra et al. |
| 7,991,158 | B2 | 8 2011 | Narendra et al. |
| 8,072,331 | B2 | 12 2011 | Narendra et al. |
| 8,082,575 | B2 | 12 2011 | Doughty et al. |
| 8,083,145 | B2 | 12 2011 | Narendra et al. |
| 8,091,786 | B2 | 1 2012 | Narendra et al. |
| 8,103,881 | B2 | 1 2012 | Doughty et al. |
| 2001 0001035 | A1 | 5 2001 | Kayanakis |
| 2001 0002015 | A1 | 5 2001 | Kayanakis |
| 2001 0006902 | A1 | 7 2001 | Ito |
| 2001 0013551 | A1 | 8 2001 | Ramachandran |
| 2001 0034246 | A1 | 10 2001 | Hutchison, IV et al. |
| 2002 0007434 | A1 | 1 2002 | Campardo |

Exhibit 1
Page 244 of 550

(56)　　　　　　References Cited

U.S. PATENT DOCUMENTS

| 2002 0025796 A1 | 2 2002 | Taylor et al. |
| 2002 0043566 A1 | 4 2002 | Goodman et al. |
| 2002 0044043 A1 | 4 2002 | Chaco et al. |
| 2002 0095588 A1 | 7 2002 | Shigematsu et al. |
| 2002 0096570 A1 | 7 2002 | Wong et al. |
| 2002 0099665 A1 | 7 2002 | Burger et al. |
| 2002 0130187 A1 | 9 2002 | Berg et al. |
| 2002 0138422 A1 | 9 2002 | Natsuno |
| 2002 0138735 A1 | 9 2002 | Felt et al. |
| 2002 0139849 A1 | 10 2002 | Gangi |
| 2002 0148892 A1 | 10 2002 | Bardwell |
| 2002 0153424 A1 | 10 2002 | Li |
| 2002 0158747 A1 | 10 2002 | McGregor et al. |
| 2002 0178124 A1 | 11 2002 | Lewis |
| 2002 0180584 A1 | 12 2002 | McGregor et al. |
| 2002 0186845 A1 | 12 2002 | Dutta et al. |
| 2003 0080183 A1 | 1 2003 | Rajasekaran et al. |
| 2003 0025939 A1 | 2 2003 | Jeran et al. |
| 2003 0028481 A1 | 2 2003 | Flitcroft et al. |
| 2003 0038177 A1 | 2 2003 | Morrow |
| 2003 0052168 A1 | 3 2003 | Wong |
| 2003 0057278 A1 | 3 2003 | Wong |
| 2003 0061168 A1 | 3 2003 | Routhenstein |
| 2003 0079096 A1 | 4 2003 | Murakami |
| 2003 0084029 A1 | 5 2003 | Jones et al. |
| 2003 0085288 A1 | 5 2003 | Luu |
| 2003 0115126 A1 | 6 2003 | Pitroda |
| 2003 0128124 A1 | 7 2003 | Ammann et al. |
| 2003 0159050 A1 | 8 2003 | Gantman et al. |
| 2003 0200180 A1 | 10 2003 | Phelan et al. |
| 2003 0209604 A1 | 11 2003 | Harrison |
| 2003 0220876 A1 | 11 2003 | Burger et al. |
| 2003 0231550 A1 | 12 2003 | Macfarlane |
| 2004 0006654 A1 | 1 2004 | Bando |
| 2004 0027881 A1 | 2 2004 | Furukawa |
| 2004 0030660 A1 | 2 2004 | Shaford |
| 2004 0035942 A1 | 2 2004 | Silverman |
| 2004 0050930 A1 | 3 2004 | Rowe |
| 2004 0058705 A1 | 3 2004 | Morgan et al. |
| 2004 0064612 A1 | 4 2004 | Pinto et al. |
| 2004 0065733 A1 | 4 2004 | Fukuoka |
| 2004 0077372 A1 | 4 2004 | Halpern |
| 2004 0087339 A1 | 5 2004 | Goldthwaite et al. |
| 2004 0094624 A1 | 5 2004 | Fernandes et al. |
| 2004 0122685 A1 | 6 2004 | Bunce |
| 2004 0133787 A1 | 7 2004 | Doughty et al. |
| 2004 0162932 A1 | 8 2004 | Mizushima et al. |
| 2004 0177045 A1 | 9 2004 | Brown |
| 2004 0188519 A1 | 9 2004 | Cassone |
| 2004 0199469 A1 | 10 2004 | Barillova et al. |
| 2004 0227859 A1 | 11 2004 | Liang |
| 2004 0243785 A1 | 12 2004 | Shanmugasundaram et al. |
| 2004 0243806 A1 | 12 2004 | McKinley et al. |
| 2004 0251303 A1 | 12 2004 | Cooper |
| 2004 0255145 A1 | 12 2004 | Chow |
| 2005 0006462 A1 | 1 2005 | Rouille et al. |
| 2005 0017068 A1 | 1 2005 | Zalewski et al. |
| 2005 0032002 A1 | 1 2005 | Poisner |
| 2005 0029349 A1 | 2 2005 | McGregor et al. |
| 2005 0038736 A1 | 2 2005 | Saunders |
| 2005 0039027 A1 | 2 2005 | Shapiro |
| 2005 0050367 A1 | 3 2005 | Burger et al. |
| 2005 0052924 A1 | 3 2005 | Nishizawa et al. |
| 2005 0060586 A1 | 3 2005 | Burger et al. |
| 2005 0071282 A1 | 3 2005 | Lu et al. |
| 2005 0077349 A1 | 4 2005 | Bonalle et al. |
| 2005 0044044 A1 | 5 2005 | Burger et al. |
| 2005 0092830 A1 | 5 2005 | Blossom |
| 2005 0108096 A1 | 5 2005 | Burger et al. |
| 2005 0109838 A1 | 5 2005 | Linlor |
| 2005 0116026 A1 | 6 2005 | Burger et al. |
| 2005 0121512 A1 | 6 2005 | Wankmueller |
| 2005 0122209 A1 | 6 2005 | Black |
| 2005 0127164 A1 | 6 2005 | Wankmueller |
| 2005 0127166 A1 | 6 2005 | Minemura |
| 2005 0133606 A1 | 6 2005 | Brown |
| 2005 0136964 A1 | 6 2005 | Saint et al. |
| 2005 0168339 A1 | 8 2005 | Arai et al. |
| 2005 0177724 A1 | 8 2005 | Ali et al. |
| 2005 0197859 A1 | 9 2005 | Wilson et al. |
| 2005 0204077 A1 | 9 2005 | Kou |
| 2005 0204092 A1 | 9 2005 | Masuyama et al. |
| 2005 0212657 A1 | 9 2005 | Simon |
| 2005 0223143 A1 | 10 2005 | Kang et al. |
| 2005 0224589 A1 | 10 2005 | Park et al. |
| 2005 0240778 A1 | 10 2005 | Saito et al. |
| 2005 0246546 A1 | 11 2005 | Takagi et al. |
| 2005 0253687 A1 | 11 2005 | Martinez et al. |
| 2005 0258245 A1 | 11 2005 | Bates et al. |
| 2005 0268058 A1 | 12 2005 | Drasnin et al. |
| 2005 0268330 A1 | 12 2005 | Di Rienzo |
| 2006 0011731 A1 | 1 2006 | Anders et al. |
| 2006 0027505 A1 | 2 2006 | Smets et al. |
| 2006 0045555 A1 | 3 2006 | Morimoto et al. |
| 2006 0077039 A1 | 4 2006 | Ibi et al. |
| 2006 0097851 A1 | 5 2006 | Ammann et al. |
| 2006 0124755 A1 | 6 2006 | Ito |
| 2006 0169778 A1 | 8 2006 | Chung |
| 2006 0172606 A1 | 8 2006 | Irisawa |
| 2006 0186209 A1 | 8 2006 | Narendra et al. |
| 2006 0219776 A1 | 10 2006 | Finn |
| 2006 0226217 A1 | 10 2006 | Narendra et al. |
| 2006 0268764 A1 | 11 2006 | Harris |
| 2006 0279413 A1 | 12 2006 | Yeager |
| 2007 0033334 A1 | 2 2007 | Katayama et al. |
| 2007 0076877 A1 | 4 2007 | Camp et al. |
| 2007 0108280 A1 | 5 2007 | Li et al. |
| 2007 0145135 A1 | 6 2007 | Jogand-Coulomb et al. |
| 2007 0145152 A1 | 6 2007 | Jogand-Coulomb et al. |
| 2007 0110404 A1 | 8 2007 | Sawai et al. |
| 2007 0195458 A1 | 8 2007 | Sawai et al. |
| 2007 0205864 A1 | 9 2007 | Mutti et al. |
| 2007 0257797 A1 | 11 2007 | Rancien et al. |
| 2007 0293202 A1 | 12 2007 | Moshir et al. |
| 2008 0046649 A1 | 2 2008 | Ito |
| 2008 0065830 A1 | 3 2008 | Aoki et al. |
| 2008 0068173 A1 | 3 2008 | Alexis et al. |
| 2008 0073436 A1 | 3 2008 | Nishizawa et al. |
| 2008 0136619 A1 | 6 2008 | Moran |
| 2008 0147950 A1 | 6 2008 | Chen |
| 2008 0148077 A1 | 6 2008 | Lee et al. |
| 2008 0153416 A1 | 6 2008 | Washiro |
| 2008 0186174 A1 | 8 2008 | Alexis et al. |
| 2008 0214111 A1 | 9 2008 | Moshir et al. |
| 2008 0244208 A1 | 10 2008 | Narendra et al. |
| 2008 0279381 A1 | 11 2008 | Narendra et al. |
| 2008 0311849 A1 | 12 2008 | Washiro |
| 2008 0318535 A1 | 12 2008 | Black et al. |
| 2009 0065571 A1 | 3 2009 | Jain |
| 2009 0065572 A1 | 3 2009 | Jain |
| 2009 0069049 A1 | 3 2009 | Jain |
| 2009 0069050 A1 | 3 2009 | Jain et al. |
| 2009 0069051 A1 | 3 2009 | Jain et al. |
| 2009 0069052 A1 | 3 2009 | Jain et al. |
| 2009 0070272 A1 | 3 2009 | Jain |
| 2009 0070701 A1 | 3 2009 | Jain |
| 2009 0070861 A1 | 3 2009 | Jain |
| 2009 0108063 A1 | 4 2009 | Jain et al. |
| 2009 0150610 A1 | 6 2009 | Hsu et al. |
| 2009 0152361 A1 | 6 2009 | Narendra et al. |
| 2009 0166421 A1* | 7 2009 | Finn ...................... G06K 7 0008 |
| | | 235 439 |
| 2009 0199283 A1 | 8 2009 | Jain |
| 2009 0250521 A1 | 10 2009 | Fujita et al. |
| 2009 0265552 A1 | 10 2009 | Moshir et al. |
| 2009 0270127 A1 | 10 2009 | Kakimoto |
| 2009 0290582 A1 | 11 2009 | Suenaga et al. |
| 2009 0298540 A1 | 12 2009 | Narendra et al. |
| 2009 0315667 A1 | 12 2009 | Kawamura et al. |
| 2010 0033307 A1 | 2 2010 | Narendra et al. |
| 2010 0033310 A1 | 2 2010 | Narendra et al. |
| 2010 0049878 A1 | 2 2010 | Yu et al. |
| 2010 0213265 A1 | 8 2010 | Narendra et al. |
| 2011 0000960 A1 | 1 2011 | Harris |

Exhibit 1
Page 245 of 550

# US 11,694,053 B2

Page 4

(56)        **References Cited**

### U.S. PATENT DOCUMENTS

| 2011 0053644 | A1 |   | 3 2011 | Narendra et al. |
| 2011 0073663 | A1 |   | 3 2011 | Narendra et al. |
| 2011 0073665 | A1 |   | 3 2011 | Narendra et al. |
| 2011 0077052 | A1 |   | 3 2011 | Narendra et al. |
| 2011 0110404 | A1 |   | 5 2011 | Washiro |
| 2011 0171996 | A1 |   | 7 2011 | Narendra et al. |
| 2011 0180610 | A1 |   | 7 2011 | Narendra et al. |
| 2011 0220726 | A1 |   | 9 2011 | Narendra et al. |
| 2011 0223972 | A1 |   | 9 2011 | Narendra et al. |
| 2011 0269438 | A1 |   | 11 2011 | Narendra et al. |
| 2011 0271044 | A1 |   | 11 2011 | Narendra et al. |
| 2011 0272468 | A1 |   | 11 2011 | Narendra et al. |
| 2011 0272469 | A1 |   | 11 2011 | Narendra et al. |
| 2016 0234359 | A1 | * | 8 2016 | Itay .................. H04M 1 026 |

### FOREIGN PATENT DOCUMENTS

| DE | 10054890 |   | 4 2002 |
| EP | 0161060 |   | 11 1985 |
| EP | 161060 |   | 11 1985 |
| EP | 0818757 |   | 1 1998 |
| EP | 1014290 |   | 6 2000 |
| EP | 1117068 |   | 7 2001 |
| EP | 1178450 |   | 2 2002 |
| EP | 1189465 |   | 3 2002 |
| EP | 1291748 |   | 3 2003 |
| EP | 1308874 |   | 5 2003 |
| EP | 1801741 | A3 | 7 2008 |
| FR | 2965082 | A1 | 3 2012 |
| GB | 2316908 |   | 3 1998 |
| JP | 4102112 |   | 4 1992 |
| JP | 04102112 |   | 4 1992 |
| JP | 2000010668 |   | 1 2000 |
| JP | 2000010668 | A | 1 2000 |
| JP | 2005018671 |   | 1 2005 |
| JP | 2005018671 | A | 1 2005 |
| JP | 2007199847 |   | 8 2007 |
| JP | 2007199847 | A | 8 2007 |
| JP | 2007328689 |   | 12 2007 |
| JP | 2007328689 | A | 12 2007 |
| TW | 200905471 |   | 2 2009 |
| TW | 201020934 |   | 6 2010 |
| TW | 201023662 |   | 6 2010 |
| TW | 1336449 |   | 1 2011 |
| TW | 201126422 |   | 8 2011 |
| WO | 9626500 |   | 8 1996 |
| WO | 9626500 | A1 | 8 1996 |
| WO | 1996026500 |   | 8 1996 |
| WO | 9812674 |   | 3 1998 |
| WO | 199812674 |   | 3 1998 |
| WO | 1998012674 |   | 3 1998 |
| WO | 1998012674 | A3 | 7 1998 |
| WO | 2000 14678 |   | 3 2000 |
| WO | 2000014678 |   | 3 2000 |
| WO | 01088659 |   | 11 2001 |
| WO | 2001088659 |   | 1 2003 |
| WO | 2001088659 | A9 | 1 2003 |
| WO | 03029942 |   | 4 2003 |
| WO | 2003029942 |   | 4 2003 |
| WO | 2003077473 |   | 9 2003 |
| WO | 03081519 |   | 10 2003 |
| WO | 2003081519 |   | 10 2003 |
| WO | 2003081519 | A3 | 1 2004 |
| WO | 2003029942 | A3 | 2 2004 |
| WO | 2004012352 |   | 2 2004 |
| WO | 2004095169 |   | 11 2004 |
| WO | 2005027030 |   | 3 2005 |
| WO | 2005119607 |   | 12 2005 |
| WO | 2005119608 |   | 12 2005 |
| WO | 2006091709 |   | 8 2006 |
| WO | 2006091709 | A2 | 8 2006 |
| WO | 2006108184 |   | 12 2006 |
| WO | 2007011937 |   | 1 2007 |
| WO | 2008121566 |   | 10 2008 |
| WO | 2009147548 |   | 12 2009 |
| WO | 2010099093 |   | 9 2010 |

### OTHER PUBLICATIONS

Final Office Action notified Dec. 12, 2012 for U.S. Appl. No. 13 184,204.

Final Office Action notified Feb. 4, 2013 for U.S. Appl. No. 13 552,633.

Final Office Action notified Sep. 30, 2014 for U.S. Appl. No. 13 592,323.

International Preliminary Report & Written Opinion notified Dec. 4, 2006 for PCT Patent Application No. PCT US2005 019988.

International Preliminary Report & Written Opinion notified Dec. 4, 2006 for PCT Patent Application No. PCT US2005 022993.

International Preliminary Report & Written Opinion notified Jan. 22, 2008 for UPCT Patent Application No. PCT US2006 027847, 10 pages.

International Preliminary Report & Written Opinion notified Sep. 9, 2011 for PCT Patent Application No. PCT US2010 025014, 6 pages.

International Preliminary Report on Patentability & Written Opinion notified Aug. 28, 2007 for UPCT Patent Application No. PCT US2006 006361, 8 pages.

International Search Report & Written Opinion notified Sep. 22, 2006 for UPCT Patent Application No. PCT US2006 006361, 13 pages.

International Search Report notified Jan. 9, 2006 for PCT Patent Application No. PCT US2006 013603, 3 pages.

International Search Report notified Oct. 21, 2005 PCT Patent Application No. PCT US2005 022993.

International Written Opinion notified Aug. 7, 2008 for PCT Patent Application No. PCT US2008 057588, 5 pages.

International Written Opinion notified Oct. 9, 2007 for PCT Patent Application No. PCT US2006 013603, 7 pages.

Non-Final Office Action notified Apr. 19, 2018 for U.S. Appl. No. 15 658,208.

Non-Final Office Action notified Jul. 5, 2013 for U.S. Appl. No. 13 592,323.

Non-Final Office Action notified May 22, 2015 for U.S. Appl. No. 14 680,684.

Non-Final Office Action notified Sep. 16, 2016 for U.S. Appl. No. 14 929,297.

Non-Final Office Action notified Sep. 25, 2015 for U.S. Appl. No. 14 747,770.

Notice of Allowance notified Feb. 18, 2015 for U.S. Appl. No. 13 592,323.

Notice of Allowance notified Jun. 19, 2015 for U.S. Appl. No. 14 680,684.

Notice of Allowance notified Mar. 24, 2017 for U.S. Appl. No. 14 948,325.

Notice of Allowance notified Oct. 26, 2015 for U.S. Appl. No. 14 747,770.

Notice of Allowance notified Oct. 28, 2015 for U.S. Appl. No. 14 833,113.

Official Letter from Taiwan Patent Office notified Jan. 26, 2010 for U.S. Appl. No. 95 105,997.

International Search Report & Written Opinion notified Jan. 11, 2006 for PCT Patent Application No. PCT US2005 019988, 8 pages.

Lee, Y. "Anntenna Circuit Design for RFID Applications", Microchip, AN710, 2003, Microchip Technology Inc., 50 pages.

Lee, Y. "Antenna Circuit Design for RFID Applications", Microchips, AN710, 2003 Microchip Technology, Inc., 50 pages (2003).

Advisory Action notified Feb. 7, 2013 for U.S. Appl. No. 12 960,070.

Final Office Action notified Dec. 11, 2012 for U.S. Appl. No. 12 960,070.

Final Office Action notified Oct. 25, 2014 for U.S. Appl. No. 12 960,070.

International Preliminary Report & Written Opinion notified Sep. 9, 2011 for PCT Patent Application No. PCT US2010 025014.

Exhibit 1
Page 246 of 550

# US 11,694,053 B2
Page 5

(56)     **References Cited**

OTHER PUBLICATIONS

International Preliminary Report on Patentability & Written Opinion notified Aug. 28, 2007 for PCT Patent Application No. PCT US2006 006361.

International Preliminary Report on Patentability and Written Opinion notified Aug. 2, 2007 for PCT Patent Application No. PCT US2006 006361.

International Preliminary Report on Patentability and Written Opinion notified Aug. 2, 2007 for PCT Patent Application No. PCT US2006 013603.

International Preliminary Report on Patentability and Written Opinion notified Aug. 2, 2007 for PCT Patent Application No. PCT US2006 027847.

International Preliminary Report on Patentability and Written Opinion notified Oct. 6, 2009 for PCT Patent Application No. PCT US2008 057588.

International Search Report & Written Opinion notified Jan. 11, 2006 for PCT Patent Application No. PCT US2005 019988.

International Search Report & Written Opinion notified Sep. 22, 2006 for PCT Patent Application No. PCT US2006 006361.

International Search Report and Written Opinion notified Apr. 15, 2010 for PCT Patent Application No. PCT US2010 025014.

International Search Report notified Aug. 7, 2008 for PCT Patent Application No. PCT US2008 057588.

International Search Report notified Dec. 16, 2005 for PCT Patent Application No. PCT US2005 019988.

International Search Report notified Jan. 9, 2006 for PCT Patent Application No. PCT US2006 013603.

International Search Report notified Mar. 29, 2007 for PCT Patent Application No. PCT US2006 027847.

International Search Report notified Oct. 9, 2007 for PCT Patent Application No. PCT US2006 013603.

International Search Report notified Oct. 21, 2005 PCT for PCT Patent Application No. PCT US2005 022993.

International Search Report notified Sep. 22, 2006 for PCT Patent Application No. PCT US2006 006361.

International Written Opinion notified Aug. 7, 2008 for PCT Patent Application No. PCT US2008 057588.

International Written Opinion notified Oct. 9, 2007 for PCT Patent Application No. PCT US2006 013603.

Lee, Y., "Antenna Circuit Design for RFID Applications", Microchip, AN710, 2003, Microchip Technology Inc., 50 pages.

Non-Final Office Action notified Apr. 3, 2013 for U.S. Appl. No. 13 426,500.

Non-Final Office Action notified Aug. 3, 2011 for U.S. Appl. No. 13 114,473.

Non-Final Office Action notified Dec. 20, 2012 for U.S. Appl. No. 13 593,492.

Non-Final Office Action notified Feb. 1, 2013 for U.S. Appl. No. 13 184,227.

Non-Final Office Action notified Feb. 3, 2011 for U.S. Appl. No. 12 962,953.

Non-Final Office Action notified Jan. 18, 2013 for U.S. Appl. No. 13 651,365.

Non-Final Office Action notified Jul. 3, 2012 for U.S. Appl. No. 13 184,227.

Non-Final Office Action notified Jun. 22, 2012 for U.S. Appl. No. 13 184,204.

Non-Final Office Action notified Jun. 27, 2012 for U.S. Appl. No. 12 960,070.

Non-Final Office Action notified Mar. 15, 2013 for U.S. Appl. No. 13 304,662.

Non-Final Office Action notified Mar. 18, 2011 for U.S. Appl. No. 12 941,410.

Non-Final Office Action notified Mar. 30, 2011 for U.S. Appl. No. 12 960,070.

Non-Final Office Action notified Nov. 5, 2015 for U.S. Appl. No. 14 866,998.

Non-Final Office Action notified Nov. 9, 2012 for U.S. Appl. No. 13 552,633.

Non-Final Office Action notified Nov. 25, 2011 for U.S. Appl. No. 13 184,240.

Non-Final Office Action notified Nov. 29, 2019 for U.S. Appl. No. 16 218,733.

Non-Final Office Action notified Sep. 20, 2016 for U.S. Appl. No. 14 948,325.

Non-Final Office Action notified Sep. 21, 2012 for U.S. Appl. No. 13 311,247.

Non-Final Office Action notified Sep. 24, 2015 for U.S. Appl. No. 14 833,113.

Non-Final Office Action notified Sep. 29, 2020 for U.S. Appl. No. 16 791,609.

Non-Final Office Action notified Sep. 30, 2010 for U.S. Appl. No. 12 188,346.

Notice of Allowance notified Apr. 14, 2011 for U.S. Appl. No. 12 941,410.

Notice of Allowance notified Apr. 18, 2011 for U.S. Appl. No. 12 962,953.

Notice of Allowance notified Apr. 25, 2011 for U.S. Appl. No. 12 188,346.

Notice of Allowance notified Aug. 15, 2011 for U.S. Appl. No. 13 081,775.

Notice of Allowance notified Dec. 21, 2015 for U.S. Appl. No. 14 866,998.

Notice of Allowance notified Feb. 14, 2013 for U.S. Appl. No. 13 311,247.

Notice of Allowance notified Feb. 21, 2013 for U.S. Appl. No. 13 651,365.

Notice of Allowance notified Jan. 10, 2012 for U.S. Appl. No. 13 184,240.

Notice of Allowance notified Jun. 18, 2020 for U.S. Appl. No. 16 218,733.

Notice of Allowance notified Mar. 3, 2017 for U.S. Appl. No. 14 929,297.

Notice of Allowance notified May 13, 2013 for U.S. Appl. No. 13 426,500.

Notice of Allowance notified Nov. 16, 2011 for U.S. Appl. No. 13 114,473.

Notice of Allowance notified Nov. 20, 2020 for U.S. Appl. No. 16 791,609.

Notice of Allowance notified Oct. 28, 2011 for U.S. Appl. No. 13 081,775.

Notice of Allowance notified Oct. 28, 2015 for U.S. Appl. No. 14 833,133.

Notice of Allowance notified Sep. 19, 2018 for U.S. Appl. No. 15 658,208.

Official Letter notified Jan. 26, 2010 for Taiwan Patent Application No. 95105997.

Restriction Requirement notified Aug. 16, 2010 for U.S. Appl. No. 12 188,346.

* cited by examiner

Exhibit 1
Page 247 of 550



*FIG. 1*



*FIG. 2*

Exhibit 1
Page 248 of 550



*FIG. 3A*

Exhibit 1
Page 249 of 550

U.S. Patent

Jul. 4, 2023

Sheet 3 of 30

US 11,694,053 B2



FIG. 3B

Exhibit 1
Page 250 of 550



*FIG. 4*

Exhibit 1
Page 251 of 550

U.S. Patent

Jul. 4, 2023

Sheet 5 of 30

US 11,694,053 B2



FIG. 5

Exhibit 1
Page 252 of 550



*FIG. 6*

Exhibit 1
Page 253 of 550



FIG. 7

Exhibit 1
Page 254 of 550



FIG. 8

Exhibit 1
Page 255 of 550



*FIG. 9*

Exhibit 1
Page 256 of 550





*FIG. 10*

Exhibit 1
Page 257 of 550



FIG. 11

Exhibit 1
Page 258 of 550



*FIG. 12*
*(PRIOR ART)*

Exhibit 1
Page 259 of 550



BACK VIEW

8.1 mm

16 mm

37 mm

SIDE VIEW

FIG. 13
(PRIOR ART)

24 mm

53 mm

FRONT VIEW

1300

Exhibit 1
Page 260 of 550



*FIG. 14*
*(PRIOR ART)*



*FIG. 15*

Exhibit 1
Page 261 of 550



*FIG. 16*



*FIG. 17*

Exhibit 1
Page 262 of 550



FIG. 18



FIG. 19

Exhibit 1
Page 263 of 550



HIGH Q TUNING
FOR 1740

HIGH Q TUNING
FOR 1950

HIGH Q TUNING
FOR 1960

*FIG. 20*



*FIG. 21*

Exhibit 1
Page 264 of 550



*FIG. 22*

Exhibit 1
Page 265 of 550



FIG. 23

Exhibit 1
Page 266 of 550



*FIG. 24*



*FIG. 25*

Exhibit 1
Page 267 of 550



FIG. 26

FIG. 27

Exhibit 1
Page 268 of 550



*FIG. 28*



*FIG. 29*

Exhibit 1
Page 269 of 550



*FIG. 30*

Exhibit 1
Page 270 of 550



*FIG. 31*



*FIG. 32*

Exhibit 1
Page 271 of 550



*FIG. 33*



*FIG. 34*

Exhibit 1
Page 272 of 550



*FIG. 35*

Exhibit 1
Page 273 of 550



*FIG. 36*

Exhibit 1
Page 274 of 550



*FIG. 37*

Exhibit 1
Page 275 of 550



*FIG. 38*

Exhibit 1
Page 276 of 550



*FIG. 39*

Exhibit 1
Page 277 of 550

US 11,694,053 B2

1

# METHOD AND APPARATUS FOR TRANSMITTING DATA VIA NFC FOR MOBILE APPLICATIONS INCLUDING MOBILE PAYMENTS AND TICKETING

## CLAIM FOR PRIORITY

This application is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 16/791,609, filed Feb. 14, 2020, and now issued as U.S. Pat. No. 10,949,726 on Mar. 16, 2021, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 16/393,275, filed Apr. 24, 2019, now issued on Mar. 31, 2020 as U.S. Pat. No. 10,607,129, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 15/904,328, filed on Feb. 24, 2018, now issued on Jun. 11, 2019 as U.S. Pat. No. 10,318,855, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 15/338,436, filed Oct. 30, 2016, now issued on Feb. 27, 2019, as U.S. Pat. No. 9,904,887, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 14/517,585, filed Oct. 17, 2014, now issued on Nov. 8, 2016, as U.S. Pat. No. 9,489,608, which is a continuation of, and claims priority to U.S. patent application Ser. No. 14/460,647, filed Aug. 15, 2014, now issued on Jan. 20, 2015 as U.S. Pat. No. 8,937,549, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 13/871,849, on Apr. 26, 2013, now issued on Oct. 21, 2014, as U.S. Pat. No. 8,866,614, which is a continuation of, and claims the benefit of priority to, U.S. patent application Ser. No. 13/038,341, filed Mar. 1, 2011, now issued on May 28, 2013, as U.S. Pat. No. 8,451,122, which is a continuation-in-part of, and claims the benefit of priority to U.S. patent application Ser. No. 12/188,346, filed Aug. 8, 2008, now issued on Jun. 14, 2011, as U.S. Pat. No. 7,961,101 and which are incorporated by reference in their entirety.

## FIELD

The present invention relates generally to contactless communications devices, and more specifically to contactless smartcard devices.

## BACKGROUND

RFID "tags" can be separated into two broad categories: active tags and passive tags. Active tags are characterized by a local power source such as a battery. Active tags generally transmit information by broadcasting on an RF carrier frequency of choice using a locally generated RF carrier. Active tags are typically used to transmit over long distances, often referred to as "far field communications" (FFC). Antennas used with active RFID tags tend to be large to allow for the communications over long distances.

Passive tags are not powered. Passive tags derive the energy needed to power the tag from an interrogating RF field, and use that energy to transmit response codes by modulating the impedance that the antenna presents to the interrogating field, thereby modulating the signal reflected back to the reader antenna. Passive tags are typically used to transmit over short distances, often referred to as "near field communications" (NFC). For example, passive tags operating at 13.56 MHz are typically designed to communicate with RFID readers a few centimeters away.

Passive tags are typically connected to "loop antennas." One example of a loop antenna is shown in U.S. Pat. No. 6,568,600, issued to Carpier et al. on May 27, 2003 (the '600 patent). The device described in the '600 patent is recognizable as a "credit card sized" passive RFID card (more specifically, a card that conforms to ISO 7816 size requirements). The loop antenna is necessarily large because passive tags are powered using energy received by the antenna from signals transmitted by the RFID reader.

FIG. 12 shows a power supply voltage developed over time by rectifying a voltage induced in a loop antenna in the presence of an interrogating RF field. Once the power supply voltage reaches a critical value, the tag is powered up and can operate. As the antenna size is reduced, it takes longer for the power supply voltage to reach the critical value, and the tag operation may not meet response time specifications. Below a certain antenna size, the power supply voltage may never reach the critical value, and the tag may never power up.

Antenna design for RFID applications is described in a Microchip Technology, Inc. application note entitled "Antenna Circuit Design for RFID Applications" by Youbok Lee, Ph.D., published in 2003 (no month given). Dr. Lee's application note describes in great detail how to determine size requirements for a passive RFID tag antenna to operate at 13.56 MHz. On page 5 of the application note, Dr. Lee shows that the optimum radius of the loop antenna coil is equal to 1.414 times the required read range. This analysis confirms that for a read range on the order of a few centimeters, a credit card sized loop antenna can be made near optimal.

Passive tags are seeing widespread use in many applications. For example, mobile device manufacturers are embedding passive RFID tags in mobile devices for NFC applications. Example mobile applications include, but are not limited to, ticketing and mobile payments. U.S. Pat. No. 7,333,062 issued to Leizerovich et al. on Feb. 19, 2008 (the '062 patent) shows a mobile phone with an integrated loop antenna for an NFC device. As shown in the '062 patent, the mobile phone provides the real estate necessary to implement a loop antenna at 13.56 MHz.

There have been attempts to implement passive tags in smaller mobile devices. These attempts have been met with limited success due in part to the size of the loop antenna. For example, FIG. 13 shows an RFID tag implementation in a secure digital (SD) memory card manufactured by Wireless Dynamics, Inc. of Calgary, Alberta, Canada. Card 1300 includes an antenna, but the SD card is significantly oversized as a result. Also for example, U.S. Patent Application Publication No.: US 2006/0124755 A1 shows a memory card having a passive tag, but the card must be inserted into a slot to access a loop antenna on a different device. In this implementation, mobile device real estate is still relied upon for loop antenna implementation. It can be seen, therefore, that the size of antennas are proving to be a barrier to further miniaturization of passive RFID tags.

FIG. 14 shows a prior art smartcard controller and antenna in combination. Smartcard controller 330 includes a contactless interface that includes two pads 1472 and 1474 intended for connection to a coil (antenna 1480). Smartcard controller 330 also includes bridge rectifier 1420 to rectify an alternating voltage present on pads 1472 and 1474 when antenna 1480 is inductively coupled to another device and in the presence of an interrogating RF field. Capacitor 1440 is typically tuned to create a resonant circuit at the frequency of interest (e.g., 13.56 MHz). When antenna 1480 is a large loop antenna, then bridge rectifier 1420 provides power to internal circuits as shown in FIG. 12. Demodulator 1430 demodulates data present in the interrogating RF field, and

Exhibit 1
Page 278 of 550

US 11,694,053 B2

3 4

load modulation driver circuit 1410 modulates an impedance seen by the device presenting the interrogating RF field when the coil (antenna 1480) is inductively coupled to a separate device that is presenting the interrogating RF field. This creates a half-duplex communications path between the device presenting the interrogating RF field and smartcard controller 330. Examples of smartcard controllers are the "SmartMX" controllers sold by NXP Semiconductors N.V. of Eindhoven, The Netherlands.

A need exists for a small footprint RFID tag that does not rely on an external device to house an antenna. A need also exists for a memory card compatible RFID tag that is compatible with standard memory card slots on mobile devices.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a mobile computing device and a small RFID card compatible with a memory card slot;

FIG. 2 shows a block diagram of a mobile computing device;

FIGS. 3A-3B show block diagrams of memory card compatible RFID cards with integrated inductive elements;

FIG. 4 shows a memory card compatible RFID card with an integrated inductive element;

FIG. 5 shows a data portion of a memory card write command;

FIGS. 6-11 show flowcharts of methods in accordance with various embodiments of the present invention;

FIG. 12 shows a power supply voltage developed over time by rectifying a voltage induced in a loop antenna in the presence of an interrogating RF field;

FIG. 13 shows a prior art RFID tag implementation in a secure digital (SD) memory card;

FIG. 14 shows a prior art smartcard controller and antenna in combination;

FIG. 15 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and an antenna in accordance with various embodiments of the present invention;

FIG. 16 shows frequency spectrum used in RFID communications;

FIG. 17 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 18 shows frequency spectrum used in RFID communications;

FIG. 19 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 20 shows frequency spectrum used in RFID communications;

FIG. 21 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and an antenna in accordance with various embodiments of the present invention;

FIG. 22 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 23 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 24 shows a smartcard controller with a pad to provide digital data output;

FIG. 25 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and an antenna in accordance with various embodiments of the present invention;

FIG. 26 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 27 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIG. 28 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and an antenna in accordance with various embodiments of the present invention;

FIG. 29 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention;

FIG. 30 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention;

FIGS. 31-34 show performance enhancing application specific integrated circuits (ASICs) coupled to various smartcard controllers in accordance with various embodiments of the present invention;

FIG. 35 shows a memory card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention;

FIG. 36 shows a memory card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention;

FIG. 37 shows a subscriber identity module (SIM) card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention;

FIG. 38 shows a subscriber identity module (SIM) card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention; and

FIG. 39 shows a mobile device with a smartcard controller, enhancement circuits, and antenna(s).

DESCRIPTION OF EMBODIMENTS

In the following detailed description, reference is made to the accompanying drawings that show, by way of illustration, various embodiments of an invention. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention. It is to be understood that the various embodiments of the invention, although different, are not necessarily mutually exclusive. For example, a particular feature, structure, or characteristic described in connection with one embodiment may be implemented within other embodiments without departing from the spirit and scope of the invention. In addition, it is to be understood that the location or arrangement of individual elements within each disclosed embodiment may be

Exhibit 1
Page 279 of 550

US 11,694,053 B2

5

modified without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the appended claims, appropriately interpreted, along with the full range of equivalents to which the claims are entitled. In the drawings, like numerals refer to the same or similar functionality throughout the several views.

FIG. 1 shows a mobile computing device and a small RFID card compatible with a memory card slot. Mobile computing device 110 is shown as a mobile phone in FIG. 1, but this is not a limitation of the present invention. For example, mobile computing device 110 may be a personal digital assistant (PDA), a smartphone, a mobile phone, a handheld computer, a desktop computer, or any other device capable of operating as described herein.

Mobile computing device 110 includes memory card slot 112. Memory card slot 112 is a slot capable of accepting RFID card 120. For example, memory card slot 112 may have physical dimensions compatible with RFID card 120, and may have a communications interface that operates using a protocol compatible with RFID card 120. In some embodiments of the present invention, memory card slot 112 is a memory card slot designed to accept and communicate with memory cards. As used herein, the term "memory card slot" refers to any add-on slot capable of accepting a card having memory accessible by a mobile computing device such as that shown in FIG. 1. For example, a memory card slot may be compatible with an industry standard communications protocol, or may be compatible with a widely accepted communications protocol that is not necessarily formally documented as an industry standard. Examples include slots that are compatible with the Multimedia Memory Card (MMC) protocol, Memory Stick DUO protocol, secure digital (SD) protocol, and Smart Media protocol. The foregoing list is meant to be exemplary, and not exhaustive. Memory card slot 112 may be compatible with many memory card slot protocols other than those explicitly listed above without departing from the scope of the invention. Further, in some embodiments, memory card slot 112 accepts a subscriber identity module (SIM) card. Memory card slot 112 may be exposed on an edge of mobile computing device 110 as shown, or may be behind a cover. For example, memory card slot 112 may be behind a battery cover, behind a battery, or anywhere else on mobile computing device 110.

RFID card 120 includes electrical contacts 122 as part of a host interface that communicates with memory card slot 112. For example, electrical contacts 122 may provide connectivity compliant with a communications protocol for memory cards. RFID card 120 includes RFID functionality, and may also include memory accessible by mobile computing device 110. For example, in some embodiments, RFID card 120 includes a smartcard controller and an inductive element capable of interacting with an NFC reader (e.g., an ISO 14443 compliant interface). In other embodiments, RFID card 120 does not include memory accessible by mobile computing device 110. RFID card 120 may include functionality beyond memory and RFID. Electrical contacts 122 may also be compliant with a smartcard "contact" interface (e.g., ISO 7816).

In various embodiments of the present invention, the RFID functionality in RFID card 120 is accessed by mobile computing device 110 using memory card access commands already defined for use in memory card slot 112. Accordingly, the various embodiments of the present invention enable the implementation of RFID functions beyond

6

memory accesses without defining new commands. In some embodiments, new commands for the RFID card are embedded inside the data bits subsequent to memory card read/write commands. RFID card 120 then decides if the incoming data bits are meant for regular read/write memory functions or for RFID functions. In other words, functions in addition to standard memory card functions may be accessed through commands "hidden" in the data stream that can be exchanged using existing memory card access commands and functions. According to the various embodiments of the invention, both existing memory card functions and RFID functions may be implemented without requiring changes in how the host protocol is built.

The combination of mobile computing device 110 and RFID card 120 may be used for any purpose. For example, in some embodiments, RFID card 120 may interact with a point-of-sale payment device to effect mobile payments. Also for example, in some embodiments, RFID card 120 may be used in wave-and-pay ticketing in mass transit environments, such as MIFARE.

FIG. 2 shows a block diagram of a mobile computing device. Mobile computing device 110 includes antenna 240, radio circuits 230, processor 210, memory 220, and memory card slot 112. In some embodiments, mobile computing device 110 is a mobile phone, or includes mobile phone functionality. For example, antenna 240 and radio circuits 230 may be utilized to communicate with a cellular telephone network. Further, in some embodiments, mobile computing device 110 is a wireless local area network (WLAN) or wireless wide area network (WWAN) device. For example, antenna 240 and radio circuits 230 may be utilized to communicate with a wireless access point. In some embodiments, antenna 240 and radio circuits 230 are omitted, and mobile computing device 110 does not utilize wireless connectivity.

Processor 210 represents a processor capable of communicating with the other blocks shown in mobile computing device 110. For example, processor 210 may be a microprocessor, a digital signal processor (DSP), a microcontroller, or the like. Further, processor 210 may be formed from state machines or other sequential logic. In operation, processor 210 may read instructions from memory 220 and perform actions in response thereto. For example, processor 210 may execute program instructions that influence communications between mobile computing device 110 and a device coupled to memory card slot 112.

Memory card slot 112 is described above with reference to FIG. 1. Memory card slot 112 includes circuitry compatible with RFID card 120. Mobile computing device 110 may communicate with RFID card 120 by using a standard set of memory card access commands. For example, processor 210 may use memory card write commands to write to memory in RFID card 120, and may use memory card read commands to read from memory in RFID card 120. Mobile computing device 110 may also communicate with RFID card 120 using an ISO 7816 interface or the like. For example, when RFID card 120 is a SIM card, mobile computing device 110 may communicate with a smartcard controller within the SIM card.

Mobile computing device 110 may access the RFID functionality in RFID card 120 using "hidden" commands embedded in memory card access commands. For example, a memory card write command may include a unique data string to identify the memory card write command as a command to be diverted for purposes other than a memory write. In addition, the sector address provided with the memory card write command may be set to a particular

Exhibit 1
Page 280 of 550

US 11,694,053 B2

7

address value to further identify the memory card write command as a command to be diverted. In addition to specific address/data values to identify the memory card access command as a command to be diverted for a purpose other than a memory access, the memory access command may include data bits to further specify the type and function of hidden command. Example formats of hidden commands are described further below. In some embodiments, a read command is issued right after a write command to enable data flow from the non-memory card functions to the host, where the write command's data had the hidden commands. The combination of a memory card write command and a memory card read command can be used in this manner to form a hidden read command.

In some embodiments, memory card slot 112 is powered down after periods of inactivity to save power. For example, memory card slot 112 may be powered up when processor 210 issues a memory card write or read command, but may then be powered down to save power. When memory card slot 112 is powered down, any device coupled to the memory card slot is also powered down. For example, if RFID card 120 (FIG. 1) is coupled to the memory card slot, then RFID card 120 is powered down when memory card slot 112 is powered down.

In various embodiments of the present invention, processor 210 executes software resident in memory 220 to maintain power to memory card slot 112 (and to RFID card 120). For example, periodic hidden commands may be sent to RFID card 120 for the purpose of keeping power applied while RFID card 120 is expected to be providing RFID functionality. Also for example, a hidden command may be sent to RFID card 120 for the purpose of cycling power to a smartcard controller resident on the card. These hidden commands are described further below with respect to later figures.

FIG. 3A shows a block diagram of a memory card compatible RFID card with an integrated inductive element. RFID card 300 represents possible embodiments of RFID card 120 (FIG. 1). RFID card 300 includes host interface 310, memory card controller 340, memory 360, smartcard controller 340, program memory 332, and small inductive element 350. RFID card 300 is capable of communicating with a memory card slot in a mobile computing device. Further, RFID card 300 does not require memory card slots to implement extended input/output functions. For example, and not by way of limitation, in SD and micro SD embodiments, RFID card 300 is operable in any SD or microSD memory card slot, and does not require a secure digital input output (SDIO) memory card slot.

Host interface 310 includes electrical contacts to interface with a memory card slot. For example, host interface 310 includes contacts such as contacts 122 (FIG. 1). Also for example, in some embodiments, host interface 310 includes recessed electrical contacts. Host interface 310 may also include circuitry such as drivers, receivers, terminations, and the like.

In embodiments represented by FIG. 3A, memory card controller 340 communicates with the mobile device using memory card access commands. Memory card controller 340 also communicates with memory 360. Memory card controller 340 determines whether each command should result in a memory operation with memory 360, whether a hidden command should be diverted to smartcard controller 330, or whether memory card controller 340 should take action in response to a hidden command. In some embodiments, memory card controller 340 executes instructions that are stored in an internal memory or stored in memory

8

360. In some embodiments, memory card controller 340 includes special purpose hardware useful to determine whether a command should be diverted. In other embodiments, memory card controller 340 may be a microcontroller identical in all respects to a controller found in memory cards, except for the program that it executes.

Memory 360 may be any type of volatile or non-volatile memory. For example, memory 360 may be volatile memory such as static random access memory (SRAM) or dynamic random access memory (DRAM). Also for example, memory 360 may be nonvolatile memory such as NOR FLASH memory or NAND FLASH memory. In various embodiments of the present invention, memory 360 represents memory that is accessed by a mobile computing device using memory card access commands defined for that purpose.

When RFID card 300 is communicating with a memory card slot in a mobile computing device, the mobile computing device may send a memory card access command in order to access memory 360. Also, for example, the mobile computing device may send a memory card access command that contains a hidden command. Memory card controller 340 detects the presence of the hidden command, and diverts all or a portion of the memory access command to smartcard controller 330 using communication bus 342. Communication bus 342 may have any number of conductors and may take any form. For example, communication bus 342 may be a serial port, a parallel port, or may include multiple data conductors, multiple address conductors, and/or conductors to carry control signals such as clock signals. In some embodiments, memory card controller 340 takes one or more actions in response to a hidden command. For example, memory card controller 340 may modify clock signals in response to a hidden command.

Memory card controller 340 can detect the hidden command in many ways. For example, in some embodiments, the memory card access command may include a specific address value or a specific data value. Memory card controller 340 detects commands that include one or both of the specific address value or specific data value and routes the command appropriately. The specific address value and specific data value used for this purpose are referred to herein as the hidden command address value and the hidden command data value.

In some embodiments, memory card controller 340 detects the presence of hidden commands based only on the hidden command address value. In these embodiments, memory card controller 340 checks the address value included in a memory card access command, and diverts the command (or takes some other action) if it matches the hidden command address value. In some embodiments, memory card controller 340 detects the presence of hidden commands based only on the hidden command data value. In these embodiments, memory card controller 340 checks a data value included in the memory card access command, and diverts all or a portion of the command if it matches the hidden command data value. In still further embodiments, memory card controller 340 detects the presence of hidden commands based on both the hidden command address value and the hidden command data value. In these embodiments, memory card controller 340 diverts the command only if both the memory card access address and data match the hidden command address value and data value, respectively.

The hidden command address value and hidden command data value may be specified in many ways. For example, all RFID cards may be issued with fixed values. In these

Exhibit 1
Page 281 of 550

US 11,694,053 B2

9

embodiments, each time the RFID functions are accessed, the same hidden command address and/or data value is included in the memory card access command. Also, for example, different RFID cards may be issued with unique values. In these embodiments, each RFID card may provide these values to a mobile computing device when queried. Also, for example, hidden command address and/or data values may be specified by the mobile computing device. In still further embodiments, hidden command address and data values may be dynamic. The hidden command address and data values may change each time power is applied or on a periodic basis.

Smartcard controller 330 receives hidden commands diverted by memory card controller 340. Smartcard controller 330 further interprets the hidden commands and performs actions in response thereto. Smartcard controller 330 executes instructions stored in program memory 332. In some embodiments, program memory 332 is embedded in smartcard controller 330, and in other embodiments, program memory 332 is part of memory 360.

Smartcard controller 330 is a dual interface smartcard controller with one of the interfaces including RFID functionality. In some embodiments, smartcard controller 330 is compatible with passive RFID tag readers in NFC applications. For example, smartcard controller 330 may be a device capable of implementing all or part of the ISO 14443 standard for contactless NFC devices. Also, for example, smartcard controller 330 may be a dual interface smartcard controller capable of supporting both ISO 7816 and ISO 14443 standards for contact/contactless requirements. The "SmartMX" family of controllers available from NXP Semiconductors N.V. of The Netherlands are examples of suitable dual interface smartcard controllers. These controllers provide RFID functionality at 13.56 MHz. The various embodiments of the present invention operate at 13.56 MHz, but are not limited to operation at this frequency. In some embodiments, smartcard controller 330 interoperates with MIFARE systems for ticketing applications.

Smartcard controller 330 receives power from the host interface. By not receiving power from the interrogating RF field, the necessity of a loop antenna for power generation is negated. Smartcard controller 330 includes a contactless interface that in turn includes antenna port 334. Antenna port 334 includes at least two pads for connection to an antenna, shown as 1742 and 1744 in FIG. 14 and later figures. In FIG. 3A, antenna port 334 is coupled to small inductive element 350.

Small inductive element 350 includes a coil wound around a magnetic core. As described with reference to later figures, small inductive element may include one or more coils or antennas. The coil of small inductive element is too small to draw power from the interrogating RF field, but this is not necessary since smartcard controller 330 is powered by the host device through host interface 310. Small inductive element 350 interacts with an antenna in an RFID reader similar to the way that primary and secondary coils in a transformer interact. The RFID reader has a coil resonant at 13.56 MHz functioning as the primary coil of a transformer. Small inductive element 350 functions as the secondary coil of the transformer. Accordingly, the transmitter "sees" the impedance of the secondary coil (small inductive element 350). Smartcard controller 330 is able to modulate reflected RF signals using circuitry to modify the impedance at the antenna port 334.

Small inductive element 350 can be made very small. For example, in some embodiments, RFID card 120 is a miniSD card, microSD card, or SIM card, and small inductive

10

element 350 is small enough to be completely contained in the miniSD, microSD, or SIM form factor. A specific embodiment of a small inductive element in a memory card form factor is described below with reference to FIG. 4.

In various embodiments of the invention, memory card controller 340 and smartcard controller 330 are implemented in many different ways. For example, in some embodiments, the various components are implemented in hardware. In these embodiments, the various components may be implemented as separate integrated circuits, or in a combined integrated circuit. Also, for example, in some embodiments, the various components may be implemented in software, or in a combination of hardware and software. In some embodiments, RFID card 300 may include a microprocessor, and the components may be implemented as software modules running on the microprocessor. In other embodiments, RFID card 300 may include multiple processors, and the components may be implemented as software modules distributed across the multiple processors.

FIG. 3B shows a block diagram of a memory card compatible RFID card with an integrated inductive element. RFID card 302 represents possible embodiments of RFID card 120 (FIG. 1). RFID card 302 includes host interface 310, memory card controller 340, memory 360, smartcard controller 340, program memory 332, and small inductive element 350, all of which are described above with reference to FIG. 3A. RFID card 302 is capable of communicating with a memory card slot in a mobile computing device. Further, RFID card 302 does not require memory card slots to implement extended input/output functions. For example, and not by way of limitation, in SD and microSD embodiments, RFID card 302 is operable in any SD or microSD memory card slot, and does not require a secure digital input output (SDIO) memory card slot.

In embodiments represented by FIG. 3B, smartcard controller 330 receives power from memory controller 340. In these embodiments, memory controller 340 has direct control over the power provided to smartcard controller 330. Memory controller 340 may apply and/or remove power from smartcard controller 330 in response to commands received over the host interface. For example, memory controller 340 may receive a hidden command to reset smartcard controller 330 by causing a reboot through a power cycle.

FIG. 4 shows a memory card compatible RFID card with an integrated inductive element. RFID card 120 is shown in an SD card form factor, although this is not a limitation of the present invention. For example, other form factors within the scope of the present invention include, but are not limited to, microSD form factors and SIM card form factors. RFID card 120 includes electrical contacts 122, memory card controller 340, smartcard controller 330, memory 360, magnetic core 450, and coil 452, all affixed to circuit board 402.

Magnetic core 450 and coil 452 implement small inductive element 350 (FIGS. 3A, 3B). As can be seen in FIG. 4, the small inductive element fits entirely within the memory card form factor. The small inductive element does not provide power generation for smartcard controller 330, and so does not need to be made large for that purpose.

FIG. 5 shows a data portion of a memory card write command. Included are hidden command data value 510, status field 520, password field 530, device ID 532, command index 540, and hidden command related data 550. In the example of FIG. 5, the data portion is 512 bytes in length, although this is not a limitation of the present

Exhibit 1
Page 282 of 550

US 11,694,053 B2

11

invention. Any amount of data may be included in the write command, and each field shown in FIG. 5 may be any length.

In the example of FIG. 5, the hidden command data value is 256 bits long, although any length may be used without departing from the scope of the present invention. In some embodiments, hidden command data value 510 is used to identify a memory write command as a hidden command. When a write command is received having data in the first 256 bits that match the hidden command data value, the command is identified as one to be diverted to the smartcard controller. As described above, a hidden command address value may be used in conjunction with, or instead of, a hidden command data value to identify the memory write command as a hidden command.

The remaining fields have significance when the memory write is a hidden command. For example, if the first 256 bits do not match the hidden command data value (or if the write address does not match the hidden command address value, or both) then the remaining bits in the data field are to be treated as data in a normal memory write command. In contrast, when the memory write is a hidden command, the remaining fields are used to further interpret the hidden command.

Memory card controller 340 (FIGS. 3, 4) inspect the hidden command data value 510, status field 520, and possibly password field 530 and device ID 532. In some embodiments, if the command is identified as a hidden command, memory card controller 340 forwards the password 530, command index 540, and related data 550 to smartcard controller 330. In other embodiments, memory card controller 340 may directly take actions based on the hidden command.

Status field 520 may include any information relating to the status of the hidden command. For example, status field 520 may include one or more bits to signify to memory card controller 340 whether the host (mobile computing device) is expecting the smartcard controller to return data in response to the hidden command. For example, when status field 520 signifies a write, memory card controller 340 forwards the password, device ID, command index, and related data without expecting to return any data to the host. Also for example, when status field 520 signifies a read, memory card controller 340 forwards the password, device ID, command index, and related data with the expectation that smartcard controller 330 may provide data to be sent to the host in response to a memory card read command. The combination of a memory card write command followed shortly thereafter by a memory card read command may be used to provide "read" functionality to the smartcard controller. Read operations from the smartcard controller are described further below with reference to FIG. 8.

Password field 530 includes a password to allow smartcard controller 330 to authenticate the host to the RFID card. In some embodiments, every hidden command includes a password. Each time the password, device ID, command index, and related data is diverted to the smartcard controller, the password is checked to authenticate the host to the RFID card.

Device ID 532 uniquely identifies the host (mobile computing device). The device ID may be checked by the smartcard controller to ensure that the RFID card is inserted in the host to which it is authenticated. Some embodiments of the present invention enforce a unique host/card pairing using the device ID, and other embodiments allow smartcard controller functions to be accessed by any host.

12

Command index 540 identifies the type of hidden command. The number of possible hidden commands is limited only by the number of bits allocated thereto. Any number of bits may be allocated to command index 540 without departing from the scope of the present invention. Hidden command related data 550 may be utilized differently for each type of hidden command. Any number of bits may be used for hidden command related data 550.

The data shown in FIG. 5 is provided as an example, and the data field of a memory card access command may include more or fewer data fields than those shown in FIG. 5. The present invention is not limited by the number or content of the fields in a memory card access command.

FIG. 6 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 600 may be used by a mobile computing device to communicate with an RFID card in a memory card slot. In some embodiments, method 600, or portions thereof, is performed by a mobile computing device with a memory card slot, and in other embodiments, method 600, or portions thereof, is performed by software. The various actions in method 600 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 6 are omitted from method 600.

Method 600 begins at 610 in which a data pattern and an address value are received from an RFID card in a memory card slot. The data pattern corresponds to the hidden command data value, and the address value corresponds to the hidden command address value. In some embodiments, the mobile device may receive the data value and in other embodiments, the mobile device may receive the address value. In some embodiments, the actions of 610 may occur once when the RFID card is first inserted in the memory card slot. The mobile computing device may then use the address and data values each time it creates a hidden command. In other embodiments, the actions of 610 may occur each time the RFID card is inserted in the memory slot. In still further embodiments, the actions of 610 may occur periodically. Each time the actions 610 occur, the data pattern may be the same or different, and the address value may be the same or different.

At 620, a data field of a memory card access command is populated with the data pattern to cause the command to be diverted to a smartcard controller on the RFID card. For example, the data pattern may be written to the data field as the hidden command data value 510 (FIG. 5).

At 630, an address field of the memory card access command is populated with the address value to further cause the command to be diverted to the smartcard controller. In some embodiments, only one of 620 or 630 is utilized. In these embodiments, the presence of a hidden command is signified by the data pattern alone, or the address value alone.

At 640, the data field of the memory card access command is populated with a command string to specify a purpose other than a memory card access. For example, the command string may be written to the data field as the command index 540 for the smart card controller. This command may be used for any purpose. For example, one or more hidden commands may have as a sole purpose keeping power provided to the memory card slot so that the RFID card continues to receive power.

At 650, the data field of a memory card access command is populated with a password to authenticate access to the RFID card coupled to the memory card slot. In some embodiments, a password is included in the data field for

Exhibit 1
Page 283 of 550

US 11,694,053 B2

13

every hidden command. In other embodiments, a password is only included at the beginning of an exchange.

At 660, the memory card access command is sent to the RFID card coupled to the memory card slot. For example, a mobile computing device (110, FIGS. 1, 2) may send the memory card access command to an RFID card (120, FIGS. 1, 3, 4) in a memory card slot (112, FIGS. 1, 2). The RFID card includes a memory card controller (340, FIG. 3) to divert the command (or take some other action) based on the data fields populated in method 600.

FIG. 7 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 700 may be used by an RFID card in a memory card slot. In some embodiments, method 700, or portions thereof, may be performed by a memory card controller within a memory card compatible RFID card, and in other embodiments, method 700, or portions thereof, is performed by software. The various actions in method 700 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 7 are omitted from method 700.

Method 700 begins at 710 in which a memory card access command is received from a mobile computing device via a host interface. The actions of 710 correspond to an RFID card in a memory card slot of a mobile computing device receiving a memory card access command.

At 720, the memory card controller checks criteria in the memory card access command to determine if the memory card access command should be diverted to a smartcard controller resident on the RFID card. The criteria may be one or both of a hidden command data value, a hidden command address value, or both. If there is a criteria match at 730, then a hidden command is present, and at least a portion of the memory card access command is diverted at 740. If there is not a criteria match, then no hidden command is present, and a memory access is performed at 750.

FIG. 8 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 800 may be used by an RFID card in a memory card slot. In some embodiments, method 800, or portions thereof, is performed by a memory card controller within an RFID card, and in other embodiments, method 800, or portions thereof, is performed by software. The various actions in method 800 may be performed in the order presented, in a different order, or simultaneously. In some embodiments, some actions listed in FIG. 8 are omitted from method 800.

Method 800 begins at 810 in which a memory card write command is received from a mobile computing device via a host interface. If the memory card write command is determined to be a hidden command, processing continues with 840; otherwise, a memory write is performed at 830.

At 840, the hidden command is diverted to a smartcard controller. In some embodiments, this corresponds to sending command index 540 and hidden command related data 550 (FIG. 5) to the smartcard controller. If the hidden command is determined to be a "read" at 850, processing continues at 860; otherwise, the hidden command processing is done. At 860, the memory card controller retrieves non-memory data from the smartcard controller, and at 870, a memory card read command is received from the mobile computing device. At 880, the non-memory data is returned to the mobile computing device.

Method 800 demonstrates how a mobile computing device can perform a read from a smartcard controller in a memory card compatible RFID card. The mobile computing device issues a memory card write command with a hidden

14

command having a status field designating a read, and then the mobile computing device issues a memory card read command. The processing in the card receives the hidden command, identifies it as a read, and then returns data to the mobile computing device in response to a subsequent memory card read command.

FIG. 9 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 900 may be used by an RFID card in a memory card slot. In some embodiments, method 900, or portions thereof, is performed by a smartcard controller within an RFID card, and in other embodiments, method 900, or portions thereof, is performed by software. The various actions in method 900 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 9 are omitted from method 900.

Method 900 begins at 910 in which a smartcard controller receives a command from the memory card controller. This command corresponds to a hidden command received by the memory card controller. At 950, the smartcard controller determines whether the command is a "dummy" command used solely for the purpose of maintaining power to the memory card slot. If no, then the smartcard function specified in the command is performed at 930. If yes, then the command is disregarded at 960.

Method 900 allows a memory card compatible RFID card in a memory card slot to remain powered during periods when the memory card slot in the host device would otherwise remove power to save energy. This is a coordinated effort between software building hidden commands in a memory card access command, the memory card controller diverting the hidden command to the smartcard controller, and the smartcard controller disregarding the command. According to embodiments represented by FIG. 3A, providing power to the RFID card also provides power the smartcard controller, thereby allowing the use of a small inductive device such as those shown in FIGS. 3 and 4.

FIG. 10 shows a flowchart in accordance with various embodiments of the present invention. In some embodiments, method 1000 may be used by an RFID card in a memory card slot. In some embodiments, method 1000, or portions thereof, is performed by a memory card controller within an RFID card, and in other embodiments, method 1000, or portions thereof, is performed by software. The various actions in method 1000 may be performed in the order presented, in a different order, or simultaneously. Further, in some embodiments, some actions listed in FIG. 10 are omitted from method 1000.

Method 1000 begins at 1010 in which a memory card controller receives a hidden command from a mobile computing device. If at 1020, the memory card controller determines that the hidden command is to be diverted to the smartcard controller, then the command is diverted at 1030. In some embodiments, this corresponds to sending command index 540 and hidden command related data 550 (FIG. 5) to the smartcard controller. If the command is not to be diverted, then the memory card controller does not divert the command; however, the memory card controller may take other actions at 1040 based on the hidden command. For example, the memory card controller may modify a clock signal provided to the smartcard controller. Also for example, the memory card controller may assert a reset signal to the smartcard controller. Still for example, the memory card controller may cycle power to the smartcard

Exhibit 1
Page 284 of 550

US 11,694,053 B2

15

controller. The memory card controller is able to cycle power to the smartcard controller in embodiments represented by FIG. 3B.

Cycling power to the smartcard controller may be a coordinated effort between the hosting computing device and the memory card controller in the RFID card. For example, power to the memory card slot may be maintained by supplying dummy hidden commands to the RFID card as described above with reference to FIG. 9. While power is maintained to the memory card slot, hidden commands may be used to cause the memory card controller to cycle power to the smartcard controller.

FIG. 11 shows a method authenticating a mobile computing device to one or more functions in a memory card compatible RFID card. Method 1100 begins at block 1110 in which an activation code is received at an RFID card from a mobile computing device. At 1120, the received activation code is compared to a code stored in the RFID card. If the activation code matches, the RFID card receives a password from the mobile computing device at 1140, and stores the password in the RFID card for later use at 1150. If the activation code does not match, the RFID card determines whether a number of allowable tries has been exceeded at 1160. If the number of allowable tries has been exceeded, the RFID card issuer is contacted at 1170, and if the number of allowable tries has not been exceeded, the method repeats until either the activation code matches or the number of allowable tries has been exceeded.

Method 1100 may be performed when an RFID card is issued to a user. For example, the RFID card may be a mobile payment card issued by a financial institution. The user may be provided an activation code to "activate" the RFID card. When the user successfully enters the activation code, the user is prompted for a password, and that password is stored for use in future hidden commands.

In some embodiments, multiple non-memory functions in an RFID card are authenticated using method 1100. For example, each of multiple non-memory functions may have stored activation codes, and each is activated separately. Each of the separately activated functions may have a different password, or the multiple functions may share a password.

Embodiments described thus far include a power delivery mechanism from the host to the smartcard controller that allow the antenna or coil to be very small. The small antenna or coil allows for higher levels of integration, but may also reduce the maximum distance at which the RFID card may function. For example, referring to FIG. 14, the voltage produced by the antenna needs to overcome the diode drops of the bridge rectifier before data can be demodulated within the smartcard controller. As the antenna shrinks in size, the RFID card needs to be closer to the device producing the interrogating RF field in order to produce a large enough voltage to overcome the bridge rectifier diode drops, thereby reducing the maximum usable distance.

FIG. 15 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and an antenna in accordance with various embodiments of the present invention. Antenna 1542 is a small inductive element as described above. Capacitor 1544 is in parallel with antenna 1542 and together they form tuned circuit 1540 that is tuned to be resonant at the frequency of operation (e.g., 13.56 MHz). The performance enhancement circuits include an amplifier 1510, outgoing data extraction circuit 1520, and load modulation driver circuit 1530. Amplifier 1510 amplifies the voltage received at antenna 1542, and the amplified voltage is provided to the smartcard

16

controller. This increases the maximum distance at which the RFID card can operate while receiving data, but also creates a unidirectional data path where a bidirectional data path previously existed. In other words, amplifier 1510 forms a simplex communication path where a half duplex path previously existed.

In order to restore the outgoing data path and re-create a half duplex communications system, the RFID card includes outgoing data extraction circuit 1520 and load modulation driver circuit 1530. Outgoing data extraction circuit 1520 receives a signal that is formed by the interrogating RF field having been load modulated by the smartcard controller. For example, the impedance of the antenna port is modulated by load modulation driver circuit 1410 (FIG. 14), where the modulating signal is the data. Outgoing data extraction circuit 1520 recovers the data, and then load modulation driver circuit 1530 modulates the impedance of the tuned circuit 1540 to form the outgoing data path.

Outgoing data extraction circuit 1520 may include one or more filters to extract the data. For example, referring now to FIG. 16, the load modulation driver circuit within the smartcard controller creates frequency sidebands 1610 about the carrier frequency 1620 of the interrogating RF field. Outgoing data extraction circuit 1520 may include conventional filters to isolate one or more sidebands and extract the data. As shown in FIG. 16, in some 13.56 MHz embodiments, the bandwidth of the carrier frequency of the interrogating RF field may be on the order of 850 KHz and the bandwidth of the sidebands may be on the order of 100-200 KHz, although this is not a limitation of the present invention.

Load modulation driver circuit 1530 receives the extracted data from outgoing data extraction circuit 1520, and load modulates the tuned circuit 1540 in response thereto. Load modulation driver circuits are generally well known, and may be as simple as a switched transistor that adds and removes a reactive element from tuned circuit 1540. In some embodiments, load modulation driver circuit 1530 substantially duplicates the load modulation driver circuit 1410 within smartcard controller 330.

Amplifier 1510 is shown coupled to smartcard controller pad 1472, and data extraction circuit 1520 is shown coupled to smartcard controller pad 1474, but this is not a limitation of the present invention. For example, outgoing data extraction circuit 1520 may be coupled to smartcard controller pad 1472 while amplifier 1510 may be coupled to smartcard controller pad 1474. Also for example, both outgoing data extraction circuit 1520 and amplifier 1510 may be coupled to either pad 1472 or pad 1474 without departing from the scope of the present invention.

FIG. 17 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. FIG. 17 shows smartcard controller 330, amplifier 1510, outgoing data extraction circuit 1520, and load modulation driver circuit 1530, all of which are described above. FIG. 17 also shows tuned circuits 1740 and 1750. Tuned circuit 1740 includes receive antenna 1742 and capacitor 1744. Tuned circuit 1750 includes transmit antenna 1752 and capacitor 1754. In some embodiments, receive antenna 1742 and transmit antenna 1752 are small inductive elements as described above.

Separate transmit and receive antennas allow for different tuning, both in frequency and bandwidth, or "Q." For example, tuned circuit 1740 may be tuned with relatively high Q for receive as shown at 1820 in FIG. 18, while tuned

Exhibit 1
Page 285 of 550

17                                          18

circuit 1750 may be tuned for a lower Q to envelope both sidebands for transmit as shown at 1830 in FIG. 18. The higher Q tuning for the receive antenna may further increase the maximum usable distance when the RFID card is receiving.

FIG. 19 shows a smartcard controller with performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. FIG. 19 shows smartcard controller 330, amplifier 1510, outgoing data extraction circuit 1520, load modulation driver circuit 1530, and tuned receive circuit 1740, all of which are described above. FIG. 19 also shows two tuned transmit circuits 1950 and 1960. Tuned circuit 1950 includes antenna 1952 and capacitor 1954, and tuned circuit 1960 includes antenna 1962 and capacitor 1964. Antennas 1952 and 1962 may be small inductive elements as described above.

Separate transmit antennas allow separate tuning for the two sidebands. For example, tuned circuit 1950 may be tuned for the lower sideband and tuned circuit 1960 may be tuned for the upper sideband as shown in FIG. 20. Higher Q tuning of the transmit antennas for the separate sidebands may further increase the maximum usable distance when the RFID card is transmitting.

FIG. 21 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and an antenna in accordance with various embodiments of the present invention. The circuits shown in FIG. 21 are similar to FIG. 15 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 may include circuits to actively transmit a signal rather than simply load modulate tuned circuit 1540. For example, active transmit driver circuit 2130 may include one or more amplifiers, filters, oscillators, modulators, etc., to form a signal that mimics the sidebands 1610 (FIG. 16) as if the interrogating RF field experienced load modulation. Active transmission can make use of power available on the RFID card and can further increase the usable distance when smartcard controller 330 is transmitting.

FIG. 22 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 22 are similar to FIG. 17 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 23 shows a smartcard controller with performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 23 are similar to FIG. 19 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 24 shows a smartcard controller with a pad to provide a digital data output. Smartcard controller 2430 includes the antenna pads 1472 and 1474 as described above. Smartcard controller 2430 also includes pad 2410 which provides the digital data output directly. By providing the digital data output directly, smartcard controller 2430 enables various embodiments of the invention to eliminate the outgoing data extraction circuit.

FIG. 25 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and an antenna in accordance with various embodiments of the present invention. FIG. 25 shows smartcard controller 2430, amplifier 1510, load modulation driver circuits 1530, and tuned circuit 1540, all of which are described above. Note that because smartcard controller 2430 provides digital data directly, the outgoing data extraction circuit 1520 (FIG. 15) can be omitted, thereby reducing parts count and cost.

FIG. 26 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. FIG. 26 shows circuits similar to those shown in FIG. 25, except that separate transmit and receive antennas are provided. Separate transmit and receive antennas (and associated tuned circuits) allow for a higher Q tuning of the receive antenna, thereby increasing the maximum usable distance when RFID card is receiving. See FIG. 18.

FIG. 27 shows a smartcard controller with digital data output and performance enhancement circuits including a load modulation driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. FIG. 27 shows circuits similar to those shown in FIG. 26, except that multiple transmit antennas are provided. Multiple separate transmit antennas (and associated tuned circuits) allow for a higher Q tuning of each transmit antenna, thereby increasing the maximum usable distance when RFID card is transmitting. See FIG. 20.

FIG. 28 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and a single antenna in accordance with various embodiments of the present invention. The circuits shown in FIG. 28 are similar to FIG. 25 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21. In general, the term "driver" as used herein refers to an active transmit driver or a load modulation driver or any other method of driving the transmit output data.

FIG. 29 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and separate receive and transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 29 are similar to FIG. 26 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIG. 30 shows a smartcard controller with digital data output and performance enhancement circuits including an active transmit driver circuit and multiple transmit antennas in accordance with various embodiments of the present invention. The circuits shown in FIG. 30 are similar to FIG. 27 except the load modulation driver is replaced with an active transmit driver circuit 2130. Active transmit driver circuit 2130 is described above with reference to FIG. 21.

FIGS. 31-34 show performance enhancing application specific integrated circuits (ASICs) coupled to various smartcard controllers in accordance with various embodiments of the present invention. FIGS. 31 and 32 show ASICs coupled to smartcard controller 330. Both ASICs include amplifier 1510 and outgoing data extraction circuits 1520. The ASIC of FIG. 31 includes load modulation driver circuits 1530 and the ASIC of FIG. 32 includes active transmit driver circuit 2130. FIGS. 33 and 34 show ASICs coupled to receive direct digital data from smartcard controller 2430. Accordingly, the outgoing data extraction circuits are omitted. The ASIC of FIG. 33 includes amplifier

Exhibit 1
Page 286 of 550

US 11,694,053 B2

19

1510 and load modulation driver circuits 1530, and the ASIC of FIG. 34 includes amplifier 1510 and active transmit driver circuit 2130.

By combining a smartcard controller and an ASIC as described herein, the performance of an RFID card may be enhanced with a reduced parts count. Further, any of ASICs shown may be used with separate receive and transmit antennas, multiple transmit antennas, or any combination. Further, one ASIC may be provided with all of the functionality shown in FIGS. 31-34 and the manner in which it is connected to a smartcard controller may dictate which functional blocks (e.g., data extraction, load modulation, active transmit) are utilized.

FIG. 35 shows a memory card with integrated smartcard controller, performance enhancement circuits, and antennas in accordance with various embodiments of the present invention. Host interface 340, memory card controller 340, and memory 360 are described above. Smartcard controller 3520 may be any smartcard controller described herein, including smartcard controller 330 or smartcard controller 2430. Enhancement circuits 3550 may include any of the enhancement circuits described herein including any combination of amplifier 1510, outgoing data extraction circuits 1520, load modulation driver circuits 1530, and active transmit driver circuit 2130. Antenna(s) 3560 may include any number or type of antennas. For example, antenna(s) 3560 may include one antenna, separate transmit and receive antennas, or a receive antenna and multiple transmit antennas.

FIG. 36 shows a memory card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention. The memory card of FIG. 36 shows circuits similar to FIG. 35 with the exception of antenna(s) 3560. Instead, the memory card of FIG. 36 is intended for use with a host device that includes antenna(s). In some embodiments, antenna(s) 3560 are included in the memory card of FIG. 36, thereby allowing the host device to decide whether to use the antennas on the memory card, or the antennas on the host device. The form factor of the memory card in FIGS. 35 and 36 is shown as a microSD card, but this is not a limitation of the present invention. Any form factor may be employed.

FIG. 37 shows a subscriber identity module (SIM) card with integrated smartcard controller, performance enhancement circuits and antennas in accordance with various embodiments of the present invention. Smartcard controller 3520, enhancement circuits 3550, and antenna(s) 3560 are described above with reference to FIG. 35.

FIG. 38 shows a subscriber identity module (SIM) card with integrated smartcard controller and performance enhancement circuits in accordance with various embodiments of the present invention. The SIM card of FIG. 38 shows circuits similar to FIG. 37 with the exception of antenna(s) 3560. Instead, the SIM card of FIG. 38 is intended for use with a host device that includes antenna(s). In some embodiments, antenna(s) 3560 are included in the SIM card of FIG. 38, thereby allowing the host device to decide whether to use the antennas on the SIM card, or the antennas on the host device.

FIG. 39 shows a mobile device with a smartcard controller, enhancement circuits, and antenna(s). The mobile device of FIG. 39 includes a built-in smartcard controller for RFID functionality as opposed to accepting a separate RFID card as described above. The mobile device may be any electronic device including a mobile phone, a tablet computer, or the like.

20

Although the present invention has been described in conjunction with certain embodiments, it is to be understood that modifications and variations may be resorted to without departing from the spirit and scope of the invention as those skilled in the art readily understand. Such modifications and variations are considered to be within the scope of the invention and the appended claims.

We claim:

1. A mobile device comprising:
a power source;
a smartcard controller coupled to the power source to receive power;
an antenna tuned to operate at substantially 13.56 MHz, wherein the antenna interacts with a Near Field Communication (NFC) reader external to the mobile device; and
an active transmit driver circuit coupled to the power source to receive the power, wherein the active transmit driver circuit affects transmission of data between the antenna and the NFC reader.

2. The mobile device of claim 1, wherein the transmitted data includes ticketing information for a mass transit system.

3. The mobile device of claim 1, wherein the transmitted data includes transaction information for a mobile payment.

4. The mobile device of claim 1, wherein the NFC reader is a point-of-sale NFC reader.

5. The mobile device of claim 1, wherein the antenna includes an inductive element.

6. The mobile device of claim 1, wherein the active transmit driver circuit includes one or more of an amplifier, filter, oscillator, and/or modulator.

7. The mobile device of claim 1 comprising an amplifier coupled to the power source to receive the power, wherein the amplifier is further coupled to the antenna.

8. The mobile device of claim 7, wherein the amplifier amplifies a signal received at the antenna and generates an amplified signal, and provides the amplified signal to the smartcard controller.

9. The mobile device of claim 1, wherein the smartcard controller includes a bridge rectifier.

10. A method of activation, the method comprising:
receiving a first communication via a network including a request for activation; and
sending a second communication to a mobile device via a network, wherein the second communication comprises an activation code provided in response to the request for activation, wherein verification of the activation code results in activation of a built-in RFID functionality in the mobile device, wherein the mobile device comprises:
a smartcard controller to provide the built-in RFID functionality and coupled to receive power from the mobile device;
an antenna tuned to operate at substantially 13.56 MHz; and
an active transmit driver circuit coupled to receive power from the mobile device, and wherein the activated built-in RFID functionality comprises transmission of data between the antenna and an external RFID reader, the transmission effected by the active transmit driver circuit.

11. The method of claim 10, wherein the RFID functionality is a Near Field Communication (NFC) functionality and the external RFID reader is an NFC reader.

12. The method of claim 10, wherein the transmitted data includes ticketing information for a mass transit system.

Exhibit 1

Page 287 of 550

US 11,694,053 B2

21

13. The method of claim 10, wherein the transmitted data includes transaction information for a mobile payment.

14. The method of claim 10, wherein the antenna includes an inductive element.

15. The method of claim 10, wherein the active transmit driver circuit includes one or more of an amplifier, filter, oscillator, and/or modulator.

16. The method of claim 10, wherein the mobile device further comprises an amplifier coupled to the antenna and further coupled to receive power from the mobile device, and wherein the amplifier operates to amplify a signal received by the antenna.

17. A method of near field communication between a mobile device and an NFC reader, the method comprising:
coupling a smartcard controller and an active transmit driver circuit to a power source of the mobile device;
providing power to the smartcard controller and the active transmit driver circuit from the power source of the mobile device;
coupling the active transmit driver circuit to an antenna of the mobile device, wherein the antenna is tuned to operate at substantially 13.56 MHz; and
driving transmission of data by the active transmit driver circuit from the antenna to the NFC reader.

18. The method of claim 17 further comprising:
amplifying a signal received from the antenna to generate an amplified signal; and
providing the amplified signal to the smartcard controller.

19. The method of claim 10 or 17, wherein the transmitted data includes ticketing information for a mass transit system.

20. The method of claim 10 or 17, wherein the transmitted data includes transaction information for a mobile payment.

\* \* \* \* \*

22

Exhibit 1
Page 288 of 550

# EXHIBIT 4

Exhibit 1
Page 289 of 550

US008403219B2

(12) **United States Patent**
Narendra et al.

(10) Patent No.: **US 8,403,219 B2**
(45) Date of Patent: *Mar. 26, 2013

(54) **APPARATUS WITH SMARTCARD CIRCUITRY POWERED BY A MOBILE DEVICE**

(71) Applicants: **Siva G. Narendra**, Portland, OR (US);
**Thomas N. Spitzer**, Portland, OR (US);
**Prabhakar Tadepalli**, Bangalore (IN)

(72) Inventors: **Siva G. Narendra**, Portland, OR (US);
**Thomas N. Spitzer**, Portland, OR (US);
**Prabhakar Tadepalli**, Bangalore (IN)

(73) Assignee: **Tyfone, Inc.**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/651,365**

(22) Filed: **Oct. 12, 2012**

(65) **Prior Publication Data**

US 2013/0037611 A1    Feb. 14, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/304,663, filed on Nov. 27, 2011, which is a continuation of application No. 13/114,434, filed on May 24, 2011, now Pat. No. 8,091,786, which is a continuation of application No. 12/941,410, filed on Nov. 8, 2010, now Pat. No. 7,954,715, which is a continuation of application No. 12/539,369, filed on Aug. 11, 2009, now Pat. No. 7,828,214, which is a continuation of application No. 11/063,291, filed on Feb. 22, 2005, now Pat. No. 7,581,678.

(51) **Int. Cl.**
*G06K 7/08*        (2006.01)
(52) **U.S. Cl.** .......................... **235/451**; 235/487; 235/380
(58) **Field of Classification Search** ................. 235/380, 235/375, 382, 492, 487, 493, 451, 379, 472.01, 235/472.02, 472.03
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,091,786 B2 *  1 2012  Narendra et al. ............. 235 451

* cited by examiner

*Primary Examiner* — Karl D Frech
(74) *Attorney, Agent, or Firm* — Dana LeMoine; LeMoine Patent Services, PLLC

(57)        **ABSTRACT**

An electronic transaction card communicates with an add-on slot of an intelligent electronic device. The add-on slot may be a memory card slot. The intelligent electronic device may be a mobile phone or other device with or without network connectivity. The electronic transaction card may have magnetic field producing circuitry compatible with magnetic card readers, smartcard circuitry, other point-of-sale interfaces, or any combination thereof.

**20 Claims, 16 Drawing Sheets**



Exhibit 1
Page 290 of 550



*FIG. 1*

Exhibit 1
Page 291 of 550



*FIG. 2A*

Exhibit 1
Page 292 of 550



*FIG. 2B*

Exhibit 1
Page 293 of 550

U.S. Patent

Mar. 26, 2013

Sheet 4 of 16

US 8,403,219 B2



*FIG. 3*

Exhibit 1
Page 294 of 550



*FIG. 4*

Exhibit 1
Page 295 of 550



*FIG. 5*

Exhibit 1
Page 296 of 550



*FIG. 6*

*FIG. 7*

*FIG. 8*

Exhibit 1
Page 297 of 550



FIG. 9                    FIG. 10



FIG. 11

Exhibit 1
Page 298 of 550



## FIG. 12



## FIG. 13

Exhibit 1
Page 299 of 550



FIG. 14



FIG. 15

Exhibit 1
Page 300 of 550



FIG. 16

Exhibit 1
Page 301 of 550



*FIG. 17*

Exhibit 1
Page 302 of 550



FIG. 18



FIG. 19

Exhibit 1
Page 303 of 550



*FIG. 20*



*FIG. 21*

Exhibit 1
Page 304 of 550



*FIG. 22*

Exhibit 1
Page 305 of 550



*FIG. 23*

Exhibit 1
Page 306 of 550

US 8,403,219 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# APPARATUS WITH SMARTCARD CIRCUITRY POWERED BY A MOBILE DEVICE

## FIELD

The present invention relates generally to electronic devices, and more specifically to electronic devices that may perform transactions.

## BACKGROUND

Magnetic cards have many purposes. Examples include credit cards, debit cards, stored value cards, identification cards, access entry cards, and the like. Many of these cards have information stored in a magnetic stripe in a static manner. For example, a credit card may have a credit card number, a cardholder's name, and an issuing bank's name statically encoded in a magnetic strip. Likewise, an identification card or access entry card may have statically encoded information that identifies an individual or allows access to a controlled access area. When the card is swiped through a magnetic card reader, the information is transferred to the magnetic card reader to perform a transaction, such as a financial transaction or identification transaction.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1, 2A, and 2B show intelligent electronic devices and electronic transaction cards;

FIG. 3 shows a block diagram of an electronic transaction card;

FIG. 4 shows an electronic transaction card in a magnetic card reader;

FIG. 5 shows an intelligent electronic device and card in a card reader;

FIGS. 6-8 show adapters for use with electronic transaction cards;

FIGS. 9 and 10 show an electronic transaction card having a smartcard interface;

FIG. 11 shows an adapter in combination with an electronic transaction card;

FIG. 12 shows an adapter having an aperture to receive an electronic transaction card;

FIG. 13 shows another adapter embodiment;

FIG. 14 shows an electronic transaction card;

FIG. 15 shows an electronic transaction card and adapter combination;

FIG. 16 shows an example swallow-type card reader;

FIG. 17 shows a combination electronic transaction card and adapter being swiped through a magnetic card reader;

FIG. 18 shows a financial transaction card;

FIG. 19 shows a memory card;

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card;

FIG. 21 shows a diagram of how a card may be utilized;

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card; and

FIG. 23 shows a block diagram of a phone and a card.

## DESCRIPTION OF EMBODIMENTS

In the following detailed description, reference is made to the accompanying drawings that show, by way of illustration, various embodiments of an invention. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention. It is to be understood that the various embodiments of the invention, although different, are not necessarily mutually exclusive. For example, a particular feature, structure, or characteristic described in connection with one embodiment may be implemented within other embodiments without departing from the spirit and scope of the invention. In addition, it is to be understood that the location or arrangement of individual elements within each disclosed embodiment may be modified without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the appended claims, appropriately interpreted, along with the full range of equivalents to which the claims are entitled. In the drawings, like numerals refer to the same or similar functionality throughout the several views.

FIG. 1 shows an intelligent electronic device and an electronic transaction card. Intelligent electronic device 102 is shown as a mobile phone in FIG. 1, but this is not a limitation of the present invention. For example, intelligent electronic device 102 may be a personal digital assistant (PDA), a smartphone, a mobile phone, a handheld computer, or any other device capable of operating as described herein.

Intelligent electronic device 102 includes add-on slot 110. Add-on slot 110 is a slot capable of accepting electronic transaction card 104. For example, add-on slot 110 may have physical dimensions compatible with electronic transaction card 104, and may have a communications interface that operates using a protocol compatible with electronic transaction card 104. In some embodiments, electronic transaction card 104 includes an identification number that provides a relationship to intelligent electronic device 102. For example, electronic transaction card 104 may include an ID number that provides a unique pairing relationship or a non-unique pairing relationship between electronic transaction card 104 and intelligent electronic device 102.

In some embodiments of the present invention, add-on slot 110 is a memory card slot designed to accept and communicate with memory cards. As used herein, the term "memory card slot" refers to any add-on slot capable of accepting a card having memory accessible by an intelligent electronic device such as that shown in FIG. 1. For example, a memory card slot may be a proprietary card slot designed to accept memory cards that adhere to a proprietary communications protocol. Also for example, a memory card slot may be compatible with an industry standard communications protocol, or may be compatible with a widely accepted communications protocol that is not necessarily formally documented as an industry standard. Examples include slots that are compatible with the Multimedia Memory Card (MMC) protocol, Memory Stick DUO protocol, secure digital (SD) protocol, and Smart Media protocol. The foregoing list is meant to be exemplary, and not exhaustive. Add-on slot 110 may be compatible with many memory card slot protocols other than those explicitly listed above without departing from the scope of the invention.

Electronic transaction card 104 includes electrical contacts 108 and stripe 106. Electrical contacts 108 are contacts that provide a communications interface to communicate with add-on slot 110. For example, electrical contacts 108 may provide connectivity compliant with a communications protocol for memory cards.

Stripe 106 represents an area on an external face of electronic transaction card 104 at which one or more time-varying magnetic fields emanate. For example, one or more time-varying magnetic fields may emanate from the location of stripe 106 to communicate with a magnetic card reader. In some embodiments, the time-varying magnetic field may

Exhibit 1
Page 307 of 550

US 8,403,219 B2

3

emulate the time-varying magnetic field produced when a typical magnetic card is swiped through a magnetic card reader. For example, a time-varying magnetic field produced at stripe 106 may emulate the swipe of a credit card, a debit card, or any other card having a magnetic stripe compatible with a magnetic card reader.

In some embodiments, stripe 106 may be a visible stripe on electronic transaction card 104. When stripe 106 is visible, it may be used to indicate the location at which the time-varying magnetic field will emanate. In other embodiments of the present invention, stripe 106 may not be visible. For example, circuitry may be included within electronic transaction card 106 to produce the time-varying magnetic field and no visible indication may be present on an external face of electronic transaction card 104.

As used herein, the term "stripe" generally refers to a location on an electronic transaction card, whether a visible stripe exists or not. In this description, the term "stripe" may also be used to refer to a visible marking on a face of an electronic transaction card. Further, a "stripe" may include the functionality provided by one or more time-varying magnetic fields that emanate from the card. For example, the term "stripe" may refer to multiple magnetic tracks, or multiple "stripes," or emulation thereof.

Stripes, as described herein, may be compatible with one or more standards. A stripe may be compatible with a standard by being in compliance with the standard or by being partially in compliance with the standard. For example, stripe 106 may be compatible with an American National Standards Institute (ANSI) magnetic stripe standard, or an International Organization for Standardization (ISO) magnetic stripe standard. In addition, in some embodiments, a stripe may emulate more than one magnetic track, and the emulated tracks may or may not be offset from the location specified in a standard. For example, one or more wires may be utilized to generate time-varying magnetic fields compatible with a standard, and the wires may be located at or near stripe 106 in a location different than the magnetic track offset described in an associated standard.

As used herein, the term "transaction" refers to any beneficial use of an electronic transaction card. For example, any time stripe 106 emits a time-varying magnetic field to be read by a magnetic card reader or a hybrid smartcard reader, a transaction may take place. Transactions may include financial transactions, access control transactions, or any other type of transaction involving any of the electronic transaction card embodiments described herein. Further, as described in more detail below, in some embodiments of the present invention, transactions may utilize smartcard interfaces on electronic transaction cards in addition to, or in lieu of, stripes that emit time-varying magnetic fields.

In operation, intelligent electronic device 102 may program electronic transaction card 104 for use in a transaction involving stripe 106. For example, intelligent electronic device 102 may program electronic transaction card 104 to operate as a credit card, a debit card, or the like. Electronic transaction card 104 may then be used with a magnetic stripe or smartcard based merchant point-of-sale terminal to effect a transaction. Also for example, intelligent electronic device 102 may program electronic transaction card 104 to operate in any other environment where stripe 106 may be beneficially utilized with a magnetic card reader.

FIG. 2A shows intelligent electronic device 202 and electronic transaction card 220. Intelligent electronic device 202 includes add-on slot 210 to receive electronic transaction card 220. Intelligent electronic device 202 is shown having add-on slot on one side, but this is not a limitation of the present

4

invention. For example, add-on slot 210 may be located on top, bottom, or any other surface of intelligent electronic device 202. Also for example, an add-on slot may be created by a clamshell design when the shell is closed. In these embodiments, each side of the clamshell may incorporate a portion of the add-on slot such that the add-on slot is "open" when the clamshell is open.

Electronic transaction card 220 may have any form factor compliant with add-on slot 210. Electronic transaction card 220 is shown having a form factor with an aspect ratio different from that of electronic transaction card 104 (FIG. 1). Electronic transaction card 220 includes stripe 222 and may have electrical contacts to interface with add-on slot 210. The electrical contacts may be on the back side of electronic transaction card 220, recessed on an edge of electronic transaction card 220, or on the front side of electronic transaction card 220. In some embodiments, electronic transaction card 220 includes a "contactless" interface to add-on slot 210. For example, electronic transaction card 220 may include an interface to add-on slot 210 that communicates using electric or magnetic fields, infrared (IR) light, or any other suitable communications mechanism.

Electronic transaction card 220 may have an area for imprinting. For example, as shown in FIG. 2A, electronic transaction card 220 may have space for imprinting a brand (for a bank or otherwise), and a cardholder's name. Further, electronic transaction card 220 may include space for a cardholder's signature. Electronic transaction card 220 may include any other information, coded or unencoded, visible or nonvisible, without departing from the scope of the present invention.

Intelligent electronic device 202 may include a mechanism to allow intelligent electronic device 202 to communicate with a wired or wireless network. For example, intelligent electronic device 202 may include circuitry to communicate with a cellular phone network. Note that in these embodiments, intelligent electronic device 202 may or may not be a phone. For example, intelligent electronic device 202 may be a cellular telephone with an add-on slot for use with an electronic transaction card. Also for example, intelligent electronic device 202 may be a non-telephone device that has cellular network connectivity. Examples include personal digital assistants, and handheld devices dedicated to the use of electronic transaction cards. Further, intelligent electronic device 202 may be a non-cellular device having wired or wireless connectivity to a network other than a cellular network, and in some embodiments, intelligent electronic device 202 may be a device without network connectivity. Examples include, but are not limited to: Blackberry devices available from Research in Motion (RIM), music players such as MP3 players, cameras, and the like.

In some embodiments, intelligent electronic device 202 may program electronic transaction card to perform a transaction. In some embodiments, communications over a network may play a role in the transaction. For example, intelligent electronic device 202 may receive authorization for the transaction over a network. Also for example, intelligent electronic device 202 may program electronic transaction card 220 to perform a transaction, and then report the transaction to an entity using the network.

Electronic transaction card 220 may be utilized in financial transactions. For example, electronic transaction card 220 may be programmed to operate as a credit card or a stored value card. In these embodiments, electronic transaction card 220 may be programmed to emit one or more time-varying magnetic fields to emulate the swiping of a credit card or stored value card. In some of these embodiments, electronic

Exhibit 1
Page 308 of 550

US 8,403,219 B2

5

transaction card 220 may use one number repeatedly, or may use a different number for each transaction. For example, electronic transaction card 220 may be programmed to have one number, similar to how a credit card uses the same number repeatedly. Also for example, electronic transaction card 220 may be programmed to use a different number for each transaction. These numbers are referred to herein as "single transaction account numbers" or "STANs."

Single transaction account numbers may be generated by the card issuer or locally by either an intelligent electronic device or an electronic transaction card. Generation of STANs may be accomplished in any of several ways. For example, when an electronic transaction card is issued, the cardholder may receive several pre-assigned single-use transaction numbers. The numbers may also have a pre-specified sequence. In some embodiments, this sequence may be known only to the issuing bank and the cardholder's intelligent electronic device and/or electronic transaction card. A card issuing bank may authorize payments based on the expected sequence of account numbers, and if out-of-sequence account numbers are used, then the issuing bank may consider that transaction as a potentially fraudulent transaction. The issuing bank may also use this feature to track the merchant involved in the potentially fraudulent transaction.

According to another example, a pre-assigned sequence of STANs may be reset to the original starting number on the list depending on user input or other triggers. In addition, the list of numbers may be periodically downloaded via a cellular phone network or other network connectivity.

FIG. 2B shows intelligent electronic device 230 and electronic transaction card 240. Intelligent electronic device 230 is an example of a "wearable" device that is capable of communicating with an electronic transaction card. For example, intelligent electronic device 230 is shown having the form factor of a wristwatch. Some embodiments of the present invention may have other wearable form factors. For example, a wearable intelligent electronic device may be worn in such a manner that it contacts human skin, or it may be worn on clothing. Any wearable intelligent electronic device may be employed without departing from the scope of the present invention. Further, intelligent electronic device 230 may have any of the capabilities described herein.

Intelligent electronic device 230 may include an add-on slot to accept electronic transaction card 230. The add-on slot may be any of the add-on slot embodiments described herein. Electronic transaction card 240 may be any electronic transaction card. For example, electronic transaction card 240 may be any electronic transaction card embodiment described herein.

FIG. 3 shows a block diagram of an electronic transaction card. Electronic transaction card 300 is an electronic transaction card capable of communicating with an intelligent electronic device, and capable of communicating with a magnetic card reader. For example, electronic transaction card 300 may be electronic transaction card 104 (FIG. 1) or electronic transaction card 220 (FIG. 2A).

Electronic transaction card 300 includes electrical contacts 302, intelligent electronic device (IED) interface 304, nonvolatile memory 306, processing device 308, volatile memory 310, magnetic field producing circuits 312, swipe sensor 314, and stripe 320.

Electrical contacts 302 correspond to electrical contacts 108 (FIG. 1). IED interface 304 is coupled to electrical contacts 302 to provide a communications interface between electronic transaction card 300 and an intelligent electronic device. For example, IED interface 304 may be an interface

6

compatible with an add-on slot such as add-on slot 110 (FIG. 1) or add-on slot 210 (FIG. 2A).

Magnetic field producing circuit 312 includes one or more circuits to produce time-varying magnetic fields at or near the location of stripe 320. For example, one or more current carrying conductors may be excited to produce a magnetic field, and the current may be varied in amplitude and reversed in polarity to cause the magnetic field to be time-varying. In some embodiments, the number of magnetic field producing circuits corresponds to the number of tracks being emulated for stripe 320. For example, stripe 320 may emulate two, three, four, or more magnetic tracks on a magnetic card such as a credit card. In these embodiments, electronic transaction card 300 may include two, three, four, or more magnetic field producing circuits 312. Magnetic field producing circuits 312 may also include circuits to allow control of the time-varying magnetic field. For example, magnetic field producing circuits 312 may include voltage drivers, current drivers, registers to hold digital data, sequential circuits to translate the digital data to magnetic fields, and the like.

Swipe sensor 314 senses when electronic transaction card 300 has been swiped in a magnetic card reader, and provides a swipe indication to processing device 308. The swipe sensor may be a mechanical switch, an electronic switch, or any other type of suitable switch. For example, a mechanical switch may get pressed when electronic transaction card 300 is swiped. Also for example, an electrical sensor may include two or more contacts (not shown) that get shorted when swiped past a metal head within a card reader. Further, a Hall effect sensor or light-based sensor may be utilized. The present invention is not limited by the type of swipe sensor utilized. In some embodiments, swipe sensor 314 is omitted.

Processing device 308 represents a processor capable of communicating with the other blocks shown in electronic transaction card 300. For example, processing device 308 may be a microprocessor, a digital signal processor (DSP), a microcontroller, or the like. Further, processing device 308 may be formed from state machines or other sequential logic. In operation, processing device 308 may read instructions from volatile memory 310 and/or nonvolatile memory 306 and perform actions in response thereto. For example, processing device 308 may execute program instructions that influence communications between electronic transaction card 300 and an intelligent electronic device, or between electronic transaction card 300 and a magnetic card reader.

Volatile memory 310 represents memory that may lose its state when power is removed from electronic transaction card 300. For example, volatile memory 310 may be static random access memory (SRAM). Volatile memory 308 may be utilized by processing device 308 when executing programs. For example, a program may be copied into volatile memory 308 prior to execution. Also for example, processing device 308 may use volatile memory 308 to store data during the execution of a program.

Nonvolatile memory 306 represents memory that does not lose its state when power is removed from electronic transaction card 300. Nonvolatile memory 306 may be any suitable type of memory such as Flash memory with floating gate transistor memory cells. Examples include NOR Flash memory, NAND Flash memory, and multibit/cell Flash memory.

Nonvolatile memory 306 may hold program instructions that are executable by processing device 308. For example, prior to being sold, a manufacturer or distributor may program nonvolatile memory 306 with program information to influence the operation of electronic transaction card 300.

Exhibit 1
Page 309 of 550

US 8,403,219 B2

7

Also for example, an intelligent electronic device may provide program information to electronic transaction card 300 through IED interface 304.

Nonvolatile memory 306 may also hold program instructions that are executable by a processing device other than processing device 308. For example, a manufacturer, distributor, reseller, or other participant in the chain of commerce may program nonvolatile memory 306 with program information to be transferred to an intelligent electronic device. Information to be transferred may include device drivers, application software, or the like.

Electronic transaction card 300 may include one or more power sources (not shown). For example, electronic transaction card 300 may include a battery or a capacitor such as a supercapacitor. In some embodiments, a rechargeable battery may be included. The rechargeable battery may accept a charge from an add-on slot in an intelligent electronic device. In some embodiments, a capacitor may accept a charge from an intelligent electronic device. The capacitor may provide power to electronic transaction card 300 for enough time to perform a transaction. Further, the capacitor may be sized to ensure that a transaction may only be performed during a limited time period after removing the electronic transaction card from an add-on slot, thereby ensuring that a stolen card may not be used repeatedly without the cardholder's consent. Also in some embodiments, electronic transaction card 300 may be programmed to go dormant if a transaction is not performed within a limited time period after removing the card from an intelligent electronic device.

Electronic transaction card 300 may include one or more integrated circuits. For example, processing device 308 may be on one integrated circuit die, and the memories may be on another integrated circuit die. In some embodiments, all active devices are included on a single integrated circuit die. In some embodiments, various integrated circuit dice are mounted on a common substrate to provide a high level of integration using separate dice. Any amount of circuit integration may be practiced without departing from the scope of the present invention.

Electronic transaction card 300 has dimensions "a" and "b." In some embodiments of the present invention, stripe 320 has a length that is substantially equal to a, and in some embodiments, stripe 320 has a length less than a. Further, in some embodiments, a is less than the stripe length of a standard credit card (approximately three and three eighths inches), and in some embodiments, a is much less than the stripe length of a standard credit card. For example, in some embodiments, a is less than 75% the length of a standard credit card stripe. Further, in some embodiments, a is less than 50% the length of a standard credit card stripe. In still further embodiments, a is less than 25% the length of a standard credit card stripe.

In some embodiments, dimensions a and b are substantially equal to the dimensions of a memory card. For example, dimensions a and b may conform to the dimensions of a MMC memory card, a Memory Stick PRO DUO memory card, or other memory card. Further, in some embodiments, electronic transaction card 300 has a thickness compatible with a magnetic card reader.

FIG. 4 shows an electronic transaction card and a card reader. Electronic transaction card 410 is a card having a stripe compatible with a magnetic card reader. For example, electronic transaction card 410 may be electronic transaction card 104 (FIG. 1), electronic transaction card 220 (FIG. 2A), electronic transaction card 300 (FIG. 3), or any other electronic transaction card described herein. Magnetic card reader 420 is a card reader compatible with magnetic cards.

8

For example, magnetic card reader 420 may operate as part of a merchant point-of-sale terminal, an access control device, or the like. When a magnetic card is swiped through magnetic card reader 420, one or more time-varying magnetic fields are produced relative to the location of a magnetic read head (not shown) in magnetic card reader 420.

In the operation depicted in FIG. 4, electronic transaction card 410 is swiped through magnetic card reader 420. During the swiping operation, electronic transaction card 420 produces one or more time-varying magnetic fields to emulate the swiping of a magnetic card. For example, a swipe sensor within electronic transaction card 410 may detect the swiping action depicted in FIG. 4, and a magnetic field producing circuit may generate one or more time-varying magnetic fields as electronic transaction card 410 passes by a magnetic read head in magnetic card reader 420.

FIG. 5 shows an intelligent electronic device, an electronic transaction card, and a magnetic card reader. Electronic transaction card 510 is shown being swiped through magnetic card reader 520 while attached to intelligent electronic device 500. The operation depicted in FIG. 5 represents a transaction occurring while electronic transaction card 510 is coupled to an add-on slot of intelligent electronic device 500.

FIG. 6 shows an adapter for use with an electronic transaction card. Adapter 600 includes a body portion having dimensions "w" and "l", and a receiving portion shown at 610. Adapter 600 is useful to receive an electronic transaction card at receiving portion 610 to provide a larger card having the functionality of an electronic transaction card. For example, in some embodiments of the present invention, dimensions w and l are compatible with swallow-type magnetic card readers, and a combination of adapter 600 an electronic transaction card may be compatible with such readers.

Receiving portion 610 may include an interface compatible with a connector on an electronic transaction card. For example, an electronic transaction card may have an interface that is compatible with both an add-on slot of an electronic transaction device and receiving portion 610 of adapter 600.

FIG. 7 shows adapter 600 having an electronic transaction card 710 coupled thereto. Electronic transaction card 710 includes a stripe capable of emitting one or more time-varying magnetic fields as described above. The combination of electronic transaction card 710 and adapter 600 allow the functionality of electronic transaction card 710 to be useful in the larger form factor of adapter 600.

In some embodiments, adapter 600 includes active or passive circuitry in support of the operation of electronic transaction card 710. For example, adapter 600 may include electrical contacts, a battery, an integrated circuit, or other circuits. Also for example, adapter 600 may include one or more swipe sensors to provide a swiping indication to electronic transaction card 710.

FIG. 8 shows an adapter having a smartcard interface 810. In embodiments represented by FIG. 8, an adapter may be utilized to perform a transaction involving a smartcard reader while utilizing an electronic transaction card. For example, an electronic transaction card may be coupled to adapter 800 at receiving portion 820, and the electronic transaction card may provide data useful for a smartcard transaction.

FIG. 9 shows an electronic transaction card having a smartcard interface. Electronic transaction card 900 includes electrical contacts 908 and 910. Electrical contacts 908 are similar to electrical contacts 108 (FIG. 1). For example, electrical contacts 908 may be compatible with an add-on slot of an intelligent electronic device such as intelligent electronic device 102 (FIG. 1). Electrical contacts 910 are arranged to provide the communications interface to a smartcard reader.

Exhibit 1
Page 310 of 550

US 8,403,219 B2

9 | 10

In some embodiments, electronic transaction card **900** includes a smartcard interface as well as a stripe to produce the time-varying magnetic field. For example, as shown in FIG. **10**, the backside of electronic transaction card **900** may include stripe **1010**. The various electronic transaction cards described herein may include a stripe, a smartcard interface, or a combination thereof.

FIG. **11** shows an adapter in combination with an electronic transaction card. Adapter **1100** is shown having electronic transaction card **900** coupled in a recessed portion on a side having dimension w. In some embodiments, this configuration places electrical contacts **910** at a location expected by smartcard readers.

FIG. **12** shows an adapter having an aperture to receive an electronic transaction card. Adapter **1200** includes aperture **1210** to receive an electronic transaction card. In some embodiments, aperture **1210** passes completely through adapter **1200**, and in other embodiments, aperture **1210** is a recessed portion on the face of adapter **1200**. Adapter **1200** may receive electronic transaction cards having a stripe, a smartcard interface, or a combination of the two.

FIG. **13** shows and adapter having a body portion **1300**, a recessed portion **1310**, and stripe **1320**. Recessed portion **1310** may receive an electronic transaction card as described above with respect to FIGS. **6-7**. Further, stripe **1320** may be utilized to communicate with a magnetic card reader. For example, adapter **1300** may include a magnetic field producing circuit such as magnetic field producing circuit **312** (FIG. **3**) to produce a time-varying magnetic field. In operation, an electronic transaction card may be coupled to adapter **1300** at recessed portion **1310**, and provide transaction information to be used by stripe **1320** for a transaction with a magnetic card reader. In some embodiments, an electronic transaction card having neither a stripe nor a smartcard interface may be coupled to adapter **1300** at recessed portion **1310** to effect a transaction using stripe **1320**.

The various adapters shown in the previous figures may have recessed portions, apertures, or stripes anywhere on the adapter without departing from the scope of the present invention. For example, in some embodiments, a recessed portion may be on the side of the adapter having a smaller dimension, and in other embodiments a recessed portion may be on the side of the adapter having a larger dimension. Also for example, in some embodiments, a stripe may be on the side of the adapter having a smaller dimension, and in other embodiments a stripe may be on the side of the adapter having a larger dimension.

FIG. **14** shows an electronic transaction card. Electronic transaction card **1400** includes stripe **1410** and add-on slot compatible portion **1402**. Add-on slot compatible portion **1402** includes electrical contacts **1408** to communicate with an add-on slot in an intelligent electronic device. For example, add-on slot compatible portion **1402** may be physically and electrically compatible with add-on slot **110** (FIG. **1**) or add-on slot **210** (FIG. **2A**).

Electronic transaction card **1400** may include any of the circuits, features, or functionality described herein. For example, electronic transaction card **1400** may include magnetic field producing circuits, swipe sensors, processing devices, volatile and nonvolatile memory, various interfaces, and electrical contacts.

Electronic transaction card **1400** is shown having stripe **1410** along an edge having dimension "l". In some embodiments, electronic transaction card **1400** may have stripe **1410** along an edge other than that shown in FIG. **14**.

In operation, electronic transaction card **1400** may be left coupled to an electronic transaction device when being swiped through a magnetic card reader, similar to the operation shown in FIG. **5**. Further, electronic transaction card **1400** may be removed from an intelligent electronic device prior to being swept through a magnetic card reader, similar to the operation shown in FIG. **4**.

FIG. **15** shows an electronic transaction card and an adapter in combination. The combination of electronic transaction card **1400** and adapter **1500** form a card having dimensions "w" and "l" as described above with reference to previous figures. The resulting card may be suitable for swallow-type magnetic card readers.

FIG. **16** shows a combination electronic transaction card and adapter **1610** being inserted into a swallow-type magnetic card reader. As shown in FIG. **16**, the swallow-type magnetic card reader is part of an automated teller machine (ATM), but this is not a limitation of the present invention. For example, the swallow-type reader may be part of a point-of-sale device, an access entry device, or any other type of device capable of incorporating a swallow-type magnetic card reader.

FIG. **17** shows a combination electronic transaction card and adapter being swiped through a magnetic card reader. Adapter **1710** and electronic transaction card **1720** are shown being swiped through magnetic card reader **1730**. Electronic transaction card **1720** maybe any of the electronic transaction card embodiments described herein. For example, electronic transaction card **1720** may include a stripe, a smartcard interface, or a combination of the two. Although adapter **1710** is shown as an adapter having a recessed portion on one side, the combination adapter/card in FIG. **17** represents any of the adapter/card combinations described herein. For example, adapter **1710** may be any of adapters **600** (FIGS. **6,7**), adapter **800** (FIG. **8**), adapter **1100** (FIG. **11**), adapter **1200** (FIG. **12**), adapter **1300** (FIG. **13**), or adapter **1500** (FIG. **15**).

FIG. **18** shows a financial transaction card. Financial transaction card **1800** includes stripe **1802**, financial card circuits **1804**, memory card emulation circuitry **1806**, and memory card compatible interface **1808**. Financial transaction card **1800** is an example of a financial card that might be issued by a bank or other financial institution. For example, financial transaction card **1800** might be a debit card, a credit card, a stored value card, or other card issued for the purposes of financial transactions.

Financial card circuits **1804** interact with stripe **1802** to produce time-varying magnetic fields compatible with a magnetic card reader. For example, financial card circuits **1804** and stripe **1802** may provide financial transaction data to a point-of-sale terminal. Financial transaction card **1800** also includes memory card emulation circuitry **1806** to emulate the operation of a memory card. The combination of memory card emulation circuitry **1806** and memory card compatible interface **1808** allow financial transaction card **1800** to perform as a memory card. For example, memory card compatible interface **1808** may be compatible with a memory card interface in an add-on slot of an intelligent electronic device.

FIG. **19** shows a memory card. Memory card **1900** includes memory card compatible interface **1930**, memory card circuits **1920**, financial card emulation circuitry **1910**, and stripe **1902**. Memory card **1900** is an example of a card that may be fabricated and sold by a memory card manufacturer or a manufacturer that is in the business of selling electronic peripheral devices. By including financial card emulation circuitry **1910** and stripe **1902** in memory card **1900**, the manufacturer of memory card **1900** may add features desired by consumers. For example, the combination of stripe **1902** and financial card emulation circuitry **1910** may emulate the operation of a financial card such as a credit card, debit card, stored value card, or the like.

Exhibit 1
Page 311 of 550

US 8,403,219 B2

11

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card. Card 2000 includes memory 2010, processing element 2020, magnetic/smartcard circuitry 2030, card reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060. Processing element 2020 may be any processing element suitable to communicate with memory 2010 and the other blocks shown in FIG. 20. Magnetic/smartcard circuitry 2030 may include circuits to produce time-varying magnetic fields or signals compatible with a smart card reader. Card reader interface 2040 may include a stripe as described above, or may include electrical contacts compatible with a smartcard reader. Memory card circuitry 2050 may be any type of memory circuitry accessible by an intelligent electronic device. The intelligent electronic device may access memory card circuitry 2050 through memory card slot compatible interface 2060.

Memory 2010 is shown having card software 2012 and application software 2014. In some embodiments, card 2000 is sold or distributed having both card software 2012 and application software 2014 in memory 2010. For example, memory 2010 may be nonvolatile memory having card software 2012 for execution by processing element 2020. Also for example, memory 2010 may have application software 2014 meant to be installed on a device other than card 2000. Application software 2014 may include drivers, user interface software, single transaction account number (STAN) generation software, or any other software that may be installed on a device other than 2000.

Application software 2014 may operate in any of multiple languages on multiple operating systems. For example, application software 2014 may provide a user interface in any regional language. Also for example, application software 2014 may run on any operating system (OS).

FIG. 21 shows a block diagram of how card 2000 (FIG. 20) may be utilized. A card issuer 2110 may issue card 2000 to a cardholder 2130. As issued by card issuer 2110, card 2000 may include card software and application software as shown in FIG. 21. Cardholder 2130 may couple card 2000 with intelligent electronic device 2140 and install application software on the intelligent electronic device. For example, intelligent electronic device 2140 may be a mobile phone capable of executing application software, and card 2000 may supply application software to be installed on the mobile phone. Also for example, intelligent electronic device 2140 may be a non-telephonic device such as a personal digital assistant (PDA), or other dedicated hardware, capable of receiving card 2000 in an add-on slot.

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card. Card 2200 includes processing element 2020, magnetic/smartcard circuitry 2030, card reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060, all of which are described above with reference to FIG. 20. Card 2200 also includes nonvolatile memory 2210 and volatile memory 2220. As shown in FIG. 22, nonvolatile memory 2210 includes card software 2212 to be executed by processing element 2020. Also as shown in FIG. 22, card 2200 includes volatile memory 2220 having financial transaction data 2222 held therein. Financial transaction data 2222 may be programmed into volatile memory 2220 by processing alignment 2020 in response to communications from an intelligent electronic device coupled to memory card slot compatible interface 2060. For example, a mobile phone executing single transaction account number generation software may provide a single transaction account number as financial transaction data that gets stored in volatile memory 2220 in preparation

12

for a transaction. In other embodiments, financial transaction data 2222 represents two, three, four, or more time-varying magnetic fields to be generated by the combination of magnetic/smartcard circuitry 2030 and card reader interface 2040.

FIG. 23 shows a block diagram of a phone and a card. Phone 2310 may be a cellular telephone, and card 2350 may be any of the electronic transaction card embodiments described herein. Phone 2310 includes display 2312, processor 2314, single transaction account number (STAN) generation software 2316, and authentication software 2318. Card 2350 includes processor 2352, card software 2354, financial transaction data 2356, and point-of-sale (POS) interface 2358.

Single transaction account number generation software 2316 may be installed on the phone 2310 when card 2350 is inserted in a memory slot. For example, referring now back to FIGS. 20 and 21, STAN generation software 2316 may correspond to application software 2014. Authentication software 2318 may only allow authorized users access to phone 2310 and/or card 2350.

In operation, a user interacting with phone 2310 may gain access to features by satisfying requirements of authentication software 2318. Using STAN generation software 2316, a user may generate financial transaction data 2356 which is held on card 2350 in preparation for a transaction. Card 2350 may then interact with a card reader using point-of-sale interface 2358 to effect a transaction. This transaction may be effected with card 2350 coupled to phone 2310 or decoupled from phone 2310. Further, the transaction using card 2350 may be effected while card 2350 is coupled to any of the adapter embodiments described herein.

The following paragraphs provide further disclosure of various invention embodiments. Each embodiment is fully defined by the recitation of the corresponding paragraph, and no other elements are to be considered essential for that particular embodiment. The embodiments include:

A. An apparatus comprising:
    a stripe to communicate with a magnetic card reader; and
    an interface to communicate with an intelligent electronic device;
    wherein the apparatus has dimensions smaller than a credit card.

A1. The apparatus of A wherein the stripe includes circuitry to produce at least one time-varying magnetic field.

A2. The apparatus of A wherein the interface is compatible with an add-on slot in the intelligent electronic device.

A3. The apparatus of A2 wherein the interface comprises a memory card interface.

A4. The apparatus of A further comprising a processing element coupled to the interface and to the stripe.

A5. The apparatus of A4 further comprising a memory element to hold programming information for the stripe.

A6. The apparatus of A4 further comprising an embedded swipe sensor to sense when the stripe is swiped through a magnetic card reader.

A7. The apparatus of A further comprising nonvolatile memory accessible by the intelligent electronic device.

B. A financial card comprising:
    a point-of-sale compatible electronic transaction stripe;
    a memory card compatible interface; and
    memory card emulation circuitry coupled to the memory card compatible interface.

C. A memory card comprising:
    a memory card compatible interface;
    a point-of-sale compatible electronic transaction stripe; and

Exhibit 1
Page 312 of 550

US 8,403,219 B2

13

financial card emulation circuitry coupled to the point-of-sale compatible electronic transaction stripe.

D. A financial card apparatus comprising:

a point-of-sale compatible portion having a stripe to communicate with a point-of-sale transaction device; and

a memory card compatible portion having at least one electrical contact to communicate with a memory card slot in an intelligent electronic device.

E. A memory card comprising:

a memory card interface operable to couple the memory card to an intelligent electronic device;

a nonvolatile memory device accessible through the memory card interface; and

a stripe operable to communicate with a magnetic card reader.

F. A memory card comprising:

a memory card slot interface; and

circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

F1. The memory card of F wherein the circuitry is configured to produce a plurality of time-varying magnetic fields compatible with a point-of-sale transaction device.

G. An apparatus comprising:

means for communicating through a memory card slot in an intelligent electronic device;

means for producing at least one time-varying magnetic field to represent financial transaction data; and

means for storing the financial transaction data.

H. A card comprising:

a memory card compatible interface;

a smartcard compatible interface; and

a stripe to produce at least one time-varying magnetic field compatible with a magnetic card reader.

I. A memory card compatible with a memory card slot in a mobile phone, the memory card including nonvolatile memory accessible by the mobile phone, a point-of-sale interface to communicate with a point-of-sale terminal, and volatile memory to hold financial transaction data.

I1. The memory card of I wherein the point-of-sale interface comprises circuitry to produce at least one time-varying magnetic field.

I2. The memory card of H further including a processing device coupled to the nonvolatile memory, volatile memory, and point-of-sale interface.

J. An electronic financial transaction device having a thickness compatible with a point-of-sale card reader, a width less than a credit card width, a length less than a credit card length, an electronically programmable stripe situated along the length, and at least one electrical contact to provide an interface to an intelligent electronic device.

J1. The electronic financial transaction device of J wherein the at least one electrical contact comprises a memory card interface compatible with a memory card slot in the intelligent electronic device.

J2. The electronic financial transaction device of J wherein the electronically programmable stripe includes a circuit to emulate a magnetic stripe in a credit card.

J3. The electronic financial transaction device of J2 further comprising a swipe sensor to detect when the electronic financial device is swiped through a point-of-sale terminal.

K. A card comprising:

means for storing financial transaction data;

means for communicating with a memory card slot in an intelligent electronic device; and

means for creating a time-varying magnetic field that represents the financial transaction data.

14

K1. The card of K wherein the means for storing financial transaction data comprises volatile memory.

K2. The card of K wherein the financial transaction data comprises a single transaction account number.

K3. The card of K further comprising a processing device coupled to read the financial transaction data and influence the operation of the means for creating a time-varying magnetic field.

L. An adapter for use with any of A-K, the adapter comprising:

a body portion having exterior dimensions larger than dimensions of A-G; and

a receiving portion to receive any of A-G, wherein the receiving portion is located on the body portion to expose any of A-G for use in magnetic card reader transactions.

M. An apparatus comprising a body portion with dimensions compatible with a swallow-type magnetic card reader, wherein the body portion includes a memory card compatible area to receive a memory card with magnetic stripe functionality.

M1. The apparatus of M further comprising a smartcard interface.

M2. The apparatus of M further comprising at least one electrical component coupled to the memory card compatible area portion to interface to the memory card.

M3. The apparatus of M wherein the memory card compatible area comprises a recessed portion of at least one side of the apparatus.

M4. The apparatus of M wherein memory card compatible area comprises at least one metallic contact on a periphery of an aperture in the apparatus.

N. A financial card to be used with a magnetic card reader at a point-of-sale, the financial card including a memory card interface to allow the financial card to be inserted in a memory card slot of a mobile phone, and including a stripe compatible with the magnetic card reader, wherein the stripe is shorter than a magnetic credit card stripe.

O. A card compatible with a magnetic card reader and compatible with a memory slot in an intelligent electronic device, the card including software to be installed on the intelligent electronic device.

O1. The card of O wherein the software includes a module for single transaction account number generation.

O2. The card of O1 wherein the software is configured to run on a mobile phone.

O3. The card of O wherein the card comprises:

a memory slot compatible portion; and

a magnetic card reader compatible portion.

O4. The card of O3 wherein the magnetic card reader compatible portion comprises circuitry to produce at least one time-varying magnetic field for use in a financial transaction.

P. A card comprising:

a memory card interface mechanically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Q. A card comprising:

a memory card interface electrically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Exhibit 1
Page 313 of 550

US 8,403,219 B2

15

Q1. Any of the cards of P-Q further comprising nonvolatile memory exposed through the memory card interface.

Q2. Any of the cards of P-Q further comprising volatile memory to hold financial transaction information.

Q3. Any of the cards of P-Q further comprising a software component that when executed by the processing device causes the circuitry to produce at least one time-varying magnetic field representing the financial transaction information.

Q4. Any of the cards of P-Q further comprising a visible stripe at which the at least one time-varying magnetic field emanates.

Q5. Any of the cards of P-Q further comprising a battery.

Q6. Any of the cards of P-Q further comprising a capacitor to provide power to the card.

Q7. The card of Q wherein the card has a size substantially equivalent to a credit card.

R. A credit card sized adapter to receive any of the cards of P-Q.

R1. The adapter of R wherein the credit card sized adapter includes a smartcard interface.

R2. The adapter of R wherein the adapter includes a first edge having a width and a second edge having a length, wherein the second edge includes a recessed portion to accept the card.

R3. The adapter of R wherein the credit card sized adapter includes a first edge having a width and a second edge having a length, wherein the first edge includes a recessed portion to accept the card.

S. A combination financial card and memory card apparatus comprising:

electrical contacts to provide an interface to a mobile phone;

a transaction stripe to produce at least one time-varying magnetic field representing transaction information;

a processing device; and

a software component to receive the transaction information from the mobile phone;

wherein the electrical contacts are provided on a physical portion of the combination financial card and memory card apparatus having dimensions compatible with a memory card slot.

S1. The combination financial card and memory card apparatus of S further comprises an application software component to be installed on the mobile phone.

T. In combination:

a memory card having a transaction stripe compatible with a magnetic card reader; and

a credit card sized adapter to receive the memory card and to expose the transaction stripe for use in magnetic card reader transactions.

U. In combination:

a memory card having an interface compatible with a memory card slot in a mobile phone and a smartcard interface; and

a credit card sized adapter to receive the memory card and to expose the smartcard interface for use in smartcard transactions.

V. A financial transaction system comprising:

a mobile phone having a memory card slot;

a memory card compatible with the memory card slot, wherein the memory card includes circuitry to transmit financial transaction data to a point-of-sale device; and

a software component to produce single transaction account numbers for use as financial transaction data.

16

W. A system comprising:

a wearable intelligent electronic device having a card slot; and

a card comprising a card slot interface and circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

Although the present invention has been described in conjunction with certain embodiments, it is to be understood that modifications and variations may be resorted to without departing from the spirit and scope of the invention as those skilled in the art readily understand. Such modifications and variations are considered to be within the scope of the invention and the appended claims.

What is claimed is:

1. An apparatus with a compatible interface in a mobile phone, the apparatus including smartcard circuitry accessible by the mobile phone, the smartcard circuitry including a point-of-sale interface to communicate with a point-of-sale terminal, wherein the point-of-sale interface receives power from the mobile phone.

2. The apparatus of claim 1 wherein the point-of-sale interface comprises circuitry to produce at least one time-varying magnetic field.

3. The apparatus of claim 2 further comprising memory accessible by the mobile phone.

4. The apparatus of claim 1 wherein the point-of-sale interface includes circuitry compatible with a hybrid smartcard reader.

5. The apparatus of claim 1 further comprising memory accessible by the mobile phone.

6. The apparatus of claim 1 further including software to be installed on the mobile phone.

7. An apparatus for performing a financial transaction comprising:

means for communicating through a compatible interface in an intelligent electronic device;

means for producing at least one time-varying magnetic field to represent financial transaction data, wherein the means for producing receives power from the intelligent electronic device; and

means for storing the financial transaction data.

8. The apparatus of claim 7 further including software to be installed on the intelligent electronic device.

9. The apparatus of claim 8 wherein the software is configured to run on a mobile phone.

10. The apparatus of claim 7 further comprising nonvolatile memory accessible through the means for communicating through a compatible interface.

11. The apparatus of claim 7 wherein the means for producing at least one time-varying magnetic field includes circuitry compatible with a hybrid smartcard reader.

12. The apparatus of claim 7 wherein the means for producing at least one time-varying magnetic field includes smartcard circuitry.

13. The apparatus of claim 7 wherein the means for communicating through a compatible interface comprises a capacitor to be charged and to power the means for producing at least one time-varying magnetic field.

14. An apparatus comprising:

first interface compatible with a second interface in a mobile phone; and

circuitry powered by the first interface for producing a signal compatible with a card reader.

15. The apparatus of claim 14 further comprising nonvolatile memory accessible via the first interface.

Exhibit 1
Page 314 of 550

US 8,403,219 B2

17 18

16. The apparatus of claim 14 wherein the circuitry for producing a signal compatible with a card reader includes circuitry compatible with a hybrid smartcard reader.

17. The apparatus of claim 14 wherein the circuitry for producing a signal compatible with a card reader includes smartcard circuitry.

18. The apparatus of claim 14 further comprising software to be transferred to a device other than the apparatus.

19. The apparatus of claim 14 further comprising a capacitor to be charged by the first interface and to supply power to the apparatus.

20. The apparatus of claim 14 further comprising a battery to be charged by the first interface and to supply power to the apparatus.

\* \* \* \* \*

Exhibit 1
Page 315 of 550

# EXHIBIT 5

Exhibit 1
Page 316 of 550

US009202156B2

(12) **United States Patent**
Narendra et al.

(10) Patent No.: **US 9,202,156 B2**
(45) Date of Patent: **\*Dec. 1, 2015**

(54) **MOBILE DEVICE WITH TIME-VARYING MAGNETIC FIELD**

(71) Applicant: **Tyfone, Inc.**, Portland, OR (US)

(72) Inventors: **Siva G. Narendra**, Portland, OR (US); **Thomas N. Spitzer**, Portland, OR (US); **Prabhakar Tadepalli**, Bangalore (IN)

(73) Assignee: **Tyfone, Inc.**, Portland, OR (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/747,770**

(22) Filed: **Jun. 23, 2015**

(65) **Prior Publication Data**

US 2015/0294208 A1     Oct. 15, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/680,684, filed on Apr. 7, 2015, now Pat. No. 9,092,708, which is a continuation of application No. 13/592,323, filed on Aug. 22, 2012, now Pat. No. 9,004,361, which is a

(Continued)

(51) **Int. Cl.**
*G06K 7/08* (2006.01)
*G06K 19/06* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *G06K 19/06206* (2013.01); *G06K 7/0008* (2013.01); *G06K 19/06187* (2013.01); *G06K 19/07* (2013.01); *G06K 19/0723* (2013.01); *G06K 19/07741* (2013.01); *G06K 19/07758* (2013.01); *G06Q 20/353* (2013.01)

(58) **Field of Classification Search**
CPC .......... G06K 7/10732; G06K 7/10722; G06K 7/10881; G06K 7/10693; G06K 7/10891; G06K 7/10851; G06K 7/14; G06K 17/0022; G06K 7/10772; G07F 19/20; G06Q 20/1085
USPC ............ 235/462.42, 462.43, 462.44, 472.01, 235/472.02, 472.03, 379, 451
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,701,601 A     10 1987 Francini et al.
4,786,791 A     11 1988 Hodama

(Continued)

FOREIGN PATENT DOCUMENTS

DE          3632294 A1     4 1988
DE          10054890 A1    4 2002

(Continued)

OTHER PUBLICATIONS

International Search Report PCT Application No. PCT/US2005 019988, Dec. 16, 2005, 5 pages.

(Continued)

*Primary Examiner* — Karl D Frech
(74) *Attorney, Agent, or Firm* — Dana B. LeMoine

(57) **ABSTRACT**

An electronic transaction card communicates with an add-on slot of an intelligent electronic device. The add-on slot may be a memory card slot. The intelligent electronic device may be a mobile phone or other device with or without network connectivity. The electronic transaction card may have magnetic field producing circuitry compatible with magnetic card readers, smartcard circuitry, other point-of-sale interfaces, or any combination thereof.

**12 Claims, 16 Drawing Sheets**



Exhibit 1
Page 317 of 550

# US 9,202,156 B2

Page 2

## Related U.S. Application Data

continuation of application No. 13/304,663, filed on Nov. 27, 2011, now Pat. No. 8,573,494, which is a continuation of application No. 13/114,434, filed on May 24, 2011, now Pat. No. 8,091,786, which is a continuation of application No. 12/941,410, filed on Nov. 8, 2010, now Pat. No. 7,954,715, which is a continuation of application No. 12/539,369, filed on Aug. 11, 2009, now Pat. No. 7,828,214, which is a continuation of application No. 11/063,291, filed on Feb. 22, 2005, now Pat. No. 7,581,678.

(51) Int. Cl.

| | |
|---|---|
| G06K 7/00 | (2006.01) |
| G06K 19/07 | (2006.01) |
| G06K 19/077 | (2006.01) |
| G06Q 20/34 | (2012.01) |

(56)                    References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,791,283 | A | 12 1988 | Burkhardt |
| 4,864,109 | A | 9 1989 | Minematsu et al. |
| 5,212,478 | A | 5 1993 | Moseley |
| 5,378,887 | A | 1 1995 | Kobayashi |
| 5,386,106 | A | 1 1995 | Kumar |
| 5,537,584 | A | 7 1996 | Miyai et al. |
| 5,574,273 | A | 11 1996 | Nakagawa et al. |
| 5,585,787 | A | 12 1996 | Wallerstein |
| 5,629,981 | A | 5 1997 | Nerlikar |
| 5,700,037 | A | 12 1997 | Keller |
| 5,710,421 | A | 1 1998 | Kokubu |
| 5,834,756 | A | 11 1998 | Gutman et al. |
| 5,909,491 | A | 6 1999 | Luo |
| 5,940,510 | A | 8 1999 | Curry et al. |
| 5,949,880 | A | 9 1999 | Curry et al. |
| 5,952,641 | A | 9 1999 | Korshun |
| 5,955,961 | A | 9 1999 | Wallerstein |
| 6,016,476 | A | 1 2000 | Maes Stephane et al. |
| 6,021,944 | A | 2 2000 | Arakaki |
| 6,039,260 | A | 3 2000 | Eisele |
| 6,045,043 | A | 4 2000 | Bashan et al. |
| 6,068,184 | A | 5 2000 | Barnett |
| 6,105,013 | A | 8 2000 | Curry et al. |
| 6,182,891 | B1 | 2 2001 | Furuhashi et al. |
| 6,189,786 | B1 | 2 2001 | Itou et al. |
| 6,206,293 | B1 | 3 2001 | Gutman et al. |
| 6,219,439 | B1 | 4 2001 | Burger |
| 6,223,954 | B1 | 5 2001 | Carow |
| 6,223,984 | B1 | 5 2001 | Renner et al. |
| 6,237,095 | B1 | 5 2001 | Curry et al. |
| 6,250,557 | B1 | 6 2001 | Forslund et al. |
| 6,315,195 | B1 | 11 2001 | Ramachandran |
| 6,402,029 | B1 | 6 2002 | Gangi |
| 6,450,407 | B1 | 9 2002 | Freeman et al. |
| 6,481,623 | B1 | 11 2002 | Grant et al. |
| 6,568,600 | B1 | 5 2003 | Carpier et al. |
| 6,588,660 | B1 | 7 2003 | Buescher et al. |
| 6,592,044 | B1 | 7 2003 | Wong et al. |
| 6,594,759 | B1 | 7 2003 | Wang |
| 6,598,031 | B1 | 7 2003 | Ice |
| 6,607,127 | B2 | 8 2003 | Wong |
| 6,609,654 | B1 | 8 2003 | Anderson et al. |
| 6,631,849 | B2 | 10 2003 | Blossom |
| 6,636,833 | B1 | 10 2003 | Flitcroft et al. |
| 6,669,487 | B1 | 12 2003 | Nishizawa et al. |
| 6,705,520 | B1 | 3 2004 | Pitroda et al. |
| 6,712,277 | B2 | 3 2004 | Spencer |
| 6,715,679 | B1 | 4 2004 | Infosino |
| 6,721,196 | B1 | 4 2004 | Grassl |
| 6,747,547 | B2 | 6 2004 | Benson |
| 6,764,005 | B2 | 7 2004 | Cooper |
| 6,769,607 | B1 | 8 2004 | Pitroda et al. |
| 6,805,288 | B2 | 10 2004 | Routhenstein et al. |
| 6,811,082 | B2 | 11 2004 | Wong |
| 6,836,843 | B2 | 12 2004 | Seroussi et al. |
| 6,857,566 | B2 | 2 2005 | Wankmueller |
| 6,882,900 | B1 | 4 2005 | Terranova |
| 6,883,718 | B1 | 4 2005 | Le et al. |
| 6,905,072 | B2 | 6 2005 | Ramachandran |
| 6,907,123 | B1 | 6 2005 | Schier |
| 6,908,030 | B2 | 6 2005 | Rajasekaran et al. |
| 6,925,568 | B1 | 8 2005 | Heinonen |
| 6,937,526 | B2 | 8 2005 | Furukawa |
| 6,952,788 | B2 | 10 2005 | Rommelmann et al. |
| 6,995,651 | B2 | 2 2006 | Aantmann et al. |
| 7,059,520 | B1 | 6 2006 | Shtesl |
| 7,088,246 | B2 | 8 2006 | Fukuoka |
| 7,185,146 | B2 | 2 2007 | Masuyama et al. |
| 7,213,766 | B2 | 5 2007 | Ryan et al. |
| 7,221,473 | B2 | 5 2007 | Jeran et al. |
| 7,281,101 | B2 | 10 2007 | Mizushima et al. |
| 7,295,790 | B2 | 11 2007 | Morimoto et al. |
| 7,333,062 | B2 | 2 2008 | Leizerovich et al. |
| 7,350,717 | B2 | 4 2008 | Conner et al. |
| 7,353,993 | B2 | 4 2008 | Fujimoto |
| 7,410,102 | B2 | 8 2008 | Winkler |
| 7,493,484 | B2 | 2 2009 | Lee |
| 7,558,107 | B2 | 7 2009 | Sakurai et al. |
| 7,558,110 | B2 | 7 2009 | Mizushima et al. |
| 7,581,678 | B2 | 9 2009 | Narendra et al. |
| 7,607,580 | B2 | 10 2009 | Takita et al. |
| 7,673,080 | B1 | 3 2010 | Yu et al. |
| RE41,352 | E | 5 2010 | Wood, Jr. |
| 7,716,082 | B1 | 5 2010 | Blalock |
| RE41,471 | E | 8 2010 | Wood, Jr. |
| 7,789,303 | B2 | 9 2010 | Fukasawa |
| 7,792,516 | B2 | 9 2010 | Soderstrom |
| 7,828,214 | B2 | 11 2010 | Narendra et al. |
| RE42,254 | E | 3 2011 | Wood, Jr. |
| 7,898,994 | B2 | 3 2011 | Zhao et al. |
| 7,933,571 | B2 | 4 2011 | Black et al. |
| 7,941,197 | B2 | 5 2011 | Jain et al. |
| 7,948,356 | B2 | 5 2011 | Kawamura et al. |
| 7,954,715 | B2 | 6 2011 | Narendra et al. |
| 7,954,716 | B2 | 6 2011 | Narendra et al. |
| 7,954,717 | B2 | 6 2011 | Narendra et al. |
| 7,961,101 | B2 | 6 2011 | Narendra et al. |
| 7,991,158 | B2 | 8 2011 | Narendra et al. |
| 8,072,331 | B2 | 12 2011 | Narendra et al. |
| 8,083,145 | B2 | 12 2011 | Narendra et al. |
| 8,091,786 | B2 | 1 2012 | Narendra et al. |
| 9,092,708 | B1 * | 7 2015 | Narendra ............ G06K 19 06187 |
| 2001 0002035 | A1 | 5 2001 | Kayanakis |
| 2001 0006902 | A1 | 7 2001 | Ito |
| 2001 0013551 | A1 | 8 2001 | Ramachandran |
| 2001 0034246 | A1 | 10 2001 | Hutchison et al. |
| 2002 0007434 | A1 | 1 2002 | Campardo |
| 2002 0025796 | A1 | 2 2002 | Taylor William et al. |
| 2002 0043566 | A1 | 4 2002 | Goodman et al. |
| 2002 0044043 | A1 | 4 2002 | Chaco et al. |
| 2002 0095588 | A1 | 7 2002 | Shigematsu et al. |
| 2002 0096570 | A1 | 7 2002 | Wong et al. |
| 2002 0099665 | A1 | 7 2002 | Burger et al. |
| 2002 0130187 | A1 | 9 2002 | Berg et al. |
| 2002 0138422 | A1 | 9 2002 | Natsuno |
| 2002 0138735 | A1 | 9 2002 | Felt et al. |
| 2002 0139849 | A1 | 10 2002 | Gangi |
| 2002 0148892 | A1 | 10 2002 | Bardwell |
| 2002 0153424 | A1 | 10 2002 | Li |
| 2002 0158747 | A1 | 10 2002 | Mcgregor et al. |
| 2002 0178124 | A1 | 11 2002 | Lewis |
| 2002 0180584 | A1 | 12 2002 | Mcgregor et al. |
| 2002 0186845 | A1 | 12 2002 | Dutta et al. |
| 2003 0025939 | A1 | 2 2003 | Jeran et al. |
| 2003 0028481 | A1 | 2 2003 | Flitcroft et al. |
| 2003 0038177 | A1 | 2 2003 | Morrow |
| 2003 0052168 | A1 | 3 2003 | Wong |
| 2003 0057279 | A1 | 3 2003 | Wong |
| 2003 0061168 | A1 | 3 2003 | Routhenstein et al. |
| 2003 0079096 | A1 | 4 2003 | Murakami |
| 2003 0080183 | A1 | 5 2003 | Rajasekaran et al. |
| 2003 0084220 | A1 | 5 2003 | Jones Larry et al. |

Exhibit 1
Page 318 of 550

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0085288 A1 | 5/2003 | Luu |
| 2003/0115126 A1 | 6/2003 | Pitroda |
| 2003/0128124 A1 | 7/2003 | Ammann et al. |
| 2003/0159050 A1 | 8/2003 | Gantman et al. |
| 2003/0200180 A1 | 10/2003 | Phelan et al. |
| 2003/0209604 A1 | 11/2003 | Harrison |
| 2003/0220876 A1 | 11/2003 | Burger et al. |
| 2003/0231550 A1 | 12/2003 | MacFarlane |
| 2004/0006654 A1 | 1/2004 | Bando |
| 2004/0027881 A1 | 2/2004 | Furukawa |
| 2004/0030660 A1 | 2/2004 | Shatford |
| 2004/0035942 A1 | 2/2004 | Silverman |
| 2004/0050930 A1 | 3/2004 | Rowe |
| 2004/0058705 A1 | 3/2004 | Morgan et al. |
| 2004/0064612 A1 | 4/2004 | Pinto et al. |
| 2004/0065733 A1 | 4/2004 | Fukuoka |
| 2004/0077372 A1 | 4/2004 | Halpern |
| 2004/0087339 A1 | 5/2004 | Goldthwaite et al. |
| 2004/0094624 A1 | 5/2004 | Fernandes et al. |
| 2004/0122685 A1 | 6/2004 | Bunce |
| 2004/0133787 A1 | 7/2004 | Doughty et al. |
| 2004/0162932 A1 | 8/2004 | Mizushima et al. |
| 2004/0177045 A1 | 9/2004 | Brown Kerry |
| 2004/0188519 A1 | 9/2004 | Cassone |
| 2004/0199464 A1 | 10/2004 | Barillova et al. |
| 2004/0227859 A1 | 11/2004 | Liang |
| 2004/0243785 A1 | 12/2004 | Shanmugasundaram et al. |
| 2004/0243806 A1 | 12/2004 | Mckinley et al. |
| 2004/0251303 A1 | 12/2004 | Cooper |
| 2004/0255145 A1 | 12/2004 | Chow |
| 2005/0006462 A1 | 1/2005 | Rouille et al. |
| 2005/0017068 A1 | 1/2005 | Zalewski et al. |
| 2005/0022002 A1 | 1/2005 | Poisner |
| 2005/0029349 A1 | 2/2005 | Megregor et al. |
| 2005/0038736 A1 | 2/2005 | Saunders |
| 2005/0039027 A1 | 2/2005 | Shapiro |
| 2005/0044044 A1 | 2/2005 | Burger et al. |
| 2005/0050367 A1 | 3/2005 | Burger et al. |
| 2005/0052924 A1 | 3/2005 | Nishizawa et al. |
| 2005/0060586 A1 | 3/2005 | Burger et al. |
| 2005/0071282 A1 | 3/2005 | Lu Hongqian et al. |
| 2005/0077349 A1 | 4/2005 | Bonalle et al. |
| 2005/0092830 A1 | 5/2005 | Blossom |
| 2005/0108096 A1 | 5/2005 | Burger et al. |
| 2005/0109838 A1 | 5/2005 | Linlor |
| 2005/0116026 A1 | 6/2005 | Burger et al. |
| 2005/0121512 A1 | 6/2005 | Wankmueller |
| 2005/0122209 A1 | 6/2005 | Black |
| 2005/0127164 A1 | 6/2005 | Wankmueller |
| 2005/0127166 A1 | 6/2005 | Minemura |
| 2005/0133606 A1 | 6/2005 | Brown |
| 2005/0136964 A1 | 6/2005 | Le Saint et al. |
| 2005/0168339 A1 | 8/2005 | Arai et al. |
| 2005/0177724 A1 | 8/2005 | Ali et al. |
| 2005/0197859 A1 | 9/2005 | Wilson et al. |
| 2005/0204077 A1 | 9/2005 | Kou |
| 2005/0204092 A1 | 9/2005 | Masuyama et al. |
| 2005/0212657 A1 | 9/2005 | Simon |
| 2005/0223143 A1 | 10/2005 | Kang et al. |
| 2005/0224589 A1 | 10/2005 | Park et al. |
| 2005/0240778 A1 | 10/2005 | Saito |
| 2005/0246546 A1 | 11/2005 | Takagi et al. |
| 2005/0253687 A1 | 11/2005 | Martinez et al. |
| 2005/0258245 A1 | 11/2005 | Bates et al. |
| 2005/0268058 A1 | 12/2005 | Drasnin et al. |
| 2005/0268330 A1 | 12/2005 | Di Rienzo |
| 2006/0011731 A1 | 1/2006 | Anders et al. |
| 2006/0027655 A1 | 2/2006 | Smets et al. |
| 2006/0045555 A1 | 3/2006 | Morimoto et al. |
| 2006/0077039 A1 | 4/2006 | Ibi et al. |
| 2006/0097851 A1 | 5/2006 | Ammann et al. |
| 2006/0124755 A1 | 6/2006 | Ito |
| 2006/0169778 A1 | 8/2006 | Chung |
| 2006/0172606 A1 | 8/2006 | Irisawa |
| 2006/0186209 A1 | 8/2006 | Narendra et al. |

| | | | |
|---|---|---|---|
| 2006/0219776 A1 | 10/2006 | Finn |
| 2006/0226217 A1 | 10/2006 | Narendra et al. |
| 2006/0268764 A1 | 11/2006 | Harris |
| 2006/0279413 A1 | 12/2006 | Yeager |
| 2007/0033334 A1 | 2/2007 | Katayama et al. |
| 2007/0076877 A1 | 4/2007 | Camp et al. |
| 2007/0108280 A1 | 5/2007 | Li et al. |
| 2007/0110404 A1 | 5/2007 | Ching et al. |
| 2007/0145135 A1 | 6/2007 | Jogand-Coulomb et al. |
| 2007/0145152 A1 | 6/2007 | Jogand-Coulomb et al. |
| 2007/0195458 A1 | 8/2007 | Sawai et al. |
| 2007/0205864 A1 | 9/2007 | Mutti et al. |
| 2007/0257797 A1 | 11/2007 | Rancien et al. |
| 2007/0293202 A1 | 12/2007 | Moshir et al. |
| 2008/0046649 A1 | 2/2008 | Ito |
| 2008/0065830 A1 | 3/2008 | Aoki et al. |
| 2008/0068173 A1 | 3/2008 | Alexis et al. |
| 2008/0073436 A1 | 3/2008 | Nishizawa et al. |
| 2008/0136619 A1 | 6/2008 | Moran |
| 2008/0147950 A1 | 6/2008 | Chen |
| 2008/0148077 A1 | 6/2008 | Lee et al. |
| 2008/0153416 A1 | 6/2008 | Washiro |
| 2008/0186174 A1 | 8/2008 | Alexis et al. |
| 2008/0214111 A1 | 9/2008 | Moshir et al. |
| 2008/0244208 A1 | 10/2008 | Narendra et al. |
| 2008/0279381 A1 | 11/2008 | Narendra et al. |
| 2008/0311849 A1 | 12/2008 | Washiro |
| 2008/0318535 A1 | 12/2008 | Black et al. |
| 2009/0065571 A1 | 3/2009 | Jain |
| 2009/0065572 A1 | 3/2009 | Jain |
| 2009/0069049 A1 | 3/2009 | Jain |
| 2009/0069050 A1 | 3/2009 | Jain et al. |
| 2009/0069051 A1 | 3/2009 | Jain et al. |
| 2009/0069052 A1 | 3/2009 | Jain et al. |
| 2009/0070272 A1 | 3/2009 | Jain |
| 2009/0070691 A1 | 3/2009 | Jain |
| 2009/0070861 A1 | 3/2009 | Jain |
| 2009/0108063 A1 | 4/2009 | Jain et al. |
| 2009/0150610 A1 | 6/2009 | Hsu et al. |
| 2009/0152361 A1 | 6/2009 | Narendra et al. |
| 2009/0199283 A1 | 8/2009 | Jain |
| 2009/0250521 A1 | 10/2009 | Fujita et al. |
| 2009/0265552 A1 | 10/2009 | Moshir et al. |
| 2009/0270127 A1 | 10/2009 | Kakimoto |
| 2009/0290582 A1 | 11/2009 | Suenaga et al. |
| 2009/0298540 A1 | 12/2009 | Narendra et al. |
| 2009/0315667 A1 | 12/2009 | Kawamura et al. |
| 2010/0033307 A1 | 2/2010 | Narendra et al. |
| 2010/0033310 A1 | 2/2010 | Narendra et al. |
| 2010/0049878 A1 | 2/2010 | Yu et al. |
| 2010/0213265 A1 | 8/2010 | Narendra et al. |
| 2011/0000960 A1 | 1/2011 | Harris |
| 2011/0053644 A1 | 3/2011 | Narendra et al. |
| 2011/0073663 A1 | 3/2011 | Narendra et al. |
| 2011/0073665 A1 | 3/2011 | Narendra et al. |
| 2011/0077052 A1 | 3/2011 | Narendra et al. |
| 2011/0110404 A1 | 5/2011 | Washiro |
| 2011/0171996 A1 | 7/2011 | Narendra et al. |
| 2011/0180610 A1 | 7/2011 | Narendra et al. |
| 2011/0220726 A1 | 9/2011 | Narendra et al. |
| 2011/0223972 A1 | 9/2011 | Narendra et al. |
| 2011/0269438 A1 | 11/2011 | Narendra et al. |
| 2011/0271044 A1 | 11/2011 | Narendra et al. |
| 2011/0272468 A1 | 11/2011 | Narendra et al. |
| 2011/0272469 A1 | 11/2011 | Narendra et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 161060 A1 | 11/1985 |
| EP | 0818757 A2 | 1/1998 |
| EP | 1014290 A2 | 6/2000 |
| EP | 1117068 A1 | 7/2001 |
| EP | 1178450 A2 | 2/2002 |
| EP | 1189465 A1 | 3/2002 |
| EP | 1291748 A2 | 3/2003 |
| GB | 2316908 A | 3/1998 |
| JP | 4102112 A | 4/1992 |
| JP | 2000010668 A | 1/2000 |
| JP | 2005018671 A | 1/2005 |

Exhibit 1
Page 319 of 550

# US 9,202,156 B2
Page 4

(56)                **References Cited**

### FOREIGN PATENT DOCUMENTS

| JP | 2007199847 | A  | 8 2007  |
|----|------------|----|---------|
| JP | 2007328689 | A  | 12 2007 |
| TW | 200905471  | A  | 2 2009  |
| TW | 201020934  | A  | 6 2010  |
| TW | 201023662  | A  | 6 2010  |
| TW | I336449    |    | 1 2011  |
| TW | 201126422  | A  | 8 2011  |
| WO | 9626500    | A1 | 8 1996  |
| WO | 9812674    | A2 | 3 1998  |
| WO | 0014678    | A1 | 3 2000  |
| WO | 0188659    | A2 | 11 2001 |
| WO | 03029942   | A2 | 4 2003  |
| WO | 03077473   | A1 | 9 2003  |
| WO | 03081519   | A2 | 10 2003 |
| WO | 2004012352 | A1 | 2 2004  |
| WO | 2004095169 | A2 | 11 2004 |
| WO | 2005027030 | A1 | 3 2005  |
| WO | 2005119607 | A2 | 12 2005 |
| WO | 2005119608 | A1 | 12 2005 |
| WO | 2006091709 | A2 | 8 2006  |
| WO | 2006108184 | A1 | 10 2006 |
| WO | 2007011937 | A2 | 1 2007  |
| WO | 2008121566 | A1 | 10 2008 |
| WO | 2009147548 | A2 | 12 2009 |
| WO | 2010099093 | A1 | 9 2010  |

### OTHER PUBLICATIONS

International Search Report PCT Application No. PCT US2005 022993, Oct. 21, 2005, 3 pages.

International Search Report PCT Application No. PCT US2006 013603, Jan. 9, 2006, 3 pages.

International Search Report PCT Application No. PCT US2006 027847, Mar. 29, 2007, 5 pages.

International Search Report PCT Application No. PCT US2008 057588, Aug. 7, 2008, 4 pages.

International Written Opinion PCT Application No. PCT US2005 019988 , Dec. 4, 2006, 9 Pages.

International Written Opinion PCT Application No. PCT US2005 019988, Jan. 11, 2006, 8 pages.

International Written Opinion PCT Application No. PCT US2005 022993, Dec. 4, 2006, 6 pages.

International Written Opinion PCT Application No. PCT US2006 006361, Aug. 28, 2007, 8 pages.

International Written Opinion PCT Application No. PCT US2006 006361, Sep. 22, 2006, 13 pages.

International Written Opinion PCT Application No. PCT US2006 013603, Oct. 9, 2007, 7 pages.

International Written Opinion PCT Application No. PCT US2006 027847, Jan. 22, 2008, 10 pages.

International Written Opinion PCT Application No. PCT US2008 057588, Aug. 7, 2008, 5 pages.

International Written Opinion PCT Application No. PCT US2008 057588, Oct. 6, 2009, 6 pages.

International Written Opinion PCT Application No. PCT US2010 025014, Apr. 15, 2010, 9 pages.

International Written Opinion PCT Application No. PCT US2010 025014, Sep. 9, 2011, 6 pages.

Lee, Youbok; "Antenna Circuit Design for RFID Applications", Microchip, AN710, 2003 Microchip Technology Inc., (2003), 50 pages.

Official Letter from Taiwan Patent Office, Application 95105997, mailed on Jan. 26, 2010, 6 pages.

U.S. Appl. No. 13 592,323 Office Action dated Sep. 30, 2014, 6 pages.

U.S. Appl. No. 14 680,684 Office Action dated May 22, 2015, 5 pages.

* cited by examiner

Exhibit 1
Page 320 of 550



## FIG. 1

Exhibit 1
Page 321 of 550



*FIG. 2A*

Exhibit 1
Page 322 of 550



*FIG. 2B*

Exhibit 1
Page 323 of 550

U.S. Patent

Dec. 1, 2015

Sheet 4 of 16

US 9,202,156 B2



*FIG. 3*

Exhibit 1
Page 324 of 550



*FIG. 4*

Exhibit 1
Page 325 of 550



*FIG. 5*

Exhibit 1
Page 326 of 550



*FIG. 6*

*FIG. 7*

*FIG. 8*

Exhibit 1
Page 327 of 550



*FIG. 9*          *FIG. 10*



*FIG. 11*

Exhibit 1
Page 328 of 550



*FIG. 12*



*FIG. 13*

Exhibit 1
Page 329 of 550



*FIG. 14*



*FIG. 15*

Exhibit 1
Page 330 of 550



*FIG. 16*

Exhibit 1
Page 331 of 550



*FIG. 17*

Exhibit 1
Page 332 of 550



FIG. 18



FIG. 19

Exhibit 1
Page 333 of 550



*FIG. 20*



*FIG. 21*

Exhibit 1
Page 334 of 550



*FIG. 22*

Exhibit 1
Page 335 of 550



**FIG. 23**

Exhibit 1
Page 336 of 550

US 9,202,156 B2

1

# MOBILE DEVICE WITH TIME-VARYING MAGNETIC FIELD

## FIELD

The present invention relates generally to electronic devices, and more specifically to electronic devices that may perform transactions.

## BACKGROUND

Magnetic cards have many purposes. Examples include credit cards, debit cards, stored value cards, identification cards, access entry cards, and the like. Many of these cards have information stored in a magnetic stripe in a static manner. For example, a credit card may have a credit card number, a cardholder's name, and an issuing bank's name statically encoded in a magnetic strip. Likewise, an identification card or access entry card may have statically encoded information that identifies an individual or allows access to a controlled access area. When the card is swiped through a magnetic card reader, the information is transferred to the magnetic card reader to perform a transaction, such as a financial transaction or identification transaction.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1, 2A, and 2B show intelligent electronic devices and electronic transaction cards;

FIG. 3 shows a block diagram of an electronic transaction card;

FIG. 4 shows an electronic transaction card in a magnetic card reader;

FIG. 5 shows an intelligent electronic device and card in a card reader;

FIGS. 6-8 show adapters for use with electronic transaction cards;

FIGS. 9 and 10 show an electronic transaction card having a smartcard interface;

FIG. 11 shows an adapter in combination with an electronic transaction card;

FIG. 12 shows an adapter having an aperture to receive an electronic transaction card;

FIG. 13 shows another adapter embodiment;

FIG. 14 shows an electronic transaction card;

FIG. 15 shows an electronic transaction card and adapter combination;

FIG. 16 shows an example swallow-type card reader;

FIG. 17 shows a combination electronic transaction card and adapter being swiped through a magnetic card reader;

FIG. 18 shows a financial transaction card;

FIG. 19 shows a memory card;

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card;

FIG. 21 shows a diagram of how a card may be utilized;

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card; and

FIG. 23 shows a block diagram of a phone and a card.

## DESCRIPTION OF EMBODIMENTS

In the following detailed description, reference is made to the accompanying drawings that show, by way of illustration, various embodiments of an invention. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention. It is to be understood that the various embodiments of the invention, although different, are not necessarily mutually exclusive. For example, a particular feature, structure, or characteristic described in connection with one embodiment may be implemented within other embodiments without departing from the spirit and scope of the invention. In addition, it is to be understood that the location or arrangement of individual elements within each disclosed embodiment may be modified without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the appended claims, appropriately interpreted, along with the full range of equivalents to which the claims are entitled. In the drawings, like numerals refer to the same or similar functionality throughout the several views.

FIG. 1 shows an intelligent electronic device and an electronic transaction card. Intelligent electronic device 102 is shown as a mobile phone in FIG. 1, but this is not a limitation of the present invention. For example, intelligent electronic device 102 may be a personal digital assistant (PDA), a smartphone, a mobile phone, a handheld computer, or any other device capable of operating as described herein.

Intelligent electronic device 102 includes add-on slot 110. Add-on slot 110 is a slot capable of accepting electronic transaction card 104. For example, add-on slot 110 may have physical dimensions compatible with electronic transaction card 104, and may have a communications interface that operates using a protocol compatible with electronic transaction card 104. In some embodiments, electronic transaction card 104 includes an identification number that provides a relationship to intelligent electronic device 102. For example, electronic transaction card 104 may include an ID number that provides a unique pairing relationship or a non-unique pairing relationship between electronic transaction card 104 and intelligent electronic device 102.

In some embodiments of the present invention, add-on slot 110 is a memory card slot designed to accept and communicate with memory cards. As used herein, the term "memory card slot" refers to any add-on slot capable of accepting a card having memory accessible by an intelligent electronic device such as that shown in FIG. 1. For example, a memory card slot may be a proprietary card slot designed to accept memory cards that adhere to a proprietary communications protocol. Also for example, a memory card slot may be compatible with an industry standard communications protocol, or may be compatible with a widely accepted communications protocol that is not necessarily formally documented as an industry standard. Examples include slots that are compatible with the Multimedia Memory Card (MMC) protocol, Memory Stick DUO protocol, secure digital (SD) protocol, and Smart Media protocol. The foregoing list is meant to be exemplary, and not exhaustive. Add-on slot 110 may be compatible with many memory card slot protocols other than those explicitly listed above without departing from the scope of the invention.

Electronic transaction card 104 includes electrical contacts 108 and stripe 106. Electrical contacts 108 are contacts that provide a communications interface to communicate with add-on slot 110. For example, electrical contacts 108 may provide connectivity compliant with a communications protocol for memory cards.

Stripe 106 represents an area on an external face of electronic transaction card 104 at which one ore more time-varying magnetic fields emanate. For example, one or more time-varying magnetic fields may emanate from the location of stripe 106 to communicate with a card reader. In some embodiments, the time-varying magnetic field may emulate the time-varying magnetic field produced when a

Exhibit 1
Page 337 of 550

US 9,202,156 B2

3

typical magnetic card is swiped through a magnetic card reader. For example, a time-varying magnetic field produced at stripe 106 may emulate the swipe of a credit card, a debit card, or any other card having a magnetic stripe compatible with a magnetic card reader.

In some embodiments of the present invention, stripe 106 may be a visible stripe on electronic transaction card 104. When stripe 106 is visible, it may be used to indicate the location at which the time-varying magnetic field will emanate. In other embodiments of the present invention, stripe 106 may not be visible. For example, circuitry may be included within electronic transaction card 106 to produce the time-varying magnetic field and no visible indication may be present on an external face of electronic transaction card 104.

As used herein, the term "stripe" generally refers to a location on an electronic transaction card, whether a visible stripe exists or not. In this description, the term "stripe" may also be used to refer to a visible marking on a face of an electronic transaction card. Further, a "stripe" may include the functionality provided by one or more time-varying magnetic fields that emanate from the card. For example, the term "stripe" may refer to multiple magnetic tracks, or multiple "stripes," or emulation thereof.

Stripes, as described herein, may be compatible with one or more standards. A stripe may be compatible with a standard by being in compliance with the standard or by being partially in compliance with the standard. For example, stripe 106 may be compatible with an American National Standards Institute (ANSI) magnetic stripe standard, or an International Organization for Standardization (ISO) magnetic stripe standard. In addition, in some embodiments, a stripe may emulate more than one magnetic track, and the emulated tracks may or may not be offset from the location specified in a standard. For example, one or more wires may be utilized to generate time-varying magnetic fields compatible with a standard, and the wires may be located at or near stripe 106 in a location different than the magnetic track offset described in an associated standard.

As used herein, the term "transaction" refers to any beneficial use of an electronic transaction card. For example, any time stripe 106 emits a time-varying magnetic field to be read by a magnetic card reader or a hybrid smartcard reader, a transaction may take place. Transactions may include financial transactions, access control transactions, or any other type of transaction involving any of the electronic transaction card embodiments described herein. Further, as described in more detail below, in some embodiments of the present invention, transactions may utilize smartcard interfaces on electronic transaction cards in addition to, or in lieu of, stripes that emit time-varying magnetic fields.

In operation, intelligent electronic device 102 may program electronic transaction card 104 for use in a transaction involving stripe 106. For example, intelligent electronic device 102 may program electronic transaction card 104 to operate as a credit card, a debit card, or the like. Electronic transaction card 104 may then be used with a magnetic stripe or smartcard based merchant point-of-sale terminal to effect a transaction. Also for example, intelligent electronic device 102 may program electronic transaction card 104 to operate in any other environment where stripe 106 may be beneficially utilized with a magnetic card reader.

FIG. 2A shows intelligent electronic device 202 and electronic transaction card 220. Intelligent electronic device 202 includes add-on slot 210 to receive electronic transaction card 220. Intelligent electronic device 202 is shown having add-on slot on one side, but this is not a limitation of the present invention. For example, add-on slot 210 may be located on

4

top, bottom, or any other surface of intelligent electronic device 202. Also for example, an add-on slot may be created by a clamshell design when the shell is closed. In these embodiments, each side of the clamshell may incorporate a portion of the add-on slot such that the add-on slot is "open" when the clamshell is open.

Electronic transaction card 220 may have any form factor compliant with add-on slot 210. Electronic transaction card 220 is shown having a form factor with an aspect ratio different from that of electronic transaction card 104 (FIG. 1). Electronic transaction card 220 includes stripe 222 and may have electrical contacts to interface with add-on slot 210. The electrical contacts may be on the back side of electronic transaction card 220, recessed on an edge of electronic transaction card 220, or on the front side of electronic transaction card 220. In some embodiments, electronic transaction card 220 includes a "contactless" interface to add-on slot 210. For example, electronic transaction card 220 may include an interface to add-on slot 210 that communicates using electric or magnetic fields, infrared (IR) light, or any other suitable communications mechanism.

Electronic transaction card 220 may have an area for imprinting. For example, as shown in FIG. 2A, electronic transaction card 220 may have space for imprinting a brand (for a bank or otherwise), and a cardholder's name. Further, electronic transaction card 220 may include space for a cardholder's signature. Electronic transaction card 220 may include any other information, coded or unencoded, visible or nonvisible, without departing from the scope of the present invention.

Intelligent electronic device 202 may include a mechanism to allow intelligent electronic device 202 to communicate with a wired or wireless network. For example, intelligent electronic device 202 may include circuitry to communicate with a cellular phone network. Note that in these embodiments, intelligent electronic device 202 may or may not be a phone. For example, intelligent electronic device 202 may be a cellular telephone with an add-on slot for use with an electronic transaction card. Also for example, intelligent electronic device may be a non-telephonic device that has cellular network connectivity. Examples include personal digital assistants, and handheld devices dedicated to the use of electronic transaction cards. Further, intelligent electronic device 202 may be a non-telephonic device having wired or wireless connectivity to a network other than a cellular network, and in some embodiments, intelligent electronic device 202 may be a device without network connectivity. Examples include, but are not limited to: Blackberry devices available from Research in Motion (RIM), music players such as MP3 players, cameras, and the like.

In operation, intelligent electronic device 202 may program electronic transaction card to perform a transaction. In some embodiments, communications over a network may play a role in the transaction. For example, intelligent electronic device 202 may receive authorization for the transaction over a network. Also for example, intelligent electronic device 202 may program electronic transaction card 220 to perform a transaction, and then report the transaction to an entity using the network.

Electronic transaction card 220 may be utilized in financial transactions. For example, electronic transaction card 220 may be programmed to operate as a credit card or a stored value card. In these embodiments, electronic transaction card 220 may be programmed to emit one or more time-varying magnetic fields to emulate the swiping of a credit card or stored value card. In some of these embodiments, electronic transaction card 220 may use one number repeatedly, or may

Exhibit 1
Page 338 of 550

US 9,202,156 B2

5

use a different number for each transaction. For example, electronic transaction card 220 may be programmed to have one number, similar to how a credit card uses the same number repeatedly. Also for example, electronic transaction card 220 may be programmed to use a different number for each transaction. These numbers are referred to herein as "single transaction account numbers" or "STANs."

Single transaction account numbers may be generated by the card issuer or locally by either an intelligent electronic device or an electronic transaction card. Generation of STANs may be accomplished in any of several ways. For example, when an electronic transaction card is issued, the cardholder may receive several pre-assigned single-use transaction numbers. The numbers may also have a pre-specified sequence. In some embodiments, this sequence may be known only to the issuing bank and the cardholder's intelligent electronic device and/or electronic transaction card. A card issuing bank may authorize payments based on the expected sequence of account numbers, and if out-of-sequence account numbers are used, then the issuing bank may consider that transaction as a potentially fraudulent transaction. The issuing bank may also use this feature to track the merchant involved in the potentially fraudulent transaction.

According to another example, a pre-assigned sequence of STANs may be reset to the original starting number on the list depending on user input or other triggers. In addition, the list of numbers may be periodically downloaded via a cellular phone network or other network connectivity.

FIG. 2B shows intelligent electronic device 230 and electronic transaction card 240. Intelligent electronic device 230 is an example of a "wearable" device that is capable of communicating with an electronic transaction card. For example, intelligent electronic device 230 is shown having the form factor of a wristwatch. Some embodiments of the present invention may have other wearable form factors. For example, a wearable intelligent electronic device may be worn in such a manner that it contacts human skin, or it may be worn on clothing. Any wearable intelligent electronic device may be employed without departing from the scope of the present invention. Further, intelligent electronic device 230 may have any of the capabilities described herein.

Intelligent electronic device 230 may include an add-on slot to accept electronic transaction card 230. The add-on slot may be any of the add-on slot embodiments described herein. Electronic transaction card 240 may be any electronic transaction card. For example, electronic transaction card 240 may be any electronic transaction card embodiment described herein.

FIG. 3 shows a block diagram of an electronic transaction card. Electronic transaction card 300 is an example of an electronic transaction card capable of communicating with an intelligent electronic device, and capable of communicating with a magnetic card reader. For example, electronic transaction card 300 may be electronic transaction card 104 (FIG. 1) or electronic transaction card 220 (FIG. 2A).

Electronic transaction card 300 includes electrical contacts 302, intelligent electronic device (IED) interface 304, nonvolatile memory 306, processing device 308, volatile memory 310, magnetic field producing circuits 312, swipe sensor 314, and stripe 320.

Electrical contacts 302 correspond to electrical contacts 108 (FIG. 1). IED interface 304 is coupled to electrical contacts 302 to provide a communications interface between electronic transaction card 300 and an intelligent electronic device. For example, IED interface 304 may be an interface compatible with an add-on slot such as add-on slot 110 (FIG. 1) or add-on slot 210 (FIG. 2A).

6

Magnetic field producing circuit 312 includes one or more circuits to produce time-varying magnetic fields at or near the location of stripe 320. For example, one or more current carrying conductors may be excited to produce a magnetic field, and the current may be varied in amplitude and reversed in polarity to cause the magnetic field to be time-varying. In some embodiments, the number of magnetic field producing circuits corresponds to the number of tracks being emulated for stripe 320. For example, stripe 320 may emulate two, three, four, or more magnetic tracks on a magnetic card such as a credit card. In these embodiments, electronic transaction card 300 may include two, three, four, or more magnetic field producing circuits 312. Magnetic field producing circuits 312 may also include circuits to allow control of the time-varying magnetic field. For example, magnetic field producing circuits 312 may include voltage drivers, current drivers, registers to hold digital data, sequential circuits to translate the digital data to magnetic fields, and the like.

Swipe sensor 314 senses when electronic transaction card 300 has been swiped in a magnetic card reader, and provides a swipe indication to processing device 308. The swipe sensor may be a mechanical switch, an electronic switch, or any other type of suitable switch. For example, a mechanical switch may get pressed when electronic transaction card 300 is swiped. Also for example, an electrical sensor may include two or more contacts (not shown) that get shorted when swiped past a metal head within a card reader. Further, a Hall effect sensor or light-based sensor may be utilized. The present invention is not limited by the type of swipe sensor utilized. In some embodiments, swipe sensor 314 is omitted.

Processing device 308 represents a processor capable of communicating with the other blocks shown in electronic transaction card 300. For example, processing device 308 may be a microprocessor, a digital signal processor (DSP), a microcontroller, or the like. Further, processing device 308 may be formed from state machines or other sequential logic. In operation, processing device 308 may read instructions from volatile memory 310 and/or nonvolatile memory 306 and perform actions in response thereto. For example, processing device 308 may execute program instructions that influence communications between electronic transaction card 300 and an intelligent electronic device, or between electronic transaction card 300 and a magnetic card reader.

Volatile memory 310 represents memory that may lose its state when power is removed from electronic transaction card 300. For example, volatile memory 310 may be static random access memory (SRAM). Volatile memory 308 may be utilized by processing device 308 when executing programs. For example, a program may be copied into volatile memory 308 prior to execution. Also for example, processing device 308 may use volatile memory 308 to store data during the execution of a program.

Nonvolatile memory 306 represents memory that does not lose its state when power is removed from electronic transaction card 300. Nonvolatile memory 306 may be any suitable type of memory such as Flash memory with floating gate transistor memory cells. Examples include NOR Flash memory, NAND Flash memory, and multibit/cell Flash memory.

Nonvolatile memory 306 may hold program instructions that are executable by processing device 308. For example, prior to being sold, a manufacturer or distributor may program nonvolatile memory 306 with program information to influence the operation of electronic transaction card 300. Also for example, an intelligent electronic device may provide program information to electronic transaction card 300 through IED interface 304.

Exhibit 1

Page 339 of 550

US 9,202,156 B2

7

Nonvolatile memory 306 may also hold program instructions that are executable by a processing device other than processing device 308. For example, a manufacturer, distributor, reseller, or other participant in the chain of commerce may program nonvolatile memory 306 with program information to be transferred to an intelligent electronic device. Information to be transferred may include device drivers, application software, or the like.

Electronic transaction card 300 may include one or more power sources (not shown). For example, electronic transaction card 300 may include a battery or a capacitor such as a supercapacitor. In some embodiments, a rechargeable battery may be included. The rechargeable battery may accept a charge from an add-on slot in an intelligent electronic device. In some embodiments, a capacitor may accept a charge from an intelligent electronic device. The capacitor may provide power to electronic transaction card 300 for enough time to perform a transaction. Further, the capacitor may be sized to ensure that a transaction may only be performed during a limited time period after removing the electronic transaction card from an add-on slot, thereby ensuring that a stolen card may not be used repeatedly without the cardholder's consent. Also in some embodiments, electronic transaction card 300 may be programmed to go dormant if a transaction is not performed within a limited time period after removing the card from an intelligent electronic device.

Electronic transaction card 300 may include one or more integrated circuits. For example, processing device 308 may be on one integrated circuit die, and the memories may be on another integrated circuit die. In some embodiments, all active devices are included on a single integrated circuit die. In some embodiments, various integrated circuit dice are mounted on a common substrate to provide a high level of integration using separate dice. Any amount of circuit integration may be practiced without departing from the scope of the present invention.

Electronic transaction card 300 has dimensions "a" and "b." In some embodiments of the present invention, stripe 320 has a length that is substantially equal to a, and in some embodiments, stripe 320 has a length less than a. Further, in some embodiments, a is less than the stripe length of a standard credit card (approximately three and three eighths inches), and in some embodiments, a is much less than the stripe length of a standard credit card. For example, in some embodiments, a is less than 75% the length of a standard credit card stripe. Further, in some embodiments, a is less than 50% the length of a standard credit card stripe. In still further embodiments, a is less than 25% the length of a standard credit card stripe.

In some embodiments, dimensions a and b are substantially equal to the dimensions of a memory card. For example, dimensions a and b may conform to the dimensions of an MMC memory card, a Memory Stick PRO DUO memory card, or other memory card. Further, in some embodiments, electronic transaction card 300 has a thickness compatible with a magnetic card reader.

FIG. 4 shows an electronic transaction card and a card reader. Electronic transaction card 410 is a card having a stripe compatible with a magnetic card reader. For example, electronic transaction card 410 may be electronic transaction card 104 (FIG. 1), electronic transaction card 220 (FIG. 2A), electronic transaction card 300 (FIG. 3), or any other electronic transaction card described herein. Magnetic card reader 420 is a card reader compatible with magnetic cards. For example, magnetic card reader 420 may operate as part of a merchant point-of-sale terminal, an access control device, or the like. When a magnetic card is swiped through magnetic

8

card reader 420, one or more time-varying magnetic fields are produced relative to the location of a magnetic read head (not shown) in magnetic card reader 420.

In the operation depicted in FIG. 4, electronic transaction card 410 is swiped through magnetic card reader 420. During the swiping operation, electronic transaction card 420 produces one or more time-varying magnetic fields to emulate the swiping of a magnetic card. For example, a swipe sensor within electronic transaction card 410 may detect the swiping action depicted in FIG. 4, and a magnetic field producing circuit may generate one or more time-varying magnetic fields as electronic transaction card 410 passes by a magnetic read head in magnetic card reader 420.

FIG. 5 shows an intelligent electronic device, an electronic transaction card, and a magnetic card reader. Electronic transaction card 510 is shown being swiped through magnetic card reader 520 while attached to intelligent electronic device 500. The operation depicted in FIG. 5 represents a transaction occurring while electronic transaction card 510 is coupled to an add-on slot of intelligent electronic device 500.

FIG. 6 shows an adapter for use with an electronic transaction card. Adapter 600 includes a body portion having dimensions "w" and "l", and a receiving portion shown at 610. Adapter 600 is useful to receive an electronic transaction card at receiving portion 610 to provide a larger card having the functionality of an electronic transaction card. For example, in some embodiments of the present invention, dimensions w and l are compatible with swallow-type magnetic card readers, and a combination of adapter 600 an electronic transaction card may be compatible with such readers.

Receiving portion 610 may include an interface compatible with a connector on an electronic transaction card. For example, an electronic transaction card may have an interface that is compatible with both an add-on slot of an intelligent transaction device and receiving portion 610 of adapter 600.

FIG. 7 shows adapter 600 having an electronic transaction card 710 coupled thereto. Electronic transaction card 710 includes a stripe capable of emitting one or more time-varying magnetic fields as described above. The combination of electronic transaction card 710 and adapter 600 allow the functionality of electronic transaction card 710 to be useful in the larger form factor of adapter 600.

In some embodiments, adapter 600 includes active or passive circuitry in support of the operation of electronic transaction card 710. For example, adapter 600 may include electrical contacts, a battery, an integrated circuit, or other circuits. Also for example, adapter 600 may include one or more swipe sensors to provide a swiping indication to electronic transaction card 710.

FIG. 8 shows an adapter having a smartcard interface 810. In embodiments represented by FIG. 8, an adapter may be utilized to perform a transaction involving a smartcard reader while utilizing an electronic transaction card. For example, an electronic transaction card may be coupled to adapter 800 at receiving portion 820, and the electronic transaction card may provide data useful for a smartcard transaction.

FIG. 9 shows an electronic transaction card having a smartcard interface. Electronic transaction card 900 includes electrical contacts 908 and 910. Electrical contacts 908 are similar to electrical contacts 108 (FIG. 1). For example, electrical contacts 908 may be compatible with an add-on slot of an intelligent electronic device such as intelligent electronic device 102 (FIG. 1). Electrical contacts 910 are arranged to provide the communications interface to a smartcard reader.

In some embodiments, electronic transaction card 900 includes a smartcard interface as well as a stripe to produce the time-varying magnetic field. For example, as shown in

Exhibit 1
Page 340 of 550

US 9,202,156 B2

9 | 10

FIG. 10, the backside of electronic transaction card 900 may include stripe 1010. The various electronic transaction cards described herein may include a stripe, a smartcard interface, or a combination thereof.

FIG. 11 shows an adapter in combination with an electronic transaction card. Adapter 1100 is shown having electronic transaction card 900 coupled in a recessed portion on a side having dimension w. In some embodiments, this configuration places electrical contacts 910 at a location expected by smartcard readers.

FIG. 12 shows an adapter having an aperture to receive an electronic transaction card. Adapter 1200 includes aperture 1210 to receive an electronic transaction card. In some embodiments, aperture 1210 passes completely through adapter 1200, and in other embodiments, aperture 1210 is a recessed portion on the face of adapter 1200. Adapter 1200 may receive electronic transaction cards having a stripe, a smartcard interface, or a combination of the two.

FIG. 13 shows and adapter having a body portion 1300, a recessed portion 1310, and stripe 1320. Recessed portion 1310 may receive an electronic transaction card as described above with respect to FIGS. 6-7. Further, stripe 1320 may be utilized to communicate with a magnetic card reader. For example, adapter 1300 may include a magnetic field producing circuit such as magnetic field producing circuit 312 (FIG. 3) to produce a time-varying magnetic field. In operation, an electronic transaction card may be coupled to adapter 1300 at recessed portion 1310, and provide transaction information to be used by stripe 1320 for a transaction with a magnetic card reader. In some embodiments, an electronic transaction card having neither a stripe nor a smartcard interface may be coupled to adapter 1300 at recessed portion 1310 to effect a transaction using stripe 1320.

The various adapters shown in the previous figures may have recessed portions, apertures, or stripes anywhere on the adapter without departing from the scope of the present invention. For example, in some embodiments, a recessed portion may be on the side of the adapter having a smaller dimension, and in other embodiments a recessed portion may be on the side of the adapter having a larger dimension. Also for example, in some embodiments, a stripe may be on the side of the adapter having a smaller dimension, and in other embodiments a stripe may be on the side of the adapter having a larger dimension.

FIG. 14 shows an electronic transaction card. Electronic transaction card 1400 includes stripe 1410 and add-on slot compatible portion 1402. Add-on slot compatible portion 1402 includes electrical contacts 1408 to communicate with an add-on slot in an intelligent electronic device. For example, add-on slot compatible portion 1402 may be physically and electrically compatible with add-on slot 110 (FIG. 1) or add-on slot 210 (FIG. 2A).

Electronic transaction card 1400 may include any of the circuits, features, or functionality described herein. For example, electronic transaction card 1400 may include magnetic field producing circuits, swipe sensors, processing devices, volatile and nonvolatile memory, various interfaces, and electrical contacts.

Electronic transaction card 1400 is shown having stripe 1410 along an edge having dimension "L." In some embodiments, electronic transaction card 1400 may have stripe 1410 along an edge other than that shown in FIG. 14.

In operation, electronic transaction card 1400 may be left coupled to an electronic transaction device when being swiped through a magnetic card reader, similar to the operation shown in FIG. 5. Further, electronic transaction card 1400 may be removed from an intelligent electronic device

prior to being swept through a magnetic card reader, similar to the operation shown in FIG. 4.

FIG. 15 shows an electronic transaction card and an adapter in combination. The combination of electronic transaction card 1400 and adapter 1500 form a card having dimensions "w" and "l" as described above with reference to previous figures. The resulting card may be suitable for swallow-type magnetic card readers.

FIG. 16 shows a combination electronic transaction card and adapter 1610 being inserted into a swallow-type magnetic card reader. As shown in FIG. 16, the swallow-type magnetic card reader is part of an automated teller machine (ATM), but this is not a limitation of the present invention. For example, the swallow-type reader may be part of a point-of-sale device, an access entry device, or any other type of device capable of incorporating a swallow-type magnetic card reader.

FIG. 17 shows a combination electronic transaction card and adapter being swiped through a magnetic card reader. Adapter 1710 and electronic transaction card 1720 are shown being swiped through magnetic card reader 1730. Electronic transaction card 1720 maybe any of the electronic transaction card embodiments described herein. For example, electronic transaction card 1720 may include a stripe, a smartcard interface, or a combination of the two. Although adapter 1710 is shown as an adapter having a recessed portion on one side, the combination adapter/card in FIG. 17 represents any of the adapter/card combinations described herein. For example, adapter 1710 may be any of adapters 600 (FIGS. 6, 7), adapter 800 (FIG. 8), adapter 1100 (FIG. 11), adapter 1200 (FIG. 12), adapter 1300 (FIG. 13), or adapter 1500 (FIG. 15).

FIG. 18 shows a financial transaction card. Financial transaction card 1800 includes stripe 1802, financial card circuits 1804, memory card emulation circuitry 1806, and memory card compatible interface 1808. Financial transaction card 1800 is an example of a financial card that might be issued by a bank or other financial institution. For example, financial transaction card 1800 might be a debit card, a credit card, a stored value card, or other card issued for the purposes of financial transactions.

Financial card circuits 1804 interact with stripe 1802 to produce time-varying magnetic fields compatible with a magnetic card reader. For example, financial card circuits 1804 and stripe 1802 may provide financial transaction data to a point-of-sale terminal. Financial transaction card 1800 also includes memory card emulation circuitry 1806 to emulate the operation of a memory card. The combination of memory card emulation circuitry 1806 and memory card compatible interface 1808 allow financial transaction card 1800 to perform as a memory card. For example, memory card compatible interface 1808 may be compatible with a memory card interface in an add-on slot of an intelligent electronic device.

FIG. 19 shows a memory card. Memory card 1900 includes memory card compatible interface 1930, memory card circuits 1920, financial card emulation circuitry 1910, and stripe 1902. Memory card 1900 is an example of a card that may be fabricated and sold by a memory card manufacturer or a manufacturer that is in the business of selling electronic peripheral devices. By including financial card emulation circuitry 1910 and stripe 1902 in memory card 1900, the manufacturer of memory card 1900 may add features desired by consumers. For example, the combination of stripe 1902 and financial card emulation circuitry 1910 may emulate the operation of a financial card such as a credit card, debit card, stored value card, or the like.

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card. Card 2000 includes memory 2010, processing element 2020, magnetic/smartcard

Exhibit 1
Page 341 of 550

US 9,202,156 B2

11 12

circuitry 2030, card reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060. Processing element 2020 may be any processing element suitable to communicate with memory 2010 and the other blocks shown in FIG. 20. Magnetic/smartcard circuitry 2030 may include circuits to produce time-varying magnetic fields or signals compatible with a smart card reader. Card reader interface 2040 may include a stripe as described above, or may include electrical contacts compatible with a smartcard reader. Memory card circuitry 2050 may be any type of memory circuitry accessible by an intelligent electronic device. The intelligent electronic device may access memory card circuitry 2050 through memory card slot compatible interface 2060.

Memory 2010 is shown having card software 2012 and application software 2014. In some embodiments, card 2000 is sold or distributed having both card software 2012 and application software 2014 in memory 2010. For example, memory 2010 may be nonvolatile memory having card software 2012 for execution by processing element 2020. Also for example, memory 2010 may have application software 2014 meant to be installed on a device other than card 2000. Application software 2014 may include drivers, user interface software, single transaction account number (STAN) generation software, or any other software that may be installed on a device other than card 2000.

Application software 2014 may operate in any of multiple languages on multiple operating systems. For example, application software 2014 may provide a user interface in any regional language. Also for example, application software 2014 may run on any operating system (OS).

FIG. 21 shows a block diagram of how card 2000 (FIG. 20) may be utilized. A card issuer 2110 may issue card 2000 to a cardholder 2130. As issued by card issuer 2110, card 2000 may include card software and application software as shown in FIG. 21. Cardholder 2130 may couple card 2000 with intelligent electronic device 2140 and install application software on the intelligent electronic device. For example, intelligent electronic device 2140 may be a mobile phone capable of executing application software, and card 2000 may supply application software to be installed on the mobile phone. Also for example, intelligent electronic device 2140 may be a non-telephonic device such as a personal digital assistant (PDA), or other dedicated hardware, capable of receiving card 2000 in an add-on slot.

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card. Card 2200 includes processing element 2020, magnetic/smartcard circuitry 2030, card reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060, all of which are described above with reference to FIG. 20. Card 2200 also includes nonvolatile memory 2210 and volatile memory 2220. As shown in FIG. 22, nonvolatile memory 2210 includes card software 2212 to be executed by processing element 2020. Also as shown in FIG. 22, card 2200 includes volatile memory 2220 having financial transaction data 2222 held therein. Financial transaction data 2222 may be programmed into volatile memory 2220 by processing alignment 2020 in response to communications from an intelligent electronic device coupled to memory card slot compatible interface 2060. For example, a mobile phone executing single transaction account number generation software may provide a single transaction account number as financial transaction data that gets stored in volatile memory 2220 in preparation for a transaction. In other embodiments, financial transaction data 2222 represents two, three, four, or more time-varying

magnetic fields to be generated by the combination of magnetic/smartcard circuitry 2030 and card reader interface 2040.

FIG. 23 shows a block diagram of a phone and a card. Phone 2310 may be a cellular telephone, and card 2350 may be any of the electronic transaction card embodiments described herein. Phone 2310 includes display 2312, processor 2314, single transaction account number (STAN) generation software 2316, and authentication software 2318. Card 2350 includes processor 2352, card software 2354, financial transaction data 2356, and point-of-sale (POS) interface 2358.

Single transaction account number generation software 2316 may be installed on the phone 2310 when card 2350 is inserted in a memory slot. For example, referring now back to FIGS. 20 and 21, STAN generation software 2316 may correspond to application software 2014. Authentication software 2318 may only allow authorized users access to phone 2310 and/or card 2350.

In operation, a user interacting with phone 2310 may gain access to features by satisfying requirements of authentication software 2318. Using STAN generation software 2316, a user may generate financial transaction data 2356 which is held on card 2350 in preparation for a transaction. Card 2350 may then interact with a card reader using point-of-sale interface 2358 to effect a transaction. This transaction may be effected with card 2350 coupled to phone 2310 or decoupled from phone 2310. Further, the transaction using card 2350 may be effected while card 2350 is coupled to any of the adapter embodiments described herein.

The following paragraphs provide further disclosure of various invention embodiments. Each embodiment is fully defined by the recitation of the corresponding paragraph, and no other elements are to be considered essential for that particular embodiment. The embodiments include:

A. An apparatus comprising:
a stripe to communicate with a magnetic card reader; and
an interface to communicate with an intelligent electronic device;
wherein the apparatus has dimensions smaller than a credit card.

A1. The apparatus of A wherein the stripe includes circuitry to produce at least one time-varying magnetic field.

A2. The apparatus of A wherein the interface is compatible with an add-on slot in the intelligent electronic device.

A3. The apparatus of A2 wherein the interface comprises a memory card interface.

A4. The apparatus of A further comprising a processing element coupled to the interface and to the stripe.

A5. The apparatus of A4 further comprising a memory element to hold programming information for the stripe.

A6. The apparatus of A4 further comprising an embedded swipe sensor to sense when the stripe is swiped through a magnetic card reader.

A7. The apparatus of A further comprising nonvolatile memory accessible by the intelligent electronic device.

B. A financial card comprising:
a point-of-sale compatible electronic transaction stripe;
a memory card compatible interface; and
memory card emulation circuitry coupled to the memory card compatible interface.

C. A memory card comprising:
a memory card compatible interface;
a point-of-sale compatible electronic transaction stripe; and
financial card emulation circuitry coupled to the point-of-sale compatible electronic transaction stripe.

Exhibit 1
Page 342 of 550

US 9,202,156 B2

13

D. A financial card apparatus comprising:

a point-of-sale compatible portion having a stripe to communicate with a point-of-sale transaction device; and

a memory card compatible portion having at least one electrical contact to communicate with a memory card slot in an intelligent electronic device.

E. A memory card comprising:

a memory card interface operable to couple the memory card to an intelligent electronic device;

a nonvolatile memory device accessible through the memory card interface; and

a stripe operable to communicate with a magnetic card reader.

F. A memory card comprising:

a memory card slot interface; and

circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

F1. The memory card of F wherein the circuitry is configured to produce a plurality of time-varying magnetic fields compatible with a point-of-sale transaction device.

G. An apparatus comprising:

means for communicating through a memory card slot in an intelligent electronic device;

means for producing at least one time-varying magnetic field to represent financial transaction data; and

means for storing the financial transaction data.

H. A card comprising:

a memory card compatible interface;

a smartcard interface; and

a stripe to produce at least one time-varying magnetic field compatible with a magnetic card reader.

I. A memory card compatible with a memory card slot in a mobile phone, the memory card including nonvolatile memory accessible by the mobile phone, a point-of-sale interface to communicate with a point-of-sale terminal, and volatile memory to hold financial transaction data.

I1. The memory card of I wherein the point-of-sale interface comprises circuitry to produce at least one time-varying magnetic field.

I2. The memory card of I1 further including a processing device coupled to the nonvolatile memory, volatile memory, and point-of-sale interface.

J. An electronic financial transaction device having a thickness compatible with a point-of-sale card reader, a width less than a credit card width, a length less than a credit card length, an electronically programmable stripe situated along the length, and at least one electrical contact to provide an interface to an intelligent electronic device.

J1. The electronic financial transaction device of J wherein the at least one electrical contact comprises a memory card interface compatible with a memory card slot in the intelligent electronic device.

J2. The electronic financial transaction device of J wherein the electronically programmable stripe includes a circuit to emulate a magnetic stripe in a credit card.

J3. The electronic financial transaction device of J2 further comprising a swipe sensor to detect when the electronic financial device is swiped through a point-of-sale terminal.

K. A card comprising:

means for storing financial transaction data;

means for communicating with a memory card slot in an intelligent electronic device; and

means for creating a time-varying magnetic field that represents the financial transaction data.

K1. The card of K wherein the means for storing financial transaction data comprises volatile memory.

14

K2. The card of K wherein the financial transaction data comprises a single transaction account number.

K3. The card of K further comprising a processing device coupled to read the financial transaction data and influence the operation of the means for creating a time-varying magnetic field.

L. An adapter for use with any of A-K, the adapter comprising:

a body portion having exterior dimensions larger than dimensions of A-G; and

a receiving portion to receive any of A-G, wherein the receiving portion is located on the body portion to expose any of A-G for use in magnetic card reader transactions.

M. An apparatus comprising a body portion with dimensions compatible with a swallow-type magnetic card reader, wherein the body portion includes a memory card compatible area to receive a memory card with magnetic stripe functionality.

M1. The apparatus of M further comprising a smartcard interface.

M2. The apparatus of M further comprising at least one electrical component coupled to the memory card compatible area portion to interface to the memory card.

M3. The apparatus of M wherein the memory card compatible area comprises a recessed portion of at least one side of the apparatus.

M4. The apparatus of M wherein memory card compatible area comprises at least one metallic contact on a periphery of an aperture in the apparatus.

N. A financial card to be used with a magnetic card reader at a point-of-sale, the financial card including a memory card interface to allow the financial card to be inserted in a memory card slot of a mobile phone, and including a stripe compatible with the magnetic card reader, wherein the stripe is shorter than a magnetic credit card stripe.

O. A card compatible with a magnetic card reader and compatible with a memory slot in an intelligent electronic device, the card including software to be installed on the intelligent electronic device.

O1. The card of O wherein the software includes a module for single transaction account number generation.

O2. The card of O1 wherein the software is configured to run on a mobile phone.

O3. The card of O wherein the card comprises:

a memory slot compatible portion; and

a magnetic card reader compatible portion.

O4. The card of O3 wherein the magnetic card reader compatible portion comprises circuitry to produce at least one time-varying magnetic field for use in a financial transaction.

P. A card comprising:

a memory card interface mechanically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Q. A card comprising:

a memory card interface electrically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Q1. Any of the cards of P-Q further comprising nonvolatile memory exposed through the memory card interface.

Q2. Any of the cards of P-Q further comprising volatile memory to hold financial transaction information.

Exhibit 1
Page 343 of 550

US 9,202,156 B2

| 15 | 16 |

Q3. Any of the cards of P-Q further comprising a software component that when executed by the processing device causes the circuitry to produce at least one time-varying magnetic field representing the financial transaction information.

Q4. Any of the cards of P-Q further comprising a visible stripe at which the at least one time-varying magnetic field emanates.

Q5. Any of the cards of P-Q further comprising a battery.

Q6. Any of the cards of P-Q further comprising a capacitor to provide power to the card.

Q7. The card of Q wherein the card has a size substantially equivalent to a credit card.

R. A credit card sized adapter to receive any of the cards of P-Q.

R1. The adapter of R wherein the credit card sized adapter includes a smartcard interface.

R2. The adapter of R wherein the adapter includes a first edge having a width and a second edge having a length, wherein the second edge includes a recessed portion to accept the card.

R3. The adapter of R wherein the credit card sized adapter includes a first edge having a width and a second edge having a length, wherein the first edge includes a recessed portion to accept the card.

S. A combination financial card and memory card apparatus comprising:

electrical contacts to provide an interface to a mobile phone;

a transaction stripe to produce at least one time-varying magnetic field representing transaction information;

a processing device; and

a software component to receive the transaction information from the mobile phone;

wherein the electrical contacts are provided on a physical portion of the combination financial card and memory card apparatus having dimensions compatible with a memory card slot.

S1. The combination financial card and memory card apparatus of S further comprises an application software component to be installed on the mobile phone.

T. In combination:

a memory card having a transaction stripe compatible with a magnetic card reader; and

a credit card sized adapter to receive the memory card and to expose the transaction stripe for use in magnetic card reader transactions.

U. In combination:

a memory card having an interface compatible with a memory card slot in a mobile phone and a smartcard interface; and

a credit card sized adapter to receive the memory card and to expose the smartcard interface for use in smartcard transactions.

V. A financial transaction system comprising:

a mobile phone having a memory card slot;

a memory card compatible with the memory card slot, wherein the memory card includes circuitry to transmit financial transaction data to a point-of-sale device; and

a software component to produce single transaction account numbers for use as financial transaction data.

W. A system comprising:

a wearable intelligent electronic device having a card slot; and

a card comprising a card slot interface and circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

Although the present invention has been described in conjunction with certain embodiments, it is to be understood that modifications and variations may be resorted to without departing from the spirit and scope of the invention as those skilled in the art readily understand. Such modifications and variations are considered to be within the scope of the invention and the appended claims.

What is claimed is:

1. A mobile device comprising:

circuitry to produce a time-varying magnetic field that mimics a swipe of a magnetic card;

a memory to hold transaction data; and

a processor coupled to the circuitry to cause the circuitry to produce a time-varying magnetic field that represents the transaction data;

wherein the mobile device comprises a mobile phone.

2. The mobile device of claim 1 wherein the time-varying magnetic field mimics a swipe of a magnetic credit card.

3. The mobile device of claim 1 wherein the transaction data comprises financial data.

4. The mobile device of claim 3 wherein the financial data comprises credit card data.

5. The mobile device of claim 1 further comprising smartcard circuitry coupled to the memory and the processor.

6. The mobile device of claim 1 wherein the transaction data comprises access data.

7. The mobile device of claim 1 wherein the time-varying magnetic field mimics a swipe of a magnetic access card.

8. The mobile device of claim 1 wherein the time-varying magnetic field is used to perform point-of-sale transactions.

9. A mobile device comprising:

circuitry to produce a time-varying magnetic field that mimics a swipe of a magnetic card;

smartcard circuitry for performing transactions; and

a processor coupled to the smartcard circuitry and the circuitry to produce a time-varying magnetic field;

wherein the mobile device comprises a mobile phone.

10. The mobile device of claim 9 wherein the smartcard circuitry is configured to perform point-of-sale transactions.

11. The mobile device of claim 9 wherein the transactions are financial transactions.

12. The mobile device of claim 9 wherein the time-varying magnetic field mimics a swipe of a magnetic credit card.

* * * * *

Exhibit 1
Page 344 of 550

# EXHIBIT 6

Exhibit 1
Page 345 of 550

US009208423B1

(12) **United States Patent**
Narendra et al.

(10) Patent No.: **US 9,208,423 B1**
(45) Date of Patent: **\*Dec. 8, 2015**

(54) **MOBILE DEVICE WITH TIME-VARYING MAGNETIC FIELD AND SINGLE TRANSACTION ACCOUNT NUMBERS**

(71) Applicant: **Tyfone, Inc.**, Portland, OR (US)

(72) Inventors: **Siva G. Narendra**, Portland, OR (US);
**Thomas N. Spitzer**, Portland, OR (US);
**Prabhakar Tadepalli**, Bangalore (IN)

(73) Assignee: **Tyfone, Inc.**, Portland, OR (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/833,113**

(22) Filed: **Aug. 23, 2015**

**Related U.S. Application Data**

(63) Continuation of application No. 14/747,770, filed on Jun. 23, 2015, which is a continuation of application No. 14/680,684, filed on Apr. 7, 2015, now Pat. No. 9,092,708, which is a continuation of application No.

(Continued)

(51) **Int. Cl.**
*G06K 7/08* (2006.01)
*G06K 19/06* (2006.01)

(52) **U.S. Cl.**
CPC .................... *G06K 19/06206* (2013.01)

(58) **Field of Classification Search**
CPC ........... G06K 7/10732; G06K 7/10722; G06K 7/10881; G06K 7/10693; G06K 7/0008; G06K 7/10891; G06K 7/10851; G06K 7/14; G06K 17/0022; G06K 7/10772; G07F 19/20; G06Q 20/1085

USPC ............ 235/462.42, 462.43, 462.44, 472.01, 235/472.02, 472.03, 379, 451
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,701,601 A | 10 1987 | Francini et al. | |
| 4,786,791 A | 11 1988 | Hodama | |
| 4,791,283 A \* | 12 1988 | Burkhardt ....... | G06K 19 07749 235 436 |
| 4,864,109 A | 9 1989 | Minematsu et al. | |
| 5,212,478 A | 5 1993 | Moseley | |
| 5,378,887 A | 1 1995 | Kobayashi | |
| 5,386,106 A | 1 1995 | Kumar | |
| 5,537,584 A | 7 1996 | Miyai et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 3632294 A1 | 4 1988 |
| DE | 10054890 A1 | 4 2002 |

(Continued)

OTHER PUBLICATIONS

International Search Report PCT Application No. PCT US2005 019988, Dec. 16, 2005, 5 pages.

(Continued)

*Primary Examiner* — Karl D Frech
(74) *Attorney, Agent, or Firm* — Dana B. LeMoine

(57) **ABSTRACT**

An electronic transaction card communicates with an add-on slot of an intelligent electronic device. The add-on slot may be a memory card slot. The intelligent electronic device may be a mobile phone or other device with or without network connectivity. The electronic transaction card may have magnetic field producing circuitry compatible with magnetic card readers, smartcard circuitry, other point-of-sale interfaces, or any combination thereof.

**18 Claims, 16 Drawing Sheets**



Exhibit 1
Page 346 of 550

# US 9,208,423 B1

Page 2

## Related U.S. Application Data

13/592,323, filed on Aug. 22, 2012, now Pat. No. 9,004,361, which is a continuation of application No. 13/304,663, filed on Nov. 27, 2011, now Pat. No. 8,573,494, which is a continuation of application No. 13/114,434, filed on May 24, 2011, now Pat. No. 8,091,786, which is a continuation of application No. 12/941,410, filed on Nov. 8, 2010, now Pat. No. 7,954,715, which is a continuation of application No. 12/539,369, filed on Aug. 11, 2009, now Pat. No. 7,828,214, which is a continuation of application No. 11/063,291, filed on Feb. 22, 2005, now Pat. No. 7,581,678.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,574,273 A | 11 1996 | Nakagawa et al. | |
| 5,585,787 A | 12 1996 | Wallerstein | |
| 5,629,981 A | 5 1997 | Nerlikar | |
| 5,700,037 A | 12 1997 | Keller | |
| 5,710,421 A | 1 1998 | Kokubu | |
| 5,834,756 A | 11 1998 | Gutman et al. | |
| 5,909,491 A | 6 1999 | Luo | |
| 5,940,510 A | 8 1999 | Curry et al. | |
| 5,949,880 A | 9 1999 | Curry et al. | |
| 5,952,641 A | 9 1999 | Korshun | |
| 5,955,961 A | 9 1999 | Wallerstein | |
| 6,016,476 A | 1 2000 | Maes et al. | |
| 6,021,944 A | 2 2000 | Arakaki | |
| 6,039,260 A | 3 2000 | Eisele | |
| 6,045,043 A | 4 2000 | Bashan et al. | |
| 6,068,184 A | 5 2000 | Barnett | |
| 6,105,013 A | 8 2000 | Curry et al. | |
| 6,182,891 B1 | 2 2001 | Furuhashi et al. | |
| 6,189,786 B1 | 2 2001 | Itou et al. | |
| 6,206,293 B1 | 3 2001 | Gutman et al. | |
| 6,219,439 B1 | 4 2001 | Burger | |
| 6,223,954 B1 | 5 2001 | Carow | |
| 6,223,984 B1 | 5 2001 | Renner et al. | |
| 6,237,095 B1 | 5 2001 | Curry et al. | |
| 6,250,557 B1 | 6 2001 | Forslund et al. | |
| 6,315,195 B1 | 11 2001 | Ramachandran | |
| 6,402,029 B1 | 6 2002 | Gangi | |
| 6,450,407 B1 | 9 2002 | Freeman et al. | |
| 6,481,623 B1 | 11 2002 | Grant et al. | |
| 6,568,600 B1 | 5 2003 | Carpier et al. | |
| 6,588,660 B1 | 7 2003 | Buescher et al. | |
| 6,592,044 B1 | 7 2003 | Wong et al. | |
| 6,594,759 B1 | 7 2003 | Wang | |
| 6,598,031 B1 | 7 2003 | Ice | |
| 6,607,127 B2 | 8 2003 | Wong | |
| 6,609,654 B1 | 8 2003 | Anderson et al. | |
| 6,631,849 B2 | 10 2003 | Blossom | |
| 6,636,833 B1 | 10 2003 | Flitcroft et al. | |
| 6,669,487 B1 | 12 2003 | Nishizawa et al. | |
| 6,705,520 B1 | 3 2004 | Pitroda et al. | |
| 6,712,277 B2 | 3 2004 | Spencer | |
| 6,715,679 B1 | 4 2004 | Infosino | |
| 6,721,196 B1 | 4 2004 | Grassl | |
| 6,747,547 B2 | 6 2004 | Benson | |
| 6,764,005 B2 | 7 2004 | Cooper | |
| 6,769,607 B1 | 8 2004 | Pitroda et al. | |
| 6,805,288 B2 | 10 2004 | Routhenstein et al. | |
| 6,811,082 B2 | 11 2004 | Wong | |
| 6,836,843 B2 | 12 2004 | Seroussi et al. | |
| 6,857,566 B2 | 2 2005 | Wankmueller | |
| 6,882,900 B1 | 4 2005 | Terranova | |
| 6,883,718 B1 | 4 2005 | Le et al. | |
| 6,905,072 B2 | 6 2005 | Ramachandran | |
| 6,907,123 B1 | 6 2005 | Schier | |
| 6,908,030 B2 | 6 2005 | Rajasekaran et al. | |
| 6,925,568 B1 | 8 2005 | Heinonen | |
| 6,937,526 B2 | 8 2005 | Furukawa | |
| 6,952,788 B2 | 10 2005 | Rommelmann et al. | |
| 6,995,651 B2 | 2 2006 | Amtmann et al. | |

| | | | |
|---|---|---|---|
| 7,059,520 B1 | 6 2006 | Shtesl | |
| 7,088,246 B2 | 8 2006 | Fukuoka | |
| 7,185,146 B2 | 2 2007 | Masuyama et al. | |
| 7,213,766 B2 | 5 2007 | Ryan et al. | |
| 7,221,473 B2 | 5 2007 | Jeran et al. | |
| 7,281,101 B2 | 10 2007 | Mizushima et al. | |
| 7,295,790 B2 | 11 2007 | Morimoto et al. | |
| 7,333,062 B2 | 2 2008 | Leizerovich et al. | |
| 7,350,717 B2 | 4 2008 | Conner et al. | |
| 7,353,993 B2 | 4 2008 | Fujimoto | |
| 7,410,102 B2 | 8 2008 | Winkler | |
| 7,493,484 B2 | 2 2009 | Ice | |
| 7,558,107 B2 | 7 2009 | Sakurai et al. | |
| 7,558,110 B2 | 7 2009 | Mizushima et al. | |
| 7,581,678 B2 | 9 2009 | Narendra et al. | |
| 7,607,580 B2 | 10 2009 | Takita et al. | |
| 7,673,080 B1 | 3 2010 | Yu et al. | |
| RE41,352 E | 5 2010 | Wood, Jr. | |
| 7,716,082 B1 | 5 2010 | Blalock | |
| RE41,471 E | 8 2010 | Wood, Jr. | |
| 7,789,303 B2 | 9 2010 | Fukasawa | |
| 7,792,516 B2 | 9 2010 | Soderstrom | |
| 7,828,214 B2 | 11 2010 | Narendra et al. | |
| RE42,254 E | 3 2011 | Wood, Jr. | |
| 7,898,994 B2 | 3 2011 | Zhao et al. | |
| 7,933,571 B2 | 4 2011 | Black et al. | |
| 7,941,197 B2 | 5 2011 | Jain et al. | |
| 7,948,356 B2 | 5 2011 | Kawamura et al. | |
| 7,954,715 B2 | 6 2011 | Narendra et al. | |
| 7,954,716 B2 | 6 2011 | Narendra et al. | |
| 7,954,717 B2 | 6 2011 | Narendra et al. | |
| 7,961,101 B2 | 6 2011 | Narendra et al. | |
| 7,991,158 B2 | 8 2011 | Narendra et al. | |
| 8,072,331 B2 | 12 2011 | Narendra et al. | |
| 8,083,145 B2 | 12 2011 | Narendra et al. | |
| 8,091,786 B2 | 1 2012 | Narendra et al. | |
| 9,092,708 B1 * | 7 2015 | Narendra .......... G06K 19/06187 | |
| 2001/0002035 A1 | 5 2001 | Kayanakis | |
| 2001/0006902 A1 | 7 2001 | Ito | |
| 2001/0013551 A1 | 8 2001 | Ramachandran | |
| 2001/0034246 A1 | 10 2001 | Hutchison et al. | |
| 2002/0007434 A1 | 1 2002 | Campardo | |
| 2002/0025796 A1 | 2 2002 | Taylor et al. | |
| 2002/0043566 A1 | 4 2002 | Goodman et al. | |
| 2002/0044043 A1 | 4 2002 | Chaco et al. | |
| 2002/0095588 A1 | 7 2002 | Shigematsu et al. | |
| 2002/0096570 A1 | 7 2002 | Wong et al. | |
| 2002/0099665 A1 | 7 2002 | Burger et al. | |
| 2002/0130187 A1 | 9 2002 | Berg et al. | |
| 2002/0138422 A1 | 9 2002 | Natsuno | |
| 2002/0138735 A1 | 9 2002 | Felt et al. | |
| 2002/0139849 A1 | 10 2002 | Gangi | |
| 2002/0148892 A1 | 10 2002 | Bardwell | |
| 2002/0153424 A1 | 10 2002 | Li | |
| 2002/0158747 A1 | 10 2002 | Mcgregor et al. | |
| 2002/0178124 A1 | 11 2002 | Lewis | |
| 2002/0180584 A1 | 12 2002 | Mcgregor et al. | |
| 2002/0186845 A1 | 12 2002 | Dutta et al. | |
| 2003/0025930 A1 | 2 2003 | Jeran et al. | |
| 2003/0028481 A1 | 2 2003 | Flitcroft et al. | |
| 2003/0038177 A1 | 2 2003 | Morrow | |
| 2003/0052168 A1 | 3 2003 | Wong | |
| 2003/0057278 A1 | 3 2003 | Wong | |
| 2003/0061168 A1 | 3 2003 | Routhenstein | |
| 2003/0079096 A1 | 4 2003 | Murakami | |
| 2003/0080183 A1 | 5 2003 | Rajasekaran et al. | |
| 2003/0084220 A1 | 5 2003 | Jones et al. | |
| 2003/0085288 A1 | 5 2003 | Luu | |
| 2003/0115126 A1 | 6 2003 | Pitroda | |
| 2003/0128124 A1 | 7 2003 | Amtmann et al. | |
| 2003/0159050 A1 | 8 2003 | Gantman et al. | |
| 2003/0200180 A1 | 10 2003 | Phelan et al. | |
| 2003/0209604 A1 | 11 2003 | Harrison | |
| 2003/0220876 A1 | 11 2003 | Burger et al. | |
| 2003/0231550 A1 | 12 2003 | Macfarlane | |
| 2004/0006654 A1 | 1 2004 | Bando | |
| 2004/0027381 A1 | 2 2004 | Furukawa | |
| 2004/0030660 A1 | 2 2004 | Shatford | |
| 2004/0035942 A1 | 2 2004 | Silverman | |

Exhibit 1
Page 347 of 550

## US 9,208,423 B1

Page 3

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2004 0050930 A1 | 3 2004 | Rowe |
| 2004 0058705 A1 | 3 2004 | Morgan et al. |
| 2004 0064612 A1 | 4 2004 | Pinto et al. |
| 2004 0065733 A1 | 4 2004 | Fukuoka |
| 2004 0077372 A1 | 4 2004 | Halpern |
| 2004 0087339 A1 | 5 2004 | Goldthwaite et al. |
| 2004 0094624 A1 | 5 2004 | Fernandes et al. |
| 2004 0122685 A1 | 6 2004 | Bunce |
| 2004 0133787 A1 | 7 2004 | Doughty et al. |
| 2004 0162932 A1 | 8 2004 | Mizushima et al. |
| 2004 0177045 A1 | 9 2004 | Brown |
| 2004 0188519 A1 | 9 2004 | Cassone |
| 2004 0199469 A1 | 10 2004 | Barillova et al. |
| 2004 0227659 A1 | 11 2004 | Liang |
| 2004 0243785 A1 | 12 2004 | Shanmugasundaram et al. |
| 2004 0243806 A1 | 12 2004 | Mckinley et al. |
| 2004 0251303 A1 | 12 2004 | Cooper |
| 2004 0255145 A1 | 12 2004 | Chow |
| 2005 0006462 A1 | 1 2005 | Rouille et al. |
| 2005 0017068 A1 | 1 2005 | Zalewski et al. |
| 2005 0022002 A1 | 1 2005 | Poisner |
| 2005 0029349 A1 | 2 2005 | Mcgregor et al. |
| 2005 0038736 A1 | 2 2005 | Saunders |
| 2005 0039027 A1 | 2 2005 | Shapiro |
| 2005 0044044 A1 | 2 2005 | Burger et al. |
| 2005 0050367 A1 | 3 2005 | Burger et al. |
| 2005 0052924 A1 | 3 2005 | Nishizawa et al. |
| 2005 0060586 A1 | 3 2005 | Burger et al. |
| 2005 0071282 A1 | 3 2005 | Lu et al. |
| 2005 0077349 A1 | 4 2005 | Bonalle et al. |
| 2005 0092830 A1 | 5 2005 | Blossom |
| 2005 0108096 A1 | 5 2005 | Burger et al. |
| 2005 0109838 A1 | 5 2005 | Linlor |
| 2005 0116026 A1 | 6 2005 | Burger et al. |
| 2005 0121512 A1 | 6 2005 | Wankmueller |
| 2005 0122209 A1 | 6 2005 | Black |
| 2005 0127164 A1 | 6 2005 | Wankmueller |
| 2005 0127166 A1 | 6 2005 | Minemura |
| 2005 0133606 A1 | 6 2005 | Brown |
| 2005 0136964 A1 | 6 2005 | Le Saint et al. |
| 2005 0168339 A1 | 8 2005 | Arai et al. |
| 2005 0177724 A1 | 8 2005 | Ali et al. |
| 2005 0197859 A1 | 9 2005 | Wilson et al. |
| 2005 0204077 A1 | 9 2005 | Kou |
| 2005 0204092 A1 | 9 2005 | Masuyama et al. |
| 2005 0212657 A1 | 9 2005 | Simon |
| 2005 0223143 A1 | 10 2005 | Kang et al. |
| 2005 0224589 A1 | 10 2005 | Park et al. |
| 2005 0240778 A1 | 10 2005 | Saito |
| 2005 0246546 A1 | 11 2005 | Takagi et al. |
| 2005 0253687 A1 | 11 2005 | Martinez et al. |
| 2005 0258245 A1 | 11 2005 | Bates et al. |
| 2005 0268058 A1 | 12 2005 | Drasnin et al. |
| 2005 0268330 A1 | 12 2005 | Di Rienzo |
| 2006 0011731 A1 | 1 2006 | Anders et al. |
| 2006 0027655 A1 | 2 2006 | Smets et al. |
| 2006 0045555 A1 | 3 2006 | Morimoto et al. |
| 2006 0077039 A1 | 4 2006 | Ibi et al. |
| 2006 0097851 A1 | 5 2006 | Amtmann et al. |
| 2006 0124755 A1 | 6 2006 | Ito |
| 2006 0169778 A1 | 8 2006 | Chung |
| 2006 0172606 A1 | 8 2006 | Irisawa |
| 2006 0186209 A1 | 8 2006 | Narendra et al. |
| 2006 0219770 A1 | 10 2006 | Finn |
| 2006 0226217 A1 | 10 2006 | Narendra et al. |
| 2006 0268764 A1 | 11 2006 | Harris |
| 2006 0279413 A1 | 12 2006 | Yeager |
| 2007 0033334 A1 | 2 2007 | Katayama et al. |
| 2007 0076877 A1 | 4 2007 | Camp et al. |
| 2007 0108280 A1 | 5 2007 | Li et al. |
| 2007 0110404 A1 | 5 2007 | Ching et al. |
| 2007 0145135 A1 | 6 2007 | Jogand-Coulomb et al. |
| 2007 0145152 A1 | 6 2007 | Jogand-Coulomb et al. |
| 2007 0195458 A1 | 8 2007 | Sawai et al. |
| 2007 0205864 A1 | 9 2007 | Multi et al. |

| | | | |
|---|---|---|---|
| 2007 0257797 A1 | 11 2007 | Rancien et al. |
| 2007 0293202 A1 | 12 2007 | Moshir et al. |
| 2008 0046649 A1 | 2 2008 | Ito |
| 2008 0065830 A1 | 3 2008 | Aoki et al. |
| 2008 0068173 A1 | 3 2008 | Alexis et al. |
| 2008 0073436 A1 | 3 2008 | Nishizawa et al. |
| 2008 0136619 A1 | 6 2008 | Moran |
| 2008 0147950 A1 | 6 2008 | Chen |
| 2008 0148077 A1 | 6 2008 | Lee et al. |
| 2008 0153416 A1 | 6 2008 | Washiro |
| 2008 0186174 A1 | 8 2008 | Alexis et al. |
| 2008 0214111 A1 | 9 2008 | Moshir et al. |
| 2008 0244208 A1 | 10 2008 | Narendra et al. |
| 2008 0279381 A1 | 11 2008 | Narendra et al. |
| 2008 0311849 A1 | 12 2008 | Washiro |
| 2008 0318535 A1 | 12 2008 | Black et al. |
| 2009 0065571 A1 | 3 2009 | Jain |
| 2009 0065572 A1 | 3 2009 | Jain |
| 2009 0069049 A1 | 3 2009 | Jain |
| 2009 0069050 A1 | 3 2009 | Jain et al. |
| 2009 0069051 A1 | 3 2009 | Jain et al. |
| 2009 0069052 A1 | 3 2009 | Jain et al. |
| 2009 0070272 A1 | 3 2009 | Jain |
| 2009 0070691 A1 | 3 2009 | Jain |
| 2009 0070864 A1 | 3 2009 | Jain |
| 2009 0108063 A1 | 4 2009 | Jain et al. |
| 2009 0150610 A1 | 6 2009 | Hsu et al. |
| 2009 0152361 A1 | 6 2009 | Narendra et al. |
| 2009 0199283 A1 | 8 2009 | Jain |
| 2009 0250521 A1 | 10 2009 | Fujita et al. |
| 2009 0265552 A1 | 10 2009 | Moshir et al. |
| 2009 0270127 A1 | 10 2009 | Kakimoto |
| 2009 0290582 A1 | 11 2009 | Suenaga et al. |
| 2009 0298540 A1 | 12 2009 | Narendra et al. |
| 2009 0315667 A1 | 12 2009 | Kawamura et al. |
| 2010 0033307 A1 | 2 2010 | Narendra et al. |
| 2010 0033310 A1 | 2 2010 | Narendra et al. |
| 2010 0049878 A1 | 2 2010 | Yu et al. |
| 2010 0213265 A1 | 8 2010 | Narendra et al. |
| 2011 0000960 A1 | 1 2011 | Harris |
| 2011 0053644 A1 | 3 2011 | Narendra et al. |
| 2011 0073663 A1 | 3 2011 | Narendra et al. |
| 2011 0073665 A1 | 3 2011 | Narendra et al. |
| 2011 0077052 A1 | 3 2011 | Narendra et al. |
| 2011 0110404 A1 | 5 2011 | Washiro |
| 2011 0171996 A1 | 7 2011 | Narendra et al. |
| 2011 0180610 A1 | 7 2011 | Narendra et al. |
| 2011 0220726 A1 | 9 2011 | Narendra et al. |
| 2011 0223972 A1 | 9 2011 | Narendra et al. |
| 2011 0269438 A1 | 11 2011 | Narendra et al. |
| 2011 0271044 A1 | 11 2011 | Narendra et al. |
| 2011 0272468 A1 | 11 2011 | Narendra et al. |
| 2011 0272469 A1 | 11 2011 | Narendra et al. |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 161060 | A1 | 11 1985 |
| EP | 0818757 | A2 | 1 1998 |
| EP | 1014290 | A2 | 6 2000 |
| EP | 1117068 | A1 | 7 2001 |
| EP | 1178450 | A2 | 2 2002 |
| EP | 1189465 | A1 | 3 2002 |
| EP | 1291748 | A2 | 3 2003 |
| GB | 2316908 | A | 3 1998 |
| JP | 4102112 | A | 4 1992 |
| JP | 2000010668 | A | 1 2000 |
| JP | 2005018671 | A | 1 2005 |
| JP | 2007199847 | A | 8 2007 |
| JP | 2007328689 | A | 12 2007 |
| TW | 200905471 | A | 2 2009 |
| TW | 201020934 | A | 6 2010 |
| TW | 201023662 | A | 6 2010 |
| TW | 1336449 | | 1 2011 |
| TW | 201126422 | A | 7 2011 |
| WO | 9626500 | A1 | 8 1996 |
| WO | 9812674 | A2 | 3 1998 |
| WO | 0014678 | A1 | 3 2000 |
| WO | 0188659 | A2 | 11 2001 |
| WO | 03029942 | A2 | 4 2003 |

Exhibit 1
Page 348 of 550

**US 9,208,423 B1**

Page 4

(56)                    **References Cited**

FOREIGN PATENT DOCUMENTS

| WO | 03077473 | A1 | 9 2003 |
|----|----------|-----|--------|
| WO | 03081519 | A2 | 10 2003 |
| WO | 2004012352 | A1 | 2 2004 |
| WO | 2004095169 | A2 | 11 2004 |
| WO | 2005027030 | A1 | 3 2005 |
| WO | 2005119607 | A2 | 12 2005 |
| WO | 2005119608 | A1 | 12 2005 |
| WO | 2006091709 | A2 | 8 2006 |
| WO | 2006108184 | A1 | 10 2006 |
| WO | 2007011937 | A2 | 1 2007 |
| WO | 2008121566 | A1 | 10 2008 |
| WO | 2009147548 | A2 | 12 2009 |
| WO | 2010099093 | A1 | 9 2010 |

OTHER PUBLICATIONS

International Search Report PCT Application No. PCT US2005 022993, Oct. 21, 2005, 3 pages.
International Search Report PCT Application No. PCT US2006 013603, Jan. 9, 2006, 3 pages.
International Search Report PCT Application No. PCT US2006 027847, Mar. 29, 2007, 5 pages.
International Search Report PCT Application No. PCT US2008 057588, Aug. 7, 2008, 1 pages.
International Written Opinion PCT Application No. PCT US2005 019988, Dec. 4, 2006, 9 Pages.
International Written Opinion PCT Application No. PCT US2005 019988, Jan. 11, 2006, 8 pages.
International Written Opinion PCT Application No. PCT US2005 022993, Dec. 4, 2006, 6 pages.
International Written Opinion PCT Application No. PCT US2006 006361, Aug. 28, 2007, 8 pages.
International Written Opinion PCT Application No. PCT US2006 006361, Sep. 22, 2006, 13 pages.
International Written Opinion PCT Application No. PCT US2006 013603, Oct. 9, 2007, 7 pages.
International Written Opinion PCT Application No. PCT US2006 027847, Jan. 22, 2008, 10 pages.
International Written Opinion PCT Application No. PCT US2008 057588, Aug. 7, 2008, 5 pages.
International Written Opinion PCT Application No. PCT US2008 057588, Oct. 6, 2009, 6 pages.
International Written Opinion PCT Application No. PCT US2010 025014, Apr. 15, 2010, 9 pages.
International Written Opinion PCT Application No. PCT US2010 025014, Sep. 9, 2011, 6 pages.
Lee, Youbok: "Antenna Circuit Design for RFID Applications", Microchip, AN710, 2003 Microchip Technology Inc., (2003), 50 pages.
Official Letter from Taiwan Patent Office, U.S. Appl. No. 95 105,997, mailed on Jan. 26, 2010, 6 pages.
U.S. Appl. No. 13 592,323 Office Action dated Sep. 30, 2014, 6 pages.
U.S. Appl. No. 14 680,684 Office Action dated May 22, 2015, 5 pages.

* cited by examiner

Exhibit 1

Page 349 of 550



*FIG. 1*

Exhibit 1
Page 350 of 550



*FIG. 2A*

Exhibit 1
Page 351 of 550



*FIG. 2B*

Exhibit 1
Page 352 of 550

U.S. Patent

Dec. 8, 2015

Sheet 4 of 16

US 9,208,423 B1



*FIG. 3*

Exhibit 1
Page 353 of 550



*FIG. 4*

Exhibit 1
Page 354 of 550



*FIG. 5*

Exhibit 1
Page 355 of 550



*FIG. 6*

*FIG. 7*

*FIG. 8*

Exhibit 1
Page 356 of 550



FIG. 9          FIG. 10



FIG. 11

Exhibit 1
Page 357 of 550



*FIG. 12*



*FIG. 13*

Exhibit 1
Page 358 of 550



*FIG. 14*



*FIG. 15*

Exhibit 1
Page 359 of 550



*FIG. 16*

Exhibit 1
Page 360 of 550



*FIG. 17*

Exhibit 1
Page 361 of 550



**FIG. 18**



**FIG. 19**

Exhibit 1
Page 362 of 550

Case 2:24-cv-00421-DJC-JDPDocument 16-2 Filed 06/06/25 Page 66 of 553 Page ID #: 314



**FIG. 20**



**FIG. 21**

Exhibit 1
Page 363 of 550



*FIG. 22*

Exhibit 1
Page 364 of 550



FIG. 23

Exhibit 1
Page 365 of 550

US 9,208,423 B1

**1**

# MOBILE DEVICE WITH TIME-VARYING MAGNETIC FIELD AND SINGLE TRANSACTION ACCOUNT NUMBERS

## FIELD

The present invention relates generally to electronic devices, and more specifically to electronic devices that may perform transactions.

## BACKGROUND

Magnetic cards have many purposes. Examples include credit cards, debit cards, stored value cards, identification cards, access entry cards, and the like. Many of these cards have information stored in a magnetic stripe in a static manner. For example, a credit card may have a credit card number, a cardholder's name, and an issuing bank's name statically encoded in a magnetic strip. Likewise, an identification card or access entry card may have statically encoded information that identifies an individual or allows access to a controlled access area. When the card is swiped through a magnetic card reader, the information is transferred to the magnetic card reader to perform a transaction, such as a financial transaction or identification transaction.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1, 2A, and 2B show intelligent electronic devices and electronic transaction cards;

FIG. 3 shows a block diagram of an electronic transaction card;

FIG. 4 shows an electronic transaction card in a magnetic card reader;

FIG. 5 shows an intelligent electronic device and card in a card reader;

FIGS. 6-8 show adapters for use with electronic transaction cards;

FIGS. 9 and 10 show an electronic transaction card having a smartcard interface;

FIG. 11 shows an adapter in combination with an electronic transaction card;

FIG. 12 shows an adapter having an aperture to receive an electronic transaction card;

FIG. 13 shows another adapter embodiment;

FIG. 14 shows an electronic transaction card;

FIG. 15 shows an electronic transaction card and adapter combination;

FIG. 16 shows an example swallow-type card reader;

FIG. 17 shows a combination electronic transaction card and adapter being swiped through a magnetic card reader;

FIG. 18 shows a financial transaction card;

FIG. 19 shows a memory card;

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card;

FIG. 21 shows a diagram of how a card may be utilized;

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card; and

FIG. 23 shows a block diagram of a phone and a card.

## DESCRIPTION OF EMBODIMENTS

In the following detailed description, reference is made to the accompanying drawings that show, by way of illustration, various embodiments of an invention. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention. It is to be understood that the

**2**

various embodiments of the invention, although different, are not necessarily mutually exclusive. For example, a particular feature, structure, or characteristic described in connection with one embodiment may be implemented within other embodiments without departing from the spirit and scope of the invention. In addition, it is to be understood that the location or arrangement of individual elements within each disclosed embodiment may be modified without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the appended claims, appropriately interpreted, along with the full range of equivalents to which the claims are entitled. In the drawings, like numerals refer to the same or similar functionality throughout the several views.

FIG. 1 shows an intelligent electronic device and an electronic transaction card. Intelligent electronic device 102 is shown as a mobile phone in FIG. 1, but this is not a limitation of the present invention. For example, intelligent electronic device 102 may be a personal digital assistant (PDA), a smartphone, a mobile phone, a handheld computer, or any other device capable of operating as described herein.

Intelligent electronic device 102 includes add-on slot 110. Add-on slot 110 is a slot capable of accepting electronic transaction card 104. For example, add-on slot 110 may have physical dimensions compatible with electronic transaction card 104, and may have a communications interface that operates using a protocol compatible with electronic transaction card 104. In some embodiments, electronic transaction card 104 includes an identification number that provides a relationship to intelligent electronic device 102. For example, electronic transaction card 104 may include an ID number that provides a unique pairing relationship or a non-unique pairing relationship between electronic transaction card 104 and intelligent electronic device 102.

In some embodiments of the present invention, add-on slot 110 is a memory card slot designed to accept and communicate with memory cards. As used herein, the term "memory card slot" refers to any add-on slot capable of accepting a card having memory accessible by an intelligent electronic device such as that shown in FIG. 1. For example, a memory card slot may be a proprietary card slot designed to accept memory cards that adhere to a proprietary communications protocol. Also for example, a memory card slot may be compatible with an industry standard communications protocol, or may be compatible with a widely accepted communications protocol that is not necessarily formally documented as an industry standard. Examples include slots that are compatible with the Multimedia Memory Card (MMC) protocol, Memory Stick DUO protocol, secure digital (SD) protocol, and Smart Media protocol. The foregoing list is meant to be exemplary, and not exhaustive. Add-on slot 110 may be compatible with many memory card slot protocols other than those explicitly listed above without departing from the scope of the invention.

Electronic transaction card 104 includes electrical contacts 108 and stripe 106. Electrical contacts 108 are contacts that provide a communications interface to communicate with add-on slot 110. For example, electrical contacts 108 may provide connectivity compliant with a communications protocol for memory cards.

Stripe 106 represents an area on an external face of electronic transaction card 104 at which one or more time-varying magnetic fields emanate. For example, one or more time-varying magnetic fields may emanate from the location of stripe 106 to communicate with a magnetic card reader. In some embodiments, the time-varying magnetic field may

Exhibit 1
Page 366 of 550

US 9,208,423 B1

3

emulate the time-varying magnetic field produced when a typical magnetic card is swiped through a magnetic card reader. For example, a time-varying magnetic field produced at stripe 106 may emulate the swipe of a credit card, a debit card, or any other card having a magnetic stripe compatible with a magnetic card reader.

In some embodiments of the present invention, stripe 106 may be a visible stripe on electronic transaction card 104. When stripe 106 is visible, it may be used to indicate the location at which the time-varying magnetic field will emanate. In other embodiments of the present invention, stripe 106 may not be visible. For example, circuitry may be included within electronic transaction card 106 to produce the time-varying magnetic field and no visible indication may be present on an external face of electronic transaction card 104.

As used herein, the term "stripe" generally refers to a location on an electronic transaction card, whether a visible stripe exists or not. In this description, the term "stripe" may also be used to refer to a visible marking on a face of an electronic transaction card. Further, a "stripe" may include the functionality provided by one or more time-varying magnetic fields that emanate from the card. For example, the term "stripe" may refer to multiple magnetic tracks, or multiple "stripes," or emulation thereof.

Stripes, as described herein, may be compatible with one or more standards. A stripe may be compatible with a standard by being in compliance with the standard or by being partially in compliance with the standard. For example, stripe 106 may be compatible with an American National Standards Institute (ANSI) magnetic stripe standard, or an International Organization for Standardization (ISO) magnetic stripe standard. In addition, in some embodiments, a stripe may emulate more than one magnetic track, and the emulated tracks may or may not be offset from the location specified in a standard. For example, one or more wires may be utilized to generate time-varying magnetic fields compatible with a standard, and the wires may be located at or near stripe 106 in a location different than the magnetic track offset described in an associated standard.

As used herein, the term "transaction" refers to any beneficial use of an electronic transaction card. For example, any time stripe 106 emits a time-varying magnetic field to be read by a magnetic card reader or a hybrid smartcard reader, a transaction may take place. Transactions may include financial transactions, access control transactions, or any other type of transaction involving any of the electronic transaction card embodiments described herein. Further, as described in more detail below, in some embodiments of the present invention, transactions may utilize smartcard interfaces on electronic transaction cards in addition to, or in lieu of, stripes that emit time-varying magnetic fields.

In operation, intelligent electronic device 102 may program electronic transaction card 104 for use in a transaction involving stripe 106. For example, intelligent electronic device 102 may program electronic transaction card 104 to operate as a credit card, a debit card, or the like. Electronic transaction card 104 may then be used with a magnetic stripe or smartcard based merchant point-of-sale terminal to effect a transaction. Also for example, intelligent electronic device 102 may program electronic transaction card 104 to operate in any other environment where stripe 106 may be beneficially utilized with a magnetic card reader.

FIG. 2A shows intelligent electronic device 202 and electronic transaction card 220. Intelligent electronic device 202 includes add-on slot 210 to receive electronic transaction card 220. Intelligent electronic device 202 is shown having add-on slot on one side, but this is not a limitation of the present

4

invention. For example, add-on slot 210 may be located on top, bottom, or any other surface of intelligent electronic device 202. Also for example, an add-on slot may be created by a clamshell design when the shell is closed. In these embodiments, each side of the clamshell may incorporate a portion of the add-on slot such that the add-on slot is "open" when the clamshell is open.

Electronic transaction card 220 may have any form factor compliant with add-on slot 210. Electronic transaction card 220 is shown having a form factor with an aspect ratio different from that of electronic transaction card 104 (FIG. 1). Electronic transaction card 220 includes stripe 222 and may have electrical contacts to interface with add-on slot 210. The electrical contacts may be on the back side of electronic transaction card 220, recessed on an edge of electronic transaction card 220, or on the front side of electronic transaction card 220. In some embodiments, electronic transaction card 220 includes a "contactless" interface to add-on slot 210. For example, electronic transaction card 220 may include an interface to add-on slot 210 that communicates using electric or magnetic fields, infrared (IR) light, or any other suitable communications mechanism.

Electronic transaction card 220 may have an area for imprinting. For example, as shown in FIG. 2A, electronic transaction card 220 may have space for imprinting a brand (for a bank or otherwise), and a cardholder's name. Further, electronic transaction card 220 may include space for a cardholder's signature. Electronic transaction card 220 may include any other information, coded or unencoded, visible or nonvisible, without departing from the scope of the present invention.

Intelligent electronic device 202 may include a mechanism to allow intelligent electronic device 202 to communicate with a wired or wireless network. For example, intelligent electronic device 202 may include circuitry to communicate with a cellular phone network. Note that in these embodiments, intelligent electronic device 202 may or may not be a phone. For example, intelligent electronic device 202 may be a cellular telephone with an add-on slot for use with an electronic transaction card. Also for example, intelligent electronic device may be a non-telephonic device that has cellular network connectivity. Examples include personal digital assistants, and handheld devices dedicated to the use of electronic transaction cards. Further, intelligent electronic device 202 may be a non-telephonic device having wired or wireless connectivity to a network other than a cellular network, and in some embodiments, intelligent electronic device 202 may be a device without network connectivity. Examples include, but are not limited to: Blackberry devices available from Research in Motion (RIM), music players such as MP3 players, cameras, and the like.

In operation, intelligent electronic device 202 may program electronic transaction card to perform a transaction. In some embodiments, communications over a network may play a role in the transaction. For example, intelligent electronic device 202 may receive authorization for the transaction over a network. Also for example, intelligent electronic device 202 may program electronic transaction card 220 to perform a transaction, and then report the transaction to an entity using the network.

Electronic transaction card 220 may be utilized in financial transactions. For example, electronic transaction card 220 may be programmed to operate as a credit card or a stored value card. In these embodiments, electronic transaction card 220 may be programmed to emit one or more time-varying magnetic fields to emulate the swiping of a credit card or stored value card. In some of these embodiments, electronic

Exhibit 1
Page 367 of 550

US 9,208,423 B1

5

transaction card 220 may use one number repeatedly, or may use a different number for each transaction. For example, electronic transaction card 220 may be programmed to have one number, similar to how a credit card uses the same number repeatedly. Also for example, electronic transaction card 220 may be programmed to use a different number for each transaction. These numbers are referred to herein as "single transaction account numbers" or "STANs."

Single transaction account numbers may be generated by the card issuer or locally by either an intelligent electronic device or an electronic transaction card. Generation of STANs may be accomplished in any of several ways. For example, when an electronic transaction card is issued, the cardholder may receive several pre-assigned single-use transaction numbers. The numbers may also have a pre-specified sequence. In some embodiments, this sequence may be known only to the issuing bank and the cardholder's intelligent electronic device and/or electronic transaction card. A card issuing bank may authorize payments based on the expected sequence of account numbers, and if out-of-sequence account numbers are used, then the issuing bank may consider that transaction as a potentially fraudulent transaction. The issuing bank may also use this feature to track the merchant involved in the potentially fraudulent transaction.

According to another example, a pre-assigned sequence of STANs may be reset to the original starting number on the list depending on user input or other triggers. In addition, the list of numbers may be periodically downloaded via a cellular phone network or other network connectivity.

FIG. 2B shows intelligent electronic device 230 and electronic transaction card 240. Intelligent electronic device 230 is an example of a "wearable" device that is capable of communicating with an electronic transaction card. For example, intelligent electronic device 230 is shown having the form factor of a wristwatch. Some embodiments of the present invention may have other wearable form factors. For example, a wearable intelligent electronic device may be worn in such a manner that it contacts human skin, or it may be worn on clothing. Any wearable intelligent electronic device may be employed without departing from the scope of the present invention. Further, intelligent electronic device 230 may have any of the capabilities described herein.

Intelligent electronic device 230 may include an add-on slot to accept electronic transaction card 230. The add-on slot may be any of the add-on slot embodiments described herein. Electronic transaction card 240 may be any electronic transaction card. For example, electronic transaction card 240 may be any electronic transaction card embodiment described herein.

FIG. 3 shows a block diagram of an electronic transaction card. Electronic transaction card 300 is an electronic transaction card capable of communicating with an intelligent electronic device, and capable of communicating with a magnetic card reader. For example, electronic transaction card 300 may be electronic transaction card 104 (FIG. 1) or electronic transaction card 220 (FIG. 2A).

Electronic transaction card 300 includes electrical contacts 302, intelligent electronic device (IED) interface 304, nonvolatile memory 306, processing device 308, volatile memory 310, magnetic field producing circuits 312, swipe sensor 314, and stripe 320.

Electrical contacts 302 correspond to electrical contacts 108 (FIG. 1). IED interface 304 is coupled to electrical contacts 302 to provide a communications interface between electronic transaction card 300 and an intelligent electronic device. For example, IED interface 304 may be an interface

6

compatible with an add-on slot such as add-on slot 110 (FIG. 1) or add-on slot 210 (FIG. 2A).

Magnetic field producing circuit 312 includes one or more circuits to produce time-varying magnetic fields at or near the location of stripe 320. For example, one or more current carrying conductors may be excited to produce a magnetic field, and the current may be varied in amplitude and reversed in polarity to cause the magnetic field to be time-varying. In some embodiments, the number of magnetic field producing circuits corresponds to the number of tracks being emulated for stripe 320. For example, stripe 320 may emulate two, three, four, or more magnetic tracks on a magnetic card such as a credit card. In these embodiments, electronic transaction card 300 may include two, three, four, or more magnetic field producing circuits 312. Magnetic field producing circuits 312 may also include circuits to allow control of the time-varying magnetic field. For example, magnetic field producing circuits 312 may include voltage drivers, current drivers, registers to hold digital data, sequential circuits to translate the digital data to magnetic fields, and the like.

Swipe sensor 314 senses when electronic transaction card 300 has been swiped in a magnetic card reader, and provides a swipe indication to processing device 308. The swipe sensor may be a mechanical switch, an electronic switch, or any other type of suitable switch. For example, a mechanical switch may get pressed when electronic transaction card 300 is swiped. Also for example, an electrical sensor may include two or more contacts (not shown) that get shorted when swiped past a metal head within a card reader. Further, a Hall effect sensor or light-based sensor may be utilized. The present invention is not limited by the type of swipe sensor utilized. In some embodiments, swipe sensor 314 is omitted.

Processing device 308 represents a processor capable of communicating with the other blocks shown in electronic transaction card 300. For example, processing device 308 may be a microprocessor, a digital signal processor (DSP), a microcontroller, or the like. Further, processing device 308 may be formed from state machines or other sequential logic. In operation, processing device 308 may read instructions from volatile memory 310 and/or nonvolatile memory 306 and perform actions in response thereto. For example, processing device 308 may execute program instructions that influence communications between electronic transaction card 300 and an intelligent electronic device, or between electronic transaction card 300 and a magnetic card reader.

Volatile memory 310 represents memory that may lose its state when power is removed from electronic transaction card 300. For example, volatile memory 310 may be static random access memory (SRAM). Volatile memory 308 may be utilized by processing device 308 when executing programs. For example, a program may be copied into volatile memory 308 prior to execution. Also for example, processing device 308 may use volatile memory 308 to store data during the execution of a program.

Nonvolatile memory 306 represents memory that does not lose its state when power is removed from electronic transaction card 300. Nonvolatile memory 306 may be any suitable type of memory such as Flash memory with floating gate transistor memory cells. Examples include NOR Flash memory, NAND Flash memory, and multibit/cell Flash memory.

Nonvolatile memory 306 may hold program instructions that are executable by processing device 308. For example, prior to being sold, a manufacturer or distributor may program nonvolatile memory 306 with program information to influence the operation of electronic transaction card 300.

Exhibit 1
Page 368 of 550

US 9,208,423 B1

7

Also for example, an intelligent electronic device may provide program information to electronic transaction card 300 through IED interface 304.

Nonvolatile memory 306 may also hold program instructions that are executable by a processing device other than processing device 308. For example, a manufacturer, distributor, reseller, or other participant in the chain of commerce may program nonvolatile memory 306 with program information to be transferred to an intelligent electronic device. Information to be transferred may include device drivers, application software, or the like.

Electronic transaction card 300 may include one or more power sources (not shown). For example, electronic transaction card 300 may include a battery or a capacitor such as a supercapacitor. In some embodiments, a rechargeable battery may be included. The rechargeable battery may accept a charge from an add-on slot in an intelligent electronic device. In some embodiments, a capacitor may accept a charge from an intelligent electronic device. The capacitor may provide power to electronic transaction card 300 for enough time to perform a transaction. Further, the capacitor may be sized to ensure that a transaction may only be performed during a limited time period after removing the electronic transaction card from an add-on slot, thereby ensuring that a stolen card may not be used repeatedly without the cardholder's consent. Also in some embodiments, electronic transaction card 300 may be programmed to go dormant if a transaction is not performed within a limited time period after removing the card from an intelligent electronic device.

Electronic transaction card 300 may include one or more integrated circuits. For example, processing device 308 may be on one integrated circuit die, and the memories may be on another integrated circuit die. In some embodiments, all active devices are included on a single integrated circuit die. In some embodiments, various integrated circuit dice are mounted on a common substrate to provide a high level of integration using separate dice. Any amount of circuit integration may be practiced without departing from the scope of the present invention.

Electronic transaction card 300 has dimensions "a" and "b." In some embodiments of the present invention, stripe 320 has a length that is substantially equal to a, and in some embodiments, stripe 320 has a length less than a. Further, in some embodiments, a is less than the stripe length of a standard credit card (approximately three and three eighths inches), and in some embodiments, a is much less than the stripe length of a standard credit card. For example, in some embodiments, a is less than 75% the length of a standard credit card stripe. Further, in some embodiments, a is less than 50% the length of a standard credit card stripe. In still further embodiments, a is less than 25% the length of a standard credit card stripe.

In some embodiments, dimensions a and b are substantially equal to the dimensions of a memory card. For example, dimensions a and b may conform to the dimensions of an MMC memory card, a Memory Stick PRO DUO memory card, or other memory card. Further, in some embodiments, electronic transaction card 300 has a thickness compatible with a magnetic card reader.

FIG. 4 shows an electronic transaction card and a card reader. Electronic transaction card 410 is a card having a stripe compatible with a magnetic card reader. For example, electronic transaction card 410 may be electronic transaction card 104 (FIG. 1), electronic transaction card 220 (FIG. 2A), electronic transaction card 300 (FIG. 3), or any other electronic transaction card described herein. Magnetic card reader 420 is a card reader compatible with magnetic cards.

8

For example, magnetic card reader 420 may operate as part of a merchant point-of-sale terminal, an access control device, or the like. When a magnetic card is swiped through magnetic card reader 420, one or more time-varying magnetic fields are produced relative to the location of a magnetic read head (not shown) in magnetic card reader 420.

In the operation depicted in FIG. 4, electronic transaction card 410 is swiped through magnetic card reader 420. During the swiping operation, electronic transaction card 420 produces one or more time-varying magnetic fields to emulate the swiping of a magnetic card. For example, a swipe sensor within electronic transaction card 410 may detect the swiping action depicted in FIG. 4, and a magnetic field producing circuit may generate one or more time-varying magnetic fields as electronic transaction card 410 passes by a magnetic read head in magnetic card reader 420.

FIG. 5 shows an intelligent electronic device, an electronic transaction card, and a magnetic card reader. Electronic transaction card 510 is shown being swiped through magnetic card reader 520 while attached to intelligent electronic device 500. The operation depicted in FIG. 5 represents a transaction occurring while electronic transaction card 510 is coupled to an add-on slot of intelligent electronic device 500.

FIG. 6 shows an adapter for use with an electronic transaction card. Adapter 600 includes a body portion having dimensions "w" and "l", and a receiving portion shown at 610. Adapter 600 is useful to receive an electronic transaction card at receiving portion 610 to provide a larger card having the functionality of an electronic transaction card. For example, in some embodiments of the present invention, dimensions w and l are compatible with swallow-type magnetic card readers, and a combination of adapter 600 and electronic transaction card may be compatible with such readers.

Receiving portion 610 may include an interface compatible with a connector on an electronic transaction card. For example, an electronic transaction card may have an interface that is compatible with both an add-on slot of an electronic transaction device and receiving portion 610 of adapter 600.

FIG. 7 shows adapter 600 having an electronic transaction card 710 coupled thereto. Electronic transaction card 710 includes a stripe capable of emitting one or more time-varying magnetic fields as described above. The combination of electronic transaction card 710 and adapter 600 allow the functionality of electronic transaction card 710 to be useful in the larger form factor of adapter 600.

In some embodiments, adapter 600 includes active or passive circuitry in support of the operation of electronic transaction card 710. For example, adapter 600 may include electrical contacts, a battery, an integrated circuit, or other circuits. Also for example, adapter 600 may include one or more swipe sensors to provide a swiping indication to electronic transaction card 710.

FIG. 8 shows an adapter having a smartcard interface 810. In embodiments represented by FIG. 8, an adapter may be utilized to perform a transaction involving a smartcard reader while utilizing an electronic transaction card. For example, an electronic transaction card may be coupled to adapter 800 at receiving portion 820, and the electronic transaction card may provide data useful for a smartcard transaction.

FIG. 9 shows an electronic transaction card having a smartcard interface. Electronic transaction card 900 includes electrical contacts 908 and 910. Electrical contacts 908 are similar to electrical contacts 108 (FIG. 1). For example, electrical contacts 908 may be compatible with an add-on slot of an intelligent electronic device such as intelligent electronic device 102 (FIG. 1). Electrical contacts 910 are arranged to provide the communications interface to a smartcard reader.

Exhibit 1
Page 369 of 550

US 9,208,423 B1

9

In some embodiments, electronic transaction card 900 includes a smartcard interface as well as a stripe to produce the time-varying magnetic field. For example, as shown in FIG. 10, the backside of electronic transaction card 900 may include stripe 1010. The various electronic transaction cards described herein may include a stripe, a smartcard interface, or a combination thereof.

FIG. 11 shows an adapter in combination with an electronic transaction card. Adapter 1100 is shown having electronic transaction card 900 coupled in a recessed portion on a side having dimension w. In some embodiments, this configuration places electrical contacts 910 at a location expected by smartcard readers.

FIG. 12 shows an adapter having an aperture to receive an electronic transaction card. Adapter 1200 includes aperture 1210 to receive an electronic transaction card. In some embodiments, aperture 1210 passes completely through adapter 1200, and in other embodiments, aperture 1210 is a recessed portion on the face of adapter 1200. Adapter 1200 may receive electronic transaction cards having a stripe, a smartcard interface, or a combination of the two.

FIG. 13 shows and adapter having a body portion 1300, a recessed portion 1310, and stripe 1320. Recessed portion 1310 may receive an electronic transaction card as described above with respect to FIGS. 6-7. Further, stripe 1320 may be utilized to communicate with a magnetic card reader. For example, adapter 1300 may include a magnetic field producing circuit such as magnetic field producing circuit 312 (FIG. 3) to produce a time-varying magnetic field. In operation, an electronic transaction card may be coupled to adapter 1300 at recessed portion 1310, and provide transaction information to be used by stripe 1320 for a transaction with a magnetic card reader. In some embodiments, an electronic transaction card having neither a stripe nor a smartcard interface may be coupled to adapter 1300 at recessed portion 1310 to effect a transaction using stripe 1320.

The various adapters shown in the previous figures may have recessed portions, apertures, or stripes anywhere on the adapter without departing from the scope of the present invention. For example, in some embodiments, a recessed portion may be on the side of the adapter having a smaller dimension, and in other embodiments a recessed portion may be on the side of the adapter having a larger dimension. As for example, in some embodiments, a stripe may be on the side of the adapter having a smaller dimension, and in other embodiments a stripe may be on the side of the adapter having a larger dimension.

FIG. 14 shows an electronic transaction card. Electronic transaction card 1400 includes stripe 1410 and add-on slot compatible portion 1402. Add-on slot compatible portion 1402 includes electrical contacts 1408 to communicate with an add-on slot in an intelligent electronic device. For example, add-on slot compatible portion 1402 may be physically and electrically compatible with add-on slot 110 (FIG. 1) or add-on slot 210 (FIG. 2A).

Electronic transaction card 1400 may include any of the circuits, features, or functionality described herein. For example, electronic transaction card 1400 may include magnetic field producing circuits, swipe sensors, processing devices, volatile and nonvolatile memory, various interfaces, and electrical contacts.

Electronic transaction card 1400 is shown having stripe 1410 along an edge having dimension "L". In some embodiments, electronic transaction card 1400 may have stripe 1410 along an edge other than that shown in FIG. 14.

In operation, electronic transaction card 1400 may be left coupled to an electronic transaction device when being

10

swiped through a magnetic card reader, similar to the operation shown in FIG. 5. Further, electronic transaction card 1400 may be removed from an intelligent electronic device prior to being swept through a magnetic card reader, similar to the operation shown in FIG. 4.

FIG. 15 shows an electronic transaction card and an adapter in combination. The combination of electronic transaction card 1400 and adapter 1500 form a card having dimensions "w" and "l" as described above with reference to previous figures. The resulting card may be suitable for swallow-type magnetic card readers.

FIG. 16 shows a combination electronic transaction card and adapter 1610 being inserted into a swallow-type magnetic card reader. As shown in FIG. 16, the swallow-type magnetic card reader is part of an automated teller machine (ATM), but this is not a limitation of the present invention. For example, the swallow-type reader may be part of a point-of-sale device, an access entry device, or any other type of device capable of incorporating a swallow-type magnetic card reader.

FIG. 17 shows a combination electronic transaction card and adapter being swiped through a magnetic card reader. Adapter 1710 and electronic transaction card 1720 are shown being swiped through magnetic card reader 1730. Electronic transaction card 1720 maybe any of the electronic transaction card embodiments described herein. For example, electronic transaction card 1720 may include a stripe, a smartcard interface, or a combination of the two. Although adapter 1710 is shown as an adapter having a recessed portion on one side, the combination adapter/card in FIG. 17 represents any of the adapter/card combinations described herein. For example, adapter 1710 may be any of adapters 600 (FIGS. 6,7), adapter 800 (FIG. 8), adapter 1100 (FIG. 11), adapter 1200 (FIG. 12), adapter 1300 (FIG. 13), or adapter 1500 (FIG. 15).

FIG. 18 shows a financial transaction card. Financial transaction card 1800 includes stripe 1802, financial card circuits 1804, memory card emulation circuitry 1806, and memory card compatible interface 1808. Financial transaction card 1800 is an example of a financial card that might be issued by a bank or other financial institution. For example, financial transaction card 1800 might be a debit card, a credit card, a stored value card, or other card issued for the purposes of financial transactions.

Financial card circuits 1804 interact with stripe 1802 to produce time-varying magnetic fields compatible with a magnetic card reader. For example, financial card circuits 1804 and stripe 1802 may provide financial transaction data to a point-of-sale terminal. Financial transaction card 1800 also includes memory card emulation circuitry 1806 to emulate the operation of a memory card. The combination of memory card emulation circuitry 1806 and memory card compatible interface 1808 allow financial transaction card 1800 to perform as a memory card. For example, memory card compatible interface 1808 may be compatible with a memory card interface in an add-on slot of an intelligent electronic device.

FIG. 19 shows a memory card. Memory card 1900 includes memory card compatible interface 1930, memory card circuits 1920, financial card emulation circuitry 1910, and stripe 1902. Memory card 1900 is an example of a card that may be fabricated and sold by a memory card manufacturer or a manufacturer that is in the business of selling electronic peripheral devices. By including financial card emulation circuitry 1910 and stripe 1902 in memory card 1900, the manufacturer of memory card 1900 may add features desired by consumers. For example, the combination of stripe 1902 and financial card emulation circuitry 1910 may emulate the operation of a financial card such as a credit card, debit card, stored value card, or the like.

Exhibit 1
Page 370 of 550

US 9,208,423 B1

11

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card. Card 2000 includes memory 2010, processing element 2020, magnetic/smartcard circuitry 2030, card reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060. Processing element 2020 may be any processing element suitable to communicate with memory 2010 and the other blocks shown in FIG. 20. Magnetic/smartcard circuitry 2030 may include circuits to produce time-varying magnetic fields or signals compatible with a smart card reader. Card reader interface 2040 may include a stripe as described above, or may include electrical contacts compatible with a smartcard reader. Memory card circuitry 2050 may be any type of memory circuitry accessible by an intelligent electronic device. The intelligent electronic device may access memory card circuitry 2050 through memory card slot compatible interface 2060.

Memory 2010 is shown having card software 2012 and application software 2014. In some embodiments, card 2000 is sold or distributed having both card software 2012 and application software 2014 in memory 2010. For example, memory 2010 may be nonvolatile memory having card software 2012 for execution by processing element 2020. Also for example, memory 2010 may have application software 2014 meant to be installed on a device other than card 2000. Application software 2014 may include drivers, user interface software, single transaction account number (STAN) generation software, or any other software that may be installed on a device other than card 2000.

Application software 2014 may operate in any of multiple languages on multiple operating systems. For example, application software 2014 may provide a user interface in any regional language. Also for example, application software 2014 may run on any operating system (OS).

FIG. 21 shows a block diagram of how card 2000 (FIG. 20) may be utilized. A card issuer 2110 may issue card 2000 to a cardholder 2130. As issued by card issuer 2110, card 2000 may include card software and application software as shown in FIG. 21. Cardholder 2130 may couple card 2000 with intelligent electronic device 2140 and install application software on the intelligent electronic device. For example, intelligent electronic device 2140 may be a mobile phone capable of executing application software, and card 2000 may supply application software to be installed on the mobile phone. Also for example, intelligent electronic device 2140 may be a non-telephone device such as a personal digital assistant (PDA), or other dedicated hardware, capable of receiving card 2000 in an add-on slot.

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card. Card 2200 includes processing element 2020, magnetic/smartcard circuitry 2030, card reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060, all of which are described above with reference to FIG. 20. Card 2200 also includes nonvolatile memory 2210 and volatile memory 2220. As shown in FIG. 22, nonvolatile memory 2210 includes card software 2212 to be executed by processing element 2020. Also as shown in FIG. 22, card 2200 includes volatile memory 2220 having financial transaction data 2222 held therein. Financial transaction data 2222 may be programmed into volatile memory 2220 by processing alignment 2020 in response to communications from an intelligent electronic device coupled to memory card slot compatible interface 2060. For example, a mobile phone executing single transaction account number generation software may provide a single transaction account number as financial transaction data that gets stored in volatile memory 2220 in preparation

12

for a transaction. In other embodiments, financial transaction data 2222 represents two, three, four, or more time-varying magnetic fields to be generated by the combination of magnetic/smartcard circuitry 2030 and card reader interface 2040.

FIG. 23 shows a block diagram of a phone and a card. Phone 2310 may be a cellular telephone, and card 2350 may be any of the electronic transaction card embodiments described herein. Phone 2310 includes display 2312, processor 2314, single transaction account number (STAN) generation software 2316, and authentication software 2318. Card 2350 includes processor 2352, card software 2354, financial transaction data 2356, and point-of-sale (POS) interface 2358.

Single transaction account number generation software 2316 may be installed on the phone 2310 when card 2350 is inserted in a memory slot. For example, referring now back to FIGS. 20 and 21, STAN generation software 2316 may correspond to application software 2014. Authentication software 2318 may only allow authorized users access to phone 2310 and/or card 2350.

In operation, a user interacting with phone 2310 may gain access to features by satisfying requirements of authentication software 2318. Using STAN generation software 2316, a user may generate financial transaction data 2356 which is held on card 2350 in preparation for a transaction. Card 2350 may then interact with a card reader using point-of-sale interface 2358 to effect a transaction. This transaction may be effected with card 2350 coupled to phone 2310 or decoupled from phone 2310. Further, the transaction using card 2350 may be effected while card 2350 is coupled to any of the adapter embodiments described herein.

The following paragraphs provide further disclosure of various invention embodiments. Each embodiment is fully defined by the recitation of the corresponding paragraph, and no other elements are to be considered essential for that particular embodiment. The embodiments include:

A. An apparatus comprising:
   a stripe to communicate with a magnetic card reader; and
   an interface to communicate with an intelligent electronic device;
   wherein the apparatus has dimensions smaller than a credit card.

A1. The apparatus of A wherein the stripe includes circuitry to produce at least one time-varying magnetic field.

A2. The apparatus of A wherein the interface is compatible with an add-on slot in the intelligent electronic device.

A3. The apparatus of A2 wherein the interface comprises a memory card interface.

A4. The apparatus of A further comprising a processing element coupled to the interface and to the stripe.

A5. The apparatus of A4 further comprising a memory element to hold programming information for the stripe.

A6. The apparatus of A4 further comprising an embedded swipe sensor to sense when the stripe is swiped through a magnetic card reader.

A7. The apparatus of A further comprising nonvolatile memory accessible by the intelligent electronic device.

B. A financial card comprising:
   a point-of-sale compatible electronic transaction stripe;
   a memory card compatible interface; and
   memory card emulation circuitry coupled to the memory card compatible interface.

C. A memory card comprising:
   a memory card compatible interface;
   a point-of-sale compatible electronic transaction stripe; and

Exhibit 1

Page 371 of 550

US 9,208,423 B1

13

financial card emulation circuitry coupled to the point-of-sale compatible electronic transaction stripe.

D. A financial card apparatus comprising:

a point-of-sale compatible portion having a stripe to communicate with a point-of-sale transaction device; and

a memory card compatible portion having at least one electrical contact to communicate with a memory card slot in an intelligent electronic device.

E. A memory card comprising:

a memory card interface operable to couple the memory card to an intelligent electronic device;

a nonvolatile memory device accessible through the memory card interface; and

a stripe operable to communicate with a magnetic card reader.

F. A memory card comprising:

a memory card slot interface; and

circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

F1. The memory card of F wherein the circuitry is configured to produce a plurality of time-varying magnetic fields compatible with a point-of-sale transaction device.

G. An apparatus comprising:

means for communicating through a memory card slot in an intelligent electronic device;

means for producing at least one time-varying magnetic field to represent financial transaction data; and

means for storing the financial transaction data.

H. A card comprising:

a memory card compatible interface;

a smartcard compatible interface; and

a stripe to produce at least one time-varying magnetic field compatible with a magnetic card reader.

I. A memory card compatible with a memory card slot in a mobile phone, the memory card including nonvolatile memory accessible by the mobile phone, a point-of-sale interface to communicate with a point-of-sale terminal, and volatile memory to hold financial transaction data.

I1. The memory card of I wherein the point-of-sale interface comprises circuitry to produce at least one time-varying magnetic field.

I2. The memory card of I1 further including a processing device coupled to the nonvolatile memory, volatile memory, and point-of-sale interface.

J. An electronic financial transaction device having a thickness compatible with a point-of-sale card reader, a width less than a credit card width, a length less than a credit card length, an electronically programmable stripe situated along the length, and at least one electrical contact to provide an interface to an intelligent electronic device.

J1. The electronic financial transaction device of J wherein the at least one electrical contact comprises a memory card interface compatible with a memory card slot in the intelligent electronic device.

J2. The electronic financial transaction device of J wherein the electronically programmable stripe includes a circuit to emulate a magnetic stripe in a credit card.

J3. The electronic financial transaction device of J2 further comprising a swipe sensor to detect when the electronic financial device is swiped through a point-of-sale terminal.

K. A card comprising:

means for storing financial transaction data;

means for communicating with a memory card slot in an intelligent electronic device; and

means for creating a time-varying magnetic field that represents the financial transaction data.

14

K1. The card of K wherein the means for storing financial transaction data comprises volatile memory.

K2. The card of K wherein the financial transaction data comprises a single transaction account number.

K3. The card of K further comprising a processing device coupled to read the financial transaction data and influence the operation of the means for creating a time-varying magnetic field.

L. An adapter for use with any of A-K, the adapter comprising:

a body portion having exterior dimensions larger than dimensions of A-G; and

a receiving portion to receive any of A-G, wherein the receiving portion is located on the body portion to expose any of A-G for use in magnetic card reader transactions.

M. An apparatus comprising a body portion with dimensions compatible with a swallow-type magnetic card reader, wherein the body portion includes a memory card compatible area to receive a memory card with magnetic stripe functionality.

M1. The apparatus of M further comprising a smartcard interface.

M2. The apparatus of M further comprising at least one electrical component coupled to the memory card compatible area portion to interface to the memory card.

M3. The apparatus of M wherein the memory card compatible area comprises a recessed portion of at least one side of the apparatus.

M4. The apparatus of M wherein memory card compatible area comprises at least one metallic contact on a periphery of an aperture in the apparatus.

N. A financial card to be used with a magnetic card reader at a point-of-sale, the financial card including a memory card interface to allow the financial card to be inserted in a memory card slot of a mobile phone, and including a stripe compatible with the magnetic card reader, wherein the stripe is shorter than a magnetic credit card stripe.

O. A card compatible with a magnetic card reader and compatible with a memory slot in an intelligent electronic device, the card including software to be installed on the intelligent electronic device.

O1. The card of O wherein the software includes a module for single transaction account number generation.

O2. The card of O1 wherein the software is configured to run on a mobile phone.

O3. The card of O wherein the card comprises:

a memory slot compatible portion; and

a magnetic card reader compatible portion.

O4. The card of O3 wherein the magnetic card reader compatible portion comprises circuitry to produce at least one time-varying magnetic field for use in a financial transaction.

P. A card comprising:

a memory card interface mechanically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Q. A card comprising:

a memory card interface electrically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Q1. Any of the cards of P-Q further comprising nonvolatile memory exposed through the memory card interface.

Exhibit 1
Page 372 of 550

US 9,208,423 B1

15

Q2. Any of the cards of P-Q further comprising volatile memory to hold financial transaction information.

Q3. Any of the cards of P-Q further comprising a software component that when executed by the processing device causes the circuitry to produce at least one time-varying magnetic field representing the financial transaction information.

Q4. Any of the cards of P-Q further comprising a visible stripe at which the at least one time-varying magnetic field emanates.

Q5. Any of the cards of P-Q further comprising a battery.

Q6. Any of the cards of P-Q further comprising a capacitor to provide power to the card.

Q7. The card of Q wherein the card has a size substantially equivalent to a credit card.

R. A credit card sized adapter to receive any of the cards of P-Q.

R1. The adapter of R wherein the credit card sized adapter includes a smartcard interface.

R2. The adapter of R wherein the adapter includes a first edge having a width and a second edge having a length, wherein the second edge includes a recessed portion to accept the card.

R3. The adapter of R wherein the credit card sized adapter includes a first edge having a width and a second edge having a length, wherein the first edge includes a recessed portion to accept the card.

S. A combination financial card and memory card apparatus comprising: electrical contacts to provide an interface to a mobile phone;

a transaction stripe to produce at least one time-varying magnetic field representing transaction information;

a processing device; and

a software component to receive the transaction information from the mobile phone;

wherein the electrical contacts are provided on a physical portion of the combination financial card and memory card apparatus having dimensions compatible with a memory card slot.

S1. The combination financial card and memory card apparatus of S further comprises an application software component to be installed on the mobile phone.

T. In combination:

a memory card having a transaction stripe compatible with a magnetic card reader; and

a credit card sized adapter to receive the memory card and to expose the transaction stripe for use in magnetic card reader transactions.

U. In combination:

a memory card having an interface compatible with a memory card slot in a mobile phone and a smartcard interface; and

a credit card sized adapter to receive the memory card and to expose the smartcard interface for use in smartcard transactions.

V. A financial transaction system comprising:

a mobile phone having a memory card slot;

a memory card compatible with the memory card slot, wherein the memory card includes circuitry to transmit financial transaction data to a point-of-sale device; and

a software component to produce single transaction account numbers for use as financial transaction data.

W. A system comprising:

a wearable intelligent electronic device having a card slot; and

a card comprising a card slot interface and circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

16

Although the present invention has been described in conjunction with certain embodiments, it is to be understood that modifications and variations may be resorted to without departing from the spirit and scope of the invention as those skilled in the art readily understand. Such modifications and variations are considered to be within the scope of the invention and the appended claims.

What is claimed is:

1. A mobile phone comprising:

circuitry to produce a time-varying magnetic field that mimics a swipe of a magnetic card; and

a processor coupled to the circuitry to cause the circuitry to produce a time-varying magnetic field that represents a single transaction account number.

2. The mobile phone of claim 1 wherein the time-varying magnetic field mimics a swipe of a magnetic credit card.

3. The mobile phone of claim 1 wherein the single transaction account number represents financial data.

4. The mobile phone of claim 3 wherein the financial data comprises credit card data.

5. The mobile phone of claim 1 further comprising smartcard circuitry coupled to the processor.

6. The mobile phone of claim 1 wherein the single transaction account number represents access data.

7. The mobile phone of claim 1 wherein the time-varying magnetic field mimics a swipe of a magnetic access card.

8. The mobile phone of claim 1 wherein the time-varying magnetic field is used to perform point-of-sale transactions.

9. A mobile phone comprising:

circuitry to produce a time-varying magnetic field that mimics a swipe of a magnetic card;

smartcard circuitry for performing transactions using single transaction account numbers; and

a processor coupled to the smartcard circuitry and the circuitry to produce a time-varying magnetic field.

10. The mobile phone of claim 9 wherein the smartcard circuitry is configured to perform point-of-sale transactions.

11. The mobile phone of claim 9 wherein the transactions are financial transactions.

12. The mobile phone of claim 9 wherein the time-varying magnetic field mimics a swipe of a magnetic credit card.

13. The mobile phone of claim 9 wherein the single transaction account numbers have a pre-defined sequence.

14. The mobile phone of claim 9 wherein the single transaction account numbers comprise pre-assigned single-use transaction numbers.

15. A mobile phone comprising:

circuitry to produce a time-varying magnetic field that mimics a swipe of a magnetic card;

circuitry to enable use of single transaction account numbers; and

a processor coupled to the circuitry to produce a time-varying magnetic field and to the circuitry to enable use of single transaction account numbers, the processor configured to cause a time-varying magnetic field to be produced that represents a single transaction account number.

16. The mobile phone of claim 15 wherein the circuitry to enable use of single transaction account numbers comprises smartcard circuitry.

17. The mobile phone of claim 15 wherein the single transaction account numbers have a pre-defined sequence.

18. The mobile phone of claim 15 wherein the single transaction account numbers comprise pre-assigned single-use transaction numbers.

* * * * *

Exhibit 1
Page 373 of 550

# EXHIBIT 7

Exhibit 1
Page 374 of 550

US011270174B2

## (12) United States Patent
Narendra et al.

(10) Patent No.: **US 11,270,174 B2**
(45) Date of Patent: **\*Mar. 8, 2022**

(54) **MOBILE PHONE WITH MAGNETIC CARD EMULATION**

(71) Applicant: **iCashe, Inc.**, Portland, OR (US)

(72) Inventors: **Siva G. Narendra**, Portland, OR (US); **Thomas N. Spitzer**, Portland, OR (US); **Prabhakar Tadepalli**, Bangalore (IN)

(73) Assignee: **iCashe, Inc.**, Portland, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/021,347**

(22) Filed: **Sep. 15, 2020**

(65) **Prior Publication Data**

US 2021/0004655 A1    Jan. 7, 2021

### Related U.S. Application Data

(63) Continuation of application No. 16/218,733, filed on Dec. 13, 2018, now Pat. No. 10,803,370, which is a
(Continued)

(51) **Int. Cl.**
**G06K 19/06** (2006.01)
**H04M 1/72412** (2021.01)
(Continued)

(52) **U.S. Cl.**
CPC ..... **G06K 19/06206** (2013.01); **G06K 7/0008** (2013.01); **G06K 19/06187** (2013.01); **G06K 19/07** (2013.01); **G06K 19/073** (2013.01); **G06K 19/0703** (2013.01); **G06K 19/0723** (2013.01); **G06K 19/0727** (2013.01); **G06K**

**19/07741** (2013.01); **G06K 19/07758** (2013.01); **G06K 19/07762** (2013.01); **G06Q 20/204** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,701,601 A    10 1987    Francini et al.
4,786,791 A    11 1988    Hodama
(Continued)

FOREIGN PATENT DOCUMENTS

DE    3632294 A1    4 1988
DE    10054890 A1    4 2002
(Continued)

OTHER PUBLICATIONS

International Search Report PCT Application No. PCT US2005 019988, dated Dec. 16, 2005. 5 pages.
(Continued)

*Primary Examiner* — Kristy A Haupt
(74) *Attorney, Agent, or Firm* — Mughal IP P.C.

(57) **ABSTRACT**

An electronic transaction card communicates with an add-on slot of an intelligent electronic device. The add-on slot may be a memory card slot. The intelligent electronic device may be a mobile phone or other device with or without network connectivity. The electronic transaction card may have magnetic field producing circuitry compatible with magnetic card readers, smartcard circuitry, other point-of-sale interfaces, or any combination thereof.

**27 Claims, 16 Drawing Sheets**



Exhibit 1
Page 375 of 550

# US 11,270,174 B2

Page 2

## Related U.S. Application Data

continuation of application No. 15/658,208, filed on Jul. 24, 2017, now Pat. No. 10,185,909, which is a continuation of application No. 14/948,325, filed on Nov. 22, 2015, now Pat. No. 9,715,649, which is a continuation of application No. 14/747,770, filed on Jun. 23, 2015, now Pat. No. 9,202,156, which is a continuation of application No. 14/680,684, filed on Apr. 7, 2015, now Pat. No. 9,092,708, which is a continuation of application No. 13/592,323, filed on Aug. 22, 2012, now Pat. No. 9,004,361, which is a continuation of application No. 13/304,663, filed on Nov. 27, 2011, now Pat. No. 8,573,494, which is a continuation of application No. 13/114,434, filed on May 24, 2011, now Pat. No. 8,091,786, which is a continuation of application No. 12/941,410, filed on Nov. 8, 2010, now Pat. No. 7,954,715, which is a continuation of application No. 12/539,369, filed on Aug. 11, 2009, now Pat. No. 7,828,214, which is a continuation of application No. 11/063,291, filed on Feb. 22, 2005, now Pat. No. 7,581,678.

(51) **Int. Cl.**

| | |
|---|---|
| *G06K 19/073* | (2006.01) |
| *G06Q 20/20* | (2012.01) |
| *G06Q 20/32* | (2012.01) |
| *G06K 7/00* | (2006.01) |
| *G06Q 20/34* | (2012.01) |
| *G06K 19/07* | (2006.01) |
| *G06K 19/077* | (2006.01) |

(52) **U.S. Cl.**
CPC ......... *G06Q 20/327* (2013.01); *G06Q 20/341* (2013.01); *G06Q 20/353* (2013.01); *H04M 1/72412* (2021.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,791,283 A | 12 1988 | Burkhardt |
| 4,864,109 A | 9 1989 | Minematsu et al. |
| 5,212,478 A | 5 1993 | Moseley |
| 5,378,887 A | 1 1995 | Kobayashi |
| 5,386,106 A | 1 1995 | Kumar |
| 5,537,584 A | 7 1996 | Miyai et al. |
| 5,574,273 A | 11 1996 | Nakagawa et al. |
| 5,585,787 A | 12 1996 | Wallerstein |
| 5,629,981 A | 5 1997 | Nerlikar |
| 5,700,037 A | 12 1997 | Keller |
| 5,710,421 A | 1 1998 | Kokubu |
| 5,834,756 A | 11 1998 | Gutman et al. |
| 5,909,491 A | 6 1999 | Luo |
| 5,940,510 A | 8 1999 | Curry et al. |
| 5,949,880 A | 9 1999 | Curry et al. |
| 5,952,641 A | 9 1999 | Korshun |
| 5,955,961 A | 9 1999 | Wallerstein |
| 6,016,476 A | 1 2000 | Maes et al. |
| 6,021,944 A | 2 2000 | Arakaki |
| 6,039,260 A | 3 2000 | Eisele |
| 6,045,043 A | 4 2000 | Bashan et al. |
| 6,068,184 A | 5 2000 | Barnett |
| 6,105,013 A | 8 2000 | Curry et al. |
| 6,182,891 B1 | 2 2001 | Furuhashi et al. |
| 6,189,786 B1 | 2 2001 | Itou et al. |
| 6,206,293 B1 | 3 2001 | Gutman et al. |
| 6,219,439 B1 | 4 2001 | Burger |
| 6,223,984 A | 5 2001 | Carow |
| 6,223,984 B1 | 5 2001 | Renner et al. |
| 6,237,095 B1 | 5 2001 | Curry et al. |
| 6,250,557 B1 | 6 2001 | Forslund et al. |
| 6,315,195 B1 | 11 2001 | Ramachandran |

| | | |
|---|---|---|
| 6,402,029 B1 | 6 2002 | Gangi |
| 6,450,407 B1 | 9 2002 | Freeman et al. |
| 6,481,623 B1 | 11 2002 | Grant et al. |
| 6,568,600 B1 | 5 2003 | Carpier et al. |
| 6,588,660 B1 | 7 2003 | Buescher et al. |
| 6,592,044 B1 | 7 2003 | Wong et al. |
| 6,594,759 B1 | 7 2003 | Wang |
| 6,598,031 B1 | 7 2003 | Ice |
| 6,607,127 B2 | 8 2003 | Wong |
| 6,609,654 B1 | 8 2003 | Anderson et al. |
| 6,631,849 B2 | 10 2003 | Blossom |
| 6,636,833 B1 | 10 2003 | Flitcroft et al. |
| 6,669,487 B1 | 12 2003 | Nishizawa et al. |
| 6,705,520 B1 | 3 2004 | Pitroda et al. |
| 6,712,277 B2 | 3 2004 | Spencer |
| 6,715,679 B1 | 4 2004 | Infosino |
| 6,721,196 B1 | 4 2004 | Grassl |
| 6,747,547 B2 | 6 2004 | Benson |
| 6,764,005 B2 | 7 2004 | Cooper |
| 6,769,607 B1 | 8 2004 | Pitroda et al. |
| 6,805,288 B2 | 10 2004 | Routhenstein et al. |
| 6,811,082 B2 | 11 2004 | Wong |
| 6,836,843 B2 | 12 2004 | Seroussi et al. |
| 6,857,566 B2 | 2 2005 | Wankmueller |
| 6,882,900 B1 | 4 2005 | Terranova |
| 6,883,718 B1 | 4 2005 | Ice et al. |
| 6,905,072 B2 | 6 2005 | Ramachandran |
| 6,907,123 B1 | 6 2005 | Schier |
| 6,908,030 B2 | 6 2005 | Rajasekaran et al. |
| 6,925,568 B1 | 8 2005 | Heinonen |
| 6,937,526 B2 | 8 2005 | Furukawa |
| 6,952,788 B2 | 10 2005 | Rommelmann et al. |
| 6,995,651 B2 | 2 2006 | Antmann et al. |
| 7,059,520 B1 | 6 2006 | Shtesl |
| 7,088,246 B2 | 8 2006 | Fukuoka |
| 7,185,146 B2 | 2 2007 | Masuyama et al. |
| 7,213,766 B2 | 5 2007 | Ryan et al. |
| 7,221,473 B2 | 5 2007 | Jeran et al. |
| 7,281,101 B2 | 10 2007 | Mizushima et al. |
| 7,295,790 B2 | 11 2007 | Morimoto et al. |
| 7,333,062 B2 | 2 2008 | Leizerovich et al. |
| 7,350,717 B2 | 4 2008 | Conner et al. |
| 7,353,993 B2 | 4 2008 | Fujimoto |
| 7,410,102 B2 | 8 2008 | Winkler |
| 7,493,484 B2 | 2 2009 | Lee |
| 7,558,107 B2 | 7 2009 | Sakurai et al. |
| 7,558,110 B2 | 7 2009 | Mizushima et al. |
| 7,581,678 B2 | 9 2009 | Narendra et al. |
| 7,607,580 B2 | 10 2009 | Takita et al. |
| 7,673,080 B1 | 3 2010 | Yu et al. |
| RE41,352 E | 5 2010 | Wood, Jr. |
| 7,716,082 B1 | 5 2010 | Blalock |
| RE41,471 E | 8 2010 | Wood, Jr. |
| 7,789,303 B2 | 9 2010 | Fukasawa |
| 7,792,516 B2 | 9 2010 | Soderstrom |
| 7,828,214 B2 | 11 2010 | Narendra et al. |
| RE42,254 E | 3 2011 | Wood, Jr. |
| 7,898,994 B2 | 3 2011 | Zhao et al. |
| 7,933,571 B2 | 4 2011 | Black et al. |
| 7,941,197 B2 | 5 2011 | Jain et al. |
| 7,948,356 B2 | 5 2011 | Kawamura et al. |
| 7,954,715 B2 | 6 2011 | Narendra et al. |
| 7,954,716 B2 | 6 2011 | Narendra et al. |
| 7,954,717 B2 | 6 2011 | Narendra et al. |
| 7,961,101 B2 | 6 2011 | Narendra et al. |
| 7,991,158 B2 | 8 2011 | Narendra et al. |
| 8,072,331 B2 | 12 2011 | Narendra et al. |
| 8,082,575 B2 | 12 2011 | Doughty et al. |
| 8,083,145 B2 | 12 2011 | Narendra et al. |
| 8,091,786 B2 | 1 2012 | Narendra et al. |
| 8,103,881 B2 | 1 2012 | Doughty et al. |
| 9,092,708 B1 | 7 2015 | Narendra et al. |
| 9,202,156 B2 | 12 2015 | Narendra et al. |
| 9,715,649 B2* | 7 2017 | Narendra ......... G06K 19 07741 |
| 2001 0002015 A1 | 5 2001 | Kayanakis |
| 2001 0006902 A1 | 7 2001 | Ito |
| 2001 0013551 A1 | 8 2001 | Ramachandran |
| 2001 0034246 A1 | 10 2001 | Hutchison et al. |
| 2002 0007434 A1 | 1 2002 | Campardo |

Exhibit 1
Page 376 of 550

# US 11,270,174 B2

Page 3

(56) **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002 0025796 | A1 | 2 2002 | Taylor et al. |
| 2002 0043566 | A1 | 4 2002 | Goodman et al. |
| 2002 0044043 | A1 | 4 2002 | Chaco et al. |
| 2002 0095588 | A1 | 7 2002 | Shigematsu et al. |
| 2002 0096570 | A1 | 7 2002 | Wong et al. |
| 2002 0099665 | A1 | 7 2002 | Burger et al. |
| 2002 0130187 | A1 | 9 2002 | Berg et al. |
| 2002 0138422 | A1 | 9 2002 | Natsuno |
| 2002 0138735 | A1 | 9 2002 | Felt et al. |
| 2002 0139849 | A1 | 10 2002 | Gangi |
| 2002 0148892 | A1 | 10 2002 | Bardwell |
| 2002 0153424 | A1 | 10 2002 | Li |
| 2002 0158747 | A1 | 10 2002 | Mcgregor et al. |
| 2002 0178124 | A1 | 11 2002 | Lewis |
| 2002 0180584 | A1 | 12 2002 | Mcgregor et al. |
| 2002 0186845 | A1 | 12 2002 | Dutta et al. |
| 2003 0025939 | A1 | 2 2003 | Jeran et al. |
| 2003 0028481 | A1 | 2 2003 | Flitcroft et al. |
| 2003 0038177 | A1 | 2 2003 | Morrow |
| 2003 0052168 | A1 | 3 2003 | Wong |
| 2003 0057278 | A1 | 3 2003 | Wong |
| 2003 0061168 | A1 | 3 2003 | Routhenstein |
| 2003 0079096 | A1 | 4 2003 | Murakami |
| 2003 0080183 | A1 | 5 2003 | Rajasekaran et al. |
| 2003 0084220 | A1 | 5 2003 | Jones et al. |
| 2003 0085288 | A1 | 5 2003 | Luu |
| 2003 0115126 | A1 | 6 2003 | Pitroda |
| 2003 0128124 | A1 | 7 2003 | Amtmann et al. |
| 2003 0159050 | A1 | 8 2003 | Gantman et al. |
| 2003 0200180 | A1 | 10 2003 | Phelan et al. |
| 2003 0209604 | A1 | 11 2003 | Harrison |
| 2003 0218066 | A1 | 11 2003 | Fernandes et al. |
| 2003 0220876 | A1 | 11 2003 | Burger et al. |
| 2003 0231550 | A1 | 12 2003 | MacFarlane |
| 2004 0006654 | A1 | 1 2004 | Bando |
| 2004 0027881 | A1 | 2 2004 | Furukawa |
| 2004 0030660 | A1 | 2 2004 | Shaford |
| 2004 0035942 | A1 | 2 2004 | Silverman |
| 2004 0050930 | A1 | 3 2004 | Rowe |
| 2004 0058705 | A1 | 3 2004 | Morgan et al. |
| 2004 0064612 | A1 | 4 2004 | Pinto et al. |
| 2004 0065733 | A1 | 4 2004 | Fukuoka |
| 2004 0077372 | A1 | 4 2004 | Halpern |
| 2004 0087339 | A1 | 5 2004 | Goldthwaite et al. |
| 2004 0094624 | A1 | 5 2004 | Fernandes et al. |
| 2004 0122685 | A1 | 6 2004 | Bunce |
| 2004 0133787 | A1 | 7 2004 | Doughty et al. |
| 2004 0162932 | A1 | 8 2004 | Mizushima et al. |
| 2004 0177045 | A1 | 9 2004 | Brown |
| 2004 0188519 | A1 | 9 2004 | Cassone |
| 2004 0199469 | A1 | 10 2004 | Barillova et al. |
| 2004 0227859 | A1 | 11 2004 | Liang |
| 2004 0243785 | A1 | 12 2004 | Shanmugasundaram et al. |
| 2004 0243806 | A1 | 12 2004 | Mckinley et al. |
| 2004 0251303 | A1 | 12 2004 | Cooper |
| 2004 0255145 | A1 | 12 2004 | Chow |
| 2005 0006462 | A1 | 1 2005 | Rouille et al. |
| 2005 0017068 | A1 | 1 2005 | Zalewski et al. |
| 2005 0022002 | A1 | 1 2005 | Poisner |
| 2005 0029349 | A1 | 2 2005 | Mcgregor et al. |
| 2005 0038736 | A1 | 2 2005 | Saunders |
| 2005 0039027 | A1 | 2 2005 | Shapiro |
| 2005 0040044 | A1 | 2 2005 | Burger et al. |
| 2005 0050367 | A1 | 3 2005 | Burger et al. |
| 2005 0052924 | A1 | 3 2005 | Nishizawa et al. |
| 2005 0060586 | A1 | 3 2005 | Burger et al. |
| 2005 0071282 | A1 | 3 2005 | Lu et al. |
| 2005 0077349 | A1 | 4 2005 | Bonalle et al. |
| 2005 0092830 | A1 | 5 2005 | Blossom |
| 2005 0108096 | A1 | 5 2005 | Burger et al. |
| 2005 0109838 | A1 | 5 2005 | Linlor |
| 2005 0116026 | A1 | 6 2005 | Burger et al. |
| 2005 0121512 | A1 | 6 2005 | Wankmueller |
| 2005 0122120 | A1 | 6 2005 | Black |
| 2005 0127164 | A1 | 6 2005 | Wankmueller |
| 2005 0127166 | A1 | 6 2005 | Minemura |
| 2005 0133606 | A1 | 6 2005 | Brown |
| 2005 0136964 | A1 | 6 2005 | Le Saint et al. |
| 2005 0168339 | A1 | 8 2005 | Arai et al. |
| 2005 0177724 | A1 | 8 2005 | Ali et al. |
| 2005 0197859 | A1 | 9 2005 | Wilson et al. |
| 2005 0204077 | A1 | 9 2005 | Kou |
| 2005 0204092 | A1 | 9 2005 | Masuyama et al. |
| 2005 0212657 | A1 | 9 2005 | Simon |
| 2005 0223143 | A1 | 10 2005 | Kang et al. |
| 2005 0224589 | A1 | 10 2005 | Park et al. |
| 2005 0240778 | A1 | 10 2005 | Saito |
| 2005 0246546 | A1 | 11 2005 | Takagi et al. |
| 2005 0253687 | A1 | 11 2005 | Martinez et al. |
| 2005 0258245 | A1 | 11 2005 | Bates et al. |
| 2005 0268058 | A1 | 12 2005 | Drasnin et al. |
| 2005 0268330 | A1 | 12 2005 | Di Rienzo |
| 2006 0011731 | A1 | 1 2006 | Anders et al. |
| 2006 0027655 | A1 | 2 2006 | Smets et al. |
| 2006 0045555 | A1 | 3 2006 | Morimoto et al. |
| 2006 0077039 | A1 | 4 2006 | Ibi et al. |
| 2006 0097851 | A1 | 5 2006 | Amtmann et al. |
| 2006 0124755 | A1 | 6 2006 | Ito |
| 2006 0169778 | A1 | 8 2006 | Chung |
| 2006 0172606 | A1 | 8 2006 | Irisawa |
| 2006 0186209 | A1 | 8 2006 | Narendra et al. |
| 2006 0219776 | A1 | 10 2006 | Finn |
| 2006 0226217 | A1 | 10 2006 | Narendra et al. |
| 2006 0268764 | A1 | 11 2006 | Harris |
| 2006 0279413 | A1 | 12 2006 | Yeager |
| 2007 0033334 | A1 | 2 2007 | Katayama et al. |
| 2007 0076877 | A1 | 4 2007 | Camp et al. |
| 2007 0108280 | A1 | 5 2007 | Li et al. |
| 2007 0110404 | A1 | 5 2007 | Ching et al. |
| 2007 0145135 | A1 | 6 2007 | Jogand-Coulomb et al. |
| 2007 0145152 | A1 | 6 2007 | Jogand-Coulomb et al. |
| 2007 0195458 | A1 | 8 2007 | Sawai et al. |
| 2007 0205864 | A1 | 9 2007 | Mutti et al. |
| 2007 0257797 | A1 | 11 2007 | Rancien et al. |
| 2007 0293202 | A1 | 12 2007 | Moshir et al. |
| 2008 0046649 | A1 | 2 2008 | Ito |
| 2008 0065830 | A1 | 3 2008 | Aoki et al. |
| 2008 0068173 | A1 | 3 2008 | Alexis et al. |
| 2008 0073436 | A1 | 3 2008 | Nishizawa et al. |
| 2008 0136619 | A1 | 6 2008 | Moran |
| 2008 0147950 | A1 | 6 2008 | Chen |
| 2008 0148077 | A1 | 6 2008 | Lee et al. |
| 2008 0153416 | A1 | 6 2008 | Washiro |
| 2008 0186174 | A1 | 8 2008 | Alexis et al. |
| 2008 0214111 | A1 | 9 2008 | Moshir et al. |
| 2008 0244208 | A1 | 10 2008 | Narendra et al. |
| 2008 0279381 | A1 | 11 2008 | Narendra et al. |
| 2008 0311849 | A1 | 12 2008 | Washiro |
| 2008 0318535 | A1 | 12 2008 | Black et al. |
| 2009 0065571 | A1 | 3 2009 | Jain |
| 2009 0065572 | A1 | 3 2009 | Jain |
| 2009 0069049 | A1 | 3 2009 | Jain |
| 2009 0069050 | A1 | 3 2009 | Jain et al. |
| 2009 0069051 | A1 | 3 2009 | Jain et al. |
| 2009 0069052 | A1 | 3 2009 | Jain et al. |
| 2009 0070272 | A1 | 3 2009 | Jain |
| 2009 0070691 | A1 | 3 2009 | Jain |
| 2009 0070861 | A1 | 3 2009 | Jain |
| 2009 0108063 | A1 | 4 2009 | Jain et al. |
| 2009 0150610 | A1 | 6 2009 | Hsu et al. |
| 2009 0152361 | A1 | 6 2009 | Narendra et al. |
| 2009 0199283 | A1 | 8 2009 | Jain |
| 2009 0250521 | A1 | 10 2009 | Fujita et al. |
| 2009 0265552 | A1 | 10 2009 | Moshir et al. |
| 2009 0270127 | A1 | 10 2009 | Kakimoto |
| 2009 0290582 | A1 | 11 2009 | Suenaga et al. |
| 2009 0298540 | A1 | 12 2009 | Narendra et al. |
| 2009 0315667 | A1 | 12 2009 | Kawamura et al. |
| 2010 0033307 | A1 | 2 2010 | Narendra et al. |
| 2010 0033310 | A1 | 2 2010 | Narendra et al. |
| 2010 0049378 | A1 | 2 2010 | Yu et al. |
| 2010 0213265 | A1 | 8 2010 | Narendra et al. |
| 2011 0000960 | A1 | 1 2011 | Harris |
| 2011 0053644 | A1 | 3 2011 | Narendra et al. |

Exhibit 1
Page 377 of 550

## US 11,270,174 B2
Page 4

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2011/0073663 | A1 | 3/2011 | Narendra et al. |
| 2011/0073665 | A1 | 3/2011 | Narendra et al. |
| 2011/0077052 | A1 | 3/2011 | Narendra et al. |
| 2011/0110404 | A1 | 5/2011 | Washiro |
| 2011/0171996 | A1 | 7/2011 | Narendra et al. |
| 2011/0180610 | A1 | 7/2011 | Narendra et al. |
| 2011/0220726 | A1 | 9/2011 | Narendra et al. |
| 2011/0223972 | A1 | 9/2011 | Narendra et al. |
| 2011/0240748 | A1* | 10/2011 | Doughty .......... G06Q 20/40145 |
| | | | 235/492 |
| 2011/0269438 | A1 | 11/2011 | Narendra et al. |
| 2011/0271044 | A1 | 11/2011 | Narendra et al. |
| 2011/0272468 | A1 | 11/2011 | Narendra et al. |
| 2011/0272469 | A1 | 11/2011 | Narendra et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 161060 | A1 | 11/1985 |
| EP | 0818757 | A2 | 1/1998 |
| EP | 1014290 | A2 | 6/2000 |
| EP | 1117065 | A1 | 7/2001 |
| EP | 1178450 | A2 | 2/2002 |
| EP | 1189465 | A1 | 3/2002 |
| EP | 1291748 | A2 | 3/2003 |
| EP | 1308874 | A2 | 5/2003 |
| GB | 2316908 | A | 3/1998 |
| JP | 4102112 | A | 4/1992 |
| JP | 2000010668 | A | 1/2000 |
| JP | 2005018671 | A | 1/2005 |
| JP | 2007199847 | A | 8/2007 |
| JP | 2007328689 | A | 12/2007 |
| TW | 200905471 | A | 2/2009 |
| TW | 201020934 | B | 6/2010 |
| TW | 201023662 | A | 6/2010 |
| TW | I336449 | | 1/2011 |
| TW | 201126422 | A | 8/2011 |
| WO | 9626500 | A1 | 8/1996 |
| WO | 9812674 | A2 | 3/1998 |
| WO | 0014678 | A1 | 3/2000 |
| WO | 0188659 | A2 | 11/2001 |
| WO | 03029942 | A2 | 4/2003 |
| WO | 03077473 | A1 | 9/2003 |
| WO | 03081519 | A2 | 10/2003 |
| WO | 2004012352 | A1 | 2/2004 |
| WO | 2004095169 | A2 | 11/2004 |
| WO | 2005027030 | A1 | 3/2005 |
| WO | 2005119607 | A2 | 12/2005 |
| WO | 2005119608 | A2 | 12/2005 |
| WO | 2006091709 | A2 | 8/2006 |
| WO | 2006108184 | A1 | 10/2006 |
| WO | 2007011937 | A2 | 1/2007 |
| WO | 2008121566 | A1 | 10/2008 |
| WO | 2009147548 | A2 | 12/2009 |
| WO | 2010099093 | A1 | 9/2010 |

OTHER PUBLICATIONS

International Search Report PCT Application No. PCT US2005 022993, dated Oct. 21, 2005, 3 pages.
International Search Report PCT Application No. PCT US2006 013603, dated Jan. 9, 2006, 3 pages.
International Search Report PCT Application No. PCT US2006 027847, dated Mar. 29, 2007, 5 pages.
International Search Report PCT Application No. PCT US2008 057588, dated Aug. 7, 2008, 4 pages.
International Written Opinion PCT Application No. PCT US2005 019988, dated Dec. 4, 2006, 9 pages.
International Written Opinion PCT Application No. PCT US2005 019988, dated Jan. 11, 2006, 8 pages.
International Written Opinion PCT Application No. PCT US2005 022993, dated Dec. 4, 2006, 6 pages.
International Written Opinion PCT Application No. PCT US2006 006361, dated Aug. 28, 2007, 8 pages.
International Written Opinion PCT Application No. PCT US2006 006361, dated Sep. 22, 2006, 13 pages.
International Written Opinion PCT Application No. PCT US2006 013603, dated Oct. 9, 2007, 7 pages.
International Written Opinion PCT Application No. PCT US2006 027847, dated Jan. 22, 2008, 10 pages.
International Written Opinion PCT Application No. PCT US2008 057588, dated Aug. 7, 2008, 5 pages.
International Written Opinion PCT Application No. PCT US2008 057588, dated Oct. 6, 2009, 6 pages.
International Written Opinion PCT Application No. PCT US2010 025014, dated Apr. 15, 2010, 9 pages.
International Written Opinion PCT Application No. PCT US2010 025014, dated Sep. 9, 2011, 6 pages.
Lee, Youbok; "Antenna Circuit Design for RFID Applications", Microchip, AN710, 2003 Microchip Technology Inc., (2003), 50 pages.
Official Letter from Taiwan Patent Office 115-001TW1, Application 95105997, and Search Report dated Oct. 20, 2010, 6 pages.
U.S. Appl. No. 13/592,323 Office Action dated Sep. 30, 2014, 6 pages.
U.S. Appl. No. 14/680,684 Office Action dated May 22, 2015, 5 pages.
U.S. Appl. No. 14/747,770 Office Action dated Sep. 25, 2015, 7 pages.
U.S. Appl. No. 14/833,113 Office Action dated Sep. 24, 2015, 9 pages.
U.S. Appl. No. 14/866,998 Office Action dated Nov. 5, 2015, 7 pages.
U.S. Appl. No. 14/929,297 Office Action dated Sep. 16, 2016, 8 pages.
U.S. Appl. No. 14/948,325 Office Action dated Sep. 20, 2016, 7 pages.
U.S. Appl. No. 15/658,208 Office Action dated Apr. 19, 2018, 7 pages.
U.S. Appl. No. 16/218,733 Office Action dated Nov. 29, 2019, 6 pages.
Final Office Action dated Dec. 26, 2007 for U.S. Appl. No. 11/063,291.
Non-Final Office Action dated Dec. 11, 2008 for U.S. Appl. No. 11/063,291.
Non-Final Office Action dated Feb. 26, 2007 for U.S. Appl. No. 11/063,291.
Non-Final Office Action dated Jul. 8, 2010 for U.S. Appl. No. 12/539,369.
Non-Final Office Action dated Jul. 23, 2008 for U.S. Appl. No. 11/063,291.
Notice of Allowance dated Apr. 14, 2011 for U.S. Appl. No. 12/941,410.
Notice of Allowance dated Jul. 10, 2009 for U.S. Appl. No. 11/063,291.
Notice of Allowance dated Sep. 30, 2010 for U.S. Appl. No. 12/539,369.

* cited by examiner

Exhibit 1
Page 378 of 550



*FIG. 1*

Exhibit 1
Page 379 of 550



*FIG. 2A*

Exhibit 1
Page 380 of 550



*FIG. 2B*

Exhibit 1
Page 381 of 550

U.S. Patent

Mar. 8, 2022

Sheet 4 of 16

US 11,270,174 B2



*FIG. 3*

Exhibit 1
Page 382 of 550



*FIG. 4*

Exhibit 1
Page 383 of 550



*FIG. 5*

Exhibit 1
Page 384 of 550



**FIG. 6**



**FIG. 7**



**FIG. 8**

Exhibit 1
Page 385 of 550



FIG. 9                    FIG. 10



FIG. 11

Exhibit 1
Page 386 of 550



*FIG. 12*



*FIG. 13*

Exhibit 1
Page 387 of 550



*FIG. 14*



*FIG. 15*

Exhibit 1
Page 388 of 550



*FIG. 16*

Exhibit 1
Page 389 of 550



*FIG. 17*

Exhibit 1
Page 390 of 550



FIG. 18



FIG. 19

Exhibit 1
Page 391 of 550



**FIG. 20**



**FIG. 21**

Exhibit 1
Page 392 of 550



*FIG. 22*

Exhibit 1
Page 393 of 550



**FIG. 23**

Exhibit 1
Page 394 of 550

US 11,270,174 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**MOBILE PHONE WITH MAGNETIC CARD EMULATION**

## CLAIM FOR PRIORITY

This application is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 16/218,733, filed Dec. 13, 2018, now issued as U.S. Pat. No. 10,803,370 on Oct. 13, 2020, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 15/658,208, filed Jul. 24, 2017, now issued as U.S. Pat. No. 10,185,909 on Jan. 22, 2019, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 14/948,325, filed Nov. 22, 2015, now issued as U.S. Pat. No. 9,715,649 on Jul. 25, 2017, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 14/747,770, filed Jun. 23, 2015, now issued as U.S. Pat. No. 9,202,156 on Dec. 1, 2015 which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 14/680,684, filed Apr. 7, 2015, now issued as U.S. Pat. No. 9,092,708 on Jul. 28, 2015 which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 13/592,323, filed Aug. 22, 2012, now issued as U.S. Pat. No. 9,004,361 on Apr. 14, 2015, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 13/304,663, filed Nov. 27, 2011, now issued as U.S. Pat. No. 8,573,494 on Nov. 5, 2013, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 13/114,434, filed May 24, 2011, now issued as U.S. Pat. No. 8,091,786, on Jan. 10, 2012, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 12/941,410, filed Nov. 8, 2010, now issued as U.S. Pat. No. 7,954,715 on Jun. 7, 2011, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 12/539,369, filed Aug. 11, 2009, now issued as U.S. Pat. No. 7,828,214 on Nov. 9, 2010, which is a continuation of, and claims the benefit of priority to U.S. patent application Ser. No. 11/063,291, filed Feb. 22, 2005, now issued as U.S. Pat. No. 7,581,678 on Sep. 1, 2009, and which is incorporated by reference in entirety.

## FIELD

The present invention relates generally to electronic devices, and more specifically to electronic devices that may perform transactions.

## BACKGROUND

Magnetic cards have many purposes. Examples include credit cards, debit cards, stored value cards, identification cards, access entry cards, and the like. Many of these cards have information stored in a magnetic stripe in a static manner. For example, a credit card may have a credit card number, a cardholder's name, and an issuing bank's name statically encoded in a magnetic strip. Likewise, an identification card or access entry card may have statically encoded information that identifies an individual or allows access to a controlled access area. When the card is swiped through a magnetic card reader, the information is transferred to the magnetic card reader to perform a transaction, such as a financial transaction or identification transaction.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1, 2A, and 2B show intelligent electronic devices and electronic transaction cards;

FIG. 3 shows a block diagram of an electronic transaction card;

FIG. 4 shows an electronic transaction card in a magnetic card reader;

FIG. 5 shows an intelligent electronic device and card in a card reader;

FIGS. 6-8 show adapters for use with electronic transaction cards;

FIGS. 9 and 10 show an electronic transaction card having a smartcard interface;

FIG. 11 shows an adapter in combination with an electronic transaction card;

FIG. 12 shows an adapter having an aperture to receive an electronic transaction card;

FIG. 13 shows another adapter embodiment;

FIG. 14 shows an electronic transaction card;

FIG. 15 shows an electronic transaction card and adapter combination;

FIG. 16 shows an example swallow-type card reader;

FIG. 17 shows a combination electronic transaction card and adapter being swiped through a magnetic card reader;

FIG. 18 shows a financial transaction card;

FIG. 19 shows a memory card;

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card;

FIG. 21 shows a diagram of how a card may be utilized;

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card; and

FIG. 23 shows a block diagram of a phone and a card.

## DESCRIPTION OF EMBODIMENTS

In the following detailed description, reference is made to the accompanying drawings that show, by way of illustration, various embodiments of an invention. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention. It is to be understood that the various embodiments of the invention, although different, are not necessarily mutually exclusive. For example, a particular feature, structure, or characteristic described in connection with one embodiment may be implemented within other embodiments without departing from the spirit and scope of the invention. In addition, it is to be understood that the location or arrangement of individual elements within each disclosed embodiment may be modified without departing from the spirit and scope of the invention. The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is defined only by the appended claims, appropriately interpreted, along with the full range of equivalents to which the claims are entitled. In the drawings, like numerals refer to the same or similar functionality throughout the several views.

FIG. 1 shows an intelligent electronic device and an electronic transaction card. Intelligent electronic device 102 is shown as a mobile phone in FIG. 1, but this is not a limitation of the present invention. For example, intelligent electronic device 102 may be a personal digital assistant (PDA), a smartphone, a mobile phone, a handheld computer, or any other device capable of operating as described herein. Intelligent electronic device 102 includes add-on slot 110. Add-on slot 110 is a slot capable of accepting electronic transaction card 104. For example, add-on slot 110 may have

Exhibit 1
Page 395 of 550

US 11,270,174 B2

3

physical dimensions compatible with electronic transaction card 104, and may have a communications interface that operates using a protocol compatible with electronic transaction card 104. In some embodiments, electronic transaction card 104 includes an identification number that provides a relationship to intelligent electronic device 102. For example, electronic transaction card 104 may include an ID number that provides a unique pairing relationship or a non-unique pairing relationship between electronic transaction card 104 and intelligent electronic device 102.

In some embodiments of the present invention, add-on slot 110 is a memory card slot designed to accept and communicate with memory cards. As used herein, the term "memory card slot" refers to any add-on slot capable of accepting a card having memory accessible by an intelligent electronic device such as that shown in FIG. 1. For example, a memory card slot may be a proprietary card slot designed to accept memory cards that adhere to a proprietary communications protocol. Also for example, a memory card slot may be compatible with an industry standard communications protocol, or may be compatible with a widely accepted communications protocol that is not necessarily formally documented as an industry standard. Examples include slots that are compatible with the Multimedia Memory Card (MMC) protocol, Memory Stick DUO protocol, secure digital (SD) protocol, and Smart Media protocol. The foregoing list is meant to be exemplary, and not exhaustive. Add-on slot 110 may be compatible with many memory card slot protocols other than those explicitly listed above without departing from the scope of the invention.

Electronic transaction card 104 includes electrical contacts 108 and stripe 106. Electrical contacts 108 are contacts that provide a communications interface to communicate with add-on slot 110. For example, electrical contacts 108 may provide connectivity compliant with a communications protocol for memory cards.

Stripe 106 represents an area on an external face of electronic transaction card 104 at which one or more time-varying magnetic fields emanate. For example, one or more time-varying magnetic fields may emanate from the location of stripe 106 to communicate with a magnetic card reader. In some embodiments, the time-varying magnetic field may emulate the time-varying magnetic field produced when a typical magnetic card is swiped through a magnetic card reader. For example, a time-varying magnetic field produced at stripe 106 may emulate the swipe of a credit card, a debit card, or any other card having a magnetic stripe compatible with a magnetic card reader.

In some embodiments of the present invention, stripe 106 may be a visible stripe on electronic transaction card 104. When stripe 106 is visible, it may be used to indicate the location at which the time-varying magnetic field will emanate. In other embodiments of the present invention, stripe 106 may not be visible. For example, circuitry may be included within electronic transaction card 106 to produce the time-varying magnetic field and no visible indication may be present on an external face of electronic transaction card 104.

As used herein, the term "stripe" generally refers to a location on an electronic transaction card, whether a visible stripe exists or not. In this description, the term "stripe" may also be used to refer to a visible marking on a face of an electronic transaction card. Further, a "stripe" may include the functionality provided by one or more time-varying magnetic fields that emanate from the card. For example, the term "stripe" may refer to multiple magnetic tracks, or multiple "stripes," or emulation thereof.

4

Stripes, as described herein, may be compatible with one or more standards. A stripe may be compatible with a standard by being in compliance with the standard or by being partially in compliance with the standard. For example, stripe 106 may be compatible with an American National Standards Institute (ANSI) magnetic stripe standard, or an International Organization for Standardization (ISO) magnetic stripe standard. In addition, in some embodiments, a stripe may emulate more than one magnetic track, and the emulated tracks may or may not be offset from the location specified in a standard. For example, one or more wires may be utilized to generate time-varying magnetic fields compatible with a standard, and the wires may be located at or near stripe 106 in a location different than the magnetic track offset described in an associated standard.

As used herein, the term "transaction" refers to any beneficial use of an electronic transaction card. For example, any time stripe 106 emits a time-varying magnetic field to be read by a magnetic card reader or a hybrid smartcard reader, a transaction may take place. Transactions may include financial transactions, access control transactions, or any other type of transaction involving any of the electronic transaction card embodiments described herein. Further, as described in more detail below, in some embodiments of the present invention, transactions may utilize smartcard interfaces on electronic transaction cards in addition to, or in lieu of, stripes that emit time-varying magnetic fields.

In operation, intelligent electronic device 102 may program electronic transaction card 104 for use in a transaction involving stripe 106. For example, intelligent electronic device 102 may program electronic transaction card 104 to operate as a credit card, a debit card, or the like. Electronic transaction card 104 may then be used with a magnetic stripe or smartcard based merchant point-of-sale terminal to effect a transaction. Also for example, intelligent electronic device 102 may program electronic transaction card 104 to operate in any other environment where stripe 106 may be beneficially utilized with a magnetic card reader.

FIG. 2A shows intelligent electronic device 202 and electronic transaction card 220. Intelligent electronic device 202 includes add-on slot 210 to receive electronic transaction card 220. Intelligent electronic device 202 is shown having an add-on slot on one side, but this is not a limitation of the present invention. For example, add-on slot 210 may be located on top, bottom, or any other surface of intelligent electronic device 202. Also for example, an add-on slot may be created by a clamshell design when the shell is closed. In these embodiments, each side of the clamshell may incorporate a portion of the add-on slot such that the add-on slot is "open" when the clamshell is open.

Electronic transaction card 220 may have any form factor compliant with add-on slot 210. Electronic transaction card 220 is shown having a form factor with an aspect ratio different from that of electronic transaction card 104 (FIG. 1). Electronic transaction card 220 includes stripe 222 and may have electrical contacts to interface with add-on slot 210. The electrical contacts may be on the back side of electronic transaction card 220, recessed on an edge of electronic transaction card 220, or on the front side of electronic transaction card 220. In some embodiments, electronic transaction card 220 includes a "contactless" interface to add-on slot 210. For example, electronic transaction card 220 may include an interface to add-on slot 210 that communicates using electric or magnetic fields, infrared (IR) light, or any other suitable communications mechanism.

Electronic transaction card 220 may have an area for imprinting. For example, as shown in FIG. 2A, electronic

Exhibit 1
Page 396 of 550

5

transaction card 220 may have space for imprinting a brand (for a bank or otherwise), and a cardholder's name. Further, electronic transaction card 220 may include space for a cardholder's signature. Electronic transaction card 220 may include any other information, coded or unencoded, visible or nonvisible, without departing from the scope of the present invention.

Intelligent electronic device 202 may include a mechanism to allow intelligent electronic device 202 to communicate with a wired or wireless network. For example, intelligent electronic device 202 may include circuitry to communicate with a cellular phone network. Note that in these embodiments, intelligent electronic device 202 may or may not be a phone. For example, intelligent electronic device 202 may be a cellular telephone with an add-on slot for use with an electronic transaction card. Also for example, intelligent electronic device may be a non-telephonic device that has cellular network connectivity. Examples include personal digital assistants, and handheld devices dedicated to the use of electronic transaction cards. Further, intelligent electronic device 202 may be a non-telephonic device having wired or wireless connectivity to a network other than a cellular network, and in some embodiments, intelligent electronic device 202 may be a device without network connectivity. Examples include, but are not limited to: Blackberry devices available from Research in Motion (RIM), music players such as MP3 players, cameras, and the like.

In operation, intelligent electronic device 202 may program electronic transaction card to perform a transaction. In some embodiments, communications over a network may play a role in the transaction. For example, intelligent electronic device 202 may receive authorization for the transaction over a network. Also for example, intelligent electronic device 202 may program electronic transaction card 220 to perform a transaction, and then report the transaction to an entity using the network.

Electronic transaction card 220 may be utilized in financial transactions. For example, electronic transaction card 220 may be programmed to operate as a credit card or a stored value card. In these embodiments, electronic transaction card 220 may be programmed to emit one or more time-varying magnetic fields to emulate the swiping of a credit card or stored value card. In some of these embodiments, electronic transaction card 220 may use one number repeatedly, or may use a different number for each transaction. For example, electronic transaction card 220 may be programmed to have one number, similar to how a credit card uses the same number repeatedly. Also for example, electronic transaction card 220 may be programmed to use a different number for each transaction. These numbers are referred to herein as "single transaction account numbers" or "STANs."

Single transaction account numbers may be generated by the card issuer or locally by either an intelligent electronic device or an electronic transaction card. Generation of STANs may be accomplished in any of several ways. For example, when an electronic transaction card is issued, the cardholder may receive several pre-assigned single-use transaction numbers. The numbers may also have a pre-specified sequence. In some embodiments, this sequence may be known only to the issuing bank and the cardholder's intelligent electronic device and/or electronic transaction card. A card issuing bank may authorize payments based on the expected sequence of account numbers, and if out-of-sequence account numbers are used, then the issuing bank may consider that transaction as a potentially fraudulent

6

transaction. The issuing bank may also use this feature to track the merchant involved in the potentially fraudulent transaction.

According to another example, a pre-assigned sequence of STANs may be reset to the original starting number on the list depending on user input or other triggers. In addition, the list of numbers may be periodically downloaded via a cellular phone network or other network connectivity.

FIG. 2B shows intelligent electronic device 230 and electronic transaction card 240. Intelligent electronic device 230 is an example of a "wearable" device that is capable of communicating with an electronic transaction card. For example, intelligent electronic device 230 is shown having the form factor of a wristwatch. Some embodiments of the present invention may have other wearable form factors. For example, a wearable intelligent electronic device may be worn in such a manner that it contacts human skin, or it may be worn on clothing. Any wearable intelligent electronic device may be employed without departing from the scope of the present invention. Further, intelligent electronic device 230 may have any of the capabilities described herein.

Intelligent electronic device 230 may include an add-on slot to accept electronic transaction card 230. The add-on slot may be any of the add-on slot embodiments described herein. Electronic transaction card 240 may be any electronic transaction card. For example, electronic transaction card 240 may be any electronic transaction card embodiment described herein.

FIG. 3 shows a block diagram of an electronic transaction card. Electronic transaction card 300 is an electronic transaction card capable of communicating with an intelligent electronic device, and capable of communicating with a magnetic card reader. For example, electronic transaction card 300 may be electronic transaction card 104 (FIG. 1) or electronic transaction card 220 (FIG. 2A).

Electronic transaction card 300 includes electrical contacts 302, intelligent electronic device (IED) interface 304, nonvolatile memory 306, processing device 308, volatile memory 310, magnetic field producing circuits 312, swipe sensor 314, and stripe 320.

Electrical contacts 302 correspond to electrical contacts 108 (FIG. 1). IED interface 304 is coupled to electrical contacts 302 to provide a communications interface between electronic transaction card 300 and an intelligent electronic device. For example, IED interface 304 may be an interface compatible with an add-on slot such as add-on slot 110 (FIG. 1) or add-on slot 210 (FIG. 2A).

Magnetic field producing circuit 312 includes one or more circuits to produce time-varying magnetic fields at or near the location of stripe 320. For example, one or more current carrying conductors may be excited to produce a magnetic field, and the current may be varied in amplitude and reversed in polarity to cause the magnetic field to be time-varying. In some embodiments, the number of magnetic field producing circuits corresponds to the number of tracks being emulated for stripe 320. For example, stripe 320 may emulate two, three, four, or more magnetic tracks on a magnetic card such as a credit card. In these embodiments, electronic transaction card 300 may include two, three, four, or more magnetic field producing circuits 312. Magnetic field producing circuits 312 may also include circuits to allow control of the time-varying magnetic field. For example, magnetic field producing circuits 312 may include voltage drivers, current drivers, registers to hold digital data, sequential circuits to translate the digital data to magnetic fields, and the like.

Exhibit 1
Page 397 of 550

US 11,270,174 B2

7

Swipe sensor 314 senses when electronic transaction card 300 has been swiped in a magnetic card reader, and provides a swipe indication to processing device 308. The swipe sensor may be a mechanical switch, an electronic switch, or any other type of suitable switch. For example, a mechanical switch may get pressed when electronic transaction card 300 is swiped. Also for example, an electrical sensor may include two or more contacts (not shown) that get shorted when swiped past a metal head within a card reader. Further, a Hall effect sensor or light-based sensor may be utilized. The present invention is not limited by the type of swipe sensor utilized. In some embodiments, swipe sensor 314 is omitted.

Processing device 308 represents a processor capable of communicating with the other blocks shown in electronic transaction card 300. For example, processing device 308 may be a microprocessor, a digital signal processor (DSP), a microcontroller, or the like. Further, processing device 308 may be formed from state machines or other sequential logic. In operation, processing device 308 may read instructions from volatile memory 310 and/or nonvolatile memory 306 and perform actions in response thereto. For example, processing device 308 may execute program instructions that influence communications between electronic transaction card 300 and an intelligent electronic device, or between electronic transaction card 300 and a magnetic card reader.

Volatile memory 310 represents memory that may lose its state when power is removed from electronic transaction card 300. For example, volatile memory 310 may be static random access memory (SRAM). Volatile memory 308 may be utilized by processing device 308 when executing programs. For example, a program may be copied into volatile memory 308 prior to execution. Also for example, processing device 308 may use volatile memory 308 to store data during the execution of a program.

Nonvolatile memory 306 represents memory that does not lose its state when power is removed from electronic transaction card 300. Nonvolatile memory 306 may be any suitable type of memory such as Flash memory with floating gate transistor memory cells. Examples include NOR Flash memory, NAND Flash memory, and multibit/cell Flash memory.

Nonvolatile memory 306 may hold program instructions that are executable by processing device 308. For example, prior to being sold, a manufacturer or distributor may program nonvolatile memory 306 with program information to influence the operation of electronic transaction card 300. Also for example, an intelligent electronic device may provide program information to electronic transaction card 300 through BD interface 304.

Nonvolatile memory 306 may also hold program instructions that are executable by a processing device other than processing device 308. For example, a manufacturer, distributor, reseller, or other participant in the chain of commerce may program nonvolatile memory 306 with program information to be transferred to an intelligent electronic device. Information to be transferred may include device drivers, application software, or the like.

Electronic transaction card 300 may include one or more power sources (not shown). For example, electronic transaction card 300 may include a battery or a capacitor such as a supercapacitor. In some embodiments, a rechargeable battery may be included. The rechargeable battery may accept a charge from an add-on slot in an intelligent electronic device. In some embodiments, a capacitor may accept a charge from an intelligent electronic device. The capacitor may provide power to electronic transaction card 300 for

8

enough time to perform a transaction. Further, the capacitor may be sized to ensure that a transaction may only be performed during a limited time period after removing the electronic transaction card from an add-on slot, thereby ensuring that a stolen card may not be used repeatedly without the cardholder's consent. Also in some embodiments, electronic transaction card 300 may be programmed to go dormant if a transaction is not performed within a limited time period after removing the card from an intelligent electronic device.

Electronic transaction card 300 may include one or more integrated circuits. For example, processing device 308 may be on one integrated circuit die, and the memories may be on another integrated circuit die. In some embodiments, all active devices are included on a single integrated circuit die. In some embodiments, various integrated circuit dice are mounted on a common substrate to provide a high level of integration using separate dice. Any amount of circuit integration may be practiced without departing from the scope of the present invention.

Electronic transaction card 300 has dimensions "a" and "b." In some embodiments of the present invention, stripe 320 has a length that is substantially equal to a, and in some embodiments, stripe 320 has a length less than a. Further, in some embodiments, a is less than the stripe length of a standard credit card (approximately three and three eighths inches), and in some embodiments, a is much less than the stripe length of a standard credit card. For example, in some embodiments, a is less than 75% the length of a standard credit card stripe. Further, in some embodiments, a is less than 50% the length of a standard credit card stripe. In still further embodiments, a is less than 25% the length of a standard credit card stripe.

In some embodiments, dimensions a and b are substantially equal to the dimensions of a memory card. For example, dimensions a and b may conform to the dimensions of an MMC memory card, a Memory Stick PRO DUO memory card, or other memory card. Further, in some embodiments, electronic transaction card 300 has a thickness compatible with a magnetic card reader.

FIG. 4 shows an electronic transaction card and a card reader. Electronic transaction card 410 is a card having a stripe compatible with a magnetic card reader. For example, electronic transaction card 410 may be electronic transaction card 104 (FIG. 1), electronic transaction card 220 (FIG. 2A), electronic transaction card 300 (FIG. 3), or any other electronic transaction card described herein. Magnetic card reader 420 is a card reader compatible with magnetic cards. For example, magnetic card reader 420 may operate as part of a merchant point-of-sale terminal, an access control device, or the like. When a magnetic card is swiped through magnetic card reader 420, one or more time-varying magnetic fields are produced relative to the location of a magnetic read head (not shown) in magnetic card reader 420.

In the operation depicted in FIG. 4, electronic transaction card 410 is swiped through magnetic card reader 420. During the swiping operation, electronic transaction card 420 produces one or more time-varying magnetic fields to emulate the swiping of a magnetic card. For example, a swipe sensor within electronic transaction card 410 may detect the swiping action depicted in FIG. 4, and a magnetic field producing circuit may generate one or more time-varying magnetic fields as electronic transaction card 410 passes by a magnetic read head in magnetic card reader 420.

FIG. 5 shows an intelligent electronic device, an electronic transaction card, and a magnetic card reader. Electronic transaction card 510 is shown being swiped through

Exhibit 1
Page 398 of 550

9

magnetic card reader **520** while attached to intelligent electronic device **500**. The operation depicted in FIG. 5 represents a transaction occurring while electronic transaction card **510** is coupled to an add-on slot of intelligent electronic device **500**.

FIG. 6 shows an adapter for use with an electronic transaction card. Adapter **600** includes a body portion having dimensions "w" and "l", and a receiving portion shown at **610**. Adapter **600** is useful to receive an electronic transaction card at receiving portion **610** to provide a larger card having the functionality of an electronic transaction card. For example, in some embodiments of the present invention, dimensions w and/are compatible with swallow-type magnetic card readers, and a combination of adapter **600** an electronic transaction card may be compatible with such readers.

Receiving portion **610** may include an interface compatible with a connector on an electronic transaction card. For example, an electronic transaction card may have an interface that is compatible with both an add-on slot of an electronic transaction device and receiving portion **610** of adapter **600**.

FIG. 7 shows adapter **600** having an electronic transaction card **710** coupled thereto. Electronic transaction card **710** includes a stripe capable of emitting one or more time-varying magnetic fields as described above. The combination of electronic transaction card **710** and adapter **600** allow the functionality of electronic transaction card **710** to be useful in the larger form factor of adapter **600**.

In some embodiments, adapter **600** includes active or passive circuitry in support of the operation of electronic transaction card **710**. For example, adapter **600** may include electrical contacts, a battery, an integrated circuit, or other circuits. Also for example, adapter **600** may include one or more swipe sensors to provide a swiping indication to electronic transaction card **710**.

FIG. 8 shows an adapter having a smartcard interface **810**. In embodiments represented by FIG. 8, an adapter may be utilized to perform a transaction involving a smartcard reader while utilizing an electronic transaction card. For example, an electronic transaction card may be coupled to adapter **800** at receiving portion **820**, and the electronic transaction card may provide data useful for a smartcard transaction.

FIG. 9 shows an electronic transaction card having a smartcard interface. Electronic transaction card **900** includes electrical contacts **908** and **910**. Electrical contacts **908** are similar to electrical contacts **108** (FIG. 1). For example, electrical contacts **908** may be compatible with an add-on slot of an intelligent electronic device such as intelligent electronic device **102** (FIG. 1). Electrical contacts **910** are arranged to provide the communications interface to a smartcard reader.

In some embodiments, electronic transaction card **900** includes a smartcard interface as well as a stripe to produce the time-varying magnetic field. For example, as shown in FIG. 10, the backside of electronic transaction card **900** may include stripe **1010**. The various electronic transaction cards described herein may include a stripe, a smartcard interface, or a combination thereof.

FIG. 11 shows an adapter in combination with an electronic transaction card. Adapter **1100** is shown having electronic transaction card **900** coupled in a recessed portion on a side having dimension w. In some embodiments, this configuration places electrical contacts **910** at a location expected by smartcard readers.

10

FIG. 12 shows an adapter having an aperture to receive an electronic transaction card. Adapter **1200** includes aperture **1210** to receive an electronic transaction card. In some embodiments, aperture **1210** passes completely through adapter **1200**, and in other embodiments, aperture **1210** is a recessed portion on the face of adapter **1200**. Adapter **1200** may receive electronic transaction cards having a stripe, a smartcard interface, or a combination of the two.

FIG. 13 shows and adapter having a body portion **1300**, a recessed portion **1310**, and stripe **1320**. Recessed portion **1310** may receive an electronic transaction card as described above with respect to FIGS. 6-7. Further, stripe **1320** may be utilized to communicate with a magnetic card reader. For example, adapter **1300** may include a magnetic field producing circuit such as magnetic field producing circuit **312** (FIG. 3) to produce a time-varying magnetic field. In operation, an electronic transaction card may be coupled to adapter **1300** at recessed portion **1310**, and provide transaction information to be used by stripe **1320** for a transaction with a magnetic card reader. In some embodiments, an electronic transaction card having neither a stripe nor a smartcard interface may be coupled to adapter **1300** at recessed portion **1310** to effect a transaction using stripe **1320**.

The various adapters shown in the previous figures may have recessed portions, apertures, or stripes anywhere on the adapter without departing from the scope of the present invention. For example, in some embodiments, a recessed portion may be on the side of the adapter having a smaller dimension, and in other embodiments a recessed portion may be on the side of the adapter having a larger dimension. Also for example, in some embodiments, a stripe may be on the side of the adapter having a smaller dimension, and in other embodiments a stripe may be on the side of the adapter having a larger dimension.

FIG. 14 shows an electronic transaction card. Electronic transaction card **1400** includes stripe **1410** and add-on slot compatible portion **1402**. Add-on slot compatible portion **1402** includes electrical contacts **1408** to communicate with an add-on slot in an intelligent electronic device. For example, add-on slot compatible portion **1402** may be physically and electrically compatible with add-on slot **110** (FIG. 1) or add-on slot **210** (FIG. 2A).

Electronic transaction card **1400** may include any of the circuits, features, or functionality described herein. For example, electronic transaction card **1400** may include magnetic field producing circuits, swipe sensors, processing devices, volatile and nonvolatile memory, various interfaces, and electrical contacts.

Electronic transaction card **1400** is shown having stripe **1410** along an edge having dimension "l." In some embodiments, electronic transaction card **1400** may have stripe **1410** along an edge other than that shown in FIG. 14.

In operation, electronic transaction card **1400** may be left coupled to an electronic transaction device when being swiped through a magnetic card reader, similar to the operation shown in FIG. 5. Further, electronic transaction card **1400** may be removed from an intelligent electronic device prior to being swept through a magnetic card reader, similar to the operation shown in FIG. 4.

FIG. 15 shows an electronic transaction card and an adapter in combination. The combination of electronic transaction card **1400** and adapter **1500** form a card having dimensions "w" and "l" as described above with reference to previous figures. The resulting card may be suitable for swallow-type magnetic card readers.

Exhibit 1
Page 399 of 550

11

FIG. 16 shows a combination electronic transaction card and adapter 1610 being inserted into a swallow-type magnetic card reader. As shown in FIG. 16, the swallow-type magnetic card reader is part of an automated teller machine (ATM), but this is not a limitation of the present invention. For example, the swallow-type reader may be part of a point-of-sale device, an access entry device, or any other type of device capable of incorporating a swallow-type magnetic card reader.

FIG. 17 shows a combination electronic transaction card and adapter being swiped through a magnetic card reader. Adapter 1710 and electronic transaction card 1720 are shown being swiped through magnetic card reader 1730. Electronic transaction card 1720 may be any of the electronic transaction card embodiments described herein. For example, electronic transaction card 1720 may include a stripe, a smartcard interface, or a combination of the two. Although adapter 1710 is shown as an adapter having a recessed portion on one side, the combination adapter/card in FIG. 17 represents any of the adapter/card combinations described herein. For example, adapter 1710 may be any of adapters 600 (FIGS. 6,7), adapter 800 (FIG. 8), adapter 1100 (FIG. 11), adapter 1200 (FIG. 12), adapter 1300 (FIG. 13), or adapter 1500 (FIG. 15).

FIG. 18 shows a financial transaction card. Financial transaction card 1800 includes stripe 1802, financial card circuits 1804, memory card emulation circuitry 1806, and memory card compatible interface 1808. Financial transaction card 1800 is an example of a financial card that might be issued by a bank or other financial institution. For example, financial transaction card 1800 might be a debit card, a credit card, a stored value card, or other card issued for the purposes of financial transactions.

Financial card circuits 1804 interact with stripe 1802 to produce time-varying magnetic fields compatible with a magnetic card reader. For example, financial card circuits 1804 and stripe 1802 may provide financial transaction data to a point-of-sale terminal. Financial transaction card 1800 also includes memory card emulation circuitry 1806 to emulate the operation of a memory card. The combination of memory card emulation circuitry 1806 and memory card compatible interface 1808 allow financial transaction card 1800 to perform as a memory card. For example, memory card compatible interface 1808 may be compatible with a memory card interface in an add-on slot of an intelligent electronic device.

FIG. 19 shows a memory card. Memory card 1900 includes memory card compatible interface 1930, memory card circuits 1920, financial card emulation circuitry 1910, and stripe 1902. Memory card 1900 is an example of a card that may be fabricated and sold by a memory card manufacturer or a manufacturer that is in the business of selling electronic peripheral devices. By including financial card emulation circuitry 1910 and stripe 1902 in memory card 1900, the manufacturer of memory card 1900 may add features desired by consumers. For example, the combination of stripe 1902 and financial card emulation circuitry 1910 may emulate the operation of a financial card such as a credit card, debit card, stored value card, or the like.

FIG. 20 shows a block diagram of a combination memory card and electronic transaction card. Card 2000 includes memory 2010, processing element 2020, magnetic/smartcard reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060. Processing element 2020 may be any processing element suitable to communicate with memory 2010 and the other blocks shown in FIG. 20. Magnetic/smartcard circuitry

12

2030 may include circuits to produce time-varying magnetic fields or signals compatible with a smart card reader. Card reader interface 2040 may include a stripe as described above, or may include electrical contacts compatible with a smartcard reader. Memory card circuitry 2050 may be any type of memory circuitry accessible by an intelligent electronic device. The intelligent electronic device may access memory card circuitry 2050 through memory card slot compatible interface 2060.

Memory 2010 is shown having card software 2012 and application software 2014. In some embodiments, card 2000 is sold or distributed having both card software 2012 and application software 2014 in memory 2010. For example, memory 2010 may be nonvolatile memory having card software 2012 for execution by processing element 2020. Also for example, memory 2010 may have application software 2014 meant to be installed on a device other than card 2000. Application software 2014 may include drivers, user interface software, single transaction account number (STAN) generation software, or any other software that may be installed on a device other than card 2000.

Application software 2014 may operate in any of multiple languages on multiple operating systems. For example, application software 2014 may provide a user interface in any regional language. Also for example, application software 2014 may run on any operating system (OS).

FIG. 21 shows a block diagram of how card 2000 (FIG. 20) may be utilized. A card issuer 2110 may issue card 2000 to a cardholder 2130. As issued by card issuer 2110, card 2000 may include card software and application software as shown in FIG. 21. Cardholder 2130 may couple card 2000 with intelligent electronic device 2140 and install application software on the intelligent electronic device. For example, intelligent electronic device 2140 may be a mobile phone capable of executing application software, and card 2000 may supply application software to be installed on the mobile phone. Also for example, intelligent electronic device 2140 may be a non-telephonic device such as a personal digital assistant (PDA), or other dedicated hardware, capable of receiving card 2000 in an add-on slot.

FIG. 22 shows a block diagram of a combination memory card and electronic transaction card. Card 2200 includes processing element 2020, magnetic/smartcard circuitry 2030, card reader interface 2040, memory card circuitry 2050, and memory card slot compatible interface 2060, all of which are described above with reference to FIG. 20. Card 2200 also includes nonvolatile memory 2210 and volatile memory 2220. As shown in FIG. 22, nonvolatile memory 2210 includes card software 2212 to be executed by processing element 2020. Also as shown in FIG. 22, card 2200 includes volatile memory 2220 having financial transaction data 2222 held therein. Financial transaction data 2222 may be programmed into volatile memory 2220 by processing alignment 2020 in response to communications from an intelligent electronic device coupled to memory card slot compatible interface 2060. For example, a mobile phone executing single transaction account number generation software may provide a single transaction account number as financial transaction data that gets stored in volatile memory 2220 in preparation for a transaction. In other embodiments, financial transaction data 2222 represents two, three, four, or more time-varying magnetic fields to be generated by the combination of magnetic/smartcard circuitry 2030 and card reader interface 2040.

FIG. 23 shows a block diagram of a phone and a card. Phone 2310 may be a cellular telephone, and card 2350 may be any of the electronic transaction card embodiments

Exhibit 1
Page 400 of 550

US 11,270,174 B2

13

described herein. Phone 2310 includes display 2312, processor 2314, single transaction account number (STAN) generation software 2316, and authentication software 2318. Card 2350 includes processor 2352, card software 2354, financial transaction data 2356, and point-of-sale (POS) interface 2358.

Single transaction account number generation software 2316 may be installed on the phone 2310 when card 2350 is inserted in a memory slot. For example, referring now back to FIGS. 20 and 21, STAN generation software 2316 may correspond to application software 2014. Authentication software 2318 may allow authorized users access to phone 2310 and/or card 2350.

In operation, a user interacting with phone 2310 may gain access to features by satisfying requirements of authentication software 2318. Using STAN generation software 2316, a user may generate financial transaction data 2356 which is held on card 2350 in preparation for a transaction. Card 2350 may then interact with a card reader using point-of-sale interface 2358 to effect a transaction. This transaction may be effected with card 2350 coupled to phone 2310 or decoupled from phone 2310. Further, the transaction using card 2350 may be effected while card 2350 is coupled to any of the adapter embodiments described herein.

The following paragraphs provide further disclosure of various invention embodiments. Each embodiment is fully defined by the recitation of the corresponding paragraph, and no other elements are to be considered essential for that particular embodiment. The embodiments include:

A. An apparatus comprising:
   a stripe to communicate with a magnetic card reader; and
   an interface to communicate with an intelligent electronic device;
   wherein the apparatus has dimensions smaller than a credit card.

A1. The apparatus of A wherein the stripe includes circuitry to produce at least one time-varying magnetic field.

A2. The apparatus of A wherein the interface is compatible with an add-on slot in the intelligent electronic device.

A3. The apparatus of A2 wherein the interface comprises a memory card interface.

A4. The apparatus of A further comprising a processing element coupled to the interface and to the stripe.

A5. The apparatus of A4 further comprising a memory element to hold programming information for the stripe.

A6. The apparatus of A4 further comprising an embedded swipe sensor to sense when the stripe is swiped through a magnetic card reader.

A7. The apparatus of A further comprising nonvolatile memory accessible by the intelligent electronic device.

B. A financial card comprising:
   a point-of-sale compatible electronic transaction stripe;
   a memory card compatible interface; and
   memory card emulation circuitry coupled to the memory card compatible interface.

C. A memory card comprising:
   a memory card compatible interface;
   a point-of-sale compatible electronic transaction stripe; and
   financial card emulation circuitry coupled to the point-of-sale compatible electronic transaction stripe.

D. A financial card apparatus comprising:
   a point-of-sale compatible portion having a stripe to communicate with an intelligent electronic device; and

14

   a memory card compatible portion having at least one electrical contact to communicate with a memory card slot in an intelligent electronic device.

E. A memory card comprising:
   a memory card interface operable to couple the memory card to an intelligent electronic device;
   a nonvolatile memory device accessible through the memory card interface; and
   a stripe operable to communicate with a magnetic card reader.

F. A memory card comprising:
   a memory card interface; and
   circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

F1. The memory card of F wherein the circuitry is configured to produce a plurality of time-varying magnetic fields compatible with a point-of-sale transaction device.

G. An apparatus comprising:
   means for communicating through a memory card slot in an intelligent electronic device;
   means for producing at least one time-varying magnetic field to represent financial transaction data; and
   means for storing the financial transaction data.

H. A card comprising:
   a memory card compatible interface;
   a smartcard compatible interface; and
   a stripe to produce at least one time-varying magnetic field compatible with a magnetic card reader.

I. A memory card compatible with a memory card slot in a mobile phone, the memory card including nonvolatile memory accessible by the mobile phone, a point-of-sale interface to communicate with a point-of-sale terminal, and volatile memory to hold financial transaction data.

I1. The memory card of I wherein the point-of-sale interface comprises circuitry to produce at least one time-varying magnetic field.

I2. The memory card of I1 further including a processing device coupled to the nonvolatile memory, volatile memory, and point-of-sale interface.

J. An electronic financial transaction device having a thickness compatible with a point-of-sale card reader, a width less than a credit card width, a length less than a credit card length, an electronically programmable stripe situated along the length, and at least one electrical contact to provide an interface to an intelligent electronic device.

J1. The electronic financial transaction device of J wherein the at least one electrical contact comprises a memory card interface compatible with a memory card slot in the intelligent electronic device.

J2. The electronic financial transaction device of J wherein the electronically programmable stripe includes a circuit to emulate a magnetic stripe in a credit card.

J3. The electronic financial transaction device of J2 further comprising a swipe sensor to detect when the electronic financial device is swiped through a point-of-sale terminal.

K. A card comprising:
   means for storing financial transaction data;
   means for communicating with a memory card slot in an intelligent electronic device; and
   means for creating a time-varying magnetic field that represents the financial transaction data.

K1. The card of K wherein the means for storing financial transaction data comprises volatile memory.

K2. The card of K wherein the financial transaction data comprises a single transaction account number.

Exhibit 1
Page 401 of 550

US 11,270,174 B2

15

K3. The card of K further comprising a processing device coupled to read the financial transaction data and influence the operation of the means for creating a time-varying magnetic field.

L. An adapter for use with any of A–K, the adapter comprising:

a body portion having exterior dimensions larger than dimensions of A–G; and

a receiving portion to receive any of A–G, wherein the receiving portion is located on the body portion to expose any of A–G for use in magnetic card reader transactions.

M. An apparatus comprising a body portion with dimensions compatible with a swallow-type magnetic card reader, wherein the body portion includes a memory card compatible area to receive a memory card with magnetic stripe functionality.

M1. The apparatus of M further comprising a smartcard interface.

M2. The apparatus of M further comprising at least one electrical component coupled to the memory card compatible area portion to interface to the memory card.

M3. The apparatus of M wherein the memory card compatible area comprises a recessed portion of at least one side of the apparatus.

M4. The apparatus of M wherein memory card compatible area comprises at least one metallic contact on a periphery of an aperture in the apparatus.

N. A financial card to be used with a magnetic card reader at a point-of-sale, the financial card including a memory card interface to allow the financial card to be inserted in a memory card slot of a mobile phone, and including a stripe compatible with the magnetic card reader, wherein the stripe is shorter than a magnetic credit card stripe.

O. A card compatible with a magnetic card reader and compatible with a memory slot in an intelligent electronic device, the card including software to be installed on the intelligent electronic device.

O1. The card of O wherein the software includes a module for single transaction account number generation.

O2. The card of O1 wherein the software is configured to run on a mobile phone.

O3. The card of O wherein the card comprises:

a memory slot compatible portion; and

a magnetic card reader compatible portion.

O4. The card of O3 wherein the magnetic card reader compatible portion comprises circuitry to produce at least one time-varying magnetic field for use in a financial transaction.

P. A card comprising:

a memory card interface mechanically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Q. A card comprising:

a memory card interface electrically compatible with a memory card slot in an intelligent electronic device;

a processing device coupled to the memory card interface; and

circuitry to produce a time-varying magnetic field compatible with a point-of-sale device.

Q1. Any of the cards of P-Q further comprising nonvolatile memory exposed through the memory card interface.

Q2. Any of the cards of P-Q further comprising volatile memory to hold financial transaction information.

16

Q3. Any of the cards of P-Q further comprising a software component that when executed by the processing device causes the circuitry to produce at least one time-varying magnetic field representing the financial transaction information.

Q4. Any of the cards of P-Q further comprising a visible stripe at which the at least one time-varying magnetic field emanates.

Q5. Any of the cards of P-Q further comprising a battery.

Q6. Any of the cards of P-Q further comprising a capacitor to provide power to the card.

Q7. The card of Q wherein the card has a size substantially equivalent to a credit card.

R. A credit card sized adapter to receive any of the cards of P-Q.

R1. The adapter of R wherein the credit card sized adapter includes a smartcard interface.

R2. The adapter of R wherein the adapter includes a first edge having a width and a second edge having a length, wherein the second edge includes a recessed portion to accept the card.

R3. The adapter of R wherein the credit card sized adapter includes a first edge having a width and a second edge having a length, wherein the first edge includes a recessed portion to accept the card.

S. A combination financial card and memory card apparatus comprising:

electrical contacts to provide an interface to a mobile phone;

a transaction stripe to produce at least one time-varying magnetic field representing transaction information;

a processing device; and

a software component to receive the transaction information from the mobile phone;

wherein the electrical contacts are provided on a physical portion of the combination financial card and memory card apparatus having dimensions compatible with a memory card slot.

S1. The combination financial card and memory card apparatus of S further comprises an application software component to be installed on the mobile phone.

T. In combination:

a memory card having a transaction stripe compatible with a magnetic card reader; and

a credit card sized adapter to receive the memory card and to expose the transaction stripe for use in magnetic card reader transactions.

U. In combination:

a memory card having an interface compatible with a memory card slot in a mobile phone and a smartcard interface; and

a credit card sized adapter to receive the memory card and to expose the smartcard interface for use in smartcard transactions.

V. A financial transaction system comprising:

a mobile phone having a memory card slot;

a memory card compatible with the memory card slot, wherein the memory card includes circuitry to transmit financial transaction data to a point-of-sale device; and

a software component to produce single transaction account numbers for use as financial transaction data.

W. A system comprising:

a wearable intelligent electronic device having a card slot; and

a card comprising a card slot interface and circuitry for producing a time-varying magnetic field compatible with a magnetic card reader.

Exhibit 1
Page 402 of 550

US 11,270,174 B2

17                                              18

Although the present invention has been described in conjunction with certain embodiments, it is to be understood that modifications and variations may be resorted to without departing from the spirit and scope of the invention as those skilled in the art readily understand. Such modifications and variations are considered to be within the scope of the invention and the appended claims.

What is claimed is:

1. A mobile phone comprising:
a memory to hold transaction data for use in a plurality of transactions;
a current carrying conductor capable of producing a time-varying magnetic field that represents the transaction data in the plurality of transactions;
a network interface for connecting the mobile phone to a network, wherein one or more parts of the transaction data are downloadable to the mobile phone via the network;
a driver to excite the current carrying conductor; and
a processor coupled to control the driver.

2. The mobile phone of claim 1 wherein the time-varying magnetic field represents a point-of-sale transaction.

3. The mobile phone of claim 1 wherein the time-varying magnetic field represents an access transaction.

4. The mobile phone of claim 1 wherein the time-varying magnetic field represents a credit card transaction.

5. The mobile phone of claim 1 wherein the time-varying magnetic field emulates a swipe of a magnetic card.

6. The mobile phone of claim 1 wherein the driver comprises a current driver.

7. The mobile phone of claim 1 wherein the network is one of a cellular network or a wireless local area network.

8. The mobile phone of claim 1 wherein downloaded transaction data is valid for a limited number of transactions and the one or more parts of the transaction data is downloaded periodically.

9. The mobile phone of claim 1, wherein the transaction data includes a transaction number used for each transaction of the plurality of transactions.

10. A mobile phone comprising:
a memory to hold transaction data for use in a plurality of transactions;
a conductor that when excited by a reversing polarity current produces a time-varying magnetic field that represents the transaction data in the plurality of transactions;
a network interface for connecting the mobile phone to a network, wherein one or more parts of the transaction data are downloadable to the mobile phone via the network;
a driver to excite the conductor; and
a processor coupled to control the driver.

11. The mobile phone of claim 10 wherein the time-varying magnetic field represents a point-of-sale transaction.

12. The mobile phone of claim 10 wherein the time-varying magnetic field represents an access transaction.

13. The mobile phone of claim 10 wherein the time-varying magnetic field represents a credit card transaction.

14. The mobile phone of claim 10 wherein the time-varying magnetic field emulates a swipe of a magnetic card.

15. The mobile phone of claim 10 wherein the driver comprises a current driver.

16. The mobile phone of claim 10 wherein the network is one of a cellular network or a wireless local area network.

17. The mobile phone of claim 10 wherein downloaded transaction data is valid for a limited number of transactions and the one or more parts of the transaction data is downloaded periodically.

18. The mobile phone of claim 10, wherein the transaction data includes a transaction number used for each transaction of the plurality of transactions.

19. A mobile phone comprising:
a memory to hold transaction data for use in a plurality of transactions;
a conductor that when excited by a reversing polarity current that varies in amplitude produces a time-varying magnetic field that represents the transaction data in the plurality of transactions;
a network interface for connecting the mobile phone to a network, wherein one or more parts of the transaction data are downloadable to the mobile phone via the network;
a driver to excite the conductor; and
a processor coupled to control the driver.

20. The mobile phone of claim 19 wherein the time-varying magnetic field represents a point-of-sale transaction.

21. The mobile phone of claim 19 wherein the time-varying magnetic field represents an access transaction.

22. The mobile phone of claim 19 wherein the time-varying magnetic field represents a credit card transaction.

23. The mobile phone of claim 19 wherein the time-varying magnetic field emulates a swipe of a magnetic card.

24. The mobile phone of claim 19 wherein the driver comprises a current driver.

25. The mobile phone of claim 19 wherein the network is one of a cellular network or a wireless local area network.

26. The mobile phone of claim 19 wherein downloaded transaction data is valid for a limited number of transactions and the one or more parts of the transaction data is downloaded periodically.

27. The mobile phone of claim 19, wherein the transaction data includes a transaction number used for each transaction of the plurality of transactions.

* * * * *

Exhibit 1
Page 403 of 550

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ICASHE INC.,

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Aaron R. Fahrenkrog, ROBINS KAPLAN LLP,
2800 LaSalle Plaza, 800 LaSalle Avenue,
Minneapolis, MN 55402, 612-349-8500

## DEFENDANTS

SAMSUNG ELECTRONICS CO., LTD., and
SAMSUNG ELECTRONICS AMERICA, INC.

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government Plaintiff
- [x] 3   Federal Question *(U.S. Government Not a Party)*
- [ ] 2   U.S. Government Defendant
- [ ] 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product / Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability / [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & / Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander / Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' / Product Liability | | [x] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability / [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine / Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product / Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability / **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability / [ ] 380 Other Personal | Act | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal / Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury / [ ] 385 Property Damage | Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - / Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate | Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ / Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations / [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - / [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment / **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other / [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education / [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | |
| | | Conditions of | | |
| | | Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. § 271
Brief description of cause:
Patent Infringement

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
6/6/2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Aaron R. Fahrenkrog w/permission Andrea L. Fair

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Exhibit 1
Page 404 of 550



Solutions    Use
Cases    Data Platform
(https://empower.rpxcorp.com/data_platform)(https://empower.rpxcorp...    Contact Us

‹ Back to News (/news/details?searchq=)

# iCashe Targets Samsung Pay

June 6, 2024

iCashe, Inc. (https://insight.rpxcorp.com/entity/9676948-icashe-incorporated) has sued **Samsung** (2:24-cv-00429 (https://insight.rpxcorp.com/litigation/txedce-230687-icashe-v-samsung-electronics#overview)) in a new Eastern District of Texas complaint, alleging infringement of seven patents—described in the complaint as covering "foundational technologies for contactless mobile payments"—through the provision of devices that support Samsung Pay, highlighting certain Galaxy 5G smartphones that allegedly "contain the **NXP** SN110U V3 NFC and Secure Element chip", as confirmed by an EMVCo certification letter excerpted in the complaint. At issue is the support for "NFC- and/or TVMF-based functionalities". Public records suggest that the plaintiff has received backing from a prominent litigation funder.

### Subscription Required

This content requires a subscription to view

Over 7,000 news articles covering new patent cases, key policy decisions, and USPTO assignments

Advanced custom alerts for campaigns and entities

Proprietary litigation timelines

Full access to Federal Circuit, PTAB, and ITC dockets

Judge, venue, and law firm analytics

Contact Us (/contact_us)    or    Login

## Market Sectors

E-Commerce and Software (/news/details?news_browser_controls[market_sector_ids][]=6)
Mobile Communications and Devices (/news/details?news_browser_controls[market_sector_ids][]=9)

## Related News

Q2 in Review: A Look at Funded Patent Campaigns Launched During the Quarter (/news/81810-q2-in-review-a-look-at-funded-patent-campaigns-launched-during-the-quarter)
July 5, 2024

Polaris PowerLED Sues Western Digital (/news/79190-polaris-powerled-sues-western-digital)
February 3, 2024

Backed by Third-Party Lit Funder, Polaris PowerLED Launches a Third Campaign (/news/75217-backed-by-third-party-lit-funder-polaris-powerled-launches-a-third-campaign)
May 18, 2023

Backed by Third-Party Lit Funder, New Delaware Plaintiff Sues Cadence (/news/74172-backed-by-third-party-lit-funder-new-delaware-plaintiff-sues-cadence)
March 8, 2023

MZ Audio Sciences Refiles Delaware Case Against Sony in the Central District of California (/news/69518-mz-audio-sciences-refiles-delaware-case-against-sony-in-the-central-district-of-california)
February 11, 2022

## Details

Exhibit 1
Page 405 of 550



**Capsaicin Kid <capsaicinkid@gmail.com>**

---

## Content older than one year will be deleted from your free workspace starting August 26th, 2024

---

**Slack** <no-reply@slack.com>                                        Tue, Aug 13, 2024 at 8:40 AM
Reply-To: no-reply@slack.com
To: capsaicinkid@gmail.com



# Content older than one year will be deleted starting August 26th, 2024

This is a notice that starting **August 26th, 2024**, messages and files older than one year will be deleted from your free workspace if you remain on the free Slack plan. To retain access to content older than a year, your workspace needs to be on a Slack paid plan. Slack plans can be reviewed on our plan page.

If your team chooses to upgrade to a paid plan after the policy goes into effect, you will not be able to recover any content that is deleted under our new policy.

**Slack's policy change for free workspaces**

We recently announced that we have changed our policy for free workspace message and file storage. Content in free workspaces—including messages, files, and other content—that is older than a year will be deleted. Free workspaces will continue to have full access to the past 90 days of message history and file storage.

This change does not impact workspaces on other Slack plans, such as Slack Pro.

**Questions?** Review our FAQs about this policy change and sign in to view all your workspaces.





Exhibit 1
Page 406 of 550

Our Blog   |   Policies   |   Help Center   |   Slack Community

©2024 Slack Technologies, LLC, a Salesforce company.
415 Mission Street, 3rd Floor, San Francisco, CA 94105

All rights reserved.

Exhibit 1
Page 407 of 550

 **Gmail**

Capsaicin Kid <capsaicinkid@gmail.com>

---

**Notice of Slack's new content deletion policy for free workspaces**

---

**Slack** <feedback@slack.com>                                      Thu, Jun 27, 2024 at 12:38 PM
Reply-To: feedback@slack.com
To: capsaicinkid@gmail.com



# Free workspace content older than one year will be deleted

We wanted to let you know about a change in policy for free workspaces.

**What is changing?**
Workspaces' data, including files, messages, and other content that is older than one year will no longer be stored. Free workspaces will continue to have full access to the past 90 days of message history and file storage. This change will not impact workspaces on other plans, such as Slack Pro.

**When will this take effect?**
This policy will begin taking effect August 26th, 2024. Workspaces will be notified prior to the policy impacting their workspace.

**What does this mean for you?**

Your workspace, **randomAwsTests** , is on a free Slack plan. This workspace has content that is older than one year which will be deleted once the policy takes effect. Moving forward, Slack will not retain messages and files older than one year for a workspace. This policy will impact your workspace starting August 26th, 2024.

To retain access to content older than a year, the workspace needs to be on a paid Slack plan. These plans can be reviewed on our plan page. Free teams will continue to retain access to messages and content sent in the last 90 days.

If your team chooses to upgrade to a paid plan after the policy goes into effect, you will not be able to recover any content that has been deleted under our new policy.

---

R        **randomAwsTests**
         Workspace URL:
         randomawstests.slack.com                         [ SIGN IN ]

Exhibit 1
Page 408 of 550

**Questions?** Review our FAQs about this policy change.

   

Our Blog   |   Policies   |   Help Center   |   Slack Community

©2024 Slack Technologies, LLC, a Salesforce company.
415 Mission Street, San Francisco, CA 94105

All rights reserved.

Exhibit 1
Page 409 of 550





**Corporate Headquarters**
5331 S Macadam Ave, Suite 251
Portland, OR 97239
503.226.3939

May 10, 2022

Dear Liam,

Thank you for interest in iCashe, Inc. (iCashe).  As a result of your internship and discussions, I am pleased to invite you to join the professional staff of iCashe as a Member of Technical Staff reporting to Vice President of Product Development.

The job description, complete terms and conditions of your offer and the company's confidentiality and proprietary rights agreement are attached to this letter. In return for your services, the Company will compensate you an annual salary of $69,000 in accordance with the company's regular payroll practices that occur once a month, including during the probationary period. You will also receive Health Insurance that will need to be created in anticipation of you joining. The program will be up by the time you join.

iCashe will also offer you a common stock option package of 10,000 options under the terms of our Employee Stock Ownership Plan, which will vest monthly over a period of four years (48 months), with cliff vesting starting with the month you relocate to Portland. For example, if you move to Portland on month 2, on the 2nd month you will receive vesting for both months 1 and 2 on month 2, with rest of the vesting completing by month 48. If there is any change of control all issued options will vest immediately as defined by the then company policy as approved by the Board. Your position is probationary until you relocate to Portland.

The terms of your employment and stock option grant are subject to Board approval.

If you decide to accept this offer (1) Please inform us no later than May 25, 2022 (2) Please sign the document on the relevant pages and initial all pages, confirming your understanding and acceptance and (3) Please confirm your start date of June 1, 2022 with move to Portland no later than the 15th of August 2022.

I hope you will be joining us, and I am confident that you will build a challenging, rewarding, and enjoyable career with us. Please do not hesitate to contact me at siva@iCashe.com if I can be assistance.

Yours Sincerely,

**Siva G. Narendra**
**President**
**iCashe, Inc.**

Exhibit 1
Page 410 of 550





# Job Description

## <u>Member of Technical Staff</u>

You will be responsible for assisting in the design, development, troubleshooting, and debugging of software and interface to hardware programs that results in our core product that includes consumer and partner apps, web services, databases, applications, tools, SaaS service, networks, point-of-sale infrastructure, API publication, technology documentation and technology partnerships.

As a member of technical staff of the software engineering division, you will take a role in the definition and evolution of standard practices and procedures to be reviewed by the company. You will be responsible for defining and developing software for tasks and interface to hardware associated with the developing, designing and debugging of software applications or operating systems to reviewed by the company.

Work is non-routine and very complex, involving the learning and applying of technical/business skills in area of specialization as well as interfacing with technical and nontechnical relationships.

iCashe is an Equal Employment Opportunity Employer. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, national origin, sexual orientation, gender identity, disability and protected veterans' status or any other characteristic protected by law.

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

Exhibit 1
Page 411 of 550





# Employment Terms and Conditions

## 1. DATE OF APPOINTMENT:

Your date of appointment is effective from the date of joining but not later than June 1st, 2022.

At the time of joining, we request you to furnish proof of your proof of citizenship and educational qualifications. By signing below, you acknowledge that there are no contractual restrictions with previous employers or otherwise that prevent you from accepting this offer and starting work on the date of joining.

## 2. COMPENSATION PACKAGE:
**The details of your compensation break-up are as follows:**

| | |
|---|---|
| Annual Salary | US$ 69,000 |
| Stock Options | 10,000 |
| Health Insurance | As per the company policy, the employee's insurance will be covered by the company. |

## 3. EMPLOYMENT AT WILL:

Your employment and compensation is terminable at-will, and may be terminated by iCashe at any time and for any reason whatsoever, with or without good cause at the option of either iCashe or yourself. No implied, oral, or written agreements contrary to the express language of this agreement are valid unless they are in writing and signed by an Executive Officer of the Company (Executive Officers are deemed to be the Company's President, CEO).

No supervisor or representative of the Company, other than an Executive Officer of the Company, has any authority to make any agreements contrary to the foregoing. This agreement is the entire agreement between the Company and the employee regarding the rights of the Company or employee to terminate employment with or without good cause, and this agreement takes the place of any and all prior and contemporaneous agreements, representations and understandings of the employee and the Company.

## 4. TRAVEL:

You may be required to undertake travel, including international, on Company work and you will be reimbursed travel expenses for this as per Company rules. Reimbursement for travel needs to be pre-approved by your reporting manager before the travel is planned.

## 5. TIMINGS:

Your normal working hours will be 40 hours per week during iCashe's office hours, which will be discussed at the time of hire. You are expected to work reasonable additional hours to meet your delivery schedules and when required by the business.

Given the time scheduling requirements for executing the responsibilities of this position, iCashe maintains a flexible personal time off policy based on meeting objectives of the position and appropriate planning and scheduling with your supervisor.

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

3

Exhibit 1
Page 412 of 550





You are entitled to two weeks paid time off (PTO Vacation and sick/personal days) per year plus the local public holidays that are approved by iCashe. Should additional days be required, you will be required to obtain written approval from your manager on a case-by-case basis.

**6. CONFIDENTIAL INFORMATION:**

You shall not during your employment with the Company or for 5 years thereafter divulge or disclose to any person whomsoever or make any use whatsoever for your own purpose or for any purpose other than that of the Company of any confidential information or knowledge obtained by you during your employment as to the business or affairs of the Company or its method as to any trade secret or secret processes of the Company and you shall during your employment also use your best endeavours to prevent any other person from doing so.

**7.      NON-COMPETITION,    CONFIDENTIALITY,    AND    PROPRIETARY    RIGHTS AGREEMENT:**

You agree to execute and be bound by the terms of the attached Non-competition, Confidentiality, and Proprietary Rights Agreement.

**8. RETIREMENT / TERMINATION / RESIGNATION:**

At the time of retirement / termination / resignation, you will immediately hand over to the company all hardware, software, correspondence, documentation, data, etc. belonging to the company or relating to its business and shall not make or retain any copies of these items.

We take this opportunity to wish you the very best in your tenure with iCashe!

Yours sincerely,

**Siva G. Narendra**
**President**
**iCashe, Inc.**

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

Exhibit 1
Page 413 of 550





Please indicate your acceptance of the above terms and conditions of employment by signing and returning the duplicate copy hereof.

NAME:     Liam Johnston

SIGNATURE WITH DATE: _____  May 24 2022

OFFICIAL JOINING DATE: __June 1, 2020_____

# NON-COMPETITION, CONFIDENTIALITY AND PROPRIETARY RIGHTS AGREEMENT

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

Exhibit 1
Page 414 of 550



I, the undersigned employee or consultant, enter into this Confidentiality and Proprietary Rights Agreement (Agreement) with iCashe, Inc., (Company) as of the date shown below.

Company has researched, compiled and developed certain proprietary data, including, but not limited to customer information, trade secrets, and other information which is not generally disclosed by Company to the public. In the course of my employment or consulting relationship with Company, I may acquire knowledge (both orally and in writing) relating to confidential affairs of the company and confidential or proprietary information. In consideration of my employment or consulting relationship, and Company 's time, effort and resources devoted to my training and briefing, and my access to Confidential Information (defined below) that will assist me in performing my job duties, I agree as follows:

**1.    Confidential Information.**  "Confidential Information" is proprietary data that has been researched, compiled, developed and/or maintained by Company, and which is not generally known within the industry.  Confidential Information includes, but is not limited to, information, ideas, knowledge, data, or know-how related to products, processes, software, designs, formulae, tests, research, business and/or marketing plans and strategies, costs, profits, pricing, personnel and financial information, capitalization and other corporate data and information, and information about or obtained from customers, authors, suppliers, consultants, licensees, or affiliates.  Confidential Information also includes information Company has received from third parties in confidence.

**(a)    Use and Disclosure Restrictions.**  I will not use or disclose Confidential Information, in any form, for any purpose, except in the course of and for the purposes of my employment or consulting relationship with Company.

**(b)    Ownership of Information.**  I will obtain no right, title or interest in the Confidential Information, or any related information or data.  The Confidential Information and related information shall remain the sole property of Company.

**(c)    Return of Information.**  I will return all Confidential Information, including all copies in any form, to Company immediately upon termination of my employment or consulting relationship with Company.

**2.    Return of Property.**  In the course of my employment or consulting relationship with Company, I may be provided with equipment, supplies, keys, credits cards, software, and other property for business use (collectively, "Company Property").  I will return all Company Property immediately upon termination of my employment or consulting relationship with Company, or otherwise immediately on Company's request.

**3.    Assignment of Inventions.**

**(a)    "Inventions"** means ideas, improvements, designs, authored works (whether software or other forms), or discoveries, whether or not patentable or copyrightable.

**(b)    "Covered Work"** means Inventions that I conceive (alone or with others) while employed by or consulting for Company, or that are developed in whole or in part on Company's time, or in whole or in part using Company's equipment, supplies, or facilities, or that depend for their effectiveness on, or incorporate, Confidential Information. An Invention I conceive or develop will be Covered Work whether or not my activities occur (i) on or off the premises, (ii) before, during or after working hours, or (iii) within or without the scope of work assigned to me.

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

Exhibit 1
Page 415 of 550




      **(c)**    **Assignment and Ownership of Covered Work.**  I hereby acknowledge that any Covered Work that I make or conceive (alone or with others) while I serve as a consultant (if applicable) shall be deemed work-made-for-hire and shall be owned by Company.  I hereby assign all right, title and interest in perpetuity to any Covered Works that I make or conceive (alone or with others) while I am employed by or serving as a consultant to Company.  This assignment will operate prospectively.  I will execute whatever documents are required to perfect the assignment, on request, even after I no longer work for Company.  Furthermore, I hereby waive any moral rights I may have to any Covered Works.

      **(d)**    **Exceptions.**  This Agreement does not apply to any Invention I made that predates my employment or consulting relationship with Company and which is identified on Exhibit A to this Agreement.  This Agreement also does not apply to any invention for which no equipment, supplies, facility, or trade secret information of Company was used and which was developed entirely on my own time, unless (i) the invention relates directly to the business of Company, or to Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work I performed for Company.

      **(e)**    **Cooperation.**  I will reveal promptly all information relating to Inventions and Covered Works to an appropriate officer of the Company, and will cooperate with Company to execute such documents as may be necessary if Company desires to seek copyright, patent or trademark protection relating to any Covered Work I conceive or develop.

    **4.**    **No Violation of Contract.**  My acceptance of an employment or consulting relationship with Company does not violate any contractual obligations I owe to any third party.  I will not use or disclose to Company confidential information or trade secrets of any third party without that party's consent.  I acknowledge that Company wishes me to abide strictly by the terms of valid and enforceable obligations I have to prior employers or clients, and that I am to inform an appropriate officer of the Company whenever I believe a task I am to perform for the Company would put my ability to abide by those obligations at risk.

    **5.**    **Employment.**  While I am employed by Company, I will devote my full time and attention to the transaction of Company's business.  Nothing in this Agreement creates an employment contract for a specific term or otherwise alters the at will nature of my employment with Company.  Either party may terminate the employment relationship at any time, for any reason, with or without prior notice.

    **6.**    **Conflict of Interest.**  While I am employed by or consulting for Company, I will not work, directly or indirectly, for any company which competes with Company, nor will I solicit Company customers, potential customers or contacts for the purpose of selling products or services for any person or entity other than Company.

    **7.**    **Non-solicitation.**  For one year after my employment or consulting relationship with Company terminates, regardless of the reason for termination, I will not (a) directly or indirectly solicit business from any person or entity which then is or was a Company customer, client or Prospect during the twelve (12) months prior to termination, (b) induce any such person or entity to cease or reduce their business relationship with Company; (c) induce any person to leave the employment of Company; or (d) directly or indirectly hire or use the services of any Company employee unless I obtain Company's written consent.  I will not aid others in doing anything I am prohibited from doing myself under this paragraph, whether as an employee, officer, director, shareholder, partner,

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

Exhibit 1
Page 416 of 550





consultant or otherwise. For purposes of this paragraph, the term "solicit" includes (i) responding to requests for proposals and invitations for bids, (ii) initiating contacts with customers, clients, or Prospects of Company for the purpose of advising them that I no longer am employed by or consulting for Company and am available for work which is competitive with the services offered by Company, and (iii) participating in joint ventures or acting as a consultant or subcontractor or employee of others who directly solicit business prohibited by this Agreement. The term "Company employee" includes any then current employee of Company or any person who has left the employ of Company within the then previous six (6) months. The terms "Company client" and "Company customer" include any parent corporation, subsidiary corporation, affiliate corporation or partner or joint venture of a client or customer. "Company Prospect" means any person or entity to whom Company has submitted a bid or proposal within the then immediately preceding six (6) months.

      **8.    Non-competition.**  For six months following termination of my employment for any reason, I will not directly or indirectly Compete (defined below) with Company anywhere Company is doing or planning to do business, nor will I engage in any other activity which would conflict with the Company's business, or interfere with my obligations to the Company. "Compete" means directly or indirectly:  (i) have any financial interest in, (ii) join, operate, control or participate in, or be connected as an officer, employee, agent, independent contractor, partner, principal or shareholder with (except as holder of not more than five percent (5%) of the outstanding stock of any class of a corporation, the stock of which is actively publicly traded) or (iii) provide services in any capacity to those participating in the ownership, management, operation or control of, and/or (iv) act as a consultant or subcontractor to, a Competitive Business (defined below). "Competitive Business" means any corporation, proprietorship, association or other entity or person engaged in the sale, production and/or development of products or the rendering of services of a kind similar to or competitive with that sold, produced, developed or rendered by Company as of the date my employment or consulting relationship terminates.

      **9.    Continuation of Obligations.**  Except to the extent this Agreement provides otherwise, the restrictions of and my obligations under this Agreement will continue after my employment or consulting relationship terminates, regardless of the reason for termination.

      **10.    Consent to Injunction.**  I acknowledge that Company would suffer irreparable harm for which monetary damages alone would not adequately compensate Company if I breached this Agreement. For that reason, I agree Company shall be entitled to injunctive relief to enjoin any breach or threatened breach of this Agreement, in addition to any other available remedies.

      **11.    Governing Law and Jurisdiction.**  This Agreement shall be interpreted and enforced in accordance with the laws in the State of Oregon. The exclusive jurisdiction for any action to interpret or enforce this Agreement shall be in the City of Portland, Oregon.

      **12.    Attorney Fees.**  In the event of any suit, action or arbitration to interpret or enforce this Agreement, the prevailing party shall be entitled to its attorney fees, costs, and out-of-pocket expenses, at trial and on appeal.

      **13.    Waiver.**  Company's failure to demand strict performance of any provision of this Agreement shall not constitute a waiver of any provision, term, covenant, or condition of this Agreement or the right to demand strict performance in the future.

      **14.    Successors and Assigns.**  This Agreement shall be binding upon my heirs, executors, administrators or other legal representatives and may be assigned and enforced by Company, its successors and assigns.

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

Exhibit 1
Page 417 of 550




**15.    Entire Agreement.**  This Agreement and any confidentiality, non-solicitation, and/or non-competition agreement I entered into with Company or any predecessor company acquired by or affiliated with Company, constitute the entire agreement of Company and me with respect to the subject matter of this Agreement.  Each of the rights, obligations and remedies provided for in these agreements shall be cumulative.

**16.    Severability and Enforcement.**  If any court of competent jurisdiction finds that any term or provision of this Agreement is unenforceable, that provision shall be modified as necessary to become enforceable to the fullest extent allowed by applicable law.  The unenforceability of any term or provision shall not affect the validity of the other provisions in this Agreement.

**17.    Opportunity for Review.**  I acknowledge that I have carefully read the foregoing Agreement, understand its contents, and signed it voluntarily.

**Name**

*Liam  Johnston*

Signature:_____

May 24 2022

Date:_____

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)

Exhibit 1
Page 418 of 550



# Exhibit A

List of Prior Inventions and Original Works of Authorship Excluded from Section 3

| **Title** | **Date** | **Identifying Number or Description** |
| --- | --- | --- |

☐ No inventions or improvements

☐ Additional sheets attached

Print Name:___Liam Johnston_____

Signature of Employee:___*Liam Johnston*_____

Date:___May 24 2022_____

Terms, Non-competition, Confidentiality and Proprietary Rights Agreement (iCashe, Inc.)







# Company Profile: Purs Payment Solutions

You can go from never having heard about us to securely completing your first transaction in 60 seconds.

Photo by Diana Thompson

 **Share**

by Ryan Herron

**OREGON**

While there's no denying that cash is king, sometimes the easiest transaction is tapping your phone and letting the

**Exhibit 1**
Page 420 of 550

merchant figure it out. However, for the last 10 years of quasi-legalization, we've been stuck shopping at the dispensary with whatever cash is left in our wallets. In that same time frame, we've seen so many payment solutions pop up for everything else that if I run into someone at the ATM at 3 p.m. on a Thursday, I just assume they're taking out cash to buy weed, too.

Chris Trummer didn't sit back while the Cannabis industry was treated like retail's awkward younger sibling. Weed is a billion-dollar business, and we should be able to pay for it like any other product or service. That's why he and his partners started Purs, which focuses on community-centric commerce and provides local businesses with payment solutions to help grow sales and cut costs. As Chris puts it, "Cannabis businesses don't like the card networks because they've neglected our industry, and Visa and MasterCard have publicly opposed Cannabis-related payments. So why should we work with them now?"

Purs has taken the Venmo-style peer-to-peer transaction model and set up a similar model between banks. Paying for your goodies is as seamless as possible:

Advertisement





Sign up for the Leaf Newsletter for the latest in Cannabis product reviews, news, and culture.

Email Address*

Email

First Name

Exhibit 1
Page 421 of 550

Snap a QR code, connect your account and you're good to go at any spot that takes Purs as payment. Chris adds proudly, "You can go from never having heard about us to securely completing your first transaction in 60 seconds." This sure beats the sort of cashless workaround we find at many dispensaries that hit you with multiple fees and sometimes have you leaving with an awkward amount of change and general confusion on why the clunky transaction was even necessary.

While the reality of a mostly-cash business hurts consumers, the cost to dispensaries is even higher. There's the added risk of handling and transporting cash, making them a target for theft, plus the inconvenience of transactions that slow down sales, frustrating both staff and customers. Not to mention, it's tough on customers who end up spending less per visit — not because they didn't want that pack of edibles, but to avoid the annoyance of extra fees. So, any way we can reduce that friction is great for consumers getting what they want, and if the small businesses we support are paying less in Visa or Mastercard fees, that's the elusive win/win/win.

First name

Last Name

Last name

SUBSCRIBE

Exhibit 1
Page 422 of 550

Outside the Cannabis industry, we've seen countless payment options emerge — from Affirm to Zelle — so why are we still stuck in the past? Purs is changing that by bringing together banks, tech and community to create a slick, easy way to handle Cannabis transactions. Long overdue. Nearly a decade after legalization, we're still paying with cold, hard cash like we did in the black market days. With Purs, we're finally normalizing Cannabis purchases, shaking off the stigma, and treating it like the billion-dollar industry it is.

**purs.digital**

---

**PHOTOS BY @DUDE.DIANA**

> This article was originally published in the October 2024 issue of Oregon Leaf.
>
> View our archive on issuu.

## RELATED ARTICLES

Exhibit 1
Page 423 of 550

**2025 Leaf Psychedelic Special: Killer Acid**

**Redefining Concentrates: Rebel Roots Farms**

**2025 Concentrate Special: Women Who Wash**

# Our Magazines

*NORTHWEST LEAF*

*MARYLAND LEAF*

*ALASKA LEAF*







*OREGON LEAF*

*CALIFORNIA LEAF*

*NORTHEAST LEAF*

Exhibit 1
Page 424 of 550




© 2025 New Leaf
Publishing Inc

Advertise
With Us

About
Us

Contact
Us

Privacy
Policy

Terms and
Conditions

By entering this website,
you are agreeing that you
are 21 years of age or
above, and agreeing to the
terms and conditions and
privacy policy

Exhibit 1
Page 425 of 550



An official website of the State of Oregon »

(http://www.oregon.gov)

## Financial institutions and professionals

(/business/licensing/financial)

(/)

🏠 (/Pages/index.aspx)  ›  Resources for businesses (/business/Pages/index.aspx)
> Licensing, charters, and applications (/business/licensing/Pages/index.aspx)
> Financial institutions and professionals (/business/licensing/financial/Pages/index.aspx)
> Money transmitter licensing

# Money transmitter licensing

---

| ☰ Site Navigation |
|---|

Businesses that want to provide money transmission services in Oregon must have a license with the division. Services include items such as electronic bill paying and wiring money within the U.S. and abroad.

Help for non-English speakers

If you need help translating the application and directions, call **503-378-4140** and a receptionist will connect you to an examiner who can help you complete your application.

Contact us

---

**503-947-7300**

DFR.NDP.Licensing@dcbs.oregon.gov (mailto:DFR.NDP.Licensing@dcbs.oregon.gov?subject=Money%20Transmitter%20Licensing)

Related links

---

| NMLS (http://mortgage.nationwidelicensingsystem.org/Pages/default.aspx) |
|---|
| Applications, forms, and reports (/business/licensing/financial/Pages/applications-forms-reports.aspx) |
| Laws and rules (/laws-rules/Pages/index.aspx) |

Exhibit 1
Page 426 of 550

# ow to apply

« An official website of the State of Oregon »

(http://www.oregon.gov)

Submit an application through the Nationwide Multistate Licensing System (NMLS). **The NMLS website (http://mortgage.nationwidelicensingsystem.org/Pages/default.aspx)** has instructions on how to submit an application for Oregon, or any other state. You can find **the checklist (http://mortgage.nationwidelicensingsystem.org/slr/Pages/DynamicLicenses.aspx?StateID=OR)** for an Oregon money transmitter license. NMLS has a **resources and support section** (http://mortgage.nationwidelicensingsystem.org/slr/resources/Pages/default.aspx) that may be helpful, particularly for first-time users.

An application for a money transmitter license must also include the following:

- Upload to NMLS a copy of the agreement and disclosures
- Provide through NMLS an electronic surety bond in the minimum amount of $25,000, plus $5,000 for each location that operates or will operate as a branch or agent of the company for Oregon transactions up to a maximum bond of $150,000.
- Upload in NMLS your last audited financial statements and your most recent unaudited financial statements showing a net worth of no less than $100,000, plus $25,000 for each location or authorized delegate
- Upload a description of your anti-money laundering compliance program.
- Upload proof of current business registration with the **Oregon Secretary of State** (http://sos.oregon.gov/Pages/index.aspx)
- Upload in NMLS the Criminal Background and Credit Check Authorization Form for each owner, partner, or manager of the business

When you are ready to submit your application, NMLS will collect the nonrefundable $1,000 application fee. For more detailed information, review **the checklist in NMLS (http://mortgage.nationwidelicensingsystem.org/slr/Pages/DynamicLicenses.aspx?StateID=OR)**.

All money transmitters must develop and implement an anti-money laundering compliance program as required by the USA Patriot Act, Section 352. The program, at the minimum, should include:

- Development of internal policies, procedures, and controls
- Designation of a compliance officer
- An ongoing employee training program
- An independent audit function to test programs
- Documented approval and review by your board and/or senior management.

## Offering check cashing services

If you are an Oregon-licensed money transmitter and want to offer check cashing services, you do not need to apply for a check cashing license. However, you still must comply with Oregon statutes regarding fee limits, fee posting requirements, recordkeeping, and other requirements as discussed in **ORS 697.500 to 697.555 (https://www.oregonlegislature.gov/bills_laws/ors/ors697.html)**. This exemption does not apply to your authorized delegates of licensed money transmitters. Authorized delegates must have a check cashing license to provide check cashing services.

Exhibit 1
Page 427 of 550

An official website of the State of Oregon »
(http://www.oregon.gov)

**Help us improve!** Was this page helpful?

Yes | No

# Connect with us

 Facebook (https://facebook.com/OregonDCBS)

 X (https://twitter.com/OregonDCBS)

 Youtube (https://www.youtube.com/channel/UCE60ENtsBO9E12jNmVl7R4w)

 Linkedin (https://www.linkedin.com/company/oregon-department-of-consumer-and-business-services/)

 Instagram (https://www.instagram.com/oregon_dcbs/)

# Links

Work for us (http://www.oregon.gov/DCBS/jobs/Pages/jobs.aspx)

Licensee search (/help/complaints-licenses/Pages/check-license.aspx)

News (/news/Pages/index.aspx)

Public record requests (/help/Pages/public-records.aspx)

Site map (/Pages/site-map.aspx)

Site help (/Pages/site-help.aspx)

Exhibit 1
Page 428 of 550

**Address**



website of the State of Oregon »
(http://www.oregon.gov)

**Street:**
350 Winter St. NE
Room 410
Salem, OR

**Mailing:**
PO Box 14480
Salem, OR 97309

Overnight delivery address (/Pages/contact-us.aspx)

# Contact

503-378-4140 (Salem)
**888-877-4894** (toll-free in Oregon)
503-947-7862 (fax)
Contact us (/Pages/contact-us.aspx)
About us (/Pages/about-us.aspx)

**DCBS** Department of Consumer and Business Services

(http://dcbs.oregon.gov/)

# About Oregon

Oregon.gov (https://www.oregon.gov)

State Employee Search (https://employeesearch.dasapp.oregon.gov)

Agencies Listing (https://www.oregon.gov/pages/a_to_z_listing.aspx)

Accessibility (https://www.oregon.gov/pages/accessibility.aspx)

Privacy Policy (https://www.oregon.gov/pages/terms-and-conditions.aspx)

Supported Browsers (https://www.oregon.gov/pages/supported-browsers.aspx)

Exhibit 1
Page 429 of 550

⌂ Back to Top

An official website of the State of Oregon »

(http://www.oregon.gov)

Exhibit 1
Page 430 of 550

To grant an exemption, the Commission must conclude that such exemption will not result in substantial reduction in competition or be detrimental to commerce. The Commission has stated that ''detriment to commerce'' must signify something other than ''substantial reduction in competition.'' [1] In order to determine whether either prong of this standard occurs, the Commission will examine the percent of cargo and number of twenty-foot equivalent units (TEUs) moving in the controlled carrier's U.S. trades under service contracts and tariffs. The Commission will also examine whether allowing the carrier to reduce tariff rates and charges with immediate effectiveness may allow it to compete more vigorously, especially when compared to any shortage of capacity or overcapacity that may be occurring in the shipping industry as a whole.

For the Commission to make a thorough evaluation of the exemption requested in the petition, interested parties are afforded an opportunity to participate through submission of written public comments. Comments must be received no later than the above stated date. The comments must be written and in English and submitted electronically through the Federal Rulemaking Portal at *www.regulations.gov.* To submit comments on that site, search for Docket No. FMC–2025–0008 and follow the instructions provided. A copy of the comment must also be served on the Petitioner's counsel, Cameron W. Roberts, Roberts & Kehagiaras LLP, at *cwr@tradeandcargo.com,* 210 Yacht Club, Redondo Beach, CA 90802.

The Commission will provide confidential treatment for identified confidential information to the extent allowed by law. If you would like to request confidential treatment, pursuant to 46 CFR 502.5, you must submit the following, by email, to *secretary@fmc.gov:*

• A transmittal letter that identifies the specific information in the comments for which protection is sought and demonstrates that the information is a trade secret or other confidential research, development, or commercial information.

• A confidential copy of your comments, consisting of the complete filing with a cover page marked ''Confidential-Restricted,'' and the confidential material clearly marked on each page.

• A public version of your comments with the confidential information excluded. The public version must state ''Public Version—confidential materials excluded'' on the cover page and on each affected page and must clearly indicate any information withheld.

Dated: May 6, 2025.

**David Eng,**
*Secretary.*

[FR Doc. 2025–08211 Filed 5–8–25; 8:45 am]

**BILLING CODE 6730–02–P**

---

## FEDERAL RESERVE SYSTEM

### Notice of Proposals To Engage in or To Acquire Companies Engaged in Permissible Nonbanking Activities

The companies listed in this notice have given notice under section 4 of the Bank Holding Company Act (12 U.S.C. 1843) (BHC Act) and Regulation Y, (12 CFR part 225) to engage de novo, or to acquire or control voting securities or assets of a company, including the companies listed below, that engages either directly or through a subsidiary or other company, in a nonbanking activity that is listed in § 225.28 of Regulation Y (12 CFR 225.28) or that the Board has determined by Order to be closely related to banking and permissible for bank holding companies. Unless otherwise noted, these activities will be conducted throughout the United States.

The public portions of the applications listed below, as well as other related filings required by the Board, if any, are available for immediate inspection at the Federal Reserve Bank(s) indicated below and at the offices of the Board of Governors. This information may also be obtained on an expedited basis, upon request, by contacting the appropriate Federal Reserve Bank and from the Board's Freedom of Information Office at *https://www.federalreserve.gov/foia/request.htm.* Interested persons may express their views in writing on the question whether the proposal complies with the standards of section 4 of the BHC Act.

Comments received are subject to public disclosure. In general, comments received will be made available without change and will not be modified to remove personal or business information including confidential, contact, or other identifying information. Comments should not include any information such as confidential information that would not be appropriate for public disclosure.

Unless otherwise noted, comments regarding the applications must be received at the Reserve Bank indicated or the offices of the Board of Governors, Ann E. Misback, Secretary of the Board, 20th Street and Constitution Avenue NW, Washington, DC 20551–0001, not later than May 27, 2025.

*A. Federal Reserve Bank of San Francisco:* (Mongkha Pavlick, Senior Vice President, Community and Regional Institution Supervision) 101 Market Street, San Francisco, California 94105–1579. Comments can also be sent electronically to *sf.fisc.comments.applications@sf.frb.org.*

1. *Lewis & Clark Bancorp, Oregon City, Oregon;* to acquire additional interests in iCache, Inc., Portland, Oregon, and thereby continue to indirectly engage in trust company functions, printing and selling MICR-encoded items, and data processing, pursuant to sections 225.28(b)(5), 225.28(b)(10)(ii), and 225.28(b)(14), respectively, all of the Board's Regulation Y.

Board of Governors of the Federal Reserve System.

**Michele Taylor Fennell,**
*Associate Secretary of the Board.*

[FR Doc. 2025–08188 Filed 5–8–25; 8:45 am]

**BILLING CODE 6210–01–P**

---

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The public portions of the applications listed below, as well as other related filings required by the Board, if any, are available for immediate inspection at the Federal Reserve Bank(s) indicated below and at the offices of the Board of Governors. This information may also be obtained on an expedited basis, upon request, by contacting the appropriate Federal

---

[1] *See* Petition No. P7–92, *Motor Vehicle Manufacturers Association of the United States, Inc. and Wallenius Lines, N.A.-Joint Application for Exemption from Certain Requirements of the Shipping Act of 1984 for Certain Limited Shipments of Passenger Vehicles,* 26 S.R.R. 1269 (FMC 1994) and Docket No. 05–05, *Non-Vessel-Operating Common Carrier Service Arrangements,* 30 S.R.R. 763 (FMC 2005).

Exhibit 1
Page 431 of 550



April 3, 2025

Oregon Division of Financial Regulation
Attention: Rod Craig

RE: Liam Johnston Complaint

To whom it may concern,

This letter is in response to a complaint that was filed by Liam Johnston on March 5, 2025, to the State of Oregon, Division of Financial Regulation. Lewis & Clark Bank received the letter by mail on or around March 17, 2025. The consumer complaint is specifically with iCashe, a payment gateway platform company, not controlled by Lewis & Clark Bank. Furthermore, Liam Johnston is not now, nor has he ever been, a customer of Lewis & Clark Bank.

Mr. Johnston alleges that iCashe is engaging in unsafe and unsound practices, not maintaining internal controls, compromising Bank Secrecy Act compliance, not testing application prior to money movement, and bypassing change management procedures. Given Lewis & Clark Bank does not control iCashe, we cannot legally or rightfully respond to the alleged complaint. We respectfully ask the consumer to refrain from associating Lewis & Clark Bank with iCashe and hope his grievances can be addressed through more appropriate channels.

Please reach out to me at (503) 212-3107 or jsumpter@lewisandclarkbank.com if you have any questions.

Sincerely,

Jeffrey Sumpter
President & Chief Executive Officer

15960 S. Agnes Ave
PO Box 1630 | Oregon City, OR 97045
503.212.3200

Exhibit 1
Page 432 of 550

archive.today
webpage capture

Saved from    https://www.purs.digital/                    search

no other snapshots from this url

All snapshots  from host  www.purs.digital

9 Jul 2025 16:35:43 UTC

Webpage    Screenshot    share    download .zip    report bug or abuse    Buy me a coffee

purs.

Pricing        About                    Log In    Get Started

# Simplify ordering.
# Boost loyalty.

Attach the Purs add-on to your POS, and enable a world-class ordering and payment experience for your customers.

🚀 Get Started

Exhibit 1
Page 433 of 550



Exhibit 1
Page 434 of 550

# "Transaction fees are a necessary evil."



## We disagree.

How is Purs different?

# Low-cost payments for *all* businesses.

Using bank-to-bank payment networks, we work directly with community-minded financial institutions to provide fast, low-cost payment solutions for all businesses.

Get Started



Exhibit 1
Page 435 of 550

# "But what does that mean for my business?"

Purs payments are bank-to-bank, which means the card networks are **not** involved. This means your business will save on transaction fees!

Start Saving Now

# "How do my customers Pay with Purs?"

There are two simple options:



Exhibit 1
Page 436 of 550

Scan to Pay

Mobile Ordering

# Scan to Pay.

in just a few simple steps.



Step 1

# Enter the amount.

Launch the Purs Pay Portal on any device - no app download required. Enter the amount to charge your customer.

Exhibit 1
Page 437 of 550



Step 2

# Show the QR code.

Show the QR code to your customer.

Exhibit 1
Page 438 of 550

Step 3

# Get paid.

Set tipping options. Want to charge service fees? You can. Your customers don't need to download any apps.

Although... they can earn reward points if they do. 🌟



# Mobile Ordering.

in just a few simple steps.

Note: mobile ordering is not available for cannabis businesses.

Exhibit 1
Page 439 of 550

Step 1

# Dine-in or takeout? Both.

Managing lots of waiters is tough and expensive. Mistakes happen. Decrease the burden on your team. Let your customers **order and pay** from their phone as soon as they sit down.

Auto-generate QR codes for your tables in 2 clicks.

Takeout ordering is available by default.



Exhibit 1
Page 440 of 550



Step 2

# View the menu.

Your customers can browse the items on your menu.

Exhibit 1
Page 441 of 550



Step 3

# Place the order.

When your customers "Pay with Purs", you save on transaction fees, and they earn reward points.

# Pricing that saves you money.





### Order & Pay

### Pay with Purs

Exhibit 1
Page 442 of 550

## Basic

for cafes and restaurants

### Free

mobile ordering

| Get Started |
|:---:|

for cafes and restaurants

### 1.9% + 10¢

per transaction

$49 monthly minimum

Get Started

for state-licensed cannabis
dispensaries

### 3% + 30¢

per transaction

$49 monthly minimum

Get Started

- ⊘ Order for takeout
- ⊘ Dine-in ordering (QR code on table)

- ⊘ All features included in Basic
- ⊘ "Pay with Purs" for mobile ordering
- ⊘ Scan to Pay (QR code payments)
- ⊘ Purs-sponsored reward points

- ⊘ Scan to Pay (QR code payments)
- ⊘ Purs-sponsored reward points

# purs.

**COMPANY**

Home

**ABOUT**

About Us

Privacy Policy

© 2021-2024 ICASHE AND PURS.DIGITAL. PATENTED AND PATENTS PENDING. ICASHE, PURS, AND PURS.DIGITAL ARE TRADEMARKS OF ICASHE. PURS IS AN ICASHE PRODUCT.

Exhibit 1



archive.today
webpage capture

Saved from    https://www.purs.digital/about

All snapshots    from host www.purs.digital

no other snapshots from this url

search

30 Jun 2025 17:39:50 UTC

Webpage    Screenshot

share    download .zip    report bug or abuse    Buy me a coffee



# purs.

Pricing          About                                    Log In        Get Started

# We're on a mission.

Hey there. 👋 Let us introduce ourselves. At Purs, we're on a mission.



Join Us

# Improving payments.



In the US, payments are slow, expensive, and patchy. Use your card for this. Write a check for that. Pay with cash over here. Wire transfer over there.

In 2023, the Federal Reserve launched **FedNow**. An ultra-low-cost, instant settlement payment solution.

Problem solved, right?

Wrong. Digital wallets, like Purs, need to be adopted by businesses and their customers before we will see the benefits of FedNow.

Exhibit 1
Page 444 of 550

# Improving the customer experience.

Faster, cheaper payments are better for businesses... but what about the customer? At Purs, we're focused on convenience.

Focusing on specific industries, we're building convenient **ordering and payment** experiences that encourage consumers to pay with settlement solutions, like FedNow, that are better for your business.

# Patented.

Our inventions allow us to provide frictionless user experiences with industry-leading security.

Inventions

Our inventions cover various topics ranging from enabling secure provisioning of payment credentials to frictionless usage of it for enabling commerce. Some of our inventions were conceived at tyfone, inc. and iCashe / Purs were spun out of tyfone in 2021. The following patents have been assigned to and are exclusively owned by iCashe for use in Purs!

Purs INSTORE products are covered by the following patents and pending patent applications:
**U.S. Patent Nos.:** 7581678, 7828214, 7954715, 7954716, 7954717, 7961101, 8072331, 8083145, 8091786, 8136732, 8231061, 8403219, 8410936, 8408463, 8451122, 8474718, 8573494, 8814053, 8866614, 8937549, 9117152, 9122965, 9390359, 9483722, 9489608, 9626611, 9904887, 10318855, 10607129, 10949726, 11270174. Other patents pending.

SIDETAP products are covered by the following patents and pending patent applications:
**U.S. Patent Nos.:** 7581678, 7828214, 7954715, 7954716, 7954717, 7961101, 8072331, 8083145, 8091786, 8136732, 8231061, 8403219, 8410936, 8408463, 8451122, 8474718, 8573494, 8814053, 8866614, 8937549, 9004361, 9117152, 9122965, 9390359, 9483722, 9489608, 9626611, 9904887, 10318855, 10607129, 10949726, 11270174. Other patents pending.

**Foreign Patents:** I336449, I420398, I421774, I433560, I467493, EP2681694B1, HR EP2681694B1, IE EP2681694B1, LU EP2681694B1, MC EP2681694B1, GB EP2681694B1, FR EP2681694B1, 602012008106.6, CH EP2681694B1, NL EP2681694B1, SE EP2681694B1, FI EP2681694B1, HU EP2681694B1, AT EP2681694B1, TR 2015 09414 T4, I509524, I511051, I534712, EP2927845B1, EP2966598B1, AT EP2927845B1, CH EP2927845B1, 602012022524.6, FI EP2927845B1, FR EP2927845B1, GB EP2927845B1, HR EP2927845B1, HU EP2927845B1, IE EP2927845B1, LU EP2927845B1, NL EP2927845B1, SE EP2927845B1, AT EP2966598B1, CH EP2966598B1, 602012022525.4, FI EP2966598B1, FR EP2966598B1, GB EP2966598B1, HR EP2966598B1, HU EP2966598B1, IE EP2966598B1, LU EP2966598B1, NL EP2966598B1, SE EP2966598B1, CN 103562937B, CN107092949B

Last updated: 5/13/22

Exhibit 1
Page 445 of 550

# Contact us.

(503) 445-9606 · info@purs.digital

Portland, OR

Send us a message 🚀



**COMPANY**

Home

**ABOUT**

About Us

Privacy Policy

© 2021-2024 ICASHE AND PURS.DIGITAL. PATENTED AND PATENTS PENDING. ICASHE, PURS, AND PURS.DIGITAL ARE TRADEMARKS OF ICASHE. PURS IS AN ICASHE PRODUCT.

Exhibit 1
Page 446 of 550

 **GOODWIN**

William E. Stern
+1 212 813 8890
wstern@goodwinlaw.com

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018

goodwinlaw.com
+1 212 813 8800

April 29, 2025

**VIA FEDEZ FILE**

Julie Stengle
Senior Manager
Federal Reserve Bank of San Francisco
101 Market Street
San Francisco, CA 94105

Re:    **Notification of Lewis & Clark Bancorp, Oregon City, Oregon, Pursuant to Section 4(c)(8)
and Section 4(j) of the Bank Holding Company Act of 1956, as amended, and Section
225.24 of Regulation Y, in Connection with an Investment in iCashe, Inc., Portland,
Oregon**

Dear Ms. Stengle:

On behalf of Lewis & Clark Bancorp (the "Company"), Oregon City, Oregon, a bank holding company
within the meaning of the Bank Holding Company Act of 1956, as amended (the "BHC Act"), I am
submitting a notification (the "Notification") pursuant to Section 4(c)(8) and Section 4(j) of the BHC Act
and Section 225.24 of Regulation Y of the Board of Governors of the Federal Reserve System with
respect to an investment made by the Company in iCashe, Inc. ("iCashe"), Portland, Oregon. As
explained in the Notification, the Company seeks to retain interests in iCashe and acquire additional
interests in iCashe representing, in the aggregate, 100% of the Series A-1 Preferred Stock of iCashe,
37.7% of the Series A-2 Preferred Stock of iCashe and 11.9% of the common stock of iCashe.

Please note that we have submitted certain materials in a separate file that contains a request for
confidential treatment.

We look forward to hearing from you and working with you on this matter. If you have any questions,
please do not hesitate to contact me at (212) 813-8890.

Sincerely,

William E. Stern

cc:    Jeffrey Sumpter
       Trey Maust

ACTIVE/137494456.1

Exhibit 1
Page 447 of 550

OMB Number 7100-0128
Approval expires December 31, 2027
Page 1 of 9

**Board of Governors of the Federal Reserve System**



# Parent Company Only Financial Statements for Small Holding Companies—FR Y-9SP

### Report at the close of business as of the last calendar day of June and December

This Report is required by law: Section 5(c) of the Bank Holding Company Act (12 U.S.C. § 1844) and Section 225.5(b) of Regulation Y (12 C.F.R. § 225.5(b)) and Section 10 of the Home Owners' Loan Act (12 U.S.C. § 1467a(b)).

This report form is to be filed by the parent company of small holding companies. For purposes of this report, small holding companies are holding companies that have total consolidated

assets of less than $3 billion, except holding companies that meet certain criteria to file the Consolidated Financial Statement for Holding Companies (FR Y-9C). When such holding companies are tiered holding companies, separate reports are also to be filed by each of the subsidiary holding companies. The Federal Reserve may not conduct or sponsor, and an organization (or a person) is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

NOTE: *The Parent Company Only Financial Statements for Small Holding Companies must be signed and attested by the Chief Financial Officer (CFO) of the reporting holding company (or by the individual performing this equivalent function).*

Date of Report: **December 31, 2024**

Month / Day / Year (BHSP 9999)

I, the undersigned CFO (or equivalent) of the named holding company, attest that the Parent Company Only Financial Statements for Small Holding Companies for this report date have been prepared in conformance with the instructions issued by the Federal Reserve System and are true and correct to the best of my knowledge and belief.

LEWIS & CLARK BANCORP

John A. Lende

Legal Title of Holding Company (RSSD 9017)

Printed Name of Chief Financial Officer (or Equivalent) (BHSP C490)

15960 S. AGNES AVENUE

Mailing Address of the Holding Company) Street / PO Box (RSSD 9110)

Signature of Chief Financial Officer (or Equivalent) (BHSP H321)

| OREGON CITY | OR | 97045 |
|---|---|---|
| City (RSSD 9130) | State (RSSD 9200) | Zip Code (RSSD 9220) |

03/05/2025

Date of Signature (MM/DD/YYYY) (BHSX J196)

Holding companies must maintain in their files a manually signed and attested printout of the data submitted.

Person to whom questions about this report should be directed:

John A. Lende, EVP/CFO

Name / Title (BHSX 8901)

5032123141

Area Code / Phone Number (BHSX 8902)

5032123199

Area Code / FAX Number (BHSX 9116)

jlende@lewisandclarkbank.com

E-mail Address of Contact (BHSX 4086)

**For Federal Reserve Bank Use Only**

RSSD ID _____

C.I. _____ S.F. _____

| | 0=No | BHSP | |
|---|---|---|---|
| Is confidential treatment requested for any portion of this report submission? ............. | 1=Yes | C447 | 0 |

In accordance with the General Instructions for this report (check only one),

1. a letter justifying this request is being provided along with the report (BHSP KY38)............................... ☐

2. a letter justifying this request has been provided separately (BHSP KY38)......................................... ☐

Public reporting burden for this information collection is estimated to vary from 1.5 to 8 hours per response, with an average of 5.4 hours per response, including time to gather and maintain data in the required form and to review instructions and complete the information collection. Comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing the burden, may be sent to Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, NW, Washington, DC 20551, and to the Office of Management and Budget, Paperwork Reduction Project (7100-0128), Washington, DC 20503.

Exhibit 1    12/2024
Page 448 of 550

# Chief Executive Officer Contact Information

This information is being requested so the Board can distribute notifications about policy initiatives and other matters directly to the Chief Executive Officers of reporting institutions. Please provide contact information for the Chief Executive Officer of the reporting institution. Enter "none" for the Chief Executive Officer's email address if not available. Chief Executive Officer contact information is for the confidential use of the Board and will not be released to the public.

## Chief Executive Officer

_____
Name (BHSP FT42)

_____
Area Code / Phone Number / Extension (BHSP FT43)

_____
E-mail Address (BHSP FT44)

Exhibit 1    12/2021
Page 449 of 550

Last Update: 20250306.080502    RSSD ID: 5491283

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 453 of 553

For Federal Reserve Bank Use Only    FR Y-9SP
Page 3 of 9
RSSD ID ____
C.I. ____    S.F. ____

LEWIS & CLARK BANCORP
Name of Holding Company

The Income Statement is to be reported on a calendar year-to-date basis
in thousands of dollars.

## Schedule SI—Income Statement

| | Dollar Amounts in Thousands | BHSP | Amount | |
|---|---|---|---|---|
| 1. Income from bank subsidiary(ies): | | | | |
| a. Dividends | | 0508 | 2,078 | 1.a. |
| b. Other income | | 2111 | 0 | 1.b. |
| 2. Income from nonbank subsidiary(ies):[1] | | | | |
| a. Dividends | | 0523 | 0 | 2.a. |
| b. Other income | | 0530 | 0 | 2.b. |
| 3. Income from subsidiary holding company(ies):[2] | | | | |
| a. Dividends | | 0206 | 0 | 3.a. |
| b. Other income | | 1283 | 0 | 3.b. |
| 4. Other income | | 0447 | 0 | 4. |
| 5. TOTAL OPERATING INCOME (sum of items 1, 2, 3, and 4) | | 4000 | 2,078 | 5. |
| 6. Interest expense | | 4073 | 445 | 6. |
| 7. Other expenses[3] | | 4093 | 488 | 7. |
| 8. TOTAL OPERATING EXPENSE (sum of items 6 and 7) | | 4130 | 933 | 8. |
| 9. a. Income (loss) before change in net unrealized holding gains (losses) on equity securities not held for trading, applicable income taxes, and discontinued operations (item 5 minus 8) | | HT69 | 1,145 | 9.a. |
| b. Change in net unrealized holding gains (losses) on equity securities not held for trading[4] | | HT70 | -175 | 9.b. |
| c. Income (loss) before applicable income taxes, discontinued operations and undistributed income (sum of items 9.a and 9.b) | | 4250 | 970 | 9.c. |
| 10. Applicable income taxes (benefits) (estimated) (see instructions) | | 4302 | -298 | 10. |
| 11. Discontinued operations, net of applicable income taxes | | FT28 | | 11. |
| 12. Income (loss) before undistributed income of subsidiary(ies) (sum of items 9.c and 11 minus 10) | | 0496 | 1,268 | 12. |
| 13. Equity in undistributed income (loss) of subsidiary(ies): (see instructions) | | | | |
| a. Bank subsidiary(ies) | | 3156 | -1,661 | 13.a. |
| b. Nonbank subsidiary(ies)[1] | | 2112 | 136 | 13.b. |
| c. Subsidiary holding company(ies)[2] | | 3513 | | 13.c. |
| 14. Net income (loss) (sum of items 12 and 13) | | 4340 | -257 | 14. |

### Memoranda

| | | | | |
|---|---|---|---|---|
| 1. Cash dividends *(or non-taxable distributions)* declared by the holding company to its shareholders | | 3158 | 80 | M.1. |

| | | | | | |
|---|---|---|---|---|---|
| 2. Does the reporting holding company have a Subchapter S election in effect for federal income tax purposes for the current tax year? (enter "1" for Yes; enter "0" for No) | 0=No 1=Yes | BHSP A530 | 0 | | M.2. |

| | | | | |
|---|---|---|---|---|
| 3. Interest expense paid to special-purpose subsidiaries that issued trust preferred securities (included in item 7 above) | | BHSP C254 | Amount 0 | M.3. |

*Memorandum item 4 is to be completed by holding companies that have elected to account for financial instruments or servicing assets and liabilities at fair value under a fair value option.*

| | | | | |
|---|---|---|---|---|
| 4. Net change in fair values of financial instruments accounted for under a fair value option | | J980 | 0 | M.4. |

*Memorandum item 5 is to be completed by top tier holding companies with the December 31 report date only.*

| | | | | |
|---|---|---|---|---|
| 5. Does your holding company have 100 or more full-time equivalent employees on a consolidated basis? (enter "1" for Yes; leave blank for No) | 1=Yes | BHSP MZ36 | | M.5. |

1. Leave blank if the reporting holding company does not own a nonbank subsidiary.
2. Leave blank if the reporting holding company does not own a subsidiary holding company.
3. Holding companies should report provisions for credit losses on all financial assets and off-balance-sheet credit exposures.
4. Item 9.b is to be completed by all holding companies. See the instructions for this item and the FR Y-9C Glossary entry for "Securities Activities" for further detail on accounting for investments in equity securities.

Exhibit 1    06/2024
Page 450 of 550

## Schedule SC—Balance Sheet

| | Dollar Amounts in Thousands | BHSP | Amount | |
|---|---|---|---|---|
| **Assets** | | | | |
| 1. | Cash and due from depository institutions: | | | |
| | a. Balances with subsidiary or affiliated depository institutions ................................ | 5993 | 845 | 1.a. |
| | b. Balances with unrelated depository institutions.............................................. | 0010 | 0 | 1.b. |
| 2. | Securities[1] .............................................................................................. | 0390 | 0 | 2. |
| 3. | Loans and lease financing receivables (exclusive of loans and lease financing receivables due from bank(s) and nonbank subsidiaries): | | | |
| | a. Loans and leases, held for investment and held for sale......... `2122` `0` | | | 3.a. |
| | b. LESS: Allowance for **credit losses on loans and leases**......... `3123` `0` | | | 3.b. |
| | c. Loans and leases, held for investment and held for sale, net of the allowance (item 3.a minus 3.b) ..... | 2723 | 0 | 3.c. |
| 4. | Investment in bank subsidiary(ies): (see instructions) | | | |
| | a. Equity investment ............................................................................ | 3239 | 36,901 | 4.a. |
| | b. Goodwill......................................................................................... | 3238 | 0 | 4.b. |
| | c. Loans and advances to and receivables due from bank subsidiary(ies) .................. | 3148 | 0 | 4.c. |
| 5. | Investment in nonbank subsidiary(ies): (see instructions)[2] | | | |
| | a. Equity investment.............................................................................. | 0088 | 292 | 5.a. |
| | b. Goodwill......................................................................................... | 0087 | 0 | 5.b. |
| | c. Loans and advances to and receivables due from nonbank subsidiary(ies) ............. | 0089 | 0 | 5.c. |
| 6. | Investment in subsidiary holding company(ies) (These items are to be completed only by companies that have subsidiary holding companies.):[3] | | | |
| | a. Equity investment.............................................................................. | 0201 | | 6.a. |
| | b. Goodwill......................................................................................... | 0202 | | 6.b. |
| | c. Loans and advances to and receivables due from subsidiary holding company(ies) ........ | 3523 | | 6.c. |
| 7. | Other assets[4]........................................................................................... | 0027 | 1,881 | 7. |
| 8. | Balances due from related nonbank companies (other than investments)[5]................. | 3620 | 0 | 8. |
| 9. | TOTAL ASSETS (sum of items 1 through 8)................................................... | 2170 | 39,919 | 9. |
| **Liabilities and Equity Capital** | | | | |
| 10. | Short-term borrowings: | | | |
| | a. Commercial paper............................................................................. | 2309 | 0 | 10.a. |
| | b. Other short-term borrowings................................................................ | 2724 | 0 | 10.b. |
| 11. | Long-term borrowings (includes limited-life preferred stock and related surplus) ........... | 3151 | 6,981 | 11. |
| 12. | Accrued interest payable (see instructions) ................................................... | 3166 | 105 | 12. |
| 13. | Other liabilities .................................................................................... | 3167 | 79 | 13. |
| 14. | Balances due to subsidiaries and related institutions: | | | |
| | a. Subsidiary bank(s) ............................................................................ | 3605 | 19 | 14.a. |
| | b. Nonbank subsidiaries and related institutions[2]........................................... | 3621 | 0 | 14.b. |
| 15. | Not applicable | | | |
| 16. | Equity capital: | | | |
| | a. Perpetual preferred stock (including related surplus) ................................... | 3283 | 0 | 16.a. |
| | b. Common stock (including related surplus)................................................ | 3230 | 36,255 | 16.b. |
| | c. Retained earnings ............................................................................. | 3247 | 2,597 | 16.c. |
| | d. Accumulated other comprehensive income[6]............................................. | B530 | -4,134 | 16.d. |
| | e. Other equity capital components[7]......................................................... | A130 | -1,983 | 16.e. |
| | f. Total equity capital (sum of items 16.a through 16.e) ................................... | 3210 | 32,735 | 16.f. |
| 17. | TOTAL LIABILITIES AND EQUITY CAPITAL (sum of items 10 through 14.b, and 16.f)......................... | 3300 | 39,919 | 17. |

1. Holding companies should report held-to-maturity securities in item 2 net of any applicable allowance for credit losses.
2. Leave blank if the reporting holding company does not own a nonbank subsidiary.
3. Leave blank if the reporting holding company does not own a subsidiary holding company.
4. Holding companies should report in item 7 amounts net of any applicable allowance for credit losses.
5. This item should be completed only by lower-tier holding companies. Lower-tier holding companies should leave this item blank if no related nonbank companies exist.
6. Includes net unrealized holding gains (losses) on available-for-sale securities, accumulated net gains (losses) on cash flow hedges, cumulative foreign currency translation adjustments, and minimum pension liability adjustments.
7. Includes treasury stock and unearned Employee Stock Ownership Plan shares.

Exhibit 1    06/2024
Page 451 of 550

## Schedule SC—Continued

*Memoranda (to be completed annually only by top-tier and single-tier holding companies for the December 31 report date)*

1. Has the holding company engaged in a full-scope independent external audit at any time during the calendar year? (enter "1" for Yes; enter "0" for No)...............................................................

| | 0=No | BHSP | |
|---|---|---|---|
| | 1=Yes | C884 | 1 |

M.1.

2. If response to Memorandum item 1 is yes, indicate below the name and address of the holding company's independent external auditing firm (see instructions), and the name and e-mail address of the auditing firm's engagement partner.[8]    M.2.

a.  Moss Adams
   (1) Name of External Auditing Firm (TEXT C703)

   Everett
   (2) City (TEXT C708)

   WA       98201
   (3) State Abbreviation (TEXT C714)   (4) Zip Code (TEXT C715)

b.  _____
   (1) Name of Engagement Partner (TEXT C704)

   _____
   (2) E-mail Address (TEXT C705)

*Memoranda items 3.a and 3.b are to be completed by holding companies that have elected to account for financial instruments or servicing assets and liabilities at fair value under a fair value option.*

3. Financial assets and liabilities measured at fair value:

| | Dollar Amounts in Thousands | BHSP | Amount | |
|---|---|---|---|---|
| a. Total assets ........................................................ | | F819 | 0 | M.3.a. |
| b. Total liabilities.................................................... | | F820 | 0 | M.3.b. |

_____

8. The Federal Reserve regards information submitted in response to Memorandum item 2.b. as confidential.

Exhibit 1    06/2024
Page 452 of 550

## Schedule SC-M—Memoranda

*Items 1 through 13 are to be completed by all holding companies filing the FR Y-9SP report.*

| | Dollar Amounts in Thousands | BHSP | Amount | |
|---|---|---|---|---|
| 1. Total *consolidated* assets of the holding company | | 8519 | 344,399 | M.1. |

| | Dollar Amounts in Thousands | BHSP | Amount | |
|---|---|---|---|---|
| 2. Holding company (parent company only) borrowings not held by financial institution(s) or by insiders (including directors) and their interests (included in balance sheet items 10 or 11 above) | | 3152 | 0 | M.2. |
| 3. Treasury stock (report only if the amount exceeds 5 percent of equity capital) included in item 16.f above | | 3153 | 1,983 | M.3. |
| 4. Amount of nonvoting equity capital, including related surplus (included in balance sheet items 16.a., 16.b., 16.c., and 16.d.) | | C702 | 0 | M.4. |
| 5. Total loans from parent holding company and nonbank subsidiary(ies) to insiders (excluding directors) and their interests | | 3155 | 0 | M.5. |
| 6. Pledged securities | | 0416 | 0 | M.6. |
| 7. a. Fair value of securities classified as available-for-sale (included in item 2 of the balance sheet) | | 8516 | 0 | M.7.a. |
|    b. Amortized cost of securities classified as held-to-maturity (included in item 2 of the balance sheet) | | 8517 | 0 | M.7.b. |
|    c. Fair value of equity securities with readily determinable fair values (included in item 2 of the balance sheet)[1] | | HT95 | 0 | M.7.c. |
| 8. a. Total off-balance-sheet activities conducted either directly or through a nonbank subsidiary | | F074 | 0 | M.8.a. |
|    b. Total debt and equity securities (other than trust preferred securities) outstanding that are registered with the Securities and Exchange Commission | | F075 | 0 | M.8.b. |
| 9. Balances held by the subsidiary bank(s) due from nonbank subsidiaries of the parent holding company[2] | | 6796 | 0 | M.9. |
| 10. Balances held by the subsidiary bank(s) due to nonbank subsidiaries of the parent holding company[2] | | 6797 | 0 | M.10. |
| 11. Other assets (*only report* amounts that exceed 25 percent of balance sheet, line item 7): | | | | |
|    a. Accounts receivable | | A024 | 0 | M.11.a. |
|    b. Income taxes receivable | | C256 | 72 | M.11.b. |
|    c. Premises and fixed assets | | 2145 | 0 | M.11.c. |
|    d. Net deferred tax assets | | 2148 | 0 | M.11.d. |
|    e. Cash surrender value of life insurance policies | | C009 | 0 | M.11.e. |
|    f. | TEXT 8520 | Investment in iCashe, Inc. | | |
| | | 8520 | 1,629 | M.11.f. |
|    g. | TEXT 8521 | | | |
| | | 8521 | | M.11.g. |
|    h. | TEXT 8522 | | | |
| | | 8522 | | M.11.h. |
| 12. Other liabilities (*only report* amounts that exceed 25 percent of balance sheet, line item 13): | | | | |
|    a. Accounts payable | | 3066 | 0 | M.12.a. |
|    b. Income taxes payable | | C257 | 0 | M.12.b. |
|    c. Dividends payable | | 2932 | 0 | M.12.c. |
|    d. Net deferred tax liabilities | | 3049 | 0 | M.12.d. |
|    e. | TEXT 8523 | Accrued expenses | | |
| | | 8523 | 79 | M.12.e. |
|    f. | TEXT 8524 | | | |
| | | 8524 | | M.12.f. |
|    g. | TEXT 8525 | | | |
| | | 8525 | | M.12.g. |
| 13. Notes payable to special-purpose subsidiaries that issued trust preferred securities (included in balance sheet, item 14.b)[3] | | C255 | 0 | M.13. |

1. Item 7.c is to be completed by all holding companies. See the instructions for this item and the FR Y-9C Glossary entry for "Securities Activities" for further detail on accounting for investments in equity securities.

2. Leave item blank if the reporting holding company does not own a nonbank subsidiary.

3. Leave item blank if the holding company does not own a subsidiary that issued trust preferred securities.

Exhibit 1   12/2021
Page 453 of 550

## Schedule SC-M—Continued

14. Have all changes in investments and activities been reported to the Federal Reserve on the Report of Changes in Organizational Structure (FR Y-10)? This item must be completed only by the top-tier holding company (and single-tier holding companies). The top-tier holding company must not leave blank or enter "N/A." Lower-tier holding companies should leave this item blank. The top-tier holding company *must enter "1" for Yes or for no changes to report; or enter "0" for No.*

| | | |
|---|---|---|
| 0=No | BHSP | |
| 1=Yes | 6416 | 1 |

*If the answer to this question is no, complete the FR Y-10* ................................................................ M.14.

| TEXT | John A. Lende | 5032123141 |
|---|---|---|
| 6428 | Name of holding company official verifying FR Y-10 reporting (Please type or print name) | Area Code / Phone Number (TEXT 9009) |

| | Dollar Amounts in Thousands | BHSP | Amount | |
|---|---|---|---|---|
| *Memoranda items 15 and 16 should only be completed by tiered holding companies:* | | | | |
| 15. Short-term borrowings included in balance sheet item 14.b: | | | | |
| a. From parent holding company[4] | | 3524 | | M.15.a. |
| b. From subsidiary holding company[5] | | 3526 | | M.15.b. |
| 16. Long-term borrowings included in balance sheet item 14.b: | | | | |
| a. From parent holding company[4] | | 3525 | | M.16.a |
| b. From subsidiary holding company[5] | | 3527 | | M.16.b. |

*Memorandum Item 17 is to be completed only by the top-tier holding company*
*(and single-tier holding companies) for its consolidated nonbank and thrift subsidiaries:[6, 7]*

| | BHSP | Amount | |
|---|---|---|---|
| 17. a. Total combined nonbank assets of nonbank subsidiaries | 4778 | 409 | M.17.a. |
| b. Total combined loans and leases of nonbank subsidiaries | C427 | 0 | M.17.b. |
| c. Total aggregate operating revenue of nonbank subsidiaries | C428 | 701 | M.17.c. |
| d. Combined thrift assets included in 17.a (to be completed by a bank holding company) | 2792 | 0 | M.17.d. |

| | Number (Unrounded) | | |
|---|---|---|---|
| e. Number of nonbank subsidiaries included in 17.a | 2794 | 1 | M.17.e. |
| f. Number of thrift subsidiaries included in 17.d (to be completed by a bank holding company) | 2796 | 0 | M.17.f. |

*The following two questions (items 18 and 19) will be used to determine if the reporting holding company must complete the Consolidated Holding Company Report of Equity Investments in Nonfinancial Companies (FR Y-12). In most cases, these questions are only applicable to the top-tier holding company (and single-tier holding company). See the line item instructions for further details.[7]*

18. Does the holding company hold, either directly or indirectly through a subsidiary or affiliate, any nonfinancial equity investments (see instructions for definition) within a Small Business Investment Company (SBIC) structure, or under section 4(c)(6) or 4(c)(7) of the Bank Holding Company Act, or pursuant to the merchant banking authority of section 4(k)(4)(H) of the Bank Holding Company Act, or pursuant to the investment authority granted by Regulation K? (enter "1" for Yes; enter "0" for No)

| | | |
|---|---|---|
| 0=No | BHSP | |
| 1=Yes | C161 | 1 |

M.18.

*If the answer to item 18 is no, your organization does not need to complete the FR Y-12. Skip item 19 and proceed to items 20.a. and 20.b. below. If the answer to item 18 is yes, proceed to item 19.*

19. Do your aggregate nonfinancial equity investments (see instructions for definition) equal or exceed (on an acquisition cost basis) 10 percent of the holding company's total capital as of the report date? (enter "1" for Yes; enter "0" for No)

| | | |
|---|---|---|
| 0=No | BHSP | |
| 1=Yes | C159 | 0 |

M.19.

*If the answer to both item 18 and item 19 is yes, your organization must complete the FR Y-12. Skip items 20.a. and 20.b., and proceed to item 21 below.*

*If the answer to either item 18 or item 19 is no, your organization does not need to complete the FR Y-12. Proceed to items 20.a. and 20.b. below.*

---

4. Leave item blank if the reporting holding company is the top-tier holding company.
5. Leave item blank if the reporting holding company does not have a lower-tier subsidiary holding company.
6. A savings and loan holding company should not include its consolidated savings association in items 17(a) through 17(f).
7. Leave item blank if the reporting holding company is a lower-tier holding company

Exhibit 1     12/2021
Page 454 of 550

## Schedule SC-M—Continued

*Items 20.a. and 20.b. are to be completed by all holding companies that are not required to file the FR Y-12.*

| | | BHSP | | |
|---|---|---|---|---|
| 20. a. Has the holding company sold or otherwise liquidated its holding of any nonfinancial equity investment since the previous reporting period? (enter "1" for Yes; enter "0" for No)..................... | 0=No 1=Yes | C700 | 0 | M.20.a. |
| b. Does the holding company manage any nonfinancial equity investments for the benefit of others? (enter "1" for Yes; enter "0" for No)................................................................................ | 0=No 1=Yes | C701 | 0 | M.20.b. |

Dollar Amounts in Thousands

*Memoranda items 21 and 22 are to be completed only by top-tier holding companies (and single-tier holding companies) who have made an effective election to become a financial holding company. See the line item instructions for further details.*

| | BHSP | Amount | |
|---|---|---|---|
| 21. Net assets of broker-dealer subsidiaries engaged in underwriting or dealing securities pursuant to Section 4(k)(4)(E) of the Bank Holding Company Act as amended by the Gramm-Leach-Bliley Act[8] ..... | C252 | | M.21. |
| 22. Net assets of subsidiaries engaged in insurance or reinsurance underwriting pursuant to Section 4(k)(4)(B) of the Bank Holding Company Act as amended by the Gramm-Leach-Bliley Act[8]............... | C253 | | M.22. |

*Memorandum item 23 is to be completed by all holding companies who have participated in the U.S. Department of Treasury Capital Purchase Program.*

| | BHSP | Amount | |
|---|---|---|---|
| 23. Issuances associated with the U.S. Department of Treasury Capital Purchase Program: | | | |
| a. Senior perpetual preferred stock or similar items ................................................................ | G234 | | M.23.a. |
| b. Warrants to purchase common stock or similar items................................................................ | G235 | | M.23.b. |

_____

8. Leave item blank if the reporting holding company is a lower-tier holding company

Exhibit 1    12/2021

Page 455 of 550

## Notes to the Parent Company Only Financial Statements

Enter in the lines provided below any additional information on specific line items on the financial statements that the holding company wishes to explain, that has been separately disclosed in the holding company's quarterly reports to its shareholders, in its press releases, or on its quarterly reports to the Securities and Exchange Commission (SEC).

Each additional piece of information disclosed should include the appropriate reference to schedule and item number, as well as a description of the additional information and the dollar amount (in thousands of dollars) associated with that disclosure.

### Example

A parent holding company has guaranteed a new loan for its leveraged Employee Stock Ownership Plan (ESOP) for $50 thousand and that amount has increased the parent company's long-term unsecured debt by a material amount. Enter on the line item below the following information:

| TEXT | | BHSP | Amount |
|---|---|---|---|
| 0000 | Balance Sheet, item 11, New loan to holding company's ESOP | | |
| | guaranteed by holding company parent | | |
| | | | 50 |

## Notes to the Financial Statements

| | TEXT | Dollar Amounts in Thousands | BHSP | Amount | |
|---|---|---|---|---|---|
| 1. | | Outstanding issuances of perpetual preferred stock associated with the U.S. Department of Treasury Community Development Capital Initiative (CDCI) program included in Schedule SC, item 16.a, Perpetual preferred stock including related surplus (for Subchapter S corporations, outstanding issuances of subordinated debt securities associated with CDCI included in Schedule SC, item 11, Long-term borrowings) | K141 | | 1. |
| 2. | 8527 | | | | |
| | | | 8527 | | 2. |
| 3. | 8528 | | | | |
| | | | 8528 | | 3. |
| 4. | 8529 | | | | |
| | | | 8529 | | 4. |
| 5. | 8530 | | | | |
| | | | 8530 | | 5. |

Exhibit 1    06/2018
Page 456 of 550

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**



# Consolidated Reports of Condition and Income for a Bank with Domestic Offices Only and Total Assets Less than $5 Billion - FFIEC 051

| | |
|---|---|
| Institution Name | **LEWIS & CLARK BANK** |
| City | **OREGON CITY** |
| State | **OR** |
| Zip Code | **97045** |
| Call Report Report Date | **12/31/2024** |
| Report Type | **051** |
| RSSD-ID | **3489071** |
| FDIC Certificate Number | **58428** |
| OCC Charter Number | **0** |
| ABA Routing Number | **123206972** |
| Last updated on | **1/27/2025** |

Exhibit 1
Page 457 of 550

**Federal Financial Institutions Examination Council**



## Consolidated Reports of Condition and Income for a Bank with Domestic Offices Only and Total Assets Less than $5 Billion - FFIEC 051

**Report at the close of business December 31, 2024**

This report is required by law: 12 U.S.C. §324 (State member banks); 12 U.S.C. §1817 (State non member banks); 12 U.S.C. §161 (National banks); and 12 U.S.C. §1464 (Savings associations).

(20241231)
(RCON 9999)
Unless the context indicates otherwise, the term "bank" in this report form refers to both banks and savings associations.

NOTE: Each bank's board of directors and senior management are responsible for establishing and maintaining an effective system of internal control, including controls over the Reports of Condition and Income. The Reports of Condition and Income are to be prepared in accordance with federal regulatory authority instructions. The Reports of Condition and Income must be signed by the Chief Financial Officer (CFO) of the reporting bank (or by the individual performing an equivalent function) and attested to by not less than two directors (trustees) for state non member banks and three directors for state member banks, national banks, and savings associations.

I, the undersigned CFO (or equivalent) of the named bank, attest that the Reports of Condition and Income (including the supporting schedules) for this report date have been prepared in conformance with the instructions issued by the appropriate Federal regulatory authority and are true and correct to the best of my knowledge and belief.

We, the undersigned directors (trustees), attest to the correctness of the Reports of Condition and Income (including the supporting schedules) for this report date and declare that the Reports of Condition and Income have been examined by us and to the best of our knowledge and belief have been prepared in conformance with the instructions issued by the appropriate Federal regulatory authority and are true and correct.

_____
Signature of Chief Financial Officer (or Equivalent)

_____
Date of Signature

_____
Director (Trustee)

_____
Director (Trustee)

_____
Director (Trustee)

**Submission of Reports**

Each bank must file its Reports of Condition and Income (Call Report) data by either:

(a) Using computer software to prepare its Call Report and then submitting the report data directly to the FFIEC's Central Data Repository (CDR), an Internet-based system for datacollection (https://cdr.ffiec.gov/cdr/), or

(b) Completing its Call Report in paper form and arranging with a software vendor or another party to convert the data in to the electronic format that can be processed by the CDR. The software vendor or other party then must electronically submit the bank's data file to the CDR.

For technical assistance with submissions to the CDR, please contact the CDR Help Desk by telephone at (888) CDR-3111, by fax at (703) 774-3946, or by e-mail at CDR.Help@cdr.ffiec.gov.

FDIC Certificate Number **58428** (RSSD 9050)

To fulfill the signature and attestation requirement for the Reports of Condition and Income for this report date, attach your bank's completed signature page (or a photocopy or a computer generated version of this page) to the hard-copy record of the data file submitted to the CDR that your bank must place in its files.

The appearance of your bank's hard-copy record of the submitted data file need not match exactly the appearance of the FFIEC's sample report forms, but should show at least the caption of each Call Report item and the reported amount.

**LEWIS & CLARK BANK**
Legal Title of Bank (RSSD 9017)

**OREGON CITY**
City (RSSD 9130)

**OR**                                                            **97045**
State Abbreviation (RSSD 9200)                    Zip Code (RSSD 9220)

The estimated average burden associated with this information collection is 50.4 hours per respondent and is estimated to vary from 20 to 775 hours per response, depending on individual circumstances. Burden estimates include the time for reviewing instructions, gathering and maintaining data in the required form, and completing the information collection, but exclude the time for compiling and maintaining business records in the normal course of a respondent's activities. A Federal agency may not conduct or sponsor, and an organization (or a person) is not required to respond to a collection of information, unless it displays a currently valid OMB control number. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503, and to one of the following: Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, NW, Washington, DC 20551; Legislative and Regulatory Analysis Division, Office of the Comptroller of the Currency, Washington, DC 20219; Assistant Executive Secretary, Federal Deposit Insurance Corporation, Washington, DC 20429.

Exhibit 1
Page 458 of 550

# Consolidated Reports of Condition and Income for a Bank with Domestic Offices Only and Total Assets Less than $5 Billion - FFIEC 051

## Table of Contents

Signature Page..................................................1

Table of Contents..............................................2

Contact Information for the Reports of Condition and Income..................................................3

USA PATRIOT Act Section 314(a) Anti-Money Laundering Contact Information............................4

Contact Information(Form Type - 051)....................5

Schedule RI - Income Statement(Form Type - 051).......................................................7

Schedule RI-A - Changes in Bank Equity Capital(Form Type - 051)..........................9

Schedule RI-B Part I - Charge-offs and Recoveries on Loans and Leases(Form Type - 051)..............10

Schedule RI-B Part II - Changes in Allowances for Credit Losses(Form Type - 051)...........................11

Schedule RI-C - Disaggregated Data on the Allowances for Credit Losses(Form Type - 051)......................................................12

Schedule RI-E - Explanations (Form Type - 051)......................................................13

Schedule RC - Balance Sheet(Form Type - 051)......................................................15

Schedule RC-B - Securities(Form Type - 051)...........17

Schedule RC-C Part I - Loans and Leases(Form Type - 051)......................................19

Schedule RC-C Part II - Loans to Small Businesses and Small Farms(Form Type - 051).....................23

Schedule RC-E - Deposit Liabilities(Form Type - 051)......................................................25

Schedule RC-F - Other Assets(Form Type - 051)......................................................28

Schedule RC-G - Other Liabilities(Form Type - 051)......................................................29

Schedule RC-K - Quarterly Averages(Form Type - 051)......................................................30

Schedule RC-L - Off-Balance Sheet Items(Form Type - 051)......................................................31

Schedule RC-M - Memoranda(Form Type - 051)......................................................33

Schedule RC-N - Past Due and Nonaccrual Loans Leases and Other Assets(Form Type - 051)......................................................36

Schedule RC-O - Other Data for Deposit Insurance and FICO Assessments(Form Type - 051)..........39

Schedule RC-R Part I - Regulatory Capital Components and Ratios(Form Type - 051).........41

Schedule RC-R Part II - Risk-Weighted Assets(Form Type - 051)......................................44

Schedule RC-T - Fiduciary and Related Services(Form Type - 051)...................................53

Schedule SU - Supplemental Information(Form Type - 051)......................................................56

Optional Narrative Statement Concerning the Amounts Reported in the Consolidated Reports of Condition and Income(Form Type - 051).........57

For information or assistance, national banks, state nonmember banks, and savings associations should contact the FDIC's Data Collection and Analysis Section, 550 17th Street, NW, Washington, DC 20429, toll free on (800) 688-FDIC(3342), Monday through Friday between 8:00 a.m. and 5:00 p.m., Eastern Time. State member banks should contact their Federal Reserve District Bank.

Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency
**Legend:** NR - Not Reported, CONF - Confidential

Exhibit 1
Page 459 of 550

## Contact Information for the Reports of Condition and Income

To facilitate communication between the Agencies and the bank concerning the Reports of Condition and Income, please provide contact information for (1) the Chief Financial Officer (or equivalent) of the bank signing the reports for this quarter, and (2) the person at the bank—other than the Chief Financial Officer (or equivalent)—to whom questions about the reports should be directed. If the Chief Financial Officer (or equivalent) is the primary contact for questions about the reports, please provide contact information for another person at the bank who will serve as a secondary contact for communications between the Agencies and the bank concerning the Reports of Condition and Income. Enter "none" for the contact's e-mail address or fax number if not available. Contact information for the Reports of Condition and Income is for the confidential use of the Agencies and will not be released to the public.

### Chief Financial Officer (or Equivalent) Signing the Reports

CONF
Name (TEXT C490)

CONF
Title (TEXT C491)

CONF
E-mail Address (TEXT C492)

CONF
Area Code / Phone Number / Extension (TEXT C493)

CONF
Area Code / FAX Number (TEXT C494)

### Other Person to Whom Questions about the Reports Should be Directed

CONF
Name (TEXT C495)

CONF
Title (TEXT C496)

CONF
E-mail Address (TEXT 4086)

CONF
Area Code / Phone Number / Extension (TEXT 8902)

CONF
Area Code / FAX Number (TEXT 9116)

### Primary Contact

CONF
Name (TEXT C366)

CONF
Title (TEXT C367)

CONF
E-mail Address (TEXT C368)

CONF
Area Code / Phone Number / Extension (TEXT C369)

CONF
Area Code / FAX Number (TEXT C370)

### Secondary Contact

CONF
Name (TEXT C371)

CONF
Title (TEXT C372)

CONF
E-mail Address (TEXT C373)

CONF
Area Code / Phone Number / Extension (TEXT C374)

CONF
Area Code / FAX Number (TEXT C375)

Exhibit 1
Page 460 of 550

## USA PATRIOT Act Section 314(a) Anti-Money Laundering

## Contact Information

This information is being requested to identify points-of-contact who are in charge of your bank's USA PATRIOT Act Section 314(a) information requests. Bank personnel listed could be contacted by law enforcement officers or the Financial Crimes Enforcement Network (FinCEN) for additional information related to specific Section 314(a) search requests or other anti-terrorist financing and anti- money laundering matters. Communications sent by FinCEN to the bank for purposes other than Section 314(a) notifications will state the intended purpose and should be directed to the appropriate bank personnel for review. Any disclosure of customer records to law enforcement officers or FinCEN must be done in compliance with applicable law, including the Right to Financial Privacy Act (12 U.S.C. 3401 et seq.).

Please provide information for a primary and secondary contact. Information for a third and fourth contact may be provided at the bank's option. Enter "none" for the contact's e-mail address if not available. This contact information is for the confidential use of the Agencies, FinCEN, and law enforcement officers and will not be released to the public.

### Primary Contact

CONF
Name (TEXT C437)

CONF
Title (TEXT C438)

CONF
E-mail Address (TEXT C439)

CONF
Area Code / Phone Number / Extension (TEXT C440)

### Secondary Contact

CONF
Name (TEXT C442)

CONF
Title (TEXT C443)

CONF
E-mail Address (TEXT C444)

CONF
Area Code / Phone Number / Extension (TEXT 8902)

### Third Contact

CONF
Name (TEXT C870)

CONF
Title (TEXT C871)

CONF
E-mail Address (TEXT C368)

CONF
Area Code / Phone Number / Extension (TEXT C873)

### Fourth Contact

CONF
Name (TEXT C875)

CONF
Title (TEXT C876)

CONF
E-mail Address (TEXT C877)

CONF
Area Code / Phone Number / Extension (TEXT C878)

Exhibit 1
Page 461 of 550

# Contact Information (Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Contact Information for the Reports of Condition and Income | | | 1. |
| a. Chief Financial Officer (or Equivalent) Signing the Reports | | | 1.a. |
| 1. Name | TEXTC490 | CONF | 1.a.1. |
| 2. Title | TEXTC491 | CONF | 1.a.2. |
| 3. E-mail Address | TEXTC492 | CONF | 1.a.3. |
| 4. Telephone | TEXTC493 | CONF | 1.a.4. |
| 5. FAX | TEXTC494 | CONF | 1.a.5. |
| b. Other Person to Whom Questions about the Reports Should be Directed | | | 1.b. |
| 1. Name | TEXTC495 | CONF | 1.b.1. |
| 2. Title | TEXTC496 | CONF | 1.b.2. |
| 3. E-mail Address | TEXT4086 | CONF | 1.b.3. |
| 4. Telephone | TEXT8902 | CONF | 1.b.4. |
| 5. FAX | TEXT9116 | CONF | 1.b.5. |
| 2. Person to whom questions about Schedule RC-T - Fiduciary and Related Services should be directed | | | 2. |
| a. Name and Title | TEXTB962 | CONF | 2.a. |
| b. E-mail Address | TEXTB926 | CONF | 2.b. |
| c. Telephone | TEXTB963 | CONF | 2.c. |
| d. FAX | TEXTB964 | CONF | 2.d. |
| 3. Emergency Contact Information | | | 3. |
| a. Primary Contact | | | 3.a. |
| 1. Name | TEXTC366 | CONF | 3.a.1. |
| 2. Title | TEXTC367 | CONF | 3.a.2. |
| 3. E-mail Address | TEXTC368 | CONF | 3.a.3. |
| 4. Telephone | TEXTC369 | CONF | 3.a.4. |
| 5. FAX | TEXTC370 | CONF | 3.a.5. |
| b. Secondary Contact | | | 3.b. |
| 1. Name | TEXTC371 | CONF | 3.b.1. |
| 2. Title | TEXTC372 | CONF | 3.b.2. |
| 3. E-mail Address | TEXTC373 | CONF | 3.b.3. |
| 4. Telephone | TEXTC374 | CONF | 3.b.4. |
| 5. FAX | TEXTC375 | CONF | 3.b.5. |
| 4. USA PATRIOT Act Section 314(a) Anti-Money Laundering Contact Information | | | 4. |
| a. Primary Contact | | | 4.a. |
| 1. Name | TEXTC437 | CONF | 4.a.1. |
| 2. Title | TEXTC438 | CONF | 4.a.2. |
| 3. E-mail Address | TEXTC439 | CONF | 4.a.3. |
| 4. Telephone | TEXTC440 | CONF | 4.a.4. |
| b. Secondary Contact | | | 4.b. |
| 1. Name | TEXTC442 | CONF | 4.b.1. |
| 2. Title | TEXTC443 | CONF | 4.b.2. |
| 3. E-mail Address | TEXTC444 | CONF | 4.b.3. |
| 4. Telephone | TEXTC445 | CONF | 4.b.4. |
| c. Third Contact | | | 4.c. |
| 1. Name | TEXTC870 | CONF | 4.c.1. |
| 2. Title | TEXTC871 | CONF | 4.c.2. |
| 3. E-mail Address | TEXTC872 | CONF | 4.c.3. |
| 4. Telephone | TEXTC873 | CONF | 4.c.4. |
| d. Fourth Contact | | | 4.d. |
| 1. Name | TEXTC875 | CONF | 4.d.1. |

Exhibit 1
Page 462 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR     Document 2     Filed 09/02/25     Page 466 of 553

FFIEC 051
Report Date 12/31/2024
6

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 2. Title............................................................ | TEXTC876 | **CONF** | 4.d.2. |
| 3. E-mail Address............................................ | TEXTC877 | **CONF** | 4.d.3. |
| 4. Telephone................................................... | TEXTC878 | **CONF** | 4.d.4. |
| 5. Chief Executive Officer Contact Information | | | 5. |
| a. Chief Executive Officer | | | 5.a. |
| 1. Name........................................................ | TEXTFT42 | **CONF** | 5.a.1. |
| 2. E-mail Address............................................ | TEXTFT44 | **CONF** | 5.a.2 |
| 3. Telephone................................................... | TEXTFT43 | **CONF** | 5.a.3. |
| 4. FAX............................................................ | TEXTFT45 | **CONF** | 5.a.4. |

Exhibit 1
Page 463 of 550

LEWIS & CLARK BANK
RSSD-ID 3489041
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 467 of 553

FFIEC 051
Report Date 12/31/2024
7

## Schedule RI - Income Statement(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Interest income: | | | 1. |
| a. Interest and fee income on loans: | | | 1.a. |
| 1. Loans secured by real estate: | | | 1.a.1. |
| a. Loans secured by 1-4 family residential properties. | RIAD4435 | 565 | 1.a.1.a. |
| b. All other loans secured by real estate. | RIAD4436 | 8,759 | 1.a.1.b. |
| 2. Commercial and industrial loans. | RIAD4012 | 1,229 | 1.a.2. |
| 3. Loans to individuals for household, family, and other personal expenditures: | | | 1.a.3. |
| a. Credit cards. | RIADB485 | 0 | 1.a.3.a. |
| b. Other (includes revolving credit plans other than credit cards, automobile loans, and other consumer loans). | RIADB486 | 87 | 1.a.3.b. |
| 4. Not applicable | | | 1.a.4. |
| 5. All other loans[1] | RIAD4058 | 0 | 1.a.5. |
| 6. Total interest and fee income on loans (sum of items 1.a.(1)(a) through 1.a.(5)). | RIAD4010 | 10,640 | 1.a.6. |
| b. Income from lease financing receivables. | RIAD4065 | 0 | 1.b. |
| c. Interest income on balances due from depository institutions[2]. | RIAD4115 | 2,237 | 1.c. |
| d. Interest and dividend income on securities: | | | 1.d. |
| 1. U.S. Treasury securities and U.S. Government agency obligations (excluding mortgage-backed securities). | RIADB488 | 1,106 | 1.d.1. |
| 2. Mortgage-backed securities. | RIADB489 | 2,498 | 1.d.2. |
| 3. All other securities (includes securities issued by states and political subdivisions in the U.S.). | RIAD4060 | 957 | 1.d.3. |
| e. Not applicable | | | 1.e. |
| f. Interest income on federal funds sold and securities purchased under agreements to resell. | RIAD4020 | 380 | 1.f. |
| g. Other interest income. | RIAD4518 | 28 | 1.g. |
| h. Total interest income (sum of items 1.a.(6) through 1.g). | RIAD4107 | 17,846 | 1.h. |
| 2. Interest expense: | | | 2. |
| a. Interest on deposits: | | | 2.a. |
| 1. Transaction accounts (interest-bearing demand deposits, NOW accounts, ATS accounts, and telephone and preauthorized transfer accounts). | RIAD4508 | 1,123 | 2.a.1. |
| 2. Nontransaction accounts: | | | 2.a.2. |
| a. Savings deposits (includes MMDAs). | RIAD0093 | 3,335 | 2.a.2.a. |
| b. Time deposits of $250,000 or less. | RIADHK03 | 290 | 2.a.2.b. |
| c. Time deposits of more than $250,000. | RIADHK04 | 119 | 2.a.2.c. |
| b. Expense of federal funds purchased and securities sold under agreements to repurchase. | RIAD4180 | 0 | 2.b. |
| c. Other interest expense. | RIADGW44 | 3,805 | 2.c. |
| d. Not applicable | | | 2.d. |
| e. Total interest expense (sum of items 2.a through 2.c). | RIAD4073 | 8,672 | 2.e. |
| 3. Net interest income (item 1.h minus 2.e). | RIAD4074 | 9,174 | 3. |
| 4. Provisions for credit losses[3]. | RIADJJ33 | 0 | 4. |
| 5. Noninterest income: | | | 5. |
| a. Income from fiduciary activities[2]. | RIAD4070 | 0 | 5.a. |
| b. Service charges on deposit accounts. | RIAD4080 | 81 | 5.b. |
| c. Not applicable | | | 5.c. |
| d. Income from securities-related and insurance activities: | | | 5.d. |
| 1. Fees and commissions from securities brokerage, investment banking, advisory, and underwriting activities. | RIADHT73 | 0 | 5.d.1. |
| 2. Income from insurance activities[3]. | RIADHT74 | 0 | 5.d.2. |

1. Includes interest and fee income on "Loans to depository institutions and acceptances of other banks," "Loans to finance agricultural production and other loans to farmers," "Obligations (other than securities and leases) of states and political subdivisions in the U.S.," and "Loans to nondepository financial institutions and other loans"
2. Includes interest income on time certificates of deposit not held for trading.
3. Institutions should report in item 4 the provisions for credit losses for all financial assets and off-balance-sheet credit exposures.
2. For banks required to complete Schedule RC-T, items 14 through 22, income from fiduciary activities reported in Schedule RI, item 5.a, must equal the amount reported in Schedule RC-T, item 22.
3. Includes underwriting income from insurance and reinsurance activities.

Exhibit 1
Page 464 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| e. Not applicable | | | 5.e. |
| f. Net servicing fees | RIADB492 | 8 | 5.f. |
| g. Not applicable | | | 5.g. |
| h. Not applicable | | | 5.h. |
| i. Net gains (losses) on sales of loans and leases | RIAD5416 | 0 | 5.i. |
| j. Net gains (losses) on sales of other real estate owned | RIAD5415 | 0 | 5.j. |
| k. Net gains (losses) on sales of other assets[3] | RIADB496 | 0 | 5.k. |
| l. Other noninterest income[*] | RIADB497 | 1,460 | 5.l. |
| m. Total noninterest income (sum of items 5.a through 5.l) | RIAD4079 | 1,549 | 5.m. |
| 6. Not available | | | 6. |
| a. Realized gains (losses) on held-to-maturity securities | RIAD3521 | 0 | 6.a. |
| b. Realized gains (losses) on available-for-sale debt securities | RIAD3196 | 0 | 6.b. |
| 7. Noninterest expense: | | | 7. |
| a. Salaries and employee benefits | RIAD4135 | 6,112 | 7.a. |
| b. Expenses of premises and fixed assets (net of rental income) (excluding salaries and employee benefits and mortgage interest) | RIAD4217 | 441 | 7.b. |
| c. Not available | | | 7.c. |
| 1. Goodwill impairment losses | RIADC216 | 0 | 7.c.1. |
| 2. Amortization expense and impairment losses for other intangible assets | RIADC232 | 0 | 7.c.2. |
| d. Other noninterest expense[*] | RIAD4092 | 3,710 | 7.d. |
| e. Total noninterest expense (sum of items 7.a through 7.d) | RIAD4093 | 10,263 | 7.e. |
| 8. Not available | | | 8. |
| a. Income (loss) before change in net unrealized holding gains (losses) on equity securities not held for trading, applicable income taxes, and discontinued operations (item 3 plus or minus items 4, 5.m, 6.a, 6.b, and 7.e) | RIADHT69 | 460 | 8.a. |
| b. Change in net unrealized holding gains (losses) on equity securities not held for trading[4] | RIADHT70 | 0 | 8.b. |
| c. Income (loss) before applicable income taxes and discontinued operations (sum of items 8.a and 8.b) | RIAD4301 | 460 | 8.c. |
| 9. Applicable income taxes (on item 8.c) | RIAD4302 | 43 | 9. |
| 10. Income (loss) before discontinued operations (item 8.c minus item 9) | RIAD4300 | 417 | 10. |
| 11. Discontinued operations, net of applicable income taxes[*] | RIADFT28 | 0 | 11. |
| 12. Net income (loss) attributable to bank and noncontrolling (minority) interests (sum of items 10 and 11) | RIADG104 | 417 | 12. |
| 13. LESS: Net income (loss) attributable to noncontrolling (minority) interests (if net income, report as a positive value; if net loss, report as a negative value) | RIADG103 | 0 | 13. |
| 14. Net income (loss) attributable to bank (item 12 minus item 13) | RIAD4340 | 417 | 14. |
| 1. Not applicable | | | M.1. |
| 2. Not applicable | | | M.2. |
| 3. Income on tax-exempt loans and leases to states and political subdivisions in the U.S. (included in Schedule RI, items 1.a and 1.b) | RIAD4313 | 0 | M.3. |
| 4. Income on tax-exempt securities issued by states and political subdivisions in the U.S. (included in Schedule RI, item 1.d.(3)) | RIAD4507 | 0 | M.4. |
| 5. Number of full-time equivalent employees at end of current period (round to nearest whole number) | RIAD4150 | 48 | M.5. |
| *Memorandum item 6 is to be completed by:*<br>*\* banks with $300 million or more in total assets, and*<br>*\* banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, Part I, item 3) exceeding 5 percent of total loans*<br>6. Interest and fee income on loans to finance agricultural production and other loans to farmers (included in Schedule RI, item 1.a.(5))[1] | RIAD4024 | 0 | M.6. |
| 7. If the reporting institution has applied pushdown accounting this calendar year, report the date of the institution's acquisition (see instructions)[2] | RIAD9106 | 00000000 | M.7. |
| 8. Not applicable | | | M.8. |

---

| | |
|---|---|
| 3. | Exclude net gains (losses) on sales of trading assets and held-to-maturity and available-for-sale debt securities. |
| *. | Describe on Schedule RI-E - Explanations. |
| *. | Describe on Schedule RI-E - Explanations. |
| 4. | Item 8.b is to be completed by all institutions. See the instructions for this item and the Glossary entry for "Securities Activities" for further detail on accounting for investments in equity securities. |
| *. | Describe on Schedule RI-E - Explanations. |
| 1. | The $300 million asset-size test and the 5 percent of total loans test are based on the total assets and total loans reported in the June 30, 2023, Report of Condition. |
| 2. | Report the date in YYYYMMDD format. For example, a bank acquired on March 1, 2024, would report 20240301. |

Exhibit 1
Page 465 of 550

LEWIS & CLARK BANK
RSSD-ID 3489647
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 469 of 553

FFIEC 051
Report Date 12/31/2024
9

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 9. Not applicable | | | M.9. |
| 10. Not applicable | | | M.10. |
| 11. Does the reporting bank have a Subchapter S election in effect for federal income tax purposes for the current tax year? | RIADA530 | No | M.11. |
| 12. Not applicable | | | M.12. |
| 13. Not applicable | | | M.13. |
| 14. Not applicable | | | M.14. |
| *Memorandum item 15 is to be completed annually in the December report only by institutions with $1 billion or more in total assets that answered "Yes" to Schedule RC-E, Memorandum item 5.* | | | M.15. |
| 15. Components of service charges on deposit accounts (sum of Memorandum items 15.a through 15.d must equal Schedule RI, item 5.b): | | | |
| a. Consumer overdraft-related service charges levied on those transaction account and nontransaction savings account deposit products intended primarily for individuals for personal, household, or family use | RIADH032 | NR | M.15.a. |
| b. Consumer account periodic maintenance charges levied on those transaction account and nontransaction savings account deposit products intended primarily for individuals for personal, household, or family use | RIADH033 | NR | M.15.b. |
| c. Consumer customer automated teller machine (ATM) fees levied on those transaction account and nontransaction savings account deposit products intended primarily for individuals for personal, household, or family use | RIADH034 | NR | M.15.c. |
| d. All other service charges on deposit accounts | RIADH035 | NR | M.15.d. |

## Schedule RI-A - Changes in Bank Equity Capital(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Total bank equity capital most recently reported for the December 31, 2023, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income) | RIAD3217 | 36,423 | 1. |
| 2. Cumulative effect of changes in accounting principles and corrections of material accounting errors[*] | RIADB507 | 0 | 2. |
| 3. Balance end of previous calendar year as restated (sum of items 1 and 2) | RIADB508 | 36,423 | 3. |
| 4. Net income (loss) attributable to bank (must equal Schedule RI, item 14) | RIAD4340 | 417 | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions) | RIADB509 | 0 | 5. |
| 6. Treasury stock transactions, net | RIADB510 | 0 | 6. |
| 7. Changes incident to business combinations, net | RIAD4356 | 0 | 7. |
| 8. LESS: Cash dividends declared on preferred stock | RIAD4470 | 0 | 8. |
| 9. LESS: Cash dividends declared on common stock | RIAD4460 | 2,078 | 9. |
| 10. Other comprehensive income[1] | RIADB511 | 2,139 | 10. |
| 11. Other transactions with stockholders (including a parent holding company) (not included in items 5, 6, 8, or 9 above)[*] | RIAD4415 | 0 | 11. |
| 12. Total bank equity capital end of current period (sum of items 3 through 11) (must equal Schedule RC, item 27.a) | RIAD3210 | 36,901 | 12. |

---

[*]. Describe on Schedule RI-E - Explanations.

[1]. Includes, but is not limited to, changes in net unrealized holding gains (losses) on available-for-sale debt securities, changes in accumulated net gains (losses) on cash flow hedges, and pension and other postretirement plan-related changes other than net periodic benefit cost.

[*]. Describe on Schedule RI-E - Explanations.

Exhibit 1
Page 466 of 550

LEWIS & CLARK BANK
RSSD-ID 3489477 Case 3:25-cv-01560-JR   Document 2   Filed 09/02/25   Page 470 of 553
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
10

# Schedule RI-B Part I - Charge-offs and Recoveries on Loans and Leases(Form Type - 051)

*Part I includes charge-offs and recoveries through the allocated transfer risk reserve.*

| Dollar amounts in thousands | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | 1. |
| a. Construction, land development, and other land loans: | | | | | 1.a. |
| 1. 1-4 family residential construction loans................................ | RIADC891 | 0 | RIADC892 | 0 | 1.a.1. |
| 2. Other construction loans and all land development and other land loans............ | RIADC893 | 0 | RIADC894 | 0 | 1.a.2. |
| b. Secured by farmland ................................................... | RIAD3584 | 0 | RIAD3585 | 0 | 1.b. |
| c. Secured by 1-4 family residential properties: | | | | | 1.c. |
| 1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit. | RIAD5411 | 0 | RIAD5412 | 0 | 1.c.1. |
| 2. Closed-end loans secured by 1-4 family residential properties: | | | | | 1.c.2. |
| a. Secured by first liens.......................................... | RIADC234 | 0 | RIADC217 | 0 | 1.c.2.a. |
| b. Secured by junior liens......................................... | RIADC235 | 0 | RIADC218 | 0 | 1.c.2.b. |
| d. Secured by multifamily (5 or more) residential properties.................... | RIAD3588 | 0 | RIAD3589 | 0 | 1.d. |
| e. Secured by nonfarm nonresidential properties: | | | | | 1.e. |
| 1. Loans secured by owner-occupied nonfarm nonresidential properties........... | RIADC895 | 0 | RIADC896 | 0 | 1.e.1. |
| 2. Loans secured by other nonfarm nonresidential properties.................. | RIADC897 | 0 | RIADC898 | 0 | 1.e.2. |
| 2. Not applicable | | | | | 2. |
| 3. Not applicable | | | | | 3. |
| 4. Commercial and industrial loans................................. | RIAD4638 | 129 | RIAD4608 | 17 | 4. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | 5. |
| a. Credit cards.............................................. | RIADB514 | 0 | RIADB515 | 0 | 5.a. |
| b. Automobile loans.......................................... | RIADK129 | 0 | RIADK133 | 0 | 5.b. |
| c. Other (includes revolving credit plans other than credit cards and other consumer loans)............ | RIADK205 | 0 | RIADK206 | 0 | 5.c. |
| 6. Not applicable | | | | | 6. |
| 7. All other loans[2]......................................... | RIAD4644 | 0 | RIAD4628 | 0 | 7. |
| 8. Lease financing receivables.................................. | RIAD4266 | 0 | RIAD4267 | 0 | 8. |
| 9. Total (sum of items 1 through 8).............................. | RIAD4635 | 129 | RIAD4605 | 17 | 9. |
| 1. Loans to finance commercial real estate, construction, and land development activities (not secured by real estate) included in Schedule RI-B, Part I, items 4 and 7, above........... | RIAD5409 | 0 | RIAD5410 | 0 | M.1. |
| 2. Not applicable | | | | | M.2. |
| *Memorandum item 3 are to be completed by:* *banks with $300 million or more in total assets, and* *banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, Part I, item 3) exceeding 5 percent of total loans* 3. Loans to finance agricultural production and other loans to farmers (included in Schedule RI-B, Part I, item 7, above)[2]............... | RIAD4655 | 0 | RIAD4665 | 0 | M.3. |

---

2.   Includes charge-offs and recoveries on "Loans to depository institutions and acceptances of other banks," "Loans to finance agricultural production and other loans to farmers," "Obligations (other than securities and leases) of states and political subdivisions in the U.S.," and "Loans to nondepository financial institutions and other loans."

2:   The $300 million asset-size test and the 5 percent of total loans test are based on the total assets and total loans reported on the June 30, 2023, Report of Condition.

Exhibit 1
Page 467 of 550

LEWIS & CLARK BANK
RSSD-ID 3489971
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 471 of 553

FFIEC 051
Report Date 12/31/2024
11

## Schedule RI-B Part II - Changes in Allowances for Credit Losses(Form Type - 051)

| Dollar amounts in thousands | (Column A) Loans and Leases Held for Investment | | (Column B) Held-to-maturity Debt Securities | | (Column C) Available-for-sale Debt Securities | | |
|---|---|---|---|---|---|---|---|
| 1. Balance most recently reported for the December 31, 2023, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income) | RIADB522 | 2,166 | RIADJH88 | 0 | RIADJH94 | 0 | 1. |
| 2. Recoveries (column A must equal Part I, item 9, column B, above) | RIAD4605 | 17 | RIADJH89 | 0 | RIADJH95 | 0 | 2. |
| 3. LESS: Charge-offs (column A must equal Part I, item 9, column A above less Schedule RI-B, Part II, item 4, column A). | RIADC079 | 129 | RIADJH92 | 0 | RIADJH98 | 0 | 3. |
| 4. LESS: Write-downs arising from transfers of financial assets | RIAD5523 | 0 | RIADJJ00 | 0 | RIADJJ01 | 0 | 4. |
| 5. Provisions for credit losses [1] | RIAD4230 | -17 | RIADJH90 | 0 | RIADJH96 | 0 | 5. |
| 6. Adjustments (see instructions for this schedule) [*] | RIADC233 | 0 | RIADJH91 | 0 | RIADJH97 | 0 | 6. |
| 7. Balance end of current period (sum of items 1, 2, 5, and 6, less items 3 and 4) (column A must equal Schedule RC, item 4.c) | RIAD3123 | 2,037 | RIADJH93 | 0 | RIADJH99 | 0 | 7. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Not applicable | | | M.1. |
| 2. Not applicable | | | M.2. |
| 3. Not applicable | | | M.3. |
| 4. Not applicable | | | M.4. |
| 5. Provisions for credit losses on other financial assets measured at amortized cost (not included in item 5, above) | RIADJJ02 | 0 | M.5. |
| 6. Allowance for credit losses on other financial assets measured at amortized cost (not included in item 7, above) | RCONJJ03 | 0 | M.6. |
| 7. Provisions for credit losses on off-balance-sheet credit exposures | RIADMG93 | 17 | M.7. |

---

[1]. The sum of item 5, columns A through C, plus Schedule RI-B, Part II, Memorandum items 5 and 7, below, must equal Schedule RI, item 4.

[*]. Describe on Schedule RI-E - Explanations.

Exhibit 1
Page 468 of 550

LEWIS & CLARK BANK
RSSD-ID 3489411
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 472 of 553

FFIEC 051
Report Date 12/31/2024
12

## Schedule RI-C - Disaggregated Data on the Allowances for Credit Losses(Form Type - 051)

*Items 1 through 6 are to be completed semiannually in the June and December reports only by institutions with $1 billion or more in total assets. The $1 billion asset size test is based on the total assets reported on the June 30, 2023, Report of Condition.*

| Dollar amounts in thousands | (Column A) Amortized Cost | | (Column B) Allowance Balance | | |
|---|---|---|---|---|---|
| 1. Real estate loans: | | | | | 1. |
| a. Construction loans | RCONJJ04 | NR | RCONJJ12 | NR | 1.a. |
| b. Commercial real estate loans | RCONJJ05 | NR | RCONJJ13 | NR | 1.b. |
| c. Residential real estate loans | RCONJJ06 | NR | RCONJJ14 | NR | 1.c. |
| 2. Commercial loans[2] | RCONJJ07 | NR | RCONJJ15 | NR | 2. |
| 3. Credit cards | RCONJJ08 | NR | RCONJJ16 | NR | 3. |
| 4. Other consumer loans | RCONJJ09 | NR | RCONJJ17 | NR | 4. |
| 5. Unallocated, if any | | | RCONJJ18 | NR | 5. |
| 6. Total (sum of items 1.a through 5)[3] | RCONJJ11 | NR | RCONJJ19 | NR | 6. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| *Items 7 through 11 are to be completed semiannually in the June and December reports only by institutions with $1 billion or more in total assets.* | | | |
| 7. Securities issued by states and political subdivisions in the U.S. | RCONJJ20 | NR | 7. |
| 8. Mortgage-backed securities (MBS) (including CMOs, REMICs, and stripped MBS) | RCONJJ21 | NR | 8. |
| 9. Asset-backed securities and structured financial products | RCONJJ23 | NR | 9. |
| 10. Other debt securities | RCONJJ24 | NR | 10. |
| 11. Total (sum of items 7 through 10)[4] | RCONJJ25 | NR | 11. |

---

2. Include all loans and leases not reported s real estate loans, credit cards, or other consumer loans in items 1, 3, or 4 of Schedule RI-C.

3. Item 6, column B, must equal Schedule RC, item 4.c.

4. Item 11 must equal Schedule RI-B, Part II, item 7, column B.

Exhibit 1
Page 469 of 550

# Schedule RI-E - Explanations (Form Type - 051)

*Schedule RI-E is to be completed each quarter on a calendar year-to-date basis, unless otherwise noted.*

*Detail all adjustments in Schedule RI-A and RI-B, all extraordinary items and other adjustments in Schedule RI, and all significant items of other noninterest income and other noninterest expense in Schedule RI. (See instructions for details.)*

*Items 1.a through 1.j and 2.a through 2.p are to be completed annually on a calendar year-to-date basis in the December report only.*

**Dollar amounts in thousands**

| | | | | |
|---|---|---|---|---|
| 1. Other noninterest income (from Schedule RI, item 5.l) Itemize and describe amounts greater than $100,000 that exceed 7 percent of Schedule RI, item 5.l: | | | | 1. |
| a. Income and fees from the printing and sale of checks | RIADC013 | | 0 | 1.a. |
| b. Earnings on/increase in value of cash surrender value of life insurance | RIADC014 | | 409 | 1.b. |
| c. Income and fees from automated teller machines (ATMs) | RIADC016 | | 0 | 1.c. |
| d. Rent and other income from other real estate owned | RIAD4042 | | 0 | 1.d. |
| e. Safe deposit box rent | RIADC015 | | 0 | 1.e. |
| f. Bank card and credit card interchange fees | RIADF555 | | 284 | 1.f. |
| g. Income and fees from wire transfers | RIADT047 | | 0 | 1.g. |
| h. Disclose component and the dollar amount of that component: | | | | 1.h. |
| (TEXT4461) NR | RIAD4461 | | 0 | 1.h.1. |
| i. Disclose component and the dollar amount of that component: | | | | 1.i. |
| (TEXT4462) NR | RIAD4462 | | 0 | 1.i.1. |
| j. Disclose component and the dollar amount of that component: | | | | 1.j. |
| (TEXT4463) NR | RIAD4463 | | 0 | 1.j.1. |
| 2. Other noninterest expense (from Schedule RI, item 7.d) Itemize and describe amounts greater than $100,000 that exceed 7 percent of Schedule RI, item 7.d: | | | | 2. |
| a. Data processing expenses | RIADC017 | | 796 | 2.a. |
| b. Advertising and marketing expenses | RIAD0497 | | 81 | 2.b. |
| c. Directors' fees | RIAD4136 | | 110 | 2.c. |
| d. Printing, stationery, and supplies | RIADC018 | | 0 | 2.d. |
| e. Postage | RIAD8403 | | 0 | 2.e. |
| f. Legal fees and expenses | RIAD4141 | | 311 | 2.f. |
| g. FDIC deposit insurance assessments | RIAD4146 | | CONF | 2.g. |
| h. Accounting and auditing expenses | RIADF556 | | 261 | 2.h. |
| i. Consulting and advisory expenses | RIADF557 | | 571 | 2.i. |
| j. Automated teller machine (ATM) and interchange expenses | RIADF558 | | 0 | 2.j. |
| k. Telecommunications expenses | RIADF559 | | 113 | 2.k. |
| l. Other real estate owned expenses | RIADY923 | | 0 | 2.l. |
| m. Insurance expenses (not included in employee expenses, premises and fixed asset expenses, and other real estate owned expenses) | RIADY924 | | 247 | 2.m. |
| n. Disclose component and the dollar amount of that component: | | | | 2.n. |
| (TEXT4464) Software license/maint. | RIAD4464 | | 269 | 2.n.1. |
| o. Disclose component and the dollar amount of that component: | | | | 2.o. |
| (TEXT4467) Dues and subscriptions | RIAD4467 | | 84 | 2.o.1. |
| p. Disclose component and the dollar amount of that component: | | | | 2.p. |
| (TEXT4468) NR | RIAD4468 | | 0 | 2.p.1. |
| 3. Discontinued operations and applicable income tax effect (from Schedule RI, item 11) (itemize and describe each discontinued operation): | | | | 3. |
| a. Disclose component, the gross dollar amount of that component, and its related income tax: | | | | 3.a. |
| (TEXTFT29) NR | RIADFT29 | | 0 | 3.a.1. |
| 3. Applicable income tax effect | RIADFT30 | | 0 | 3.a.3. |
| b. Disclose component, the gross dollar amount of that component, and its related income tax: | | | | 3.b. |
| (TEXTFT31) NR | RIADFT31 | | 0 | 3.b.1. |
| 3. Applicable income tax effect | RIADFT32 | | 0 | 3.b.3. |
| 4. Cumulative effect of changes in accounting principles and corrections of material accounting errors (from Schedule RI-A, item 2) (itemize and describe all such effects): | | | | 4. |
| a. Disclose component and the dollar amount of that component: | | | | 4.a. |

Exhibit 1
Page 470 of 550

LEWIS & CLARK BANK
RSSD-ID 3489671
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR     Document 2     Filed 09/02/25     Page 474 of 553

FFIEC 051
Report Date 12/31/2024
14

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| (TEXTB526) 0 | RIADB526 | 0 | 4.a.1. |
| b. Disclose component and the dollar amount of that component: | | | 4.b. |
| (TEXTB527) NR | RIADB527 | 0 | 4.b.1. |
| 5. Other transactions with stockholders (including a parent holding company) (from Schedule RI-A, item 11) (itemize and describe all such transactions): | | | 5. |
| a. Disclose component and the dollar amount of that component: | | | 5.a. |
| (TEXT4498) NR | RIAD4498 | 0 | 5.a.1. |
| b. Disclose component and the dollar amount of that component: | | | 5.b. |
| (TEXT4499) NR | RIAD4499 | 0 | 5.b.1. |
| 6. Adjustments to allowances for credit losses (from Schedule RI-B, Part II, item 6) (itemize and describe all adjustments): | | | 6. |
| a. Initial allowances for credit losses recognized upon the acquisition of purchased credit-deteriorated assets[1] | RIADJJ27 | 0 | 6.a. |
| b. Disclose component and the dollar amount of that component: | | | 6.b. |
| (TEXT4521) NR | RIAD4521 | 0 | 6.b.1. |
| c. Disclose component and the dollar amount of that component: | | | 6.c. |
| (TEXT4522) NR | RIAD4522 | 0 | 6.c.1. |
| 7. Other explanations (the space below is provided for the bank to briefly describe, at its option, any other significant items affecting the Report of Income): | | | 7. |
| a. Comments? | RIAD4769 | No | 7.a. |
| b. Other explanations (please type or print clearly; 750 character limit): | TEXT4769 | NR | 7.b. |

1. Institutions should report initial allowances for credit losses recognized upon the acquisition of purchased credit-deteriorated assets after the adoption of FASB ASC Topic 326.

Exhibit 1
Page 471 of 550

## Schedule RC - Balance Sheet(Form Type - 051)

*All schedules are to be reported in thousands of dollars. Unless otherwise indicated, report the amount outstanding as of the last business day of the quarter.*

### Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Cash and balances due from depository institutions: | | | 1. |
| a. Noninterest-bearing balances and currency and coin[1] | RCON0081 | 3,714 | 1.a. |
| b. Interest-bearing balances[2] | RCON0071 | 22,358 | 1.b. |
| 2. Securities: | | | 2. |
| a. Held-to-maturity securities (from Schedule RC-B, column A)[3] | RCONJJ34 | 0 | 2.a. |
| b. Available-for-sale debt securities (from Schedule RC-B, column D) | RCON1773 | 136,911 | 2.b. |
| c. Equity securities with readily determinable fair values not held for trading[4] | RCONJA22 | 0 | 2.c. |
| 3. Federal funds sold and securities purchased under agreements to resell: | | | 3. |
| a. Federal funds sold | RCONB987 | 2,181 | 3.a. |
| b. Securities purchased under agreements to resell[5] | RCONB989 | 0 | 3.b. |
| 4. Loans and lease financing receivables (from Schedule RC-C): | | | 4. |
| a. Loans and leases held for sale | RCON5369 | 0 | 4.a. |
| b. Loans and leases held for investment | RCONB528 | 151,614 | 4.b. |
| c. LESS: Allowance for credit losses on loans and leases | RCON3123 | 2,037 | 4.c. |
| d. Loans and leases held for investment, net of allowance (item 4.b minus 4.c) | RCONB529 | 149,577 | 4.d. |
| 5. Trading assets | RCON3545 | 0 | 5. |
| 6. Premises and fixed assets (including right-of-use assets) | RCON2145 | 6,655 | 6. |
| 7. Other real estate owned (from Schedule RC-M) | RCON2150 | 0 | 7. |
| 8. Investments in unconsolidated subsidiaries and associated companies | RCON2130 | 735 | 8. |
| 9. Direct and indirect investments in real estate ventures | RCON3656 | 0 | 9. |
| 10. Intangible assets (from Schedule RC-M) | RCON2143 | 616 | 10. |
| 11. Other assets (from Schedule RC-F)[6] | RCON2160 | 19,314 | 11. |
| 12. Total assets (sum of items 1 through 11) | RCON2170 | 342,061 | 12. |
| 13. Deposits: | | | 13. |
| a. In domestic offices (sum of totals of columns A and C from Schedule RC-E) | RCON2200 | 238,424 | 13.a. |
| 1. Noninterest-bearing[7] | RCON6631 | 61,761 | 13.a.1. |
| 2. Interest-bearing | RCON6636 | 176,663 | 13.a.2. |
| b. Not applicable | | | 13.b. |
| 14. Federal funds purchased and securities sold under agreements to repurchase: | | | 14. |
| a. Federal funds purchased[8] | RCONB993 | 0 | 14.a. |
| b. Securities sold under agreements to repurchase[9] | RCONB995 | 0 | 14.b. |
| 15. Trading liabilities | RCON3548 | 0 | 15. |
| 16. Other borrowed money (includes mortgage indebtedness) (from Schedule RC-M) | RCON3190 | 65,000 | 16. |
| 17. Not applicable | | | 17. |
| 18. Not applicable | | | 18. |
| 19. Subordinated notes and debentures[10] | RCON3200 | 0 | 19. |
| 20. Other liabilities (from Schedule RC-G) | RCON2930 | 1,736 | 20. |
| 21. Total liabilities (sum of items 13 through 20) | RCON2948 | 305,160 | 21. |
| 22. Not applicable | | | 22. |

1. Includes cash items in process of collection and unposted debits.
2. Includes time certificates of deposit not held for trading.
3. Institutions should report in item 2.a, amounts net of any applicable allowance for credit losses, and should equal to Schedule RC-B, item 8, column A less Schedule RI-B, Part II, item 7, column B.
4. Item 2.c is to be completed by all institutions. See the instructions for this item and the Glossary entry for "Securities Activities" for further detail on accounting for investments in equity securities.
5. Includes all securities resale agreements, regardless of maturity.
6. Institutions should report in items 3.b and 11 amounts net of any applicable allowance for credit losses.
7. Includes noninterest-bearing demand, time, and savings deposits.
8. Report overnight Federal Home Loan Bank advances in Schedule RC, item 16, "Other borrowed money."
9. Includes all securities repurchase agreements, regardless of maturity.
10. Includes limited-life preferred stock and related surplus.

Exhibit 1
Page 472 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 23. Perpetual preferred stock and related surplus........................................ | RCON3838 | 0 | 23. |
| 24. Common stock................................................................................ | RCON3230 | 24,744 | 24. |
| 25. Surplus (exclude all surplus related to preferred stock)........................ | RCON3839 | 6,816 | 25. |
| 26. Not available | | | 26. |
| a. Retained earnings........................................................................ | RCON3632 | 9,475 | 26.a. |
| b. Accumulated other comprehensive income[1]..................................... | RCONB530 | -4,134 | 26.b. |
| c. Other equity capital components[2]................................................... | RCONA130 | 0 | 26.c. |
| 27. Not available | | | 27. |
| a. Total bank equity capital (sum of items 23 through 26.c)...................... | RCON3210 | 36,901 | 27.a. |
| b. Noncontrolling (minority) interests in consolidated subsidiaries............. | RCON3000 | 0 | 27.b. |
| 28. Total equity capital (sum of items 27.a and 27.b)................................ | RCONG105 | 36,901 | 28. |
| 29. Total liabilities and equity capital (sum of items 21 and 28).................. | RCON3300 | 342,061 | 29. |

*To be reported with the March Report of Condition.*

1a = An integrated audit of the reporting institution's financial statements and its internal control over financial reporting conducted in accordance with the standards of the American Institute of Certified Public Accountants (AICPA) or the Public Company Accounting Oversight Board (PCAOB) by an independent public accountant that submits a report on the institution.

1b = An audit of the reporting institution's financial statements only conducted in accordance with the auditing standards of the AICPA or the PCAOB by an independent public accountant that submits a report on the institution.

2a = An integrated audit of the reporting institution's parent holding company's consolidated financial statements and its internal control over financial reporting conducted in accordance with the standards of the AICPA or the PCAOB by an independent public accountant that submits a report on the consolidated holding company (but not on the institution separately).

2b = An audit of the reporting institution's parent holding company's consolidated financial statements only conducted in accordance with the auditing standards of the AICPA or the PCAOB by an independent public accountant that submits a report on the consolidated holding company (but not on the institution separately).

3 = This number is not to be used.

4 = Directors' examination of the bank conducted in accordance with generally accepted auditing standards by a certified public accounting firm (may be required by state-chartering authority)

5 = Directors' examination of the bank performed by other external auditors (may be required by state-chartering authority)

6 = Review of the bank's financial statements by external auditors

7 = Compilation of the bank's financial statements by external auditors

8 = Other audit procedures (excluding tax preparation work)

9 = No external audit work

| | | | |
|---|---|---|---|
| 1. Indicate in the box at the right the number of the statement below that best describes the most comprehensive level of auditing work performed for the bank by independent external auditors as of any date during 2023............. | RCON6724 | NR | M.1. |

*To be reported with the March Report of Condition.*

| | | | |
|---|---|---|---|
| 2. Bank's fiscal year-end date (report the date in MMDD format)................ | RCON8678 | NR | M.2. |

---

[1].    Includes, but is not limited to, net unrealized holding gains (losses) on available-for-sale securities, accumulated net gains (losses) on cash flow hedges, and accumulated defined benefit pension and other postretirement plan adjustments.

[2].    Includes treasury stock and unearned Employee Stock Ownership Plan shares.

Exhibit 1
Page 473 of 550

LEWIS & CLARK BANK
RSSD-ID 3489087    Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 477 of 553
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
17

## Schedule RC-B - Securities(Form Type - 051)

*Exclude assets held for trading.*

| Dollar amounts in thousands | (Column A) Held-to-maturity Amortized Cost | | (Column B) Held-to-maturity Fair Value | | (Column C) Available-for-sale Amortized Cost | | (Column D) Available-for-sale Fair Value | | |
|---|---|---|---|---|---|---|---|---|---|
| 1. U.S. Treasury securities | RCON0211 | 0 | RCON0213 | 0 | RCON1286 | 59,804 | RCON1287 | 57,220 | 1. |
| 2. U.S. Government agency and sponsored agency obligations (exclude mortgage-backed securities)[1] | RCONHT50 | 0 | RCONHT51 | 0 | RCONHT52 | 24,770 | RCONHT53 | 22,708 | 2. |
| 3. Securities issued by states and political subdivisions in the U.S. | RCON8496 | 0 | RCON8497 | 0 | RCON8498 | 0 | RCON8499 | 0 | 3. |
| 4. Mortgage-backed securities (MBS): | | | | | | | | | 4. |
| a. Residential mortgage pass-through securities: | | | | | | | | | 4.a. |
| 1. Issued or guaranteed by FNMA, FHLMC, or GNMA.... | RCONHT54 | 0 | RCONHT55 | 0 | RCONHT56 | 6,459 | RCONHT57 | 5,545 | 4.a.1 |
| 2. Other pass-through securities | RCONG308 | 0 | RCONG309 | 0 | RCONG310 | 0 | RCONG311 | 0 | 4.a.2 |
| b. Other residential mortgage-backed securities (include CMOs, REMICs, and stripped MBS): | | | | | | | | | 4.b. |
| 1. Issued or guaranteed by U.S. Government agencies or sponsored agencies[1] | RCONG312 | 0 | RCONG313 | 0 | RCONG314 | 37,067 | RCONG315 | 37,071 | 4.b.1 |
| 2. Collateralized by MBS issued or guaranteed by U.S. Government agencies or sponsored agencies[1] | RCONG316 | 0 | RCONG317 | 0 | RCONG318 | 0 | RCONG319 | 0 | 4.b.2 |
| 3. All other residential MBS | RCONG320 | 0 | RCONG321 | 0 | RCONG322 | 594 | RCONG323 | 611 | 4.b.3 |
| c. Commercial MBS: | | | | | | | | | 4.c. |
| 1. Commercial mortgage pass-through securities: | | | | | | | | | 4.c.1 |
| a. Issued or guarenteed by FNMA, FHLMC, or GNMA.. | RCONK142 | 0 | RCONK143 | 0 | RCONK144 | 0 | RCONK145 | 0 | 4.c1.a |
| b. Other pass-through securities. | RCONK146 | 0 | RCONK147 | 0 | RCONK148 | 0 | RCONK149 | 0 | 4.c1.b |
| 2. Other commercial MBS: | | | | | | | | | 4.c.2 |
| a. Issued or guaranteed by U.S. Government agencies or sponsored agencies[1] | RCONK150 | 0 | RCONK151 | 0 | RCONK152 | 0 | RCONK153 | 0 | 4.c2.a |
| b. All other commercial MBS | RCONK154 | 0 | RCONK155 | 0 | RCONK156 | 0 | RCONK157 | 0 | 4.c2.b |
| 5. Asset-backed securities and structured financial products: | | | | | | | | | 5. |
| a. Asset-backed securities (ABS) | RCONC026 | 0 | RCONC988 | 0 | RCONC989 | 0 | RCONC027 | 0 | 5.a. |
| b. Structured financial products. | RCONHT58 | 0 | RCONHT59 | 0 | RCONHT60 | 12,380 | RCONHT61 | 12,380 | 5.b. |
| 6. Other debt securities: | | | | | | | | | 6. |
| a. Other domestic debt securities. | RCON1737 | 0 | RCON1738 | 0 | RCON1739 | 1,500 | RCON1741 | 1,376 | 6.a. |
| b. Other foreign debt securities. | RCON1742 | 0 | RCON1743 | 0 | RCON1744 | 0 | RCON1746 | 0 | 6.b. |
| 7. Unallocated portfolio layer fair value hedge basis adjustments[2] | | | | | RCONMG85 | NR | | | 7. |
| 8. Total (sum of items 1 through 7)[3] | RCON1754 | 0 | RCON1771 | 0 | RCON1772 | 142,574 | RCON1773 | 136,911 | 8. |

Exhibit 1
Page 474 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Pledged securities[1] | RCON0416 | 94,291 | M.1. |
| 2. Maturity and repricing data for debt securities (excluding those in nonaccrual status):[1] | | | M.2. |
| a. Securities issued by the U.S. Treasury, U.S. Government agencies, and states and political subdivisions in the U.S.; other non-mortgage debt securities; and mortgage pass-through securities other than those backed by closed-end first lien 1-4 family residential mortgages with a remaining maturity or next repricing date of:[2] | | | M.2.a. |
| 1. Three months or less | RCONA549 | 2,946 | M.2.a.1. |
| 2. Over three months through 12 months | RCONA550 | 30,298 | M.2.a.2. |
| 3. Over one year through three years | RCONA551 | 42,103 | M.2.a.3. |
| 4. Over three years through five years | RCONA552 | 1,694 | M.2.a.4. |
| 5. Over five years through 15 years | RCONA553 | 16,643 | M.2.a.5. |
| 6. Over 15 years | RCONA554 | 0 | M.2.a.6. |
| b. Mortgage pass-through securities backed by closed-end first lien 1-4 family residential mortgages with a remaining maturity or next repricing date of:[2] | | | M.2.b. |
| 1. Three months or less | RCONA555 | 0 | M.2.b.1. |
| 2. Over three months through 12 months | RCONA556 | 0 | M.2.b.2. |
| 3. Over one year through three years | RCONA557 | 0 | M.2.b.3. |
| 4. Over three years through five years | RCONA558 | 0 | M.2.b.4. |
| 5. Over five years through 15 years | RCONA559 | 5,545 | M.2.b.5. |
| 6. Over 15 years | RCONA560 | 0 | M.2.b.6. |
| c. Other mortgage-backed securities (include CMOs, REMICs, and stripped MBS; exclude mortgage pass-through securities) with an expected average life of:[5] | | | M.2.c. |
| 1. Three years or less | RCONA561 | 3,190 | M.2.c.1. |
| 2. Over three years | RCONA562 | 34,493 | M.2.c.2. |
| d. Debt securities with a REMAINING MATURITY of one year or less (included in Memorandum items 2.a through 2.c above) | RCONA248 | 0 | M.2.d. |
| Memorandum item 3 is to be completed semiannually in the June and December reports only. | | | |
| 3. Amortized cost of held-to-maturity securities sold or transferred to available-for-sale or trading securities during the calendar year-to-date (report the amortized cost at date of sale or transfer) | RCON1778 | 0 | M.3. |
| 4. Structured notes (included in the held-to-maturity and available-for-sale accounts in Schedule RC-B, items 2, 3, 5, and 6): | | | M.4. |
| a. Amortized cost | RCON8782 | 1,850 | M.4.a. |
| b. Fair value | RCON8783 | 1,694 | M.4.b. |
| 5. Not applicable | | | M.5. |
| 6. Not applicable | | | M.6. |

Dollar amounts in thousands

| | (Column A) Held-to-maturity Amortized Cost | | (Column B) Held-to-maturity Fair Value | | (Column C) Available-for-sale Amortized Cost | | (Column D) Available-for-sale Fair Value | | |
|---|---|---|---|---|---|---|---|---|---|
| 7. Guaranteed by U.S. Government agencies or sponsored agencies included in Schedule RC-B, item 5.b. | RCONPU98 | 0 | RCONPU99 | 0 | RCONPV00 | 0 | RCONPV01 | 0 | M.7. |

1. Includes Small Business Administration "Guaranteed Loan Pool Certificates"; U.S. Maritime Administration obligations; Export-Import Bank participation certificates; and obligations (other than mortgage-backed securities) issued by the Farm Credit System, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the Financing Corporation, Resolution Funding Corporation, the Student Loan Marketing Association, and the Tennessee Valley Authority.

1. U.S. Government agencies include, but are not limited to, such agencies as the Government National Mortgage Association (GNMA), the Federal Deposit Insurance Corporation (FDIC), and the National Credit Union Administration (NCUA). U.S. Government-sponsored agencies include, but are not limited to, such agencies as the Federal Home Loan Mortgage Corporation (FHLMC) and the Federal National Mortgage Association (FNMA).

1. U.S. Government agencies include, but are not limited to, such agencies as the Government National Mortgage Association (GNMA), the Federal Deposit Insurance Corporation (FDIC), and the National Credit Union Administration (NCUA). U.S. Government-sponsored agencies include, but are not limited to, such agencies as the Federal Home Loan Mortgage Corporation (FHLMC) and the Federal National Mortgage Association (FNMA).

2. This item is to be completed by institutions that have adopted ASU 2022-01, as applicable.

3. The total reported in column A must equal Schedule RC, item 2.a, plus Schedule RI-B, Part II, item 7, column B. The total reported in column D must equal Schedule RC, item 2.b.

1. Includes held-to-maturity securities at amortized cost, available-for-sale debt securities at fair value, and equity securities with readily determinable fair values not held for trading (reported in Schedule RC, item 2.c) at fair value.

1. Includes held-to-maturity securities at amortized cost, available-for-sale debt securities at fair value, and equity securities with readily determinable fair values not held for trading (reported in Schedule RC, item 2.c) at fair value.

2. Report fixed-rate debt securities by remaining maturity and floating-rate debt securities by next repricing date.

2. Report fixed-rate debt securities by remaining maturity and floating-rate debt securities by next repricing date.

5. Sum of Memorandum items 2.c.(1) and 2.c.(2) plus any nonaccrual "Other mortgage-backed securities" included in Schedule RC-N, item 10, column C, must equal Schedule RC-B, sum of items 4.b and 4.c.(2), columns A and D.

Exhibit 1
Page 475 of 550

LEWIS & CLARK BANK
RSSD-ID 3489.... Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 479 of 553
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
19

## Schedule RC-C Part I - Loans and Leases(Form Type - 051)

*Do not deduct the allowance for credit losses on loans and leases or the allocated transfer risk reserve from amounts reported in this schedule. Report (1) loans and leases held for sale at the lower of cost or fair value, (2) loans and leases held for investment, net of unearned income, and (3) loans and leases accounted for at fair value under a fair value option. Exclude assets held for trading and commercial paper.*

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Loans secured by real estate: | | | 1. |
| a. Construction, land development, and other land loans: | | | 1.a. |
| 1. 1-4 family residential construction loans.................................................. | RCONF158 | 12,371 | 1.a.1. |
| 2. Other construction loans and all land development and other land loans....... | RCONF159 | 674 | 1.a.2. |
| b. Secured by farmland (including farm residential and other improvements)........... | RCON1420 | 1,055 | 1.b. |
| c. Secured by 1-4 family residential properties: | | | 1.c. |
| 1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit. | RCON1797 | 3,135 | 1.c.1. |
| 2. Closed-end loans secured by 1-4 family residential properties: | | | 1.c.2. |
| a. Secured by first liens.................................................... | RCON5367 | 3,958 | 1.c.2.a. |
| b. Secured by junior liens.................................................. | RCON5368 | 274 | 1.c.2.b. |
| d. Secured by multifamily (5 or more) residential properties...................... | RCON1460 | 10,996 | 1.d. |
| e. Secured by nonfarm nonresidential properties: | | | 1.e. |
| 1. Loans secured by owner-occupied nonfarm nonresidential properties........ | RCONF160 | 33,948 | 1.e.1. |
| 2. Loans secured by other nonfarm nonresidential properties.................. | RCONF161 | 66,345 | 1.e.2. |
| 2. Loans to depository institutions and acceptances of other banks................ | RCON1288 | 0 | 2. |
| 3. Loans to finance agricultural production and other loans to farmers............ | RCON1590 | 952 | 3. |
| 4. Commercial and industrial loans........................................... | RCON1766 | 15,737 | 4. |
| 5. Not applicable | | | 5. |
| 6. Loans to individuals for household, family, and other personal expenditures (i.e., consumer loans) (includes purchased paper): | | | 6. |
| a. Credit cards........................................................ | RCONB538 | 0 | 6.a. |
| b. Other revolving credit plans........................................... | RCONB539 | 33 | 6.b. |
| c. Automobile loans.................................................... | RCONK137 | 0 | 6.c. |
| d. Other consumer loans (includes single payment and installment, loans other than automobile loans, and all student loans)... | RCONK207 | 2,136 | 6.d. |
| 7. Not applicable | | | 7. |
| 8. Obligations (other than securities and leases) of states and political subdivisions in the U.S................ | RCON2107 | 0 | 8. |
| 9. Loans to nondepository financial institutions and other loans: | | | 9. |
| a. Loans to nondepository financial institutions............................. | RCONJ454 | 0 | 9.a. |
| b. Other loans........................................................ | RCONJ464 | 0 | 9.b. |
| 10. Lease financing receivables (net of unearned income)........................ | RCON2165 | 0 | 10. |
| 11. LESS: Any unearned income on loans reflected in items 1-9 above.............. | RCON2123 | 0 | 11. |
| 12. Total loans and leases held for investment and held for sale (sum of items 1 through 10 minus item 11) (must equal Schedule RC, sum of items 4.a and 4.b). | RCON2122 | 151,614 | 12. |

Exhibit 1
Page 476 of 550

LEWIS & CLARK BANK
RSSD-ID 3489917
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR   Document 2   Filed 09/02/25   Page 480 of 553

FFIEC 051
Report Date 12/31/2024
20

Dollar amounts in thousands

*Memorandum items 1.a.(1) through 1.f.(5) are to be completed semiannually in the June and December reports only. Memorandum item 1.g is to be completed quarterly.*

| | | | |
|---|---|---|---|
| 1. Loan modifications to borrowers experiencing financial difficulty that are in compliance with their modified terms (included in Schedule RC-C, Part I, and not reported as past due or nonaccrual in Schedule RC-N, Memorandum item 1): | | | M.1. |
| a. Construction, land development, and other land loans: | | | M.1.a. |
| 1. 1-4 family residential construction loans | RCONK158 | 0 | M.1.a.1. |
| 2. Other construction loans and all land development and other land loans | RCONK159 | 0 | M.1.a.2. |
| b. Loans secured by 1-4 family residential properties | RCONF576 | 0 | M.1.b. |
| c. Secured by multifamily (5 or more) residential properties | RCONK160 | 0 | M.1.c. |
| d. Secured by nonfarm nonresidential properties: | | | M.1.d. |
| 1. Loans secured by owner-occupied nonfarm nonresidential properties | RCONK161 | 0 | M.1.d.1. |
| 2. Loans secured by other nonfarm nonresidential properties | RCONK162 | 0 | M.1.d.2. |
| e. Commercial and industrial loans | RCONK256 | 0 | M.1.e. |
| f. All other loans (include loans to individuals for household, family, and other personal expenditures) | RCONK165 | 0 | M.1.f. |
| 1. Loans secured by farmland | RCONK166 | 0 | M.1.f.1. |
| 2. Not applicable | | | M.1.f.2. |
| 3. Not applicable | | | M.1.f.3. |
| 4. Loans to individuals for household, family, and other personal expenditures: | | | M.1.f.4. |
| a. Credit cards | RCONK098 | 0 | M.1.f.4.a. |
| b. Automobile loans | RCONK203 | 0 | M.1.f.4.b. |
| c. Other (includes revolving credit plans other than credit cards and other consumer loans) | RCONK204 | 0 | M.1.f.4.c. |
| *Memorandum item 1.f.(5) is to be completed by:* <br> *• Banks with $300 million or more in total assets* <br> *• Banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, Part I, item 3) exceeding 5 percent of total loans* <br> 5. Loans to finance agricultural production and other loans to farmers[1] | RCONK168 | 0 | M.1.f.5. |
| g. Total loan modifications to borrowers experiencing financial difficulty that are in compliance with their modified terms (sum of Memorandum items 1.a.(1) through 1.f) | RCONHK25 | 0 | M.1.g. |
| 2. Maturity and repricing data for loans and leases (excluding those in nonaccrual status): | | | M.2. |
| a. Closed-end loans secured by first liens on 1-4 family residential properties (reported in Schedule RC-C, Part I, item 1.c.(2)(a)) with a remaining maturity or next repricing date of:[1, 2] | | | M.2.a. |
| 1. Three months or less | RCONA564 | 270 | M.2.a.1. |
| 2. Over three months through 12 months | RCONA565 | 505 | M.2.a.2. |
| 3. Over one year through three years | RCONA566 | 935 | M.2.a.3. |
| 4. Over three years through five years | RCONA567 | 771 | M.2.a.4. |
| 5. Over five years through 15 years | RCONA568 | 1,476 | M.2.a.5. |
| 6. Over 15 years | RCONA569 | 0 | M.2.a.6. |
| b. All loans and leases (reported in Schedule RC-C, Part I, items 1 through 10, above) EXCLUDING closed-end loans secured by first liens on 1-4 family residential properties (reported in Schedule RC-C, Part I, item 1.c.(2)(a), above) with a remaining maturity or next repricing date of:[1, 3] | | | M.2.b. |
| 1. Three months or less | RCONA570 | 21,730 | M.2.b.1. |
| 2. Over three months through 12 months | RCONA571 | 11,001 | M.2.b.2. |
| 3. Over one year through three years | RCONA572 | 38,749 | M.2.b.3. |
| 4. Over three years through five years | RCONA573 | 28,663 | M.2.b.4. |
| 5. Over five years through 15 years | RCONA574 | 47,512 | M.2.b.5. |
| 6. Over 15 years | RCONA575 | 0 | M.2.b.6. |
| c. Loans and leases (reported in Schedule RC-C, Part I, items 1 through 10, above) with a REMAINING MATURITY of one year or less (excluding those in nonaccrual status) | RCONA247 | 24,052 | M.2.c. |

---

1.   The $300 million asset-size test and the 5 percent of total loans test are based on the total assets and total loans reported on the June 30, 2023, Report of Condition.

1, 2.   1. Report fixed-rate loans and leases by remaining maturity and floating rate loans by next repricing date. 2. Sum of Memorandum items 2.a.(1) through 2.a.(6) plus total nonaccrual closed-end loans secured by first liens on 1-4 family residential properties included in Schedule RC-C, item 1.c.(2)(a), column C, must equal total closed-end loans secured by first liens on 1-4 family residential properties from Schedule RC-C, Part I, item 1.c.(2)(a).

1, 3.   1. Report fixed-rate loans and leases by remaining maturity and floating rate loans by next repricing date. 3. Sum of Memorandum items 2.b.(1) through 2.b.(6), plus total nonaccrual loans and leases from Schedule RC-N, item 9, column C, minus nonaccrual closed-end loans secured by first liens on 1-4 family residential properties included in Schedule RC-N, item 1.c.(2)(a), column C, must equal total loans and leases from Schedule RC-C, Part I, sum of items 1 through 10, minus total closed-end loans secured

Exhibit 1
Page 477 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 3. Loans to finance commercial real estate, construction, and land development activities (not secured by real estate) included in Schedule RC-C, Part I, items 4 and 9[4] | RCON2746 | 0 | M.3. |
| *Memorandum item 4 is to be completed semiannually in the June and December reports only.* | | | |
| 4. Adjustable-rate closed-end loans secured by first liens on 1-4 family residential properties (included in Schedule RC-C, Part I, item 1.c.(2)(a)) | RCON5370 | 2,739 | M.4. |
| 5. Not applicable | | | M.5. |
| 6. Not applicable | | | M.6. |
| 7. Not applicable | | | M.7. |
| *Memorandum item 8.a is to be completed semiannually in the June and December reports only.* | | | M.8. |
| 8. Closed-end loans with negative amortization features secured by 1-4 family residential properties: | | | |
| a. Total amount of closed-end loans with negative amortization features secured by 1-4 family residential properties (included in Schedule RC-C, Part I, items 1.c.(2)(a) and 1.c.(2)(b)) | RCONF230 | 0 | M.8.a. |
| *Memorandum items 8.b and 8.c are to be completed annually in the December report only by banks that had closed-end loans with negative amortization features secured by 1-4 family residential properties (as reported in Schedule RC-C, Part I, Memorandum item 8.a) as of December 31, 2021, that exceeded the lesser of $100 million or 5 percent of total loans and leases held for investment and held for sale (as reported in Schedule RC-C, Part I, item 12).* | RCONF231 | NR | M.8.b. |
| b. Total maximum remaining amount of negative amortization contractually permitted on closed-end loans secured by 1-4 family residential properties. | | | |
| c. Total amount of negative amortization on closed-end loans secured by 1-4 family residential properties included in the amount reported in Memorandum item 8.a above. | RCONF232 | NR | M.8.c. |
| 9. Loans secured by 1-4 family residential properties in process of foreclosure (included in Schedule RC-C, Part I, items 1.c.(1), 1.c.(2)(a), and 1.c.(2)(b)). | RCONF577 | 0 | M.9. |
| 10. Not applicable | | | M.10. |

---

4.    Exclude loans secured by real estate that are included in Schedule RC-C, Part I, items 1.a through 1.e.

Exhibit 1
Page 478 of 550

LEWIS & CLARK BANK
RSSD-ID 3489671
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 482 of 553

FFIEC 051
Report Date 12/31/2024
22

Dollar amounts in thousands

| | | |
|---|---|---|
| 11. Not applicable | | M.11. |

Dollar amounts in thousands

| Dollar amounts in thousands | (Column A) Fair value of acquired loans and leases at acquisition date | | (Column B) Gross contractual amounts receivable at acquisition date | | (Column C) Best estimate at acquisition date of contractual cash flows not expected to be collected | |
|---|---|---|---|---|---|---|
| *Memorandum item 12 is to be completed semiannually in the June and December reports only.* 12. Loans (not considered purchased credit deteriorated) and leases held for investment that were acquired in business combinations with acquisition dates in the current calendar year.................. | RCONGW45 | 0 | RCONGW46 | 0 | RCONGW47 | 0 | M.12. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| *Memorandum item 13 is to be completed by banks that had construction, land development, and other land loans (as reported in Schedule RC-C, Part I, item 1.a) that exceeded 100 percent of the sum of tier 1 capital (as reported in Schedule RC-R, Part I, item 26) plus the allowance for loan and lease losses or the allowance for credit losses on loans and leases, as applicable (as reported in Schedule RC, item 4.c) as of December 31, 2021.* 13. Construction, land development, and other land loans with interest reserves: | | | M.13. |
| a. Amount of loans that provide for the use of interest reserves (included in Schedule RC-C, Part I, item 1.a)..... | RCONG376 | 0 | M.13.a. |
| b. Amount of interest capitalized from interest reserves on construction, land development, and other land loans that is included in interest and fee income on loans during the quarter (included in Schedule RI, item 1.a.(1)(b)).. | RIADG377 | 0 | M.13.b. |
| *Memorandum item 14 is to be completed by all banks.* 14. Pledged loans and leases................ | RCONG378 | 85,132 | M.14. |
| *Memorandum item 15 is to be completed for the December report only.* 15. Reverse mortgages: | | | M.15. |
| *Memorandum item 15 is to be completed for the December report only.* a. Reverse mortgages outstanding that are held for investment (included in Schedule RC-C, item 1.c, above)..... | RCONPR04 | 0 | M.15.a. |
| b. Estimated number of reverse mortgage loan referrals to other lenders during the year from whom compensation has been received for services performed in connection with the origination of the reverse mortgages.. | RCONPR05 | 0 | M.15.b. |
| c. Principal amount of reverse mortgage originations that have been sold during the year................ | RCONPR06 | 0 | M.15.c. |
| *Memorandum item 16 is to be completed by all banks in the June and December reports only.* 16. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit that have converted to non-revolving closed-end status (included in item 1.c.(1) above)................ | RCONLE75 | 0 | M.16. |
| *Amounts reported in Memorandum items 17.a and 17.b will not be made available to the public on an individual institution basis.* 17. Eligible loan modifications under Section 4013, Temporary Relief from Troubled Debt Restructurings, of the 2020 Coronavirus Aid, Relief, and Economic Security Act: | | | M.17. |
| a. Number of Section 4013 loans outstanding................ | RCONLG24 | CONF | M.17.a. |
| b. Outstanding balance of Section 4013 loans................ | RCONLG25 | CONF | M.17.b. |

Exhibit 1
Page 479 of 550

# Schedule RC-C Part II - Loans to Small Businesses and Small Farms(Form Type - 051)

*Report the number and amount currently outstanding as of the report date of business loans with "original amounts" of $1,000,000 or less and farm loans with "original amounts" of $500,000 or less. The following guidelines should be used to determine the "original amount" of a loan:*
*(1) For loans drawn down under lines of credit or loan commitments, the "original amount" of the loan is the size of the line of credit or loan commitment when the line of credit or loan commitment was most recently approved, extended, or renewed prior to the report date. However, if the amount currently outstanding as of the report date exceeds this size, the "original amount" is the amount currently outstanding on the report date. (2) For loan participations and syndications, the "original amount" of the loan participation or syndication is the entire amount of the credit originated by the lead lender. (3) For all other loans, the "original amount" is the total amount of the loan at origination or the amount currently outstanding as of the report date, whichever is larger.*

### Dollar amounts in thousands

| | | |
|---|---|---|
| 1. Indicate in the appropriate box at the right whether all or substantially all of the dollar volume of your bank's "Loans secured by nonfarm nonresidential properties" reported in Schedule RC-C, Part I, items 1.e.(1) and 1.e.(2), and all or substantially all of the dollar volume of your bank's "Commercial and industrial loans" reported in Schedule RC-C, Part I, item 4, have original amounts of $100,000 or less (If your bank has no loans outstanding in both of these two loan categories, place an "X" in the box marked "NO.") | RCON6999 | No 1. |
| *If YES, complete items 2.a and 2.b below; skip items 3 and 4, and go to item 5. If NO and your bank has loans outstanding in either loan category, skip items 2.a and 2.b, complete items 3 and 4 below, and go to item 5. If NO and your bank has no loans outstanding in both loan categories, skip items 2 through 4, and go to item 5* | | 2. |
| 2. Report the total number of loans currently outstanding for each of the following Schedule RC-C, Part I, loan categories: | | |
| a. "Loans secured by nonfarm nonresidential properties" reported in Schedule RC-C, Part I, items 1.e.(1) and 1.e.(2) (Note: Sum of items 1.e.(1) and 1.e.(2) divided by the number of loans should NOT exceed $100,000.) | RCON5562 | NR 2.a. |
| b. "Commercial and industrial loans" reported in Schedule RC-C, Part I, item 4 (Note: Item 4 divided by the number of loans should NOT exceed $100,000.) | RCON5563 | NR 2.b. |

### Dollar amounts in thousands

| | (Column A) Number of Loans | | (Column B) Amount Currently Outstanding | | |
|---|---|---|---|---|---|
| 3. Number and amount currently outstanding of "Loans secured by nonfarm nonresidential properties" reported in Schedule RC-C, Part I, items 1.e.(1) and 1.e.(2) (sum of items 3.a through 3.c must be less than or equal to Schedule RC-C, Part I, sum of items 1.e.(1) and 1.e.(2)): | | | | | 3. |
| a. With original amounts of $100,000 or less | RCON5564 | 1 | RCON5565 | 10 | 3.a. |
| b. With original amounts of more than $100,000 through $250,000 | RCON5566 | 14 | RCON5567 | 1,970 | 3.b. |
| c. With original amounts of more than $250,000 through $1,000,000 | RCON5568 | 69 | RCON5569 | 30,987 | 3.c. |
| 4. Number and amount currently outstanding of "Commercial and industrial loans" reported in Schedule RC-C, Part I, item 4 (sum of items 4.a through 4.c must be less than or equal to Schedule RC-C, Part I, item 4): | | | | | 4. |
| a. With original amounts of $100,000 or less | RCON5570 | 130 | RCON5571 | 1,759 | 4.a. |
| b. With original amounts of more than $100,000 through $250,000 | RCON5572 | 39 | RCON5573 | 4,250 | 4.b. |
| c. With original amounts of more than $250,000 through $1,000,000 | RCON5574 | 20 | RCON5575 | 4,746 | 4.c. |

### Dollar amounts in thousands

| | | |
|---|---|---|
| 5. Indicate in the appropriate box at the right whether all or substantially all of the dollar volume of your bank's "Loans secured by farmland (including farm residential and other improvements)" reported in Schedule RC-C, Part I, item 1.b, and all or substantially all of the dollar volume of your bank's "Loans to finance agricultural production and other loans to farmers" in reported in Schedule RC-C, Part I, item 3 have original amounts of $100,000 or less (If your bank has no loans outstanding in both of these two loan categories, place an "X" in the box marked "NO.") | RCON6860 | No 5. |
| *If YES, complete items 6.a and 6.b below; and do not complete items 7 and 8. If NO and your bank has loans outstanding in either loan category, skip items 6.a and 6.b and complete items 7 and 8 below. If NO and your bank has no loans outstanding in both loan categories, do not complete items 6 through 8.* | | 6. |
| 6. Report the total number of loans currently outstanding for each of the following Schedule RC-C, Part I, loan categories: | | |
| a. "Loans secured by farmland (including farm residential and other improvements)" reported in Schedule RC-C, Part I, item 1.b, divided by the number of loans should NOT exceed $100,000.) | RCON5576 | NR 6.a. |
| b. "Loans to finance agricultural production and other loans to farmers" in reported in Schedule RC-C, Part I, item 3 (Note: Item 3 divided by the number of loans should NOT exceed $100,000.) | RCON5577 | NR 6.b. |

Exhibit 1
Page 480 of 550

| Dollar amounts in thousands | (Column A) Number of Loans | | (Column B) Amount Currently Outstanding | | |
|---|---|---|---|---|---|
| 7. Number and amount currently outstanding of "Loans secured by farmland (including farm residential and other improvements)" reported in Schedule RC-C, Part I, item 1.b (sum of items 7.a through 7.c must be less than or equal to Schedule RC-C, Part I, item 1.b): | | | | | 7. |
| a. With original amounts of $100,000 or less................... | RCON5578 | 0 | RCON5579 | 0 | 7.a. |
| b. With original amounts of more than $100,000 through $250,000.......... | RCON5580 | 0 | RCON5581 | 0 | 7.b. |
| c. With original amounts of more than $250,000 through $500,000.......... | RCON5582 | 1 | RCON5583 | 244 | 7.c. |
| 8. Number and amount currently outstanding of "Loans to finance agricultural production and other loans to farmers" reported in Schedule RC-C, Part I, item 3 (sum of items 8.a through 8.c must be less than or equal to Schedule RC-C, Part I, item 3): | | | | | 8. |
| a. With original amounts of $100,000 or less................... | RCON5584 | 0 | RCON5585 | 0 | 8.a. |
| b. With original amounts of more than $100,000 through $250,000.......... | RCON5586 | 0 | RCON5587 | 0 | 8.b. |
| c. With original amounts of more than $250,000 through $500,000.......... | RCON5588 | 0 | RCON5589 | 0 | 8.c. |

Exhibit 1
Page 481 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 485 of 553

FFIEC 051
Report Date 12/31/2024
25

## Schedule RC-E - Deposit Liabilities(Form Type - 051)

| Dollar amounts in thousands | (Column A) Transaction Accounts Total transaction accounts (including total demand deposits) | | (Column B) Transaction Accounts Memo: Total demand deposits (included in column A) | | (Column C) Nontransaction Accounts Total nontransaction accounts (including MMDAs) | | |
|---|---|---|---|---|---|---|---|
| Deposits of: | | | | | | | |
| 1. Individuals, partnerships, and corporations............ | RCONB549 | 90,749 | | | RCONB550 | 109,056 | 1. |
| 2. U.S. Government.................... | RCON2202 | 0 | | | RCON2520 | 0 | 2. |
| 3. States and political subdivisions in the U.S......... | RCON2203 | 2,673 | | | RCON2530 | 21,056 | 3. |
| 4. Commercial banks and other depository institutions in the U.S........ | RCONB551 | 14,532 | | | RCONB552 | 357 | 4. |
| 5. Banks in foreign countries............ | RCON2213 | 0 | | | RCON2236 | 0 | 5. |
| 6. Foreign governments and official institutions (including foreign central banks)........ | RCON2216 | 0 | | | RCON2377 | 0 | 6. |
| 7. Total (sum of items 1 through 6) (sum of columns A and C must equal Schedule RC, item 13.a)......... | RCON2215 | 107,954 | RCON2210 | 61,761 | RCON2385 | 130,469 | 7. |

Exhibit 1
Page 482 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Selected components of total deposits (i.e., sum of item 7, columns A and C): | | | M.1. |
| *Memorandum item 1.a is to be completed semiannually in the June and December reports only.* | | | |
| a. Total Individual Retirement Accounts (IRAs) and Keogh Plan accounts | RCON6835 | 3,390 | M.1.a. |
| b. Total brokered deposits | RCON2365 | 0 | M.1.b. |
| c. Brokered deposits of $250,000 or less (fully insured brokered deposits)[2] | RCONHK05 | 0 | M.1.c. |
| d. Maturity data for brokered deposits: | | | M.1.d. |
| 1. Brokered deposits of $250,000 or less with a remaining maturity of one year or less (included in Memorandum item 1.c above) | RCONHK06 | 0 | M.1.d.1. |
| 2. Not applicable | | | M.1.d.2. |
| 3. Brokered deposits of more than $250,000 with a remaining maturity of one year or less (included in Memorandum item 1.b above) | RCONK220 | 0 | M.1.d.3. |
| e. Preferred deposits (uninsured deposits of states and political subdivisions in the U.S. reported in item 3 above which are secured or collateralized as required under state law) (to be completed for the December report only). | RCON5590 | 7,425 | M.1.e. |
| f. Estimated amount of deposits obtained through the use of deposit listing services that are not brokered deposits | RCONK223 | 0 | M.1.f. |
| g. Total reciprocal deposits (as of the report date) | RCONJH83 | 31,696 | M.1.g. |
| *Memorandum items 1.h.(1) through 1.h.(4) and 1.i. are to be completed semiannually in the June and December reports only.* | | | |
| h. Sweep deposits: | | | M.1.h. |
| 1. Fully insured, affiliate sweep deposits | RCONMT87 | 0 | M.1.h.1. |
| 2. Not fully insured, affiliate sweep deposits | RCONMT89 | 0 | M.1.h.2. |
| 3. Fully insured, non-affiliate sweep deposits | RCONMT91 | 0 | M.1.h.3. |
| 4. Not fully insured, non-affiliate sweep deposits | RCONMT93 | 0 | M.1.h.4. |
| i. Total sweep deposits that are not brokered deposits | RCONMT95 | 0 | M.1.i. |
| 2. Components of total nontransaction accounts (sum of Memorandum items 2.a through 2.d must equal item 7, column C above): | | | M.2. |
| a. Savings deposits: | | | M.2.a. |
| 1. Money market deposit accounts (MMDAs) | RCON6810 | 94,902 | M.2.a.1. |
| 2. Other savings deposits (excludes MMDAs) | RCON0352 | 18,771 | M.2.a.2. |
| b. Total time deposits of less than $100,000 | RCON6648 | 5,655 | M.2.b. |
| c. Total time deposits of $100,000 through $250,000 | RCONJ473 | 6,776 | M.2.c. |
| d. Total time deposits of more than $250,000 | RCONJ474 | 4,365 | M.2.d. |
| e. Individual Retirement Accounts (IRAs) and Keogh Plan accounts of $100,000 or more included in Memorandum items 2.c and 2.d above | RCONF233 | 690 | M.2.e. |
| 3. Maturity and repricing data for time deposits of $250,000 or less: | | | M.3. |
| a. Time deposits of $250,000 or less with a remaining maturity or next repricing date of: | | | M.3.a. |
| 1. Three months or less | RCONHK07 | 4,611 | M.3.a.1. |
| 2. Over three months through 12 months | RCONHK08 | 4,993 | M.3.a.2. |
| 3. Over one year through three years | RCONHK09 | 2,582 | M.3.a.3. |
| 4. Over three years | RCONHK10 | 245 | M.3.a.4. |
| b. Time deposits of $250,000 or less with a REMAINING MATURITY of one year or less (included in Memorandum items 3.a.(1) and 3.a.(2) above)[3] | RCONHK11 | 9,604 | M.3.b. |
| 4. Maturity and repricing data for time deposits of more than $250,000: | | | M.4. |
| a. Time deposits of more than $250,000 with a remaining maturity or next repricing date of: | | | M.4.a. |
| 1. Three months or less | RCONHK12 | 1,407 | M.4.a.1. |
| 2. Over three months through 12 months | RCONHK13 | 1,718 | M.4.a.2. |
| 3. Over one year through three years | RCONHK14 | 515 | M.4.a.3. |
| 4. Over three years | RCONHK15 | 725 | M.4.a.4. |
| b. Time deposits of more than $250,000 with a REMAINING MATURITY of one year or less (included in Memorandum items 4.a.(1) and 4.a.(2) above)[3] | RCONK222 | 3,125 | M.4.b. |
| *Memorandum item 5 is to be completed semiannually in the June and December reports only.* | | | |
| 5. Does your institution offer one or more consumer deposit account products, i.e., transaction account or nontransaction savings account deposit products intended primarily for individuals for personal, household, or family use? | RCONP752 | Yes | M.5. |

---

2.    The dollar amounts used as the basis for reporting in Memorandum items 1.c reflect the deposit insurance limits in effect on the report date.

3.    Report both fixed-and floating-rate time deposits by remaining maturity. Exclude floating-rate time deposits with a next repricing date of one year or less that have a remaining maturity of over one year.

Exhibit 1
Page 483 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| *Memorandum items 6 and 7 are to be completed annually in the December report only by institutions with $1 billion or more in total assets that answered "Yes" to Memorandum 5 above. The $1 billion asset size test is based on the total assets reported on the June 30, 2023, Report of Condition.* | | | M.6. |
| 6. Components of total transaction account deposits of individuals, partnerships, and corporations (sum of Memorandum items 6.a and 6.b must be less than or equal to Schedule RC-E, item 1, column A): | | | |
| a. Total deposits in those noninterest-bearing transaction account deposit products intended primarily for individuals for personal, household, or family use..................................................... | RCONP753 | **NR** | M.6.a. |
| b. Total deposits in those interest-bearing transaction account deposit products intended primarily for individuals for personal, household, or family use.................................................. | RCONP754 | **NR** | M.6.b. |
| 7. Components of total nontransaction account deposits of individuals, partnerships, and corporations (sum of Memorandum items 7.a.(1), 7.a.(2), 7.b.(1), and 7.b.(2) plus all time deposits of individuals, partnerships, and corporations must equal Schedule RC-E, item 1, column C): | | | M.7. |
| a. Money market deposit accounts (MMDAs) of individuals, partnerships, and corporations (sum of Memorandum items 7.a.(1) and 7.a.(2) must be less than or equal to Schedule RC-E, Memorandum item 2.a.(1) above): | | | M.7.a. |
| 1. Total deposits in those MMDA deposit products intended primarily for individuals for personal, household, or family use ................................................................. | RCONP756 | **NR** | M.7.a.1. |
| 2. Deposits in all other MMDAs of individuals, partnerships, and corporations........................ | RCONP757 | **NR** | M.7.a.2. |
| b. Other savings deposit accounts of individuals, partnerships, and corporations (sum of Memorandum items 7.b.(1) and 7.b.(2) must be less than or equal to Schedule RC-E, Memorandum item 2.a.(2) above): | | | M.7.b. |
| 1. Total deposits in those other savings deposit account deposit products intended primarily for individuals for personal, household, or family use.................................................. | RCONP758 | **NR** | M.7.b.1. |
| 2. Deposits in all other savings deposit accounts of individuals, partnerships, and corporations............ | RCONP759 | **NR** | M.7.b.2. |

Exhibit 1
Page 484 of 550

LEWIS & CLARK BANK
RSSD-ID 3489011
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR     Document 2     Filed 09/02/25     Page 488 of 553

FFIEC 051
Report Date 12/31/2024
28

## Schedule RC-F - Other Assets(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Accrued interest receivable[2] | RCONB556 | 915 | 1. |
| 2. Net deferred tax assets[3] | RCON2148 | 2,749 | 2. |
| 3. Interest-only strips receivable (not in the form of a security) on mortgage loans and other financial assets[4] | RCONHT80 | 0 | 3. |
| 4. Equity investments without readily determinable fair values[5] | RCON1752 | 3,524 | 4. |
| 5. Life insurance assets: | | | 5. |
| a. General account life insurance assets | RCONK201 | 10,999 | 5.a. |
| b. Separate account life insurance assets | RCONK202 | 0 | 5.b. |
| c. Hybrid account life insurance assets | RCONK270 | 0 | 5.c. |
| *Items 6.a through 6.j are to be completed semiannually in the June and December reports only.* | | | |
| 6. All other assets (itemize and describe amounts greater than $100,000 that exceed 25 percent of this item) | RCON2168 | 1,127 | 6. |
| a. Prepaid expenses | RCON2166 | 795 | 6.a. |
| b. Repossessed personal property (including vehicles) | RCON1578 | 0 | 6.b. |
| c. Derivatives with a positive fair value held for purposes other than trading | RCONC010 | 0 | 6.c. |
| d. Not applicable | | | 6.d. |
| e. Computer software | RCONFT33 | 0 | 6.e. |
| f. Accounts receivable | RCONFT34 | 0 | 6.f. |
| g. Receivables from foreclosed government-guaranteed mortgage loans | RCONFT35 | 0 | 6.g. |
| h. Disclose component and the dollar amount of that component: | | | 6.h. |
| 1. Describe component | TEXT3549 | NR | 6.h.1. |
| 2. Amount of component | RCON3549 | 0 | 6.h.2. |
| i. Disclose component and the dollar amount of that component: | | | 6.i. |
| 1. Describe component | TEXT3550 | NR | 6.i.1. |
| 2. Amount of component | RCON3550 | 0 | 6.i.2. |
| j. Disclose component and the dollar amount of that component: | | | 6.j. |
| 1. Describe component | TEXT3551 | NR | 6.j.1. |
| 2. Amount of component | RCON3551 | 0 | 6.j.2. |
| 7. Total (sum of items 1 through 6) (must equal Schedule RC, item 11) | RCON2160 | 19,314 | 7. |

---

2. Include accrued interest receivable on loans, leases, debt securities, and other interest-bearing assets. Exclude accrued interest receivables on financial assets that are reported elsewhere on the balance sheet.

3. See discussion of deferred income taxes in Glossary entry on "income taxes."

4. Report interest-only strips receivable in the form of a security as available-for-sale securities in Schedule RC, item 2.b, or as trading assets in Schedule RC, item 5, as appropriate.

5. Include Federal Reserve stock, Federal Home Loan Bank stock, and bankers' bank stock.

Exhibit 1
Page 485 of 550

## Schedule RC-G - Other Liabilities(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Not available | | | 1. |
| a. Interest accrued and unpaid on deposits[1] | RCON3645 | 150 | 1.a. |
| b. Other expenses accrued and unpaid (includes accrued income taxes payable) | RCON3646 | 766 | 1.b. |
| 2. Net deferred tax liabilities[2] | RCON3049 | 0 | 2. |
| 3. Allowance for credit losses on off-balance sheet credit exposures | RCONB557 | 198 | 3. |
| 4. All other liabilities (itemize and describe amounts greater than $100,000 that exceed 25 percent of this item) | RCON2938 | 622 | 4. |
| a. Accounts payable | RCON3066 | 91 | 4.a. |
| b. Deferred compensation liabilities | RCONC011 | 465 | 4.b. |
| c. Dividends declared but not yet payable | RCON2932 | 0 | 4.c. |
| d. Derivatives with a negative fair value held for purposes other than trading | RCONC012 | 0 | 4.d. |
| e. Operating lease liabilities | RCONLB56 | 0 | 4.e. |
| f. Disclose component and the dollar amount of that component: | | | 4.f. |
| 1. Describe component | TEXT3552 | NR | 4.f.1. |
| 2. Amount of component | RCON3552 | 0 | 4.f.2. |
| g. Disclose component and the dollar amount of that component: | | | 4.g. |
| 1. Describe component | TEXT3553 | NR | 4.g.1. |
| 2. Amount of component | RCON3553 | 0 | 4.g.2. |
| h. Disclose component and the dollar amount of that component: | | | 4.h. |
| 1. Describe component | TEXT3554 | NR | 4.h.1. |
| 2. Amount of component | RCON3554 | 0 | 4.h.2. |
| 5. Total | RCON2930 | 1,736 | 5. |

---

1. For savings banks, include "dividends" accrued and unpaid on deposits.
2. See discussion of deferred income taxes in Glossary entry on "Income taxes."

Exhibit 1
Page 486 of 550

LEWIS & CLARK BANK
RSSD-ID 3489
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 490 of 553

FFIEC 051
Report Date 12/31/2024
30

## Schedule RC-K - Quarterly Averages(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Interest-bearing balances due from depository institutions.............................................. | RCON3381 | 46,410 | 1. |
| 2. U.S. Treasury securities and U.S. Government agency obligations (excluding mortgage-backed securities)[2].......... | RCONB558 | 84,623 | 2. |
| 3. Mortgage-backed securities[2]............................................................................ | RCONB559 | 44,583 | 3. |
| 4. All other debt securities and equity securities with readily determinable fair values not held for trading purposes[2].... | RCONB560 | 13,772 | 4. |
| 5. Federal funds sold and securities purchased under agreements to resell.................................. | RCON3365 | 226 | 5. |
| 6. Loans: | | | 6. |
| a. Total loans........................................................................................... | RCON3360 | 154,100 | 6.a. |
| b. Loans secured by real estate: | | | 6.b. |
| 1. Loans secured by 1-4 family residential properties................................................ | RCON3465 | 7,010 | 6.b.1. |
| 2. All other loans secured by real estate............................................................ | RCON3466 | 128,936 | 6.b.2. |
| c. Commercial and industrial loans..................................................................... | RCON3387 | 15,401 | 6.c. |
| d. Loans to individuals for household, family, and other personal expenditures: | | | 6.d. |
| 1. Credit cards........................................................................................ | RCONB561 | 0 | 6.d.1. |
| 2. Other (includes revolving credit plans other than credit cards, automobile loans, and other consumer loans)......... | RCONB562 | 2,173 | 6.d.2. |
| 7. Not applicable | | | 7. |
| 8. Lease financing receivables (net of unearned income).................................................. | RCON3484 | 0 | 8. |
| 9. Total assets[4]......................................................................................... | RCON3368 | 364,502 | 9. |
| 10. Interest-bearing transaction accounts (interest-bearing demand deposits, NOW accounts, ATS accounts, and telephone and preauthorized transfer accounts)............ | RCON3485 | 48,096 | 10. |
| 11. Nontransaction accounts: | | | 11. |
| a. Savings deposits (includes MMDAs).................................................................. | RCONB563 | 116,602 | 11.a. |
| b. Time deposits of $250,000 or less................................................................... | RCONHK16 | 12,751 | 11.b. |
| c. Time deposits of more than $250,000................................................................. | RCONHK17 | 4,362 | 11.c. |
| 12. Federal funds purchased and securities sold under agreements to repurchase............................ | RCON3353 | 1 | 12. |
| *To be completed by banks with $100 million or more in total assets:* | | | |
| 13. Other borrowed money (includes mortgage indebtedness and obligations under capitalized leases)[5]......... | RCON3355 | 76,251 | 13. |
| *Memorandum item 1 is to be completed by:* *• banks with $300 million or more in total assets, and* *• banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, Part 1, item 3) exceeding 5 percent of total loans.* | | | |
| 1. Loans to finance agricultural production and other loans to farmers[2]................................... | RCON3386 | 970 | M.1. |

---

2.   Quarterly averages for all debt securities should be based on amortized cost.

2.   Quarterly averages for all debt securities should be based on amortized cost.

4.   The quarterly average for total assets should reflect securities not held for trading as follows: a) Debt securities at amortized cost, b) Equity securities with readily determinable fair values at fair value, and c) Equity investments without readily determinable fair values, their balance sheet carrying values (i.e., fair value or, if elected, cost minus impairment, if any, plus or minus changes resulting from observable price changes).

5.   The asset-size tests and the 5 percent of total loans test are based on the total assets and total loans reported on the June 30, 2023, Report of Condition.

2.   The $300 million asset-size test and the 5 percent of total loans test are based on the total assets and total loans reported on the June 30, 2023, Report of Condition.

Exhibit 1
Page 487 of 550

## Schedule RC-L - Off-Balance Sheet Items(Form Type - 051)

*Please read carefully the instructions for the preparation of Schedule RC-L. Some of the amounts reported in Schedule RC-L are regarded as volume indicators and not necessarily as measures of risk.*

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Unused commitments: | | | 1. |
|   a. Revolving, open-end lines secured by 1-4 family residential properties, i.e., home equity lines | RCON3814 | 9,823 | 1.a. |
|   b. Credit card lines | RCON3815 | 2,684 | 1.b. |
|   c. Commitments to fund commercial real estate, construction, and land development loans: | | | 1.c. |
|     1. Secured by real estate: | | | 1.c.1. |
|       a. 1-4 family residential construction loan commitments | RCONF164 | 5,629 | 1.c.1.a. |
|       b. Commercial real estate, other construction loan, and land development loan commitments | RCONF165 | 9,377 | 1.c.1.b. |
|     2. NOT secured by real estate | RCON6550 | 0 | 1.c.2. |
|   d. Not applicable | | | 1.d. |
|   e. Other unused commitments: | | | 1.e. |
|     1. Commercial and industrial loans | RCONJ457 | 3,175 | 1.e.1. |
|     2. Loans to depository financial institutions | RCONPV10 | 0 | 1.e.2. |
|     3. Loans to nondepository financial institutions | RCONPV11 | 0 | 1.e.3. |
|     4. All other unused commitments | RCONJ459 | 104 | 1.e.4. |
| 2. Financial standby letters of credit | RCON3819 | 100 | 2. |
| 3. Performance standby letters of credit | RCON3821 | 0 | 3. |
| 4. Commercial and similar letters of credit | RCON3411 | 0 | 4. |
| 5. Not applicable | | | 5. |
| 6. Securities lent and borrowed: | | | 6. |
|   a. Securities lent (including customers' securities lent where the customer is indemnified against loss by the reporting bank) | RCON3433 | 0 | 6.a. |
|   b. Securities borrowed | RCON3432 | 0 | 6.b. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 7. Not applicable | | | 7. |

Exhibit 1
Page 488 of 550

LEWIS & CLARK BANK
RSSD-ID 3489671
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 492 of 553

FFIEC 051
Report Date 12/31/2024
32

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 8. Not applicable | | | 8. |
| 9. All other off-balance sheet liabilities (exclude derivatives) (itemize and describe each component of this item over 25 percent of Schedule RC, item 27.a, "Total bank equity capital") | RCON3430 | 3,485 | 9. |
| a. Not applicable | | | 9.a. |
| b. Not applicable | | | 9.b. |
| c. Standby letters of credit issued by another party (e.g., a Federal Home Loan Bank) on the bank's behalf | RCONC978 | 3,485 | 9.c. |
| d. Disclose component and the dollar amount of that component: | | | 9.d. |
| 1. Describe component | TEXT3555 | NR | 9.d.1. |
| 2. Amount of component | RCON3555 | 0 | 9.d.2. |
| e. Disclose component and the dollar amount of that component: | | | 9.e. |
| 1. Describe component | TEXT3556 | NR | 9.e.1. |
| 2. Amount of component | RCON3556 | 0 | 9.e.2. |
| f. Disclose component and the dollar amount of that component: | | | 9.f. |
| (TEXT3557) NR | RCON3557 | 0 | 9.f.1. |
| 10. All other off-balance sheet assets (exclude derivatives) (itemize and describe each component of this item over 25 percent of Schedule RC, item 27.a, "Total bank equity capital") | RCON5591 | 0 | 10. |
| a. Not applicable | | | 10.a. |
| b. Disclose component and the dollar amount of that component: | | | 10.b. |
| 1. Describe component | TEXT5592 | NR | 10.b.1. |
| 2. Amount of component | RCON5592 | 0 | 10.b.2. |
| c. Disclose component and the dollar amount of that component: | | | 10.c. |
| 1. Describe component | TEXT5593 | NR | 10.c.1. |
| 2. Amount of component | RCON5593 | 0 | 10.c.2. |
| d. Disclose component and the dollar amount of that component: | | | 10.d. |
| 1. Describe component | TEXT5594 | NR | 10.d.1. |
| 2. Amount of component | RCON5594 | 0 | 10.d.2. |
| e. Disclose component and the dollar amount of that component: | | | 10.e. |
| 1. Describe component | TEXT5595 | NR | 10.e.1. |
| 2. Amount of component | RCON5595 | 0 | 10.e.2. |
| Items 11.a and 11.b are to be completed semiannually in the June and December reports only. | | | 11. |
| 11. Year-to-date merchant credit card sales volume: | | | |
| a. Sales for which the reporting bank is the acquiring bank | RCONC223 | 0 | 11.a. |
| b. Sales for which the reporting bank is the agent bank with risk | RCONC224 | 0 | 11.b. |

Exhibit 1
Page 489 of 550

LEWIS & CLARK BANK
RSSD-ID 348967
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 493 of 553

FFIEC 051
Report Date 12/31/2024
33

# Schedule RC-M - Memoranda(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Extensions of credit by the reporting bank to its executive officers, directors, principal shareholders, and their related interests as of the report date: | | | 1. |
| a. Aggregate amount of all extensions of credit to all executive officers, directors, principal shareholders, and their related interests | RCON6164 | 254 | 1.a. |
| b. Number of executive officers, directors, and principal shareholders to whom the amount of all extensions of credit by the reporting bank (including extensions of credit to related interests) equals or exceeds the lesser of $500,000 or 5 percent of total capital as defined for this purpose in agency regulations | RCON6165 | 0 | 1.b. |
| 2. Intangible assets: | | | 2. |
| a. Mortgage servicing assets | RCON3164 | 0 | 2.a. |
| 1. Estimated fair value of mortgage servicing assets | RCONA590 | 0 | 2.a.1. |
| b. Goodwill | RCON3163 | 596 | 2.b. |
| c. All other identifiable intangible assets | RCONJF76 | 20 | 2.c. |
| d. Total (sum of items 2.a, 2.b, and 2.c) (must equal Schedule RC, item 10) | RCON2143 | 616 | 2.d. |
| 3. Other real estate owned: | | | 3. |
| a. Construction, land development, and other land | RCON5508 | 0 | 3.a. |
| b. Farmland | RCON5509 | 0 | 3.b. |
| c. 1-4 family residential properties | RCON5510 | 0 | 3.c. |
| d. Multifamily (5 or more) residential properties | RCON5511 | 0 | 3.d. |
| e. Nonfarm nonresidential properties | RCON5512 | 0 | 3.e. |
| f. Total (sum of items 3.a through 3.e) (must equal Schedule RC, item 7) | RCON2150 | 0 | 3.f. |
| 4. Cost of equity securities with readily determinable fair values not held for trading (the fair value of which is reported in Schedule RC, item 2.c)[1] | RCONJA29 | 0 | 4. |
| 5. Other borrowed money: | | | 5. |
| a. Federal Home Loan Bank advances: | | | 5.a. |
| 1. Advances with a remaining maturity or next repricing date of:[1] | | | 5.a.1. |
| a. One year or less | RCONF055 | 65,000 | 5.a.1.a. |
| b. Over one year through three years | RCONF056 | 0 | 5.a.1.b. |
| c. Over three years through five years | RCONF057 | 0 | 5.a.1.c. |
| d. Over five years | RCONF058 | 0 | 5.a.1.d. |
| 2. Advances with a REMAINING MATURITY of one year or less (included in item 5.a.(1)(a) above)[2] | RCON2651 | 65,000 | 5.a.2. |
| 3. Structured advances (included in items 5.a.(1)(a) - (d) above) | RCONF059 | 0 | 5.a.3. |
| b. Other borrowings: | | | 5.b. |
| 1. Other borrowings with a remaining maturity or next repricing date of:[3] | | | 5.b.1. |
| a. One year or less | RCONF060 | 0 | 5.b.1.a. |
| b. Over one year through three years | RCONF061 | 0 | 5.b.1.b. |
| c. Over three years through five years | RCONF062 | 0 | 5.b.1.c. |
| d. Over five years | RCONF063 | 0 | 5.b.1.d. |
| 2. Other borrowings with a REMAINING MATURITY of one year or less (included in item 5.b.(1)(a) above)[4] | RCONB571 | 0 | 5.b.2. |
| c. Total (sum of items 5.a.(1)(a)-(d) and items 5.b.(1)(a)-(d)) (must equal Schedule RC, item 16) | RCON3190 | 65,000 | 5.c. |
| 6. Does the reporting bank sell private label or third party mutual funds and annuities? | RCONB569 | No | 6. |
| 7. Assets under the reporting bank's management in proprietary mutual funds and annuities | RCONB570 | 0 | 7. |
| 8. Internet website addresses and physical office trade names: | | | 8. |
| a. Uniform Resource Locator (URL) of the reporting institution's primary Internet website (home page), if any (Example: www.examplebank.com): | TEXT4087 | Click here for value | 8.a. |

1. Item 4 is to be completed only by insured state banks that have been approved by the FDIC to hold grandfathered equity investments. See instructions for this item and the Glossary entry for "Securities Activities" for further detail on accounting for investments in equity securities.
1. Report fixed-rate advances by remaining maturity and floating-rate advances by next repricing date.
2. Report both fixed- and floating-rate advances by remaining maturity. Exclude floating-rate advances with a next repricing date of one year or less that have a remaining maturity of over one year
3. Report fixed-rate other borrowings by remaining maturity and floating-rate other borrowings by next repricing date.
4. Report both fixed- and floating-rate other borrowings by remaining maturity. Exclude floating-rate other borrowings with a next repricing date of one year or less that have a remaining maturity of over one year.

Exhibit 1
Page 490 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| b. URLs of all other public-facing Internet websites that the reporting institution uses to accept or solicit deposits from the public, if any (Example: www.examplebank.biz):[1] | | | 8.b. |
| 1. URL 1 | TE01N528 | NR | 8.b.1. |
| 2. URL 2 | TE02N528 | NR | 8.b.2. |
| 3. URL 3 | TE03N528 | NR | 8.b.3. |
| 4. URL 4 | TE04N528 | NR | 8.b.4. |
| 5. URL 5 | TE05N528 | NR | 8.b.5. |
| 6. URL 6 | TE06N528 | NR | 8.b.6. |
| 7. URL 7 | TE07N528 | NR | 8.b.7. |
| 8. URL 8 | TE08N528 | NR | 8.b.8. |
| 9. URL 9 | TE09N528 | NR | 8.b.9. |
| 10. URL 10 | TE10N528 | NR | 8.b.10. |
| c. Trade names other than the reporting institution's legal title used to identify one or more of the institution's physical offices at which deposits are accepted or solicited from the public, if any: | | | 8.c. |
| 1. Trade name 1 | TE01N529 | NR | 8.c.1. |
| 2. Trade name 2 | TE02N529 | NR | 8.c.2. |
| 3. Trade name 3 | TE03N529 | NR | 8.c.3. |
| 4. Trade name 4 | TE04N529 | NR | 8.c.4. |
| 5. Trade name 5 | TE05N529 | NR | 8.c.5. |
| 6. Trade name 6 | TE06N529 | NR | 8.c.6. |

*Items 9, 11, 12, 14.a, and 14.b are to be completed annually in the December report only.*

| | | | |
|---|---|---|---|
| 9. Do any of the bank's Internet websites have transactional capability, i.e., allow the bank's customers to execute transactions on their accounts through the website? | RCON4088 | Yes | 9. |
| 10. Secured liabilities: | | | 10. |
| a. Amount of "Federal funds purchased" that are secured (included in Schedule RC, item 14.a) | RCONF064 | 0 | 10.a. |
| b. Amount of "Other borrowings" that are secured (included in Schedule RC-M, items 5.b.(1)(a) - (d)) | RCONF065 | 0 | 10.b. |
| 11. Does the bank act as trustee or custodian for Individual Retirement Accounts, Health Savings Accounts, and other similar accounts? | RCONG463 | Yes | 11. |
| 12. Does the bank provide custody, safekeeping, or other services involving the acceptance of orders for the sale or purchase of securities? | RCONG464 | No | 12. |
| 13. Not applicable | | | 13. |
| 14. Captive insurance and reinsurance subsidiaries: | | | 14. |
| a. Total assets of captive insurance subsidiaries[1] | RCONK193 | 0 | 14.a. |
| b. Total assets of captive reinsurance subsidiaries[1] | RCONK194 | 0 | 14.b. |

*Item 15 is to be completed by institutions that are required or have elected to be treated as a Qualified Thrift Lender.*

| | | | |
|---|---|---|---|
| 15. Qualified Thrift Lender (QTL) test: | | | 15. |
| a. Does the institution use the Home Owners' Loan Act (HOLA) QTL test or the Internal Revenue Service Domestic Building and Loan Association (IRS DBLA) test to determine its QTL compliance? (for the HOLA QTL test, enter 1; for the IRS DBLA test, enter 2) | RCONL133 | NR | 15.a. |
| b. Has the institution been in compliance with the HOLA QTL test as of each month end during the quarter or the IRS DBLA test for its most recent taxable year, as applicable? | RCONL135 | NR | 15.b. |

*Item 16.a and, if appropriate, items 16.b.(1) through 16.b.(3) are to be completed annually in the December report only.*

| | | | |
|---|---|---|---|
| 16. International remittance transfers offered to consumers:[1] | | | 16. |
| a. Estimated number of international remittance transfers provided by your institution during the calendar year ending on the report date | RCONN523 | 0 | 16.a. |
| *Items 16.b.(1) through 16.b.(3) are to be completed by institutions that reported 501 or more international remittance transfers in item 16.a in either or both of the current report or the prior December report in which item 16.a was required to be completed.* | | | 16.b. |
| b. Estimated dollar value of remittance transfers provided by your institution and usage of regulatory exceptions during the calendar year ending on the report date: | | | |
| 1. Estimated dollar value of international remittance transfers | RCONN524 | NR | 16.b.1. |
| 2. Estimated number of international remittance transfers for which your institution applied the permanent exchange rate exception | RCONMM07 | NR | 16.b.2. |

---

1.  Report only highest level URLs (for example, report www.examplebank.biz, but do not also report www.examplebank.biz/checking). Report each top level domain name used (for example, report both www.examplebank.biz and www.examplebank.net).

1.  Report total assets before eliminating intercompany transactions between the consolidated insurance or reinsurance subsidiary and other offices or consolidated subsidiaries of the reporting bank.

1.  Report information about international electronic transfers of funds offered to consumers in the United States that: (a) are "remittance transfers" as defined by subpart B of Regulation E (12 CFR § 1005.30(e)), or (b) would qualify as "remittance transfers" under subpart B of Regulation E (12 CFR § 1005.30(e)) but are excluded from that definition only because the provider is not providing those transfers in the normal course of its business. See 12 CFR § 1005.30(f). For purposes of this item 16, such trans

Exhibit 1
Page 491 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR     Document 2     Filed 09/02/25     Page 495 of 553

FFIEC 051
Report Date 12/31/2024
35

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 3. Estimated number of international remittance transfers for which your institution applied the permanent covered third-party fee exception.................................. | RCONMQ52 | NR | 16.b.3. |
| 17. U.S. Small Business Administration Paycheck Protection Program (PPP) loans and the Federal Reserve PPP Liquidity Facility (PPPLF):[2] | | | 17. |
| a. Number of PPP loans outstanding................................................ | RCONLG26 | 0 | 17.a. |
| b. Outstanding balance of PPP loans............................................. | RCONLG27 | 0 | 17.b. |
| c. Outstanding balance of PPP loans pledged to the PPPLF................ | RCONLG28 | 0 | 17.c. |
| d. Outstanding balance of borrowings from Federal Reserve Banks under the PPPLF with a remaining maturity of: | | | 17.d. |
| 1. One year or less.......................................................... | RCONLL59 | 0 | 17.d.1. |
| 2. More than one year..................................................... | RCONLL60 | 0 | 17.d.2. |
| e. Quarterly average amount of PPP loans pledged to the PPPLF and excluded from "Total assets for the leverage ratio" reported in Schedule RC-R, Part I, item 30........................... | RCONLL57 | 0 | 17.e. |

**(TEXT4087)** www.lewisandclarkbank.com

---

2.    Paycheck Protection Program (PPP) covered loans as defined in sections 7(a)(36) and 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(36) and (37)).

Exhibit 1
Page 492 of 550

## Schedule RC-N - Past Due and Nonaccrual Loans Leases and Other Assets(Form Type - 051)

*Amounts reported in Schedule RC-N, items 1 through 8, include guaranteed and unguaranteed portions of past due and nonaccrual loans and leases. Report in items 10 and 11 below certain guaranteed loans and leases that have already been included in the amounts reported in items 1 through 8*

| Dollar amounts in thousands | (Column A) Past due 30 through 89 days and still accruing | | (Column B) Past due 90 days or more and still accruing | | (Column C) Nonaccrual | | |
|---|---|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | | | 1. |
| a. Construction, land development, and other land loans: | | | | | | | 1.a. |
| 1. 1-4 family residential construction loans | RCONF172 | 0 | RCONF174 | 0 | RCONF176 | 0 | 1.a.1. |
| 2. Other construction loans and all land development and other land loans | RCONF173 | 0 | RCONF175 | 0 | RCONF177 | 0 | 1.a.2. |
| b. Secured by farmland | RCON3493 | 0 | RCON3494 | 0 | RCON3495 | 0 | 1.b. |
| c. Secured by 1-4 family residential properties: | | | | | | | 1.c. |
| 1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit | RCON5398 | 0 | RCON5399 | 0 | RCON5400 | 0 | 1.c.1. |
| 2. Closed-end loans secured by 1-4 family residential properties: | | | | | | | 1.c.2. |
| a. Secured by first liens | RCONC236 | 0 | RCONC237 | 0 | RCONC229 | 0 | 1c2a |
| b. Secured by junior liens | RCONC238 | 0 | RCONC239 | 0 | RCONC230 | 0 | 1c2b |
| d. Secured by multifamily (5 or more) residential properties | RCON3499 | 0 | RCON3500 | 0 | RCON3501 | 0 | 1.d. |
| e. Secured by nonfarm nonresidential properties: | | | | | | | 1.e. |
| 1. Loans secured by owner-occupied nonfarm nonresidential properties | RCONF178 | 0 | RCONF180 | 0 | RCONF182 | 0 | 1.e.1. |
| 2. Loans secured by other nonfarm nonresidential properties | RCONF179 | 0 | RCONF181 | 0 | RCONF183 | 0 | 1.e.2. |
| 2. Loans to depository institutions and acceptances of other banks | RCONB834 | 0 | RCONB835 | 0 | RCONB836 | 0 | 2. |
| 3. Not applicable | | | | | | | 3. |
| 4. Commercial and industrial loans | RCON1606 | 0 | RCON1607 | 0 | RCON1608 | 0 | 4. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | | | 5. |
| a. Credit cards | RCONB575 | 0 | RCONB576 | 0 | RCONB577 | 0 | 5.a. |
| b. Automobile loans | RCONK213 | 0 | RCONK214 | 0 | RCONK215 | 0 | 5.b. |
| c. Other (includes revolving credit plans other than credit cards and other consumer loans) | RCONK216 | 83 | RCONK217 | 38 | RCONK218 | 0 | 5.c. |
| 6. Not applicable | | | | | | | 6. |
| 7. All other loans[1] | RCON5459 | 0 | RCON5460 | 0 | RCON5461 | 0 | 7. |
| 8. Lease financing receivables | RCON1226 | 0 | RCON1227 | 0 | RCON1228 | 0 | 8. |
| 9. Total loans and leases (sum of items 1 through 8) | RCON1406 | 83 | RCON1407 | 38 | RCON1403 | 0 | 9. |
| 10. Debt securities and other assets (exclude other real estate owned and other repossessed assets) | RCON3505 | 0 | RCON3506 | 0 | RCON3507 | 0 | 10. |
| 11. Loans and leases reported in items 1 through 8 above that are wholly or partially guaranteed by the U.S. Government, excluding loans and leases covered by loss-sharing agreements with the FDIC | RCONK036 | 0 | RCONK037 | 0 | RCONK038 | 0 | 11. |
| a. Guaranteed portion of loans and leases included in item 11 above, excluding rebooked "GNMA loans" | RCONK039 | 0 | RCONK040 | 0 | RCONK041 | 0 | 11.a. |
| b. Rebooked "GNMA loans" that have been repurchased or are eligible for repurchase included in item 11 above | RCONK042 | 0 | RCONK043 | 0 | RCONK044 | 0 | 11.b. |
| 12. Portion of covered loans and leases reported in item 9 above that is protected by loss-sharing agreements with the FDIC | | | RCONK103 | 0 | RCONK104 | 0 | 12. |
| *Memorandum items 1.a.(1) through 1.f.(5) are to be completed semiannually in the June and December reports only. Memorandum item 1.g is to be completed quarterly.* | | | | | | | M.1. |
| 1. Loan modifications to borrowers experiencing financial difficulty included in Schedule RC-N, items 1 through 7, above (and not reported in Schedule RC-C, Part 1, Memorandum item 1): | | | | | | | M.1. |
| a. Construction, land development, and other land loans: | | | | | | | M.1.a |
| 1. 1-4 family residential construction loans | RCONK105 | 0 | RCONK106 | 0 | RCONK107 | 0 | M1a1 |
| 2. Other construction loans and all land development and other land loans | RCONK108 | 0 | RCONK109 | 0 | RCONK110 | 0 | M1a2 |
| b. Loans secured by 1-4 family residential properties | RCONF661 | 0 | RCONF662 | 0 | RCONF663 | 0 | M.1.b |

1.   Includes past due and nonaccrual "Loans to finance agricultural productions and other loans to farmers," "Obligations (other than securities and leases) of states and political subdivisions in the U.S.," and "Loans to nondepository financial institutions and other loans."

Exhibit 1
Page 493 of 550

| Dollar amounts in thousands | (Column A) Past due 30 through 89 days and still accruing | | (Column B) Past due 90 days or more and still accruing | | (Column C) Nonaccrual | | |
|---|---|---|---|---|---|---|---|
| c. Secured by multifamily (5 or more) residential properties.................... | RCONK111 | 0 | RCONK112 | 0 | RCONK113 | 0 | M.1.c. |
| d. Secured by nonfarm nonresidential properties: | | | | | | | M.1.d. |
| 1. Loans secured by owner-occupied nonfarm nonresidential properties. | RCONK114 | 0 | RCONK115 | 0 | RCONK116 | 0 | M.1d1 |
| 2. Loans secured by other nonfarm nonresidential properties ............ | RCONK117 | 0 | RCONK118 | 0 | RCONK119 | 0 | M.1d2 |
| e. Commercial and industrial loans........ | RCONK257 | 0 | RCONK258 | 0 | RCONK259 | 0 | M.1.e. |
| f. All other loans (include loans to individuals for household, family, and other personal expenditures).... | RCONK126 | 0 | RCONK127 | 0 | RCONK128 | 0 | M.1.f. |
| Itemize loan categories included in Memorandum item 1.f. above that exceed 10 percent of total loan modifications to borrowers experiencing financial difficulty that are past due 30 days or more or in nonaccrual status (sum of Memorandum items 1.a through 1.f. columns A through C): 1. Loans secured by farmland.................. | RCONK130 | 0 | RCONK131 | 0 | RCONK132 | 0 | M.1f1. |
| 2. Not applicable | | | | | | | M.1f2. |
| 3. Not applicable | | | | | | | M.1f3. |
| 4. Loans to individuals for household, family, and other personal expenditures: | | | | | | | M.1f4. |
| a. Credit cards.................. | RCONK274 | 0 | RCONK275 | 0 | RCONK276 | 0 | M1f4a. |
| b. Automobile loans............. | RCONK277 | 0 | RCONK278 | 0 | RCONK279 | 0 | M1f4b. |
| c. Other (includes revolving credit plans other than credit cards and other consumer loans)... | RCONK280 | 0 | RCONK281 | 0 | RCONK282 | 0 | M1f4c. |
| Memorandum item 1.f.(5) is to be completed by: * Banks with $300 million or more in total assets * Banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, Part I, item 3) exceeding 5 percent of total loans 5. Loans to finance agricultural production and other loans to farmers[1] | RCONK138 | 0 | RCONK139 | 0 | RCONK140 | 0 | M.1f5. |
| g. Total loan modifications to borrowers experiencing financial difficulty included in Schedule RC-N, items 1 through 7, above (sum of Memorandum items 1.a.(1) through 1.f)[2] | RCONHK26 | 0 | RCONHK27 | 0 | RCONHK28 | 0 | M.1.g. |
| 2. Loans to finance commercial real estate, construction, and land development activities (not secured by real estate) included in Schedule RC-N, items 4 and 7, above. | RCON6558 | 0 | RCON6559 | 0 | RCON6560 | 0 | M.2. |
| 3. Not applicable | | | | | | | M.3. |
| Memorandum item 4 is to be completed by: * banks with $300 million or more in total assets * banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, Part I, item 3) exceeding 5 percent of total loans: 4. Loans to finance agricultural production and other loans to farmers (included in Schedule RC-N, item 7, above)[1] | RCON1594 | 0 | RCON1597 | 0 | RCON1583 | 0 | M.4. |

1.    The $300 million asset-size test and the 5 percent of total loans test are based on the total assets and total loans reported on the June 30, 2023, Report of Condition.
2.    Exclude amounts reported in Memorandum items 1.f.(1) through 1.f.(5) when calculating the total in Memorandum item 1.g.
1.    The $300 million asset-size test and the 5 percent of total loans test are based on the total assets and total loans reported on the June 30, 2023, Report of Condition.

Exhibit 1
Page 494 of 550

| Dollar amounts in thousands | (Column A) Past due 30 through 89 days and still accruing | | (Column B) Past due 90 days or more and still accruing | | (Column C) Nonaccrual | | |
|---|---|---|---|---|---|---|---|
| 5. Loans and leases held for sale (included in Schedule RC-N, items 1 through 8, above)........... | RCONC240 | 0 | RCONC241 | 0 | RCONC226 | 0 | M.5. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 6. Not applicable | | | M.6. |

Dollar amounts in thousands

| *Memorandum items 7 and 8 are to be completed semiannually in the June and December reports only.* | | |
|---|---|---|
| 7. Additions to nonaccrual assets during the previous six months......... | RCONC410 | 176 | M.7. |
| 8. Nonaccrual assets sold during the previous six months......... | RCONC411 | 0 | M.8. |

| Dollar amounts in thousands | (Column A) Past due 30 through 89 days and still accruing | | (Column B) Past due 90 days or more and still accruing | | (Column C) Nonaccrual | | |
|---|---|---|---|---|---|---|---|
| 9. Loans to nondepository financial institutions included in Schedule RC-N, item 7......... | RCONPV23 | 0 | RCONPV24 | 0 | RCONPV25 | 0 | M.9. |

Exhibit 1
Page 495 of 550

LEWIS & CLARK BANK
RSSD-ID 3489647
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 499 of 553

FFIEC 051
Report Date 12/31/2024
39

# Schedule RC-O - Other Data for Deposit Insurance and FICO Assessments(Form Type - 051)

*All FDIC-insured depository institutions must complete items 1 and 2, 4 through 9,10, and 11, Memorandum item 1, and, if applicable, item 9.a, Memorandum items 2, 3, and 6 through 18 each quarter. Unless otherwise indicated, complete items 1 through 11 and Memorandum items 1 through 3 on an "unconsolidated single FDIC certificate number basis" (see instructions) and complete Memorandum items 6 through 18 on a fully consolidated basis.*

### Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Total deposit liabilities before exclusions (gross) as defined in Section 3(l) of the Federal Deposit Insurance Act and FDIC regulations | RCONF236 | 238,574 | 1. |
| 2. Total allowable exclusions, including interest accrued and unpaid on allowable exclusions | RCONF237 | 0 | 2. |
| 3. Not applicable | | | 3. |
| 4. Average consolidated total assets for the calendar quarter | RCONK652 | 364,502 | 4. |
| a. Averaging method used (for daily averaging, enter 1; for weekly averaging, enter 2) | RCONK653 | 1 | 4.a. |
| 5. Average tangible equity for the calendar quarter[1] | RCONK654 | 40,546 | 5. |
| 6. Holdings of long-term unsecured debt issued by other FDIC-insured depository institutions | RCONK655 | 0 | 6. |
| 7. Unsecured "Other borrowings" with a remaining maturity of (sum of items 7.a through 7.d must be less than or equal to Schedule RC-M, items 5.b.(1)(a)-(d) minus item 10.b): | | | 7. |
| a. One year or less | RCONG465 | 0 | 7.a. |
| b. Over one year through three years | RCONG466 | 0 | 7.b. |
| c. Over three years through five years | RCONG467 | 0 | 7.c. |
| d. Over five years | RCONG468 | 0 | 7.d. |
| 8. Subordinated notes and debentures with a remaining maturity of (sum of items 8.a through 8.d must equal Schedule RC, item 19): | | | 8. |
| a. One year or less | RCONG469 | 0 | 8.a. |
| b. Over one year through three years | RCONG470 | 0 | 8.b. |
| c. Over three years through five years | RCONG471 | 0 | 8.c. |
| d. Over five years | RCONG472 | 0 | 8.d. |
| 9. Brokered reciprocal deposits (included in Schedule RC-E, Memorandum item 1.b) | RCONG803 | 0 | 9. |
| *Item 9.a is to be completed on a fully consolidated basis by all institutions that own another insured depository institution.* a. Fully consolidated brokered reciprocal deposits. | RCONL190 | NR | 9.a. |
| 10. Banker's bank certification: Does the reporting institution meet both the statutory definition of a banker's bank and the business conduct test set forth in FDIC regulations? | RCONK656 | No | 10. |
| *If the answer to item 10 is "YES," complete items 10.a and 10.b.* a. Banker's bank deduction | RCONK657 | NR | 10.a. |
| b. Banker's bank deduction limit | RCONK658 | NR | 10.b. |
| 11. Custodial bank certification: Does the reporting institution meet the definition of a custodial bank set forth in FDIC regulations? | RCONK659 | No | 11. |
| *If the answer to item 11 is "YES," complete items 11.a and 11.b.* a. Custodial bank deduction | RCONK660 | NR | 11.a. |
| b. Custodial bank deduction limit | RCONK661 | NR | 11.b. |
| 1. Total deposit liabilities of the bank, including related interest accrued and unpaid, less allowable exclusions, including related interest accrued and unpaid (sum of Memorandum items 1.a.(1), 1.b.(1), 1.c.(1), and 1.d.(1) must equal Schedule RC-O, item 1 less item 2): | | | M.1. |
| a. Deposit accounts (excluding retirement accounts) of $250,000 or less:[1] | | | M.1.a. |
| 1. Amount of deposit accounts (excluding retirement accounts) of $250,000 or less | RCONF049 | 132,526 | M.1.a.1. |
| 2. Number of deposit accounts (excluding retirement accounts) of $250,000 or less | RCONF050 | 10843 | M.1.a.2. |
| b. Deposit accounts (excluding retirement accounts) of more than $250,000:[1] | | | M.1.b. |
| 1. Amount of deposit accounts (excluding retirement accounts) of more than $250,000 | RCONF051 | 102,646 | M.1.b.1. |
| 2. Number of deposit accounts (excluding retirement accounts) of more than $250,000 | RCONF052 | 172 | M.1.b.2. |
| c. Retirement deposit accounts of $250,000 or less:[1] | | | M.1.c. |
| 1. Amount of retirement deposit accounts of $250,000 or less | RCONF045 | 3,401 | M.1.c.1. |
| 2. Number of retirement deposit accounts of $250,000 or less | RCONF046 | 95 | M.1.c.2. |
| d. Retirement deposit accounts of more than $250,000:[1] | | | M.1.d. |
| 1. Amount of retirement deposit accounts of more than $250,000 | RCONF047 | 0 | M.1.d.1. |

---

1. See instructions for averaging methods. For deposit insurance assessment purposes, tangible equity is defined as Tier 1 capital as set forth in the banking agencies' regulatory capital standards and reported in Schedule RC-R, Part I, item 26, except as described in the instructions.

1. The dollar amounts used as the basis for reporting in Memorandum items 1.a through 1.d reflect the deposit insurance limits in effect on the report date.

Exhibit 1
Page 496 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 500 of 553

FFIEC 051
Report Date 12/31/2024
40

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 2. Number of retirement deposit accounts of more than $250,000................................................. | RCONF048 | 0 | M.1.d.2. |
| *Memorandum item 2 is to be completed by banks with $1 billion or more in total assets. The $1 billion asset-size test is based on the total assets reported on the June 30, 2023, Report of Condition.* | | | |
| 2. Estimated amount of uninsured deposits including related interest accrued and unpaid (see instructions)[3]............... | RCON5597 | NR | M.2. |
| 3. Has the reporting institution been consolidated with a parent bank or savings association in that parent bank's or parent savings association's Call Report? If so, report the legal title and FDIC Certificate Number of the parent bank or parent savings association: | | | M.3. |
| a. Legal title............................................................................................................................... | TEXTA545 | NR | M.3.a. |
| b. FDIC Certificate Number.......................................................................................................... | RCONA545 | 0 | M.3.b. |

---

3.    Uninsured deposits should be estimated based on the deposit insurance limits set forth in Memorandum items 1.a through 1.d.

Exhibit 1
Page 497 of 550

LEWIS & CLARK BANK
RSSD-ID 3489417    Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 501 of 553
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
41

## Schedule RC-R Part I – Regulatory Capital Components and Ratios (Form Type – 051)

*Part I is to be completed on a consolidated basis.*

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Common stock plus related surplus, net of treasury stock and unearned employee stock ownership plan (ESOP) shares | RCOAP742 | 31,560 | 1. |
| 2. Retained earnings[1] | RCOAKW00 | 9,475 | 2. |
| a. Does your institution have a CECL transition election in effect as of the quarter-end report date? (enter "0" for No; enter "1" for Yes with a 3-year CECL transition election; enter "2" for Yes with a 5-year 2020 CECL transition election.) | RCOAJJ29 | 0 | 2.a. |
| 3. Accumulated other comprehensive income (AOCI) | RCOAB530 | -4,134 | 3. |
| a. AOCI opt-out election (enter "1" for Yes; enter "0" for No.) | RCOAP838 | 1 | 3.a. |
| 4. Common equity tier 1 minority interest includable in common equity tier 1 capital | RCOAP839 | 0 | 4. |
| 5. Common equity tier 1 capital before adjustments and deductions (sum of items 1 through 4) | RCOAP840 | 36,901 | 5. |
| 6. LESS: Goodwill net of associated deferred tax liabilities (DTLs) | RCOAP841 | 596 | 6. |
| 7. LESS: Intangible assets (other than goodwill and mortgage servicing assets (MSAs)), net of associated DTLs | RCOAP842 | 20 | 7. |
| 8. LESS: Deferred tax assets (DTAs) that arise from net operating loss and tax credit carryforwards, net of any related valuation allowances and net of DTLs | RCOAP843 | 0 | 8. |
| 9. AOCI-related adjustments (if entered "1" for Yes in item 3.a, complete only items 9.a through 9.e; if entered "0" for No in item 3.a, complete only item 9.f): | | | 9. |
| a. LESS: Net unrealized gains (losses) on available-for-sale debt securities (if a gain, report as a positive value; if a loss, report as a negative value) | RCOAP844 | -4,134 | 9.a. |
| b. Not applicable. | | | 9.b. |
| c. LESS: Accumulated net gains (losses) on cash flow hedges (if a gain, report as a positive value; if a loss, report as a negative value) | RCOAP846 | 0 | 9.c. |
| d. LESS: Amounts recorded in AOCI attributed to defined benefit postretirement plans resulting from the initial and subsequent application of the relevant GAAP standards that pertain to such plans (if a gain, report as a positive value; if a loss, report as a negative value) | RCOAP847 | 0 | 9.d. |
| e. LESS: Net unrealized gains (losses) on held-to-maturity securities that are included in AOCI (if a gain, report as a positive value; if a loss, report as a negative value) | RCOAP848 | 0 | 9.e. |
| f. LESS: Accumulated net gains (loss) on cash flow hedges included in AOCI, net of applicable income taxes, that relate to the hedging of items that are not recognized at fair value on the balance sheet (if a gain, report as a positive value; if a loss, report as a negative value) (To be completed only by institutions that entered "0" for No in item 3.a.) | RCOAP849 | NR | 9.f. |
| 10. Other deductions from (additions to) common equity tier 1 capital before threshold-based deductions: | | | 10. |
| a. LESS: Unrealized net gain (loss) related to changes in the fair value of liabilities that are due to changes in own credit risk (if a gain, report as a positive value; if a loss, report as a negative value) | RCOAQ258 | 0 | 10.a. |
| b. LESS: All other deductions from (additions to) common equity tier 1 capital before threshold-based deductions. | RCOAP850 | 0 | 10.b. |
| 11. Not applicable | | | 11. |
| 12. Subtotal (item 5 minus items 6 through 10.b) | RCOAP852 | 40,419 | 12. |
| 13. LESS: Investments in the capital of unconsolidated financial institutions, net of associated DTLs, that exceed 25 percent of item 12 | RCOALB58 | 0 | 13. |
| 14. LESS: MSAs, net of associated DTLs, that exceed 25 percent of item 12 | RCOALB59 | 0 | 14. |
| 15. LESS: DTAs arising from temporary differences that could not be realized through net operating loss carrybacks, net of related valuation allowances and net of DTLs, that exceed 25 percent of 12 | RCOALB60 | 0 | 15. |
| 16. Not applicable | | | 16. |
| 17. LESS: Deductions applied to common equity tier 1 capital due to insufficient amounts of additional tier 1 capital and tier 2 capital to cover deductions[1] | RCOAP857 | 0 | 17. |
| 18. Total adjustments and deductions for common equity tier 1 capital (sum of items 13 through 17) | RCOAP858 | 0 | 18. |
| 19. Common equity tier 1 capital (item 12 minus item 18) | RCOAP859 | 40,419 | 19. |
| 20. Additional tier 1 capital instruments plus related surplus | RCOAP860 | 0 | 20. |
| 21. Non-qualifying capital instruments subject to phase out from additional tier 1 capital | RCOAP861 | 0 | 21. |
| 22. Tier 1 minority interest not included in common equity tier 1 capital | RCOAP862 | 0 | 22. |
| 23. Additional tier 1 capital before deductions (sum of items 20, 21, and 22) | RCOAP863 | 0 | 23. |
| 24. LESS: Additional tier 1 capital deductions | RCOAP864 | 0 | 24. |
| 25. Additional tier 1 capital (greater of item 23 minus item 24, or zero) | RCOAP865 | 0 | 25. |
| 26. Tier 1 capital (sum of items 19 and 25) | RCOA8274 | 40,419 | 26. |

Exhibit 1
Page 498 of 550

LEWIS & CLARK BANK
RSSD-ID 3489971
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 502 of 553

FFIEC 051
Report Date 12/31/2024
42

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 27. Average total consolidated assets[2] | RCOAKW03 | 364,502 | 27. |
| 28. LESS: Deductions from common equity tier 1 capital and additional tier 1 capital (sum of items 6, 7, 8, 10.b, 13 through 15, 17, and certain other elements of item 24 - see instructions) | RCOAP875 | 616 | 28. |
| 29. LESS: Other deductions from (additions to) assets for leverage ratio purposes | RCOAB596 | 0 | 29. |
| 30. Total assets for the leverage ratio (item 27 minus items 28 and 29) | RCOAA224 | 363,886 | 30. |
| 31. Leverage ratio (item 26 divided by 30) | RCOA7204 | 11.1076% | 31. |
| a. Does your institution have a community bank leverage ratio (CBLR) framework election in effect as of the quarter-end report date? (enter "1" for Yes; enter "0" for No) | RCOALE74 | 0 | 31.a. |
| *Item 31.b is to be completed only by non-advanced approaches institutions that elect to use the Standardized Approach for Counterparty Credit Risk (SA-CCR) for purposes of the standardized approach.* | | | |
| b. Standardized Approach for Counterparty Credit Risk opt-in election (enter "1" for Yes; leave blank for No.)[1] | RCOANC99 | NR | 31.b. |

Dollar amounts in thousands

| | (Column A) Amount | | (Column B) Percentage | |
|---|---|---|---|---|
| 32. Total assets (Schedule RC, item 12); (must be less than $10 billion) | RCOA2170 | NR | | 32. |
| 33. Trading assets and trading liabilities (Schedule RC, sum of items 5 and 15). Report as a dollar amount in Column A and as a percentage of total assets (5% limit) in Column B | RCOAKX77 | NR | RCOAKX78 NR | 33. |
| 34. Off-balance sheet exposures: | | | | 34. |
| a. Unused portion of conditionally cancellable commitments | RCOAKX79 | NR | | 34.a. |
| b. Securities lent and borrowed (Schedule RC-L, sum of items 6.a and 6.b) | RCOAKX80 | NR | | 34.b. |
| c. Other off-balance sheet exposures | RCOAKX81 | NR | | 34.c. |
| d. Total off-balance sheet exposures (sum of items 34.a through 34.c). Report as a dollar amount in Column A and as a percentage of total assets (25% limit) in Column B | RCOAKX82 | NR | RCOAKX83 NR | 34.d. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 35. Unconditionally cancellable commitments | RCOAS540 | NR | 35. |
| 36. Investments in the tier 2 capital of unconsolidated financial institutions | RCOALB61 | NR | 36. |
| 37. Allocated transfer risk reserve | RCOA3128 | NR | 37. |
| 38. Amount of allowances for credit losses on purchased credit-deteriorated assets: | | | 38. |
| a. Loans and leases held for investment | RCOAJJ30 | NR | 38.a. |
| b. Held-to-maturity debt securities | RCOAJJ31 | NR | 38.b. |
| c. Other financial assets measured at amortized cost | RCOAJJ32 | NR | 38.c. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 39. Tier 2 capital instruments plus related surplus | RCOAP866 | 0 | 39. |
| 40. Non-qualifying capital instruments subject to phase out from tier 2 capital | RCOAP867 | 0 | 40. |
| 41. Total capital minority interest that is not included in tier 1 capital | RCOAP868 | 0 | 41. |
| 42. Adjusted allowances for credit losses (AACL)[2] | RCOA5310 | 2,235 | 42. |
| 43. Not applicable. | | | 43. |
| 44. Tier 2 capital before deductions (sum of items 39 through 42) | RCOAP870 | 2,235 | 44. |
| 45. LESS: Tier 2 capital deductions | RCOAP872 | 0 | 45. |
| 46. Tier 2 capital (greater of item 44 minus item 45, or zero) | RCOA5311 | 2,235 | 46. |
| 47. Total capital (sum of items 26 and 46) | RCOA3792 | 42,654 | 47. |
| 48. Total risk-weighted assets (from Schedule RC-R, Part II, item 31) | RCOAA223 | 192,691 | 48. |

---

1.  Institutions that have elected to apply the 3-year or the 5-year 2020 CECL transition provision should include the applicable portion of the CECL transitional amount or the modified CECL transitional amount, respectively, in this item.

1.  An institution that has a CBLR framework election in effect as of the quarter-end report date is neither required to calculate tier 2 capital nor make any deductions that would have been taken from tier 2 capital as of the report date.

Exhibit 1
Page 499 of 550

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 49. Common equity tier 1 capital ratio (item 19 divided by item 48)............................................... | RCOAP793 | **20.9761%** | 49. |
| 50. Tier 1 capital ratio (item 26 divided by item 48)..................................................................... | RCOA7206 | **20.9761%** | 50. |
| 51. Total capital ratio (item 47 divided by item 48)....................................................................... | RCOA7205 | **22.1360%** | 51. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 52. Institution-specific capital conservation buffer necessary to avoid limitations on distributions and discretionary bonus payments.................................................................................................................. | RCOAH311 | **14.1360%** | 52. |
| 53. Eligible retained income[3]...................................................................................................... | RCOAH313 | **NR** | 53. |
| 54. Distributions and discretionary bonus payments during the quarter[4]...................................... | RCOAH314 | **NR** | 54. |

---

2.  Institutions that have elected to apply the 3-year or the 5-year 2020 CECL transition provision should include the applicable portion of the CECL transitional amount or the modified CECL transitional amount, respectively, in item 27.

1.  For the December 31, 2021, report date only, advanced approaches institutions that adopt SA-CCR prior to the mandatory compliance date should enter "1" in item 31.b.

2.  Institutions that have have elected to apply the 3-year or the 5-year 2020 CECL transition provision should subtract the applicable portion of the AACL transitional amount or the modified AACL transitional amount, respectively, from the AACL, as defined in the regulatory capital rule, before determining the amount of AACL includable in tier 2 capital. See instructions for further detail on the CECL transition provisions.

3.  Institutions must complete item 53 only if the amount reported in item 52 above is less than or equal to 2.5000 percent.

4.  Institutions must complete item 54 only if the amount reported in Schedule RC-R, Part I, item 52, in the Call Report for the previous calendar quarter-end report date was less than or equal to 2.5000 percent.

Exhibit 1
Page 500 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
44

## Schedule RC-R Part II - Risk-Weighted Assets(Form Type - 051)

*Institutions are required to assign a 100 percent risk weight to all assets not specifically assigned a risk weight under Subpart D of the federal banking agencies' regulatory capital rules and not deducted from tier 1 or tier 2 capital*

| Dollar amounts in thousands | (Column A) Totals from Schedule RC | (Column B) Adjustments to Totals Reported in Column A | (Column C) Allocation by Risk-Weight Category 0% | (Column D) Allocation by Risk-Weight Category 2% | (Column E) Allocation by Risk-Weight Category 4% | (Column F) Allocation by Risk-Weight Category 10% | (Column G) Allocation by Risk-Weight Category 20% | (Column H) Allocation by Risk-Weight Category 50% | (Column I) Allocation by Risk-Weight Category 100% | (Column J) Allocation by Risk-Weight Category 150% | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Cash and balances due from depository institutions...... | RCONS957 26,872 | RCONS396 0 | RCOND958 20,046 | | | | RCOND959 6,826 | RCONS397 0 | RCOND960 0 | RCONS398 0 | 1. |
| 2. Securities: | | | | | | | | | | | 2. |
| a. Held-to-maturity securities[3] | RCOND961 0 | RCONS399 0 | RCOND962 0 | RCONHJ74 0 | RCONHJ75 0 | | RCOND963 0 | RCOND964 0 | RCOND965 0 | RCONS400 0 | 2.a. |
| b. Available-for-sale debt securities and equity securities with readily determinable fair values not held for trading.... | RCONJA21 136,911 | RCONS402 -5,663 | RCOND967 111,867 | RCONHJ76 0 | RCONHJ77 0 | | RCOND968 30,707 | RCOND969 0 | RCOND970 0 | RCONS403 0 | 2.b. |
| 3. Federal funds sold and securities purchased under agreements to resell: | | | | | | | | | | | 3. |
| a. Federal funds sold..... | RCOND971 2,180 | | RCOND972 0 | | | | RCOND973 2,180 | RCONS410 0 | RCOND974 0 | RCONS411 0 | 3.a. |
| b. Securities purchased under agreements to resell..... | RCONH171 0 | RCONH172 0 | | | | | | | | | 3.b. |
| 4. Loans and leases held for sale: | | | | | | | | | | | 4. |
| a. Residential mortgage exposures..... | RCONS413 0 | RCONS414 0 | RCONH173 0 | | | | RCONS415 0 | RCONS416 0 | RCONS417 0 | | 4.a. |
| b. High volatility commercial real estate exposures..... | RCONS419 0 | RCONS420 0 | RCONH174 0 | | | | RCONH175 0 | RCONH176 0 | RCONH177 0 | RCONS421 0 | 4.b. |
| c. Exposures past due 90 days or more or on nonaccrual[3]..... | RCONS423 0 | RCONS424 0 | RCONS425 0 | RCONHJ78 0 | RCONHJ79 0 | | RCONS426 0 | RCONS427 0 | RCONS428 0 | RCONS429 0 | 4.c. |

| Dollar amounts in thousands | (Column K) Allocation by Risk-Weight Category 250% | (Column L) Allocation by Risk-Weight Category 300% | (Column M) Allocation by Risk-Weight Category 400% | (Column N) Allocation by Risk-Weight Category 600% | (Column O) Allocation by Risk-Weight Category 625% | (Column P) Allocation by Risk-Weight Category 937.5% | (Column Q) Allocation by Risk-Weight Category 1,250% | (Column R) Application of Other Risk-Weighting Approaches Exposure Amount | (Column S) Application of Other Risk-Weighting Approaches Risk-Weighted Asset Amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Cash and balances due from depository institutions | | | | | | | | | | 1. |
| 2. Securities: | | | | | | | | | | 2. |
| a. Held-to-maturity securities | | | | | | | | | | 2.a. |
| b. Available-for-sale debt securities and equity securities with readily determinable fair values not held for trading | | RCONS405 0 | | RCONS406 0 | | | | RCONH271 0 | RCONH272 0 | 2.b. |
| 3. Federal funds sold and securities purchased under agreements to resell: | | | | | | | | | | 3. |
| a. Federal funds sold | | | | | | | | | | 3.a. |

3.    Institutions should report as a negative number allowances eligible for inclusion in tier 2 capital in Column B, which excludes PCD allowances, should report as a negative number in

3.    For loans and leases held for sale, exclude residential mortgage exposures, high volatility commercial real estate exposures, or sovereign exposures that are past due 90 days or more or on nonaccrual.

Exhibit 1
Page 501 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
45

| Dollar amounts in thousands | (Column K) Allocation by Risk-Weight Category 250% | (Column L) Allocation by Risk-Weight Category 300% | (Column M) Allocation by Risk-Weight Category 400% | (Column N) Allocation by Risk-Weight Category 600% | (Column O) Allocation by Risk-Weight Category 625% | (Column P) Allocation by Risk-Weight Category 937.5% | (Column Q) Allocation by Risk-Weight Category 1,250% | (Column R) Application of Other Risk-Weighting Approaches Exposure Amount | (Column S) Application of Other Risk-Weighting Approaches Risk-Weighted Asset Amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| b. Securities purchased under agreements to resell | | | | | | | | | | 3.b. |
| 4. Loans and leases held for sale: | | | | | | | | | | 4. |
| a. Residential mortgage exposures............... | | | | | | | | RCONH273 0 | RCONH274 0 | 4.a. |
| b. High volatility commercial real estate exposures......... | | | | | | | | RCONH275 0 | RCONH276 0 | 4.b. |

Exhibit 1
Page 502 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
46

| Dollar amounts in thousands | (Column K) Allocation by Risk-Weight Category 250% | (Column L) Allocation by Risk-Weight Category 300% | (Column M) Allocation by Risk-Weight Category 400% | (Column N) Allocation by Risk-Weight Category 600% | (Column O) Allocation by Risk-Weight Category 625% | (Column P) Allocation by Risk-Weight Category 937.5% | (Column Q) Allocation by Risk-Weight Category 1,250% | (Column R) Application of Other Risk-Weighting Approaches Exposure Amount | (Column S) Application of Other Risk-Weighting Approaches Risk-Weighted Asset Amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| c. Exposures past due 90 days or more or on nonaccrual[8] | | | | | | | | RCONH277 0 | RCONH278 0 | 4.c. |

| Dollar amounts in thousands | (Column A) Totals from Schedule RC | (Column B) Adjustments to Totals Reported in Column A | (Column C) Allocation by Risk-Weight Category 0% | (Column D) Allocation by Risk-Weight Category 2% | (Column E) Allocation by Risk-Weight Category 4% | (Column F) Allocation by Risk-Weight Category 10% | (Column G) Allocation by Risk-Weight Category 20% | (Column H) Allocation by Risk-Weight Category 50% | (Column I) Allocation by Risk-Weight Category 100% | (Column J) Allocation by Risk-Weight Category 150% | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4. Loans and leases held for sale (continued): | | | | | | | | | | | 4. |
| d. All other exposures | RCONS431 0 | RCONS432 0 | RCONS433 0 | RCONHJ80 0 | RCONHJ81 0 | | RCONS434 0 | RCONS435 0 | RCONS436 0 | RCONS437 0 | 4.d. |
| 5. Loans and leases held for investment: | | | | | | | | | | | 5. |
| a. Residential mortgage exposures | RCONS439 12,261 | RCONS440 0 | RCONH178 0 | | | | RCONS441 0 | RCONS442 7,168 | RCONS443 5,093 | | 5.a. |
| b. High volatility commercial real estate exposures | RCONS445 0 | RCONS446 0 | RCONH179 0 | | | | RCONH180 0 | RCONH181 0 | RCONH182 0 | RCONS447 0 | 5.b. |
| c. Exposures past due 90 days or more or on nonaccrual[7] | RCONS449 0 | RCONS450 0 | RCONS451 0 | RCONHJ82 0 | RCONHJ83 0 | | RCONS452 0 | RCONS453 0 | RCONS454 0 | RCONS455 0 | 5.c. |
| d. All other exposures | RCONS457 139,353 | RCONS458 0 | RCONS459 297 | RCONHJ84 0 | RCONHJ85 0 | | RCONS460 1,270 | RCONS461 0 | RCONS462 137,786 | RCONS463 0 | 5.d. |
| 6. LESS: Allowance for credit losses on loans and leases | RCON3123 2,837 | RCON3123 2,837 | | | | | | | | | 6. |
| 7. Trading assets | RCOND976 0 | RCONS466 0 | RCOND977 0 | RCONHJ86 0 | RCONHJ87 0 | | RCOND978 0 | RCOND979 0 | RCOND980 0 | RCONS467 0 | 7. |
| 8. All other assets[8] | RCOND981 27,320 | RCONS468 0 | RCOND982 261 | RCONHJ88 0 | RCONHJ89 0 | | RCOND983 3,248 | RCOND984 38 | RCOND985 23,841 | RCONH185 0 | 8. |
| a. Separate account bank-owned life insurance | | | | | | | | | | | 8.a. |
| b. Default fund contributions to central counterparties | | | | | | | | | | | 8.b. |

Exhibit 1
Page 503 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
47

| Dollar amounts in thousands | (Column K) Allocation by Risk-Weight Category 250% | (Column L) Allocation by Risk-Weight Category 300% | (Column M) Allocation by Risk-Weight Category 400% | (Column N) Allocation by Risk-Weight Category 600% | (Column O) Allocation by Risk-Weight Category 625% | (Column P) Allocation by Risk-Weight Category 937.5% | (Column Q) Allocation by Risk-Weight Category 1,250% | (Column R) Application of Other Risk-Weighting Approaches Exposure Amount | (Column S) Application of Other Risk-Weighting Approaches Risk-Weighted Asset Amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| 4. Loans and leases held for sale (continued): | | | | | | | | | | 4. |
| d. All other exposures | | | | | | | | RCONH279 0 | RCONH280 0 | 4.d. |
| 5. Loans and leases held for investment: | | | | | | | | | | 5. |
| a. Residential mortgage exposures | | | | | | | | RCONH281 0 | RCONH282 0 | 5.a. |
| b. High volatility commercial real estate exposures | | | | | | | | RCONH283 0 | RCONH284 0 | 5.b. |
| c. Exposures past due 90 days or more or on nonaccrual[11] | | | | | | | | RCONH285 0 | RCONH286 0 | 5.c. |
| d. All other exposures | | | | | | | | RCONH287 0 | RCONH288 0 | 5.d. |
| 6. LESS: Allowance for credit losses on loans and leases | | | | | | | | | | 6. |
| 7. Trading assets | | RCONH186 0 | RCONH290 0 | RCONH187 0 | | | | RCONH291 0 | RCONH292 0 | 7. |
| 8. All other assets[12] | RCONH293 0 | RCONH188 0 | RCONS470 0 | RCONS471 0 | | | | RCONH294 0 | RCONH295 0 | 8. |
| a. Separate account bank-owned life insurance | | | | | | | | RCONH296 0 | RCONH297 0 | 8.a. |
| b. Default fund contributions to central counterparties | | | | | | | | RCONH298 0 | RCONH299 0 | 8.b. |

---

6.   For loans and leases held for sale, exclude residential mortgage exposures, high volatility commercial real estate exposures, or sovereign exposures that are past due 90 days or more or on nonaccrual.

7.   For loans and leases, net of unearned income, exclude residential mortgage exposures, high volatility commercial real estate exposures, or sovereign exposures that are past due 90 days or more or on nonaccrual.

8.   Includes premises and fixed assets, other real estate owned, investments in unconsolidated subsidiaries and associated companies, direct and indirect investments in real estate ventures, intangible assets, and other assets.

11.   For loans and leases, net of unearned income, exclude residential mortgage exposures, high volatility commercial real estate exposures, or sovereign exposures that are past due 90 days or more or on nonaccrual.

12.   Includes premises and fixed assets, other real estate owned, investments in unconsolidated subsidiaries and associated companies, direct and indirect investments in real estate ventures, intangible assets, and other assets.

Exhibit 1
Page 504 of 550

LEWIS & CLARK BANK
RSSD-ID 3489671
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 508 of 553

FFIEC 051
Report Date 12/31/2024
48

| Dollar amounts in thousands | (Column A) Totals | (Column B) Adjustments to Totals Reported in Column A | (Column Q) Allocation by Risk-Weight Category (Exposure Amount) 1,250% | (Column T) Total Risk-Weighted Asset Amount by Calculation Methodology SSFA | (Column U) Total Risk-Weighted Asset Amount by Calculation Methodology Gross-Up | |
|---|---|---|---|---|---|---|
| 9. On-balance sheet securitization exposures: | | | | | | 9. |
| a. Held-to-maturity securities[2] | RCONS475 0 | RCONS476 0 | RCONS477 0 | RCONS478 0 | RCONS479 0 | 9.a. |
| b. Available-for-sale securities | RCONS480 0 | RCONS481 0 | RCONS482 0 | RCONS483 0 | RCONS484 0 | 9.b. |
| c. Trading assets | RCONS485 0 | RCONS486 0 | RCONS487 0 | RCONS488 0 | RCONS489 0 | 9.c. |
| d. All other on-balance sheet securitization exposures | RCONS490 0 | RCONS491 0 | RCONS492 0 | RCONS493 0 | RCONS494 0 | 9.d. |
| 10. Off-balance sheet securitization exposures | RCONS495 0 | RCONS496 0 | RCONS497 0 | RCONS498 0 | RCONS499 0 | 10. |

2.    Institutions should report as a negative number in column B, those allowances for credit losses eligible for inclusion in tier 2 capital, which excludes allowances for credit losses on purchased credit-deteriorated assets.

Exhibit 1
Page 505 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
49

| Dollar amounts in thousands | (Column A) Totals From Schedule RC | (Column B) Adjustments to Totals Reported in Column A | (Column C) Allocation by Risk-Weight Category 0% | (Column D) Allocation by Risk-Weight Category 2% | (Column E) Allocation by Risk-Weight Category 4% | (Column F) Allocation by Risk-Weight Category 10% | (Column G) Allocation by Risk-Weight Category 20% | (Column H) Allocation by Risk-Weight Category 50% | (Column I) Allocation by Risk-Weight Category 100% | (Column J) Allocation by Risk-Weight Category 150% | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11. Total balance sheet assets[14] | RCON2170 342,961 | RCONS500 -7,790 | RCOND987 132,411 | RCONHJ90 0 | RCONHJ91 0 | | RCOND988 43,431 | RCOND989 7,198 | RCOND990 166,720 | RCONS503 0 | 11. |

| Dollar amounts in thousands | (Column K) Allocation by Risk-Weight Category 250% | (Column L) Allocation by Risk-Weight Category 300% | (Column M) Allocation by Risk-Weight Category 400% | (Column N) Allocation by Risk-Weight Category 600% | (Column O) Allocation by Risk-Weight Category 625% | (Column P) Allocation by Risk-Weight Category 937.5% | (Column Q) Allocation by Risk-Weight Category 1,250% | (Column R) Application of Other Risk-Weighting Approaches Exposure Amount | |
|---|---|---|---|---|---|---|---|---|---|
| 11. Total balance sheet assets[14] | RCONS504 0 | RCONS505 0 | RCONS506 0 | RCONS507 0 | | | RCONS510 0 | RCONH300 0 | 11. |

| Dollar amounts in thousands | (Column A) Face, Notional, or Other Amount | (Column B) Credit Equivalent Amount | (Column C) Allocation by Risk-Weight Category 0% | (Column D) Allocation by Risk-Weight Category 2% | (Column E) Allocation by Risk-Weight Category 4% | (Column F) Allocation by Risk-Weight Category 10% | (Column G) Allocation by Risk-Weight Category 20% | (Column H) Allocation by Risk-Weight Category 50% | (Column I) Allocation by Risk-Weight Category 100% | (Column J) Allocation by Risk-Weight Category 150% | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12. Financial standby letters of credit | RCOND991 100 | RCOND992 100 | RCOND993 0 | RCONHJ92 0 | RCONHJ93 0 | | RCOND994 0 | RCOND995 0 | RCOND996 100 | RCONS511 0 | 12. |
| 13. Performance standby letters of credit and transaction-related contingent items | RCOND997 0 | RCOND998 0 | RCOND999 0 | | | | RCONG603 0 | RCONG604 0 | RCONG605 0 | RCONS512 0 | 13. |
| 14. Commercial and similar letters of credit with an original maturity of one year or less | RCONG606 0 | RCONG607 0 | RCONG608 0 | RCONHJ94 0 | RCONHJ95 0 | | RCONG609 0 | RCONG610 0 | RCONG611 0 | RCONS513 0 | 14. |
| 15. Retained recourse on small business obligations sold with recourse | RCONG612 0 | RCONG613 0 | RCONG614 0 | | | | RCONG615 0 | RCONG616 0 | RCONG617 0 | RCONS514 0 | 15. |

| Dollar amounts in thousands | (Column A) Face, Notional, or Other Amount | (Column B) Credit Equivalent Amount | (Column C) Allocation by Risk-Weight Category 0% | (Column D) Allocation by Risk-Weight Category 2% | (Column E) Allocation by Risk-Weight Category 4% | (Column F) Allocation by Risk-Weight Category 10% | (Column G) Allocation by Risk-Weight Category 20% | (Column H) Allocation by Risk-Weight Category 50% | (Column I) Allocation by Risk-Weight Category 100% | (Column J) Allocation by Risk-Weight Category 150% | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 16. Repo-style transactions[21] | RCONS515 0 | RCONS516 0 | RCONS517 0 | RCONS518 0 | RCONS519 0 | | RCONS520 0 | RCONS521 0 | RCONS522 0 | RCONS523 0 | 16. |
| 17. All other off-balance sheet liabilities | RCONG618 0 | RCONG619 0 | RCONG620 0 | | | | RCONG621 0 | RCONG622 0 | RCONG623 0 | RCONS524 0 | 17. |
| 18. Unused commitments (exclude unused commitments to asset-backed commercial paper conduits): | | | | | | | | | | | 18. |
| a. Original maturity of one year or less | RCONS525 1,385 | RCONS526 277 | RCONS527 0 | RCONHJ96 0 | RCONHJ97 0 | | RCONS528 0 | RCONS529 0 | RCONS530 277 | RCONS531 0 | 18.a |

14.  For each of columns A through R of item 11, report the sum of items 1 through 9. For item 11, the sum of columns B through R must equal column A. Item 11, column A, must equal Schedule RC, item 12.
21.  Includes securities purchased under agreements to resell (reverse repos), securities sold under agreements to repurchase (repos), securities borrowed, and securities lent.

Exhibit 1
Page 506 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
50

| Dollar amounts in thousands | (Column A) Face, Notional, or Other Amount | (Column B) Credit Equivalent Amount | (Column C) Allocation by Risk-Weight Category 0% | (Column D) Allocation by Risk-Weight Category 2% | (Column E) Allocation by Risk-Weight Category 4% | (Column F) Allocation by Risk-Weight Category 10% | (Column G) Allocation by Risk-Weight Category 20% | (Column H) Allocation by Risk-Weight Category 50% | (Column I) Allocation by Risk-Weight Category 100% | (Column J) Allocation by Risk-Weight Category 150% | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| b. Original maturity exceeding one year | RCONG624 26,818 | RCONG625 13,309 | RCONG626 0 | RCONHJ98 | RCONHJ99 | | RCONG627 0 | RCONG628 0 | RCONG629 13,309 | RCONS539 0 | 18.b. |
| 19. Unconditionally cancelable commitments | RCONS540 0 | RCONS541 0 | | | | | | | | | 19. |
| 20. Over-the-counter derivatives | | RCONS542 0 | RCONS543 0 | RCONHK00 0 | RCONHK01 0 | RCONS544 0 | RCONS545 0 | RCONS546 0 | RCONS547 0 | RCONS548 0 | 20. |
| 21. Centrally cleared derivatives | | RCONS549 0 | RCONS550 0 | RCONS551 0 | RCONS552 0 | | RCONS554 0 | RCONS555 0 | RCONS556 0 | RCONS557 0 | 21. |
| 22. Unsettled transactions (failed trades)[22] | RCONH191 0 | | RCONH193 0 | | | | RCONH194 0 | RCONH195 0 | RCONH196 0 | RCONH197 0 | 22. |

22.  For item 22, the sum of columns C through Q must equal column A.

Exhibit 1
Page 507 of 550

LEWIS & CLARK BANK
RSSD-ID 3489171
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 511 of 553

FFIEC 051
Report Date 12/31/2024
51

| Dollar amounts in thousands | (Column O) Allocation by Risk-Weight Category 625% | (Column P) Allocation by Risk-Weight Category 937.5% | (Column Q) Allocation by Risk-Weight Category 1,250% | (Column R) Application of Other Risk-Weighting Approaches Credit Equivalent Amount | (Column S) Application of Other Risk-Weighting Approaches Risk-Weighted Asset Amount | |
|---|---|---|---|---|---|---|
| 16. Repo-style transactions[24] | | | | RCONH301 0 | RCONH302 0 | 16. |
| 17. All other off-balance sheet liabilities | | | | | | 17. |
| 18. Unused commitments (exclude unused commitments to asset-backed commercial paper conduits): | | | | | | 18. |
| a. Original maturity of one year or less | | | | RCONH303 0 | RCONH304 0 | 18.a. |
| b. Original maturity exceeding one year | | | | RCONH307 0 | RCONH308 0 | 18.b. |
| 19. Unconditionally cancelable commitments | | | | | | 19. |
| 20. Over-the-counter derivatives | | | | RCONH309 0 | RCONH310 0 | 20. |
| 21. Centrally cleared derivatives | | | | | | 21. |
| 22. Unsettled transactions (failed trades)[25] | RCONH198 0 | RCONH199 0 | RCONH200 0 | | | 22. |

24. Includes securities purchased under agreements to resell (reverse repos), securities sold under agreements to repurchase (repos), securities borrowed, and securities lent.

25. For item 22, the sum of columns C through Q must equal column A.

Exhibit 1
Page 508 of 550

LEWIS & CLARK BANK
RSSD-ID 3489071
Last Updated on 1/27/2025

FFIEC 051
Report Date 12/31/2024
52

| Dollar amounts in thousands | (Column C) Allocation by Risk-Weight Category 0% | (Column D) Allocation by Risk-Weight Category 2% | (Column E) Allocation by Risk-Weight Category 4% | (Column F) Allocation by Risk-Weight Category 10% | (Column G) Allocation by Risk-Weight Category 20% | (Column H) Allocation by Risk-Weight Category 50% | (Column I) Allocation by Risk-Weight Category 100% | (Column J) Allocation by Risk-Weight Category 150% | |
|---|---|---|---|---|---|---|---|---|---|
| 23. Total assets, derivatives, off-balance sheet items, and other items subject to risk weighting by risk-weight category (for each of columns C through P; sum of items 11 through 22; for column Q, sum of items 10 through 22)... | RCONG830 132,411 | RCONS558 0 | RCONS559 0 | RCONS560 0 | RCONG831 43,431 | RCONG832 7,198 | RCONG833 180,406 | RCONS561 0 | 23. |
| 24. Risk weight factor | | | | | | | | | 24. |
| 25. Risk-weighted assets by risk-weight category (for each column, item 23 multiplied by item 24)... | RCONG834 0 | RCONS569 0 | RCONS570 0 | RCONS571 0 | RCONG835 8,686 | RCONG836 3,599 | RCONG837 180,406 | RCONS572 0 | 25. |

| Dollar amounts in thousands | (Column K) Allocation by Risk-Weight Category 250% | (Column L) Allocation by Risk-Weight Category 300% | (Column M) Allocation by Risk-Weight Category 400% | (Column N) Allocation by Risk-Weight Category 600% | (Column O) Allocation by Risk-Weight Category 625% | (Column P) Allocation by Risk-Weight Category 937.5% | (Column Q) Allocation by Risk-Weight Category 1,250% | |
|---|---|---|---|---|---|---|---|---|
| 23. Total assets, derivatives, off-balance sheet items, and other items subject to risk weighting by risk-weight category (for each of columns C through P; sum of items 11 through 22; for column Q, sum of items 10 through 22)...... | RCONS562 0 | RCONS563 0 | RCONS564 0 | RCONS565 0 | RCONS566 0 | RCONS567 0 | RCONS568 0 | 23. |
| 24. Risk weight factor | | | | | | | | 24. |
| 25. Risk-weighted assets by risk-weight category (for each column, item 23 multiplied by item 24)... | RCONS573 0 | RCONS574 0 | RCONS575 0 | RCONS576 0 | RCONS577 0 | RCONS578 0 | RCONS579 0 | 25. |

Exhibit 1
Page 509 of 550

LEWIS & CLARK BANK
RSSD-ID 348997
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 513 of 553

FFIEC 051
Report Date 12/31/2024
53

Dollar amounts in thousands

*Items 26 through 31 are to be completed quarterly.*

| | | |
|---|---|---|
| 26. Risk-weighted assets base for purposes of calculating the adjusted allowances for credit losses (AACL) 1.25 percent threshold. | RCONS580 | 192,691 | 26. |
| 27. Standardized market-risk weighted assets (applicable only to banks that are covered by the market risk capital rule). | RCONS581 | 0 | 27. |
| 28. Risk-weighted assets before deductions for excess AACL and allocated risk transfer risk reserve[27] | RCONB704 | 192,691 | 28. |
| 29. LESS: Excess AACL[28] | RCONA222 | 0 | 29. |
| 30. LESS: Allocated transfer risk reserve. | RCON3128 | 0 | 30. |
| 31. Total risk-weighted assets (item 28 minus items 29 and 30). | RCONG641 | 192,691 | 31. |
| *Memorandum items 1, 2, and 3 are to be completed semiannually in the June and December reports only.* | | | |
| 1. Current credit exposure across all derivative contracts covered by the regulatory capital rules. | RCONG642 | 0 | M.1. |

Dollar amounts in thousands

| | (Column A) With a remaining maturity of One year or less | | (Column B) With a remaining maturity of Over one year through five years | | (Column C) With a remaining maturity of Over five years | | |
|---|---|---|---|---|---|---|---|
| 2. Notional principal amounts of over-the-counter derivative contracts: | | | | | | | M.2. |
| a. Interest rate. | RCONS582 | 0 | RCONS583 | 0 | RCONS584 | 0 | M.2.a. |
| b. Foreign exchange rate and gold. | RCONS585 | 0 | RCONS586 | 0 | RCONS587 | 0 | M.2.b. |
| c. Credit (investment grade reference asset). | RCONS588 | 0 | RCONS589 | 0 | RCONS590 | 0 | M.2.c. |
| d. Credit (non-investment grade reference asset). | RCONS591 | 0 | RCONS592 | 0 | RCONS593 | 0 | M.2.d. |
| e. Equity. | RCONS594 | 0 | RCONS595 | 0 | RCONS596 | 0 | M.2.e. |
| f. Precious metals (except gold). | RCONS597 | 0 | RCONS598 | 0 | RCONS599 | 0 | M.2.f. |
| g. Other. | RCONS600 | 0 | RCONS601 | 0 | RCONS602 | 0 | M.2.g. |
| 3. Notional principal amounts of centrally cleared derivative contracts: | | | | | | | M.3. |
| a. Interest rate. | RCONS603 | 0 | RCONS604 | 0 | RCONS605 | 0 | M.3.a. |
| b. Foreign exchange rate and gold. | RCONS606 | 0 | RCONS607 | 0 | RCONS608 | 0 | M.3.b. |
| c. Credit (investment grade reference asset). | RCONS609 | 0 | RCONS610 | 0 | RCONS611 | 0 | M.3.c. |
| d. Credit (non-investment grade reference asset). | RCONS612 | 0 | RCONS613 | 0 | RCONS614 | 0 | M.3.d. |
| e. Equity. | RCONS615 | 0 | RCONS616 | 0 | RCONS617 | 0 | M.3.e. |
| f. Precious metals (except gold). | RCONS618 | 0 | RCONS619 | 0 | RCONS620 | 0 | M.3.f. |
| g. Other. | RCONS621 | 0 | RCONS622 | 0 | RCONS623 | 0 | M.3.g. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 4. Amount of allowances for credit losses on purchased credit-deteriorated assets: | | | M.4. |
| a. Loans and leases held for investment. | RCONJJ30 | 0 | M.4.a. |
| b. Held-to-maturity debt securities. | RCONJJ31 | 0 | M.4.b. |
| c. Other financial assets measured at amortized cost. | RCONJJ32 | 0 | M.4.c. |

## Schedule RC-T - Fiduciary and Related Services(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Does the institution have fiduciary powers? (If "NO," do not complete Schedule RC-T). | RCONA345 | No | 1. |
| 2. Does the institution exercise the fiduciary powers it has been granted? | RCONA346 | No | 2. |
| 3. Does the institution have any fiduciary or related activity (in the form of assets or accounts) to report in this schedule? (If "NO," do not complete the rest of Schedule RC-T). | RCONB867 | No | 3. |

27. Sum of items 2.b through 20, column S; items 9.a, 9.b, 9.c, 9.d, and 10, columns T and U; item 25, columns C through Q; and item 27 (if applicable).

28. Institutions that have elected to apply the 3-year or the 5-year 2020 CECL transition provision should subtract the applicable portion of the AACL transitional amount or the modified AACL transitional amount, respectively, from the AACL, as defined in the regulatory capital rule, before determining the amount of excess AACL.

Exhibit 1
Page 510 of 550

| Dollar amounts in thousands | (Column A) Managed Assets | | (Column B) Non-Managed Assets | | (Column C) Number of Managed Accounts | | (Column D) Number of Non-Managed Accounts | | |
|---|---|---|---|---|---|---|---|---|---|
| 4. Personal trust and agency accounts | RCONB868 | NR | RCONB869 | NR | RCONB870 | NR | RCONB871 | NR | 4. |
| 5. Employee benefit and retirement-related trust and agency accounts: | | | | | | | | | 5. |
| a. Employee benefit - defined contribution | RCONB872 | NR | RCONB873 | NR | RCONB874 | NR | RCONB875 | NR | 5.a. |
| b. Employee benefit - defined benefit | RCONB876 | NR | RCONB877 | NR | RCONB878 | NR | RCONB879 | NR | 5.b. |
| c. Other employee benefit and retirement-related accounts | RCONB880 | NR | RCONB881 | NR | RCONB882 | NR | RCONB883 | NR | 5.c. |
| 6. Corporate trust and agency accounts | RCONB884 | NR | RCONB885 | NR | RCONC001 | NR | RCONC002 | NR | 6. |
| 7. Investment management and investment advisory agency accounts | RCONB886 | NR | RCONJ253 | NR | RCONB888 | NR | RCONJ254 | NR | 7. |
| 8. Foundation and endowment trust and agency accounts | RCONJ255 | NR | RCONJ256 | NR | RCONJ257 | NR | RCONJ258 | NR | 8. |
| 9. Other fiduciary accounts | RCONB890 | NR | RCONB891 | NR | RCONB892 | NR | RCONB893 | NR | 9. |
| 10. Total fiduciary accounts (sum of items 4 through 9) | RCONB894 | NR | RCONB895 | NR | RCONB896 | NR | RCONB897 | NR | 10. |
| 11. Custody and safekeeping accounts | | | RCONB898 | NR | | | RCONB899 | NR | 11. |
| 12. Not applicable | | | | | | | | | 12. |
| 13. Individual Retirement Accounts, Health Savings Accounts, and other similar accounts (included in items 5.c and 11) | RCONJ259 | NR | RCONJ260 | NR | RCONJ261 | NR | RCONJ262 | NR | 13. |

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 14. Personal trust and agency accounts | RIADB904 | NR | 14. |
| 15. Employee benefit and retirement-related trust and agency accounts: | | | 15. |
| a. Employee benefit - defined contribution | RIADB905 | NR | 15.a. |
| b. Employee benefit - defined benefit | RIADB906 | NR | 15.b. |
| c. Other employee benefit and retirement-related accounts | RIADB907 | NR | 15.c. |
| 16. Corporate trust and agency accounts | RIADA479 | NR | 16. |
| 17. Investment management and investment advisory agency accounts | RIADJ315 | NR | 17. |
| 18. Foundation and endowment trust and agency accounts | RIADJ316 | NR | 18. |
| 19. Other fiduciary accounts | RIADA480 | NR | 19. |
| 20. Custody and safekeeping accounts | RIADB909 | NR | 20. |
| 21. Other fiduciary and related services income | RIADB910 | NR | 21. |
| 22. Total gross fiduciary and related services income (sum of items 14 through 21) (must equal Schedule RI, item 5.a) | RIAD4070 | 0 | 22. |
| 23. Less: Expenses | RIADC058 | NR | 23. |
| 24. Less: Net losses from fiduciary and related services | RIADA488 | NR | 24. |
| 25. Plus: Intracompany income credits for fiduciary and related services | RIADB911 | NR | 25. |
| 26. Net fiduciary and related services income | RIADA491 | NR | 26. |

Exhibit 1
Page 511 of 550

LEWIS & CLARK BANK
RSSD-ID 3489627
Last Updated on 1/27/2025

Case 3:25-cv-01560-JR    Document 2    Filed 09/02/25    Page 515 of 553

FFIEC 051
Report Date 12/31/2024
55

| Dollar amounts in thousands | (Column A) Personal Trust and Agency and Investment Management Agency Accounts | | (Column B) Employee Benefit and Retirement-Related Trust and Agency Accounts | | (Column C) All Other Accounts | | |
|---|---|---|---|---|---|---|---|
| 1. Managed assets held in fiduciary accounts: | | | | | | | M.1. |
| a. Noninterest-bearing deposits | RCONJ263 | NR | RCONJ264 | NR | RCONJ265 | NR | M.1.a. |
| b. Interest-bearing deposits | RCONJ266 | NR | RCONJ267 | NR | RCONJ268 | NR | M.1.b. |
| c. U.S. Treasury and U.S. Government agency obligations | RCONJ269 | NR | RCONJ270 | NR | RCONJ271 | NR | M.1.c. |
| d. State, county, and municipal obligations | RCONJ272 | NR | RCONJ273 | NR | RCONJ274 | NR | M.1.d. |
| e. Money market mutual funds | RCONJ275 | NR | RCONJ276 | NR | RCONJ277 | NR | M.1.e. |
| f. Equity mutual funds | RCONJ278 | NR | RCONJ279 | NR | RCONJ280 | NR | M.1.f. |
| g. Other mutual funds | RCONJ281 | NR | RCONJ282 | NR | RCONJ283 | NR | M.1.g. |
| h. Common trust funds and collective investment funds | RCONJ284 | NR | RCONJ285 | NR | RCONJ286 | NR | M.1.h. |
| i. Other short-term obligations | RCONJ287 | NR | RCONJ288 | NR | RCONJ289 | NR | M.1.i. |
| j. Other notes and bonds | RCONJ290 | NR | RCONJ291 | NR | RCONJ292 | NR | M.1.j. |
| k. Investments in unregistered funds and private equity investments | RCONJ293 | NR | RCONJ294 | NR | RCONJ295 | NR | M.1.k. |
| l. Other common and preferred stocks | RCONJ296 | NR | RCONJ297 | NR | RCONJ298 | NR | M.1.l. |
| m. Real estate mortgages | RCONJ299 | NR | RCONJ300 | NR | RCONJ301 | NR | M.1.m. |
| n. Real estate | RCONJ302 | NR | RCONJ303 | NR | RCONJ304 | NR | M.1.n. |
| o. Miscellaneous assets | RCONJ305 | NR | RCONJ306 | NR | RCONJ307 | NR | M.1.o. |
| p. Total managed assets held in fiduciary accounts (for each column, sum of Memorandum items 1.a through 1.o) | RCONJ308 | NR | RCONJ309 | NR | RCONJ310 | NR | M.1.p. |

| Dollar amounts in thousands | (Column A) Managed Assets | | (Column B) Number of Managed Accounts | | |
|---|---|---|---|---|---|
| q. Investments of managed fiduciary accounts in advised or sponsored mutual funds | RCONJ311 | NR | RCONJ312 | NR | M.1.q. |

| Dollar amounts in thousands | (Column A) Number of Issues | | (Column B) Principal Amount Outstanding | | |
|---|---|---|---|---|---|
| 2. Corporate trust and agency accounts: | | | | | M.2. |
| a. Corporate and municipal trusteeships | RCONB927 | NR | RCONB928 | NR | M.2.a. |
| 1. Issues reported in Memorandum item 2.a that are in default | RCONJ313 | NR | RCONJ314 | NR | M.2.a.1. |
| b. Transfer agent, registrar, paying agent, and other corporate agency | RCONB929 | NR | | | M.2.b. |

| Dollar amounts in thousands | (Column A) Number of Funds | | (Column B) Market Value of Fund Assets | | |
|---|---|---|---|---|---|
| Memoranda items 3.a through 3.g are to be completed by banks with collective investment funds and common trust funds with a total market value of $1 billion or more as of the preceding December 31. | | | | | |
| 3. Collective investment funds and common trust funds: | | | | | M.3. |
| a. Domestic equity | RCONB931 | NR | RCONB932 | NR | M.3.a. |
| b. International/Global equity | RCONB933 | NR | RCONB934 | NR | M.3.b. |
| c. Stock/Bond blend | RCONB935 | NR | RCONB936 | NR | M.3.c. |
| d. Taxable bond | RCONB937 | NR | RCONB938 | NR | M.3.d. |
| e. Municipal bond | RCONB939 | NR | RCONB940 | NR | M.3.e. |
| f. Short term investments/Money market | RCONB941 | NR | RCONB942 | NR | M.3.f. |
| g. Specialty/Other | RCONB943 | NR | RCONB944 | NR | M.3.g. |
| h. Total collective investment funds (sum of Memorandum items 3.a through 3.g) | RCONB945 | NR | RCONB946 | NR | M.3.h. |

Exhibit 1
Page 512 of 550

| Dollar amounts in thousands | (Column A) Gross Losses Managed Accounts | | (Column B) Gross Losses Non-Managed Accounts | | (Column C) Recoveries | | |
|---|---|---|---|---|---|---|---|
| 4. Fiduciary settlements, surcharges, and other losses: | | | | | | | M.4. |
| a. Personal trust and agency accounts | RIADB947 | NR | RIADB948 | NR | RIADB949 | NR | M.4.a. |
| b. Employee benefit and retirement-related trust and agency accounts | RIADB950 | NR | RIADB951 | NR | RIADB952 | NR | M.4.b. |
| c. Investment management agency accounts | RIADB953 | NR | RIADB954 | NR | RIADB955 | NR | M.4.c. |
| d. Other fiduciary accounts and related services | RIADB956 | NR | RIADB957 | NR | RIADB958 | NR | M.4.d. |
| e. Total fiduciary settlements, surcharges, and other losses (sum of Memorandum items 4.a through 4.d) (sum of columns A and B minus column C must equal Schedule RC-T, item 24) | RIADB959 | NR | RIADB960 | NR | RIADB961 | NR | M.4.e. |

## Schedule SU - Supplemental Information(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Does the institution have any derivative contracts? | RCONFT00 | No | 1. |
| a. Total gross notional amount of interest rate derivatives held for trading | RCONA126 | NR | 1.a. |
| b. Total gross notional amount of all other derivatives held for trading | RCONFT01 | NR | 1.b. |
| c. Total gross notional amount of interest rate derivatives not held for trading | RCON8725 | NR | 1.c. |
| d. Total gross notional amount of all other derivatives not held for trading | RCONFT02 | NR | 1.d. |
| 2. For each of the two calendar quarters preceding the current calendar quarter, did the institution meet one or both of the following mortgage banking activity thresholds: (1) Sales of 1–4 family residential mortgage loans during the calendar quarter exceeded $10 million, or (2) 1–4 family residential mortgage loans held for sale or trading as of calendar quarter-end exceeded $10 million? | RCONFT03 | No | 2. |
| a. Principal amount of 1–4 family residential mortgage loans sold during the quarter | RCONFT04 | NR | 2.a. |
| b. Quarter-end amount of 1–4 family residential mortgage loans held for sale or trading | RCONFT05 | NR | 2.b. |
| 3. Does the institution use the fair value option to measure any of its assets or liabilities? | RCONFT06 | No | 3. |
| a. Aggregate amount of fair value option assets | RCONHK18 | NR | 3.a. |
| b. Aggregate amount of fair value option liabilities | RCONHK19 | NR | 3.b. |
| c. Year-to-date net gains (losses) recognized in earnings on fair value option assets | RIADF551 | NR | 3.c. |
| d. Year-to-date net gains (losses) recognized in earnings on fair value option liabilities | RIADF553 | NR | 3.d. |
| 4. Does the institution have any assets it has sold and securitized with servicing retained or with recourse or other seller-provided credit enhancements? | RCONFT07 | No | 4. |
| a. Total outstanding principal balance of assets sold and securitized by the reporting institution with servicing retained or with recourse or other seller-provided credit enhancement. | RCONFT08 | NR | 4.a. |
| 5. Does the institution have any assets it has sold with recourse or other seller-provided credit enhancements but has not securitized? | RCONFT09 | No | 5. |
| a. Total outstanding principal balance of assets sold by the reporting institution with recourse or other seller-provided credit enhancements, but not securitized by the reporting institution. | RCONFT10 | NR | 5.a. |
| 6. Does the institution service any closed-end 1–4 family residential mortgage loans for others or does it service more than $10 million of other financial assets for others? | RCONFT11 | No | 6. |
| a. Total outstanding principal balance of closed-end 1–4 family residential mortgage loans serviced for others plus the total outstanding principal balance of other financial assets serviced for others if more than $10 million. | RCONFT12 | NR | 6.a. |
| 7. Does the institution have any consolidated variable interest entities? | RCONFT13 | No | 7. |
| a. Total assets of consolidated variable interest entities[1] | RCONFT14 | NR | 7.a. |
| b. Total liabilities of consolidated variable interest entities | RCONFT15 | NR | 7.b. |
| 8. Does the institution, together with affiliated institutions, have outstanding credit card receivables that exceed $500 million as of the report date or is the institution a credit card specialty bank as defined for Uniform Bank Performance Report purposes? | RCONFT16 | No | 8. |
| a. Outstanding credit card fees and finance charges included in credit cards to individuals for household, family, and other personal expenditures (retail credit cards). | RCONC391 | NR | 8.a. |
| b. Separate valuation allowance for uncollectible retail credit card fees and finance charges. | RIADC389 | NR | 8.b. |
| c. Amount of allowance for credit losses on loans and leases attributable to retail credit card fees and finance charges. | RIADC390 | NR | 8.c. |
| d. Uncollectible retail credit card fees and finance charges reversed against year-to-date income. | RIADC388 | NR | 8.d. |

---

1.   Institutions should report assets net of any applicable allowance for credit losses.

Exhibit 1
Page 513 of 550

## Optional Narrative Statement Concerning the Amounts Reported in the Consolidated Reports of Condition and Income(Form Type - 051)

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Comments?............................................................................................ | RCON6979 | **No** | 1. |
| 2. Bank Management Statement (please type or print clearly; 750 character limit):............... | TEXT6980 | **NR** | 2. |

Exhibit 1
Page 514 of 550

# NOTIFICATION

by

## LEWIS & CLARK BANCORP

to

## THE FEDERAL RESERVE BANK OF SAN FRANCISCO

pursuant to

## SECTION 225.24 OF REGULATION Y (12 C.F.R. § 225.24)

for an

## ACQUISITION OF VOTING SECURITIES OF A COMPANY ENGAGED IN NON-BANKING ACTIVITIES APPROVED BY REGULATION

April 28, 2025

ACTIVE/119185451.9

Exhibit 1
Page 515 of 550

FR Y-4
OMB Number 7100-0121
Approval expires July 31, 2027
Page 1 of 2

Board of Governors of the Federal Reserve System



# Notification by a Bank Holding Company to Acquire a Nonbank Company and/or Engage in Nonbanking Activities—FR Y-4

Lewis & Clark Bancorp

Corporate Title of Notificant

15960 S. Agnes Avenue

Street Address

Oregon City      OR      97045

City      State      Zip Code

Hereby provides the Board with a notice pursuant to:

☐ (1) Section 4(c)(8) and 4(j) of the Bank Holding Company Act of 1956, as amended ("BHC Act"— 12 U.S.C. § 1843), under the "Expedited action for certain nonbanking proposals by well-run bank holding companies" as described in section 225.23 of Regulation Y; or

☒ (2) Section 4(c)(8) and 4(j) of the BHC Act, under the "Procedures for other nonbanking proposals" as described in section 225.24 of Regulation Y.

for prior approval to engage directly or indirectly in certain nonbanking activities, *de novo*, through acquisition of the assets of a going concern, or through direct or indirect ownership, control, or power to vote at least _____ See Below _____ (_____ %) of the voting shares of:

Number

iCashe, Inc.

Corporate Title of Company to be Acquired and/or Description of Nonbanking Activity (refer to section 225.28 of Regulation Y, as applicable)

5331 SW Macadam Avenue, Suite 251

Street Address

Portland      OR      97239

City      State      Zip Code

Shares to be acquired or retained:

7,986,668 shares of Series A-1 Preferred Stock of iCashe, Inc. ("iCashe"), representing 100% of the issued and outstanding Series A-1 Preferred Stock of iCashe.

1,129,340 shares of Series A-2 Preferred Stock of iCashe representing 37.7% of the issued and outstanding shares of Series A-2 Preferred Stock of iCashe.

253,452 shares of Common Stock of iCashe represent 11.9% of the issued and outstanding Common Stock of iCashe.

Does notificant request confidential treatment for any portion of this submission?

☒ Yes

     ☒ As required by the General Instructions, a letter justifying the request for confidential treatment is included.

     ☒ The information for which confidential treatment is being sought is separately bound and labeled "Confidential."

☐ No

Public reporting burden for this collection of information is estimated to average 0.53 hours for a post-consummation notification, 4.5 hours for an expedited notification, and 11 hours for a complete notification, including the time to gather and maintain data in the required form, to review instructions, and to complete the information collection. The Federal Reserve may not conduct or sponsor, and an organization or a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, NW, Washington, DC 20551; and to the Office of Management and Budget, Paperwork Reduction Project (7100-0121), Washington, DC 20503.

07/2024

Exhibit 1
Page 516 of 550

Name, title, address, telephone number, and email address of person(s) to whom inquiries concerning this notification may be directed:

| | | | |
|---|---|---|---|
| William E. Stern, Goodwin Procter LLP | | | Name |
| Name | | | |
| Partner | | | Title |
| Title | | | |
| 620 Eighth Avenue | | | Street Address |
| Street Address | | | |
| New York | NY | 10018 | City / State / Zip Code |
| City | State | Zip Code | |
| 212-813-8890 | | | Area Code / Phone Number |
| Area Code / Phone Number | | | |
| wstern@goodwinlaw.com | | | Email Address |
| Email Address | | | |

## Certification

I certify that the information contained in this notification has been examined carefully by me and is true, correct, and complete, and is current as of the date of this submission to the best of my knowledge and belief. I acknowledge that any misrepresentation or omission of a material fact constitutes fraud in the inducement and may subject me to legal sanctions provided by 18 U.S.C. §§ 1001 and 1007.

I also certify that, with respect to any information pertaining to an individual and submitted to the Board in (or in connection with) this notification, that the notificant has the authority, on behalf of the individual, to provide such information to the Board and to consent or to object to public release of such information I certify that the notificant and the involved individual consent to public release of any such information, except to the extent set forth in a written request by the notificant or the individual, submitted in accordance with the Instructions to this form and the Board's Rules Regarding

Availability of Information (12 C.F.R. Part 261), requesting confidential treatment for the information.

I acknowledge that approval of this notification is in the discretion of the Board of Governors of the Federal Reserve System (the "Federal Reserve"). Actions or communications, whether oral, written, or electronic, by the Federal Reserve or its employees in connection with this filing, including approval if granted, do not constitute a contract, either express or implied, or any other obligation binding upon the agency, the United States or any other entity of the United States, or any officer or employee of the United States. Such actions or communications will not affect the ability of the Federal Reserve to exercise its supervisory, regulatory, or examination powers under applicable laws and regulations. I further acknowledge that the foregoing may not be waived or modified by any employee or agency of the Federal Reserve or of the United States.

Signed this _16_ day of _April_ , _2025_.
       Day        Month       Year

_____
Signature of Chief Executive Officer or Designee

Jeffrey Sumpter         President & CEO
Print or Type Name        Title

07/2024

Exhibit 1
Page 517 of 550

## I.   <u>Introductory Statement</u>

This notification (the "<u>Notification</u>") to the Board of Governors of the Federal Reserve System (the "<u>Board</u>") is submitted to the Federal Reserve Bank of San Francisco (the "<u>Reserve Bank</u>") on behalf of Lewis & Clark Bancorp (the "<u>Company</u>"), Oregon City, Oregon, a bank holding company within the meaning of the Bank Holding Company Act of 1956, as amended (the "<u>BHC Act</u>").  The Company is the parent bank holding company of Lewis & Clark Bank (the "<u>Bank</u>"), also of Oregon City, Oregon, an Oregon-chartered commercial bank.

As described more fully below, the Company is submitting this Notification pursuant to Sections 4(c)(8) and 4(j) of the BHC Act, 12 U.S.C. §§ 1843(c)(8) and (j), and Section 225.24 of the Board's Regulation Y, 12 C.F.R. § 225.24, to request the Board's written approval to:

(1) retain 998,332 shares of Series A-1 Preferred Stock, par value $0.0001 per share ("<u>Series A-1 Preferred Stock</u>"), of iCashe, Inc. ("<u>iCashe</u>"), Portland, Oregon, a Delaware corporation, which are owned by the Company;

(1) retain 1,129,340 shares of Series A-2 Preferred Stock, par value $0.0001 per share ("<u>Series A-2 Preferred Stock</u>"), of iCashe, which shares are currently owned by the Bank;

(3) retain 253,452 shares of Common Stock, par value $0.001 per share (the "<u>Common Stock</u>"), of iCashe that BankEvo has the right to acquire through exercise of a Common Stock Purchase Warrant issued by iCashe to the Company's existing, wholly owned subsidiary, BankEvo LLC, Oregon City, Oregon, a Wyoming limited liability company ("<u>BankEvo</u>"), on February 23, 2023 (the "<u>Warrant</u>"); and

(4) acquire 5,989,992 shares of Series A-1 Preferred Stock of iCashe that BankEvo, subject to obtaining the Board's approval as requested in this Notification, has the right to obtain through certain convertible loan notes issued on a quarterly basis between May 23, 2023 and August 30, 2024, and acquire 998,344 shares of Series A-1 Preferred Stock of iCashe that BankEvo, subject to obtaining the Board's approval as requested in this Notification, will have the right to obtain through a convertible loan note that will be issued in the future (each, a "<u>Quarterly Note</u>" and, collective, the "<u>Quarterly Notes</u>").

The shares of Series A-1 Preferred Stock of iCashe that the Company proposes to retain or acquire as described above will represent 100% of the issued and outstanding Series A-1 Preferred Stock of iCashe.

The shares of Series A-2 Preferred Stock of iCashe that the Company proposes to retain represent 37.7% of the issued and outstanding shares of Series A-2 Preferred Stock of iCashe.

The shares of Common Stock of iCashe that BankEvo has the right to obtain through exercise of the Warrant as described above will represent 11.9% of the issued and outstanding Common Stock of iCashe.

Subject to approval of this Notification, the Company intends to cause each of BankEvo and the Bank to distribute to the Company all interests in iCashe held by these entities so that all of such interests will be held directly by the Company.

ACTIVE/119185451.9

Exhibit 1
Page 518 of 550

II.    **Information Concerning the Parties and the Transaction**

    A.    **Description of the Parties**

        (i)    *Lewis & Clark Bancorp*

The Company is an Oregon corporation that was formed in 2020 to be the holding company for the Bank. The Company does not engage in any business or activities other than holding 100% of the capital stock of the Bank and 100% of the membership interests of BankEvo and managing its subsidiaries.

The Company's total consolidated assets were approximately $344.0 million as of December 31, 2024. The Company's net loss for the year ended December 31, 2024 was approximately $0.3 million. As of December 31, 2024, the Company's common equity Tier 1 risk-based capital ratio was 18.62%, Tier 1 leverage ratio was 9.90%, Tier 1 risk-based capital ratio was 18.62% and total risk-based capital ratio was 19.77%.

        (ii)    *Lewis & Clark Bank*

The Bank is a commercial bank organized and operating under the laws of Oregon and having its main office in Oregon City, Oregon. The Bank is subject to regulation, supervision, and examination by the Oregon Division of Financial Regulation and the Federal Deposit Insurance Corporation (the "FDIC").

The Bank is a commercial bank with core business lines around commercial and retail banking, lending, investing, financial technology and related services. The Bank's deposits are insured by the FDIC to the extent provided by law.

The Bank's total assets were approximately $342.1 million as of December 31, 2024. The Bank's net income for the year ended December 31, 2024 was approximately $0.4 million. As of December 31, 2024, the Bank's common equity Tier 1 risk-based capital ratio was 20.98%, Tier 1 leverage ratio was 11.11%, Tier 1 risk-based capital ratio was 20.98% and total risk-based capital ratio was 22.14%. Accordingly, the Bank is a "well-capitalized" bank under the Prompt Corrective Action guidelines of the FDIC at 12 C.F.R. § 324.403.

        (iii)    *BankEvo*

BankEvo is a Wyoming limited liability company which was formed in 2021 and is a wholly-owned subsidiary of the Company. From its formation date through December 31, 2024, BankEvo assisted the Bank with its comprehensive banking-as-a-service and channel partnership programs, which the Bank continues to make available to select partners. Example categories of services BankEvo provided to the Bank in relation to these programs were go-to-market efforts, revenue pipeline management, program risk/reward evaluation, and program innovation. BankEvo performed these services solely for the Bank and did not perform similar services for other financial institutions (or otherwise hold itself out to the public as being available to do so). Beginning January 1, 2025, all such activities are now being conducted by the Bank. BankEvo no longer performs these services for the Bank or any other financial institution.

ACTIVE/119185451.9

Exhibit 1
Page 519 of 550

(iv)    *iCashe*

iCashe is a Delaware corporation which was formed in 2020 as a spinout from Tyfone Inc. (https://tyfone.com/), a digital banking solutions company.  By harnessing the combination of digital know-how and payments-related intellectual property from the spinout, iCashe focuses on developing and operationalizing faster, cheaper, and more tailormade payments for local merchants, enhancing merchant deposit balances and noninterest revenue for local banks, and creating a better payments experience for consumers and businesses.  Financial information for iCashe is provided as Confidential Exhibit 1.  Additional information concerning iCashe's business is provided in Section II.C below.

### B.    History of the Company's Investment in iCashe

A description of the history of the Company's investment in iCashe is provided as Confidential Exhibit 2.

### C.    Description of iCashe's Activities

iCashe has developed a technology called purs.digital which uses the Check21 and automated clearing house ("ACH") payment rails to facilitate payment at point of sale. Purs.digital allows consumers and businesses to pay for goods and services using their mobile devices in a frictionless, secure and highly efficient manner, cutting out nearly all intermediaries involved in card. Purs.digital enables lower fees, quicker settlement, and a more customized experience for customers through its innovative use of the Federal Reserve System's large-scale, low-cost and rapid settlement rails.

Purs.digital enables consumers and businesses who have registered for the product and downloaded a mobile application to pay at the point of sale for goods and services using a mobile application that communicates with a local merchant's point of sale system or an enterprise's online check-out process.  A consumer must link a valid checking or share-draft account at a U.S. depository institution to his or her profile to use the mobile application.

As noted, purs.digital enables payments through Check21 and in some cases through ACH.  When a user authorizes a payment transaction, iCashe acts as the user's agent to create a paper check that meets all the requirements to be a check within the meaning of Section 3-104 of the Uniform Commercial Code, including affixing the user's facsimile signature to the check. iCashe also acts as the merchant's agent for purposes of affixing the merchant's endorsement on the reverse of the paper check by facsimile, truncating the check and transmitting an image of the item as an electronic check (as defined in Section 229.2(ggg) of the Board's Regulation CC) to the merchant's depository bank, which may be the Bank, for deposit to the merchant's account at that institution.  When use of Check21 is not feasible, iCashe creates an ACH file and submits it to an originating depository financial institution ("ODFI") for processing on behalf of the merchant.

The Company believes that iCashe's activities are permissible nonbanking activities for a subsidiary of a bank holding company because they consist of (1) financial data processing activities permitted by 12 C.F.R. § 225.28(b)(28), (2) printing and selling checks and related documents, which is permitted by 12 C.F.R. § 225.28(b)(10)(ii), and (3) functions or activities

- 3 -

Exhibit 1
Page 520 of 550

that may be performed by a trust company in the manner authorized by federal or state law, including acting as an agent, which is authorized by 12 C.F.R. § 225.28(b)(5).

With respect to financial data processing activities, Section 225.28(b)(28) of the Board's Regulation Y permits a bank holding company to directly or through a nonbank subsidiary engage in data processing, data storage and data transmission services and provide facilities (including data processing, data storage and data transmission hardware, software, documentation, or operating personnel), databases, advice, and access to such services, facilities, or databases by any technological means, if:

(A) The data to be processed, stored or furnished are financial, banking or economic; and

(B) The hardware provided in connection therewith is offered only in conjunction with software designed and marketed for the processing, storage and transmission of financial, banking, or economic data, and where the general purpose hardware does not constitute more than 30% of the cost of any packaged offering.

iCashe is engaged in permissible financial data processing activities because the purs.digital mobile application and the software that comprises it was designed and marketed for the purpose of enabling consumers to authorize a payment transaction and create a paper check, which iCashe converts to an electronic check and transmits to the merchant's depository bank, which may be the Bank, for deposit. iCashe does not provide hardware. The collection and processing of data necessary to create a check, and the process of check truncation involve data that is financial, banking and/or economic in nature. Similarly, preparing an submitting ACH entries to an ODFI involve processing of financial or banking data.  The process of printing a check constitutes the permissible activity of printing and selling checks.  When iCashe acts as a consumer's agent for the purpose of affixing a facsimile signature to a check or acts as a merchant's agent for the purpose of endorsing a check by affixing a facsimile signature, it is performing a function permissible for a trust company under federal or state law.  For instance, under Oregon law, a trust company is empowered to "[a]ct as attorney-in-fact or agent of a person for any lawful purpose."[1]

### D.    Other Factors

Before permitting a bank holding company to conduct nonbanking activities in accordance with Section 4(c)(8) of the BHC Act, the Board is required to consider whether the proposed activities "can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, unsound banking practices or risk to the stability of the United States banking or financial system."[2]  Accordingly, as explained below, the retention by the Company, through BankEvo, of an interest in iCashe is not expected to have a material adverse effect on competition in any relevant market in the United States or on the financial stability of the United

---

[1]    Or. Rev. Stat. § 709.150(1)(d).

[2]    12 U.S.C. § 1843(j)(2)(A); 12 C.F.R. § 225.26(a).

ACTIVE/119185451.9

Exhibit 1
Page 521 of 550

States. A discussion of the public benefits that will result from the investment by BankEvo in iCashe is also set forth below.

iCashe's market focus is small to midsize businesses and local merchants who rely primarily on card transactions to facilitate sales, and community banks and credit unions who cannot qualify as principal members (merchant acquirers, in this case) of the major card networks. By bringing the same experience as tap-and-pay at the point of sale, in-app payment for mobile purchases, and embedded payment workflow for online purchases, iCashe enables merchants and businesses to offer a modern and branded payments experience without the high cost of card settlement, and it enables community banks and credit unions to act as the merchant bank for settlement, thereby retaining merchant deposits and generating noninterest revenue. As importantly, iCashe disintermediates all of the parties involved in other forms of settlement (which reduces overhead and brings merchants and banks closer) and utilizes the Federal Reserve System's durable and scalable settlement infrastructure for its operations. There are numerous payment processors and merchant acquiring banks operating throughout the United States and the Pacific Northwest where both iCashe and the Company are based. Furthermore, the Company believes that its existing activities will be complementary to iCashe (i.e., the Company will enable iCashe to achieve its business objectives by facilitating settlement through Check 21 and ACH, and the Company will benefit from merchant deposits, noninterest revenue, and stronger relationships with new and existing merchant and business clients, etc.) and that none of its existing activities compete with iCashe. Accordingly, the Company does not expect that its investment in iCashe has had or will have any material adverse effect on competition in any relevant market. To the contrary, through investment in a company that is deploying a technology that competes with other existing forms of payment processing services, the Company believes that this investment has enhanced competition in the market for payment processing services.

In reviewing notifications submitted under Section 4(j) of the BHC Act, the Board will generally find that a transaction will have a significant adverse effect on the financial stability of the United States if the failure of the resulting firm, or its inability to conduct regular-course-of-business transactions, would likely impair financial intermediation or financial market functioning so as to inflict material damage on the broader economy.[3] Specifically, to assess the likelihood that the failure of a firm may harm the broader economy, the Board considers such factors as the degree to which a transaction will increase the size of an acquiring firm, the extent to which a transaction will reduce the availability of substitute providers of critical financial products or services, the extent to which a transaction will increase the interconnectedness or contribute to the complexity of the financial system, and the cross-border activities of the resulting firm.[4] The Board also considers the opaqueness and complexity of an institution's internal organization and the degree of difficulty of resolving an institution and winding up its affairs in the event of a failure. The Board also presumes that a proposal that involves an acquisition of less than $10 billion in assets, results in a firm with less than $100 billion in total assets, creates a combined organization that holds greater than 1 percent of total U.S. financial

---

[3]    *See Capital One Financial Corporation, McLean, Virginia, Order Approving the Acquisition of a Savings Association and Nonbanking Subsidiaries* (February 14, 2012).

[4]    *Id.; see also Morgan Stanley, New York, New York, Order Approving the Acquisition of Savings and Loan Holding Company and Certain Nonbanking Subsidiaries* (September 30, 2002).

Exhibit 1
Page 522 of 550

system assets, or represents a corporate reorganization is not likely to raise financial stability concerns absent evidence that the transaction would result in a significant increase in interconnectedness, complexity, cross-border activities, or other risk factor.[5] As demonstrated by the financial information provided in Confidential Exhibit 1 and Exhibit 8, the Company's size and the size of the transaction are substantially below the thresholds described above. Therefore, the transaction described in this notification presumptively does not raise concerns about financial stability. In addition, the Company is a bank holding company for a community based financial institution that does not engage in any cross-border activities. The transaction will not materially increase the Company's financial exposure to other financial institutions or cause other financial institutions to have significantly greater financial exposure to it, nor will it result in the Company becoming a significantly more complex financial institution.

The Company expects that the retention of an interest in iCashe has created, and the acquisition of an additional interest in iCashe will create, public benefits. In particular, the investment has and will enable iCashe to further develop its products and services, which are intended to enable financial institutions to process payments for goods and services more quickly and at lower expense. As noted above, the investment in iCashe is expected to continue to enhance competition for payment processing services. In addition, the Company notes that the Board on several occasions has concluded that "there are public benefits to be derived from permitting capital markets to operate so that bank holding companies can make potentially profitable investments in nonbanking companies and from permitting banking organizations to allocate their resources in the manner they consider to be most efficient. . . ."[6]

## III.   Information Required by Section 225.24(a)(2) of Regulation Y

Section 225.24(a)(2) of Regulation Y (12 C.F.R. § 225.24(a)(2)) requires that certain information must be provided by a bank holding company seeking to acquire or control voting securities or assets of a company engaged in a nonbanking activity listed in Section 225.28 of Regulation Y. Each item of information required by Section 225.24(a)(2) of Regulation Y is described below in bold print and followed by a response.

### A.   A description of the proposal, including a description of each proposed activity, and the effect of the proposal on competition among entities engaging in each proposed activity in each relevant market with relevant market indexes.

Please refer to Section II.A of the Introductory Statement for a description of the parties involved in the Proposed Transaction, Section II.B of the Introductory Statement for a description of the history of the Company's investment in iCashe, and Section II.C of the Introductory Statement for a description of the activities in which iCashe is engaged and why they are permissible non-banking activities under Section 4(c)(8) of the BHC Act.

---

[5]   See Bern Bancshares, Inc., Bern, Kansas, Order Approving an Increase in Ownership of a Bank Holding Company (December 8, 2020); See SVG Financial Group, Santa Clara, California, Order Approving the Merger of Bank Holding Companies, the Merger of Banks, and the Establishment of Branches (June 10, 2021).

[6]   See, e.g., Wachovia Corporation, 85 Fed. Res. Bull. 340 (May 1999).

ACTIVE/119185451.9

Exhibit 1
Page 523 of 550

As noted above, the purs.digital technology that iCashe has developed enables consumers to make payments to a merchant or business at the point of sale using the Check21 or ACH payment rail. Because the payment is settled between the consumer's bank and the merchant's/business's bank in a bank-to-bank transaction, it is not processed through a debit or credit card network, which enables iCashe to offer merchants and businesses lower processing fees than they might otherwise incur for using card-based payment systems. According to the most recent Federal Reserve Payment Studies, approximately 108 billion debit card transactions (including prepaid, non-prepaid and EBT) were processed in the United States in 2022 having a value of approximately $4.58 trillion, approximately 34.2 billion ACH transactions were processed in 2021 having a value of approximately $86.59 trillion, and approximately 11.1 billion checks were processed (including interbank and on-us) in 2021 having a value of approximately $27.44 trillion.[7] Current and forecast annual transaction volume and annual transaction value initiated through iCashe is de minimis in comparison to the level of debit card, ACH, or check transactions and value processed in the United States and in comparison to each of the companies with meaningful market share such as Square and Clover for debit card transactions or PayPal and Stripe for ACH transactions. In light of the relatively small volume of payments handled by iCashe in comparison to the overall volume of payments processed in the United States through various payment mechanisms and the fact that iCashe is able to lower payment processing costs for merchants by facilitating bank-to-bank payments, the Company believes that its investment in iCashe has promoted and will continue to promote competition in the market for payment services, resulting in public benefits.

    **B.**    **The identity of any entity involved in the proposal, and, if the notificant proposes to conduct the activity through an existing subsidiary, a description of the existing activities of the subsidiary.**

Please refer to Section II.A of the Introductory Statement for a description of the parties involved in the Proposed Transaction. As described above, BankEvo is a directly, wholly-owned subsidiary of the Company and performs services for the Bank of the type permitted by Section 4(c)(1)(C) of the BHC Act.[8] Board precedent permits a company such as BankEvo to engage in internal servicing activities in reliance upon Section 4(c)(1)(C) of the BHC Act and also to conduct activities authorized by Section 4(c)(8) of the BHC Act.[9]

    **C.**    **A statement of the public benefits that can reasonably be expected to result from the proposal.**

Please refer to Section II.D. of the Introductory Statement.

---

[7]   *See* https://www.federalreserve.gov/paymentsystems/2024-November-The-Federal-Reserve-Payments-Study.htm and https://www.federalreserve.gov/paymentsystems/frps-dfips-cy-2021.htm.

[8]   Section 4(c)(1)(C) of the BHC Act, as implemented by Section 225.22(b) of Regulation Y, permits a bank holding company to establish or acquire a company that engages solely in servicing activities for the bank holding company and its subsidiaries in connection with their activities authorized by law and in connection with their internal operations. *See* 12 U.S.C. § 1843(c)(1)(C); 12 C.F.R. § 225.22(b).

[9]   *See* 12 C.F.R. § 225.123(b).

ACTIVE/119185451.9

Exhibit 1
Page 524 of 550

D.    If the bank holding company has consolidated assets of $150 million or more:

    (i)    Parent company and consolidated *pro forma* balance sheets for the acquiring bank holding company as of the most recent quarter showing credit and debit adjustments that reflect the proposed transaction;

    (ii)    Consolidated pro forma risk-based capital and leverage ratio calculations for the acquiring bank holding company as of the most recent quarter (or, in the case of a qualifying community banking organization (as defined in 12 C.F.R. § 217.12) that is subject to the community bank leverage ratio framework (as defined in 12 C.F.R. § 217.12), consolidated pro forma leverage ratio calculations under 12 C.F.R. § 217.12) for the acquiring bank holding company as of the most recent quarter); and

    (iii)    A description of the purchase price and the terms and sources of funding for the transaction.

The requested financial information with respect to the Company is attached as <u>Exhibit 7</u>.

E.    If the bank holding company has consolidated assets of less than $150 million:

    (i)    A *pro forma* parent-only balance sheet as of the most recent quarter showing credit and debit adjustments that reflect the proposed transaction; and

    (ii)    A description of the purchase price and the terms and sources of funding for the transaction and, if the transaction is debt funded, one-year income statement and cash flow projections for the parent company, and the sources and schedule for retiring any debt incurred in the transaction.

The Company has consolidated assets of more than $150 million, so this item is not applicable.

F.    **Information Concerning Subsidiary Depository Institutions**

    (i)    For each insured depository institution (that is not a qualifying community banking organization (as defined in 12 C.F.R. § 217.12) that is subject to the community bank leverage ratio framework (as defined in 12 C.F.R. § 217.12) whose Tier 1 capital, total capital, total assets or risk-weighted assets change as a result of the transaction, the total risk-weighted assets, total assets, Tier 1 capital and total capital of the institution on a pro forma basis; and

    (ii)    For each insured depository institution that is a qualifying community banking organization (as defined in 12 C.F.R. § 217.12) that is subject

- 8 -

> to the community bank leverage ratio framework (as defined in 12
> C.F.R. § 217.12) whose Tier 1 capital (as defined in 12 C.F.R. § 217.2
> and calculated in accordance with 12 C.F.R. § 217.12(b)) or total
> assets change as a result of the transaction, the total assets and Tier 1
> capital of the institution on a pro forma basis.

The Bank has not elected to use the community bank leverage ratio framework. The financial information attached as Exhibit 9 includes information concerning the Bank's total assets, total risk-weighted assets, common equity Tier 1 capital, Tier 1 capital and total capital.

**G.** **A description of the management expertise, internal controls and risk management systems that will be utilized in the conduct of the proposed activities; and**

The management team is led by the Chairman of iCashe, Mr. Stephen Pawlowski. Mr. Pawlowski is a Senior Fellow at Intel Corporation, where he is the Intel Foundry Services' senior design architect. Prior to this, Mr. Pawlowski was Vice President of Advanced Computing Solutions at Micron Technology, responsible for defining and developing value-added memory solutions across enterprise and high-performance computing markets. Prior to Micron, Mr. Pawlowski spent thirty-one years at Intel, serving as Chief Technology Officer of the Data Center and Connected Systems Group and General Manager of the Architecture and Pathfinding Group. He also helped develop the initial PC and server platforms at Intel, drove industry standards such as USB and PCI-Express, and has extensive experience in processor, memory and caching architectures.

Internal control and risk management is and will be achieved through a combination of financial controls, operational controls, information technology controls, and board oversight. Examples of financial controls include segregation of duties (e.g., accounting and reporting is conducted by a third party that does not initiate bank transactions), access restrictions (e.g., bank accounts, accounting software, etc.), and financial review. Examples of operational controls include documented procedures for operational processes, mirrored production and back-up systems and data, and documented systems and source code. Examples of information technology controls include multi-factor authentication across systems, patching and antivirus for workstations, employee awareness, and least privilege access. Examples of board oversight include regular board meetings with documented materials and minutes, direct access to management and employees, and board representation by the Company.

**H.** **A copy of the purchase agreements, and balance sheet and income statements for the most recent quarter and year-end for any company to be acquired.**

A balance sheet for iCashe for the year ended December 31, 2024 and an income statement for iCashe for the 12-month period ended December 31, 2024 are attached as Confidential Exhibit 1. The transaction agreements described in Confidential Exhibit 2 are provided as Confidential Exhibits 3 through 7.

ACTIVE/119185451.9

Exhibit 1
Page 526 of 550

## IV.    <u>Request for Confidential Treatment</u>

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552(b), and the Board's regulations thereunder at 12 C.F.R. § 261.14(a)(4), the Company hereby requests that the Federal Reserve System accord confidential treatment to the information set forth in the separately bound volume provided with this Notification (the "<u>Confidential Information</u>").

The Confidential Information consists of commercial and financial information that is customarily and actually treated as confidential by the Company and disclosure of which would result in competitive harm. This information is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. §§ 552(b)(4), and the applicable regulations of the Board. Examples of this information include projected financial information of the Company and the Bank, including projected capital ratios.  Disclosure of this information will result in negative consequences that could adversely affect the Company and the Bank and cause substantial competitive harm. The Company and the Bank have numerous competitors, and they do not possess similar information concerning their competitors. The Company believes that the public could not otherwise obtain the Confidential Information.

The Company requests that the Confidential Information be indefinitely treated as confidential because the basis for confidential treatment will continue to exist indefinitely. The Company requests that if, notwithstanding the foregoing, the Board or the Reserve Bank should determine preliminarily to make any of the Confidential Information available to the public or other third parties, it will inform the Company prior to such release and permit a response to such determination.

ACTIVE/119185451.9

Exhibit 1
Page 527 of 550

EXHIBITS

| Tab | Description |
|---|---|
| *1. | iCashe Financial Statements |
| *2. | History of Company's Investment in iCashe |
| *3. | Convertible Note Purchase Agreement |
| *4. | Series A-1 Purchase Agreement |
| *5. | Investor Rights Agreement |
| *6. | Right of First Refusal and Co-Sale Agreement |
| *7. | Voting Agreement |
| 8. | Company Financial Statements |
| 9. | Bank Financial Statements |

* The confidential exhibits listed above are provided in a separately bound Confidential Exhibit Supplement volume.

_Verified Correct Copy of Original 8/14/2025._

25CV40776
PT
Petition
19402254

FILED MULTNOMAH CO CIRCUIT CT
'25 AUG 14 PM 2:29

### IN THE CIRCUIT COURT OF THE STATE OF OREGON
### FOR MULTNOMAH COUNTY

**Liam Johnston,**

      Plaintiff,

v.

**iCashe, Inc.,**
a Delaware Corporation DBA Purs.digital

      Defendant.

)
)
)
)
)
)
)
)
)
) ss.

Case No.  25CV40776

**SWORN PETITION FOR
PROVISIONAL PROCESS
RESTRAINING CORPORATE
RESTRUCTURING**

**TO THE HONORABLE COURT:**

Plaintiff respectfully petitions this Court for provisional process in the form of a restraining order to prevent defendant and related corporate entities from engaging in corporate restructuring that would dissipate assets and frustrate judgment collection in this RICO action. This petition is made pursuant to ORCP 83(A) and is supported by the following sworn allegations:

## ORCP 83(A) REQUIREMENTS

**A(1) NAME AND RESIDENCE OF DEFENDANT:**

- **Primary Defendant:** iCashe, Inc., Delaware corporation
- **Registered Agent Office:** 850 NEW BURTON ROAD SUITE 201, DOVER, DE 19904
- **Principal Place of Business:**
  Edgar lists(note some fillings have a NJ zip code): 5331 SW MACADAM AVE STE 251, PORTLAND, OR 97239
  My understanding it was/is actually: 920 SW 6th Ave, 12th floor, Portland, OR 97204
- **Oregon Operations:** Conducting business in Oregon as "Purs.digital"
- **Related Entities Subject to Restraint:** Lewis & Clark Bancorp (which holds at least 10% ownership interest in defendant) and any subsidiaries, affiliates, or related corporate entities of defendant as clearified by the section 7.1 filing

**A(2) CONSUMER TRANSACTION:**

This action does not arise from a consumer transaction. No provisional process in consumer goods is sought. This petition seeks restraint of corporate restructuring activities that would dissipate business assets and ownership interests.

**A(3)(a) CLAIM AND DELIVERY:**

Not applicable. This petition does not seek claim and delivery of specific personal property.

**A(3)(b) RESTRAINING ORDER - SPECIFIC ACTS TO BE RESTRAINED:**

Plaintiff seeks a restraining order prohibiting defendant and all related corporate entities from engaging in the following acts:

Exhibit 1
Page 529 of 550

_Verified Correct Copy of Original 8/14/2025._

**1. Corporate Restructuring Activities:**
- Merging, consolidating, or combining with any other corporate entity
- Selling, transferring, or conveying all or substantially all corporate assets
- Dissolving, liquidating, or winding up corporate operations
- Creating new subsidiaries, LLCs, or other business entities for asset transfer purposes
- Transferring assets to subsidiary entities or newly-formed shell companies

**2. Ownership Interest Transfers:**
- Transferring any portion of defendant's corporate ownership or equity
- Selling, assigning, or encumbering defendant's corporate stock or membership interests
- Allowing Lewis & Clark Bancorp to sell, transfer, or dilute its 10% ownership stake in defendant
- Participating in any bank transfer, merger, or acquisition that would affect Lewis & Clark Bancorp's ownership of defendant

**3. Asset Dissipation Activities:**
- Distributing extraordinary dividends or payments outside ordinary business operations
- Creating new liens, security interests, or encumbrances on corporate assets
- Transferring intellectual property, business operations, or key assets

**4. Financial Restructuring:**
- Recapitalizing or reorganizing corporate financial structure
- Issuing new debt or equity securities that would dilute existing assets
- Entering agreements that would transfer control or management rights

**A(4) BASIS FOR CLAIM TO PROVISIONAL PROCESS:**

Plaintiff's claim to provisional process is based upon entitlement to damages, restitution, and attorney fees under multiple statutory frameworks:

**1. RICO Claims (18 U.S.C. § 1964):**
- Treble damages for pattern of racketeering activity
- Business restitution and disgorgement of ill-gotten gains
- Attorney fees and litigation costs

**2. Oregon Uniform Fraudulent Transfer Act (ORS Chapter 95):**
- **ORS 95.230:** Recovery for transfers made with actual intent to hinder, delay, or defraud creditors
- **ORS 95.240:** Recovery for transfers fraudulent as to present creditors
- **ORS 95.260:** Judgment for value of fraudulently transferred assets

**3. Federal Fraudulent Transfer Claims:**
- **18 U.S.C. § 152(7):** Criminal penalties for fraudulent transfer or concealment of assets
- **18 U.S.C. § 1963:** RICO asset forfeiture for property involved in racketeering

Plaintiff seeks to preserve defendant's assets and corporate structure to ensure meaningful recovery is possible under all applicable statutory remedies.

**A(5) WRITING EVIDENCING ORIGIN OF CLAIM:**

Exhibit 1
Page 530 of 550

_Verified Correct Copy of Original 8/14/2025._

Plaintiff's claims originate from extensive documentary evidence. Due to this Court's 20-page limit, only the most critical documents are attached as clean exhibits:

- **Exhibit 1:** Oregon Secretary of State Search Results dated August 9, 2025, showing defendant's unregistered status during hiring, employment period, and to this day
- **Exhibit 2:** Lewis & Clark Bancorp acquisition documentation evidencing bank ownership transfer affecting defendant's 10% ownership stake
- **Exhibit 3:** Section 7.1 filing documenting Lewis & Clark Bancorp's ownership of at least 10% interest in iCashe, Inc.(iCashe Inc)

Complete documentary evidence (employment agreement, termination records, disability discrimination evidence, RICO predicate act documentation, and supporting materials) is provided electronically via secure zip file (SHA-512 checksum: 2d1021d60f69fd27b69c7c67dc82d358180eb3662f96e0cc2188b194c608abbe580e0b89605b867c5575304dl and will be presented in full at hearing due to page constraints on this emergency petition.

## A(6) WRONGFUL DETENTION:

The assets sought to be preserved (corporate ownership interests and business assets) are not wrongfully detained in the traditional sense, but are at risk of dissipation through corporate restructuring that would place them beyond the reach of judgment collection.

## A(7) PUBLIC AUTHORITY:

To plaintiff's knowledge, no public authority has taken the claimed assets for tax, assessment, or fine.

## A(8) WAIVER OF RIGHT TO BE HEARD:

Defendant has not waived the right to be heard.

## A(9) SUBSTANTIAL DANGER OF ASSET DISSIPATION:

There is substantial danger that defendant and related entities are engaging in, or are about to engage in, conduct that would place recoverable assets in danger of concealment, removal from Oregon, or transfer beyond recovery:

### A. Documented Pattern of Legal Evasion (Case No. 25SC14401):

1. **Service Evasion:** Defendant's Delaware registered agent improperly refused service on June 4, 2025, violating Delaware General Corporation Law § 132
2. **Strategic Delay:** Despite 63 days of constructive notice, defendant delayed response until August 6, 2025—23 days after court-clarified deadline
3. **Multi-Jurisdictional Violations:** Systematic violations of corporate service obligations in Delaware and Oregon
4. **Tactical Timing:** Filed response only after plaintiff commenced related litigation, proving calculated manipulation

### B. Immediate Corporate Restructuring Threats:

1. **Bank Owner Transfer with Federal Notice:** Lewis & Clark Bank, which holds at least 10% ownership interest in defendant, is being acquired by Maps Credit Union. Federal banking regulators received notification that iCashe was issuing checks through the banking relationship.

Exhibit 1
Page 531 of 550

_Verified Correct Copy of Original 8/14/2025._

2. **Unlicensed Operations Exposure:** Defendant has operated for years without proper Oregon business registration while maintaining principal office in Oregon per SEC Edgar filings, creating ongoing regulatory violations that were previously overlooked by the current bank.

3. **New Bank Due Diligence Risk:** Maps Credit Union's acquisition due diligence process will likely discover defendant's unregistered status and check-issuing activities, creating immediate pressure for defendant to restructure or dissolve to avoid new banking compliance requirements.

4. **Strategic Window Before Oversight:** Defendant has optimal opportunity to transfer or dissipate assets during the transition period before new bank ownership implements compliance reviews, making immediate restraint critical to preserve recovery opportunity.

**C. Imminent Fraudulent Transfer Threat - ORS 95.230(2) Circumstantial Factors Present:**

All circumstances that Oregon law recognizes as indicating fraudulent transfer intent under ORS 95.230(2) are currently present, creating imminent threat that defendant will complete fraudulent transfers:

1. **Transfer to Insider (ORS 95.230(2)(a)):** Lewis & Clark Bancorp's 10% ownership creates existing insider relationship enabling fraudulent transfers to related entities

2. **Retention of Control (ORS 95.230(2)(b)):** Defendant's multi-entity corporate structure allows retention of possession or control of property after nominal transfers

3. **Concealed Transfer Capability (ORS 95.230(2)(c)):** Defendant's 63-day systematic evasion pattern proves willingness and ability to conceal transfers rather than disclose them

4. **Threatened with Suit Timing (ORS 95.230(2)(d)):** Pending corporate restructuring would occur after debtor was sued with RICO claims, indicating strategic timing

5. **Substantially All Assets Transfer (ORS 95.230(2)(e)):** Corporate restructuring threatens transfer of substantially all defendant's recoverable assets

6. **Asset Removal Pattern (ORS 95.230(2)(g)):** Defendant's documented legal evasion demonstrates existing pattern of removing or concealing assets

7. **Inadequate Consideration Risk (ORS 95.230(2)(h)):** Complex corporate restructuring creates opportunity for transfers without reasonably equivalent consideration

8. **Substantial Debt Timing (ORS 95.230(2)(j)):** Asset transfers would occur shortly after substantial RICO liability debt was incurred through defendant's racketeering activities

**Legal Standard:** Courts may issue preventive relief when circumstances demonstrate imminent fraudulent transfer threat. Here, eight of the eleven circumstantial factors that Oregon law identifies as indicating fraudulent intent under ORS 95.230(2) are present - only completion of actual transfers is needed. Waiting for completion would render judicial relief meaningless and frustrate the purpose of fraudulent transfer protection.

**D. Mathematical Proof of Strategic Conduct:**

- **235% Extension:** Defendant used 235% of court-allowed response time before filing in small claims case
- **63-Day Evasion Pattern:** Systematic delay from June 4 to August 6, 2025, proves deliberate asset protection strategy
- **Perfect Timing:** Response filed only when tactically advantageous, demonstrating strategic rather than inadvertent conduct

**A(10) IMMEDIATE AND IRREPARABLE INJURY WITHOUT RESTRAINT:**

Without immediate restraint, plaintiff will suffer immediate and irreparable injury that cannot be remedied by money damages:

Exhibit 1
Page 532 of 550

_Verified Correct Copy of Original 8/14/2025._

1. **Fraudulent Transfer Violations (ORS 95.230/95.240):** Corporate restructuring activities would constitute fraudulent transfers made with actual intent to hinder, delay, or defraud creditors, making future asset recovery under Oregon UFTA impossible
2. **Asset Dissipation Beyond Statutory Reach:** Once assets are fraudulently transferred through corporate restructuring, plaintiff's statutory remedies under ORS 95.260 become meaningless as assets will be beyond recovery
3. **Banking Ownership Change:** Bank transfer could result in new ownership facilitating fraudulent asset transfers through sophisticated financial mechanisms
4. **"Badges of Fraud" Completion:** Each day without restraint allows defendant to complete additional fraudulent transfer factors under ORS 95.230(2), including concealed transfers, insider transactions, and substantial asset removal
5. **Federal Asset Forfeiture Evasion:** Corporate restructuring could place assets beyond reach of 18 U.S.C. § 1963 RICO forfeiture remedies
6. **Shell Entity Asset Laundering:** Defendant's proven disregard for legal compliance creates immediate risk of fraudulent asset transfer through newly-created entities
7. **Ongoing RICO Violations:** Each day defendant continues racketeering activities causes additional accumulating harm that cannot be fully remedied by retrospective money damages
8. **Litigation Strategy Disruption:** Asset dissipation forces plaintiff to pursue collection remedies rather than focusing on merits of underlying RICO and fraudulent transfer claims

## A(11) SUBSTANTIAL DANGER OF NON-COMPLIANCE:

There is substantial danger that defendant would not comply with a temporary restraining order based on documented pattern of legal non-compliance:

1. **Court Order Violations:** Defendant ignored court-clarified deadline in Case No. 25SC14401 for 23 days, demonstrating willingness to violate direct court orders
2. **Multi-Jurisdictional Evasion:** Systematic violations of Delaware and Oregon corporate service laws show pattern of ignoring legal obligations across multiple jurisdictions
3. **Strategic Non-Compliance:** The 63-day evasion pattern proves defendant strategically chooses when to comply with legal requirements based on tactical advantage
4. **Corporate Sophistication:** As Delaware corporation with multi-jurisdictional operations and legal counsel access, defendant has both means and demonstrated willingness to evade court orders
5. **Financial Incentive:** Defendant has strong financial incentive to complete asset transfers before restraining order can be enforced

## A(12) NO REASONABLE DEFENSE PROBABILITY:

Plaintiff brings multiple overlapping legal theories arising from defendant's conduct: RICO violations, federal wire fraud (registration omission), federal whistleblower retaliation, Oregon whistleblower protection violations, Oregon disability discrimination, wrongful termination, and common law negligent misrepresentation. **While individual claims may present varying degrees of complexity, the overlapping nature of these theories makes complete defense unlikely.**

Under established principles of cumulative liability, **when multiple legal theories arise from the same underlying conduct, defendants face substantially increased exposure even if individual claims present varying strengths.** Oregon and federal laws provide that victims of unlawful employment discrimination may recover lost wages, benefits, damages for emotional distress, and possible punitive damages, and Oregon state disability discrimination laws apply to defendant's conduct. Here, defendant's unregistered business operations, discriminatory employment practices, and retaliatory termination create

Exhibit 1
Page 533 of 550

_ Verified Correct Copy of Original 8/14/2025._

overlapping liability exposure under both federal and state statutory frameworks, plus common law remedies—making complete exoneration highly unlikely.

Plaintiff challenged the severance agreement of the defendant in small claims. Defendant's response to the severance challenge was submitted 23 days late—235% past the court-ordered deadline—despite ample constructive notice. Under *ORS 46.475(2)*, this untimeliness should result in default judgment against defendant on the severance issue. Even if defendant somehow overcomes this default by showing good cause (an unlikely "miracle"), the strong statutory framework and overlapping claims independently justify rejecting the severance agreement and continuing the litigation.

- The severance agreement is void ab initio because defendant failed to provide the required workplace policy under *ORS 659A.375*. Emails from Christian Trummer conclusively show no policy was provided, and plaintiff never requested severance agreement terms. The agreement's waiver provisions, which attempt to bar all claims, are illegal and void under *ORS 659A.370*, particularly subsection (7), which invalidates waivers of statutory rights where such policies have not been provided.
- This interpretation aligns with the strong legislative intent that all employees must be provided workplace policies under *ORS 659A.375*, creating a clear public policy basis for voiding any severance agreement lacking this requirement. The Oregon Court of Appeals in *Bagley v. Mt. Bachelor, Inc.* affirms this position, holding that waivers are unenforceable if against public policy.

Plaintiff has moved to strike defendant's untimely response for lack of good cause, emphasizing defendant's ongoing pattern of delay and evasion. Any defense based on this untimely filing or the severance agreement's enforceability lacks legal merit under the governing statutes and rules, and underscores the pattern of procedural disregard that supports the need for provisional relief to prevent further prejudice to Plaintiff.

More critically, **the extraordinary flight risk demonstrated by defendant's 63-day systematic evasion, multi-jurisdictional corporate violations, and strategic delay tactics makes provisional process necessary regardless of ultimate liability on any specific theory.** Even if some claims are defended successfully, the documented avoidance creates substantial risk that **any recovery will be impossible without asset preservation.**

**Multiple viable legal theories combined with a void severance agreement, egregiously late filings, and extraordinary flight risk justify provisional process to preserve meaningful judicial resolution opportunity.**

# ORCP 82 REQUIREMENTS

**Bond Not Required - Unlawful Conduct Prevention:**

Pursuant to ORCP 82 A(1)(b)(ii), no security bond should be required for this restraining order because plaintiff seeks to prevent unlawful conduct, and the effect of the injunction would be to restrict defendant to available judicial remedies.

**A. Preventing Unlawful Conduct:**

The requested restraining order seeks to prevent defendant's unlawful conduct including:

1. **Fraudulent Transfer Violations (ORS 95.230):** Preventing transfers made with actual intent to hinder, delay, or defraud creditors as evidenced by defendant's systematic legal evasion pattern
2. **Asset Concealment (18 U.S.C. § 152(7)):** Stopping defendant's pattern of fraudulent transfer or concealment of assets to avoid creditor collection

Exhibit 1
Page 534 of 550

_Verified Correct Copy of Original 8/14/2025._

3. **Systematic Legal Evasion:** Defendant's 63-day pattern of service evasion and 23-day violation of court-clarified deadlines constitutes systematic obstruction of judicial process
4. **Corporate Law Violations:** Defendant's violations of Delaware General Corporation Law § 132 and Oregon corporate service requirements constitute ongoing unlawful conduct
5. **"Badges of Fraud" Prevention:** Stopping defendant from completing fraudulent transfer factors under ORS 95.230(2), including concealed transfers, insider transactions, and asset removal

**B. Restriction to Judicial Remedies:**

The restraining order's effect would be to restrict defendant to available judicial remedies by:

1. **Preventing Asset Dissipation:** Stopping defendant from using corporate restructuring to evade court jurisdiction and judgment collection
2. **Preserving Status Quo:** Maintaining current corporate structure to allow orderly judicial resolution of RICO and fraudulent transfer claims
3. **Ensuring Court Access:** Preventing defendant from restructuring assets in ways that would make judicial relief meaningless
4. **Forcing Legal Compliance:** Requiring defendant to resolve disputes through proper legal channels rather than asset concealment and legal evasion

**C. Public Policy Supporting Bond Exemption:**

Courts have recognized that bond requirements should not protect defendants who systematically violate legal obligations. Here, defendant's documented pattern of:

- Service evasion across multiple jurisdictions
- Strategic court deadline violations
- Corporate law non-compliance
- Asset concealment activities demonstrating fraudulent transfer intent

Creates precisely the circumstances where ORCP 82 A(1)(b)(ii) exemption applies to prevent unlawful conduct and preserve judicial remedies.

**Therefore, plaintiff respectfully requests this Court find that no bond is required under ORCP 82 A(1)(b)(ii) as the restraining order prevents unlawful conduct and restricts defendant to available judicial remedies.**

The evidence demonstrates that defendant poses substantial flight risk and immediate threat of asset dissipation through corporate restructuring. The documented pattern of systematic legal evasion across multiple jurisdictions, combined with pending bank transfer threatening defendant's primary recoverable asset, creates precisely the circumstances requiring immediate provisional process to preserve meaningful recovery opportunity under RICO and Oregon fraudulent transfer statutes.

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court grant a show cause hearing.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

Exhibit 1
Page 535 of 550

_Verified Correct Copy of Original 8/14/2025._

**DATED:** ___August 10___, 2025

_Liam Johnston_

**Liam Johnston**
2717 21st Street, Apt 6D
Astoria, NY 11102
302-766-0117
capsaicinkid@gmail.com
Pro Se Plaintiff

Exhibit 1
Page 536 of 550

_Verified Correct Copy of Original 8/14/2025_

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ICASHE INC.,<br>a Delaware corporation,<br><br>Plaintiff,<br><br>     v.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br>a Korean business entity, and<br>SAMSUNG ELECTRONICS AMERICA,<br>INC., a New York corporation.<br><br>Defendants | § § § § § § § § § § § § § § § | CIVIL ACTION NO. 2:24cv429<br><br>JURY TRIAL DEMANDED |

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Civil Procedure 7.1, Plaintiff iCashe, Inc. ("iCashe"), by its

attorneys, certifies that it has no parent entity. The undersigned further certifies that

publicly held corporations that own at least ten percent of the stock in iCashe include:

Lewis & Clark Bancorp.

Dated: June 6, 2024

Respectfully submitted,

By: */s/ Aaron R. Fahrenkrog w/permission*
*Andrea L. Fair*
Aaron R. Fahrenkrog
LEAD ATTORNEY
MN Bar No. 0386673 (admitted in this District)
Email: afahrenkrog@robinskaplan.com
Logan J. Drew
MN Bar No. 0389449 (admitted in this District)
Email: ldrew@robinskaplan.com
Emily J. Tremblay
MN Bar No. 0395003 (to appear *pro hac vice*)
Email: etremblay@robinskaplan.com

Exhibit 1
Page 537 of 550

_ Verified Correct Copy of Original 8/14/2025._

Jessica L. Gutierrez
MN Bar No. 0396359 (to appear *pro hac vice*)
Email: jgutierrez@robinskaplan.com
William R. Jones
MN Bar No. 0402360 (to appear *pro hac vice*)
Email: wjones@robinskaplan.com
**ROBINS KAPLAN LLP**
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181

Of Counsel:
Andrea L. Fair
Texas State Bar No. 24078488
E-mail: andrea@wsfirm.com
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)

*Attorneys for Plaintiff iCashe, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of June, 2024, a copy of the foregoing document was

filed electronically via CM/ECF and therefore served on all counsel who are deemed to have

consented to electronic service.

/s/ Andrea L. Fair
Andrea L. Fair

Exhibit 1
Page 538 of 550

Verified Correct Copy of Original 8/14/2025.

Certificate of Readiness

This proposed order or judgment is ready for judicial signature because:

1. [ ] Each party affected by this order or judgment has stipulated to the order or judgment, as shown by each party's signature on the document being submitted.

2. [ ] Each party affected by this order or judgment has approved the order or judgment, as shown by each party's signature on the document being submitted or by written confirmation of approval sent to me.

3. [ ] I have served a copy of this order or judgment on each party entitled to service and:

a. [ ] No objection has been served on me.

b. [ ] I received objections that I could not resolve with a party despite reasonable efforts to do so. I have filed a copy of the objections I received and indicated which objections remain unresolved.

c. [ ] After conferring about objections, [role and name of objecting party] agreed to independently file any remaining objection.

4. [✓] Service is not required pursuant to subsection (3) of this rule, or by statute, rule, or otherwise. UTCR 8/1/22 5.5

5. [ ] This is a proposed judgment that includes an award of punitive damages and notice has been served on the Director of the Crime Victims' Assistance Section as required by subsection (5) of this rule.
6. [ ] Other: _____.

August 10, 2025
_____
Dated

_Eric Delmate_
_____
Submitted By

2717 21st street, Apt 6D
_____
Address

302-766-0117
_____
Phone Number

capsaicinkid@gmail.com
_____
Email Address

Exhibit 1
Page 539 of 550

_Verified Correct Copy of Original 8/14/2025._

 BANKING**DIVE**

# Oregon credit union to buy in-state bank

**Salem-based Maps Credit Union's purchase of Lewis & Clark Bank marks the fourth whole-bank acquisition proposed by a credit union this year.**

Published April 16, 2025

 Dan Ennis
Senior Editor

*"Oregon Capitol" by ZehnKatzen is licensed under CC BY 3.0*

Salem, Oregon-based Maps Credit Union will acquire Oregon City-based Lewis & Clark Bank, the institutions said in separate statements Monday.

The transaction, set to close in the first quarter of 2026, is expected to create a $1.7 billion-asset institution with 13 branches, Lewis & Clark Bank CEO Jeffrey Sumpter said in a statement.

Maps does not anticipate any branch closures and said it would retain all Lewis & Clark employees, according to the bank.

Buying Lewis & Clark will expand Maps' footprint to include locations in Seaside and Astoria. Lewis & Clark counted $392.1 million in assets as of Dec. 31, 2023.

The move represents the fourth proposed acquisition of a bank by a credit union this year. That's well off pace from 2024, when credit unions sought to buy a record 22 banks. Last year, by comparison, credit unions had proposed four whole-bank acquisitions by the end of January.

Exhibit 1
Page 540 of 550

_Verified Correct Copy of Original 8/14/2025._

Michael Bell, a partner at law firm Honigman, said last month such transactions "will be on the same pace as last year."

Still, the deals have raised rancor between trade groups representing banks and credit unions alike.

The Independent Community Bankers of America has long argued the tax-exempt nature of credit unions allows them to offer a higher purchase price, putting acquisitive banks at a disadvantage.

The ICBA in March introduced a resolution calling on lawmakers to end the federal tax exemption for credit unions with $1 billion or more in assets or to establish a tax uniformity between credit unions and community banks that pay taxes.

ICBA CEO Rebeca Romero Rainey said the move would "help ensure taxpayer dollars no longer tilt the competitive marketplace, subsidize community banking consolidation, and result in fewer choices for consumers and small businesses."

Jim Nussle, the outgoing CEO of the trade group America's Credit Unions, blasted the ICBA the following day, saying their targeting of just the largest credit unions "shows they know their message is weak with lawmakers and consumers alike."

"This isn't about the millions of Americans who will suffer without access to a credit union, this is about credit union competition chipping away at the banks' own bottom lines," Nussle said. "For decades, banks have taken advantage of taxpayers for their own profit: they enjoy Subchapter S subsidies, make risky decisions that consequentially rip away people's American dreams, abandon communities, and get bailed out by the government when they overstep."

Subchapter S corporation status, Nussle said, allows publicly traded banks to pass corporate income directly to shareholders for

Exhibit 1
Page 541 of 550

_Verified Correct Copy of Original 8/14/2025._

federal tax purposes. Banks, for their part, argue Subchapter S exists so income is not double-taxed — first on the corporation, and again on shareholders.

Maps, for its part, contends the transaction will enhance its commercial and small-business offerings.

"Becoming a larger credit union gives us the scale to continue to grow and to keep up with rapidly evolving advancements in technology," the credit union said in its statement. "We'll provide even more value to members in the form of expanded products, services and locations, all while continuing in our dedication to providing impactful community outreach in every area we serve."

Sumpter, likewise, said Lewis & Clark is "excited about our shared vision for the future, including additional locations and expanded capabilities to support both commercial clients and individual customers."

Exhibit 1
Page 542 of 550

# Business Registry Business Name Search

**Business Entity Names returned for:**
Name: ICASHE
Using: Exact Words in Any Word Order
  For Active and Inactive businesses.

New Search

08-09-2025
06:22

| Record No | Entity Type | Entity Status | Registry Number | Name Status | Name | Assoc Search |
|---|---|---|---|---|---|---|

Your search returned no business entity names.

© 2025 Oregon Secretary of State. All Rights Reserved.

Verified Correct Copy of Original 8/14/2025.

Exhibit 1
Page 543 of 550

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF MULTNOMAH

_ Verified Correct Copy of Original 8/14/2025._

FILED MULTNOMAH CO CIRCUIT CT
'25 AUG 14 PM2:29

Liam Johnston
_____
Plaintiff

vs

iCashe, Inc.
_____
Defendant

Case No.

25CV40776
_____

**EX PARTE MOTION FOR ORDER TO
SCHEDULE SHOW CAUSE HEARING**

Liam Johnston _____ moves to set a show cause hearing. Supporting
(insert the name of the party requesting the show cause hearing)
documentation showing the basis for the show cause hearing is presented with this motion.

Nature of the Proceeding for Which a Show Cause Hearing is Requested:

☐ For Preliminary Injunction      ☐ For Receivership

☑ Provisional Process

☐ Other Proceeding As Follows: _____

Estimated Length of Hearing:    1-2 hours _____

I certify to the court that I have complied with SLR 5.025(3) regarding one judicial day's notice
of an ex parte appearance to opposing parties, that I will appear at Call as required by SLR
7.055(8)(A), and will comply with UTCR 7.040 and give the court **immediate notice of
resolution of this matter**.

August 10, 2025
_____
Date

_Liam Johnston_
_____
Signature

Liam Johnston
_____
Name Typed or Printed and OSB Number

05-27A (10/20)    EX PARTE MOTION FOR ORDER TO SCHEDULE SHOW CAUSE HEARING

Exhibit 1
Page 544 of 550

8/18/2025 8:35 AM
25CV40776

### IN THE CIRCUIT COURT OF THE STATE OF OREGON
### FOR THE COUNTY OF __Multnomah__

Case No: _____25SC14401_____

__Liam Johnston__

Plaintiff/Petitioner

vs

__iCashe, Inc., a Delaware Corporation DBA Purs.digital__

Defendant/Respondent

**CERTIFICATE OF
ALTERNATIVE SERVICE**

(ORCP 7D(6))

I, *(name)*___Liam Johnston_____ certify that I served true copies of
the original documents listed below on *(name of party being served)*:___iCashe, Inc. ,___
_a Delaware Corporation DBA Purs.digital_
*(check all that apply)*:
- ☑ Summons
- ☑ Petition, Claim, or Complaint
- ☐ Order to Show Cause
- ☑ Other *(name all forms or documents served)*___Mediation Notice - English.pdf and___
the Secretary of State also received: a check for the filing fee and Service of
Process form found at their website

_____
_____

**by** *(check all that apply and complete all information):*

☐ **Certified or Registered Mail, Return Receipt Requested** on *(date)*_____
I personally deposited true copies with ☐ the U.S. Postal Service by certified or registered mail,
Return Receipt Requested, or by express mail, postage paid *or* ☐ by delivery service or courier
*(name of service or courier)*_____addressed to the party to be
served: *(name)* _____at *(address)* _____

_____

☐ **Electronic service** by ☐ email ☐ social media ☐ text message ☐ fax
at *(addresses, sites, or numbers)*: _____

_____
on *(dates)*: _____
    ☐ The service transmission/message/posting was made in such a way that the case
name, case number, and court name were most likely to be read first. For email, this
information was in the subject line. For fax, text message, or social media post, this information
was in the first/top line.
    ☐ The served documents were linked or attached in a file format that is capable of
showing a true copy of the original document

Certificate of Alternative Service
Page 1 of 2

**OJD Official**
*(Feb 2022)*

Exhibit 1
Page 545 of 550

☐ **Posting at the courthouse for this county** *and*

| Dates: | Location: |
|--------|-----------|
|        |           |
|        |           |
|        |           |

☑ **Other method authorized by court order** on *(date)* ___07/31/2025___

*(describe)* ___In accordance with ORS 60.121,ORS 60.731,and ORCP 7D(3)(b)(ii)(D) to:___

___Secretary of State - Corporation Division / Process Service - 255 Capitol St. NE, Suite 151 - Salem, OR___

___97310-1327; Cognecy INC , registered agent for iCashe, Inc. 850 new burton road Suite 201,___
___Dover DE 19904-5786; and ICASHE INC, 920 sw 6th ave, floor 12, Portland OR, 97204-1239___

*AND*

☐ **First Class Mail** on *(date)*_____I personally deposited true

copies with the U.S. Postal Service by first class mail addressed to the party to be served:

*(name)* _____at *(address)* _____

_____

---

*Amended Certificate*
☐ I previously filed a *Certificate of Alternative Service* for service by electronic means. I now believe that the recipient did not personally receive the electronic transmission.

---

**I hereby declare that the above statements are true to the best of my knowledge and belief. I understand they are made for use as evidence in court and I am subject to penalty for perjury.**

___08/16/2025___                              *Eric Johnston* (signature)
Date                                          Signature of Server

                                             ___Liam Johnston___
                                             Print Name

*If person serving is NOT a sheriff or sheriff's deputy, address and phone number of server:*

___2717 21st street, Apt 6D, Astoria, Ny 11102___

_____

Certificate of Alternative Service
Page **2** of **2**

**OJD Official**
*(Feb 2022)*

Exhibit 1
Page 546 of 550



Exhibit 1
Page 547 of 550

25CV40776

IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR MULTNOMAH COUNTY

**Liam Johnston,**

*Plaintiff(s) / Petitioner(s)*

v.                                                                              Case No.: 25CV40776

**iCashe, Inc., a Delaware Corporation DBA Purs.digital**

*Defendant(s) / Respondent(s)*

### AFFIDAVIT OF SERVICE

I, Marcia Boyer, state:

I am 18 years or older and not a party to this action or a member of a corporation or organization that is a party to this action.

I served the following documents to Cogency Global Inc., registered agent for iCashe, Inc. in Kent County, DE on August 19, 2025 at 11:10 am at 850 New Burton Road, suite 201, Dover, DE 19904 by leaving the following documents with Teresa Grandison who as Administrative Assistant is authorized by appointment or by law to receive service of process for Cogency Global Inc., registered agent for iCashe, Inc..

Business Registry Business Name Search
Oregon credit union to buy instate bank article
Sworn Petition for Provisional Process Restraining Corporate Restructuring
Corporate Disclosure Statement
Order Re: Motion For Show Cause Hearing
Declaration

Black or African American Female, est. age 35-44, glasses: Y, Black hair, 240 lbs to 260 lbs, 5' 6" to 5' 9".
Geolocation of Serve: https://google.com/maps?q=39.148757,-75.5306146
Photograph: See Exhibit 1

Total Cost: $0.00

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF OREGON THAT THE FACTS HEREIN ARE TRUE AND CORRECT.

Executed in

_Kent County_____ ,

__DE_____ on __8/20/2025_____ .

/s/ *Marcia Boyer*
_____
Signature
Marcia Boyer
+1 (302) 670-3959



